# No. 20-____

## In the United States Court of Appeals
## For the Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS, on behalf of themselves and all others similarly situated,

*Plaintiffs-Respondents*,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

*Defendant-Petitioner.*

On Petition for Permission to Appeal from the United States District Court for the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

## EXHIBITS IN SUPPORT OF PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(F)

MORGAN, LEWIS & BOCKIUS LLP
    Brian W. Shaffer
    Matthew D. Klayman
1701 Market St.
Philadelphia, PA 19103
(215) 963-5000

MORGAN, LEWIS & BOCKIUS LLP
    William R. Peterson
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

***Counsel for Defendant-Petitioner***

## TABLE OF CONTENTS

|  | Petition Exhibit No. |
|---|---|
| Plaintiffs' Memorandum of Law in Support of Motion for Class Certification (Dkt. 32-1)................................................... | **1** |
| Dkt. 32-3: About ECFMG (Exhibit 1) ................................. | **2** |
| Dkt. 32-5: About ECFMG Certification (Exhibit 3)........... | **3** |
| Dkt. 32-21: ECFMG Certificate No. 0-553-258-5 (Exhibit 19)....................................................................................... | **4** |
| Dkt. 32-23: Letter from James McCorkel to Rice Holmes (Exhibit 21) ......................................................................... | **5** |
| Dkt. 32-26: Letter from John Akoda to William Kelly (Exhibit 24) ......................................................................... | **6** |
| Dkt. 32-27: September 27, 2000 Memo (Exhibit 25)......... | **7** |
| Dkt. 32-29: December 22, 2000 Memo (Exhibit 27).......... | **8** |
| Dkt. 32-32: October 31, 2016 Plea Agreement (Exhibit 30)....................................................................................... | **9** |
| Dkt. 32-33: December 18, 2016 Letter from Kara Corrado to John Nosa Akoda (Exhibit 31)........................................ | **10** |
| Dkt. 32-34: Final Decision and Order – Maryland State Board of Physicians (Exhibit 32)........................................ | **11** |
| Dkt. 32-46: Deposition Transcript of Kara Corrado (Exhibit 45) ......................................................................... | **12** |
| Defendant Educational Commission for Foreign Medical Graduates' Opposition to Plaintiffs' Motion for Class Certification (Dkt. 39-1).................................................... | **13** |
| Dkt. 39-5: March 16, 2007 Letter from Olanrewaju Adeyiga to John-Charles Akoda (Exhibit 5)...................... | **14** |
| Dkt. 39-7: January 31, 2014 Letter from Larry Gilstrap to John-Charles Akoda (Exhibit 7) ........................................ | **15** |
| Dkt. 39-9: November 7, 2000 Letter from Anne Marie Sesso to State of Maryland Board of Physician Assurance (Exhibit 9) ........................................................................... | **16** |
| Dkt. 39-33: Monique Russell Facebook Chat (Exhibit 33) | **17** |
| Dkt. 46-12: September 25, 2019 Dr., Fenichel Report regarding Jasmine Riggins (Exhibit 28) ............................ | **18** |
| Dkt. 46-13: September 23, 2019 Dr. Fenichel Report regarding Elsa Powell (Exhibit 29).................................... | **19** |
| Dkt. 46-16: September 23, 2019 Dr. Goldberg Report (Exhibit 32) ......................................................................... | **20** |

i

Dkt. 50-7: September 23, 2019 Dr. Fenichel Report
regarding Monique Russell (Exhibit 27)............................ **21**
Dkt. 50-8: September 23, 2019 Dr. Fenichel Report
regarding Desire Evans (Exhibit 30).................................. **22**
January 30, 2020 Class Certification Hearing Transcript ............. **23**

# PETITION
# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS,** | **CIVIL ACTION NO. 18-5629** |
| **Plaintiffs,** | |
| **v.** | |
| **EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,** | |
| **Defendant.** | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... ii

Table of Authorities ...................................................................................................... iii

Factual Background ........................................................................................................ 1

Class Representatives .................................................................................................... 7

Experts .......................................................................................................................... 8

Argument ..................................................................................................................... 10

    I.  Certifying the common issues satisfies Rule 23(a) ............................................. 11

        A.  The class members are sufficiently numerous ........................................... 12

        B.  There are common questions of fact and law ............................................. 13

        C.  The claims of the named Plaintiffs are typical of those of the class. ........ 15

        D.  The adequacy requirement is satisfied here. .............................................. 16

    II.  <u>Plaintiffs also satisfy the requirements of Rule 23(c)(4)</u> ................................. 17

    A.  Certification of liability or the Common Issues satisfies the ascertainability requirement, if that requirement even applies. ............................................. 18

    B.  Certification of the issue of liability or the Common Issues satisfies Rule 23(c)(4). ... 20

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  370 F. Supp. 3d 826 (E.D. Tenn. 2019) ................................................. 15
*Amchem Prods. v. Windsor*,
  521 U.S. 617 (1997) ................................................................................. 12
*Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*,
  568 U.S. 455 (2013) ................................................................................. 12
*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994) .................................................................. 16, 18
*Byrd v. Aaron's Inc.*
  784 F.3d 154 (3d Cir. 2015) .................................................................... 18
*Cannon v. Cherry Hill Toyota*,
  184 F.R.D. 540 (D.N J, 1999) ................................................................. 13
*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) .................................................................... 18
*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) .................................................................... 19
*Chiang v. Veneman*,
  385 F.3d 256 (3d Cir. 2004) ........................................................ 14, 19, 21
*Gates v. Rohm & Haas Co.*,
  655 F.3d 255 (3d Cir. 2011) .............................................................. 19, 20
*Gonzalez v. Corning*,
  885 F.3d 186 (3d Cir. 2018) .............................................................. 12, 20
*Griffith v. United Air Lines, Inc.*,
  203 A.2d 796 (Pa. 1964) ......................................................................... 23
*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981) ................................................................................... 12
*Gunnells v. Healthplan Serv., Inc.*,
  348 F.3d 417 (4th Cir. 2003) .................................................................. 15
*Hohider v. United Parcel Serv., Inc.*,
  574 F.3d 169 (3d Cir. 2009) .............................................................. 20, 21
*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .................................................................. 20
*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) .................................................................... 12
*In re Paoli R.R. Yard PCB Litig.*,
  113 F.3d 444 (3d Cir. 1997) .............................................................. 24, 25
*In re Titanium Dioxide Antitrust Litig.*,
  284 F.R.D. 328 (D. Md. 2012) ................................................................ 25
*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004) .................................................................... 16

*Jane Doe 30 v. Bradley,*
    2012 WL 5949216 (Del. Super. Nov. 19, 2012) ..................................................... 17
*Johnston v. HBO Film Mgmt., Inc.,*
    265 F.3d 178 (3d Cir. 2001) ....................................................................................... 13
*Lisa v. Saxon Mortgage Servs.*
    Nos. 11-4586, 12-5366, 2016 WL 5930846 (E.D. Pa. 2016) ................................... 19
*Marcus v. BMW of N. Am., LLC,*
    687 F.3d 583 (3d Cir. 2012) ................................................................................. 14, 18
*Martin v. Behr,*
    896 F.3d 405 (6th Cir. 2018) .............................................................................. passim
*Mielo v. Steak 'n Shake Operations, Inc.,*
    897 F.3d 467 (3d Cir. 2018) ....................................................................................... 13
*Robinson v. Metro-North Commuter R.R. Co.,*
    267 F.3d 147 (2d Cir. 2001) ....................................................................................... 24
*Steering Comm. v. Exxon Mobil Corp.,*
    461 F.3d 598 (5th Cir. 2006) ...................................................................................... 20
*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. 2011) ................................................................................. 11, 12
*Wallace v. Powell,*
    No. 3:09-CV-0291, 2013 WL 2042369 (M.D. Pa. May 14, 2013) ............................ 15
*Wal-Mart Stores Inc. v. Dukes,*
    131 S. Ct. 2541 (2011) ............................................................................................... 13
*Young v. Nationwide Mut. Ins. Co.,*
    693 F.3d 532 (6th Cir. 2012) ..................................................................................... 14

## RULES

Federal Rule of Civil Procedure 23(a) ................................................................... passim
Federal Rule of Civil Procedure 23(c)(4) .............................................................. passim

## OTHER AUTHORITIES

Newberg on Class Actions, § 4:89 (5th ed. 2012) ................................................ 19, 24
Principles of the Law of Aggregate Litigation §§ 2.02 ............................................... 20
Restatement (Second) of Torts § 313 ................................................................... 11, 14
Restatement (Second) of Torts § 324A ................................................................. 11, 14
Restatement (Second) of Torts § 876 .................................................................... 11, 14

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of Motion for Class Certification.

## FACTUAL BACKGROUND

This action arises from allegations that Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") was negligent in failing to properly investigate and provide certification to Oluwafemi Igberase a/k/a Charles Akoda, which enabled Akoda to enter a medical residency program in obstetrics and gynecology at Howard University in Washington, D.C. and go on to treat hundreds of women at Howard and in Prince George's County, Maryland—despite the fact that he obtained certification from ECFMG based on identity and document fraud. As Plaintiffs allege, and as internal memoranda document, ECFMG knew of Igberase's fraud, but failed to adequately investigate it or refer Igberase's conduct to ECFMG's Medical Education Credentials Committee. ECFMG failed to inform state medical boards, residency programs, and hospitals of Igberase's fraud, even as they submitted reports to these entities upon request that attested that Igberase was appropriately certified. As a result, hundreds of women were sexually assaulted by Igberase: they were examined in the most intimate fashion, without knowing that Igberase had been certified and allowed to practice medicine based on identity fraud—information that ECFMG clearly knew but chose not to disclose to the health care entities that relied on it for primary source verification. Many experienced touching and comments that in and of themselves constituted sexual assault, sexual harassment, a boundary

violation, or medical malpractice. Plaintiffs never would have consented to being examined or treated by Igberase had they known the true state of affairs.

ECFMG's stated mission is to promote quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education. *See* Ex. 1. To accomplish its mission, ECFMG, among other things, verifies credentials and provides other services to healthcare professionals worldwide. *Id.*

Persons who receive their medical education outside of the United States and Canada are referred to as International Medical Graduates ("IMG's"). *See* Ex. 2. In order for an IMG to practice medicine in the United States, the IMG must apply to ECFMG, which verifies that the IMG has obtained a diploma from a medical school recognized by the country in which the school is situated; that the school is listed in the International Medical Education Directory; that the curriculum requirement is a minimum of 4 academic years; that the IMG has passed steps 1 and 2 of the United States Medical Licensing Examination (USMLE), has passed the Clinical Skills Assessment Examination and has passed the Test of English as a Foreign Language. *See* Ex. 3 at 1–2. Additionally, the ECFMG uses primary source verification of the IMG's diploma. *Id.* When all of this is satisfactorily completed, the ECFMG issues a certificate to the IMG. *Id.*

To enter programs of graduate medical education in the United States accredited by the American College of Graduate Medical Education ("ACGME"), IMG's must hold a valid ECFMG certificate. *See* Ex. 3 at 1. When an IMG applies to a residency program using the Electronic Residency Application Service ("ERAS"), ECFMG automatically transmits an ECFMG certification status report to the residency program to which the IMG applies. Ex. 4. ECFMG provides each IMG applicant with a unique identification number, known as a token, which allows the IMG applicant to access the AAMC's ERAS web site to complete the ERAS

application. *Id.* The IMG applicant also sends supporting documents to the ECFMG for scanning and transmission. *Id.* The ECFMG also transmits the IMG applicants' USMLE transcript, as requested by the applicant. *Id.*

An IMG must have ECFMG certification to enter an accredited residency program and obtain a state medical license unless the state exercises its authority to make a special exception. Ex. 45 at 230–31.ECFMG has undertaken to provide hospitals with a service to verify a physician's credentials, which fulfills the hospital's obligation to perform primary-source verification. *Id.* at 48–50. As discussed, ECFMG has also undertaken to provide the same service to residency programs. *Id.* at 45.

On April 6, 1992 ECFMG received an application from Oluwafemi Charles Igberase ("Igberase") to take the foreign medical graduate examination in Medical Sciences and the ECFMG English Test. *See* Ex. 5 at 0000155. He provided ECFMG with a diploma from the University of Ibadan dated June 19, 1987. *See* Ex. 6. Igberase failed both the basic medical science and clinical science components of the FMGEMS and passed the ECFMG English test. Ex. 7 at 0000075. He failed the Day 1 test again but passed it on the third try. *Id.* On October 4, 1993, after he successfully completed steps 1 and 2 of the USMLE, ECFMG issued to him certificate number 0-482-700-2. *See* Ex. 8 at 0003572.

On March 30, 1994, ECFMG received an application from "Igberase Oluwafemi Charles" ("Charles") to take Steps 1 and 2 of the USMLE examinations. Ex. 9 at 0000407. He provided a date of birth that was different than the date of birth provided by Igberase. The diploma he submitted was the identical diploma that had been submitted by Igberase. On December 14, 1994, after Charles successfully completed the USMLE examinations, ECFMG issued to him certificate number 0-519-573-0.

ECFMG subsequently began to investigate whether Igberase and Charles were the same person. Ex. 8 at 0003572–73. Igberase/Charles explained his actions in a handwritten letter dated July 14, 1995 in which he admitted he had lied about not taking the examination previously and why he rearranged his names. *See* Ex. 10 at 0000433–37. As Igberase explained, he applied under a false identity because he had been rejected from residency programs for repeatedly failing the USMLE examinations. *Id.* at 0000433–34.

The ECFMG Committee on Medical Education Credentials found that Igberase/Charles had engaged in "irregular behavior," invalidated certificate number 0-519-573-0 issued to Charles and revoked certificate number 0-482-700-2 issued to Igberase. Ex. 11.[1] Charles appealed the decision which led to a hearing on July 10, 1996. Ex. 12. The ECFMG Review Committee for Appeals affirmed the decision of the ECFMG Committee on Medical Education Credentials to revoke certificate number 0-482-700-2 but limited the length of the revocation to a period of five years from July 10, 1996, i.e., to July 10, 2001. Ex. 14. Ultimately, ECFMG revoked permanently this certificate. Ex. 15.

On January 3, 1996 and again on August 30, 1996, ECFMG received an application from "John Nosa Akoda" to take Steps 1 and 2 of the USMLE examinations. Ex. 16 at 0000703, Ex. 17 at 0000643. He provided ECFMG with a diploma from the University of Benin dated February 6, 1998. Ex. 18. On August 18, 1998, after he successfully completed the required examinations, ECFMG issued to him certificate number 0-553-258-5. *See* Ex. 19. At some time in 1998 he provided ECFMG with social security number xxx-xx- 9065. *See* Ex. 20, 22.

---

[1] Irregular behavior is defined as "all actions … on the part of applicants … that would or could subvert the … certification … processes of ECFMG …." Ex. 12.

In July 1998, Akoda entered the graduate residency program at Jersey Shore Medical Center. *See* Ex. 20. On July 24, 1998, ECFMG received a Request for Permanent Revalidation of Standard ECFMG Certificate from Akoda due to his having entered this program. On September 2, 1998, ECFMG sent this validated form. *See* Ex. 20.

By letter dated August 11, 2000 from Dr. James McCorkel, ECFMG was notified that the Jersey Shore Medical Center graduate residency program in which Akoda was enrolled was investigating allegations that Akoda had used a social security number issued to a person named Oluwafemi Charles Igberase. *See* Ex. 21. ECFMG advised Dr. McCorkel that Akoda had provided ECFMG with social security no. xxx-xx-9065. *See* Ex. 22 at 0000552. This is the same number Akoda provided to the Jersey Shore Medical Center. *See* Ex. 21.

ECFMG sent Akoda a "charge letter" dated August 22, 2000 advising that ECFMG had received information alleging that Akoda may have engaged in irregular behavior. *See* Ex. 23 at 0004194–95. Akoda responded by representing to ECFMG that Igberase Oluwafemi Charles was his cousin and admitting that he had used his cousin's social security number. *See* Ex. 24. Akoda presented a purported Nigerian passport and a Nigerian "international driving permit." Ex. 25.

In December 2000, ECFMG learned that Jersey Shore Medical Center dismissed Akoda from its graduate residency program because he used a false social security number – that of his cousin Charles Igberase - and because the green card he had provided the hospital was inconsistent with a subsequent green card he also provided. Ex. 26. In a December 22, 2000 memorandum, William Kelly, Manager of the Medical Education Credentials Department of ECFMG, advised in a memorandum intentionally not made part of the official file that he and Dr. McCorkel both believed Igberase and Akoda were the same person. Ex. 27. But he concluded that he did not think there was enough information to refer the matter to the ECFMG

Credentials Committee for investigation. *Id.* Per Kelly, if it had been, "the irregular behavior he would have been charged with would be providing false information to ECFMG on an application, among other things." Ex. 33 at 158:1–3.

The members of ECFMG's Board and Credentials Committee had no awareness of the matter until November 2016. Ex. 45 at 171. This contrasted with ECFMG's practice of referring an allegation to the Committee for investigation if a charge letter was sent. Ex. 45 at 82. ECFMG never notified anyone outside the organization that Akoda had been dismissed from the Jersey Shore residency program, such as the hospitals and medical boards to which it provided reports verifying Akoda's ECFMG certification status. Ex. 45 at 181–82.

In October 2006, Akoda used the ERAS of ECFMG to apply to Howard University Medical Center for a graduate residency program, which included three purported letters of reference. Ex. 28. Although he was not part of the ERAS process (Ex. 33 at 161:22–24), William Kelly of ECFMG attempted to verify the authenticity of these three letters of reference (Ex. 29) because he had concerns about Akoda's credibility (*id.* at 200:18–23). Kelly did not typically take this action with regard to residency applicants. *Id.* at 205:15–20. He never received responses from the persons passed off as references for Akoda. *Id.*

In or about October 2011 Akoda obtained privileges and became a member of the medical staff at Prince George's Hospital Center under the name "Charles John Nosa Akoda" which was different than the name on his ECFMG certification and also using a fake permanent resident card, a fake Maryland driver's license, fake Nigerian passport and fake letters of recommendation. Ex. 30 at 0000019. Akoda began seeing patients at Prince George's Hospital Center on or about November 5, 2011. ECF No. 1, Ex. A at ¶ 30.

On June 9, 2016, law enforcement executed search warrants at Akoda's residence, medical office and vehicle where they found fraudulent or altered immigration documents, medical diplomas, medical transcripts, letters of recommendation and birth certificates. ECF No. 1, Ex. A at ¶ 34. On November 15, 2016, Akoda signed a plea agreement admitting to misuse of a social security account number and admitting to being Igberase. Ex. 30 at 0000020. On December 19, 2016, ECFMG revoked certificate number 0-482-700-2 issued to Akoda, based upon his plea agreement with the U.S. Ex. 31. In 2017, Akoda was sentenced by the United States District Court for the District of Maryland to six (6) months incarceration, followed by probation. ECF No. 1, Ex. A at ¶ 37. Prince George's Hospital Center then terminated his privileges and the Maryland Board of Physicians revoked his medical license. *Id.* at ¶¶ 38–39. In 2017, ECFMG revoked Akoda's certification (Ex. 45 at 224–225) on the basis of his plea bargain (*id.* at 170-171).

As Plaintiffs allege, none of Igberase's patients (the Plaintiffs and others similarly situated) knew his true identity or of his fraudulent background and conduct. ECF No. 1, Ex. A at ¶¶ 44–45. Moreover, none of Igberase's patients were capable of giving informed consent to be touched by him. *Id.* at ¶ 46. On many occasions, Igberase touched and penetrated his patients without consent and on false pretenses, constituting battery, and committed ongoing boundary violations by performing inappropriate examinations of a sexual nature and utilizing inappropriate language. *Id.* at ¶ 47.

## CLASS REPRESENTATIVES

### A.     Monique Russell

Monique Russell is a 42 year old resident of Annapolis, Maryland. Ex. 33 at 12. Akoda delivered her son in 2016. *Id.* at 41. Ms. Russell became aware of Akoda's and ECFMG's

conduct through various sources. *Id.* at 47–50. She has suffered from emotional distress as a result of learning about Akoda's conduct. *Id.* at 75. Ms. Russell is pursuing the class action in part because she believes that every woman who has ever been a patient of Akoda should know that he is not a real doctor. *Id.*

### B.     Jasmine Riggins

Ms. Riggins is a 27 year old mother of three children. Ex. 35 at 20. She lives in Washington, DC. *Id.* She was a patient of Akoda between August 2012 and March 2013. *Id.* at 121. Akoda delivered her second child by C-section. *Id.* As a result of what she learned about Akoda, she has suffered emotional distress. *Id.* at 56.

### C.     Elsa Powell

Ms. Powell is a 32 year old mother of five children. Ex. 36 at 7, 19. Ms. Powell initially encountered Igberase upon presentation to the medical office of Abdul Chaudry, M.D. in 2014. *Id.* at 40, 94. Igberase, claiming to be Akoda, delivered her child at Prince George's Hospital Center. *Id.* at 42, 88. Ms. Powell has experienced emotional distress after learning that Igberase treated her on false pretenses, and is prepared to speak on behalf of others in connection with her role as a class representative. *Id.* at 96.

### D.     Desire Evans

Desire Evans is a 40 year old mother of one child. Ex. 37 at 8, 13. Ms. Evans first encountered Igberase, whom she knew as Charles Akoda, at Prince George's Hospital Center for the delivery of her child in March of 2018. *Id.* at 83. Ms. Evans has suffered emotional distress upon learning that physician whom she trusted for medical care misrepresented his identity. *Id.* at 165, 172. Ms. Evans understands her role as a class representative and is willing to speak as a representative on behalf of others who were treated by Igeberase. *Id.* at 153, 183.

## EXPERTS

Plaintiffs have retained six experts to opine on the issues of liability and damages.

**David Samuel Markenson, M.D., MBA, FAAP, FACEP, FCCM, FACHE** is a health care physician executive with experience in leadership roles, including Division Vice President, Chief Medical Officer, Vice President, Medical Director, Section Chief, Academic Chairman, Center Director and Designated Institutional Official with a publicly traded national hospital corporation, large regional health system, academic medical center, medical school, municipal hospitals and community hospital. Dr. Markenson has issued a report which identifies various breaches in the standards of care by ECFMG. Dr. Markenson states in his report that these breaches in the standards of care permitted Igberase to practice medicine under the fictitious Akoda identity and has caused harm to the Plaintiffs and the members of the class. Ex. 38 at 3.

**John Charles Hyde, II, Ph.D., FACHE**, is a health care consultant and retired Professor in the field of healthcare management. Dr. Hyde provides expertise and advice to hospitals, healthcare organizations, healthcare trade/professional associations, on topics including administration, provider credentialing, employee management, and other various healthcare related needs. Dr. Hyde has issued a report identifying breaches in the standards of care which have caused harm to the Plaintiffs and the class. *See* Ex. 39 at 7.

**Jonathan Burroughs, M.D., MBA, FACHE, FAAPL** is a physician and healthcare consultant with experience in various hospital administrative roles. Dr. Burroughs has issued a report in which he offers his opinion that ECFMG breached its duty to the public, as set forth in their own mission statement and other publications. *See* Ex. 40 at 30.

**Jerry Williamson, M.D., FAAP, MJ, CHC, LHRM** is a physician and hospital administrator, having held administrative positions as a Chief Medical Officer, Medical Director,

and Vice President for Medical Affairs in both the ambulatory and inpatient settings. In these

positions, Dr. Williamson served on and chaired credentialing committees. Dr. Williamson has

offered a report which concludes that ECFMG failed to act in a reasonable and prudent manner

which has directly impacted patient safety. Ex. 41 at 6.

**Christine Tellefsen, M.D.** is a psychiatrist affiliated with the Mercy Medical Center in

Baltimore, Maryland and the University of Maryland Medical Center. Dr. Tellefsen's report

summarizes the result of several independent medical examinations performed on the

representative Plaintiffs, and describes the breach of trust suffered by patients associated with

fraudulent conduct on the part of physicians—particularly in the context of obstetric care. Dr.

Tellefsen concludes that each of the representative plaintiffs reported shock, dismay, anger,

recrimination and guilt, and were all distress upon learning of Igberase's conduct. *See generally*

Ex. 42.

**Annie Steinberg, M.D.** is a psychiatrist with a Clinical Professor faculty appointment in

the Department of Psychiatry at The Perelman School of Medicine at the University of

Pennsylvania. Dr. Steinberg has conducted a survey completed by 306 presumed patients of

Igberase. Dr. Steinberg found consistency in terms of damages across the women surveyed, and

concluded that the misconduct of Oluwafemi Charles Igberase has resulted in degrees of

confusion, anxiety, depression, avoidance and fear of medical caregivers, and the loss of trust in

medical providers and health care institutions among those she surveyed. Ex. 43 at 21.

## ARGUMENT

Plaintiffs seek an order providing for class certification as to "all patients examined

and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)"

(ECF No. 1, Ex. A at ¶ 48), on two alternate grounds, both pursuant to Federal Rule of Civil

Procedure 23(c)(4). The first option ("Option A") is certification on liability only for the causes

of action of the class members: negligence (ECF No. 1 at 27–30) and negligent infliction of

emotional distress (ECF No. 1 at 31–32). In the alternative, Plaintiffs seek certification of the

following issues classes) ("Option B"):

1.  Whether ECFMG undertook or otherwise owed a duty to class members who were patients of Igberase;
2.  Whether ECFMG breached its duty to class members;
3.  Whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable for foreseeable injuries to third persons such as class members pursuant to Restatement (Second) of Torts § 324A;
4.  Whether ECFMG breached its duty to hospitals and state medical boards;
5.  Whether the emotional distress and other damages alleged by Plaintiffs and class members were a foreseeable result of ECFMG's conduct;
6.  Whether ECFMG's conduct involved an unusual risk of causing emotional distress to others under Restatement (Second) of Torts § 313;
7.  Whether ECFMG is subject to liability under Restatement (Second) of Torts § 876 for assisting Igberase in committing fraud;
8.  Whether ECFMG knew or should have known that Akoda was, in fact, Igberase;
9.  Whether it was foreseeable that ECFMG's actions and/or alleged failures to act, including their alleged negligent failure to certify Igberase and properly investigate and deny or revoke Igberase certification, could result in emotional distress experienced by Class Members.

For the following reasons, Plaintiffs contend that certification under either Option A or Option B

is permitted under Rule 23 and would materially advance the termination of the litigation.

I.    **Certifying the common issues satisfies Rule 23(a).**

Rule 23 is "'designed to assure that courts will identify the common interests of Class

members and evaluate the named plaintiffs' and counsel's ability to fairly and adequately protect

class interests.'" *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (citation

omitted). The class action vehicle allows large numbers of potentially low-value claims

involving the same core issues to proceed in the aggregate. This provides a path to relief where

11

otherwise there is none, as the cost to litigate an individual case often exceeds the expected

return for an individual plaintiff. *See Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

Moreover, class certification can benefit a defendant in that resolution of common issues can

dispose of thousands of claims in one stroke. Thus, "[c]lass actions serve an important function

in our system of civil justice." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981).

Both the Supreme Court and Third Circuit have held that the requirements

for class certification are "readily met" in consumer protection cases where common factual

questions necessarily center upon the defendant's course of conduct. *See Amchem Prods.,* 521

U.S. at 625; *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 298 (3d Cir. 2011) (*en banc)*. For

example, where "liability depends on the conduct of [defendant], and whether it conducted a

nationwide campaign of misrepresentation and deception, [and] does not depend on the conduct

of individual class members," class certification is appropriate. *Sullivan* 667 F.3d at 298.

Courts should not "'put[ ] the cart before the horse' by allowing their views of the merits

to affect their analysis of the independent question whether a putative class satisfies the

requirements of Rule 23," which "'grants courts no license to engage in free-ranging merits

inquiries at the certification stage.'" *Gonzalez v. Corning*, 885 F.3d 186, 200 (3d Cir. 2018), *as

amended* (Apr. 4, 2018) (quoting *Amgen, Inc. v. Conn. Retirement Plans and Trust Funds*, 568

U.S. 455, 460, 466 (2013).

Rule 23(a) sets forth four "threshold requirements" for all class actions. *Sullivan v. DB

Investments, Inc.*, 667 F.3d 273, 298 (3d Cir. 2011). At class certification, Plaintiffs must

"demonstrate that [those elements are] capable of proof at trial through evidence that is common

to the class rather than individual to its members," *In re Hydrogen Peroxide Antitrust Litig.*, 552

F.3d 305 (3d Cir. 2008). The four prerequisites—numerosity, commonality, typicality and adequacy—are satisfied here.

### A. The class members are sufficiently numerous.

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs are not required to state the size of the class with precision. *Cannon v. Cherry Hill Toyota,* 184 F.R.D. 540, 543 (D.N J, 1999). There is "[n]o minimum number of plaintiffs is required to maintain a suit as a class action," and a plaintiff "can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing 'that the potential number of plaintiffs exceeds 40.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (citation omitted).

Here, Plaintiffs have alleged that there are over 1,000 members of the class. (ECF No. 41 at ¶ 50.) In a related lawsuit involving Igberase's conduct, Dimensions Healthcare, which operated Prince George's Hospital Center in Cheverly, MD, responded that Igberase had treated 712 patients at its facility. (*See* Ex. 44 at 12.) Numerosity is satisfied here.

### B. There are common questions of fact and law.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Commonality is satisfied where common questions are capable of generating common answers apt to drive the resolution of the litigation. *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct, 2541, 2551 (2011). "Commonality does not require an identity of claims or facts among Class Members; instead, [t]he commonality requirement will be satisfied if the named Plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Mgmt., Inc*., 265 F.3d 178, 184 (3d Cir. 2001) (internal quotation marks omitted). The commonality requirement "is not a high bar" and is satisfied "if the named plaintiffs share at

least one question of law or fact with the grievances of the prospective class," *Chiang v. Veneman*, 385 F.3d 256, 265 (3d Cir. 2004) (*abrog. on other grounds recognized by Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 597 (3d Cir. 2012)). Importantly, "[c]ases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 545 (6th Cir. 2012).

Here, the representative Plaintiffs all allege injury stemming from a single course of wrongful conduct by ECFMG, in negligently providing certification to Igberase (as Akoda), failing to investigate his conduct and identity despite ample knowledge he obtained ECFMG certification on false pretenses, and failing to warn residency programs, state medical boards, and the public of their concerns regarding his conduct. The common questions of law and fact include the following:

1. Whether ECFMG undertook or otherwise owed a duty to class members who were patients of Igberase;
2. Whether ECFMG breached its duty to class members;
3. Whether ECFMG undertook or otherwise owed a duty to hospitals and state medical boards, such that ECFMG may be held liable for foreseeable injuries to third persons such as class members pursuant to Restatement (Second) of Torts § 324A;
4. Whether ECFMG breached its duty to hospitals and state medical boards;
5. Whether the emotional distress and other damages alleged by Plaintiffs and class members were a foreseeable result of ECFMG's conduct;
6. Whether ECFMG's conduct involved an unusual risk of causing emotional distress to others under Restatement (Second) of Torts § 313;
7. Whether ECFMG is subject to liability under Restatement (Second) of Torts § 876 for assisting Igberase in committing fraud;
8. Whether ECFMG knew or should have known that Akoda was, in fact, Igberase;
9. Whether it was foreseeable that ECFMG's actions and/or alleged failures to act, including their alleged negligent failure to certify Igberase and properly investigate and deny or revoke Igberase certification, could result in emotional distress experienced by Class Members.

All of these issues are apt to drive the resolution of the litigation. Resolution of any one of these common issues will resolve a key issue central to the individuals' claims in one stroke. If resolved in Defendants' favor, Plaintiffs' claims may be dismissed; if resolved in Plaintiffs' favor, key issues central to the determination of liability and damages will have been determined. There are more than enough common issues to support a finding of commonality here.

Importantly, courts regularly certify common issues that pertain to liability without certifying the entire issue of liability for class-wide resolution. For example, in *Martin v. Behr*, 896 F.3d 405 (6th Cir. 2018), a toxic tort class action for property damages caused by groundwater contamination, the Sixth Circuit affirmed a district court's certification of seven issues pertaining to general causation and the defendants' liability. Likewise, in *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826 (E.D. Tenn. 2019), a negligence action brought by workers exposed to fly ash at a coal-ash cleanup project, a federal district court ordered that a consolidated action first be tried first on issues pertaining to the defendants' general liability ("(1) whether defendant owed plaintiffs a legal duty; (2) whether defendant breached that duty; and (3) whether defendant's breach was capable of causing plaintiffs' alleged injuries.") *Id.* at 836–37. If the plaintiffs prevailed, the court ordered that a second trial address issues of specific liability with respect to individual plaintiffs. ("(1) specific causation with respect to individual plaintiffs; (2) each plaintiff's alleged injuries; and (3) the extent to which individual plaintiffs are entitled to damages.") *Id.*

The fact that individualized issues of damages may remain to be resolved following resolution of the common issues cannot defeat class certification under Rule 23(c)(4). *See, e.g.*, *Wallace v. Powell*, No. 3:09-CV-0291, 2013 WL 2042369, at *20–21 (M.D. Pa. May 14, 2013); *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 427-28 (4th Cir. 2003).

15

### C. The claims of the named Plaintiffs are typical of those of the class.

Federal Rule of Civil Procedure 23(a)(3) requires that the class representatives' claims be "typical of the claims . . . of the class." As the Third Circuit explained, "[t]he typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named Plaintiffs have incentives that align with those of absent Class Members so as to assure that the absentees' interests will be fairly represented." *Baby Neal v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994). The typicality prong is normally met where "claims of representative Plaintiffs arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

Here, the named Plaintiffs and putative class members all suffered emotional distress by being treated by a physician who had obtained medical credentials through fraud. Although the individual plaintiffs suffered injury under different circumstances, the named Plaintiffs' and class's claims "arise from the same alleged wrongful conduct" of ECFMG and are "based on the same legal theory." Class members' interests align with those of the named Plaintiffs. Typicality is satisfied here.

### D. The adequacy requirement is satisfied here.

Both class members and their counsel will adequately and fairly represent the interests of the class for the same reasons as stated above. The plaintiffs have suffered a common injury. The interests of the class representatives and the members of the putative class are identical in resolving the common issues under Option A or Option B.

Plaintiffs' counsel have the experience and necessary resources to prosecute this action. Plaintiffs' counsel have already engaged in significant document discovery in this action, taken and defended numerous depositions, and retained six experts. Schochor, Federico and Staton,

P.A. have successfully led a similar class action previously. In *Jane Doe No. 1 v. Johns Hopkins Hospital,* No. 24-C-13-001041 (Balt. City Cir. Ct.), which involved allegations of sexual misconduct by a physician, Plaintiffs' counsel Jonathan Schochor chaired the steering committee for the litigation. That litigation involved over eight thousand (8,000) plaintiffs against Johns Hopkins Hospital and was resolved successfully for $190 million. Additionally, the Schochor firm held a leadership role in *Jane Doe 30 v. Bradley,* 2012 WL 5949216 (Del. Super. Nov. 19, 2012), which involved sexual abuse by a pediatrician, and resulted in a $123 million settlement. The Schochor firm has been involved in complex litigation for more than thirty years.

The Law Offices of Peter G. Angelos, P.C. has significant experience in significant complex litigation. Representative cases include the 1998 tobacco litigation that resulted in $4,2 billion settlement on behalf of the State of Maryland; the Tower Securities litigation that resulted in a $117,500,000 recovery for the Steamship Trade Association pension fund; a $1 billion verdict against ExxonMobil on behalf of 466 Baltimore County residents whose water aquifer was polluted with 26,000 gallons of gasoline; and a class action suit against Dr. Mark Midei and Catholic Health Initiatives based upon allegations of unnecessary, fraudulent treatment, in which counsel Paul Vettori appeared on behalf of the firm.

Karen Evans and The Cochran Firm, a national law firm, also have significant prior class and mass action experience, including the ongoing Round-Up litigation (No. 3:16-md-02741-VC, N.D. Cal.) and the aforementioned *Johns Hopkins Hospital v. Levy* matter.

The law firm of Janet, Janet and Suggs, LLC have served as lead counsel or on the steering committee of several major class actions that have resolved successfully, including a $2.2 billion settlement of claims by one class of residential and commercial electricity ratepayers against one of the defendants in an ongoing civil RICO lawsuit, *Glibowski v. SCANA*, No. 9:18-

cv-00273 (D.S.C.); a $190 million settlement on behalf of patients of Dr. Charles Levy in *Jane Doe No. 1, et al. v. Johns Hopkins Hospital, et al,* No. 24-C-13-001041 (Balt. City Cir. Ct.), a $10 million settlement on behalf of Jersey City, New Jersey property owners in *Halley v. Honeywell, Inc.*, No. 2:10-cv-3345 (D.N.J.); an ongoing class action on behalf of Dayton, Ohio property owners in *Martin v. Behr Dayton Thermal Products*, No. 3:08-cv-00326-WHR (S.D. Ohio), *aff'd,* 896 F.3d 405 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019), in addition to numerous other complex litigations. Counsel Patrick Thronson has had and maintains significant responsibilities as counsel in the *Glibowski*, *Halley*, and *Martin* matters.

## II.     Plaintiffs Also Satisfy the Requirements of Rule 23(c)(4)

### A.     Certification of liability or the Common Issues satisfies the ascertainability requirement, if that requirement even applies.

Establishing the implied requirement of ascertainability involves showing (1) the class is "defined with reference to objective criteria;" and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* at 355 (citing *Marcus v. BMW of North Amer., LLC*, 687 F.3d 583, 593–94 (3d Cir. 2012)). Plaintiffs need simply show that "class members *can* be identified." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013)).

The Third Circuit has not addressed the question of whether the ascertainability requirement applies to class actions brought pursuant to Rule 23(c)(4). Regardless of its applicability, Plaintiffs meet this requirement. The class consists of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)." ECF No. 1, Ex. A at ¶ 48. One of the health care facilities at which Igberase worked, Prince George's Hospital Center, has already identified 712 individuals who were treated by Igberase. Ex. 44 at

12. Members of the class can be identified through records of medical treatment, which will show when and how patients were treated by Igberase. Indeed, Plaintiffs have already produced records corresponding to hundreds of class members to defendants as part of discovery in this action. Clearly, class members can be identified, which satisfies the ascertainability requirement.

**B.      Certification of the issue of liability or the Common Issues satisfies Rule 23(c)(4).**

Rule 23(c)(4) provides, "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Under this rule, a court may grant class certification for litigation of certain issues, while allowing the remaining ones to proceed on an individual basis. *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272 (3d Cir. 2011). "The ability to certify issue classes accords the courts discretion to realize the advantages and efficiencies of class-wide adjudication of common issues when there also exist individual issues that must be tried separately." *Lisa v. Saxon Mortgage Servs.*, Nos. 11-4586, 12-5366, 2016 WL 5930846, at *3 (quoting Newberg on Class Actions, § 4:89 (5th ed. 2012)); see also *In re Chiang*, 385 F.3d 256, 267 (3d Cir. 2004) ("[C]ourts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication—or, perhaps more realistically, settlement.").

A question arises as to whether class actions seeking money damages that are certified as to Rule 23(c)(4) must satisfy the predominance requirement of Rule 23(b)(3). The prevailing view among federal circuit courts of appeals is that common questions must predominate over individualized inquiries *within* the issues proposed for certification, as opposed to the claim as a whole. *See, e.g.*, *Martin*, 896 F.3d at 413 (6th Cir. 2018) (collecting cases). Although a panel of the Fifth Circuit once expressed an opposing view (the "narrow view") in a footnote (*see Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996)), which implied that

predominance must be satisfied as to the action as a whole, it has since aligned with the other

circuits that have considered the issue.[2]

The Third Circuit has taken a different path, and has held that the decision to certify an

issues class under Rule 23(c)(4) is "analytically independent" from Rule 23(b)(3)'s

predominance and superiority inquiry, and a district court must consider a different set of factors

in deciding certification. *Gonzalez v. Corning*, 885 F.3d 186, 202 (3d Cir. 2018). The Third

Circuit has enumerated those factors as follows:

> [W]hen deciding whether or not to certify an issue class, the trial court should
> consider: [1] the type of claim(s) and issue(s) in question; [2] the overall complexity
> of the case; [3] the efficiencies to be gained by granting partial certification in light
> of realistic procedural alternatives; [4] the substantive law underlying the claim(s),
> including any choice-of-law questions it may present and whether the substantive
> law separates the issue(s) from other issues concerning liability or remedy; [5] the
> impact partial certification will have on the constitutional and statutory rights of
> both the class members and the defendant(s); [6] the potential preclusive effect or
> lack thereof that resolution of the proposed issue class will have; [7] the
> repercussions certification of an issue(s) class will have on the effectiveness and
> fairness of resolution of remaining issues; [8] the impact individual proceedings
> may have upon one another, including whether remedies are indivisible such that
> granting or not granting relief to any claimant as a practical matter determines the
> claims of others; and [8] the kind of evidence presented on the issue(s) certified and
> potentially presented on the remaining issues, including the risk subsequent triers
> of fact will need to reexamine evidence and findings from resolution of the common
> issue(s).

*See Gates v. Rohm & Haas Co.*, 655 F.3d 255, 274 (3d Cir. 2011) (quoting Principles of the Law

of Aggregate Litigation §§ 2.02–05 (2010)); *Hohider v. United Parcel Serv., Inc.,* 574 F.3d 169,

201 (3d Cir. 2009). These factors are non-exclusive and "should guide courts as they apply Fed.

R. Civ. P. 23(c)(4) 'to treat common things in common and to distinguish the distinguishable.'"

---

[2] *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006); *In re Deepwater Horizon*, 739 F.3d 790, 806, 814, 817 & n.66 (5th Cir. 2014).

*Id.* (quoting *Chiang,* 385 F.3d at 256). The *Gates* factors have been characterized as a "functional, superiority like analysis." *Martin*, 896 F.3d at 413. Plaintiffs more likely than not satisfy all of the foregoing *Gates* factors, both under a liability only issues class (Option A above) and an issues class certified for resolution of the Common Issues (Option B above).

1.  **The type of claims and issues in question in this action are susceptible to efficient class-wide resolution.**

The issues to be certified for class-wide resolution under either Option A or Option B are focused on ECFMG's conduct and are common to the entire class. Resolution of liability of the Common Issues will apply to the claims of all Plaintiffs: issues such as whether ECFMG has a duty to patients of Igberase and whether Plaintiffs have a legally cognizable claim for damages are central to the resolution of Plaintiffs' claims. ECFMG's conduct, not individual characteristics of the Plaintiffs or their particular interactions with Igberase, is the subject of the issue of liability and the Common Issues. Liability and the Common Issues also admit of common proof. They involve the same underlying conduct of the Defendant in granting Igberase certification, failing to investigate when they knew or should have known that he had obtained that certification by fraud, and failing to notify state medical boards, hospitals, and residency programs to which they provided ECFMG certification reports of the facts that supported the conclusion that Igberase had achieved certification on false pretenses.

2.  **The complexity of the case warrants certification of common issues.**

Proof of defendants' conduct centers on common evidence tied to ECFMG's conduct and requires extensive document review, deposition testimony, and expert analyses of complex issues involving ECFMG's role in the United States medical system, the fraud committed by Igberase, and the pattern of conduct of ECFMG. For the sake of time and cost, it is in all parties'

and the Court's interest that presentation of this evidence be done once. The issues in this case are complex but are susceptible of being tried with common proof.

### 3. Issue certification of liability or the Common Issues is the most efficient way of resolving common issues given realistic procedural alternatives.

The alternative to certifying liability or the Common Issues for class treatment is to conduct trials of the issues hundreds of times for each individual plaintiff, necessitating presentation of each expert witness, fact witness, and documentary evidence in each case. This is far less efficient than the resolution of common issues by a single class jury and will save scarce judicial resources. Moreover, the cost of litigating each individual case likely outweighs an individual award. On the other hand, the resolution of common issues under Options A or B in a classwide proceeding will either resolve the claims of the class in favor of ECFMG or, if resolved in Plaintiffs' favor, permit them to pursue their claims by avoiding the necessity of expensive presentation of expert evidence. The certification of an issues class here allows for the final adjudication of common liability issues, in contrast to the attempted application of collateral estoppel after resolution of an individual case, which would be repeatedly contested by the parties in each follow-on proceeding.

### 4. The substantive law underlying the claims supports resolution of liability or the Common Issues on a class-wide basis.

There are no impediments in the underlying substantive law to certifying an issues class. Pennsylvania law will likely apply to all issues in this action—and, at any rate, Plaintiffs are unaware of meaningful conflicts between the tort law of Pennsylvania applicable to resolution of liability or the common issues and the tort law of the states in which Igberase interacted with class members. Even if a conflict existed, it would likely be resolved in favor of Pennsylvania law. Pennsylvania has long abandoned the *lex loci delicti* rule for choice of law questions "in

favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964). Under that framework, "the state in which injury occurred, as such, has relatively little interest in the measure of damages to be recovered unless it can be said with reasonable certainty that defendant acted in reliance on that state's rule." *Id.* at 806. There is no evidence that ECFMG relied on the laws of any other state in granting certification to Igberase. And, at any rate, "where the tort is unintentional," as is true here, "the reliance argument is almost totally untenable." *Id.*

**5.        There are no constitutional or statutory obstacles to issue class certification.**

There are no unique constitutional or statutory issues here and the constitutionality of class actions is well-established. Certification of liability or the Common Issues will not present any Seventh Amendment problems, for the reasons discussed under subpoint 8, *infra*.

**6.        The preclusive effect of resolving common issues on a class-wide basis is expedient and provides valuable efficiency to resolving the class claims.**

Resolution of common issues will dispose of the most complex and time-consuming aspects of the case, allowing individual plaintiffs to proceed with individual damage claims at a much lower cost. The "remaining issues"—fact of injury and damages—could be proven by individual plaintiffs in follow-up litigation with evidence of, *inter alia,* medical records showing the extent and frequency of treatment by Igberase and testimony by individual plaintiffs on the impact Igberase's conduct—made possible by ECFMG's conduct—has had on their lives. Mini-trials on damages will also function as bellwether proceedings, facilitating settlement.

7. **The resolution of common issues on a class-wide basis and issues of damages in individualized proceedings will not result in prejudice or unfairness to a plaintiff.**

Individual proceedings to resolve whether an individual plaintiff has been injured and the damages to which she is entitled will not prejudice any individual. Resolution of one plaintiffs' injury and damages claim will have no effect on the claims of others or the ability of others to fairly vindicate their right to a remedy.

8. **The evidence presented on common issues is common to the class. Subsequent juries will not need to reexamine earlier findings of the class jury in a manner that violates the Reexamination Clause.**

The Seventh Amendment to the United States Constitution provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." The Reexamination Clause "is not against having two juries review the same evidence, but rather against having two juries decide the same essential issues." *See In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 (3d Cir. 1997) "Partial certification" or "[t]rying a bifurcated claim before separate juries does not run afoul of the Seventh Amendment" so long as: [1] the same factual issue is not "'tried by different, successive juries'"; [2] "the verdict form for the first jury" is carefully crafted "so that the second jury knows what has been decided already"; and [3] "the first jury makes sufficiently detailed findings, [which] are then akin to instructions for the second jury to follow." *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167 (2d Cir. 2001) (citations omitted) (*abrog. on other grounds*. "[I]f done properly, bifurcation will not raise any constitutional issues,'" *Martin*, 896 F.3d at 417 (citation omitted)—a proposition with which "leading class action treatises agree," *id.* (citing 2 Newberg on Class Actions § 4:92 (5th ed. 2010)).

In this case, trying the issue of liability or the Common Issues would result in rulings of law by the Court and fact-finding pertaining solely to ECFMG's conduct, pertaining to liability in negligence or to the Common Issues. The second-round jury or juries will decide issues pertaining to the existence and extent of an individual plaintiff's damages. They will not decide issues pertaining to ECFMG's conduct. Thus, no Reexamination Clause problem arises under the framework Plaintiffs propose.

Issue class certification will aid the Court and the administration of justice in this case. As the Third Circuit has observed, "[s]everance of the question of liability from other issues can 'reduce the length of trial, particularly if the severed issue[s] [are] dispositive of the case, and can also improve comprehension of the issues and evidence.'" *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d at 452 (3d Cir. 1997) (citation omitted). Issue class certification also provides advantages to Defendant. For example, if it is determined ECFMG has no liability to the class, or has no duty to class members, hospitals, or medical boards, then all class members will be bound by that decision, and Defendant can be assured that the litigation is over.

Here, "[t]he Court has several viable options at its disposal for resolution of damages inquiries following the class-wide proceeding of common issues of liability." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 349 (D. Md. 2012). The flexibility of the issue class certification mechanism will ensure the litigation is resolved efficiently (especially in comparison with the alternatives) while ensuring fairness to all parties.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification, appoint them as representative plaintiffs, and appoint their counsel as class counsel. Plaintiffs respectfully request oral argument on this motion.

Dated: October 7, 2019                    Respectfully submitted,

CONRAD O'BRIEN PC                         THE COCHRAN FIRM

*/s/ Nicholas M. Centrella*                 */s/ Karen Evans*
Nicholas M. Centrella, Esquire (Pa. I.D. No.   Karen E. Evans, R.N., J.D. (*pro hac vice*)
67666)                                    kevans@cochranfirm.com
Howard M. Klein, Esquire (Pa. I.D. No. 33632)   1100 New York Ave, N.W.
Benjamin O. Present, Esquire (Pa. I.D. No.   Washington, D.C. 20005
322682)                                   Telephone: (202) 682-5800
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600                 JANET, JANET & SUGGS, LLC

SCHOCHOR, FEDERICO AND STATON             */s/ Patrick Thronson*
                                          Patrick A. Thronson (*pro hac vice*)
*/s/ Brent Ceryes*                          pthronson@JJSjustice.com
Jonathan Schochor jschoehor@sfspa.com (*pro*   Executive Centre at Hooks Lane
*hac vice*                                   4 Reservoir Circle, Suite 200
Lauren Schochor (Identification No. 87618)   Baltimore, MD 21208
lsehochor@sfspa.corn                      Telephone: (410) 653-3200
Brent Ceryes (*pro hac vice*)               Fax: (410) 653-9030
 bceryes@sfspa.com
Phil Federico (*pro hac vice*)
The Paulton
1211 St. Paul Street                      *Attorneys for Plaintiffs*
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

LAW OFFICES OF PETER G. ANGELOS,
P.C.

*/s/ Paul M. Vettori*
Danielle S. Dinsmore (*pro hac vice*)
ddinsmore@lawpga.com
Paul M. Vettori (*pro hac vice*)
pvettori@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150

# PETITION
# EXHIBIT 2

EXHIBIT 1

# About ECFMG

Overview | Statement of Values, Mission, and Purposes | Board of Trustees | ECFMG Leadership | Initiatives | History | Careers at ECFMG

## Statement of Values, Mission, and Purposes

**Values**

The values of ECFMG are expressed in its vision statement:

"Improving world health through excellence in medical education in the context of ECFMG's core values of collaboration, professionalism and accountability."

**Mission**

The charge of ECFMG is expressed in its mission statement:

"The ECFMG promotes quality health care for the public by certifying international medical graduates for entry into U.S. graduate medical education, and by participating in the evaluation and certification of other physicians and health care professionals nationally and internationally. In conjunction with its Foundation for Advancement of International Medical Education and Research (FAIMER), and other partners, it actively seeks opportunities to promote medical education through programmatic and research activities."

**Purposes**

The purposes (goals) that actuate and accomplish ECFMG's mission are to:

- Certify the readiness of international medical graduates for entry into graduate medical education and health care systems in the United States through an evaluation of their qualifications.
- Provide complete, timely, and accessible information to international medical graduates regarding entry into graduate medical education in the United States.
- Assess the readiness of international medical graduates to recognize the diverse social, economic and cultural needs of U.S. patients upon entry into graduate medical education.
- Identify the needs of international medical graduates to become acculturated into U.S. health care.
- Verify credentials and provide other services to health care professionals worldwide.
- Provide international access to testing and evaluation programs.
- Expand knowledge about international medical education programs and their graduates by gathering data, conducting research, and disseminating the findings.
- Improve international medical education through consultation and cooperation with medical schools and other institutions relative to program development, standard setting, and evaluation.
- Improve assessment through collaboration with other entities in the United States and abroad.
- Improve the quality of health care by providing research and consultation services to institutions that evaluate international medical graduates for entry into their country.
- Enhance effectiveness by delegating appropriate activities in international medical education to FAIMER.

Back to top

Last updated December 16, 2011.

® Registered in the US Patent and Trademark Office.

Copyright © 1996-2019 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

# PETITION
# EXHIBIT 3

EXHIBIT 3

# Certification

About ECFMG Certification | New to Certification? | IMGs in the United States | Definition of an IMG | How the Certification Process Works | Requirements for Certification | 2023 Accreditation Requirement | Reference Guide for Medical Education Credentials | Eligibility for Examination | Verification of Credentials | Certification Verification | ECFMG Medical Credentials Reference Library

## About ECFMG Certification

ECFMG was founded in 1956 to assess, through a program of certification, whether international medical graduates (IMGs) are ready to enter residency or fellowship programs in the United States that are accredited by the Accreditation Council for Graduate Medical Education (ACGME). ACGME requires IMGs who enter ACGME-accredited programs to be certified by ECFMG. ECFMG Certification is also one of the eligibility requirements for IMGs to take Step 3 of the three-step United States Medical Licensing Examination (USMLE). Medical licensing authorities in the United States require that IMGs be certified by ECFMG, among other requirements, to obtain an unrestricted license to practice medicine.

The foundation of ECFMG's certification program has endured remarkably over the last five decades. Throughout the history of the program, the requirements have included examinations in the medical sciences, evaluation of English language proficiency, and documentation of medical education credentials. Over the years, there have been changes in the examinations accepted to meet the requirements for ECFMG Certification and changes to the requirements themselves. These changes have been made to enhance the certification program, respond to the needs of the U.S. graduate medical education community, comply with the changing immigration landscape, take advantage of new technologies, and achieve a common examination pathway to medical licensure for IMGs and U.S. medical graduates.

ECFMG Certification is an effective screening mechanism for ensuring that IMGs in patient care situations have met minimum standards. Each year, thousands of IMGs in the certification process apply to ECFMG for USMLE. Just over half of these individuals are successful in completing all the examination and medical education credential requirements for ECFMG Certification. During the 20-year period from 1991 through 2010, more than 295,000 international medical students/graduates applied to take their first examination with ECFMG; of this number, 60.7% have achieved certification.

Back to top

Last updated September 7, 2016.

® Registered in the US Patent and Trademark Office.

Copyright © 1996-2019 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

10/3/2019
Case 2:20-cv-02456-DJC-AC Document 1 Filed 04/06/2020 Page 41 of 341
Certification how-the-certification-process-works.html

# Certification

## How the Certification Process Works

An international medical student/graduate (IMG) should begin the ECFMG Certification process by first confirming his/her medical school meets ECFMG requirements. Once an IMG confirms that students/graduates of his/her medical school are eligible to apply to ECFMG for ECFMG Certification and examination, he/she can apply for a USMLE/ECFMG Identification Number. Once an IMG has obtained this number, he/she can use it to complete the Application for ECFMG Certification. Once the Application for ECFMG Certification, including the notarized Certification of Identification Form (Form 186), has been accepted by ECFMG, the IMG may then apply for examination.

To be certified by ECFMG, an IMG must meet both examination and medical education credential requirements. These requirements include passing performance on medical science and clinical skills examinations—USMLE Step 1, Step 2 Clinical Knowledge (CK), and Step 2 Clinical Skills (CS) are the exams currently administered that satisfy these requirements—and primary-source verification of the IMG's medical education credentials, including the final medical diploma, final medical school transcript, and transcript(s) to document transferred academic credits (if applicable).

The time required to complete the certification process is different for each individual. Both medical school students and graduates may begin the certification process and may apply for the required exams as soon as they meet the eligibility requirements for examination. However, since one of the requirements for ECFMG Certification is that the final medical diploma be verified by ECFMG with the issuing medical school, an IMG cannot complete the certification process until after graduation from medical school. The time required for some aspects of the certification process, such as the time required by a medical school to verify medical education credentials, is beyond the control of ECFMG.

Back to top

Last updated September 13, 2018.
® Registered in the US Patent and Trademark Office.
Copyright © 1996-2019 by the Educational Commission for Foreign Medical Graduates. All rights reserved.

# PETITION
# EXHIBIT 4

EXHIBIT 19

IGBERLASE_1908

# EDUCATIONAL COMMISSION

## for

# FOREIGN MEDICAL GRADUATES

CERTIFIES THAT

— JOHN NOSA AKODA

HAS SATISFIED ALL THE REQUIREMENTS OF THE COMMISSION,

SUCCESSFULLY PASSED ITS EXAMINATIONS

AND HAS BEEN AWARDED THIS CERTIFICATE.

RECEIVED

AUG 1 1 2011

MARYLAND BOARD OF PHYSICIANS

CERTIFICATE NUMBER   0-553-258-5

MEDICAL EXAMINATION

BASIC SCIENCE          JUNE 11, 1997

CLINICAL SCIENCE       AUGUST 28, 1996

ENGLISH EXAMINATION    AUGUST 28, 1996

VALID THROUGH

CERTIFICATE NUMBER
0-553-258-5
ENGLISH EXAMINATION
August 28, 1996

CHAIRMAN, BOARD OF TRUSTEES

PRESIDENT, CHIEF EXECUTIVE OFFICER

DATE ISSUED   AUGUST 18, 1997

# PETITION
# EXHIBIT 5

EXHIBIT 21



RSEY SHORE MEDICAL CENTER
EDICAL CENTER OF OCEAN COUNTY
BRICK AND POINT PLEASANT DIVISIONS
VERVIEW MEDICAL CENTER

**Meridian**
*Health System®*

Friday, August 11, 2000

*via telefax to (215) 386-9196*

*to Bill*

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

www.meridianhealth.com

Rice Holmes
Education Commission for Foreign Medical Graduates
364 Market Street
Philadelphia, PA 19104-2685

**RECEIVED**

IAUG 1 1 2000

ECFMG
AIS

*Personal and Confidential*

Dear Mr. Holmes:

An allegation has been made that a resident at Jersey Shore Medical Center/Meridian Hospitals Corporation who goes by the name of John Charles Akoda (ECFMG certificate # 0-553-258-5 in the name of John Nosa Akoda, issued August 18, 1997) has also served as a resident in two other U.S. residency programs under the name of Oluwafemi Charles Igberasi. On verifying his social security number ( -9065) we have discovered that it was issued to "Charles Igberase". When presented with this information late yesterday, this doctor stated that he has used all of these names and that he has never served in another U.S. ACGME-accredited residency program. The three birth dates given by this individual are 04/17/62, 1/1/63, and 4/17/63.

This request is that you search your files to ascertain whether there may be a second ECFMG certificate issued in the name of Oluwafemi Charles Igberasi (or Ibgerase) or some combination of six names he has given us (John, Nosa, and Akoda being the other three). Also, we would be interested in knowing whether you have had requests for verification of Dr. Akoda AKA Dr. Igberasi's ECFMG certificate(s) status from other teaching hospitals including Harlem Hospital Center in the time period of approx. 1995-96 or JFK Memorial Hospital in 1997-98.

Obviously, we are concerned that we resolve this issue promptly. Your priority attention is requested.

I can be reached by phone at (732) 776-4732. My secretary is Terry Smith, and should I not be available at my private line number as listed, she can be telephoned at (732) 776-4179 in an attempt to reach me.

Thank you in advance for your cooperation.

Very truly yours,

James McCorkel, Ph.D., Vice President, Academic Affairs
Jersey Shore Medical Center, Meridian Hospitals Corporation

ECFMG_RUSS_0000559

# PETITION
# EXHIBIT 6

EXHIBIT 24

John Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

August 29, 2000

RECEIVED
CREDENTIALS DEPT

Mr. William C. Kelly
Manager, Medical Education
Credentials Department/ECFMG
3624 Market Street
Philadelphia, PA 19104

SEP 1 2000

ECFMG

Re: USMILE/ECFMG Identification No. 0-553-258

Dear Mr. Kelly:

I am writing in response to your letter dated August 22, 2000 in which it was alleged that
I took ECFMC under various names. **These allegations are false.** The identification
numbers listed in your letter apparently belong to my cousin Dr. Igberase Oluwafemi
Charles, who left the country to practice, I believe, in South Africa. We are two different
persons who attended two different Colleges of Medicine. However, I did use his social
security number pending INS clearance of my own social security number. I have only
taken the examination in my name, John NOSA Akoda. I will provide you with my
country issued passport (presently submitted for renewal) if you so desire.

Thank you for your assistance with resolving this unfortunate confusion.

Sincerely,

John Akoda, MD

Transfer to Lee

ECFMG-000557

ECFMG_RUSS_0000557

# PETITION EXHIBIT 7

EXHIBIT 25

## EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.
TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

September 27, 2000

Memorandum

To:      File #0-553-258-5
           John Akoda

From:    William Kelly

Dr. Akoda came to the ECFMG office today. He reiterated that he is not "Igberase Charles" and said he was his cousin. He said he did use Charles's social security number.

Akoda provided his original Nigerian passport and Nigerian "international driving permit." I made copies.

Akoda indicated that Jersey Shore Medical Center had suspended him pending outcome of ECFMG's investigation. Akoda asked when his case will be reviewed.

I told him I understood Jersey Shore was conducting its own investigation. I asked him to send me a copy of the letter he received form the hospital.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG-000556

ECFMG_RUSS_0000556

# PETITION
# EXHIBIT 8

EXHIBIT 27



# EDUCATIONAL COMMISSION for FOREIGN MEDICAL GRADUATES

PHILADELPHIA OFFICE

3624 MARKET STREET, PHILADELPHIA, PENNSYLVANIA 19104-2685, U.S.A.

TELEPHONE: 215-386-5900 ● FAX: 215-386-9767 ● INTERNET: www.ecfmg.org

December 22, 2000

**Memorandum**

To:      Stephen S. Seeling, JD

From:    William Kelly

Subject:   Dr. John Akoda, ID No. 0-553-258-5

Attached is a copy of a Memorandum for the file.

This memorandum is being written separately since I did not think it should be made part of the official file.

In my discussion with Dr. McCorkel he indicated he believed Igberase and Akoda were one and the same person. He has no proof, just a strong suspicion. Information he received from an "informant" provided details that led him to believe this.

I also believe Akoda and Igberase are one and the same. However, at this point, the only information that we have for the ECFMG Credentials Committee is Akoda's written statement that he is NOT Igberase, although he did admit in writing that he used Igberase's social security number. He has given us a passport that appears to confirm his identity as John Akoda. I don't think this is enough for the Committee.

Igberase has not replied to my letter. The FedEx letter was returned undelivered. I tried the phone number he listed on his application and was told it was a wrong number (although the correct address). I sent Igberase an email (cfemi@hotmail.com) and who should reply, but Akoda!

Akoda still has a valid ECFMG Certificate. We need to brainstorm on this one. Maybe Shirley Williams (Miss Sherlock) could sit in.

*ECFMG® is an organization committed to promoting excellence in international medical education.*

ECFMG_RUSS_0004160

# PETITION
# EXHIBIT 9

EXHIBIT 30



U.S. Department of Justice

United States Attorney
District of Maryland
Southern Division

| | | |
|---|---|---|
| Kelly O. Hayes | Mailing Address: | Office Location: | DIRECT: 301-344-0041 |
| Assistant United States Attorney | 6500 Cherrywood Lane, Suite 200 | 6406 Ivy Lane, 8th Floor | MAIN: 301-344-4433 |
| Kelly.Hayes@usdoj.gov | Greenbelt, MD 20770-1249 | Greenbelt, MD 20770-1249 | FAX: 301-344-4516 |

October 31, 2016

Peter Goldman, Esq.
O'Reilly & Mark, P.C.
524 King Street
Alexandria, VA 22314

$PNG \ 16-0277$

Re:  United States v. Oluwafemi Charles Igberase,
     a/k/a "Charles John Nosa Akoda,"
     Criminal No. PWG-16-277

Dear Mr. Goldman,

This letter confirms the plea agreement, together with the sealed supplement, which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by November 4, 2016, it will be deemed withdrawn. **The plea agreement is entered into and will be submitted to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).** The terms of the agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty to Count One of the Superseding Indictment now pending against him, which charges him with misuse of a Social Security Account Number, in violation of 42 U.S.C. § 408(a)(7)(B). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: (1) the Defendant falsely represented a number to be the Social Security Account Number assigned to him by the Commissioner of Social Security; (2) the Defendant made that false statement with the intent to deceive or for any other purpose; and (3) the Defendant acted knowingly and willfully.

ECFMG-000011

ECFMG_RUSS_0000011

## Penalties

3.      The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: five years of imprisonment, a fine of $250,000, and a period of supervised release of three years. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.      If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

d.     The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.     If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Indeed, because the Defendant is pleading guilty to the identity fraud charges in this case, and because he is an illegal alien, removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences, even if the consequence is his automatic removal from the United States.

### Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

ECFMG-000013

ECFMG_RUSS_0000013

Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.      The base offense level is 6, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(2).

b.      Pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means and the Defendant intentionally engaged in or caused the conduct constituting sophisticated means, and because the resulting offense level is less than level 12, the offense level is increased to 12.

c.      A 3-level enhancement applies, pursuant to U.S.S.G. § 3B1.3, because the Defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense.

d.      This Office does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. If the Defendant receives a 2-level reduction, the final offense level will be 13.

7.      The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a Career Offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.      This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

Rule 11(c)(1)(C) Plea

9.      The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement, is the appropriate disposition of this case. This agreement does not affect the Court's

4

ECFMG-000014

ECFMG_RUSS_0000014

discretion to impose any lawful fine or to set any additional lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

<u>Obligations of the United States Attorney's Office and the Defendant</u>

10.     At the time of sentencing, the parties will jointly request the Court to accept the **stipulated sentence of six months of imprisonment, followed by three years of supervised release, which includes as a condition of supervised release six months of home confinement.** At the time of sentencing, this Office will move to dismiss all open counts.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

<u>Agreement Not to Prosecute Other Offenses the Defendant May Have Committed</u>

12.     Other than the offense to which the Defendant has agreed to plead guilty, and with the exception of crimes of violence, crimes against children and tax violations, this Office will not prosecute the Defendant for any other violations of federal criminal law that arise from the facts stipulated by the Defendant and this Office, attached hereto and incorporated herein as Attachment A, that form the basis of this plea agreement.

<u>Waiver of Appeal</u>

13.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b.      If the Court accepts this Plea Agreement and imposes the agreed-upon sentence, the Defendant and this Office knowingly waive all rights, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal the sentence imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

5

ECFMG-000015

ECFMG_RUSS_0000015

d.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

14.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Entire Agreement

15.     This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: Kelly O. Hayes
Kelly O. Hayes
Assistant United States Attorney

6

ECFMG-000016

ECFMG_RUSS_0000016

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_11/15/16_
Date

Oluwafemi Charles Igberase
a/k/a "Charles John Nosa Akoda"

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

_11/15/16_
Date

Peter Goldman, Esq.

7

ECFMG-000017

ECFMG_RUSS_0000017

<u>ATTACHMENT A - Stipulated Facts</u>

*The United States and the Defendant stipulate and agree that if this case proceeded to trial, the United States would prove the facts set forth below beyond a reasonable doubt. The parties further stipulate and agree that these are not all of the facts that the United States would prove if this case proceeded to trial.*

In October 1991, the Defendant, **OLUWAFEMI CHARLES IGBERASE** ("**IGBERASE**"), entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, **IGBERASE** applied for and obtained a Social Security number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, **IGBERASE** applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase Jr." and a false date of birth. In September 1998, **IGBERASE**, this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, **IGBERASE** fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, **IGBERASE** submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). **IGBERASE** submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, **IGBERASE** failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is Step 2 of the USMLE. In January 1993, **IGBERASE** again failed the basic medical science (Day 1) component of the FMGEMS. In September 1993, **IGBERASE** failed Step 1 of the USMLE. Eventually, between July 1992 and September 1993, **IGBERASE** passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, **IGBERASE** submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, **IGBERASE** passed all three steps of the USMLE and was issued a second ECFMG certificate under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that **IGBERASE** had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December 1995, ECFMG revoked or suspended both ECFMG certifications assigned to **IGBERASE**.

8

ECFMG-000018

ECFMG_RUSS_0000018

In August 1996, **IGBERASE** submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, **IGBERASE** submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, **IGBERASE**, as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, **IGBERASE** applied for and was accepted into a residency program at Jersey Shore Medical Center ("JSMC"). In 2000, JSMC learned that the SSN that **IGBERASE** used belonged not to "Akoda" but rather to **IGBERASE**. **IGBERASE** was suspended from JSMC's residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, **IGBERASE**, using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at Howard University. In March 2007, Howard University accepted **IGBERASE** into its residency program, and asked **IGBERASE** to submit evidence of legal residence in the United States. In response, **IGBERASE** submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after the completion of his residency at Howard University, **IGBERASE**, using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, **IGBERASE** submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to **IGBERASE** under the name "Charles John Nosa Akoda," and **IGBERASE** began practicing medicine in the field of obstetrics and gynecology.

In 2012, **IGBERASE**, using the "Akoda" identity, sought and obtained medical privileges at Prince George's Hospital Center ("PGHC") in Maryland. To do so, **IGBERASE** submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, **IGBERASE** submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied **IGBERASE**'s application based, in part, on CMS's determination that **IGBERASE** did not provide an accurate SSN.

On June 9, 2016, law enforcement executed search warrants at **IGBERASE**'s residence, medical practice, and vehicle. From **IGBERASE**'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From **IGBERASE**'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

9

ECFMG-000019

ECFMG_RUSS_0000019

Throughout the above-referenced scheme, **IGBERASE** also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

\* \* \*

I have read this statement of facts and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

11/15/16
Date

Oluwafemi Charles Igberase
a/k/a Charles John Nosa Akoda

I am Oluwafemi Charles Igberase's attorney. I have carefully reviewed the statement of facts with him.

11/15/16
Date

Peter Goldman, Esq.

10

ECFMG-000020

ECFMG_RUSS_0000020

# PETITION
# EXHIBIT 10

EXHIBIT 31



**ECFMG**   EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES

3624 Market Street
Philadelphia PA 19104-2685 USA
215-386-5900 | 215-386-9767 Fax
www.ecfmg.org

PERSONAL AND CONFIDENTIAL
VIA E-MAIL: adcfrancis@aol.com

December 19, 2016

John Nosa Akoda
3013 Kasar Ct
Waldorf, MD 20603

Re: USMLE®/ECFMG® Identification No. 0-553-258-5

Dear Mr. Akoda:

I am writing to inform you that the Educational Commission for Foreign Medical Graduates has received a copy of an October 31, 2016 document from the U.S. Department of Justice which outlines a plea agreement between you (under the name Oluwafemi Charles Igberase) and the United States. A copy of this document is enclosed for your reference.

In this document, you in stipulated to a number of facts, including that you applied to ECFMG under the name "John Nosa Akoda" and that you provided a false Nigerian passport to ECFMG.

As you are aware, you had previously obtained two ECFMG Certificates which have both been revoked, as you were determined to have engaged in irregular behavior because you provided false information to ECFMG in order to obtain or attempt to obtain additional ECFMG Certificates. Those revoked ECFMG Certificates were issued under the following names and ECFMG ID numbers:

| Name | ECFMG ID Number |
|------|-----------------|
| Oluwafemi Charles Igberase | 0-482-700-2 |
| Igberase Oluwafemi Charles | 0-519-573-0 |

In addition to the revocation of these ECFMG Certificates, you were permanently barred from ECFMG Certification.

In light of the revocation and permanent bar from ECFMG Certification in your previous ECFMG record and the information received in the October 31, 2016 U.S. Department of Justice letter, specifically that John Nosa Akoda is an alias for Oluwafemi Charles Igberase, the ECFMG Certificate issued to you under the name John Nosa Aokda has been revoked. In accordance with ECFMG procedures, your records have been consolidated under the USMLE/ECFMG Identification number: 0-482-700-2. Please be sure to use this number in all correspondences with ECFMG in the future.

ECFMG_RUSS_0000021

John Nosa Akoda
December 19, 2016
Page 2 of 2

In accordance with procedures, ECFMG will report the revocation of your Standard ECFMG Certificate to the Federation of State Medical Boards of the United States, U.S. state and international medical licensing authorities, directors of graduate medical education programs, and to any other organization or individual who, in the judgment of ECFMG, has a legitimate interest in such information.

If you have any questions or need additional information, please telephone me at (215) 823-2273 or e-mail me at kcorrado@ecfmg.org.

Sincerely,

*Kcorrado*

Ms. Kara Corrado, J.D.
Assistant Vice President for Operations

Encl: As noted.

ECFMG-000022

ECFMG_RUSS_0000022

# PETITION
# EXHIBIT 11

EXHIBIT 32

| IN THE MATTER OF | * | BEFORE THE MARYLAND |
| CHARLES J.N. AKODA, M.D. | * | STATE BOARD OF PHYSICIANS |
| Respondent. | * | Case Number 2017-0083B |
| License Number D73049 | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## FINAL DECISION AND ORDER

### PROCEDURAL HISTORY

On November 15, 2016, Charles J.N. Akoda, M.D., a physician licensed[1] by the Maryland State Board of Physicians ("Board"), entered a plea of guilty to one count of Social Security Account Number Fraud in the United States District Court for the District of Maryland ("U.S. District Court"), in violation of 42 U.S.C. § 408(a)(7)(B). (Case No. PWG-8-16-CR-00277-001). On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00. Dr. Akoda has not filed an appeal of his conviction and the time for filing an appeal has passed.

On April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine, pursuant to section 14-404(b)(2) of the Health Occupations Article, which provides:

> After completion of the appellate process if the conviction has not been reversed or the plea has not been set aside with respect to a crime involving moral turpitude, a disciplinary panel shall order the revocation of a license on the certification by the Office of the Attorney General.

---

[1] Dr. Akoda allowed his license to expire on September 30, 2016. The Board was notified of Dr. Akoda's criminal indictment in August of 2016 and began its investigation prior to the expiration of Dr. Akoda's license. Pursuant to Section 14-403 of the Health Occupations Article, the license of an individual regulated by the Board "may [not] lapse by operation of law while the individual is under investigation . . ." Md. Code. Ann., Health Occ. § 14-403(a) (2014 Repl. Vol.). Therefore, by operation of law, Dr. Akoda's license was not permitted to expire during the pendency of these proceedings.

Attached to the Petition were certified copies of the criminal docket entries, indictment, superseding indictment, plea agreement with stipulated facts, sentencing order, the judgment entered, and a show cause order[2] mandating that Dr. Akoda show cause in writing by May 8, 2017 if there were any reason why his license to practice medicine should not be revoked. To date, the Board has not received a response from Dr. Akoda.

Having reviewed and considered the entire record in these § 14-404(b)(2) proceedings, Panel B issues this Final Decision and Order.

## FINDINGS OF FACT

Panel B finds the following facts by a preponderance of the evidence:

1. Dr. Akoda was originally licensed to practice medicine in the State of Maryland on September 14, 2011, having been issued License Number D73049. Dr. Akoda continuously renewed his license until September 30, 2016 when his license expired.[3]

2. On June 1, 2016, in Case No. PWG-8-16-CR-00277-001, the United States Attorney filed an indictment charging Dr. Akoda[4] with social security account number fraud, 42 U.S.C. § 408(a)(7)(B), and aggravated identity theft, 18 U.S.C. § 1028A(a)(1).

3. On October 19, 2016, in a superseding indictment, Dr. Akoda was charged with an additional count of social security account number fraud, 42 U.S.C. § 408(a)(7)(B); false statement relating to a health care matter, 18 U.S.C. § 1035(a); an additional count of aggravated identity theft, 18 U.S.C. § 1028A(a)(1); and fraud and misuse of an immigration document, 18 U.S.C. § 1546(a).

4. On November 15, 2016, Dr. Akoda pled guilty to social security account number fraud, in violation of 42 U.S.C. § 408(a)(7)(B).[5] The plea agreement was based on the following statement of facts, which Dr. Akoda acknowledged were true and correct:

---

[2] An updated show cause order was mailed to Dr. Akoda on April 6, 2017 with the same response date of May 8, 2017.

[3] As discussed above, because of the Board's continuing investigation of Dr. Akoda throughout these proceedings, his license to practice medicine did not lapse or expire.

[4] The indictment included eleven different names for Dr. Akoda, including Charles John Nosa Akoda, the name under which Dr. Akoda applied for and was granted a license by the Board.

[5] 42 U.S.C. § 408(a)(7)(B) provides: "Whoever . . . for the purpose of causing an increase in any payment authorized under this title (or any other program financed in whole or in part from Federal funds), or for the purpose of causing a payment under this title (or any such other program) to be made when no payment is authorized thereunder, or for the purpose of obtaining (for himself or any other person) any payment or any other benefit to which he (or such

In October 1991, [Dr. Akoda] entered the United States pursuant to a Nonimmigrant Visa.

In November 1991, [Dr. Akoda] applied for and obtained a Social Security Number ("SSN"), XXX-XX-5054 (the "5054 SSN"), using the name "Igberase Oluwafemi Charles" and date of birth April 17, 1962. In January 1995, [Dr. Akoda] applied for and obtained a second SSN, XXX-XX-9065 (the "9065 SSN"), using the name "Charles Oluwafemi Igberase, Jr." and a false date of birth. In September 1998, [Dr. Akoda] this time using the name "Oluwafemi Igberase," and a false date of birth, applied for and obtained a third SSN, XXX-XX-7353 (the "7353 SSN"). In or about 2011, [Dr. Akoda] fraudulently used the 7353 SSN to apply for federal education loans for his children.

In April 1992, [Dr. Akoda] submitted an application for certification by the Educational Commission for Foreign Medical Graduates ("ECFMG"). [Dr. Akoda] submitted the application using the name "Oluwafemi Charles Igberase," and indicated SSN ending in 5054 SSN and date of birth April 17, 1962. ECFMG is an organization which, among other things, provides certification to international medical school graduates before such individuals may enter graduate medical education programs in the United States, where they provide supervised patient care. Foreign medical graduates must obtain ECFMG certification in order to take the three-step United States Medical Licensing Examination ("USMLE"). All medical graduates must pass all three steps of the USMLE in order to obtain an unrestricted license to practice medicine in the United States. In July 1992, [Dr. Akoda] failed both the basic medical science (Day 1) and clinical science (Day 2) components of the Foreign Medical Graduate Examination in Medical Sciences ("FMGEMS"), which is step 2 of the USMLE. Eventually, between July 1992 and September 1993, [Dr. Akoda] passed all three steps of the USMLE and, in October 1993, was issued ECMFG Certification under the name "Oluwafemi Charles Igberase."

In March 1994, [Dr. Akoda] submitted a second application for ECFMG certification, this time under the name "Igberase Oluwafemi Charles," using a false date of birth. Between August 1994 and September 1994, [Dr. Akoda] passed all three steps of the USMLE and was issued a second ECMFG Certification under the name "Igberase Oluwafemi Charles."

In 1995, the ECFMG Committee on Medical Education Credentials became aware that [Dr. Akoda] had fraudulently applied for and obtained two ECFMG certifications under different names and dates of birth. In December

---

other person) is not entitled, or for the purpose of obtaining anything of value from any person, or for any other purpose . . . with intent to deceive, falsely represents a number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person . . . shall be guilty of a felony and upon conviction thereof shall be fined under title 18, United States Code, or imprisoned for not more than five years, or both."

3

1995, ECFMG revoked or suspended both ECFMG certifications assigned to [Dr. Akoda].

In August 1996, [Dr. Akoda] submitted a third application for ECFMG certification, this time using the name "John Nosa Akoda." Along with this third application, [Dr. Akoda] submitted to ECFMG a false Nigerian passport in the name of "John Nosakhane Charles Akoda." Between 1996 and 1998, [Dr. Akoda], as "John Nosa Akoda," passed all three steps of the USMLE and received ECFMG certification under the "Akoda" name.

After receiving ECFMG certification under the "Akoda" name, [Dr. Akoda] applied for and was accepted into a residency program at [Facility A].[6] In 2000, [Facility A] learned that the SSN that [Dr. Akoda] used belonged not to "Akoda" but rather to Igberase. [Dr. Akoda] was suspended from [Facility A's] residency program in August 2000 and ultimately dismissed in November 2000.

In 1999, Individual A applied for and obtained SSN XXX-XX-1623 (the "1623 SSN").

In 2006, [Dr. Akoda], using the name "John-Charles Akoda," and the 1623 SSN assigned to Individual A, applied for residency at [Facility B]. In March 2007, [Facility B] accepted [Dr. Akoda] into its residency program, and asked [Dr. Akoda] to submit evidence of legal residence in the United States. In response, [Dr. Akoda] submitted a false permanent resident card in the name "N. Akoda, John Charles."

In 2011, after completion of his residency at [Facility B], [Dr. Akoda], using the name "Charles John Nosa Akoda" and the 1623 SSN, applied for medical licensure with the Maryland Board of Physicians. In support of this application, [Dr. Akoda] submitted a false permanent residence card, as well as a false Nigerian passport. In September 2011, the Maryland Board of Physicians granted the requested medical license to [Dr. Akoda] under the name "Charles John Nosa Akoda," and [Dr. Akoda] began practicing medicine in the field of obstetrics and gynecology.

In 2012, [Dr. Akoda], using the "Akoda" identity, sought and obtained medical privileges at [Facility C] in Maryland. To do so, [Dr. Akoda] submitted a false permanent residence card, as well as a false Maryland driver's license.

On March 1, 2012, [Dr. Akoda] submitted a Medicare Enrollment Application to the Center of Medicare and Medicaid Services ("CMS") using the "Akoda" identity and the 1623 SSN. CMS denied [Dr. Akoda]'s application based, in part, on CMS's determination that [Dr. Akoda] did not provide an accurate SSN.

---

[6] In order to maintain confidentiality, facility names will not be used in this Order.

On June 9, 2016, law enforcement executed search warrants at [Dr. Akoda]'s residence, medical practice, and vehicle. From [Dr. Akoda]'s vehicle, law enforcement seized a Maryland driver's license in the "Akoda" name. From [Dr. Akoda]'s residence, law enforcement seized (1) a false Social security card for the 1623 SSN in the name "John Charles N. Akoda," (2) a false Nigerian passport for "Akoda," and (3) a false United States visa in the "Akoda" name. Law enforcement also found fraudulent or altered documents related to immigration, medical diplomas, medical transcripts, letters of recommendation, and birth certificates.

Throughout the above-referenced scheme, [Dr. Akoda] also used the 1623 SSN and false documentation to open various bank accounts using the "Akoda" identity.

5.  On March 2, 2017, Dr. Akoda was sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

6.  April 4, 2017, the Office of the Attorney General filed with the Board a Petition to Revoke Dr. Akoda's license to practice medicine pursuant to Health Occ. § 14-404(b)(2).

7.  Dr. Akoda did not appeal his conviction within the time prescribed by law and the guilty plea and conviction have not been set aside.

## CONCLUSIONS OF LAW

Dr. Akoda does not dispute that he pled guilty to a crime involving moral turpitude and has not filed a response to the petition to revoke his license. Panel B makes the following conclusions of law.

Dr. Akoda's plea of guilty to social security account number fraud, a felony, in violation of 42 U.S.C. § 408(a)(7)(B), constitutes a crime involving moral turpitude *per se.* The essential elements of the crime include intent to deceive. Dr. Akoda admitted that he knowingly and willfully falsely represented several different numbers to be the social security number assigned to him with the intent to deceive.

Maryland appellate courts have repeatedly held that if dishonesty, fraud, or intent to deceive is an essential element of a statute under which a defendant is convicted, the crime involves moral turpitude as a matter of law. *See Board of Physician Quality Assurance v.*

5

*Felsenberg,* 351 Md. 288, 295 (1998) (crimes involving fraud are crimes involving moral turpitude); *Attorney Grievance Comm'n v. Klauber,* 289 Md. 446, 457-59, *cert. denied*, 451 U.S. 1018 (1981) (the term "moral turpitude" connotes a fraudulent or dishonest intent); *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 459-60 (1977) (a crime of moral turpitude is characterized by dishonesty, fraud, or deceit); *Oltman v. Maryland State Bd. of Physicians,* 162 Md. App. 453, 485-87, *cert. denied,* 389 Md. 125 (2005) (crime was one of moral turpitude [because] it was dishonest, and characterized by fraud).

It is also settled that "the related group of offenses involving intentional dishonesty for purposes of personal gain are crimes involving moral turpitude." *Oltman,* 162 Md. App. at 486 (citations and quotation marks omitted). By using false social security numbers to open bank accounts, apply for federal education loans for his children and obtain a medical license, Dr. Akoda intended to defraud and deceive the government and Board for purposes of personal financial gain to which he was not entitled. His conduct involved repeated fraud, deceit, and intentional dishonesty for purposes of his own personal gain. The facts underlying Dr. Akoda's criminal offenses, therefore, also establish moral turpitude. *Oltman,* 162 Md. App. at 486.

In the instant case, Dr. Akoda was convicted of social security number fraud, in violation of 42 U.S.C. § 408(a)(7)(B). Dr. Akoda was intentionally dishonest in committing an act of willful deception on a massive scale for a prolonged duration of time for purposes of his own personal financial gain. Panel B concludes that Dr. Akoda was convicted of a crime involving moral turpitude and the time for filing an appeal has passed, thus the revocation of Dr. Akoda's license to practice medicine is required under Health Occ. § 14-404(b)(2).

## ORDER

It is, on the affirmative vote of a majority of the quorum of Disciplinary Panel B, hereby

**ORDERED** that the medical license of Charles J.N. Akoda, M.D., license number **D73049,** is **REVOKED,** as mandated by Health Occ. §14-404(b)(2); and it is further

**ORDERED** that this final decision and order is a **PUBLIC DOCUMENT**.

07/10/2017
Date

Christine A. Farrelly, Executive Director
Maryland State Board of Physicians

## NOTICE OF RIGHT TO PETITION FOR JUDICIAL REVIEW

Pursuant to Md. Code Ann., Health Occ. § 14-408, Dr. Akoda has the right to seek judicial review of this Final Decision and Order. Any petition for judicial review shall be filed within thirty (30) days from the date of mailing of his Final Decision and Order. The cover letter accompanying this final decision and order indicates the date the decision is mailed. Any petition for judicial review shall be made as provided for in the Administrative Procedure Act, Md. Code Ann., State Gov't § 10-222 and Title 7, Chapter 200 of the Maryland Rules of Procedure.

If Dr. Akoda files a petition for judicial review, the Board is a party and should be served with the court's process at the following address:

> **Maryland State Board of Physicians**
> **Christine A. Farrelly, Executive Director**
> **4201 Patterson Avenue**
> **Baltimore, Maryland 21215**

Notice of any petition should also be sent to the Board's counsel at the following address:

> **Stacey M. Darin**
> **Assistant Attorney General**
> **Department of Health and Mental Hygiene**
> **300 West Preston Street, Suite 302**
> **Baltimore, Maryland 21201**

# PETITION
# EXHIBIT 12

EXHIBIT 45



Deposition of:

# Kara Corrado

*September 10, 2019*

In the Matter of:

# Russell, Monique  Vs. Educational Commission For Foreign Medical Graduates

Veritext Legal Solutions

888.777.6690 | cs-midatlantic@veritext.com | 215-241-1000

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                    - - -
 4   MONIQUE RUSSELL, JASMINE :  Case No.
     RIGGINS, ELSA M. POWELL   :
 5   AND DESIRE EVANS,         :  2:18-cv-05629-JW
                               :
 6           Plaintiffs,       :
                               :
 7        vs.                  :  Hon. Joshua D. Wolson
                               :
 8   EDUCATIONAL COMMISSION    :
     FOR FOREIGN MEDICAL       :
 9   GRADUATES,                :
                               :
10           Defendant.        :
11                    - - -
12              September 10, 2019
13                    - - -
14        Oral deposition of KARA CORRADO, taken
15    at the offices of MORGAN LEWIS BOCKUS, LLP,
16   1701 Market Street, Philadelphia, Pennsylvania
17       beginning at 10:48 a.m., before
18    Jennifer L. McDonald, a Professional Reporter
19   and a Notary Public in and for the Commonwealth
20               of Pennsylvania.
21                    - - -
22     VERITEXT NATIONAL COURT REPORTING COMPANY
                MID-ATLANTIC REGION
23         1801 Market Street - Suite 1800
           Philadelphia, Pennsylvania 19103
24
```

Page 2

1 A P E A R A N C E S :
2
    JANET, JANET, & SUGGS, LLC
3 BY: PATRICK A THRONSON, ESQ
    Executive Centre At Hooks Kane
4 4 Reservoir Circle Suite 200
    Baltimore, Maryland 21208
5 (410) 653-3200
    PThronson@JJSjustice com
6 Representing the Plaintiff
7 MORGAN LEWIS & BOCKUS LLP
    BY: ELISA P McENROE, ESQ
8 1701 Market Street
    Philadelphia, Pennsylvania 19103
9 (215) 963-5176
    elisa mcenroe@morganlewis com
10 Representing the Defendant ECFMG
11 SCHOCHOR FEDERICO & STATON, P A
    BY: BRENT CERYES, ESQ
12 1211 St Paul Street
    Baltimore, Maryland 21202
13 (410) 234-1000
    bceryes@sfspa com
14 Representing the Plaintiff Monique Russell
15
    LAW OFFICES OF PETER G ANGELOS
16 BY: PAUL M VETTORI, ESQ
    One Charles Center
17 100 N Charles Street, 22nd Floor
    Baltimore, Maryland 21201
18 (410) 649-2000
    pvettori@lawpga com
19 Representing the Plaintiff Jasmine Riggins
20
21
22
23
24

Page 4

1       DEPOSITION SUPPORT INDEX
2
3 DIRECTION TO WITNESS NOT TO ANSWER
4 Page   Line
5    8    12
6   235   13
7
8 REQUEST FOR PRODUCTION OF DOCUMENTS
9 Page   Line    Description
10  71   10 Table of contents
11  126  21 Diplomas
12
13 STIPULATIONS
14 Page   Line
15   5    1
16
17
18 QUESTIONS MARKED
19 Page   Line
20 None
21
22
23
24

Page 3

1           I N D E X
2           - - -
3 Testimony of:  KARA CORRADO
4 By Mr. Thronson              5, 247
5 By Ms. McEnroe                  238
6
7
8           - - -
9        E X H I B I T S
10          - - -
11 EXHIBIT NUMBER  DESCRIPTION     PAGE MARKED
12
13 CORRADO-1 Notice of Deposition          7
14 CORRADO-2 Credential procedures draft    67
15 CORRADO-3 Email 8-6-18           94
16 CORRADO-4 Email 1-17-18          112
17 CORRADO-5 University of Benin documents   216
18 CORRADO-6 Email 2-12-18          227
19 CORRADO-7 Letter dated 8-29-2000      238
20 CORRADO-8 Email 11-27-17          252
21 CORRADO-9 Email 11-28-16          255
22
23          - - -
24

Page 5

1           (It is hereby stipulated and
2    agreed by and between counsel that
3    sealing, certification and filing are
4    waived; and that all objections, except
5    as to the form of the question, are
6    reserved until the time of trial.)
7           - - -
8           KARA CORRADO, after having been
9    first duly sworn, was examined and
10   testified as follows:
11          - - -
12          DIRECT EXAMINATION
13          - - -
14 BY MR. THRONSON:
15   Q.      Would you please state your
16 name?
17   A.      Kara Corrado.
18   Q.      Ms. Corrado, my name is Patrick
19 Thronson.  I'm an attorney representing the
20 plaintiffs in a lawsuit that's been brought
21 against ECFMG.  We met briefly before the
22 deposition, and I appreciate you being here
23 today.
24          As I understand it, you are here

KARA CORRADO

Page 6

1 as a representative of ECFMG?
2      A.      Yes, that's correct.
3      Q.      You're providing testimony today
4 in the capacity of a representative of ECFMG?
5      A.      Yes.
6      Q.      So for clarity sake, I will try
7 to refer, ask questions as refer to ECFMG, but
8 if I happen to say "U" or something like that,
9 if you could just interpret that as referring
10 to ECFMG I'd appreciate that?
11      A.      Yes.
12      Q.      Do you work at ECFMG?
13      A.      Yes.
14      Q.      Can you tell us what ECFMG
15 stands for?
16      A.      Educational Commission for
17 Foreign Medical Graduates.
18      Q.      What is your position there?
19      A.      I'm the Vice President for
20 Operations.
21      Q.      Is it fair to say you're an
22 officer of ECFMG?
23         MS. McENROE:  Objection to form.
24         You can answer, if you know.

Page 7

1         THE WITNESS:  I don't know.
2 BY MR. THRONSON:
3      Q.      Is vice president of ECFMG
4 considered an officer of ECFMG?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  I am an executive
7      at ECFMG.
8 BY MR. THRONSON:
9      Q.      You understand that ECFMG is
10 responsible for producing a witness today who's
11 prepared to testify as to all of the matters
12 that were designated in the notice of
13 deposition?
14      A.      Yes.
15      Q.      Let me provide that to you.
16         MR. THRONSON:  We'll mark this.
17              - - -
18         (Whereupon the document was
19      marked, for identification purposes, as
20      Exhibit Number CORRADO-1.)
21              - - -
22 BY MR. THRONSON:
23      Q.      Ms. Corrado, you've seen this
24 notice before?

Page 8

1      A.      Yes.
2      Q.      Do you have full authority to
3 speak on behalf of ECFMG with respect to the
4 matters of inquiry that are identified within
5 the notice?
6         MS. McENROE:  Objection to form.
7         THE WITNESS:  Yes.
8 BY MR. THRONSON:
9      Q.      Who designated you to testify
10 today?
11         MS. McENROE:  Objection to form,
12      and I instruct her not to answer to the
13      extent it reveals conversations with
14      counsel on the basis of privilege.
15 BY MR. THRONSON.
16      Q.      Let me ask it this way:  Did
17 anyone at ECFMG designate you or make the
18 decision that you would be designated as a
19 representative of ECFMG to testify today?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  Representing ECFMG
22      at proceedings like this is part of my
23      job duties.
24 BY MR. THRONSON:

Page 9

1      Q.      Did you confer with anyone at
2 ECFMG who made the decision to have you
3 designated as a corporate representative today?
4         MS. McENROE:  Objection to form.
5         THE WITNESS:  I spoke with my
6      senior vice president.
7 BY MR. THRONSON:
8      Q.      Who's that?
9      A.      Lisa Cover.
10      Q.      Did she make that decision?
11         MS. McENROE:  Objection to form.
12         THE WITNESS:  I don't know.
13 BY MR. THRONSON:
14      Q.      What did you all talk about?
15      A.      I told her I had a deposition
16 today.
17      Q.      What did she say?
18      A.      Okay.
19      Q.      Did you talk about your
20 testimony at all?
21      A.      No.
22      Q.      Did you talk about the notice of
23 deposition at all?
24      A.      Other than the fact that it

3 (Pages 6 - 9)

KARA CORRADO

Page 10

1  existed, no.
2      Q.     You are aware that the answers
3  you give to my questions today will be binding
4  upon ECFMG?
5          MS. McENROE:  Objection to form;
6  calls for a legal conclusion.
7          You may answer.
8          THE WITNESS:  Yes.
9  BY MR. THRONSON:
10     Q.    Do you agree to have your
11 answers to my questions be binding upon ECFMG?
12         MS. McENROE:  Objection to form;
13 calls for a legal conclusion.
14         THE WITNESS:  Yes.
15 BY MR. THRONSON:
16     Q.    Can you describe your current
17 job responsibilities?
18     A.    As I said, I'm the Vice
19 President for Operations.  In that role I
20 oversee a number of ECFMG's programs and
21 services which include our international
22 credential services which is known as EPIC; our
23 ECFMG certification program; our medical
24 education resources team, which is a team that

Page 11

1  reviews and contacts medical schools; and our
2  special investigations team, and I'm
3  responsible for -- as the staff for our
4  irregular behavior proceedings at ECFMG.
5      Q.    When you say you oversee EPIC,
6  does that mean that you oversee credentialing
7  and primary-source verification of -- strike
8  that.
9          When you say that you oversee
10 EPIC, does that apply to the certification
11 process as a whole?
12     A.    Yes.  So it does apply to
13 ECFMG's primary-source verification of
14 credentials.
15     Q.    So it's fair to say that you
16 oversee the primary-source verification
17 function of ECFMG?
18     A.    Yes.
19     Q.    How long have you held that
20 responsibility?
21     A.    I have been responsible for some
22 of the programs that have primary-source
23 verification in them for -- I'm sorry, I have
24 to think about it for a second -- about seven

Page 12

1  or eight years, and within the last two years,
2  I assumed responsibility for all of the lines
3  of service that we have that use primary-source
4  verification.
5      Q.    Who was your predecessor in that
6  role in terms of overseeing the primary-source
7  verification function at ECFMG?
8      A.    So our structure is a little bit
9  different than it had been in the past, but my
10 prior direct supervisor was William Kelly.
11     Q.    How has your structure changed?
12         MS. McENROE:  Objection to form.
13 BY MR. THRONSON:
14     Q.    As you refer to?
15     A.    There are a number of new
16 departments and new lines of services.  So we
17 have a senior vice president now, when we only
18 had a vice president of operations in the past.
19     Q.    You are a senior vice president?
20     A.    I'm a vice president.
21     Q.    You're a vice president, okay.
22 The senior vice president was Lisa Cover?
23     A.    Is Lisa Cover.
24     Q.    Is Lisa Cover, okay.  You

Page 13

1  mentioned another -- commission in responsible
2  for primary-source verification and the medical
3  education resource team, special investigations
4  team, and also you're responsible as staff for
5  the irregular behavior; is that right?
6      A.    Yes, that's right.
7      Q.    I think there was one more that
8  I missed?  As if that wasn't enough.
9      A.    Maybe the ECFMG certification
10 program that's generally the areas of
11 responsibility that I have.
12     Q.    How would you distinguish your
13 responsibilities in the ECFMG certification
14 program from your responsibilities in
15 overseeing the primary-source verification of
16 ECFMG?
17     A.    How do I distinguish them?
18     Q.    I guess, how are they different,
19 or are they different?
20     A.    The primary-source verification
21 that we do for medical education credentials is
22 the same process regardless of the service that
23 we are doing primary-source verification for.
24 So the process that we use in the ECFMG

4 (Pages 10 - 13)

1 certification program, is the same process that
2 the team that is working on our international
3 credential services, it is the same process.
4     Q.    How long have you overseen the
5 ECFMG certification program?
6     A.    Since -- it's about seven or
7 eight years. Since around -- I'm sorry, let me
8 think about it. No, it's about four or five
9 years.
10     Q.    Who was your predecessor in that
11 role?
12     A.    That would have been William
13 Kelly.
14     Q.    You mentioned also the medical
15 education resource team, can you describe that
16 responsibility for me?
17     A.    Yes. That team is the team that
18 communicates with medical schools and
19 hospitals, institutions around the world to
20 collect information that we use in our
21 primary-source verification.
22     Q.    What kind of information?
23     A.    They will reach out to the
24 medical school officials to determine who are

1 the officials of the school, who's the dean,
2 what their signatures look like, what the
3 school seal looks like, and to ask any
4 questions about the medical education at that
5 school; any questions that we may have, that
6 our staff may have.
7     Q.    About how often does the medical
8 education resources team reach out to an
9 individual school to update information about
10 deans, seals, signatures, that kind of thing?
11     A.    So they reach out on an ad hoc
12 basis depending upon the circumstances. So if
13 it's a new school and we don't know who the
14 officials are, then we, as part of the process
15 of adding a new school, will reach out to get
16 the list.
17         If we receive forms that are
18 signed by an official of the school that has
19 the same title as someone on the list, we will
20 reach out to the school to see if that -- if
21 it's the dean, has the dean been replaced, and
22 get an updated contact information.
23     Q.    Does that occur every time you
24 receive an application from an ECFMG candidate

1 for certification?
2     A.    Only if the school -- sorry, do
3 you mean, do we reach out to determine who the
4 officials are every time we get an application?
5     Q.    Right.
6     A.    Okay. So, no. Only if the
7 school is a new school. So if we don't already
8 have the information on file, then we will
9 reach out. If you are an applicant from a
10 school and we've already seen hundreds of
11 classmates of yours, then we don't reach out to
12 the school again because we know who the
13 responsible parties are.
14     Q.    How does ECFMG become aware if
15 there's been a change of deans at a school?
16     A.    We become aware in a variety of
17 ways. Sometimes there are many schools that
18 will reach out to us proactively because they
19 know we would ask for that information.
20         As I mentioned earlier,
21 sometimes we will see there is a new signatory
22 on a form and before we can accept it, we will
23 clarify with the school if there's been a
24 change; and occasionally, periodically we will

1 send out a request to the school if we haven't
2 had an update or if there's some other reason
3 that the coordinator is reaching out to the
4 school. They may notice the list is five years
5 old and while they are reaching out to ask
6 another question, they may ask is everything
7 up-to-date.
8     Q.    What does the special
9 investigations team do?
10     A.    The special investigations team
11 handles the review of investigation into
12 irregular behavior and also requests for
13 exceptions to ECFMG. They are also responsible
14 for reviewing any potential matches to the
15 specially designated national list which is the
16 department of treasury for OFAC.
17     Q.    Just skipping back, how long has
18 the medical education resources team existed?
19     A.    It has existed as a department
20 for about four years.
21     Q.    Prior to its existence as a
22 department, was there any other department that
23 performed all of the functions that the medical
24 education resources team currently performs?

KARA CORRADO

Page 18

1    A.    Yes. The department that
2 processed applications for examinations and for
3 ECFMG certification they would do the same type
4 of reach out to medical schools.
5    Q.    Why was -- why the change in
6 organizational structure to create a separate
7 medical education resources team?
8         MS. McENROE: Objection to form.
9         You may answer.
10        THE WITNESS: In our
11    credentialing verification services over
12    probably the last five years or so, we
13    have increased the number of regulatory
14    authorities that use our services. In
15    doing that, we've increased the volume
16    and it became apparent to us that we
17    needed to have individuals fully focused;
18    their whole job would be to communicate
19    with medical schools and to get
20    information from them.
21 BY MR. THRONSON:
22    Q.    How long has that special
23 investigations team existed?
24    A.    The special investigations team

Page 19

1 has existed as the department of special
2 investigations for about the same amount of
3 time, four to five years.
4    Q.    Why did it come to be?
5         MS. McENROE: Objection to form.
6         THE WITNESS: So, similar to the
7    answer that I just gave you about the
8    medical education resources team, we
9    increased our volume of credentials that
10    we are verifying and exponentially that
11    would increase the number of
12    investigations that we would need to do.
13        So there wasn't a department
14    called special investigations prior to
15    that time, however, there were personnel
16    assigned to the same type of work.
17 BY MR. THRONSON:
18    Q.    So obviously in this case as you
19 probably know we're talking about a period of
20 time from 1992 to 2017, in terms of conduct and
21 issues that are the focus of the case. You are
22 aware of that?
23    A.    Yes.
24    Q.    Do you know over that period of

Page 20

1 time any individuals who were responsible for
2 the functions of the special investigations
3 team?
4    A.    Yes.
5    Q.    Who were they?
6    A.    They were William Kelly and
7 Steve Seeling. That would have been sometime
8 around '98 that Steve would have had oversight
9 as he was the vice president of operations.
10        Bill, or Bill Kelly, he was
11 responsible, as far as I know, during that time
12 period from '92 to -- well, to 2016 I think,
13 when he retired. So he was involved in that
14 process during that time period.
15    Q.    Any other individuals you know
16 that were involved, that had a special
17 investigative team type role from 1992 to the
18 time in which the special investigations team
19 as a department was created?
20    A.    Yes. So I started working on
21 those types of cases in 2008. In a similar
22 role that my special investigations team does
23 now.
24        MR. VETTORI: I didn't hear --

Page 21

1         THE WITNESS: 2008.
2         MR. VETTORI: Thank you, very
3    much.
4         THE WITNESS: Now, we have
5    Virginia Kesting who is currently in the
6    special investigations department. She
7    was working on those types of cases
8    probably from around 2001, around that
9    time period; and there was another woman
10    prior to that who is long retired who did
11    administrative work in coordinating the
12    meetings of the medical education
13    credentials committee.
14 BY MR. THRONSON:
15    Q.    Do you remember her name?
16    A.    Her name was Connie. I don't
17 remember her last name, I'm sorry.
18    Q.    That's fine. Anybody else?
19    A.    Not that I'm aware of.
20    Q.    Have you been deposed before?
21    A.    About this or in general?
22    Q.    Yes.
23    A.    No, I don't think so.
24    Q.    Have you testified at trial

6 (Pages 18 - 21)

KARA CORRADO

Page 22

1 before?
2      A.      Yes.
3      Q.      How many times?
4      A.      I testified before a grand jury.
5 Is that what you're asking about?
6      Q.      Any type of court proceeding?
7      A.      So twice, I think.
8      Q.      So you testified; one time was
9 before a grand jury?
10     A.      Yes.
11     Q.      Did that involve this case?
12     A.      No.
13     Q.      What type of matter generally
14 did it involve?
15             MS. McENROE:  Objection.  Just
16 to preserve the record and make sure -- I
17 don't know what sort of instructions you
18 were provided in conjunction with the
19 Grand Jury and whether the subject of it
20 is allowed to be public or not.
21             So I just want to make sure that
22 you are comfortable with providing the
23 responses to the questions that you've
24 been asked.

Page 23

1             THE WITNESS:  Okay.
2             MS. McENROE:  If you're not, you
3 don't have to.
4             THE WITNESS:  Okay.
5             MR. THRONSON:  Usually grand
6 jury secrecy doesn't apply to the
7 witness.
8             MS. McENROE:  She also just
9 testified it has nothing to do with this
10 case.
11            THE WITNESS:  I don't remember
12 what the instructions were.  It was a
13 long time ago.
14 BY MR. THRONSON:
15     Q.      Was it a matter that was similar
16 at all to this case?
17     A.      No.
18     Q.      Did it involve ECFMG
19 certification of a physician?
20     A.      No.
21     Q.      You mentioned another matter
22 that you testified in, what was that?
23     A.      That was a preliminary
24 injunction hearing.

Page 24

1      Q.      What type of matter?
2      A.      That is related to -- it's a
3 matter regarding a medical school.
4      Q.      Had you provided any other
5 testimony under oath besides on those two
6 occasions and our conversation today?
7      A.      No.  Not that I can recall.
8      Q.      Have you ever reviewed any
9 matters as an expert witness?
10     A.      No.
11     Q.      Did you prepare for the
12 deposition today?
13     A.      In what way?  Sorry.
14     Q.      I guess, let me ask this.  I'm
15 sure you did.  How did you prepare for the
16 deposition today?
17     A.      I looked over the documents.
18     Q.      Which documents?
19     A.      The legal documents and also the
20 bunch of documents from the file.
21     Q.      The legal documents mean filings
22 in this case?
23     A.      Yes.
24     Q.      To your knowledge, did all the

Page 25

1 documents that you reviewed to the best of the
2 your recollection have a Bates stamp on them?
3      A.      Yes, to the best of my
4 recollection.
5      Q.      Did you review any material that
6 you're aware that a privilege is being asserted
7 regarding...
8             MS. McENROE:  Objection to form.
9             MR. THRONSON:  Let me ask that
10     differently.
11 BY MR. THRONSON:
12     Q.      Did you review any information
13 that is privileged or that ECFMG might assert a
14 claim of privilege about?
15     A.      Not that I can recall.
16     Q.      About how many hours did you
17 spend reviewing today -- preparing for the
18 deposition today?  Sorry.
19     A.      Probably around eight.
20     Q.      Did you do anything else besides
21 review the documents in preparation for the
22 deposition today?
23     A.      No.
24     Q.      Just to cover my bases.  Did you

7 (Pages 22 - 25)

Case 2:18-cv-05629-JDW Document 112 Filed 04/06/2020 Page 93 of 341

KARA CORRADO

Page 26

1 speak with anyone about the deposition today?
2    A.    Yes.
3    Q.    Who did you speak to?
4    A.    Elisa and Matthew.
5    Q.    Anybody else?
6    A.    No.
7    Q.    I guess you had a brief
8 conversation with Lisa Cover?
9    A.    Oh, yes. I mean with respect to
10 I'm not going to be at work today because I
11 have a deposition.
12    Q.    Anyone else besides her at
13 ECFMG?
14    A.    I probably told -- my admin
15 probably told the team I was at a deposition
16 today.
17    Q.    So the only people you spoke to
18 about the substance of the deposition were
19 counsel for ECFMG at Morgan Lewis?
20    A.    Yes.
21    Q.    Did you learn any facts from
22 counsel that you weren't aware of in your
23 review of the documents or your experience
24 regarding the matters that are an issue in this

Page 27

1 case?
2        MS. McENROE: Objection to form.
3    I'll just caution you not to devil with
4    privileged information. Counsel is
5    specifically asking about facts you may
6    have learned, as opposed to advice or
7    substantive input or whatnot, guidance.
8        MR. THRONSON: Exactly.
9        THE WITNESS: So there were no
10    new facts that I learned.
11 BY MR. THRONSON:
12    Q.    About how much time did you
13 spend with Counsel in preparation for the
14 deposition today?
15    A.    About the same amount of time,
16 maybe a little bit less.
17    Q.    Same amount of time?
18    A.    I'm sorry. As I answered
19 previously, in looking over the document.
20    Q.    So you spent about 8 hours
21 reviewing documents --
22    A.    And about 7 maybe with Counsel.
23    Q.    Okay. Did anyone provide you
24 any information in writing regarding subjects

Page 28

1 that are -- I guess in preparation for the
2 deposition today?
3    A.    I'm sorry. Can you say that
4 again?
5    Q.    You mentioned you didn't speak
6 with anyone other than Counsel about the
7 substance of the deposition. Did you
8 correspond with anyone in writing about the
9 substance of the deposition?
10    A.    No.
11    Q.    Do you believe that everything
12 possible has been done to investigate and
13 gather all information known or reasonably
14 available to ECFMG to respond fully and
15 completely to the matters of inquiry listed on
16 the notice of deposition?
17        MS. McENROE: Objection to form.
18        THE WITNESS: Yes, that's my
19    understanding.
20 BY MR. THRONSON:
21    Q.    To ensure that a court and jury
22 would have all the information available for it
23 to make a determination of the facts on the law
24 in this case, do you think anything else could

Page 29

1 have been done to gather information relevant
2 to this case?
3        MS. McENROE: Objection to form.
4 BY MR. THRONSON:
5    Q.    Relevant to the matters of
6 inquiry in the notice of deposition?
7        MS. McENROE: Objection to form.
8        THE WITNESS: Not that I'm aware
9    of.
10 BY MR. THRONSON:
11    Q.    Are there any documents that you
12 believe have not been made available to the
13 plaintiffs?
14    A.    No.
15    Q.    What has been your involvement
16 in the litigation so far apart from testifying
17 today?
18        MS. McENROE: Objection to form;
19    just insofar it could divulge privileged
20    communications, but separate from that
21    you may answer in terms of the nuts and
22    bolts of things you might have done.
23        THE WITNESS: For the
24    litigation?

8 (Pages 26 - 29)

Case 1:18-cv-05629-Document-12 Page 94 Filed Date Filed: 04/06/2020/070

Page 30

1          MR. THRONSON: Right.
2          THE WITNESS: So I have not been
3   involved other than helping to produce
4   documents, locating the file, organizing,
5   those types of things.
6   BY MR. THRONSON:
7      Q.    I believe you may have assisted
8   in providing answers to interrogatories?
9      A.    Yes.
10     Q.    Did you help in drafting the
11  answer to the Complaint or providing
12  information regarding the answer to the
13  Complaint?
14     A.    Yes.
15     Q.    When did you first become aware
16  of the lawsuit?
17     A.    So I can't remember the date,
18  but right around at time the information was
19  provided to ECFMG.
20     Q.    Is that lawsuit the only claim
21  that you are aware of that has been asserted or
22  that you're aware of as a potential claim
23  against ECFMG regrading the conduct of Igberase
24  Akoda?

Page 31

1      A.    I am not aware of any other
2   litigation that ECFMG is involved in.
3      Q.    Are you aware of any other
4   litigation that ECFMG is involved in regarding
5   the allegations that ECFMG negligently
6   performed it's function in terms of
7   primary-source verification of a physician or
8   something similar?
9          MS. McENROE: Objection to form.
10         THE WITNESS: No, not that I'm
11  aware of.
12  BY MR. THRONSON:
13     Q.    Are you aware of any claim in
14  the past that's been asserted against ECFMG
15  regarding, alleging, that ECFMG negligently
16  certified an international medical graduate?
17         MS. McENROE: Objection to form.
18         THE WITNESS: Not that I'm aware
19  of.
20  BY MR. THRONSON:
21     Q.    Could you give me your
22  educational background since high school?
23     A.    I have a bachelors degree in
24  international relations with a minor in Eastern

Page 32

1   European studies and Russian from Saint Joe's
2   University in Philadelphia. I also have a law
3   degree from Temple University and a Master of
4   Liberal Arts from the University of
5   Pennsylvania.
6      Q.    When did you get your law
7   degree?
8      A.    2007.
9      Q.    Your MLA what is that?
10     A.    The master of liberal arts?
11     Q.    Right.
12     A.    Which school or...
13     Q.    I guess was it for writing or --
14     A.    It's a liberal arts master
15  degree so it covered a variety of essentially
16  electives in college of general studies at the
17  University of Pennsylvania so there is no
18  specific major or focus in the degree.
19     Q.    Why did you pursue that degree?
20     A.    I pursued that degree shortly
21  after I graduated from Saint Joe's because I
22  was not sure what I wanted to do in terms of
23  continuing my education; and to be perfectly
24  honest with you, the program was easy and you

Page 33

1   didn't have to take GREs to get into it and I
2   thought it would look good on my resume if I
3   had a degree from the University of
4   Pennsylvania.
5      Q.    That sounds great. What jobs
6   have you held since you graduated from college?
7      A.    So I starting working at ECFMG
8   two months after I graduated from college.
9      Q.    What year was that?
10     A.    1998.
11     Q.    Okay.
12     A.    I left because I moved in 1999,
13  and I worked at Gucci as a sales associate, and
14  then I came back to Philadelphia in 2001 and
15  started working at ECFMG again in May of 2001
16  until now.
17     Q.    Do you know approximately when
18  you left ECFMG?
19     A.    September 1999.
20     Q.    Was there any other reason other
21  than your relocation?
22     A.    No.
23     Q.    Why did you decide to come back?
24     A.    Because my wedding was called

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 34

1 off so I came back to Philadelphia, to home.
2      Q.      Can you tell me what your
3 positions were at ECFMG both before and after;
4 I guess in your initial employment and then
5 your second?
6      A.      Yes. I was hired as an
7 applicant information services representative.
8 Then when I came back -- I got that job and
9 that's what I left in 1999 as.
10            When I came back in 2001, I got
11 the same job back as an applicant information
12 services representative. I was promoted in
13 that same department to a senior advisor, I
14 think the title was.
15            Then I was assistant manager of
16 the credentials department, and I was assistant
17 manger of the registration and credentials
18 department. Then I was the manager of the
19 operations program development department.
20 Then I became director of credentialing
21 services. Then assistant vice president for
22 operations, and then vice president for
23 operations.
24      Q.      Can you remind me of about when

Page 35

1 you became director of credentialing services?
2      A.      Around 2013.
3      Q.      Before that, it sounds like you
4 had some supervisory authority over the
5 credentialing functioning at ECFMG. When did
6 you -- I guess you started out in terms of a
7 managerial type role as an assistant manager of
8 the credentials department?
9      A.      That's correct.
10      Q.      When did that happen?
11      A.      2004.
12      Q.      Then can you kind of give me the
13 years, I guess, between 2004 and 2013 as to
14 when your positions changed?
15      A.      Sure. 2004 to 2005 it was about
16 one year I was the assistant manager of the
17 credentials department. Then the registration
18 department and the credentials department
19 merged so I became the assistant manager of the
20 merged departments which was registration and
21 credentials.
22            Then in 2008 I became the
23 manager of the operations program development,
24 and then around 2013 I became director of

Page 36

1 credential services -- I'm sorry, assistant
2 vice president in 2015 or '16. And then vice
3 president in 2018; give or take.
4      Q.      Understood. Understood. You
5 mentioned earlier one other job responsibility
6 that you were responsible as staff with respect
7 to the irregular behavior function of ECFMG.
8 Is that a fair way to describe it?
9      A.      Yes.
10      Q.      Can you tell me what your role
11 is there?
12      A.      My role is to run the, from a
13 staff perspective, I run the administrative
14 hearing that we have at our board of trustees
15 which is the medical education credentials
16 committee.
17            I'm responsible for sending out
18 charges of irregular behavior. So I have
19 oversight of the team that are doing the
20 investigations, the letters go out under my
21 name; and that also includes exceptions,
22 requests for exceptions to our policies, that
23 committee hears both types of matters.
24      Q.      How long have you held that

Page 37

1 position?
2      A.      About four years in running the,
3 you know, in direct oversight in running the
4 administrative hearing.
5      Q.      Who preceded you in that role?
6      A.      That was Bill Kelly.
7      Q.      Is there anyone that works
8 alongside of you as staff in irregular behavior
9 function?
10      A.      So alongside you mean, has the
11 same responsibilities or works --
12      Q.      Is there any other staff?
13      A.      Yes. The special investigations
14 department.
15      Q.      You may have told me this, I'm
16 sorry, but who else works in the special
17 investigations department?
18      A.      There's a manager, Scott Mealey,
19 and there are three case managers.
20      Q.      Can you spell Mr. Mealey's name?
21      A.      Yes, M-e-a-l-e-y.
22      Q.      Who are the three case managers?
23      A.      Virginia Kesting, Rosemary
24 Carlin, and Svetlana Gridneva.

10 (Pages 34 - 37)

KARA CORRADO

Page 38

1    Q.    Is the medical education
2  credentials committee a committee of the board
3  above trustees?
4    A.    Yes, it's a subcommittee.
5    Q.    So its membership is comprised
6  entirely of members of the board of trustees?
7        MS. McENROE:  Objection to form.
8        THE WITNESS:  Yes.
9  BY MR. THRONSON:
10   Q.    About how long has that
11 committee existed?
12   A.    Since about 1986.
13   Q.    Before your current, I guess,
14 managerial role in overseeing the irregular
15 behavior function, did you work as staff with
16 respect to that function at ECFMG?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  Yes.
19 BY MR. THRONSON:
20   Q.    What roles did you have in that;
21 is it a department of ECFMG?
22       MS. McENROE:  Objection to form.
23       THE WITNESS:  So the special
24   investigations is a department.  Prior to

Page 39

1    special investigations and the addition
2    of case managers, it fell under the
3    purview of the associate vice president,
4    who was Bill Kelly, and I, at the time, a
5    manager of operations program
6    development.
7        So Bill, myself, and Virginia
8    Kesting, who reported to me, we were the
9    folks working on the irregular behavior.
10   So in that respect when I was working for
11   Bill, I was staff.
12 BY MR. THRONSON:
13   Q.    When did you get involved in
14 work on irregular behavior matters?
15   A.    That was around 2008 when I
16 moved -- changed position.
17   Q.    So the staff for the irregular
18 behavior is part of the special investigations
19 team?
20   A.    That is the special
21 investigations team now, yes.
22   Q.    Okay.  Got it.  How does ECFMG
23 serve the public?
24       MS. McENROE:  Objection to form.

Page 40

1        THE WITNESS:  ECFMG serves the
2    public in a number of ways.  Our original
3    program which was the certification
4    program severs the public in ensuring
5    that those physicians that are educated
6    outside of the U.S. and Canada meet
7    certain minimum requirements in order to
8    enter an accredited residency program in
9    the United States.
10       We also serve the public in
11   facilitating an appropriate review of
12   them, at the same time making sure that
13   we are efficient about doing it, because
14   IMGs -- or International Medical
15   Graduates represent about 25 percent of
16   the physicians that are working in the
17   United States.
18       So it's important from a
19   physician-workforce point of view to make
20   sure we have qualified physicians.  So in
21   those two broad ways I would say that we
22   serve the public.
23 BY MR. THRONSON:
24   Q.    How does ECFMG serve medical

Page 41

1  residency programs?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  So ECFMG has a
4    certification program that is required
5    for entrance into ACGME accredited
6    residency programs.
7  BY MR. THRONSON:
8    Q.    Any other ways in which ECFMG
9  severs medical residency programs?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  So we also have an
12   exchange visitor sponsorship program.  We
13   are responsible for physicians who are
14   seeking residency and training in the
15   United States on a J-1 nonimmigracy
16   step.
17 BY MR. THRONSON:
18   Q.    Beyond the ways in which you
19 serve medical residency programs that you
20 described, how else does ECFMG serve hospitals?
21       MS. McENROE:  Objection to form.
22       THE WITNESS:  I don't know that
23   I would say that we serve hospitals,
24   however, we do provide a service for

11 (Pages 38 - 41)

Case 1:20-cv-03529-DCN Document 1-2 Page 97 Filed 04/06/2020

Page 42

```
 1    employers that will verify the
 2    certification status of an IMG which is
 3    typically required when physicians, who
 4    are IMGs, are attempting to get
 5    credentialing privileges at hospitals.
 6 BY MR. THRONSON:
 7    Q.    Hospitals rely on ECFMG to
 8 provide that service?
 9          MS. McENROE:  Objection to form.
10          THE WITNESS:  I think that
11    hospitals, either in-house or through a
12    third party, CVO, collect the
13    verification information on the
14    physicians which include the verification
15    report of an ECFMG certified physician.
16 BY MR. THRONSON:
17    Q.    Do hospitals -- strike that.  Do
18 hospitals rely on ECFMG to provide
19 primary-source verification of a physician's
20 medical credentials as part of the application
21 process?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  I'm not sure if
24    hospitals have a requirement to
```

Page 43

```
 1    primary-source verified medical education
 2    credentials.
 3          If they do, they can use an
 4    ECFMG certification report to indicate
 5    whether or not a physician is certified
 6    by ECFMG which would include
 7    primary-source verification of their
 8    medical education credentials.
 9 BY MR. THRONSON:
10    Q.    You're aware that hospitals do
11 use ECFMG for that purpose?
12    A.    Yes.
13          MS. McENROE:  Objection to form.
14 BY MR. THRONSON:
15    Q.    Do a lot of hospitals use ECFMG
16 for that purpose?
17          MS. McENROE:  Objection to form.
18          THE WITNESS:  So I don't know
19    that I could say what the hospital's
20    purpose is in using the certification
21    report, but I can tell you that
22    physicians are required to be ECFMG
23    certified; and as part of the
24    credentialing process, the hospitals will
```

Page 44

```
 1    typically verify that information.
 2          So, yes, lots of hospitals are
 3    requesting reports from us as part of
 4    their routine, I think, credentialing of
 5    the physicians that are working in their
 6    hospitals.
 7 BY MR. THRONSON:
 8    Q.    What's in an ECFMG report to the
 9 hospital?
10    A.    The status report would contain
11 the physician's name; date of birth; the name
12 of the medical school, and the country of the
13 medical school where they went to school; their
14 year of graduation; whether or not they are
15 ECFMG certified, and what the validity of that
16 certification is, whether it's valid
17 indefinitely or expired, et cetera; and there
18 may be score information on examinations, it
19 depends on who the recipient of the report is.
20    Q.    Was that also true back in the
21 late 1990s when Akoda was applying for
22 residency programs?
23    A.    Yes.
24    Q.    Was that also true in the
```

Page 45

```
 1 mid-2000s when Akoda was applying for residency
 2 programs?
 3    A.    Yes.
 4    Q.    During those two time frames, I
 5 guess, from 1996 to the present, is it fair to
 6 say that ECFMG undertook to provide medical
 7 residency programs with information regarding
 8 ECFMG certification and acted essentially as a
 9 dean's office for those programs?
10          MS. McENROE:  Objection to form.
11          THE WITNESS:  So it's fair to
12    say that ECFMG would provide the
13    certification status reports to residency
14    programs to which the physician would
15    apply.
16          In some cases that's electronic
17    and in some cases it was paper, depending
18    upon the year.
19 BY MR. THRONSON:
20    Q.    Is it fair to say that from 1996
21 to the present -- let me back up.  Why is that
22 service that you provided to medical residency
23 programs, that we've been discussing, why is
24 that important?
```

12 (Pages 42 - 45)

KARA CORRADO

Page 46

1        MS. McENROE: Objection to form.
2        THE WITNESS: The certification
3 verification service?
4        MR. THRONSON: Right.
5        THE WITNESS: Because the ACGME
6 which is the accreditation council for
7 graduate medical education, determined
8 that it would use ECFMG certification for
9 international medical graduates as one of
10 the requirements for entrance into those
11 residency programs.
12 BY MR. THRONSON:
13     Q. Is it important to promote
14 public health?
15     A. I don't -- I think it's
16 important because it demonstrates to the
17 program that that physician has met the minimum
18 requirements to enter GME in the United States.
19     Q. Why is that important?
20     A. That's important because the
21 organizations like the residency programs have
22 the requirement that there is a standard, a
23 minimum standard, for those physicians because
24 there's a variance in medical education

Page 47

1 worldwide.
2     So I don't know when the ACGME
3 determined that in order to accept
4 international graduates they would have this
5 requirement of certification; but I think it's
6 important for them from a credentialing
7 perspective to make sure to know what the
8 status of the person is entering their program.
9     Q. Part of ECFMG's mission is to
10 promote public health, correct?
11     A. Part of ECFMG's mission is to
12 promote public health and to protect the
13 public, yes.
14     Q. Is part of ECFMG's mission also
15 to promote patient safety?
16        MS. McENROE: Objection to form.
17        THE WITNESS: ECFMG's mission is
18 broader in terms of what we state about
19 the improvement of the world's health
20 essentially.
21 BY MR. THRONSON:
22     Q. Why is primary-source
23 verification of an applicant's identity and
24 credentials important?

Page 48

1        MS. McENROE: Objection.
2        THE WITNESS: Primary-source
3 verification of an applicant's medical
4 education credentials is the best
5 practice in medical regulation.
6     So the international association
7 of medical regulatory authorities has
8 indicated to regulatory authorities
9 around the world that it's the best
10 practice, you should go directly to the
11 source to determine if someone has an
12 education that they purport to have or
13 not.
14 BY MR. THRONSON:
15     Q. That's been true from 1996 to
16 the present, at least?
17     A. Yes, that's true. Well, I don't
18 know if the international association has
19 promoted it since then, but for ECFMG that has
20 been our practice since 1996 until now.
21     Q. Sounds like, also, ECFMG has
22 undertaken a responsibility to provide
23 hospitals with information regarding ECFMG
24 certification of applicants, correct?

Page 49

1        MS. McENROE: Objection to form.
2        THE WITNESS: So we have a
3 service that hospitals can use to verify
4 certification status of physicians.
5 BY MR. THRONSON:
6     Q. About how long has that service
7 existed?
8     A. I don't know when the service
9 started, but the service was in existence at
10 least from the 1990s, early 1990s onward. I
11 believe it existed even prior to that. I just
12 don't have knowledge as to when exactly the
13 program started.
14     Q. You are aware that hospitals
15 have an obligation to verify credentials of
16 physicians who apply to a hospital for medical
17 privileges?
18        MS. McENROE: Objection to form.
19        THE WITNESS: That's my
20 understanding.
21 BY MR. THRONSON:
22     Q. Is it also your understanding
23 that the joint commission has opined that
24 hospitals can rely on reports from ECFMG to

13 (Pages 46 - 49)

KARA CORRADO

<table>
<tr><td colspan="2">

Page 50

1 satisfy that obligation?
2     MS. McENROE: Objection to form.
3     THE WITNESS: I'm aware that the
4    joint commission has recognized the
5    ECFMG's certification status report as
6    meeting their requirements for
7    primary-source verification of
8    credentials.
9 BY MR. THRONSON:
10  Q.   Is that -- the service that
11 we've been discussing, that ECFMG provides to
12 hospitals, is that also part of ECFMG's role in
13 promoting public health as it sees it?
14     MS. McENROE: Objection to form.
15     THE WITNESS: I'm sorry. Can
16    you ask me that again?
17 BY MR. THRONSON:
18  Q.   Sure. Does the service you
19 provide to hospitals, in terms of information
20 about ECFMG certification, does that align with
21 the organization's role in promoting public
22 health and safety?
23     MS. McENROE: Objection to form.
24     THE WITNESS: So I think that

</td>
<td colspan="2">

Page 52

1  A.   Yes.
2  Q.   And you are aware that that's
3 part of the hospital's process of determining
4 whether a hospital will grant medical
5 privileges to physicians to practice at that
6 hospital?
7     MS. McENROE: Objection to form.
8     THE WITNESS: Yes, that's my
9    understanding.
10 BY MR. THRONSON:
11  Q.   Do you believe patients have the
12 right to be treated by physicians who are
13 appropriately credentialed?
14     MS. McENROE: Objection to form.
15     THE WITNESS: Yes.
16 BY MR. THRONSON:
17  Q.   Do you believe patients have the
18 right to be treated by a physician who did not
19 obtain ECFMG certification through
20 misrepresentations?
21     MS. McENROE: Objection to form.
22     THE WITNESS: So the question is
23    do I...
24 BY MR. THRONSON:

</td></tr>
<tr><td colspan="2">

Page 51

1    aligns to our mission as it relates to
2    public health in that we are certifying
3    the authenticity of a certificate, or the
4    validity of a certificate, to the
5    hospital so they have that information so
6    they can, as I mentioned earlier, bring
7    on the physician if that's part of their
8    requirements.
9 BY MR. THRONSON:
10  Q.   Is it fair to say that ECFMG
11 supplements a hospital's function of verifying
12 the credentials of medical residents and
13 doctors?
14     MS. McENROE: Objection to form.
15     THE WITNESS: I don't know what
16    the process is for all the hospitals or
17    all the residency programs. So I don't
18    know that I could say that.
19 BY MR. THRONSON:
20  Q.   It sounds like ECF -- you are
21 aware that as part of a credentialing process
22 the hospital or residency program will request
23 information from ECFMG regarding whether an
24 applicant is ECFMG certified?

</td>
<td colspan="2">

Page 53

1  Q.   Sure. Do you believe patients
2 have the right to be treated by physicians who
3 did not obtain ECFMG certification through
4 misrepresentations?
5     MS. McENROE: Objection to form.
6 BY MR. THRONSON:
7  Q.   That is who obtained ECFMG
8 certification by providing accurate
9 information?
10     MS. McENROE: Objection to form.
11     THE WITNESS: So you're asking,
12    if they have the right not to be; is that
13    what you said? I'm sorry.
14 BY MR. THRONSON:
15  Q.   No, it's okay. It's my fault.
16 Do you believe that patients have the right to
17 not be treated by physicians who have obtained
18 ECFMG certification based on false pretenses?
19     MS. McENROE: Objection to form.
20     THE WITNESS: Yes.
21 BY MR. THRONSON:
22  Q.   Do you believe in providing the
23 services that we've been discussing to
24 hospitals and residency programs that ECFMG is

</td></tr>
</table>

14 (Pages 50 - 53)

KARA CORRADO

Page 54

1 obligated to exercise reasonable care in
2 performing those services?
3        MS. McENROE:  Objection to form;
4 calls for legal conclusion as does this
5 whole line of questioning.
6        THE WITNESS:  So ECFMG has a set
7 of policies and procedures that it
8 enforces when it is processing applicants
9 or certifying them.
10 BY MR. THRONSON:
11    Q.     Okay.  Is following -- does
12 ECFMG have the obligation to follow those
13 policies and procedures?
14        MS. McENROE:  Objection to form;
15 also calls for legal conclusion.
16        THE WITNESS:  I mean ECFMG, I
17     think, like any organization will follow
18     it's policies and procedures and the
19     staff will follow the policies and
20     procedures, and in the course of their
21     normal work will be working to make sure
22     they are appropriately following those
23     policies and procedures.
24 BY MR. THRONSON:

Page 55

1    Q.     Can you tell me about the
2 various categories of policies and procedures
3 that have applied perhaps at different times
4 from 1996 to the present with respect to ECFMG
5 certification of IMGs?
6        MS. McENROE:  Objection to form;
7 calls for a narrative.
8        You can answer if you can.
9        THE WITNESS:  So there are
10     myriad policies and procedures that would
11     apply to ECFMG certification.  Is there a
12     specific one or type of policy that you
13     are interested in?
14 BY MR. THRONSON:
15    Q.     What I'm thinking of, is there a
16 set of policies on irregular behavior called
17 irregular behavior policies; is there a set of
18 policies called how to perform primary-source
19 verification of the diploma?
20        Just sort of broad categories of
21 policies or names of sets of policies?
22        MS. McENROE:  Objection to form.
23        THE WITNESS:  So ECFMG has
24     irregular behavior policies and

Page 56

1     procedures, and we also have an
2     information booklet that's updated yearly
3     that contains all of the policies related
4     to ECFMG certification; eligibility for
5     certification, eligibility for
6     examinations, and those types of
7     policies.
8 BY MR. THRONSON:
9    Q.     How about -- strike that.  Has
10 it had irregular behavior policies continuously
11 from 1996 to the present?
12    A.     Yes, that's my understanding.
13    Q.     Are there any internal irregular
14 behavior polices that are not necessarily
15 published on a website or in a booklet for the
16 benefit of IMGs?
17        So basically internal procedures
18 that govern the operation of ECFMG with respect
19 to irregular behavior?
20        MS. McENROE:  Objection to form.
21        THE WITNESS:  So there are
22     policies that are published on the
23     website, but there are also procedures
24     that staff would follow in terms of

Page 57

1     preparing cases for the committee and
2     sending letters out and things like that
3     that are not necessarily published.
4 BY MR. THRONSON:
5    Q.     One of the things that we've
6 been seeking in this case is just to get all
7 the relevant sets of polices and procedures,
8 and we have gotten some, but I'm trying to get
9 a sense of the universe of documents that might
10 be relevant to this case just so we have a full
11 picture of what ECFMG polices are.
12        So if we were to, say, request
13 polices from the organization obviously one set
14 of polices that we would request would be --
15 actually have some meaning, would be a request
16 for the irregular behavior policies and
17 procedures, right?
18        MS. McENROE:  Objection to form.
19        THE WITNESS:  (Nonverbal
20     response.)
21 BY MR. THRONSON:
22    Q.     Is there another set of polices
23 called -- that governs when to refer cases to
24 the credentialing committee?

15 (Pages 54 - 57)

KARA CORRADO

1    A.    There are procedures that we
2 follow that would govern that.
3    Q.    What are those called?
4    A.    I'm not sure that they
5 necessarily have a set name.  It would just be
6 our internal procedures.
7    Q.    Do you remember the title of any
8 of those internal procedures or a number?
9    A.    We have a draft, a document that
10 is labeled draft procedures that captures the
11 procedures for irregular behavior.
12    Q.    What does -- can you sort of
13 generally describe what that draft procedure
14 document contains?
15         MS. McENROE:  Objection to form.
16         THE WITNESS:  It essentially
17    contains guidelines in reviewing cases or
18    matters that come before the staff that
19    are working on those investigations; how
20    we process the investigations.
21 BY MR. THRONSON:
22    Q.    The organization uses that draft
23 document essentially as a formal policy
24 governing the performance of irregular behavior

1 investigations and referrals to the committee?
2         MS. McENROE:  Objection to form.
3         THE WITNESS:  Those procedures
4    are the procedures we follow, and have
5    followed, for quite some time in
6    reviewing the investigations of an
7    irregular behavior and referring matters
8    to the committee.
9 BY MR. THRONSON:
10    Q.    Are you aware of any other
11 irregular -- procedures that apply to how to
12 conduct irregular behavior investigations or
13 when to refer matters to a committee that have
14 applied from 1996 to the present, besides the
15 policy labeled "draft policy" that you just
16 mentioned?
17    A.    Not that I'm aware of.
18    Q.    How long has the policy that you
19 mentioned been in effect?
20    A.    The document I mentioned is, and
21 I might be splitting hairs, but it's
22 procedures.
23         So we have an irregular behavior
24 policy that governs the process that we publish

1 on our website and that is given to
2 individuals.
3         The document that I'm referring
4 to that says "draft" is the procedures that
5 staff had been doing probably -- was probably
6 drafted around 2015 time frame, was put to
7 paper in 2015.
8    Q.    Did any procedure exist before
9 that time that applied to how the organization
10 should conduct irregular behavior
11 investigations and when the staff should refer
12 matters to the creds committee?
13    A.    Yes, those procedures that were
14 documented in 2015 were the procedures that
15 staff had been using at least since I started
16 working directly on cases of irregular
17 behavior, which is 2008 onward, and my
18 understanding would be prior to that as well.
19 I just wasn't working on those cases then.
20    Q.    So is it fair to say that up
21 until 2015, those procedures were a custom of
22 the organization in terms of how to conduct
23 investigations and when to refer matters to the
24 committee and then they were written down in

1 2015 in the document that we've been talking
2 about?
3         MS. McENROE:  Objection to form.
4         THE WITNESS:  So I don't know if
5    I would characterize them as a custom,
6    but they were documented together in
7    2015.
8         But when I started working on
9    irregular behavior cases those procedures
10    were -- I was trained on those procedures
11    and how to conduct the case.
12 BY MR. THRONSON:
13    Q.    Was there a written policy --
14 sorry, written procedure that predated the 2015
15 procedure?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  Not that I can
18    recall.
19 BY MR. THRONSON:
20    Q.    So as part of your training in
21 how to conduct irregular behavior
22 investigations prior to 2015, you weren't
23 trained on a particular written procedure; fair
24 to say?

16 (Pages 58 - 61)

KARA CORRADO

Page 62

1         MS. McENROE:  Objection to form.
2         THE WITNESS:  No.  Not that I
3    recall other than the irregular behavior
4    policies and procedures that we have
5    written.
6  BY MR. THRONSON:
7    Q.      So 2015 is the first time that
8  an irregular behavior procedure, which included
9  procedures for referring matters to the
10  credentials committee, was written down at
11  ECFMG?
12    A.      To my knowledge -- I don't know.
13  I believe so.  If they were written down
14  previously, I didn't see them; or they would
15  have been in communications from someone to
16  another person.
17    Q.      What do you mean by that?
18    A.      I don't know what people did
19  before I started working on those cases.  I
20  guess what I'm trying to say is, I don't know
21  if I can say they were never written down
22  before, because I don't know what individuals
23  may or may not have done before me, but I have
24  not seen a set of written procedures prior to

Page 63

1  that time.
2    Q.      So to the best of your knowledge
3  both individually and as a representative of
4  ECFMG, 2015 was the first time that an
5  irregular behavior procedure, including a
6  procedure for referring matters to the
7  credentials committee, was actually written
8  down at ECFMG; to the best of your knowledge?
9         MS. McENROE:  Objection to form.
10         THE WITNESS:  To the best of my
11    knowledge 2015 is when we documented the
12    procedures that we were using as staff to
13    process investigations for irregular
14    behavior.
15  BY MR. THRONSON:
16    Q.      What caused the organization to
17  write those procedures down in 2015?
18    A.      So William Kelly, who was the
19  vice president of operation at the time, he had
20  been doing that work for a very long time and
21  he was retiring and so as part of his
22  retirement he was still doing some consulting
23  for ECFMG, and one of the things I asked him to
24  do was to document all of the procedures in

Page 64

1  writing for us because his knowledge of the
2  organization, historically, not just irregular
3  behavior procedures but things that the
4  organization had done, so when he was fully
5  gone we would have that resource.
6    Q.      Did anyone else contribute to
7  the drafting of those procedures?
8    A.      No.
9    Q.      So it's fair to say, before that
10  procedure was drafted what the procedure was
11  for irregular behavior at ECFMG was essentially
12  what Bill Kelly decided to do?
13         MS. McENROE:  Objection to form.
14         THE WITNESS:  No, I would not
15    characterize it that way.
16         What is documented in 2015 is a
17    set of procedures the organization had
18    used.  Bill had used those procedures,
19    but not independently.  So he would have
20    been consulting with his superior others
21    at the organization.  He wouldn't just
22    act on his own to create procedures.
23  BY MR. THRONSON:
24    Q.      Understood.

Page 65

1         MR. THRONSON:  Obviously we'll
2    be requesting a copy of the --
3         MS. McENROE:  I believe we
4    produced that already.  We produced that
5    this morning, I think.  Oh, great, I have
6    hard copies for you.
7         Also, we've been going for about
8    an hour and 20 minutes, and I think we
9    might have lunch ready if there's a good
10    time to take a break?
11         MR. THRONSON:  Can we spend
12    about 5 more minutes to close out this
13    line of questioning; is that okay?
14         THE WITNESS:  That's fine.
15  BY MR. THRONSON:
16    Q.      Why has the -- is there a reason
17  that the policy, at least on the face of it,
18  had remained a draft policy?
19         MS. McENROE:  Objection to form.
20         THE WITNESS:  No other reason
21    than we didn't change the title on the
22    Microsoft Word document.
23  BY MR. THRONSON:
24    Q.      So for all intents and purposes

17 (Pages 62 - 65)

KARA CORRADO

Page 66

1   it's a final policy?
2           MS. McENROE: Objection to form.
3           THE WITNESS: I would say it
4   captures the procedure that we follow.
5   Off the top of my head, not looking at it
6   right now, I don't know if there are
7   other sort of processes that are not
8   documented in there, but it's generally
9   the guidelines that we use for
10  investigations.
11  BY MR. THRONSON:
12      Q.    Are there any other polices
13  from -- strike that. Are there any other
14  procedures, from 1996 to the present, that
15  ECFMG has used with respect to investigations
16  of irregular behavior and determinations as to
17  whether to refer a matter to the credentials
18  committee other than the 2015 written policy --
19  written procedures we've been discussing?
20          MS. McENROE: Objection to form.
21          THE WITNESS: Not that I'm aware
22  of.
23  BY MR. THRONSON:
24      Q.    Does ECFMG have any procedures,

Page 67

1   written procedures, regarding -- tell you what,
2   let me strike that. Let's take a break. I'll
3   look at the document, and then we can
4   reconvene.
5           - - -
6           (Whereupon there was a recess in
7       the proceeding from 12:09 p.m. to 12:51
8       p.m.)
9           - - -
10          MR. THRONSON: Back on the
11      record. We'll mark this.
12          - - -
13          (Whereupon the document was
14      marked, for identification purposes, as
15      Exhibit Number CORRADO-2.)
16          - - -
17  BY MR. THRONSON:
18      Q.    Ms. Corrado, before we left off
19  we were discussing a credentials procedure that
20  was drafted in 2015.
21          Ma'am, the court reporter has
22  marked a document as exhibit 2, and I'll
23  represent to you this document contains all the
24  production we were provided, supplement

Page 68

1   production we were provided by defendants this
2   morning.
3           The first roughly 10 pages of
4   it, from Bates 10198 to 10208, does that
5   comprise the 2015 procedure we were talking
6   about?
7       A.    Yes.
8       Q.    It looks like there are a few
9   attachments to the procedure that are --
10  attachment 1 is referenced on page 10207,
11  that's a sample text to a third part in
12  response to an allegation. Do you see that?
13      A.    I'm sorry. Which page?
14      Q.    10207. In the middle of the
15  page there, you'll see there's a reference to
16  an attachment?
17      A.    Yes, I see it.
18      Q.    Then on page 10205 there's a
19  reference to attachment 2 at the bottom of that
20  page. Apparently attachment 2 is a sample
21  charge letter to an applicant. Do you see
22  that?
23      A.    Yes.
24      Q.    It doesn't appear that those

Page 69

1   attachments are in this production. Other than
2   those attachments, does what you have in front
3   of you as Exhibit 2 contain the complete 2015
4   policy we've been discussing?
5           MS. McENROE: Objection to form.
6           THE WITNESS: Yes, this appears
7       to be the document from 2015.
8   BY MR. THRONSON:
9       Q.    On page 11 there are -- I guess
10  I'm wondering if the policy is incomplete or if
11  content was intended to be added to it?
12          It looks like there are some --
13  there's a charge of falsified credential,
14  charge of falsified student status, falsified
15  credentials, other consideration of ongoing
16  investigations.
17          Do you see that text?
18      A.    (Nonverbal response.)
19      Q.    Are those prospective of
20  sections to be added to the policy?
21          MS. McENROE: Objection to form.
22          THE WITNESS: I am not sure.
23  BY MR. THRONSON:
24      Q.    Let me ask you, what do you

18 (Pages 66 - 69)

KARA CORRADO

Page 70

1 think those represent?
2     A.     Can I have a minute?
3     Q.     Yes.  Of course.  Take all the
4 time you need.
5     A.     I am not sure what the intent
6 would have been by Bill in these, but my
7 educated guess would be these are types of
8 tools -- these are types of cases that we
9 typically see of irregular behavior.
10     Q.     If you turn back to the first
11 page of the policy...
12         MS. McENROE:  Objection.
13         MR. THRONSON:  I'm sorry, what
14     is the objection?
15         MS. McENROE:  You kept calling
16     it a policy.  I went through it
17     extensively this morning, it's a
18     procedure not a policy.
19         MR. THRONSON:  Okay, fair
20     enough.
21 BY MR. THRONSON:
22     Q.     Apparently this belongs to a set
23 of ECFMG credentials procedures; is that
24 correct?

Page 71

1     A.     Yes.
2     Q.     It's labeled Section 5 of those
3 procedures, correct?
4     A.     This does, yes.
5     Q.     So are there other sections of
6 the ECFMG credentials procedures?
7     A.     I believe there are other
8 sections.
9         MR. THRONSON:  I'd like to
10     request a table of contents for those
11     procedures.
12         MS. McENROE:  We can investigate
13     if a table of contents exists.
14         MR. THRONSON:  If not that, then
15     the whole set.
16 BY MR. THRONSON:
17     Q.     Do you recall the headings of
18 the other sections or generally what the other
19 sections contain?
20     A.     Only one which would have been,
21 I believe, our procedures on exceptions to
22 credentialing policies, but I don't remember
23 the other ones.
24     Q.     All right.  Are there -- do you

Page 72

1 recall any others among the ECFMG credentials
2 procedures that bear on investigating
3 allegations of irregular behavior?
4     A.     I don't believe so.
5     Q.     Do you remember any other
6 section of the procedures that bear on the
7 question of when to refer a matter to the
8 medical education credentials committee?
9     A.     I don't believe so.
10     Q.     The document refers to the ECFMG
11 medical education and credentials committee
12 policies and procedures.  Is that a separate
13 set of policies and procedures?
14     A.     Yes.  That is a set of policies
15 and procedures that are published and provided
16 to the applicants when they are charged with
17 irregular behavior.
18     Q.     Are there any other policies and
19 procedures or polices that the credentials
20 committee -- that apply to the credentials
21 committee that are not published?
22     A.     Yes.  There is an appeals
23 procedure that is not published on our website
24 but it is given to any individual along with a

Page 73

1 decision letter when a determination of
2 irregular behavior is made.
3     Q.     Anything else?
4     A.     There are no other policies
5 related to irregular behavior that applies to
6 the credentials committee.
7     Q.     Does the credentials committee
8 itself have any policies and procedures that
9 govern when an allegation of irregular behavior
10 should be forwarded to the committee for
11 investigation and review?
12     A.     The irregular behavior policies
13 and procedures that we have are the ones that
14 govern the committee.
15     Q.     In Exhibit 2, in front of you?
16     A.     No.  The ones that are
17 referenced in here, the medical education
18 credentials committee polices and procedures.
19     Q.     Okay.
20     A.     Which are the irregular behavior
21 procedures that are published right now online,
22 those policies.
23     Q.     Do those published polices also
24 govern staff?

19 (Pages 70 - 73)

KARA CORRADO

1        MS. McENROE: Objection to form.
2        THE WITNESS: I wouldn't say
3    they govern staff, but those are the
4    policies and procedures that staff use
5    when reviewing irregular behavior and
6    when we are communicating with
7    applicants.
8 BY MR. THRONSON:
9    Q.    Has that been true from '96 to
10 the present?
11   A.    Do you mean specifically this
12 policy?
13   Q.    I mean the policies that are
14 published regarding irregular behavior. Has
15 the committee staff, such as yourself, followed
16 those polices from '96 to the present?
17   A.    That's my understanding.
18   Q.    Does Exhibit 2 vary at all from
19 the historical practice of the credentials
20 committee and credentials committee staff with
21 respect to investigations of irregular behavior
22 and referrals to the credentials committee?
23       MS. McENROE: Objection to form.
24       THE WITNESS: Not that I'm aware

1    of.
2 BY MR. THRONSON:
3    Q.    So Mr. Kelly, in drafting this
4 document, never indicated to you that this is
5 something new that I'm putting in here, I think
6 we should change how we're doing a particular
7 thing?
8        MS. McENROE: Objection to form.
9        THE WITNESS: Not that I recall.
10 BY MR. THRONSON:
11   Q.    According to these procedures
12 when should an allegation of irregular behavior
13 be referred to the credentials committee?
14       MS. McENROE: Objection to form.
15 BY MR. THRONSON:
16   Q.    By these procedures I mean the
17 ones in Exhibit 2.
18   A.    There is, on page 4, an
19 indication to send the allegation of irregular
20 behavior which in quotes we call "the charge
21 letter to the applicant."
22   Q.    Can you show me the language you
23 are referring to; read it for me?
24   A.    The bottom of page 4. The very

1 last two italicized phrases.
2    Q.    I see that. So I'm interested
3 in knowing when staff becomes aware of an
4 allegation of irregular behavior, is there
5 anything in Exhibit 2 that indicates when staff
6 should refer that allegation to the credentials
7 committee?
8        MS. McENROE: Objection to form.
9 BY MR. THRONSON:
10   Q.    Or under what circumstances the
11 staff should refer to the --
12   A.    The document -- the procedures
13 are documenting walking through the process of
14 the investigation which starts with determining
15 whether the irregular behavior relates to
16 ECFMG, whether the source of the allegation is
17 credible, and the process you go through when
18 this comes to the source of the allegation.
19   Q.    Is it ECFMG's position that if
20 staff determines an allegation is credible,
21 that that allegation should be forwarded to the
22 credentials committee?
23       MS. McENROE: Objection to form.
24       THE WITNESS: So the policies

1        and procedures on irregular behavior
2        indicate that if staff determines there
3        is sufficient evidence of irregular
4        behavior the matter will be referred to
5        the credentials committee.
6 BY MR. THRONSON:
7    Q.    Is that language in this
8 procedure; is it written down somewhere else?
9    A.    So that language without sitting
10 and reading through here, I don't know for sure
11 if it's in this document or not; but it is in
12 the medical education credentials committee
13 polices and procedures on irregular behavior.
14   Q.    Okay. Can you say that for me
15 again, if staff determines that there is
16 sufficient evidence; is that what you said?
17   A.    That is what I said, yes.
18   Q.    What is sufficient evidence?
19   A.    Sufficient evidence, it depends
20 on the case. For example, if it's a falsified
21 credential and the school responded and said
22 the diploma is false, then that response would
23 be sufficient evidence to make an allegation of
24 irregular behavior on a falsified credential.

KARA CORRADO

Page 78

1    Q.    Okay. I'd like to walk through
2  some -- strike that. Has it been ECFMG's
3  procedure since 1996 that if staff determines
4  that an allegation is supported by sufficient
5  evidence that the allegation is referred to the
6  credentials committee?
7    A.    That is my understanding, yes.
8    Q.    Does the evidence have to be in
9  a particular form? For example, does there
10 have to be a particular kind of documentary
11 evidence, or does that depend on the case?
12   A.    It depends on the case.
13   Q.    On page 6 of the polices and
14 procedures, this is Bates 10203, the procedure
15 reads "if the third party is not already
16 provided the appropriate identifying
17 information about the individual" -- so on and
18 so forth -- "ECFMG staff must determine whether
19 the individual is an applicant to ECFMG for any
20 program or service such as ECFMG certification,
21 EPIC, et cetera. To do this staff must use all
22 the appropriate search functions to query all
23 ECFMG databases," and it mentions AMES, OASIS,
24 and EPIC as examples of those databases.

Page 79

1        Can you tell me about what each
2  of those databases are, what the acronym stands
3  for and what the databases do?
4    A.    I believe that the example --
5  the uses of these -- these are programs,
6  software programs for ECFMG. So I don't know
7  that they are really databases. They obviously
8  feed from a database, but I don't believe they
9  are the names of a database.
10       AMES is a program that our staff
11 uses to process records. OASIS is an external
12 facing portal that applicants can use to check
13 on their application status and their
14 certification status of ECFMG, and EPIC is our
15 electronic portfolio of international
16 credentials which has a variety of software
17 programs that we use. It's not in the name of
18 a program.
19   Q.    Are there any databases that
20 ECFMG uses in the course of the certification
21 process?
22       MS. McENROE: Objection to form.
23       THE WITNESS: I assume so, yes.
24 BY MR. THRONSON:

Page 80

1    Q.    Do you know the names of any of
2  those databases?
3    A.    I don't know if we have a name
4  for the database or if there's multiple
5  databases. We have a variety of software
6  programs that we use, and this is saying to
7  make sure we check in each of our lines of
8  service to see if the applicant exists in those
9  lines of service.
10   Q.    As a general matter, if a charge
11 letter is sent to an applicant should the
12 matter be referred to the credentials committee
13 for review?
14       MS. McENROE: Objection to form.
15       THE WITNESS: That is our
16   current process.
17 BY MR. THRONSON:
18   Q.    How long has that been a
19 process?
20   A.    That has been the process at
21 least since I've been working with the
22 credentials committee which is since 2008, and
23 I believe prior to that probably somewhere
24 around the late 90s early 2000s.

Page 81

1    Q.    So you believe that was also the
2  process in the late 90s, early 2000s?
3    A.    Yes.
4    Q.    Okay. Do you know of any --
5  strike that. Do you know of any circumstances
6  where you would -- where ECFMG would vary from
7  that process?
8        MS. McENORE: Objection to form.
9  BY MR. THRONSON:
10   Q.    That is, would vary from the
11 process of once a charge letter is sent to an
12 applicant to refer the matter to the
13 credentials committee for investigation?
14   A.    Prior to -- like I said, I think
15 it was around '99, 2000 that the matter would
16 be referred.
17       Let me just clarify. Unless
18 there was some exculpatory evidence that we
19 discovered after we sent the charge letter,
20 then we would withdraw the charge letter and it
21 wouldn't be referred to the credentials
22 committee; but prior to that there are cases
23 where we contacted the applicant to ask them to
24 provide information about an allegation or an

21 (Pages 78 - 81)

Page 82

1 anomaly. In some of those cases they were not
2 referred to the committee, if that applicant
3 did not respond.
4      Q.      If the applicant did not respond
5 they were not referred to the committee?
6      A.      In some cases. Right, you asked
7 me if we always referred them.
8      Q.      Sure.
9      A.      And the answer is no, because
10 there are some cases that are old, prior to my
11 time, that we contacted the individual about
12 the allegation but they are not necessarily
13 referred to the credentials committee.
14      Q.      Do you know why they were not
15 referred to the credentials committee in those
16 cases?
17      A.      I don't.
18      Q.      But as a general rule after a
19 charge letter was sent, the matter was referred
20 to the credentials committee as a matter of
21 course?
22          MS. McENROE: Objection to form.
23          THE WITNESS: Yes.
24 BY MR. THRONSON:

Page 83

1      Q.      Obviously this case has a long
2 history and we covered a lot of this in the
3 deposition of William Kelly. Did you happen to
4 read that deposition?
5      A.      I did not.
6      Q.      Was it made available to you for
7 review?
8      A.      No.
9      Q.      Do you know that it had taken
10 place?
11      A.      No.
12      Q.      Did ask you for a transcript?
13      A.      No, I did not.
14      Q.      Why not?
15          MS. McENROE: Objection to form.
16          THE WITNESS: I don't know. I
17 didn't ask for one.
18 BY MR. THRONSON:
19      Q.      You didn't feel it was important
20 for your testimony today?
21          MS. McENROE: Objection to form.
22          THE WITNESS: I don't think I
23 thought about it to be perfectly honest.
24 BY MR. THRONSON:

Page 84

1      Q.      I'd like to go through some of
2 the history and just so we can orientate
3 ourselves, is it ECFMG's understanding that the
4 names Charles Nosa Akoda, Igberase Oluwafemi
5 Charles, and Oluwafemi Charles Igberase were
6 names used by the same person?
7      A.      That is our understanding which
8 is based on the information that we got from
9 the plea that he signed.
10      Q.      Do you know what that
11 individual's given name was at birth?
12          MS. McENROE: Objection to form.
13          THE WITNESS: I do not know what
14      his given name was at birth.
15 BY MR. THRONSON:
16      Q.      Does the organization have an
17 opinion as to where he was born?
18          MS. McENROE: Objection to form.
19          THE WITNESS: We would only have
20      information that he provided to us about
21      where he was born.
22 BY MR. THRONSON:
23      Q.      Did he receive any medical
24 education before enrolling in a residency

Page 85

1 program?
2      A.      ECFMG has documentation that the
3 medical school officials verified to us that he
4 completed medical education at a school in
5 Nigeria, and they verified his final medical
6 diploma to us.
7      Q.      Is it ECFMG's position that
8 Akoda actually graduated from the University of
9 Benin?
10      A.      So ECFMG's position on that is
11 that an individual with that name submitted a
12 diploma which was source verified by the
13 medical school officials, which indicated that
14 the diploma was authentic and confirmed that
15 the person named on that diploma graduated from
16 their medical school. I believe it was Benin,
17 I can't remember, but assuming that's the
18 school on the diploma.
19      Q.      You are aware that same
20 individual, under the Igberase name, supplied a
21 medical degree from -- submitted a diploma from
22 the University of Ibadan as part of his
23 application --
24          MS. McENROE: Objection to form.

22 (Pages 82 - 85)

KARA CORRADO

Page 86

1    THE WITNESS: Yes, so an
2  individual named -- well, one of his name
3  is Igberase, applied to ECFMG and
4  submitted a diploma which was source
5  verified by the University of Ibadan
6  indicating that he had attended medical
7  school there and the diploma was
8  authentic.
9  BY MR. THRONSON:
10   Q.    Does ECFMG believe Akoda
11 Igberase attended both the University of Ibadan
12 and the University of Benin?
13   MS. McENROE: Objection to form.
14   THE WITNESS: ECFMG has two
15  diplomas for Igberase in his file that
16  were source verified by the medical
17  school officials. Whether or not he
18  attended both of those medical schools,
19  that particular person that presented
20  those diplomas, I wouldn't know.
21 BY MR. THRONSON:
22   Q.    So the only -- if I'm
23 understanding you correctly, ECFMG doesn't take
24 a position on where Igberase Akoda actually

Page 87

1 went to medical school beyond that ECFMG
2 received these two diplomas that were source
3 verified by the institution?
4    A.    Yes, that's correct.
5    Q.    Does ECFMG have any information
6 apart from the source verification of those
7 diplomas that would indicate where this
8 individual actually went to medical school, if
9 anywhere?
10   A.    All of the information we have
11 about his medical education, aside from the
12 verification of the diploma by the medical
13 school's officials, would have been provided by
14 him on his applications to ECFMG.
15   Q.    So just to be totally clear,
16 apart from having these two diplomas that were
17 source verified by the institution and ECFMG's
18 belief, ECFMG can't say where and when this
19 individual, Akoda Igberase, went to medical
20 school, if anywhere?
21   MS. McENROE: Objection to form.
22   THE WITNESS: We could only
23  provide the information that the school
24  verified to us, which would include the

Page 88

1  graduation date on the diploma.
2 BY MR. THRONSON:
3    Q.    How did you obtain source
4 verification from the school?
5    A.    For those diplomas?
6    Q.    For those diplomas.
7    A.    We followed our processes at the
8 time for source verification which was to send
9 a copy of the diploma to the medical school
10 directly with a form for the school official to
11 complete, it's a safety paper form, and a
12 prepaid envelope, -- I'm sorry, it's not a
13 prepaid envelope, but an envelope addressed to
14 ECFMG to be returned to us.
15   Q.    At this time, did you also
16 request, we're talking about between 1992 to
17 2000, did you also request verification of
18 whether an individual was registered as a
19 medical practitioner or licensed to practice
20 medicine in his or her home country?
21   A.    The credentialing requirements
22 for certification at that time included source
23 verification of the diploma only, and the
24 individual was required to also submit a copy

Page 89

1 of their certificate of their full registration
2 or license, but those were not source-verified.
3    Q.    Why not?
4    A.    I don't know why they were not,
5 but the decision prior to me had been source
6 verification of diploma with a submission of
7 the license, which is not a requirement now.
8    Q.    Why did it cease becoming a
9 requirement?
10   A.    We introduced a clinical skills
11 assessment examination in 1998, and at that
12 time the organization determined it did not
13 need the license or certificate of registration
14 from an international medical graduate when it
15 introduced a clinic skill assessment which is
16 an in-person exam simulated with patients.
17   Q.    It has never been a requirement
18 for international medical graduates applying
19 for ECFMG certification to provide government
20 issued photoed identification, correct?
21   A.    It is a requirement to submit
22 photo identification currently, but it was not
23 in the past.
24   Q.    When did it become a

23 (Pages 86 - 89)

KARA CORRADO

Page 90

1 requirement?
2     A.     It varies based on the service.
3 So the international credential services, EPIC,
4 when that program was launched, which I believe
5 was I was in 2012 or 2013, part of the
6 requirement was to submit a copy of the
7 passport and have it notarized -- an
8 identification form notarized and for ECFMG
9 certification that became part of the
10 requirement in 2017, I believe, or 2018; maybe
11 2018, more recently.
12     Q.     Why did it become a requirement?
13     A.     We were looking across our
14 processes and programs and we wanted to
15 standardize it, work towards standardization,
16 and bring, like have a notary -- the process is
17 essentially the same as it had been but we
18 wanted to tighten it up in terms of having one
19 notary that we contract with to provide
20 notarization of the identification forms to us.
21     Q.     Is that a separate requirement,
22 in terms of ECFMG now has a requirement that an
23 applicant provide government issued photo
24 identification if I'm understanding you right?

Page 91

1     A.     Yes, to ECFMG.
2     Q.     I'm sorry -- right that it is
3 supplied to ECFMG.  There's a separate
4 requirement that the applicant used, I believe,
5 Notary Cam?
6     A.     (Nonverbal response.)
7         MS. McENROE:  Is that a "yes"?
8         THE WITNESS:  Yes.
9 BY MR. THRONSON:
10     Q.     Why was that Notary Cam
11 introduced?
12     A.     The requirement to use Notary
13 Cam?
14     Q.     Right.
15     A.     So Notary Cam is a vendor in the
16 United States that provides online notary
17 services.  They also have an ability -- they
18 have a database of passports so they know what
19 the passport should look like, and we decided
20 to use an online -- one notary that we knew in
21 order to essentially improve the process that
22 we've had over the years.
23         Over the years we've introduced
24 a number of improvement to all of our processes

Page 92

1 essentially and that was one of them for
2 identification.
3     Q.     Why do you think it wasn't
4 introduced beforehand?
5         MS. McENROE:  Objection to form.
6         THE WITNESS:  I believe it was
7     not introduced beforehand because,
8     frankly, of system restraints.
9 BY MR. THRONSON:
10     Q.     What do you mean by that?
11     A.     It is a technology matter, so to
12 speak, that we -- it was a project that we had
13 sort of in the pipeline for a while, and it
14 goes through a process with IT, and updating
15 the system to be able to accept those things
16 electronically took some time.
17     Q.     Why do you think the government
18 issued photo ID requirement was not a
19 requirement until 2017, 2018?
20         MS. McENROE:  Objection to form.
21         THE WITNESS:  So presenting the
22     government ID was a requirement prior to
23     this in the sense that as part of the
24     identification of the individual on an

Page 93

1     application they were required to appear
2     in front of a notary, first class
3     magistrate, Consul official or a medical
4     school official and provide their
5     identification to that individual to
6     notarize or sign off on their application
7     form, but they were not submitted to
8     ECFMG.
9 BY MR. THRONSON:
10     Q.     Where was it submitted?
11     A.     I assume it would be submitted
12 to the notary -- right -- you have to show up
13 to the notary and the instructions to the
14 notary indicate that they are certifying that
15 the person before them, based on their
16 government issued ID or other form of
17 identification, is that person.
18     Q.     Was the notary supposed to send
19 that documentation directly to ECFMG?
20     A.     The -- no, I don't belive so.
21     Q.     I wanted to go back to the issue
22 of the diplomas.  I believe that there were
23 some emails that were produced in production
24 from defense counsel in this case.

24 (Pages 90 - 93)

KARA CORRADO

1    One of them I'd like to mark as
2 Exhibit 3, please.
3        - - -
4    (Whereupon the document was
5    marked, for identification purposes, as
6    Exhibit Number CORRADO-3.)
7        - - -
8 BY MR. THRONSON:
9    Q.    So Ms. Corrado, I'm handing you
10 a copy of what's been marked as Exhibit 3.
11 This is Bates 3206 to 3209, and it appears to
12 be an exchange between you and -- initially a
13 few physicians, Nigerian physicians, and then
14 the most recent response on the exhibit is
15 between you and physician Dr. Okwukenye; is
16 that right?
17    A.    Yes.
18    Q.    Dr. Henry?
19    A.    Dr. Henry, yes.
20    Q.    It appears that you submitted
21 diplomas and certificates of full registration
22 that most of which it appears have been source
23 verified to Dr. Henry to take a look at, right?
24    A.    Yes.

1    Q.    First of all, how did you meet
2 Dr. Henry?
3    A.    Dr. Henry is, I believe, he is
4 the registrar of the Medical and Dental Council
5 of Nigeria.  The Medical and Dental Council of
6 Nigeria is one of the medical regulatory
7 authorities that uses our credentialing
8 verification services for applicants that are
9 applying to Nigeria for licensure in Nigeria.
10    So Dr. Henry has been one of our
11 point people in that relationship in providing
12 the services to the medical council.
13    Q.    Got it.  Has the Medical and
14 Dental Council of Nigeria been in existence
15 since at least 1996?
16    A.    That's my understanding.
17    Q.    How did you meet doctor Henry?
18    A.    I met Dr. Henry aside from
19 email, but in person I met him at a conference.
20    Q.    It looks like the AMCOA
21 Conference in Ghana?
22    A.    Yes, I met him at AMCOA, but I
23 might have met him at a previous conference of
24 AMCOA.

1    Q.    About how long do you think
2 you've known him?
3    A.    Probably around three years.
4 I'm not sure off the top of my head when they
5 signed on with us.  So from the time
6 essentially that the medical and dental council
7 signed on, Dr. Henry was the point person.  I
8 would have known him through email and then
9 when I met him at conferences that we both
10 attended.
11    Q.    What is the AMCOA Conference?
12    A.    That is the Association of
13 Medical Councils of Africa.
14    Q.    So it looks like you provided
15 copies of various diplomas and certificates of
16 full registrations that are listed on pages
17 3206 and 3207?
18    A.    Yes.
19    Q.    Those included diplomas and
20 certificates of full registration from the
21 individual Johnbull Enosakhare Akoda as well as
22 Charles Olufemi Igberase and Charles Igberase
23 Oluwafemi, correct?
24    A.    Yes.  All of the names that are

1 listed in the emails.
2    Q.    Got it.  Dr. Henry said he would
3 -- he was out of the office but would verify
4 these by Thursday?
5    A.    (Nonverbal response.)
6    MS. McENROE:  Is that a "yes"?
7    THE WITNESS:  Yes.  Sorry.
8 BY MR. THRONSON:
9    Q.    I don't have a response from
10 him.  Did he respond to you?
11    A.    Yes.  In here you mean or?
12    Q.    Subsequent to this email, did
13 you have correspondences with him?
14    A.    Not about this.  Not about this
15 that I'm aware of.
16    Q.    Did he ever give an opinion as
17 to whether any of the documents that you sent
18 him were authentic?
19    A.    He did not.
20    Q.    Did you ever follow up with him
21 to ask again?
22    A.    Yes, I believe I did in an
23 email.
24    Q.    Do you know about when you did

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 98

1 that?
2    A.    Probably a few months after
3 that.
4    Q.    Did he respond?
5    A.    I don't think he responded.
6    Q.    Has he every gotten back to you
7 about his opinion about whether the documents
8 you sent him were authentic?
9    A.    No.
10    Q.    Have you sent any of the
11 documents that are identified in this email
12 chain in Exhibit 3 to anybody else to get their
13 opinion on whether they were authentic?
14    A.    No.
15    Q.    Why did you send them to
16 Dr. Henry?
17    A.    Dr. Igberase applied to our
18 international credential services after the
19 issue that he had and his licenses were revoked
20 in the States. He applied to use our services
21 indicating he was applying to Nigeria, and I
22 believe Ireland for licensure.
23        As part of our regular process
24 and procedure when an individual that has

Page 99

1 engaged in irregular behavior in any of our
2 programs and services uses our international
3 credentialing services and indicates they are
4 going to apply to another jurisdiction, we will
5 reach out to our partners at that jurisdiction
6 to let them know that an individual with an
7 annotation of irregular behavior has indicated
8 that they are going to apply to that regulatory
9 authority for licensure.
10        So that was the original email,
11 was notifying them that he had applied, and I'm
12 sorry, I think I lost the question.
13    Q.    That's fine. So it looks like,
14 if the email is accurate, that while you were
15 at AMCOA, you discussed the case of
16 Dr. Igberase and Dr. Akoda with him, and this
17 was after the notification to the MDCN on June
18 29th --
19    A.    Yes. Yes. Sorry.
20    Q.    So why did you bring the case up
21 with him?
22    A.    So because he was applying to
23 them, we gave them the heads up about it, so
24 they could make a decision. If he continued

Page 100

1 the process in Nigeria, the medical and dental
2 council would make a decision about his
3 application for licensure with a full
4 understanding of the information that we had
5 about this particular physician.
6        So when I met Dr. Henry in Ghana
7 we discussed this case because he had the
8 email, and I asked him if we could provide all
9 the documents to him because the individual,
10 you know, Dr. Igberase, was using our
11 credentialing services to apply to us, what
12 appeared to apply to other jurisdictions
13 seeking medical licensure.
14    Q.    Okay. So it looks like you
15 provided the initial notification on June 29th,
16 then you had a conversation with him at the
17 conference that essentially grew out of that
18 initial notification?
19    A.    Yes, that is right.
20    Q.    He said that the medical council
21 could verify the documents that were submitted
22 to ECFMG by this individual, according to the
23 email here; is that right?
24    A.    Yes.

Page 101

1    Q.    Why did he offer, or why did you
2 ask him to do that?
3    A.    So because Dr. Igberase appeared
4 to be engaging in our credentialing services,
5 we would then be verifying these documents to
6 other organizations, and I wanted to cross
7 check the information.
8        We also hadn't ever necessarily
9 verified the registration certificates with the
10 medical and dental council. Those had not been
11 previously source verified so I was looking to
12 source verify those as well, and then we could
13 put those in Dr. Igberase's account and send
14 out the verification of them to the regulatory
15 authorities he was applying to.
16    Q.    So even though the registrations
17 apparently had been verified as authentic by
18 deans at the schools Ibadan and Benin, that
19 didn't constitute source verification; correct?
20    A.    That is correct.
21    Q.    As he says in his email,
22 however, no dean in the world can verify full
23 registration.
24        Is that accurate?

26 (Pages 98 - 101)

KARA CORRADO

Page 102

1     MS. McENROE: Objection to form.
2          THE WITNESS: That's what
3     Dr. Henry told me about their process in
4     Nigeria. So I assume that whoever he's
5     representing in Nigeria can't do that.
6  BY MR. THRONSON:
7     Q.    Does ECFMG agree that deans are
8  not able to verify full registration at least
9  in Nigeria?
10         MS. McENROE: Objection to form.
11         THE WITNESS: ECFMG will use the
12    issuing institution as the primary
13    source. So we would not typically verify
14    a certificate of registration with a
15    medical school unless it was issued by
16    the medical school in some capacity, or
17    we were otherwise instructed by the
18    primary area source to the verification
19    with another organization.
20 BY MR. THRONSON:
21    Q.    Why in this case were the
22 certificates of full registration provided by
23 Igberase Akoda verified with the deans of these
24 schools instead of the MDCN?

Page 103

1     A.    So it wouldn't have been instead
2  of this time, because we weren't source
3  verifying registration or licensure.
4          So I don't know why the staff
5  person sent those along with the diploma to the
6  school. In looking at the file, my assumption
7  would be they were stapled together with the
8  diploma so they just stapled it to the form and
9  mailed it to the school.
10         When it came back, since that
11 was a document that came back with the
12 verification we left it, but we would not have
13 considered it source verified or primary-source
14 verified.
15    Q.    The only way to determine --
16 strike that. The best way to determine if a
17 document submitted by applicants is to
18 primary-source verify it; is that fair to say?
19         MS. McENROE: Objection to form.
20         THE WITNESS: That is our
21    process. We will primary-source verify
22    credentials.
23 BY MR. THRONSON:
24    Q.    When, if ever, did it become

Page 104

1  ECFMG's process to source verify medical
2  registration?
3     A.    ECFMG, for ECFMG certification,
4  does not require source verification of
5  licensure or registration because it's not a
6  requirement for certification.
7     Q.    That ended in '98?
8     A.    Submission of the licensure
9  ended in '98. We provide source verification
10 of registration certificates and licensure for
11 other regulatory authorities and other partners
12 that do require that, and outsource their
13 credentialing verification to us.
14         We are still verifying
15 certificates of registration and licensure
16 today, but not because it's a requirement of
17 ECFMG certification.
18    Q.    Let's go down the list here, and
19 I'd like to know ECFMG's position on whether
20 these documents are authentic or not.
21         So the MBBS diploma issued in
22 1987 to Charles Oluwafemi Igberase, I have
23 copies if you want, but you're probably very
24 well familiar with them -- that diploma issued

Page 105

1  in '87 from the University of Ibadan, in
2  ECFMG'S belief, is that diploma authentic?
3          MS. McENROE: Objection to form.
4          THE WITNESS: The very first one
5     you're talking about, correct, 19 --
6          MR. THRONSON: Right.
7          THE WITNESS: -- '87?
8          It's ECFMG's position that that
9     diploma has been source verified as
10    authentic. We have no reason to believe
11    otherwise that it is not.
12 BY MR. THRONSON:
13    Q.    The second item on the list,
14 certificate of full registration, issued to
15 Charles Olufemi Igberase 1989, does ECFMG
16 believe that that certification of full
17 registration is authentic?
18         MS. McENROE: Objection to form.
19         THE WITNESS: ECFMG does not
20    have information to determine whether
21    this document is authentic or not because
22    we would verify it with a primary source.
23 BY MR. THRONSON:
24    Q.    Was it ECFMG's policy when it

27 (Pages 102 - 105)

KARA CORRADO

Page 106

1 required provision -- submission of the
2 certificates to have some verification of the
3 authenticity of the certificate of
4 registration?
5     A.    Not to my knowledge. We did not
6 require a source verification of the
7 registration or license.
8     Q.    Why was that?
9     A.    I don't know.
10    Q.    Who would know?
11        MS. McENROE: Objection to form.
12        THE WITNESS: I don't know.
13 BY MR. THRONSON:
14    Q.    The third item on the list, the
15 MBBS diploma allegedly issued in '96 to Charles
16 Igberase Oluwafemi from the University of
17 Ibadan, what is ECFMG's position as to the
18 authenticity to that document?
19    A.    So ECFMG has no information
20 about the authenticity of that document.
21    Q.    So ECFMG doesn't take a position
22 either way?
23    A.    Correct.
24    Q.    The fourth item, the MBBS

Page 107

1 diploma, allegedly issued to Johnbull
2 Enosakhare Akoda in 1988 from the University of
3 Benin, what is ECFMG's position as to the
4 authenticity of that document?
5     A.    ECFMG's position is that this
6 document, the MBBS diploma, is authentic based
7 on the information that was provided to us from
8 the primary source at the medical school.
9     Q.    Does ECFMG have any reason to
10 believe that that diploma issued to Akoda is
11 not authentic?
12    A.    ECFMG has no reason to believe
13 that that diploma is not authentic.
14    Q.    The fifth -- strike that. Does
15 ECFMG -- is it ECFMG's position that the '87
16 diploma from Ibadan, the '96 diploma from
17 Ibadan, and the '88 diploma from Benin were all
18 obtained by the same person?
19        MS. McENROE: Objection to form.
20 BY MR. THRONSON:
21    Q.    Do you understand what I'm
22 asking, that one person actually graduated from
23 all those schools?
24    A.    Yes. We don't have information

Page 108

1 that we could take a position that one
2 individual graduated from all of those schools.
3        What we have is an individual
4 submitted those documents to ECFMG, and they
5 were verified as authentic.
6     Q.    Does ECFMG have any reason to
7 believe that one individual, a single
8 individual, did not obtain those three diplomas
9 from schools, from the three schools -- or from
10 Ibadan or Benin?
11        MS. McENROE: Objection to form.
12        THE WITNESS: So, again, ECFMG
13    doesn't have any information on which to
14    take a position on how those documents or
15    those educations were obtained.
16        What we have is an individual
17    that submitted documents to us that were
18    source verified to us as authentic.
19 BY MR. THRONSON:
20    Q.    I may have already asked this
21 but just to be sure. ECFMG has cooperated in
22 at least one federal, criminal investigation
23 regarding this matter; right?
24    A.    Yes.

Page 109

1     Q.    Has it cooperated in any other
2 investigations concerning this matter?
3     A.    I think it was part of the same
4 investigation, the Maryland Board of Physicians
5 reached out to us initially, I believe, about
6 requesting information on these two physicians.
7     Q.    During the course of that
8 process, including in a plea agreement, did
9 ECFMG obtain any additional insight as to the
10 authenticity of the five documents listed in
11 Exhibit 3?
12        MS. McENROE: Objection to form.
13        THE WITNESS: So at the time
14    when we reviewed the file for the medical
15    board, the information we have here is
16    the same information we had then which is
17    those documents were verified as
18    authentic. We didn't have any reason to
19    believe they were not authentic.
20 BY MR. THRONSON:
21    Q.    The fifth document listed, the
22 certificate of full registration, allegedly
23 issued to Johnbull Enosakhare Akoda, in 1989,
24 does ECFMG take a position as to whether that

28 (Pages 106 - 109)

KARA CORRADO

Page 110

1 document is authentic?
2      A.      ECFMG does not have enough
3 information to take a position on whether that
4 document is authentic or not, because it hasn't
5 been primary-source verified.
6      Q.      Does ECFMG take a position as to
7 whether any transcripts provided by this
8 applicant, on these various applications, are
9 authentic or not?
10      A.      I am not aware that ECFMG has
11 any transcripts for him unless they were
12 submitted through the -- they may have been
13 submitted through the residency application
14 service program; but I don't believe we ever
15 source verified a medical school transcript for
16 Dr. Igberase, because it wasn't a requirement
17 at the time he was certified.
18      Q.      Did it ever become a
19 requirement?
20      A.      Yes.
21      Q.      When did that happen?
22      A.      Approximately 2004.
23      Q.      Are you aware of any other cases
24 where allegations have been made of irregular

Page 111

1 behavior concerning applicants who presented
2 diplomas from the University of Ibadan?
3      A.      None that I can recall. Our
4 falsified credentials are -- we get falsified
5 credentials from all different parts of the
6 world so I don't know off the top of my head if
7 we ever had someone else from that medical
8 school that submitted a falsified credential.
9      Q.      Do you know, both individually
10 and as a representative of ECFMG, if anyone has
11 been investigated for irregular behavior and
12 that person has submitted a diploma from the
13 University of Benin?
14      A.      My answer would be the same as
15 the last, that I don't know of the cases that
16 we reviewed over all time if there were any;
17 it's possible, but any school essentially is
18 possible. We get fraudulent credentials from
19 different areas of the world.
20      Q.      You've received them from
21 Nigeria before?
22      A.      I don't know. I'd have to
23 check.
24      Q.      I wanted you to review another

Page 112

1 email.
2           I'll have this marked as Exhibit
3 4.
4                - - -
5           (Whereupon the document was
6      marked, for identification purposes, as
7      Exhibit Number CORRADO-4.)
8                - - -
9 BY MR. THRONSON:
10      Q.      So Exhibit 4, I'll represent to
11 you is another document we received in the
12 course of discovery in this case, and it
13 appears to be an email exchange involving --
14 among staff in the special investigations team
15 at ECFMG; is that right?
16      A.      That's right.
17      Q.      So it appears that an individual
18 named Saraogi Chirag pulled data concerning the
19 University of Ibadan and the University of
20 Benin?
21      A.      I'm sorry, is that a question?
22      Q.      Yes.
23      A.      Yes, he did.
24      Q.      Are you aware of that project?

Page 113

1      A.      Yes.
2      Q.      What was it about?
3      A.      This was a review of these two
4 medical schools -- the applicants to ECFMG to
5 determine if there were any open cases of an
6 allegation of irregular behavior of another
7 anomaly.
8      Q.      Was this motivated by the Akoda
9 matter?
10      A.      Yes.
11      Q.      What were the findings, if any,
12 of this investigation; what did you all
13 conclude?
14      A.      If I recall correctly, there
15 were no other incidents of irregular behavior
16 or abnormalities.
17      Q.      No other incidents in the
18 history of the organization?
19      A.      No. Not including people that
20 we maybe had already concluded a case on, but
21 was this anything from the past that had been
22 open and not concluded.
23      Q.      Got it. Okay. So the
24 conclusion that there weren't any other

29 (Pages 110 - 113)

KARA CORRADO

Page 114

1 incidents of irregular behavior from applicants
2 submitting credentials from these two
3 universities, that only applied to open cases
4 that hadn't yet been resolved by the
5 organization?
6    A.    Yes.
7    Q.    I want to just go through the
8 timeline a little bit of what happened here.
9 There are a lot of documents that you can refer
10 to in the -- review of exhibits from the
11 deposition of Bill Kelly. If you need to
12 verify something in reference to my questions,
13 please feel free to do so.
14         My understanding is that
15 Igberase first applied to ECFMG in 1992?
16    A.    I believe that's correct.
17    Q.    He ultimately received a
18 certificate in 1993?
19    A.    Yes.
20    Q.    Then ECFMG received a separate
21 application from an individual, the same
22 individual going by the name Igberase Charles
23 in 1994?
24    A.    Yes.

Page 115

1    Q.    That certificate was issued to
2 him, I believe, in approximately 1995?
3    A.    Yes.
4    Q.    Then the creds committee, the
5 committee of medical education credentials,
6 revoked that certificate in '95?
7    A.    Yes. Around that -- after that
8 meeting, yes.
9    Q.    Then it appears that the same
10 individual -- I have a letter it's Exhibit 7 to
11 the Kelly deposition -- where the creds
12 committee announced it's revocation of that
13 certificate in December 1995?
14    A.    Yes.
15    Q.    Then the same individual,
16 according to exhibit 23 of the Kelly
17 deposition, applied as Akado in 1996?
18    A.    Yes. So we received an
19 application from Johnbull Akado in '96.
20    Q.    He did not provide a social
21 security number on this application, correct?
22    A.    Yes, that's correct.
23    Q.    Was it a requirement at that
24 time to provide one?

Page 116

1    A.    No.
2    Q.    Was it a requirement to state
3 one if you had one?
4    A.    No.
5    Q.    He indicated that he had not
6 taken an ECFMG examination before, correct?
7    A.    That's correct.
8    Q.    That statement was false?
9    A.    Yes.
10    Q.    In making that false statement,
11 that constituted irregular behavior?
12    A.    In making the false statement?
13    Q.    That he had never taken the
14 examination before?
15    A.    That would constitute evidence
16 of irregular behavior.
17    Q.    In fact, it was that same type
18 of irregular behavior that ultimately led to
19 the Igberase and Charles certificates being
20 revoked, correct?
21    A.    That's correct.
22    Q.    On page 705 of Exhibit 23 there
23 is a box for office use only in the lower
24 left-hand corner of the page. Can you tell me

Page 117

1 what those various codes and numbers mean?
2    A.    I cannot tell you.
3    Q.    Who can?
4    A.    I don't know if there's anyone
5 that works at ECFMG that would know at this
6 point in time.
7    Q.    Then this individual, under the
8 Igberase moniker, took an appeal from the
9 revocation of ECFMG certificates March 7, 1996?
10         MS. McENROE: Are you referring
11 to a specific exhibit you want her to
12 look at?
13         MR. THRONSON: Sure Exhibit 9.
14         THE WITNESS: Yes.
15 BY MR. THRONSON:
16    Q.    It appears that ECFMG, the
17 appeals committee, a review committee?
18    A.    Yes.
19    Q.    They affirmed the decision of
20 the creds committee that limited the period of
21 revocation to five years?
22    A.    That's correct.
23    Q.    Why did they do that?
24    A.    I don't know what their thought

30 (Pages 114 - 117)

KARA CORRADO

Page 118

1 process was.
2    Q.    With respect to the 1996
3 application which is Exhibit 23, what was done
4 to -- you mentioned earlier that ECFMG
5 attempted primary-source verification with a
6 medical school, the University of Benin and
7 also verification of the medical registration
8 with Benin.
9          Did ECFMG conduct any other
10 investigation or inquiry with respect to this
11 application to determine whether it was true
12 and accurate in any or all respects?
13    A.    ECFMG staff would have processed
14 this application in accordance with the
15 procedures that were in effect at the time to
16 determine if there was another applicant in the
17 database with this same information or name.
18    Q.    How would it do that?
19    A.    The staff person would search
20 the database we had at the time, the system we
21 were using.  I don't know the specifics of how
22 that system worked.
23    Q.    Did the staff ever investigate
24 or inquire into whether the naterial (phonetic)

Page 119

1 steel was authentic or suspicious in any way?
2    A.    Not that I'm aware of.  It was
3 processed as any other application would be
4 processed; with the same level of scrutiny.
5    Q.    So then in Exhibit 24, Akoda
6 applies again, my recollection is that he
7 either applied too late or he was a no show for
8 one round of exams and so applied again, and
9 this time indicated that he had taken an
10 examine previously, or he applied before;
11 correct?
12    A.    Yes.
13    Q.    Would ECFMG staff have compared
14 the contents of this application to the
15 contents of the previous application to see if
16 there were any red flags?
17       MS. McENROE:  Objection to form.
18       THE WITNESS:  The staff would
19 have updated any information the
20 applicant had provided in the system.  So
21 generally speaking they wouldn't look at
22 the paper application because it would be
23 in the file.
24       They would look at what was in

Page 120

1 the system that had been data entered
2 when the last person processed the last
3 application.
4 BY MR. THRONSON:
5    Q.    What data information was
6 entered?
7    A.    Not all of the information on
8 the application is data entered.  So the
9 biographic information, name, address, date of
10 birth, social security number is provided.  In
11 the application software we would indicate
12 whether they were a student or a graduate, test
13 center information.  Their fees would have been
14 entered into the payment system.
15       We did not key in any secondary
16 school information.  We would key in the
17 medical school degree, school information,
18 attended state's information, birth place, and
19 citizenship would be collected as well.
20    Q.    Was the clerkship information
21 entered?
22    A.    No.  It was also not required to
23 be completed.
24    Q.    So -- I'm wondering how to

Page 121

1 reconcile that statement with the statement
2 right at the top, under part A, all items on
3 all sides of the application must be filled out
4 completely for initial and reexamination or
5 application will not be accepted.
6    A.    Yes.  There were fields in here
7 that might not necessarily be applicable to
8 each person.
9       So as a matter of process, they
10 were not required when we received the
11 application; they would not have caused a
12 rejection because that would have impeded the
13 applicant over information that wasn't
14 necessarily relevant to their registration for
15 exam, and at that time we only gave exams, I
16 think, twice or three times a year so it could
17 be a problem if you missed the exam
18 registration.
19       So only the relevant information
20 we needed was required.
21    Q.    If you take a look, compare it
22 to 23 and 24 for a moment.  Just the clinical
23 clerkships under both.  So I'm wondering if
24 you'll agree that the clinical clerkship

31 (Pages 118 - 121)

KARA CORRADO

Page 122

1 information provided on page 706 of Exhibit 23
2 differs from the clinical clerkship information
3 provided on page 646 of Exhibit 24?
4          MS. McENROE:  Objection to form.
5          THE WITNESS:  In what way?
6 BY MR. THRONSON:
7     Q.     So for example, the hospital and
8 the clinic in Exhibit 23, General Hospital
9 Warri; Exhibit 24, Specialist Hospital,
10 Benin/Warri?
11     A.     So I would say that how the
12 information is presented is different, but I
13 wouldn't be able to say whether that was the
14 same hospital or not.
15     Q.     Would it matter to ECFMG?
16     A.     Not as it related to
17 certification or registration for examination.
18     Q.     So under surgery for example, on
19 Exhibit 23, Akoda wrote he did a clerkship at
20 the Echos General Hospital Warri with
21 Dr. Henderson; and on Exhibit 24, he did it at
22 the Specialist Hospital Benin, Warri with
23 Dr. Eddiblekia (phonetic) -- or something like
24 that, but it's not Henderson, correct?

Page 123

1     A.     Correct.
2     Q.     If ECFMG staff had gone back and
3 looked the at the paper applications and
4 compared this, these two applications in that
5 respect would that have prompted additional
6 investigation into this applicant?
7          MS. McENROE:  Objection to form,
8     calls for speculation.
9          THE WITNESS:  No.  As I said the
10     clerkships were not required, and they
11     could have been partial clerkships.  So
12     it might not necessarily be not true that
13     he had different surgery clerkships in
14     the same year.
15 BY MR. THRONSON:
16     Q.     So it would not be part of
17 ECFMG's procedures to contact the applicant to
18 ask the applicant about this?
19     A.     Not about clerkships, no.
20     Q.     It would not be part of ECFMG's
21 procedures to contact these hospitals to verify
22 that this individual had completed clerkships
23 at these hospitals?
24     A.     That was not part of our

Page 124

1 requirement or process.
2     Q.     Has it ever been?
3     A.     Not to my knowledge.
4     Q.     Has it ever been part of ECFMG's
5 process to inquire, to ask an applicant about,
6 when confronted with inconsistent information,
7 about clerkships?
8     A.     No.
9     Q.     When ECFMG received the
10 applications in Exhibit 23 and 24, did it check
11 them against it's credentials reference
12 library?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  My understanding
15     of the process at the time was that the
16     credential would be checked against the
17     reference library.
18          Whether the person who was
19     processing these applications did that, I
20     was not here so I wouldn't be able to
21     say yes; but that was the process.
22 BY MR. THRONSON:
23     Q.     Does ECFMG take a position
24 either way as to whether information submitted

Page 125

1 by this applicant, Akoda, was checked against
2 ECFMG reference library?
3     A.     So I would say the diploma would
4 have been checked against the reference
5 library.
6     Q.     How about the registration?
7     A.     We would not check the
8 registration against the library.  I don't
9 believe that certificates of registration were
10 in the library at that time.
11     Q.     What did ECFMG do at the time
12 this application was submitted to make sure
13 that the credentials library was -- am I using
14 that term correctly?
15     A.     Yes.
16     Q.     Okay -- that the credentials
17 library was up-to-date with the most current
18 signatures that were being used on diplomas at
19 various schools?
20     A.     There were processes in place to
21 have the staff update the library with copies
22 of verified credentials.  So if the format was
23 the same on a diploma as the year before and
24 the official verified it, they would send a

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 126

1 copy of that diploma that had been verified to
2 the person that was responsible for putting the
3 documents into the library.
4          The library at that time was not
5 electronic. So it was a paper file library
6 that could be accessed by the staff if they
7 needed to cross reference.
8     Q.    Are historical samples of the
9 diplomas maintained? For example, could you
10 take the diploma from the University of Benin,
11 Exhibit 25 from Kelly deposition, and go into
12 the reference library and say, hey, in '96 did
13 ECFMG have a document on file where these
14 signatures match the document that was in the
15 reference library?
16    A.    So ECFMG has historical
17 information on diplomas.
18    Q.    So it's the kind of record it
19 would typically maintain?
20    A.    Yes.
21          MR. THRONSON: I'd like to
22    request that also.
23          MS. McENROE: Any new requests
24    that haven't been produced, if you can

Page 127

1    put that in writing and we can evaluate
2    it following the deposition, that would
3    be fine.
4          MR. THRONSON: We'll see if
5    they're actually new, but we can work
6    that out later.
7 BY MR. THRONSON:
8     Q.    It looks -- if you could just
9 turn to Exhibit 31. So this is a letter from
10 Steve Steeling to James McCorkle dated
11 August 22, 2000.
12    A.    Yes.
13    Q.    On the second paragraph of the
14 letter it reads, the social security number he,
15 Akoda, provided ECFMG in 1998 is 9065. Is that
16 ECFMG's understanding as well?
17          MS. McENROE: Objection to form.
18          THE WITNESS: I would say, yes,
19    if that's what we put in the letter at
20    that time.
21 BY MR. THRONSON:
22    Q.    Do you know how that social
23 security number was provided to ECFMG?
24    A.    I do not, unless it was on an

Page 128

1 application.
2     Q.    If you could turn to Exhibit 33.
3 This is a request for permanent revalidation of
4 standard ECFMG certificate?
5     A.    Yes.
6     Q.    It looks here there's a social
7 security number -- there's an initial number
8 crossed out, then there's another number, it's
9 either 4065 or 9065 to my eye. Do you think
10 that's where ECFMG was provided that social
11 security number?
12    A.    That's probably where the social
13 security number came from.
14    Q.    Can you explain what Exhibit 33
15 is?
16    A.    Exhibit 33 is a request for
17 permanent revalidation of the standard ECFMG
18 certificate.
19          At the time that Dr. Akoda was
20 ECFMG certified, the certificate had an
21 expiration date and it was based on the
22 validity of the English language test. So a
23 test of the English language was a requirement
24 for certification, and that would only be valid

Page 129

1 for a two-year period.
2          When the individual entered an
3 ACGME accredited program, they could then
4 request, on the basis of entering that training
5 program, a revalidation sticker for an
6 indefinite status so that they would not have
7 to continually revalidate the English
8 examination.
9          So this form is a request from
10 John Akoda requesting that revalidation sticker
11 for his certificate so that his status would be
12 updated to valid indefinitely.
13    Q.    It looks like that request was
14 approved by ECFMG?
15    A.    Yes.
16    Q.    Can you tell who approved it by
17 the signature on the page?
18    A.    No, I cannot.
19    Q.    Looks like the document asks for
20 notarization but is not notarized, correct?
21    A.    It doesn't appear to be
22 notarized. Whether there was an institutional
23 seal that was raised on that and you cannot see
24 on the copy I don't know.

33 (Pages 126 - 129)

Case: 1:20-802629 Document 1-2 Page 1 of 19 Filed Date: 04/06/2020
Case: 20-8029 Document 12 Page: 611 Filed Date: 07/06/2020

KARA CORRADO

Page 130

1  Q.  When ECFMG received a request
2  like this, would it look anything up in the
3  system about the applicant before granting the
4  request?
5  A.  ECFMG would process these in the
6  system, the information you would be looking up
7  would be related to the certification status;
8  keying in the ID number and pulling up the
9  correct record.
10  Q.  Is part of that process -- was
11  it the procedure of ECFMG to verify that the
12  applicant's name was consistent between the
13  request for permanent revalidation and the name
14  that was on file for the applicant?
15  A.  That was not part of the process
16  that I'm aware of.
17  Q.  Was it the process of ECFMG to
18  verify that the date of birth given on the
19  request for permanent revalidation was
20  consistent with the date of birth on file with
21  ECFMG for the applicant?
22  A.  Not that I'm aware of.
23  Q.  Was there -- did ECFMG have any
24  requirements for its staff as to verifying

Page 131

1  information on a request for permanent
2  revalidation was consistent with information
3  that it had on file for the applicant?
4  A.  I don't know what the specific
5  procedures were in terms of processing these
6  requests.
7  Q.  Obviously the name on this
8  application, John Charles Akoda, is different
9  than John Nosa Akoda?
10  A.  Yes.
11  Q.  The date of birth of
12  4/17/63 that's on the request for permanent
13  revalidation is different than the date of
14  birth that Akoda gave on his applications to
15  ECFMG of --
16  A.  Yes.
17  Q.  Now there's a difference between
18  the name on Akoda's diploma which you can see
19  on Exhibit 25.  The name on the diploma is
20  Johnbull Enosakhare Akoda?
21  A.  Yes.
22  Q.  And that's different obviously
23  then John Nosa Akoda?
24  A.  Yes.  It appears to be the

Page 132

1  expanded versions of the names.
2  Q.  How do you know it's the
3  expanded version of the name?
4  A.  John is part of the name of
5  Johnbull and Nosa is part of the name
6  Enosakhare.
7  Q.  Obviously you can have
8  circumstances where an applicant's name
9  differed between a diploma and an application
10  the difference was benign and didn't reflect
11  anything about the authenticity of the
12  application, or the trustworthiness of it, or
13  the trustworthiness of the diploma; right?
14  A.  Yes.  You're asking me if we can
15  have benign variations in the name?
16  Q.  Right.
17  A.  Yes, there could be variation in
18  the name from the diploma to the name on the
19  applicant record.
20  Q.  There can also be variations
21  between the diploma and the name on the
22  applicant record that are not benign that may
23  suggest misconduct on the part of the applicant
24  or third parties, correct?

Page 133

1  A.  Yes.  If someone submitted a
2  diploma with a totally different name.  I don't
3  know if I would characterize it as benign or
4  not benign, but it would raise a question.
5  Q.  Did ECFMG take any steps at this
6  time when it was faced with an application,
7  where the name on the application differed from
8  the name on the diploma, to determine whether
9  that difference, as we've characterized it, was
10  benign or not?
11  A.  At the time, the processes would
12  have allowed for cultural variations in names,
13  and in shortening names, like Johnbull -- so
14  would not have seemed incongruent with the
15  person whose name was on the application.
16  If the diploma name was Johnbull
17  and he's applying as John, the name of record
18  would be sent to the medical school when
19  verifying this diploma.  So the name of record,
20  if it varied, would be on the form that the
21  school would be verifying with this diploma
22  attached to it.
23  Q.  The name of the record being the
24  name on the application?

34 (Pages 130 - 133)

KARA CORRADO

Page 134

1    A.    Yes.
2         MS. McENROE:  We've been going
3    for about an hour and 40 minutes, is this
4    a good time to take a short break.
5         MR. THRONSON:  Sure.
6              - - -
7         (Whereupon there was a brief
8    recess in the proceeding.)
9              - - -
10        MR. THRONSON:  Back on.
11   BY MR. THRONSON:
12   Q.    Ms. Corrado, looking at Exhibit
13   25 in front of you.  You'll see there's a stamp
14   on it, received August 11, 2011, by the
15   Maryland Board of Physicians.
16        Do you know why that stamp is
17   there and why a Maryland Board of Physicians
18   document is in the ECFMG files?
19        MS. McENROE:  Objection to form.
20        THE WITNESS:  I don't know.  The
21   Maryland Board of Physicians would have
22   been responsible for licensing Dr. Akoda.
23   My understanding of their current
24   process, is that as part of the

Page 135

1    application process for an international
2    medical graduate they have to source
3    verify the medical education credentials.
4    Maryland currently has a form
5    where they will either accept the
6    verification through the Federation of
7    State Medical Boards or directly
8    themselves.  So they have a form that
9    they require the individual to send to
10   the medical school and must be sent back
11   directly to Maryland.
12        So I don't know why the Maryland
13   Board of Physician's copy is in this
14   file.
15   BY MR. THRONSON:
16   Q.    Okay.  Would it have happened as
17   the result of any criminal investigation that
18   ECFMG cooperated in?
19   A.    I don't -- I don't know.
20        My understanding of what -- when
21   we have requests on information about the case,
22   particularly -- I know we got a request from
23   the board of physicians in about the 2014 time
24   period.

Page 136

1         I'm not aware of anything prior
2    to that, so I can't speculate.
3    Q.    What was the request that you
4    got in 2014 about?
5    A.    The Maryland Board reached out
6    to us for, I believe, file copies or specific
7    copies of documents on Dr. Akoda and
8    Dr. Igberase.
9    Q.    Do you know why?
10   A.    I don't know.  I don't know.
11   There's an email, I think about it.
12   Q.    Yeah, there was a reference, I
13   believe, in one of these emails to the
14   information you had provided the board in 2014,
15   and there was a detective in one of the emails
16   who was in a sex crimes unit or sexual assault
17   unit.
18        Do you recall any sex crimes or
19   sexual assaults investigation that ECFMG
20   provided information in connection with or
21   participated in?
22        MS. McENROE:  Objection to form.
23        You mean specifically for Dr. Igberase
24        and Dr. Akoda?

Page 137

1         MR. THRONSON:  Correct.
2         THE WITNESS:  There was a
3    request around that same time period from
4    an individual, law enforcement, that I
5    think was in a sex crimes unit.
6    BY MR. THRONSON:
7    Q.    Do you know any of the details
8    or allegations that prompted that request?
9    A.    I do not.  ECFMG's procedure
10   when it comes to a request from law enforcement
11   is generally to cooperate with law enforcement.
12        So if a law enforcement official
13   reaches out and indicates to us that they have
14   an active investigation about an individual, we
15   will provide the information that they seek if
16   appropriate and if we have it.
17   Q.    Do you know what information you
18   provided in connection with that investigation?
19   A.    I believe we provided -- the
20   files we provided would be included in the
21   documents that are in this, in the binders.
22   Q.    So we got a little over 10,000
23   pages.  Do you think you gave all of that or...
24   A.    If they requested for the file,

35 (Pages 134 - 137)

KARA CORRADO

Page 138

1 we would have give them a copy of his file,
2 both files for those individuals. If they only
3 requested specific pieces of the file, like an
4 application, then we would give them that. It
5 just depends on what they're looking for.
6 Q. Just to close this out. So
7 there was an investigation that the Maryland
8 Board of Physicians was doing that was around
9 the 2014 time period?
10 A. That's my understanding from
11 their communication.
12 Q. Were you involved in responding
13 to the inquiries from the Maryland Board?
14 A. No, I was not.
15 Q. Do you know what information was
16 provided?
17 A. I know what information was
18 provided in the sense we provided the file. I
19 just don't know which parts of it at this
20 particular moment were provided; but what they
21 asked for we would have provided.
22 Q. Do you know what the outcome
23 was?
24 A. I do not; other than at the end

Page 139

1 of all of this, his Maryland license was
2 revoked.
3 Q. Do you know what the outcome of
4 the sex crimes investigation was?
5 A. I do not.
6 Q. At some point you were contacted
7 by a federal law enforcement?
8 A. Yes.
9 Q. Who contacted you and when?
10 A. I'm sorry, I don't remember the
11 name of the agent; and it was sometime, I
12 think, in the 2015 or 2016 time period.
13 Q. That was FBI or U.S. Attorney's
14 Office?
15 A. I believe it was -- I'm not
16 sure. I think there's communication that we
17 have in there. I don't want to misrepresent
18 who reached out to us; but yes, a federal
19 agency reached out to us in that time period.
20 MR. THRONSON: I have not seen
21 it, but we can talk about that.
22 BY MR. THRONSON:
23 Q. What was your understanding of
24 the purpose of the investigation?

Page 140

1 A. My understanding is that the
2 authorities were reviewing a matter involving
3 Dr. Igberase and Dr. Akoda and that there was
4 some type of potential fraud. They asked us
5 for information, and they asked us not to
6 provide information to anyone about their
7 investigation, because they were worried about
8 not being able to catch him. I think that's
9 generally the knowledge that I have of that
10 request.
11 Q. Not being able to catch him
12 because he would flee the country?
13 A. I'm not sure. It appeared from
14 the information that we have from them they
15 were trying to catch him, for a lack of better
16 words, and they were worried that he somehow
17 would be able to slip through. If he had got
18 any notice that someone was looking at his
19 record, it might tip him off.
20 Q. Did you understand that to be a
21 legal obligation that you had to not notify
22 anyone about the investigation, or not notify
23 anyone about the potential fraud that Igberase
24 may have committed?

Page 141

1 MS. McENROE: Objection to form.
2 THE WITNESS: I would say that
3 we generally cooperate with law
4 enforcement. So if they asked us not to
5 do anything or not to provide information
6 to other parties we would generally do
7 what they ask of us.
8 BY MR. THRONSON:
9 Q. Do you know generally what
10 information you provided to law enforcement in
11 connection to that investigation; 2015, 2016?
12 A. So we would have provided the
13 files to the authorities on that investigation.
14 Q. The files, as I understand it,
15 there are two hard files that we had the
16 opportunity to go through today that are under
17 the Igberase applicant number and Akado
18 applicant number, right?
19 A. Yes.
20 Q. What other files does ECFMG
21 maintain relative to Akado?
22 A. Those are the hard copy file and
23 there would be an electronic file which would
24 have copies of some of the documents in there.

36 (Pages 138 - 141)

KARA CORRADO

Page 142

1        We started doing electronic
2 files after Dr. Igberase came through our
3 system. So all of his information would be in
4 paper file, and then if he had communicated
5 with us after that time, that would be in the
6 electronic file and we would, when law
7 enforcement asked, combine those two things.
8    Q.    Is there a software program you
9 use to access the electronic file?
10    A.    Yeah. I forget what it's
11 called, but you can access the scanned
12 documents.
13    Q.    They are stored on a hard drive
14 somewhere at ECFMG?
15    A.    I don't know if they are on a
16 hard drive.
17    Q.    Or the cloud?
18    A.    But, yes, they are stored
19 somewhere in the electronic file.
20    Q.    Then is there a separate
21 electronic file that contains perhaps internal
22 memos about Akoda, deliberations, things of
23 that nature?
24    A.    The file, the record I should

Page 143

1 say in our system, may include comments from
2 our staff that are progressing, that wouldn't
3 necessarily be in the electronic file. Those
4 are more operational kind of comments, you
5 know, process this, send it there.
6        The decision of the medical
7 education credentials committee are kept in the
8 applicant's file, but the minutes from the
9 meeting are not kept in the applicant's file.
10 So that would be the only other record, if you
11 will, of the applicant's irregular behavior.
12    Q.    Everything else would be in the
13 applicant's file?
14    A.    It would be in the file. It
15 would be in the system, the electronic system.
16    Q.    Going back to our story. When
17 did ECFMG first become aware that Akoda. Sorry
18 I'm skipping around.
19        When did ECFMG first become
20 aware that Akoda engaged in irregular behavior?
21        MS. McENROE: Objection to form.
22        THE WITNESS: There was
23 allegation that he had used a social
24 security number that was not his, and

Page 144

1 that was reported to us by the residency
2 program at the time. So at that time
3 there would have been a review of that
4 scenario to determine if there was
5 sufficient evidence of irregular
6 behavior. If he had violated any of our
7 policies or provided any false documents
8 or anything like that to ECFMG.
9 BY MR. THRONSON:
10    Q.    If you turn to Exhibit 34, this
11 is a letter from James McCorkle at Jersey Shore
12 Medical Center to Rice Holmes at ECFMG sent and
13 received on August 11, 2000. This contains, I
14 believe, the information you were just
15 discussing about Akoda was using a social
16 security number that was issued to Igberase.
17        In the first paragraph McCorkel
18 reports that Akoda admitted using these various
19 names, Igberase, Charles Igberase and also
20 having admitted to using three birth dates.
21        Do you see that information?
22    A.    I do.
23    Q.    Did I characterize that
24 accurately?

Page 145

1    A.    Yes.
2    Q.    He mentions the social security
3 number 9065. That's the same number on the
4 request to permanently revalidate his
5 certificate that we looked at earlier, right?
6    A.    Yes, I believe it was.
7    Q.    So is this the first date on
8 which ECFMG became aware that Akoda might have
9 engaged in irregular behavior when it got this
10 letter?
11        MS. McENROE: Objection to form.
12        THE WITNESS: Yes. Either on or
13 about this date. I don't know if he
14 called before that and then faxed this
15 over.
16 BY MR. THRONSON:
17    Q.    There wasn't anything before
18 this?
19    A.    Not that I'm aware of.
20    Q.    In the procedures we were
21 discussing earlier regarding irregular
22 behavior, there's a discussion about what makes
23 a credible allegation and an allegation that's
24 considered not credible.

37 (Pages 142 - 145)

KARA CORRADO

Page 146

1        Is an allegation that's reported
2 by a vice president of academic affairs at a
3 residency program typically considered
4 credible?
5        MS. McENROE:  Objection to form.
6        THE WITNESS:  So it depends on
7    what the information is.  If the
8    credibility of the individual -- I would
9    say it just depends on what the
10    information is they are providing to us;
11    but generally if it's a residency program
12    director who's signing it that we can
13    follow up with, it would be something we
14    would follow up on.
15 BY MR. THRONSON:
16    Q.        Have you reviewed the
17 correspondence with Jersey Shore and the notes
18 that William Kelly made in the file regarding
19 his conversations with Jersey Shore?
20    A.        Yes.
21    Q.        It appears that Akoda came to
22 visit Kelly around September 27, 2000, and this
23 is -- you can see a memo about this Exhibit 41.
24 Exhibit 41 to Kelly's deposition is a memo to

Page 147

1 file regarding Akoda.  Have you reviewed this
2 document before?
3    A.        Yes.
4    Q.        It is as I described?
5    A.        Yes.
6    Q.        So according to Kelly, he
7 admitted -- Akoda admitted to using Igberase
8 Charles's social security number?
9    A.        Yes.
10    Q.        So at that point surely
11 Dr. McCorkle's allegation that Akoda had
12 submitted a false social security number would
13 have been regarded as credible by ECFMG?
14    A.        That he submitted a false social
15 security number to the program, yes.
16    Q.        And he also submitted that false
17 social security number to ECFMG, correct?
18    A.        If...
19    Q.        On the request for permanent
20 certification at least if you turn to...
21    A.        Yes, because that's -- well,
22 that's the social security number that the
23 program -- that form is usually completed by
24 the program coordinator.

Page 148

1        So whether he or she filled it
2 out based on the information he provided to
3 Jersey Shore, then it was sent to ECFMG.
4    Q.        Got it.  So at some point -- but
5 before this memo was released and before the
6 request for permanent recertification, Akoda
7 had submitted a social security number to ECFMG
8 that he represented was his, but it wasn't;
9 right?
10        MS. McENROE:  Objection to form.
11        THE WITNESS:  So the answer to
12    that question is yes, but that wasn't
13    something that was known to us at that
14    time, when we received this form.
15 BY MR. THRONSON:
16    Q.        But by September 27, 2000, when
17 Kelly wrote this memorandum, that was known to
18 ECFMG?
19    A.        Right.  We would have known that
20 he presented that social security number to the
21 program, and that he claimed that it wasn't
22 his, that it was Igberase's.
23    Q.        ECFMG would have known around
24 that time that Akoda submitted a false social

Page 149

1 security number to ECFMG itself, correct?
2    A.        It would depend on whether -- I
3 mean we would have known, yeah.  I think we put
4 that in the letter to them, we got the social
5 security number.  So if -- if we knew because
6 they advised us that he had used the other
7 social security number that that was not his
8 social security number, yes.
9    Q.        If you turn to Exhibit 31, this
10 is the letter we were talking about earlier.
11 Exhibit 31 to the Kelly deposition from Steve
12 Seeling to James McCorkle.  In the second
13 paragraph Steve Seeling states the social
14 security number he provided ECFMG in 1998 is
15 9065?
16    A.        Yes, I see that.
17    Q.        Providing a false social
18 security number or using a false social
19 security number can be a federal, criminal
20 offense; correct?
21        MS. McENROE:  Objection to form;
22    calls for a legal conclusion.
23        THE WITNESS:  That's my
24    understanding, yes.

38 (Pages 146 - 149)

KARA CORRADO

Page 150

1 BY MR. THRONSON:
2     Q.     At least based on the plea
3 agreement and so fourth --
4     A.     Yes.
5     Q.     Right, and it was also one of
6 the reasons that Akoda was ultimately kicked
7 out of the Jersey Shore residency, right?
8     A.     Yes.
9     Q.     Under ECFMG's judgement would
10 providing a false social security number to
11 ECFMG at that time have constituted irregular
12 behavior?
13     A.     I think it would depend on the
14 circumstances around how the information was
15 provided and what evidence we had of that.
16     Q.     Do you have a sense of what,
17 after ECFMG became aware that -- well, let me
18 back up. You said it would depend on the
19 circumstances. So under the circumstances of
20 this case, is it ECFMG's position that Akoda
21 providing a false social security number to
22 ECFMG in 1998 constituted irregular behavior?
23     MS. McENROE: Objection to form.
24     THE WITNESS: What I know is

Page 151

1     that it constituted the allegation from
2     the residency program; constituted enough
3     information for us to do an investigation
4     on that, but we did not have sufficient
5     evidence of the irregular behavior to
6     charge him with irregular behavior.
7     So there would be a policy tie
8     to the provision of false information.
9     For example, I don't know where anybody
10     lives, you could put an address on the
11     application that is not really your
12     address. You might be using someone
13     else's address that you know. I don't
14     know that that necessarily constitutes
15     irregular.
16     So if I have evidence of -- if
17     someone wrote a social security number on
18     the application and maybe the number is
19     off, I don't have any way to verify
20     whether the social security is valid or
21     not.
22     So if you were providing a false
23     number to us, in addition to other pieces
24     of information, that would show that you

Page 152

1     were trying to subvert our processes like
2     Dr. Igberase did in using different
3     pieces of information in order to subvert
4     the policy that you can't retake the
5     exam, then you would have evidence of
6     irregular behavior.
7 BY MR. THRONSON:
8     Q.     How about giving a false name on
9 an application, would you agree that in
10 applying for ECFMG certification in 1996 that
11 an individual identified himself as John Nosa
12 Akoda and that's a false name?
13     MS. McENROE: Objection to form.
14     THE WITNESS: Someone applied to
15     ECFMG in 1996 and used the name John Nosa
16     Akoda, and based on the facts that were
17     stipulated in plea bargain Igberase has
18     stated that he used John Nosa Akoda's
19     name.
20 BY MR. THRONSON:
21     Q.     It appears that Kelly suspected
22 in 2000 that Akoda and Igberase were the same
23 person, right?
24     A.     Yes. He, I think, had a

Page 153

1 suspicion.
2     Q.     McCorkle did as well?
3     A.     That's my understanding based on
4 the notes from the file.
5     Q.     Obviously Akoda -- it was
6 irregular behavior for Akoda to retake
7 examinations that he had already taken,
8 correct?
9     MS. McENROE: Objection to form.
10     THE WITNESS: It would be a
11     policy violation. So if we had the
12     evidence to prove that he wasn't two
13     different people, then we would charge
14     him with irregular behavior which is what
15     the review that happened at that time was
16     intended to look at; is there sufficient
17     evidence here that we can demonstrate he
18     is the same person to charge with
19     irregular behavior.
20     After that review, there was at
21     that time and subsequently not evidence
22     to make the allegation.
23 BY MR. THRONSON:
24     Q.     Let's look at Exhibit 49. So

39 (Pages 150 - 153)

KARA CORRADO

Page 154

1 this is a memorandum from the file that Kelly
2 wrote separately, "since I did not think it
3 should be made part of the official file"?
4     A.    I don't think that's what I
5 have.
6     Q.    I'm sorry, 48. So you have
7 Kelly Exhibit 48 in front of you?
8     A.    Yes, I do.
9     Q.    This is the memo that Kelly
10 wrote to file on December 22, 2000, that was
11 not made part of the official file?
12       MS. McENROE: Just for
13    clarification you said "to file," are you
14    introducing a document?
15       MR. THRONSON: Right. It says,
16    "attached is a copy of the memorandum for
17    the file, this memorandum is being
18    written separately since I did not think
19    it should be made part of the official
20    file."
21       THE WITNESS: That's what it
22    says, yes.
23 BY MR. THRONSON:
24     Q.    So I guess my first question is,

Page 155

1 what is the difference between the official
2 file and the file?
3     A.    I'm not aware of what
4 Mr. Kelly's intentions were in terms of two
5 separate files.
6       My understanding is that this is
7 a document -- he wanted to document the
8 discussion that he had with McCorkle, but it
9 wouldn't be made part of the official file in
10 terms of, I guess, potentially giving a copy of
11 the file.
12       Sometimes applicants require a
13 copy of the file or if someone else required it
14 in the normal course of credentialing. If they
15 needed something it wouldn't be part of the
16 official file.
17     Q.    Where was it stored at ECFMG;
18 where was it filed?
19     A.    I believe it was filed in a
20 paper file with Dr. Akoda's file.
21     Q.    I would have thought that would
22 be the official file. I guess are we talking
23 about multiple files pertaining to Akoda?
24       MS. McENROE: Objection to form.

Page 156

1       THE WITNESS: The
2 investigations -- I think what this may
3 be referring to now -- and I'm sorry to
4 clarify this. When we start an
5 investigation on an individual, generally
6 because there's a lot of information that
7 we are collecting, we used to collect the
8 information in, and in a manila file like
9 this. That would be kept, in a sense,
10 with the official paper file of the
11 individual, in the office of the person
12 who was reviewing it.
13       So if Mr. Kelly was working on a
14 case, he would have the official file and
15 then there would probably be a working
16 file for the investigation that would
17 contain information relevant to the
18 investigation that was ongoing. So that
19 would be my assumption on what Mr. Kelly
20 is indicating here.
21       Ultimately those files are
22 marked with the individual's name and so
23 they are stored -- if the person has a
24 paper file they're stored probably inside

Page 157

1 the paper file, which is where I assume
2 this was.
3 BY MR. THRONSON:
4     Q.    Is there a separate
5 investigative file today which pertains to
6 Igberase or Akoda?
7     A.    No.
8     Q.    Who decides whether something is
9 made part of the official file or separate
10 investigative file?
11     A.    Currently today, the case
12 managers will creat ane electronic file they
13 can work out of when they receive information,
14 but all that information becomes part of the
15 individual's official electronic file.
16       So if I'm working on a case and
17 I have email correspondence and I have
18 correspondence with the school, I keep it in an
19 electronic file that is shared in that
20 investigative department. Then once that case
21 is concluded all of that information is put
22 into the official electronic file. So it's
23 just like a working file that ultimately ends
24 up in the official file.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 158

1    Q.    So today everything that was in
2  the working file's correspondence to this case
3  should be in the hard files?
4    A.    Yes.
5    Q.    So in the third paragraph Kelly
6  goes through some evidence, he talks about his
7  belief that Akoda and Igberase are one and the
8  same, right?
9    A.    Yes.
10    Q.    And states that Akoda admitted
11  in writing that he used Igberase's social
12  security number, correct?
13    A.    Yes.
14    Q.    And he also admitted that in
15  person when he visited the office on September
16  27, 2000, I think we went over that?
17    A.    Yes.  Yes, sorry.
18    Q.    He said, I don't think this is
19  enough for the committee.  Is that also ECFMG's
20  position at this time, that the evidence as of
21  December 22, 2000, that was reasonably
22  available to ECFMG, was not enough to refer the
23  case to the credentials committee?
24    A.    Yes.  I did not review it at

Page 159

1  this time, but I reviewed the file again when
2  the federal authorities reached out to us, and
3  I came to the same conclusion that there was
4  not sufficient evidence based to make the
5  allegation of irregular behavior based on the
6  file and the information that ECFMG had.
7          We ultimately connected the two
8  together, once Igberase stipulated that he
9  provided that name to us and represented
10  himself as such to us.
11    Q.    Kelly also mentions that he
12  wrote to Igberase and Akoda responded, correct?
13    A.    Yes.
14    Q.    Would it have been inappropriate
15  for Kelly to refer this case to the credentials
16  committee at this point?
17        MS. McENROE:  Objection to form.
18        THE WITNESS:  I wouldn't use the
19    term inappropriate, but I would use the
20    term it didn't have sufficient evidence
21    for an allegation to be made to refer to
22    the committee because it was a suspicion
23    at the time, and we had not specific
24    evidence other than him saying, I'm not

Page 160

1    that person, that was consistent with
2    what we understood he told the residency
3    program, that it was his cousin, and he
4    appeared in the office with the passport
5    and the driver's license to demonstrate
6    he was a separate person.
7  BY MR. THRONSON:
8    Q.    He says at the end of the
9  letter, we need to brainstorm on this one --
10  this memo, sorry, we need to brainstorm on this
11  one, maybe Shirley Williams can sit in.  Who is
12  Shirley Williams?
13    A.    Shirley Williams was an employee
14  at ECFMG.  She has retired.  In her latest
15  roles for quite sometime, at least 10 years,
16  she was a board secretary to FAIMER which is
17  the Foundation for the Advancement of
18  International Medical Education and Research
19  which is ECFMG's foundation.  Prior to that,
20  sometime earlier in her career, and she worked
21  at ECFMG for I think over 30 years, she worked
22  on, I think, the cases that were related to
23  restricting records of irregular behavior if
24  they came from the  USMLE program.  She may

Page 161

1  have been an admin support for the board or for
2  the committee as well, but I'm not sure what
3  her specific role was.
4    Q.    Did ECFMG do anything to
5  determine whether the passport and
6  international driving certified that Akoda
7  provided to ECFMG in 2000 were genuine or
8  authentic?
9    A.    Other than their appearance of
10  being genuine or authentic, no.
11    Q.    What would it have done to
12  investigate -- what did it do to investigate
13  the appear -- when you say appearance were
14  there particular things that ECFMG assessed
15  from the document?
16    A.    My assumption would be that if
17  Dr. Akoda came in with a photocopy of a
18  passport and tried to pass it as an original
19  that would have triggered a question about it.
20        So I don't know that we were
21  looking at any specific details on the
22  passport, but if somebody hands you a passport
23  it looked and felt to Mr. Kelly to be an actual
24  passport and driver's license.

41 (Pages 158 - 161)

KARA CORRADO

Page 162

1    Q.      Does ECFMG inquire of any other
2  organizations today or entities to confirm the
3  validity of government issued documents such as
4  passports?
5    A.      Today as part of our
6  identification process and our work with Notary
7  Cam, we may reach out to a third party to help
8  validate passports and we use software to help
9  validate.
10        Not that it's -- the software
11  doesn't determine if it's a validly issued
12  passport, it determines whether the features of
13  the passport appear as they should.  So the
14  system is picking up if there could be any
15  potential abnormalities in the passport.
16    Q.      If you could turn briefly to
17  Exhibit 42.  This is a photocopy of the
18  passport that Akoda provided to ECFMG in
19  September of 2000?
20    A.      Yes.
21    Q.      You note that it lists the place
22  of birth as Lagos?
23    A.      Yes, that's what it says.
24    Q.      If you look at Exhibit 23, turn

Page 163

1  to page two of that.  This is an application
2  that Akoda submitted to ECFMG?
3    A.      Yes.
4    Q.      What's the place of birth listed
5  there?
6    A.      Benin City, Nigeria.
7    Q.      Those are different cities?
8    A.      Yes, that's my understanding.
9    Q.      If you turn to Exhibit 15, it's
10  an application that Igberase submitted to
11  ECFMG?
12    A.      Yes.
13    Q.      Dated, I guess, he signed it
14  10/18/2000 on the last page?
15    A.      Yes.
16    Q.      Turn to the third page of the
17  application Bates 3467?
18    A.      Yes.
19    Q.      I'm sorry.  The first page of it
20  3465.  What's the place of birth that Igberase
21  listed on his application?
22    A.      Lagos, Nigeria.
23    Q.      Obviously this is an exercise
24  that Mr. Kelly could have done at the time?

Page 164

1        MS. McENROE:  Objection to form.
2        THE WITNESS:  You mean look at
3    the birth places on the applications?
4  BY MR. THRONSON:
5    Q.      Yeah, could compare the birth
6  place listed on the passport to the birth
7  places listed on these two applications?
8    A.      Sure he could have done that.
9  He may have done that, but we wouldn't have the
10  information to know which is the correct city
11  of birth.
12    Q.      Could Mr. Kelly also have
13  compared, or anyone at ECFMG compared the
14  photograph on the passport with the photographs
15  accompanying the applications of Akoda,
16  Igberase?
17        MS. McENROE:  Objection to form;
18    calls for speculation.
19        THE WITNESS:  You could have.
20    It's not sort of presented to you right
21    there when you pull up the record, so you
22    have to look through the file to see a
23    photograph of the individual.
24    Q.      Did ECFMG ever take any action

Page 165

1  to verify that the passport was authentic?
2        MS. McENROE:  Objection to form.
3        THE WITNESS:  No.
4  BY MR. THRONSON:
5    Q.      Does it take the position today
6  that the passport that Akoda provided is
7  authentic?
8    A.      No, based on the information
9  that was stipulated to in the plea bargain that
10  he said, I presented a false passport to ECFMG.
11    Q.      Did it ever compare the
12  photographs accompanying the application of
13  Igberase and Akoda to assess if, to determine
14  if there was additional evidence in those
15  photographs to suggest that these two
16  applicants may be, in fact, the same
17  individual?
18    A.      It's likely that we would have
19  looked at the photographs but the photographs
20  would have been years apart, and we are not
21  necessarily experts in determining whether this
22  photograph is a photograph of that same person
23  so the could have looked similar.  The person
24  who is reviewing the file might say, yeah they

42 (Pages 162 - 165)

KARA CORRADO

Page 166

1 look similar, but there would be no way for us
2 to know if it was the same person in those
3 photographs.
4    Q.    If they were similar, that would
5 be additional evidence that could substantiate
6 the allegation of irregular behavior?
7         MS. McENROE:  Objection to form.
8         THE WITNESS:  It could.
9 BY MR. THRONSON:
10    Q.    So you don't know for sure one
11 way or the other if that was ever done?
12    A.    My assumption would be that it
13 was.  When we were investigating, we would look
14 at the files together.
15    Q.    We were looking earlier at
16 Exhibit 46.  So it appears in this memo that
17 Kelly is referring -- I'm sorry.
18         MR. VETTORI:  48.
19         MR. THRONSON:  48.  While you're
20 at it could you also pull out 36.
21 BY MR. THRONSON:
22    Q.    So let's first look at 36.  The
23 Kelly deposition.  This is a letter from
24 Mr. Kelly to Akoda dated August 22, 2000?

Page 167

1    A.    Yes.
2    Q.    This is what would be referred
3 to as a charging letter from ECFMG?
4    A.    Yes.
5    Q.    Is it ECFMG's position that --
6    A.    Sorry, can I just clarify that.
7 This is a letter -- I just want to take a
8 minute to read it.  Yes.  Sorry, yes.
9    Q.    Yes, it is a --
10    A.    Yes, it could be considered a
11 charge letter.
12    Q.    And in the letter -- take all
13 the time that you'd like to read it -- but
14 Kelly adverts to an allegation that Akoda may
15 have recently, previously applied to ECFMG
16 using the Igberase and Charles names, correct?
17    A.    Yes.
18    Q.    And he also refers to Akoda's
19 representation -- strike that.  On the second
20 page Kelly wrote, ECFMG requires an explanation
21 from you in writing within 15 days of your
22 receipt of this letter.  Did ECFMG ever receive
23 that explanation?
24    A.    ECFMG received the explanation

Page 168

1 in person from Dr. Akoda to Mr. Kelly, and I
2 believe maybe an email.  I'm just not sure of
3 the time frame and I don't think it was within
4 the 15 days.
5    Q.    Then he wrote, the information
6 in your ECFMG file together with your
7 explanation and any other material you submit
8 will be referred to the ECFMG committee on
9 medical education credentials for review at its
10 next scheduled meeting.
11         Did I read that correctly?
12    A.    Yes.
13    Q.    So at the time of writing this
14 letter Kelly apparently believed there was
15 sufficient information to refer Akoda's file to
16 the credentialing committee for review?
17    A.    Yes.  Well, he's writing to him
18 telling him about the allegation and asking him
19 for an explanation and then saying it would be
20 referred to the committee, yes.
21    Q.    When was it first referred to
22 the committee after Kelly sent this letter in
23 August 22, 2000?
24    A.    So it wasn't referred to the

Page 169

1 committee, because on the basis of the
2 information that Kelly subsequently gathered
3 from Akoda the determination was made that
4 there wasn't enough evidence to refer it to the
5 committee because Akoda had indicated that he
6 was a cousin of Igberase's; he brought the
7 passport in and the driver's license in which
8 the ECFMG believed to be authentic, which
9 demonstrated to us at the time that he was a
10 separate person from Igberase; and that we had
11 no other evidence to refer the matter to the
12 committee.
13         So if he had within 15 days
14 said, yes, I did that, he would have admitted
15 to doing it, and then we would have referred
16 it.  We had nothing except for his explanation
17 that was consistent with what he had provided
18 previously to the residency program,
19 supplemented by the in-office visit with what
20 appeared to be the authentic identification
21 documents.  So it wasn't referred to the
22 committee at that time.
23    Q.    When was Akoda's case first
24 referred to the committee aft -- I guess when

43 (Pages 166 - 169)

KARA CORRADO

Page 170

1 was the first time after 2000 it was referred
2 to the committee?
3      A.      So technically it was not
4 referred to the committee for a decision as an
5 information item, because when we received a
6 copy of the plea bargain in which Igberase
7 stipulated the fact that he had presented the
8 false passport to ECFMG and that he had used
9 this alias, John Nosa Akoda, that was
10 sufficient evidence then to demonstrate that
11 this person is the same person; and this person
12 Igberase already had his certificate
13 permanently revoked.
14         So it wasn't necessary to charge
15 Akoda, which essentially would have been
16 Igberase, with irregular behavior and go
17 through the committee process, because he had
18 already been permanently barred and had his
19 certificate permanently revoked.
20         So as we normally do when we
21 have consolidations of records, we would
22 consolidate the file, that is to say these
23 files belong together, because they belong to
24 the same person, and any annotation of

Page 171

1 irregular behavior that was already there would
2 carry over to Akoda. So essentially we
3 consolidated the file, revoked the certificate
4 because it was -- it should not have been
5 obtained. He was not eligible to obtain that
6 certificate because he had admitted to being
7 Igberase at that point. The update was
8 provided to the committee to let them know that
9 this action had been taken by ECFMG to revoke
10 the other certificate.
11      Q.      As I recall that was an update
12 in approximately November 2016?
13      A.      Yes.
14      Q.      So before that update in
15 November of 2016, did the members of the
16 credentials committee have any awareness of the
17 Akoda matter?
18      A.      No.
19      Q.      Did the board of trustees have
20 any awareness the Akoda matter?
21      A.      No.
22      Q.      Who knew about it?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  I knew about it,

Page 172

1 counsel knew about it.  Our senior vice
2 president knew about it.  The specialty
3 investigations committee would have known
4 about it, because they -- I would have
5 asked them to collect the documents or
6 the file, and that's part of their job
7 when we get subpoenas, so they would have
8 been aware of the request from law
9 enforcement in the case; and potentially
10 some of the executive team, if the senior
11 vice president shared that with the
12 executive team.
13 BY MR. THRONSON:
14      Q.      How about before federal law
15 enforcement got involved, 2015, 2106 as we
16 discussed, who knew at least about Mr. Kelly's
17 suspicion or the possibility as he expressed in
18 his December 2000 memorandum, not withstanding
19 Akoda's provision of the passport, his belief
20 that Akoda and Igberase might be the same
21 person, who knew about that from 2000 until the
22 feds got involved in 2015?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  I would say Steve

Page 173

1      Seeling, who was the vice president of
2      operations would have known about that.
3         Then Virginia Kesting would have
4      been doing the administrative work on the
5      file, so by that token she may have known
6      about that conversation or been in the
7      room when they were having the
8      conversation.  Other than that, I'm not
9      aware of anyone else who worked on
10      irregular behavior files that would have
11      known about it.  Unless he did brainstorm
12      with Shirley Williams he might have done
13      that, but the file doesn't reflect that.
14 BY MR. THRONSON:
15      Q.      So it appears in the December
16 2000 memorandum that Kelly wrote to Seeling,
17 he's contemplating some additional
18 investigation or some additional action that
19 ECFMG might take to gather additional evidence
20 to rule out the possibility that Akoda is
21 Igberase; is that fair to say?
22         MS. McENROE:  Objection to form.
23         THE WITNESS:  I believe that
24      Mr. Kelly was trying to think about what

44 (Pages 170 - 173)

KARA CORRADO

Page 174

1  other way we could get evidence to
2  substantiate that these two people were
3  the same person.
4 BY MR. THRONSON:
5      Q.    What other efforts after this
6  point, but before the federal investigation,
7  did ECFMG undertake in that regard; that is to
8  determine whether Igberase and Akoda are the
9  same person?
10     A.    I am not aware of any other
11  steps that we took in this investigation other
12  than it was an open investigation, such that if
13  we had gotten any future evidence that we could
14  still go back and make the allegation of
15  irregular behavior.
16     Q.    So as a representative of ECFMG,
17  you're saying that ECFMG is not aware of any
18  additional steps that it took between December
19  of 2000 and 2015, 2016 timeframe to determine
20  whether Akoda and Igberase were the same
21  person?
22          MS. McENROE:  Objection to form.
23          THE WITNESS:  Yes, that's my
24  understanding.  We had -- the file was

Page 175

1  restricted internally, it was flagged, so
2  that if anything came in it would be
3  passed along to the case managers; and I
4  believe around the 2006 time frame when
5  Akoda applied for residency, we sent his
6  -- he had submitted letters of
7  recommendation, and we sent those for
8  verification.  That was a process we
9  followed in investigations of irregular
10  behavior generally as a matter of course
11  that if there was some ongoing
12  investigation, even if it was unrelated
13  to that, we'd send the letters for
14  verification, so we did do that.
15 BY MR. THRONSON:
16     Q.    There was no response to those
17  letters, the request for verification of
18  letters of recommendation, correct?
19     A.    Correct.
20     Q.    That tended to increase the
21  index of suspicions as to whether those letters
22  are genuine?
23     A.    Generally, not.  It's difficult
24  for us sometimes to get a response from

Page 176

1  physicians who are working and busy, so it
2  doesn't necessarily indicate that they are not
3  authentic.  Usually when they are not
4  authentic, that's when the office will reach
5  out to us to say they are not authentic.
6      Q.    Did ECFMG call those physicians
7  who allegedly wrote the letters of
8  recommendations?
9      A.    I'm not aware that the file
10  documents that.  I don't know, it's possible.
11     Q.    You haven't seen it documented
12  anywhere?
13     A.    No.
14     Q.    Why not do any additional
15  investigation from 2015 as to whether Akoda and
16  Igberase are the same person?
17          MS. McENROE:  Objection to form.
18 BY MR. THRONSON:
19     Q.    From ECFMG's perspective, why
20  not do that?
21     A.    So the reason that we would not
22  have done it would be, at the time that we
23  didn't have any other way or venue; or had not
24  contemplated a way or venue that we could

Page 177

1  substantiate this evidence or allegation
2  independently.
3          So like I said, if something
4  came in, the file was still restricted and it
5  would get referred to the group that was
6  reviewing the investigation, but there was no
7  other abnormality in the file to the extent
8  about -- there was no other accusation to say
9  that his credentials were not authentic or that
10  he didn't pass the exams, none of that was
11  alleged.  So the only allegation that we had
12  would have been related to our policy about not
13  being able to retake exams that he had already
14  taken.
15     Q.    So in essence, ECFMG didn't do
16  anything else to verify that Akoda and
17  Igberase, whether Akoda and Igberase were the
18  same person -- strike that.
19          In essence, ECFMG didn't do
20  anything else between 2000 and 2015 to
21  determine whether Akoda and Igberase were the
22  same person because from ECFMG's perspective
23  there was nothing else that could have been
24  done?

45 (Pages 174 - 177)

KARA CORRADO

1     MS. McENROE: Objection to form.
2     THE WITNESS: So I think from
3  our perspective, there was nothing that
4  we had that would substantiate that they
5  were the same person, and we did not have
6  a way to prove it otherwise.
7  BY MR. THRONSON:
8     Q.    So ECFMG's view is that there's
9  nothing in the file up till this point, 2000,
10 either in Igberase's file or Akoda's, that
11 would substantiate that Akoda and Igberase are
12 the same person?
13       I'm talking about through
14 December of 2000, there's nothing ECFMG had
15 that would substantiate that conclusion; is
16 that what you're saying?
17       MS. McENROE: Objection to form.
18       THE WITNESS: What I'm saying
19    is, while the staff who were reviewing it
20    had a suspicion that he was the same
21    person, they didn't have sufficient
22    evidence to allege irregular behavior,
23    and in weighing that in the
24    investigation, in terms of all the

1     processes that he would go through, there
2     wasn't at that time anything else to do.
3        For example, he got into a
4     residency training program who presumably
5     checked his information and vetted him in
6     a way that they were supposed to. He got
7     licensed by the licensing board, so the
8     licensing board would have done its due
9     diligence on him. He would have gone
10    through all of those steps.
11       Like I said, there was no
12    accusation that he was not -- that his
13    diploma was not authentic, or that he had
14    not received his medical education. So
15    at the time, considering all of those
16    factors, there was not enough to charge
17    him with irregular behavior.
18 BY MR. THRONSON:
19    Q.    He got into the residency
20 program in part by information that ECFMG
21 supplied regarding his ECFMG certification,
22 correct?
23       MS. McENROE: Objection to form.
24       THE WITNESS: So he got into the

1     residency program presumably on his
2     merits, his own merits, and we would have
3     verified it, as we do with all residency
4     programs.
5        What his certification status
6     was, which was true at the time that we
7     verified it to them, he had a certificate
8     that was issued to him in that name, and
9     it was valid.
10 BY MR. THRONSON:
11    Q.    That was information that -- the
12 certification information that ECFMG supplied,
13 that was one of the pieces of information that
14 Howard University had before when determining
15 whether to accept this person into its
16 residency program, correct?
17       MS. McENROE: Objection to form.
18       THE WITNESS: Yes. They would
19    have received a status report through the
20    regular residency application process.
21 BY MR. THRONSON:
22    Q.    The same is true for the
23 Maryland Board of Physicians, in determining
24 whether to grant Igberase, Akoda a license to

1     practice medicine it would have had before it
2     information supplied by ECFMG regarding his
3     ECFMG certification status?
4     A.    Yes.
5     Q.    The same is true for Prince
6  George's County Hospital?
7     A.    Yes. I believe they requested a
8  verification of his certification status.
9     Q.    Did ECFMG ever tell anyone
10 outside of the organization of the suspicion of
11 at least one of it's staff members, perhaps
12 more, that Igberase and Akoda were the same
13 person, before the law enforcement
14 investigation?
15    A.    Before the law enforcement, not
16 that I'm aware of. I don't think it would have
17 necessarily been appropriate for them to do
18 that if we didn't feel that we had evidence
19 that they were the same person, because we
20 could potentially be providing information that
21 was not substantiated that may have an impact
22 on a physician's career or on residency
23 program.
24    Q.    Did ECFMG ever notify anyone

46 (Pages 178 - 181)

KARA CORRADO

1  outside of the organization, before the law
2  enforcement investigation, that Jersey Shore
3  had dismissed him from their residency program?
4      A.     Not that I'm aware of.
5      Q.     Why not?
6      A.     Why didn't we tell anyone about
7  a potential suspicion?
8      Q.     Why didn't you tell anyone that
9  he had been dismissed from his residency
10 program among other things, providing --
11     A.     That kind of information, that's
12 not within our scope or responsibility to
13 report loss of residency, I assume.  Well,
14 maybe not loss, but residents are dismissed
15 from their programs for a variety of reasons.
16 Unless they are a J-1, which he was not, we
17 don't get that kind of information or keep it
18 on a regular basis, and it's not in our scope
19 to report that to other organizations.
20     Q.     If this same set of facts came
21 before ECFMG today, came before your
22 department, would you handle it the same way?
23          MS. McENROE:  Objection to form;
24      calls for speculation.

1          THE WITNESS:  If it was exactly
2      identical as this, I would have come to
3      the same conclusion.  In fact, I did in
4      2016; when I looked at it again, I didn't
5      see that we had sufficient evidence to
6      make the allegation of irregular
7      behavior.
8  BY MR. THRONSON:
9      Q.     So essentially ECFMG's position
10 is if this all happened again today, we would
11 handle it exactly the same way as we did from
12 2015?
13          MS. McENROE:  Objection to form.
14          THE WITNESS:  I don't think we
15     could say that only because the processes
16     are not the same; the application process
17     is not the same; the technology that we
18     use is not the same.
19          So from that -- in that respect
20     I couldn't say we a hundred percent do
21     every single thing the same way, but we
22     come to the same conclusion that there
23     wasn't sufficient evidence.  We have
24     cases where there's not sufficient

1      evidence to make allegations on a number
2      of things.
3  BY MR. THRONSON:
4      Q.     At the time when this case
5  happened in 2000, I guess when the question of
6  whether Akoda and Igberase were the same person
7  was being considered, were there other
8  allegations of irregular behavior in which
9  ECFMG affirmatively sought out evidence beyond
10 what would normally have been in an applicant's
11 file?
12          Essentially were there
13 circumstances under which it sought out
14 evidence or made phone calls, interviews of a
15 type that it didn't do here?
16          MS. McENROE:  Objection to form.
17          THE WITNESS:  Not that I'm aware
18     of.  Our investigations would follow the
19     same process or procedure; but each
20     investigation is different, each case is
21     different, so who we would reach out to
22     might change or how we reach out to them
23     might change, but the general guiding
24     principles of the investigation would be

1      the same.
2  BY MR. THRONSON:
3      Q.     Today -- well, we are talking
4  about the draft, the policy and procedure on --
5      A.     Yes.
6      Q.     Exhibit 2 earlier, and if I
7  understand your testimony correctly the
8  substance -- that policy was essentially what
9  ECFMG followed between 2000 and the time that
10 this policy was drafted in 2015, even if it
11 wasn't written down before 2015?
12     A.     So just to clarify, this policy
13 would have been the published policy on
14 irregular behavior, and these would have been
15 the procedures that --
16     Q.     Right.  Sorry.
17     A.     That's okay -- that we followed,
18 and the organization followed prior to 2015
19 when these were documented.
20     Q.     You mentioned a restricted file
21 earlier, and I wanted to get more clarification
22 on that.  Were both Igberase's and Akoda's
23 files restricted before the federal
24 investigation began?

47 (Pages 182 - 185)

1    A.    Yes.
2    Q.    When was Akoda's first
3 restricted?
4    A.    Akoda's file would have been
5 first restricted when McCorkle reached out to
6 us with the allegation. So it would be at the
7 start of an investigation. Part of our
8 procedure, in the system, is to restrict the
9 file when we conduct an investigation.
10        Igberase's would be restricted
11 because there had been an investigation and a
12 finding of irregular behavior. So his would
13 stay restricted.
14    Q.    What's the purpose of
15 restricting a file?
16    A.    The restriction is really an
17 operational procedure. Such that it prevents
18 other staff in the organization from maybe
19 update information, processing applications,
20 any of that without first contacting the
21 investigative team that are doing the review of
22 it. So it serves that purpose. When we start
23 an investigation just to make sure if there's
24 any contact from that individual so we know

1 about it, the people that are investigating
2 know about it.
3        It will also serve to -- it will
4 also serve as a flag in our certification
5 verification service that when a request comes
6 in electronically the file is restricted, they
7 have to be reviewed manually. The system will
8 not automatically generate a report.
9        We do that so we can put the
10 annotation of irregular behavior onto the
11 report before it goes out to the recipient for
12 those individuals we have already determined
13 having irregular behavior.
14        There's a number of other
15 reasons that we use it internally just to keep
16 people from processing, but it's an operational
17 internal process, the restrictions.
18    Q.    Okay. Let's take a look at
19 Exhibit 52, please, of the Kelly deposition.
20 Can you identify this document?
21    A.    This is a printout of one of our
22 internal programs.
23    Q.    It's the applicant status
24 program?

1    A.    Yes.
2    Q.    At the bottom there's a date of
3 10/15/2014. Do you know the significance of
4 that?
5    A.    That is likely when we first
6 produced a copy of this for the Maryland Board,
7 when they requested information.
8    Q.    So there's a date on the
9 left-hand column, left most column, does that
10 refer to the date an application was first
11 restricted?
12    A.    So what this column is is a date
13 that a restriction was put on the account.
14    Q.    Then there's a reason column,
15 and it appears that in 2000 it was restricted
16 because -- well, before we get there. Sorry.
17 So column two is the reason for the
18 restriction?
19    A.    Yes.
20    Q.    The next column is the level of
21 restriction?
22    A.    Yes.
23    Q.    I see 3s and 1, 4. What do
24 those numbers mean?

1    A.    The numbers refer to the type of
2 access that would be granted when that level of
3 restriction is placed on the account.
4        So for example, a level 1
5 restriction is a read only. So anybody who
6 would normally have access to the file would
7 still have access to the file and can see all
8 the information, they can't make any changes to
9 it.
10        It goes up from there. Level 2
11 is, if you have a staff role you can't see
12 anything, but the manager -- you can read only,
13 but the manager would have rights if the
14 manager of the team wanted to do something.
15        It goes up from there. So level
16 3 and 4 will prevent internal staff, other than
17 the investigation team, from being able to
18 process anything in the record and from seeing
19 most of the information in the record.
20    Q.    Why would you want to prevent
21 staff from seeing the information in the
22 record?
23    A.    If we're doing an investigation,
24 we don't want staff inadvertently providing

48 (Pages 186 - 189)

KARA CORRADO

Page 190

1 information to the individual, in certain
2 cases, not in all cases, that might jeopardize
3 the investigation. Like if the person called
4 into our call center, if the account is
5 restricted, the phone representative will
6 contact special investigations who will either
7 take the call or advise them on how they can
8 respond appropriately.
9        Q.     Did Igberase, Akoda -- strike
10 that. Did Akoda have any in-person contact
11 with anyone working at ECFMG other than, I
12 suppose, the occasions on which he took the
13 examination and his meeting with William Kelly
14 on September 27, 2000?
15       A.     None that I'm aware of. His
16 file only documents the office visit that he
17 made with Mr. Kelly.
18       Q.     Did you have any awareness of
19 any telephone contact that he had with anyone
20 at ECFMG at any time?
21       A.     I'm not aware to answer the
22 question specifically, because we don't
23 catalogue every telephone call in our system.
24 So it's entirely possible that he called to ask

Page 191

1 questions about getting registered or anything
2 like that.
3        Q.     Did he know anyone personally at
4 ECFMG either as a friend or relative?
5        MS. McENROE: Objection to form.
6        THE WITNESS: Not that I'm aware
7 of.
8 BY MR. THRONSON:
9        Q.     Did he have any business
10 relationship with ECFMG or anyone at ECFMG?
11       A.     Not that I'm aware of.
12       Q.     Turning back to Exhibit 52, then
13 there's a column called release dates. What
14 does that refer to?
15       A.     That is when the restriction is
16 released. So the restrictions -- just to
17 clarify something about the restrictions and
18 the reasons and the levels. There's not
19 necessarily a specific meaning to which reason
20 the person chose or the level between 3 and 4
21 in terms of what the restriction is.
22       So it's not as if the reasons,
23 invested the investigation into a different
24 area. It's just a feature that's built into

Page 192

1 the system.
2        The release date is when we
3 release the restriction to either put a new
4 restriction on or to provide some service that
5 we've determined can be provided, despite the
6 fact the person is restricted.
7        So you would generally see that
8 the dates coincide with when it was
9 re-released, and then it would be re-restricted
10 again would generally be related to some
11 service or some point of contact.
12       Q.     Then there's a column -- well, I
13 guess, who would make the determination as to
14 whether a restriction should be released; who
15 made that determination over this time period?
16       A.     Bill Kelly would have made the
17 determination as the individual who had
18 oversight for the areas of investigation. I
19 mean would have directed, you know, Ms. Kesting
20 to go ahead and process whatever request had
21 come in at that time.
22       Q.     Do the comments refer to the
23 reason that an applicant is restricted?
24       A.     Generally, yes. That's a note

Page 193

1 that our team will put in there that other
2 staff can see, and that is also sometimes a
3 note for ourselves so we know which
4 investigation it is.
5        Q.     So it appears in essence if you
6 compare the restrictions date the release date,
7 the application was restricted continuously
8 from August 17, 2000, through September 13,
9 2011, right?
10       A.     Yes.
11       Q.     Do you know why it was
12 repeatedly released and then re-restricted?
13       A.     Yes. Initially it looks like
14 Shirley had restricted the file then when
15 Mr. Kelly, when the case, I think, was bumped
16 up to him, he re-restricted it, put his own
17 notation in. So he would have released her
18 restriction, and put his own on there, because
19 the case would go to him.
20       Then these releases by Virginia
21 Kesting, these, I believe, coincide with
22 requests from organizations or from Dr. Akoda
23 to verify his ECFMG certification status.
24       Q.     Was the information that's

49 (Pages 190 - 193)

KARA CORRADO

Page 194

1 reflected in the comments, that ECFMG's belief
2 that the applicant may have a previous ID
3 Number ever communicated to anyone outside
4 organization -- sorry, let me ask that
5 differently.
6        Was any of the information that
7 ECFMG provided annotated to reflect that
8 comment of the information in the comments in
9 Exhibit 52?
10       MS. McENROE:  Objection to form.
11       THE WITNESS:  No, because that
12       wouldn't have been consistent with our
13       process or procedure.  A determination of
14       irregular behavior hadn't been made, so
15       we wouldn't put an annotation on the
16       report.
17 BY MR. THRONSON:
18    Q.    What's the difference between a
19 level 3 and a level 4?
20    A.    I'm not sure, but it's
21 negligible.  It has to do with, like I said,
22 operationally who has access to view the
23 information in the system.
24       So it has to do with roles.

Page 195

1 Three and 4, there are only certain people who
2 have the role 4.  If you have a role in the
3 system, based on the level you can still see
4 the information if you have that level.  So it
5 would have just been a smaller group of people
6 who had access to see; but in terms of the
7 prevention of services it would have been the
8 same between the two restrictions.
9    Q.    It looks like the application --
10 the applicant file of Akoda was released on
11 September 13, 2011, and then it was not
12 re-restricted after that time.  Is that your
13 understanding?
14    A.    I believe it was re-restricted
15 at some point after that time.
16    Q.    Okay.  Well, at least -- so the
17 date of this document, Kelly Exhibit --
18    A.    Yes, 2014.
19    Q.    Right, so at least between 2011
20 and 2014 it was not re-restricted?
21    A.    Yes.  That's what it appears on
22 here, right.
23    Q.    Do you know why?
24    A.    I don't.  I don't know why.

Page 196

1 It's possible that they forgot to re-restrict
2 it just in terms of the process.
3    Q.    Between December of 2000 and the
4 commencement of the federal criminal
5 investigation, 2015, 2016, did ECFMG receive
6 any additional information that would tend to
7 dispel the suspicion that Akoda and Igberase
8 are not the same person?
9    A.    Before?  You said, before?
10    Q.    Yeah, between December 2000 and
11 2015, did ECFMG receive any exculpatory
12 information regarding Akoda or Igberase as to
13 this question whether they were the same
14 person?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  So the information
17       that we had during that time period, was
18       the same information that we had when we
19       made the review initially in 2000.
20 BY MR. THRONSON:
21    Q.    Okay.  What other information
22 would ECFMG reasonably have expected to come in
23 between 2000 and 2015 regarding this question
24 of whether Igberase and Akoda were the same

Page 197

1 person?
2       MS. McENROE:  Objection to form.
3       THE WITNESS:  What other
4       information would we have expected?
5       MR. THRONSON:  Yeah.
6       THE WITNESS:  I don't know.  It
7       could be anything.
8 BY MR. THRONSON:
9    Q.    Is there any organization that
10 is better situated than ECFMG to determine
11 whether the applicant, who identified himself
12 as Igberase Charles, and the applicant who
13 identified himself as Akoda, were in fact the
14 same applicant?
15       MS. McENROE:  Objection to form.
16       THE WITNESS:  So the
17       verification of the identity of someone
18       who is showing up at the residency
19       program would be on the residency program
20       or the hospital, would be my assumption.
21       If they are hiring the
22       individual, they're not relying on ECFMG
23       to say that we identified -- that they
24       don't have to do their own review of who

50 (Pages 194 - 197)

KARA CORRADO

1    that person; is that what you're asking?
2  BY MR. THRONSON:
3    Q.    Who is better situated? Are you
4  saying the hospitals are in a better
5  position to answer -- strike that.
6         Were the hospitals in this case
7  in a better position to answer whether Igberase
8  and Akoda are the same person; are you
9  contending they were?
10        MS. McENROE: Objection to form.
11        THE WITNESS: What I'm saying
12   is, each organization has its own process
13   to verify identities or certification of
14   identities.
15        We would not -- those processes
16   would differ. We are not hiring the
17   person so whatever the requirements would
18   be for identity, for VISA status, for any
19   of those things, it wouldn't be
20   appropriate for us to check those because
21   it's not within our scope of the
22   certification program.
23        For example, other than the J-1
24   visas we sponsor, we don't confirm to

1    residency programs that those individuals
2  have the appropriate visas to be in the
3  United States.
4         It is the responsibility of the
5  individual and then the organization
6  that's hiring them to do that kind of
7  identification and review of the
8  individual.
9         I don't know that one is in a
10   better position than the other. It's
11   just that each organization has different
12   processes and ways to certify identities
13   and records.
14  BY MR. THRONSON:
15   Q.    So is it your contention, that
16  it would have been inappropriate for ECFMG to
17  do further investigation into this question of
18  identity, to determine whether Igberase and
19  Akoda are the same person?
20        MS. McENROE: Objection to form.
21        MR. THRONSON: Are you saying
22   that would have been inappropriate?
23        MS. McENROE: Objection to form.
24        THE WITNESS: I wouldn't use the

1    word inappropriate, but it wasn't part of
2  our process to go further or to see if
3  some -- I don't know what other
4  organization we could have gone to at the
5  time to see if the two people were the
6  same; if that's what you are asking.
7  BY MR. THRONSON:
8    Q.    Could you have consulted with
9  someone from the Nigeria Consulate to determine
10  if the passport was authentic from their
11  perspective?
12        MS. McENROE: Objection to form.
13        THE WITNESS: I suppose we could
14   have, but that wasn't part of our process
15   at the time.
16  BY MR. THRONSON:
17   Q.    Could you have called any of the
18  references that Akoda gave to determine whether
19  the letters of recommendation were authentic?
20        MS. McENROE: Objection to form.
21        THE WITNESS: We could have, and
22   we may have. I just don't have any
23   documentation in the file that we made
24   the phone calls.

1  BY MR. THRONSON:
2    Q.    Obviously you could have
3  compared the photos between the two
4  applications to see if they resemble each
5  other?
6         MS. McENROE: Objection to form.
7         THE WITNESS: Yes, we could. We
8   did when we reviewed the file. We would
9   have looked at both photographs when we
10   reviewed the file in 2000 in the
11   investigation, but again we would -- the
12   photos could be -- they could look like
13   each other, but I look like my cousin,
14   right, so they are not definitive in and
15   of themselves to say they are the same
16   person.
17        We are not expert in being able
18   to do that between two photographs.
19  BY MR. THRONSON:
20   Q.    So you're saying that, ECFMG did
21  look through both applications; the
22  applications that Igberase Charles submitted
23  and the applications that Akoda submitted?
24    A.    In 2000 --

51 (Pages 198 - 201)

KARA CORRADO

1    Q.    Yes.
2    A.    Yes, that would have been done.
3  We would have looked at both files.
4    Q.    Is that inquiry documented
5  anywhere; that step, did anyone write down, hey
6  I that; this is the result?
7    A.    No.  It would have been in the
8  hard copy file if it was written down.
9    Q.    Have you seen any document like
10 that, that would reflect that those two
11 documents were compared?
12   A.    No.
13   Q.    That would have been normal
14 procedure at the time to do that, to compare
15 two files if there was an allegation that ECFMG
16 received that two applicants might, in fact, be
17 the same person?
18   A.    Oh, yes.
19   Q.    What else would have been
20 standard procedure at that time for ECFMG to do
21 if it were presented with such an allegation?
22   A.    You mean the investigation
23 steps; like what would we do to investigate if
24 somebody potentially was using a different

1  identity?
2    Q.    Right.
3    A.    We would look at the information
4  that was given to us; so where did the
5  information come from, request follow-up
6  information if possible from that source
7  depending on who the source was.  Then we would
8  review both files to see if there was any
9  evidence between the two files that they were
10 the same person; which is what happened with
11 Igberase two or three times.
12         We did that same review and you
13 saw the information crossed, and then we wrote
14 to him, and he responded, yes, I did it; that
15 was me.  So those are generally the steps we
16 would go through.
17         In Akoda's case, we did that.
18 And he said, it's not me; and it's my cousin --
19 right -- and I'm in the office, and here's my
20 passport that's demonstrating I'm a different
21 person; and yes, I used his social security
22 number but it's not me.
23         So we follow the same steps in
24 the process.

1    Q.    Did you ever reach out to the
2  alleged cousin after Akoda came into the
3  office?
4    A.    You mean Igberase?
5    Q.    Yeah, and describe the
6  situation, say we have this allegation, Akoda
7  showed up, he says you're his cousin, and used
8  his social security number, is that true?
9    A.    I don't believe that we did
10 that.
11   Q.    Why not?
12   A.    I don't know.
13   Q.    So essentially if I understand
14 it, ECFMG's reason for believing that it
15 compared the two files of Akoda and Igberase at
16 the time in 2000, is that that was the standard
17 practice?
18   A.    In investigations like that,
19 yes.
20   Q.    But there is no direct evidence
21 that you are aware of that that was, in fact,
22 performed?
23         MS. McENROE:  Objection to form.
24         THE WITNESS:  Correct.

1         MS. McENROE:  We've been going
2  for about an hour an 45 minutes.
3         MR. THRONSON:  Okay.  Yes, let's
4  take a break.
5              - - -
6         (Whereupon there was a brief
7  recess in the proceeding.)
8              - - -
9         MR. THRONSON:  Back on.
10 BY MR. THRONSON:
11   Q.    Ms. Corrado, I'd like you to
12 take a look at Exhibit 47 from the Kelly
13 deposition, please.
14   A.    Yes.  Okay.  I have it.
15   Q.    Have you seen this document
16 before?
17   A.    Yes.
18   Q.    What is it?
19   A.    This is a summary of information
20 on Igberase Akoda prepared by ECFMG staff.
21   Q.    When was that prepared?
22   A.    This would have been prepared in
23 2014, I believe when the Maryland Board reached
24 out to us for information.

KARA CORRADO

Page 206

1    Q.    Who prepared it?
2    A.    I believe Virginia Kesting would
3 have prepared it.
4    Q.    Did you review it around that
5 time, 2014?
6    A.    I did not review it in 2014.
7    Q.    When did you first see it?
8    A.    I reviewed it in 2015 or 2016,
9 sometimes in that timeframe when the federal
10 authorities reached out to us.
11    Q.    Why was it generated?
12    A.    It was generated to assist with
13 the review of the files at that time.
14    Q.    The review of the files that
15 ECFMG was going to provide to Maryland Board of
16 Physicians?
17    A.    Yes.
18    Q.    Was the issue of whether
19 Igberase and Akoda were the same person, was
20 that issue part of the Maryland Board of
21 Physicians investigation?
22         MS. McENROE:  Object to form.
23         THE WITNESS:  I don't recall if
24    they said in their message to us what

Page 207

1    they were investigating.
2 BY MR. THRONSON:
3    Q.    Did ECFMG provide any
4 information to the Maryland Board of Physicians
5 -- strike that.  Did ECFMG provide files of
6 both Igberase, also know as Charles, and John
7 Nosa Akoda to the Maryland Board of Physicians?
8    A.    Yes.  Whatever they requested we
9 would have provided to them.
10    Q.    Did ECFMG provide this document
11 to the Maryland Board of Physicians, Exhibit
12 47?
13    A.    I don't think so.
14    Q.    Did ECFMG provide this document
15 to anyone outside of the organization?
16    A.    Other than in production for
17 this matter, not that I'm aware of.  It's an
18 internal document.
19    Q.    Who was it provided to at ECFMG?
20 After staff, you believe Ms. Kesting for
21 example generated...
22    A.    Yes, I believe that Ms. Kesting
23 generated this when the request came in so that
24 Mr. Kelly could review the matter again and

Page 208

1 what the information was as it pertained to
2 both individuals since the request came in from
3 Maryland for the file.
4         That's generally part of our
5 procedure.  If we get a request from someone we
6 take a look at the file to see what information
7 we have about it; if we flagged it in any way.
8    Q.    Did ECFMG communicate to
9 Maryland Board of Physicians it's suspicion
10 that Igberase and Akoda might be the same
11 person?
12    A.    I don't think so.
13    Q.    Is ECFMG responsibile in any way
14 for confirming that an applicant is who she or
15 he say he or she is?
16         MS. McENROE:  Objection to form.
17         THE WITNESS:  So as part of the
18    application process, we have an identity
19    section for the individual to certify to
20    their identity, which the process has
21    evolved over time.
22 BY MR. THRONSON:
23    Q.    What has it evolved into?
24    A.    The process is, as I was

Page 209

1 describing earlier, we originally had a notary
2 or a medical school official certify to the
3 identity and to the information on the
4 application.
5         That has since evolved where we
6 are still using a notary, but we have a notary
7 vendor and we require the individual to submit
8 a copy of their passport to us as part of the
9 their initial application to ECFMG.
10    Q.    You've reviewed the applications
11 that Igberase and Charles submitted to the
12 ECFMG?
13    A.    Yes.
14    Q.    You've seen photographs that
15 were submitted in connection with those
16 applications?
17    A.    Yes.
18    Q.    And obviously you've also seen
19 the photographs that were submitted to
20 accompany Akoda's applications, correct?
21    A.    Yes.
22    Q.    Is it ECFMG's position that any
23 of those photographs are photographs of --
24 strike that.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

Page 210

1 Does ECFMG deny that the
2 photographs of Igberase and Charles are
3 photographs of the same person who identified
4 himself as Akoda?
5 MS. McENROE: Objection to form.
6 THE WITNESS: Based on the
7 information that we have now, that he
8 admitted to using the John Nosa Akoda
9 name, our understanding is that he
10 submitted both of those applications and
11 submitted both of those photographs.
12 We don't have any way of
13 verifying whether it's him in the
14 photographs, but he submitted them on
15 behalf of those applications.
16 BY MR. THRONSON:
17 Q. Did the individual who
18 identified himself as Igberase and Charles take
19 all of the ECFMG examinations that he
20 represented that he sat for?
21 MS. McENROE: Objection to form.
22 THE WITNESS: So yes, he was
23 certified. So the individual took the
24 exams and passed them.

Page 211

1 BY MR. THRONSON:
2 Q. You're certain also that Akoda
3 took the exams and passed them too; the
4 organization is certain that, for example, no
5 one else took the exams in Akoda's place?
6 MS. McENROE: Objection to form.
7 THE WITNESS: Based on the
8 information that we had, that the test
9 center would verify identity, we would
10 rely on that. So if there was no report
11 that he wasn't the person that showed up
12 at the test center...
13 BY MR. THRONSON:
14 Q. There was a reference in one of
15 the documents to a ECFMG pink card, what is
16 that?
17 A. A pink card?
18 Q. A pink card. There was an
19 irregularity report -- we can dig it out --
20 that Igberase didn't have a pink card so he
21 supplied a Maryland driver's license instead?
22 A. Yes. So when the exams were
23 given in paper and pencil, they were given only
24 two times a year, when ECFMG registered an

Page 212

1 individual you would get a permit, and that
2 permit which was pink in some years, had a
3 photograph of you on it and your information.
4 It was part of the application
5 that you filled out when you sent to ECFMG, you
6 were required to fill that out. So once you
7 were registered, the permit would be mailed to
8 you so that you would take it to the center and
9 appear at the center with the permit; and it
10 was a very strictly followed rule that you had
11 to have the permit issued by ECFMG in order to
12 take the exam.
13 However, because it's high
14 stakes and it's only two times a year, if the
15 person lost the permit or forgot the permit
16 they would generally, the staff at the test
17 center, would call into ECFMG offices and
18 advise the person didn't have it, they would
19 check to see if the person was registered, and
20 then they would tell them they could use a
21 driver's license or another form of
22 identification to admit the individual to the
23 center.
24 Q. In 1996 and 1997 when Akoda took

Page 213

1 ECFMG exams, did ECFMG operate the test centers
2 where you took the exams?
3 A. I would have to look at the
4 exams he took. Specifically I can't remember
5 if they were USMLE examinations or if they were
6 the FMGMF examinations.
7 Q. USMLE was step 3 at that time,
8 no?
9 A. So USMLE had at the time 3
10 exams, which was a basic science Step 1;
11 clinical knowledge which is Step 2; and
12 clinical skills -- I'm sorry, they didn't have
13 clinical skills at that time.
14 They had Step 3 which was an
15 exam that you would take in order to fulfil one
16 of the requirements for licensure in the state.
17 Generally you would take it after you got into
18 a residency program.
19 Q. Were there any exams in '96 and
20 '97 that ECFMG administered?
21 A. I don't belive so. I'm not sure
22 of the exact date when we stopped administering
23 the FMGFM exam.
24 Q. Who was responsible for

54 (Pages 210 - 213)

KARA CORRADO

Page 214

1 verifying a test taker's identity at the test
2 centers in '96 and '97?
3    A.    The individuals at the test
4 center.
5    Q.    Were those under contract with
6 ECFMG?
7    A.    That I don't know. I'm not sure
8 how the process worked for those test centers.
9    Q.    How many employees does ECFMG
10 have?
11    A.    Roughly I think a thousand,
12 somewhere around there. A good portion of
13 them, more than half are part-time standardized
14 patients that work in the Step 2 CF clinical
15 skills examination.
16    Q.    Do you know how many employees
17 ECFMG has apart from those part-time patients?
18    A.    So full-time ECFMG employees?
19    Q.    Right.
20    A.    I believe around, I believe,
21 it's around 200; somewhere around 200, 300.
22    Q.    Is it fair to say that fees
23 submitted by applicants to take ECFMG
24 examinations or other fees associated with

Page 215

1 their applications is a source of revenue for
2 ECFMG?
3       MS. McENROE: Objection to form.
4       THE WITNESS: Yes.
5 BY MR. THRONSON:
6    Q.    That also applies -- does ECFMG
7 charge a fee to residency programs to submit an
8 ECFMG report to the residency program for an
9 applicant?
10    A.    No, there is no fee for the
11 report to be sent to the residency program.
12    Q.    There are fees for ERAS tokens?
13    A.    Yes.
14    Q.    Do you charge fees to medical
15 boards to obtain information?
16    A.    There's a fee, yes, whether it's
17 the board requesting it or the physician
18 requesting it, there's a fee for the report to
19 go to the board.
20    Q.    Do you have any reason -- does
21 ECFMG have any reason to disagree that the
22 Maryland Board of Physicians, Howard
23 University, and Prince George's University
24 Hospital relied, at least in part, on

Page 216

1 information supplied by ECFMG when making it's
2 decisions regarding the medical practice of
3 Akoda?
4       MS. McENROE: Objection to form.
5       THE WITNESS: So, yes, those
6    organizations would have, I assume, taken
7    into account the status report we sent to
8    them as part of making their decision.
9 BY MR. THRONSON:
10    Q.    So you don't disagree with my
11 statement? You agree they would have taken
12 that information into account?
13       MS. McENROE: Objection to form.
14       THE WITNESS: Yes.
15 BY MR. THRONSON:
16    Q.    I want to ask about this
17 document here.
18       - - -
19       (Whereupon the document was
20    marked, for identification purposes, as
21    Exhibit Number CORRADO-5.)
22       - - -
23    Q.    Ms. Corrado, I'm handing you the
24 original that corresponds to a copy that's

Page 217

1 being marked as Exhibit 5 to the deposition,
2 and I'm wondering if you can identify it for
3 me?
4       I'll represent to you that it
5 was a document that we reviewed in looking at
6 the -- the material in the original file of
7 Akoda before we took the deposition today.
8       Can you identify what it is?
9    A.    Yes. This appears to be a copy
10 of the University of Benin Diploma for
11 Dr. Akoda; a copy of the certificate of full
12 registration for Dr. Akoda; a correspondence
13 from ECFMG from 1996 to Dr. Akoda; and a
14 statement of account which was generated by
15 ECFMG for Dr. Akoda; and it looks like another
16 copy of the certificate of full registration
17 for Dr. Akoda.
18    Q.    Is the first page of Exhibit 5,
19 the original, is that the original diploma from
20 the institution?
21    A.    No, I don't believe so.
22    Q.    Did ECFMG ever receive an
23 original copy of the diploma from the
24 University of Benin that was allegedly issued

55 (Pages 214 - 217)

KARA CORRADO

Page 218

1 to Akoda?
2          MS. McENROE: Objection to form.
3          THE WITNESS: No. We required
4     applicants to send us copies. In fact,
5     we discourage them from sending us the
6     originals so that they wouldn't lose them
7     in the mail. We would ask for two
8     photocopies of the degree.
9 BY MR. THRONSON:
10    Q.     Is that the copy that ECFMG
11 claims it sent to the University of Benin to be
12 verified?
13         MS. McENROE: Objection to form.
14         THE WITNESS: I would have to
15    look at the diploma that we sent, that
16    was attached to the verification.
17         I believe he applied. He had an
18    application prior to this, so there may
19    have been another copy of the same
20    document that he submitted at that time
21    that could have been the one that was
22    sent. If it wasn't, this would have been
23    the one that was sent. I assume that if
24    there's two copies of them, they're the

Page 219

1     same.
2 BY MR. THRONSON:
3     Q.     So at no point in evaluating
4 Akoda's credentials and qualifications did
5 ECFMG receive an original or a certified copy
6 of his diploma or registration certificate,
7 correct?
8          MS. McENROE: Objection to form.
9          THE WITNESS: That's correct.
10 BY MR. THRONSON:
11    Q.     Is that the practice today?
12    A.     To require a photocopy of a
13 diploma?
14    Q.     Yes, to not work with original
15 or certified copies?
16    A.     Yes. So we require a photocopy
17 because we will source verify it with the
18 institution. We don't require it to be a
19 certified copy because we're going to go to the
20 primary source and verify it.
21    Q.     Has ECFMG ever confronted a
22 situation in which an institution mistakenly
23 source verified a diploma as being genuine?
24         MS. McENROE: Objection to form.

Page 220

1          THE WITNESS: Not that I can
2     recall.
3 BY MR. THRONSON:
4     Q.     I know you have not reviewed the
5 deposition of Bill Kelly, but I wanted to just
6 ask you about a couple aspects of his
7 testimony.
8          There is a transcript in the
9 front of that binder, Ms. McEnroe.
10         MS. McENROE: What page are you
11    reading from?
12         MR. THRONSON: The first is page
13    157 starting on line 21.
14 BY MR. THRONSON:
15    Q.     So this is the deposition of
16 Mr. Kelly on August 20, 2019. Mr. Vettori
17 asked him, and it continues on to 158, so if he
18 had been referred to the --
19         MS. McENROE: Hold on. Which
20    line?
21         MR. THRONSON: 21.
22 BY MR. THRONSON:
23    Q.     "So if he had been referred to
24 the credentials committee would he have been

Page 221

1 charged with irregular behavior for using
2 someone else's social security number?
3          MS. McENROE: Objection to form.
4          ANSWER: The irregular behavior
5 he would have been charged with would be
6 providing false information to ECFMG on an
7 application among other things?"
8          So do you agree with that
9 testimony?
10    A.     Yes, it would have been
11 providing false information to an application
12 to ECFMG among other things.
13    Q.     You believe that would have
14 occurred had he been referred based on the
15 information that ECFMG had in 2000?
16         MS. McENROE: Objection to form.
17         THE WITNESS: I'm sorry. Are
18    you asking me if that would have been the
19    charge if we sent a letter to him?
20         MR. THRONSON: Right. I guess.
21    I'll tell you what, I'll withdraw that
22    question.
23 BY MR. THRONSON:
24    Q.     Are you aware if the document in

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

KARA CORRADO

1 Exhibit 5 --
2          MS. McENROE: Can I put the
3     transcript away?
4          MR. THRONSON: Sorry. There's
5     one more page I'll ask about first. Page
6     185 to 86.
7          MS. McENROE: 185 to 186?
8          MR. THRONSON: Yes.
9 BY MR. THRONSON:
10   Q.     On line 15 Mr. Vettori asked --
11         MR. VETTORI: I think it's
12     Mr. Ceryes.
13 BY MR. THRONSON:
14   Q.     Ceryes, okay.
15         "And would you agree that ECFMG
16 plays an important role in public health by
17 verifying that physicians who come here to
18 practice medicine have the necessary and
19 requisite credentials to do so?
20         MS. McENROE: Objection to form.
21         ANSWER: That is part of it, to
22 protect the American public."
23         Do you agree with that statement
24 by Mr. Kelly?

1   A.     Yes.
2   Q.     Then Mr. Ceryes continued:
3     "In another role that ECFMG
4 plays is detecting or endeavoring to detect
5 when an individual lacks the -- well, when an
6 individual has not been honest in presenting
7 their identity or credentials.
8         Objection to form.
9         MR. CERYES: Fair."
10         Then Mr. Kelly responded "yes."
11 Do you agree with Mr. Kelly's statement?
12   A.     I'm not sure that I would agree
13 with this statement as it's phrased.
14         ECFMG's review of applicants
15 that attempt to subvert it's policies and
16 procedures is an important role that it has,
17 but specifically that we have a role to detect
18 whether an individual is or isn't that
19 individual isn't part of our certification
20 program.
21         So our certificate program is
22 about eligibility for the exams and for
23 credentials. I don't know that I would agree
24 with it as it's phrased this way.

1   Q.     So if you were to break down the
2 question Mr. Ceryes asked on 185, 22 to 186, 1;
3 which part of that do you not agree with? Are
4 there certain words you can X out of it to make
5 it a statement you agree with?
6         MS. McENROE: Objection to form.
7     The witness just answered that question.
8         THE WITNESS: I wouldn't be --
9     it's not a sentence I would pull words
10     out of. I would rephrase it as I just
11     mentioned.
12 BY MR. THRONSON:
13   Q.     If you took out the words
14 "identity or" is it a sentence -- a question
15 you would agree with?
16         MS. McENROE: Objection to form;
17     asked and answered.
18         THE WITNESS: I don't think in
19     the way that it's presented here, I would
20     agree with it even with the word taken
21     out. I would rephrase it.
22 BY MR. THRONSON:
23   Q.     Akoda's certification was
24 revoked in approximately December of 2016?

1   A.     Yes.
2   Q.     Then his case was brought before
3 the USMLE committee on individual review?
4   A.     I believe so, yes.
5   Q.     That committee made a
6 determination on his case; is that right?
7   A.     That is my understanding.
8   Q.     What's your understanding of the
9 decision that they made?
10   A.     I don't know what their decision
11 was. I'd have to look at the letter that they
12 would have sent to him and what the specifics
13 of their findings were.
14   Q.     What's the relationship between
15 that committee and the creds committee of
16 ECFMG?
17   A.     The committee for individualized
18 review is a committee that is comprised of
19 members representing the USMLE program.
20         The USMLE program which is
21 owned, and the exams are administered by, the
22 National Board of Medical Examiners and the
23 Federation of State Medical Boards. So they
24 have representatives from their board of

KARA CORRADO

Page 226

1  trustees, that are on that committee to review
2  allegations of irregular behavior; and they
3  also have members of ECFMG's board on that
4  committee as well to review irregular behavior.
5          If there is an irregular
6  behavior that relates to USMLE policies or
7  something in their jurisdiction, they will take
8  an independent action to review and make a
9  determination of irregular behavior.
10         So if we have information and
11 the allegation is related to an USMLE
12 application, then we will refer the case to
13 them for their review as well, so they can
14 determine whether they want to take an action
15 against the individual from their perspective
16 in accordance with their policies and
17 procedures.
18 Q.     Is the committee on individual
19 review and the ECFMG creds committee, are those
20 separate and independent --
21 A.     Yes.
22 Q.     So it's not like one has a
23 superior position over the other?
24 A.     That's correct.  They are

Page 227

1  separate, independent for each of the
2  organizations.
3          MR. THRONSON:  I'd like to mark
4     exhibit 6.
5             - - -
6          (Whereupon the document was
7     marked, for identification purposes, as
8     Exhibit Number CORRADO-6.)
9             - - -
10 BY MR. THRONSON:
11 Q.     I'm handing you what the court
12 reporter marked as exhibit 6.  This is a
13 document produced to us, that is a decision
14 summary from the committee for individualized
15 review; does that seem right to you?
16 A.     Yes.
17 Q.     Then on the last page of the
18 exhibit, Bates 9158, it appears that the
19 committee made a finding of irregular behavior,
20 minimum 5 year bar, with state medical board
21 sponsorship required, told beginning
22 12/12/2017.  What does that mean?
23 A.     That means that they have found
24 irregular behavior, so he will have a notation

Page 228

1  on his USMLE transcript that he engaged in
2  irregular behavior.  He is barred for a minimum
3  of 5 years from taking USMLE examinations, and
4  after five years they will only consider
5  letting him take the exam if a state medical
6  board sponsors him or if they request on his
7  behalf that they want him to take the
8  examination, and that time period starts as of
9  12/12/2017.
10 Q.     This individual has had his
11 ECFMG certificate permanently revoked, right?
12 A.     That's correct.
13 Q.     And he's barred from future
14 ECFMG examinations?
15 A.     That's correct.
16 Q.     And he would need to apply -- he
17 would need to obtain an ECFMG certificate in
18 order to practice medicine again in the United
19 States, correct?
20 A.     That is correct.  Unless he went
21 to a U.S. medical school over again.  If he
22 enrolled in a U.S. medical school, then he
23 wouldn't need an ECFMG certificate; but he
24 would have the bar or whatever restraints that

Page 229

1  the USLME put on him.
2  Q.     Do you believe that's the
3  possibility they're taking into account in
4  imposing a 5 year bar, as opposed to a lifetime
5  bar?
6          MS. McENROE:  Objection to form.
7          THE WITNESS:  I can't speak for
8     the committee for individualized review
9     on what their sanctions are, whether they
10    follow the same sanctions for the same
11    types of case.  So I don't know what
12    their reasoning was in giving him that
13    particular bar.
14 BY MR. THRONSON:
15 Q.     So from your standpoint Akoda
16 can't practice medicine in the United States
17 unless he attends and graduates from a US
18 medical school, correct?
19 A.     Correct, and he gets the state
20 board sponsorship to take the exams again, and
21 the USMLE allows him to take the exams again.
22 So it's not -- this is not a fait accompli.  He
23 would only be able to petition them with these
24 things and they could still tell him no.

58 (Pages 226 - 229)

KARA CORRADO

Page 230

1   Q.      Igberase and Akoda both needed
2   ECFMG certification in order to be able to --
3   strike that. The individual identifying
4   himself as Igberase and Akoda needed ECFMG
5   certification to be able to practice medicine
6   in the United States, correct?
7           MS. McENROE: Objection to form.
8           THE WITNESS: I would say he
9       needed a license to practice medicine,
10      but as an international medical graduate,
11      part of the requirements for him to get
12      into a training program, which would be a
13      requirement for licensure and to take
14      Step 3, was that he have a valid ECFMG
15      certificate.
16  BY MR. THRONSON:
17      Q.      So an ECFMG certificate was a
18  necessary condition for him to be able to
19  practice medicine in --
20          MS. McENROE: Objection to form.
21          THE WITNESS: Generally
22      speaking, unless the state board made an
23      exception for him. The state boards, the
24      regulatory authorities, have autonomy and

Page 231

1       the authority to issue a license to
2       whomever they want to; it's within their
3       regulation.
4           So generally speaking, yes, an
5       international medical graduate would have
6       to have an ECFMG certificate; but that's
7       not to say a licensing board couldn't
8       take its own decision to license him
9       without it.
10  BY MR. THRONSON:
11      Q.      Could Akoda have gotten into the
12  residency program at Howard without ECFMG
13  certification?
14          MS. McENROE: Objection to form.
15          THE WITNESS: If it's an ACGME
16      accredited program, then ECFMG
17      certification would have been required.
18      I don't know if they would make
19      exceptions to that or not, but
20      certification is required for entrance
21      into an ACGME accredited programs; and
22      assuming Howard is an ACGME accredited
23      program.
24  BY MR. THRONSON:

Page 232

1   Q.      To obtain a medical license to
2   practice in Maryland ECFMG certification was
3   required, correct?
4   A.      That's my understanding. As
5   part of their requirements, they needed
6   verification of his ECFMG certificate status.
7   Q.      Is ECFMG aware of any route
8   other than through ECFMG certification that
9   Akoda would have been able to obtain a place in
10  the residency program at Howard?
11          MS. McENROE: Objection to form.
12          THE WITNESS: Only if Howard
13      waived that requirement for him.
14  BY MR. THRONSON:
15      Q.      Is that typically done?
16      A.      I don't think so; but if you're
17  asking me if there's any other possible way,
18  that would be the only way I can think of for
19  him.
20      Q.      You're not contending that
21  Howard regularly waives that requirement?
22      A.      No.
23      Q.      Or did back then?
24      A.      No.

Page 233

1   Q.      Are you aware of any other
2   routes, beside through ECFMG certification, by
3   which Akoda could have obtained a license to
4   practice medicine in Maryland?
5   A.      Other than the exception process
6   by the licensing board, that I sort of just
7   described, no.
8   Q.      Do you know if Maryland has that
9   exception process?
10  A.      I do not know.
11  Q.      Have you ever spoken with Akoda?
12  A.      No, I don't believe so.
13  Q.      If ECFMG had believed that the
14  letters of recommendation it received in
15  connection with Akoda's eras*** application,
16  residency application, were not authentic,
17  would ECFMG have had an obligation to inform
18  the residency programs to which he was a part
19  of?
20          MS. McENROE: Objection to form.
21          THE WITNESS: I wouldn't say
22      that we would have an obligation, but if
23      we determine that letters of
24      recommendation were fraudulent, we would

59 (Pages 230 - 233)

KARA CORRADO

Page 234

1    report it to the residency programs.  It
2    would be reported to residency programs
3    in general through our official
4    notification process.
5  BY MR. THRONSON:
6    Q.    Is the public entitled to have
7  confidence that ECFMG is acting in a reasonably
8  prudent fashion in assessing and verifying the
9  credentials and qualifications of international
10  medical graduates?
11        MS. McENROE:  Objection to form;
12    calls for legal conclusion.
13        THE WITNESS:  I wouldn't say
14    that they're entitled.  I would say that
15    they may have an expectation that ECFMG
16    or any organization is following its
17    procedures appropriately et cetera.
18  BY MR. THRONSON:
19    Q.    Should they have that
20  confidence?
21        MR. McENROE:  Objection to form.
22        THE WITNESS:  I mean, yes, I
23    think they could have that expectation.
24  BY MR. THRONSON:

Page 235

1    Q.    Should they have that
2  expectation from 1996 to the present?
3        MS. McENROE:  Objection to form.
4        THE WITNESS:  You mean in
5    general, yeah, I don't think their
6    expectations have changed.
7  BY MR. THRONSON:
8    Q.    We've taken a few breaks during
9  the deposition did you confer with Counsel
10  about the substance of the deposition during
11  those breaks?
12        MS. McENROE:  Objection to form.
13    I instruct you not to answer to the
14    extent it divulge privileged information,
15    but generally speaking you can give a
16    sort of general answer.
17        THE WITNESS:  Yes, and no, in
18    that we talked about other things that
19    were not related to this deposition.
20  BY MR. THRONSON:
21    Q.    So you talked about other things
22  not related to the deposition.  Did you also
23  talk about the testimony that you have given in
24  the deposition?

Page 236

1        MS. McENROE:  Objection, same
2  objection.
3        THE WITNESS:  I did raise a
4    question about the way that I phrased an
5    answer earlier, and whether I could
6    clarify that.  So it was related to a
7    question you had asked in the beginning
8    about, does the American public have the
9    right to have a physician that has been
10    appropriately vetted, something like
11    that.
12        In looking back, I thought I
13    would not have agreed with the words "the
14    right," but that they would have an
15    expectation.  I asked Counsel about
16    whether I could clarify that.
17  BY MR. THRONSON:
18    Q.    Anything else?
19    A.    No.
20    Q.    Did any procedural safeguards at
21  ECFMG fail in the process of certifying Akoda,
22  and then it's subsequent history with Akoda?
23        MS. McENROE:  Objection to form.
24        THE WITNESS:  No, I don't belive

Page 237

1    so.
2  BY MR. THRONSON:
3    Q.    Have you seen any evidence in
4  the file that specifically indicates that the
5  verified -- the document that purports to be an
6  authentication of the diploma from Benin was
7  sent by Benin?
8    A.    I don't recall if there is an
9  envelope in the file or not.  So to that
10  extent, I don't know other than to say, whether
11  there is an envelope present or not, the
12  process, at the time and still is, if it's not
13  returned directly from the school we do not
14  accept it.
15    Q.    Okay.  Pass the witness.
16        MS. McENROE:  Can we take a
17    quick break so I can go over my notes?
18        MR. THRONSON:  Sure.
19        - - -
20        (Whereupon there was a brief
21    recess in the proceeding.)
22        - - -
23        MS. McENROE:  Back on.
24        - - -

60 (Pages 234 - 237)

KARA CORRADO

Page 238

1          (Whereupon the document was
2     marked, for identification purposes, as
3     Exhibit Number CORRADO-7.)
4               - - -
5          CROSS-EXAMINATION
6               - - -
7 BY MS. McENROE:
8     Q.     Ms. Corrado, my name is Elisa
9 McEnroe.  We are acquainted; that's correct?
10    A.     Yes.
11    Q.     I am counsel for ECFMG, you
12 understand that?
13    A.     Yes.
14    Q.     I have a couple of very narrow
15 questions, I'm hoping, about some testimony
16 that you gave today.  Do you understand that?
17    A.     Yes.
18    Q.     I'm handing you what I've marked
19 as CORRADO-7.  Do you recognize that letter?
20    A.     Yes.
21    Q.     What is it?
22    A.     This is a letter from Dr. Akoda
23 responding to Mr. Kelly's August 22, 2000,
24 letter in which he alleged that he was using

Page 239

1 Igberase's information.
2     Q.     You were asked some questions a
3 little bit earlier today regarding whether and
4 when Dr. Akoda responded to the letter from
5 Mr. Kelly dated August 22, 2000.  Do you recall
6 that?
7     A.     Yes.
8     Q.     Does this refresh your
9 recollection for that testimony?
10    A.     Yes.  So I think I said that he
11 had not responded within the requisite 15 days,
12 but looking at the receipt date on this it
13 appears that he did.
14    Q.     There was some discussion
15 earlier today about what it means to have a
16 finding of irregular behavior for false
17 information on an application.  Do you remember
18 generally that kind of testimony?
19    A.     Yes.
20    Q.     Can you clarify what could
21 constitute irregular behavior for false
22 information on an application to ECFMG?
23    A.     False information on an
24 application for ECFMG would, could consist of

Page 240

1 indicating to ECFMG that you had not taken an
2 exam previously when you had taken an exam.
3          It could also refer to your
4 medical school attendance and graduation if
5 when we sourced verified your diploma, it was
6 inauthentic.
7     Q.     Could an inaccurate address be
8 considered by ECFMG to be false information
9 that would constitute irregular behavior?
10    A.     That is not something that we
11 would consider irregular behavior.
12    Q.     What about the location of the
13 birth?
14    A.     No.
15    Q.     What about social security
16 number?
17    A.     No.
18    Q.     Is it possible for there to be
19 information that is false on an ECFMG
20 application that might constitute a violation
21 of law, but would not constitute a basis for
22 irregular behavior for ECFMG?
23    A.     Yes, that's possible.
24    Q.     Does ECFMG make allegations of

Page 241

1 irregular behavior for applicants' violations
2 of law just because they are a violation of
3 law?  So for example, rape or murder?
4     A.     No.  The criminal activities of
5 applicants are not within our jurisdiction for
6 irregular behavior.
7     Q.     There was a lot of discussion
8 today about ECFMG certification, correct?
9     A.     Yes.
10    Q.     What does an ECFMG certificate
11 signify?
12    A.     An ECFMG certificate signifies,
13 that the individual has met minimum
14 requirements which includes passing medical
15 licensing examinations, as well as meeting our
16 credentialing requirements.
17          It signifies to an ACGME
18 accredited residency program that the
19 individual has met those requirements for
20 admission to GME, and it is part of the
21 requirements for eligibility for Step 3 and for
22 licensure.
23    Q.     Does an ECFMG certificate
24 signify certification of an applicant's

61 (Pages 238 - 241)

KARA CORRADO

Page 242

1 identity to a recipient of a ECFMG status
2 report indicating there's an ECFMG certificate
3 in place?
4     A.     No.
5     Q.     What do you mean by that?
6     A.     So when we certify the status of
7 an ECFMG certificate, we are not certifying to
8 the organization necessarily the identity of
9 the individual, but that an individual with
10 that name and date of birth has met the
11 requirements for certification and what the
12 validity is of their certificate and where they
13 went to medical school.
14     Q.     Is ECFMG certifying to the
15 recipients of the ECFMG certification
16 information that the applicant's social
17 security number is accurate?
18     A.     No.
19     Q.     Is ECFMG certifying to the
20 recipient of the ECFMG certification that the
21 location of the birth is accurate?
22     A.     No.
23     Q.     Is ECFMG certifying to the
24 recipients of the ECFMG certification status

Page 243

1 that the clinical clerkships are accurate as
2 represented on ECFMG's application?
3     A.     No.
4     Q.     Is it ECFMG's expectations that
5 individuals from the public rely on ECFMG
6 certification for any purpose?
7     A.     I'm sorry, can you say that
8 again?
9     Q.     Yes.  Is it ECFMG's expectation
10 that individuals from the public rely on ECFMG
11 status for any purpose?
12     A.     No.
13     Q.     So can an individual off the
14 street or who is examining the credentials of a
15 potential physician they want to go see, are
16 they entitled to contact ECFMG and ask about a
17 physician's certification status?
18     A.     No.  We would not release a
19 physician's certification status or a status
20 report to a member of the public.
21     Q.     Would ECFMG release a
22 certification status report to the individual
23 himself?
24     A.     No.

Page 244

1     Q.     To whom would ECFMG release a
2 ECFMG certification status report?
3     A.     To residency programs, licensing
4 boards, and other organizations that are
5 employing the physician as a physician.
6     Q.     Like hospitals and --
7     A.     Hospitals, right, CVOs that are
8 working on behalf of the hospitals.
9     Q.     Is it ECFMG's expectation that
10 recipients of ECFMG certification get
11 additional credentials before laying hands on
12 patients independently?  I can restate that if
13 you need?
14     A.     Yes, can you.
15     Q.     Yes.  So what I'm asking is
16 there was a lot of questions today about
17 whether an ECFMG certificate was necessary for
18 an applicant to do other things, for example go
19 to a residency program.  Do you remember that
20 testimony?
21     A.     Yes.
22     Q.     Is it ECFMG's understanding that
23 an ECFMG certificate is sufficient for an
24 applicant to treat patients?

Page 245

1     A.     No, it's not sufficient.
2     Q.     What else would be required
3 under ECFMG's expectations?
4     A.     So ECFMG certification is one of
5 the initial steps in the process for an
6 international medical graduate to ultimately
7 practice medicine in the United States.
8         While ECFMG certification may be
9 required for entrance into residency or for
10 licensure, it is not the only requirement that
11 the residency programs and the licensing boards
12 have in order to admit those individuals to
13 their programs or to license those individuals.
14     Q.     So to make sure I understand.
15 After an applicant gets an ECFMG certificate,
16 do they take any other board exams?
17     A.     Yes.  They need to take USMLE
18 Step 3.  So essentially they have to become
19 ECFMG certified which is the beginning of the
20 process, taking the examinations required for
21 certification; have their credentials source
22 verified; go through the residency application
23 process; get accepted to a residency program,
24 and meet whatever requirements the residency

62 (Pages 242 - 245)

KARA CORRADO

Page 246

1 programs has.
2          They can then apply for Step 3,
3 and they have to be certified and meet the
4 eligibility requirements that the Federation of
5 State Medical Boards has for Step 3; complete
6 their training and then again meet whatever
7 requirements the licensing board would have on
8 them to be licensed.
9     Q.     You said "complete training,"
10 what do you mean by that?
11     A.     Graduate medical education
12 training is generally a requirement for
13 licensure in all states.
14     Q.     So in other words, would that be
15 like a residency program, for example?
16     A.     Yes, residency program.
17     Q.     So are the applicants coming
18 through ECFMG still in graduate medical
19 education as they are proceeding forward; do
20 they still have more education requirements
21 after they get an ECFMG certificate?
22     A.     To be licensed in the U.S., yes.
23     Q.     Is -- FSMB, that's an acronym
24 you just used, what does that stand for?

Page 247

1     A.     That is the Federation of State
2 Medical Boards.
3     Q.     Is that an entity under ECFMG's
4 control?
5     A.     No.
6     Q.     That's a separate entity?
7     A.     Yes.
8     Q.     Thank you.
9          I have no further questions of
10 this witness.
11          MR. THRONSON: Just a few follow
12     ups to echo a few of Counsel's questions.
13               - - -
14          REDIRECT EXAMINATION
15               - - -
16 BY MR. THRONSON:
17     Q.     Is it ECFMG's expectation that
18 state medical boards will rely on reports of
19 ECFMG certification status for any purpose?
20     A.     Yes.  To meet the requirement
21 that the board might have for ECFMG
22 certification.
23     Q.     Is it ECFMG's expectation that
24 residency programs, such as that at Howard

Page 248

1 University, would rely on ECFMG status for any
2 purpose?
3     A.     Yes, to demarcate that that
4 person met the certification so they could
5 enter GME among whatever other requirements the
6 program had.
7     Q.     It is ECFMG's expectation that
8 hospitals that are considering whether to grant
9 clinical privileges to a physician rely on
10 ECFMG status for any purpose?
11     A.     I think it would be fair to say
12 that they have the same expectation as the
13 licensing board and the residency programs have
14 on the status reports; on ECFMG providing
15 information about certificate status.
16     Q.     The status report that was
17 provided to the Howard residency program
18 regarding Akoda, what was all the information
19 that that status report contained?
20     A.     The status report would contain,
21 his name; his USMLE identification number; his
22 medical school; the year he graduated; the
23 country of medical school; the validity of his
24 ECFMG certificate, what the status is; whether

Page 249

1 it expired or valid indefinitely; and when it
2 was issued.
3     Q.     If there were any finding of
4 irregular behavior, would the status report
5 contain an annotation reflecting that finding?
6     A.     Yes.
7     Q.     Any other information that the
8 status report contains, in that was submitted
9 to the Howard Residency Program?
10     A.     The status report to the
11 residency program may have had the dates that
12 he passed the USMLE examinations; and that
13 would be for the exams that met ECFMG's
14 examination requirement, but we would not
15 include scores to the residency program because
16 they would get those through a USMLE
17 transcript.
18     Q.     Any other information?
19     A.     No, electronically through the
20 system I don't believe there's any other
21 information.
22     Q.     ECFMG also provided status
23 reports to the Maryland Board -- a status
24 report to the Maryland Board of Physicians,

63 (Pages 246 - 249)

KARA CORRADO

Page 250

1 right?
2    A.    Yes.
3    Q.    Would that status report have
4 contained all the information that you just
5 mentioned?
6    A.    Yes.
7    Q.    Would it have been the same
8 status report that was sent to them?
9    A.    It would have been the same
10 status report, yes.  In terms of the
11 information that is on it, it's in a different
12 format.  When Howard gets it electronically,
13 it's not a PDF it's data; and when the Maryland
14 board gets it, it would be in more of a PDF
15 format --
16    Q.    Okay.
17    A.    -- the substance is the same.
18    Q.    Any additional information that
19 was on the report to the Maryland Board of
20 Physicians?
21    A.    Other than, our -- we have some
22 disclaimers at the bottom, but other than that
23 there's no other information that I recall.
24    Q.    What are the disclaimers?

Page 251

1    A.    They are disclaimers about
2 ensuring that the requesting organization has
3 the authorization from the physician to request
4 the information about them.
5    Q.    Anything else?
6    A.    Not that I can recall.
7    Q.    ECFMG also sent that status
8 report regarding Akoda to Prince George's
9 County Hospital, right?
10    A.    Yes.
11    Q.    Was that status report identical
12 to the one sent to Howard University?
13    A.    Yes.
14    Q.    Did it contain any additional
15 information, or did it omit any information?
16    A.    It is all the same.
17    Q.    I just have some very brief
18 questions about two emails.
19         MS. McENROE:  Counsellor, I just
20    want to check, if this is outside the
21    scope of my cross, just in the interest
22    of everybody's time, trying to understand
23    how this fits into the course of how
24    you're conducting today's deposition.

Page 252

1         MR. THRONSON:  I don't think so.
2    If you want to make that objection you
3    can.
4         MS. McENROE:  Let me take a look
5    real quick.  I do object.  I'm just
6    wondering what your nexus is to the
7    redirect examination?
8         MR. THRONSON:  I think it --
9    it's about the concerns -- it concerns
10    identity verification; it concerns the
11    role of ECFMG in doing that.  If you want
12    to put your objection on the record,
13    that's fine.
14         MS. McENROE:  Yes, just for the
15    sake of everybody's afternoon and
16    childcare obligations, I'm objecting to
17    the redirect examination being beyond the
18    scope of the cross-examination; preserve
19    any other objections that I have to
20    specific questions.
21             - - -
22         (Whereupon the document was
23    marked, for identification purposes, as
24    Exhibit Number CORRADO-8.)

Page 253

1             - - -
2 BY MR. THRONSON:
3    Q.    This is an email that you sent
4 to Lisa Cover, Marc Malachesky, and Tracy Gill
5 dated 11/27/2017?
6    A.    Yes.
7    Q.    And in it you appeared to have
8 attached information, it was an update, I
9 believe, to the creds committee regarding the
10 Akoda matter?
11    A.    Yes.
12    Q.    You said in the third paragraph,
13 I think this case is the "worse case scenario,"
14 for applicants who attempt to establish new
15 identities.
16         What did you mean by "worse case
17 scenario"?
18    A.    This is an applicant
19 representing to us that he has a different
20 identity or defrauding us.  That this case was
21 a worse case scenario of that, that he was able
22 to defraud ECFMG with a wholly new identity and
23 that it was important for us to continue to
24 make the enhancements to our overall process.

64 (Pages 250 - 253)

## KARA CORRADO

Page 254

1    Q.    Is it ECFMG's position that
2 implementation -- or that Notary Cam technology
3 had been available earlier, been implemented
4 earlier, that it could have detected the fraud
5 at an earlier point?
6          MS. McENROE:  Objection to form;
7    calls for speculation.
8          THE WITNESS:  It would have been
9    more difficult for an individual to
10   present themselves to us with a wholly
11   different identity.
12         So I don't think it will a
13   hundred percent stop that.  I think it
14   will help to reduce it.
15 BY MR. THRONSON:
16   Q.    I see in some of the documents
17 you refer to an IV process.  Do you know what's
18 meant by that?
19   A.    Depends on what documents it's
20 in.  We refer to irregular behavior and special
21 investigations as IV, but the organization
22 generally looks at IV as the information
23 booklet.  So I don't know which document.
24   Q.    This is my last question.  I

Page 255

1 understand this will probably also be taken
2 subject to objection.
3          MS. McENROE:  Same objection.
4          MR. THRONSON:  I'd like this
5    email to be marked as Exhibit 9.
6                 - - -
7          (Whereupon the document was
8    marked, for identification purposes, as
9    Exhibit Number CORRADO-9.)
10                - - -
11 BY MR. THRONSON:
12   Q.    Exhibit 9 represents an email
13 chain that involves correspondence between you
14 and Lisa Cover and you and Amy Buono and some
15 other individuals at -- that are State Medical
16 Boards, National Board of Medical Examiners;
17 fair to say?
18   A.    Yes.
19   Q.    You were asked by Amy Buono can
20 you provide an update as to the work you've
21 done so far with the US Attorney's Office?
22   A.    Yes, she asked that.
23   Q.    You asked Lisa, you weren't sure
24 what more to share then "we provided insight

Page 256

1 and information to Maryland".  Then you wrote
2 "I'm sensitive to the current issues related to
3 our IB."  What did you mean by that?
4    A.    Oh, that is related to the
5 contract that we have with the National Board
6 of Medical Examiners and the Federation of
7 State Medical Boards.  We have separate
8 processes, we talked about the committee for
9 individualized review.
10         In the past we adjudicated the
11 cases in a different way, in that we referred
12 them to the committee for individualized
13 review, and then they would be remanded, after
14 a determination was made they would be
15 remanded, for a sanction to be set.  We changed
16 that process because it was inefficient, so
17 it's related to that.
18   Q.    So there are contracts that
19 exist between ECFMG and the Federation of State
20 Medical Boards related to the irregular
21 behavior processes?
22   A.    The contract is related to
23 ECFMG's role in determining the eligibility for
24 international medical graduates to take the

Page 257

1 United States Medical Licensing Examination.
2          So the USMLE program has
3 essentially contracted with ECFMG to do that
4 for international medical graduates.  So we
5 will enforce their eligibility requirements, as
6 well as our own requirements for certification
7 on international medical graduates.  That's
8 really related to efficiencies in the
9 examination process.
10         There were a number of
11 examinations in the past.  Licensing boards
12 used to give their own exams, ECFMG had exams,
13 and when the USMLE examinations were introduced
14 in the mid 90s, the licensing boards all
15 decided that they would use those examinations
16 to make the process more efficient for
17 physicians.
18         Then ECFMG at that time also
19 agreed to use the USMLE examination to meet its
20 examination requirements for certification.  So
21 in that process, the USMLE program agreed to
22 have ECFMG determine eligibility on its USMLE's
23 programs' behalf, for international medical
24 graduates.

65 (Pages 254 - 257)

KARA CORRADO

Page 258

1    Q.     So contractual arrangement began
2  in the mid 90s and has continued through until
3  today?
4    A.    Yes.
5    Q.     That's all the questions I have.
6         MS. McENROE:  Nothing further
7  from us.
8              - - -
9         (Witness excused.)
10              - - -
11  (Deposition concluded at 6:13 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 260

1      INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8       After doing so, please sign the errata
9  sheet and date it.
10       You are signing same subject to the
11  changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13       It is imperative that you return the
14  original errata sheet to the deposing attorney
15  within thirty (30) days of receipt of the
16  deposition transcript by you.  If you fail to
17  do so, the deposition transcript may be deemed
18  to be accurate and may be used in court.
19
20
21
22
23
24

Page 259

1      C E R T I F I C A T E
2
   COMMONWEALTH OF PENNSYLVANIA:
3
   COUNTY OF PHILADELPHIA:
4
5     I, Jennifer L McDonald, a Notary
   Public within and for the County and State
6  aforesaid, do hereby certify that the foregoing
   deposition of KARA CORRADO was taken before me,
7  pursuant to notice, at the time and place
   indicated; that said deponent was by me duly
8  sworn to tell the truth, the whole truth, and
   nothing but the truth; that the testimony of
9  said deponent was correctly recorded in machine
   shorthand by me and thereafter transcribed
10  under my supervision with computer-aided
   transcription; that the deposition is a true
11  record of the testimony given by the witness;
   and that I am neither of counsel nor kin to any
12  party in said action, nor interested in the
   outcome thereof
13
       WITNESS my hand and official seal this
14  16th day of September 2019
15
16
17
       Jennifer L  McDonald,
18        Notary Public
19
20
21
22
23
24

Page 261

1      - - - - -
       E R R A T A
2      - - - - -
3  PAGE  LINE   CHANGE
4  ___ ___ _____
5  Reason for
6  Change:_____
7  ___ ___ _____
8  Reason for
9  Change:_____
10  ___ ___ _____
11  Reason for
12  Change:_____
13  ___ ___ _____
14  Reason for Change:
15  _____
16  ___ ___ _____
17  Reason for Change:
18  _____
19  ___ ___ _____
20  Reason for Change:
21  _____
22  ___ ___ _____
23  Reason for Change:
24  _____

66 (Pages 258 - 261)

KARA CORRADO

Page 262

1          ACKNOWLEDGMENT OF DEPONENT
2       I, _____, do hereby
3   certify that I have read the foregoing pages __
4   to ___ and that the same is a correct
5   transcription of the answers given by me to the
6   questions therein propounded, except for the
7   corrections or changes in form or substance, if
8   any, noted in the attached Errata Sheet.
9
10   _____  _____
11   DATE         SIGNATURE
12
13
14           Subscribed and sworn to before
15   me this _____ day of _____,
16   2017.
17
18           My commission expires:
19           _____
20           _____
21           Notary Public
22
23
24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

# PETITION
# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## DEFENDANT EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Dated: October 28, 2019

Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:    +1.215.963.5000
Facsimile:    +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for Foreign Medical Graduates*

# TABLE OF CONTENTS

**Page**

I.    FACTS RELEVANT TO THE MOTION ................................................................. 2

    A.    ECFMG's Certification And Irregular Behavior Processes............................. 2

    B.    The Medical Field Uses ECFMG Certification For Limited Purposes.................. 3

    C.    John Nosa Akoda And His Aliases ................................................... 4

        1.    *Oluwafemi Charles Igberase and Oluwafemi Igberase Charles* .............. 5

        2.    *John Nosa Akoda* ................................................... 5

    D.    This Lawsuit ................................................................. 7

II.    LEGAL STANDARD ................................................................. 9

III.    ARGUMENT ................................................................. 11

    A.    Issue Certification Is Not Appropriate Because There Is No Meaningful Commonality And Individual Issues Of Fact And Law Predominate. ............... 11

        1.    *Duty and Breach* ............................................... 13

        2.    *Causation* ................................................... 14

        3.    *Statute of Limitations Defense* ............................... 17

    B.    A Class Action Is Neither Superior Nor Manageable And Will Not Lead To Judicial Efficiency. ................................................... 18

    C.    Plaintiffs' Claims Are Not Typical Of Other Claims. ....................... 20

    D.    Plaintiffs Are Not Adequate Class Representatives........................... 21

    E.    Plaintiffs Cannot Satisfy Rule 23's Inherent Ascertainability Requirement. ...... 23

    F.    For All Of The Foregoing Reasons, The *Gates* Factors Weigh Against Issue Certification Under Rule 23(C)(4)........................................ 24

IV.    CONCLUSION ................................................................. 25

APPENDIX - CONTENTS OF EXHIBITS ................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkisson v. Jacobs Eng'g Grp., Inc.*,
  370 F. Supp. 3d 826 (E.D. Tenn. 2019)................................................16

*In re "Agent Orange" Prod. Liability Litig.*,
  818 F.2d 145 (2d Cir. 1987)........................................................17

*Alban v. Fiels*,
  61 A.3d 867 (Md. 2013) ............................................................20

*Althaus ex rel. Althaus v. Cohen*,
  756 A.2d 1166 (Pa. 2000) ..........................................................13

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997).............................................................21, 22

*Arch v. Am. Tobacco Co., Inc.*,
  175 F.R.D. 469 (E.D. Pa. 1997)..................................................16, 17

*Barnes v. Am. Tobacco Co.*,
  161 F.3d 127 (3d Cir. 1998)........................................................18

*Blain v. Smithkline Beecham Corp.*,
  240 F.R.D. 179 (E.D. Pa. 2007)..............................................16, 19, 20

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)........................................................23

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
  867 F.3d 434 (3d Cir. 2017)........................................................23

*Com. of Puerto Rico v. M/V Emily S.*,
  158 F.R.D. 9 (D.P.R. 1994) ........................................................12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................9, 10, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................14

*Eckroth v. Pennsylvania Elec., Inc.*,
  12 A.3d 422 (Pa. Super. 2010).....................................................15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Erisoty v. Rizik,*
  No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) ........................................17

*Exxon Mobil Corp. v. Albright,*
  71 A.3d 30 (Md. 2013) ........................................................................................15

*Gasoline Prods. Co. v. Champlin Refining Co.,*
  283 U.S. 494 (1931)........................................................................................18, 24

*Gates v. Rohm & Haas Co.,*
  655 F.3d 255 (3d Cir. 2011)........................................................................11, 16, 24

*Georgine v. Amchem Prods., Inc.,*
  83 F.3d 610 (3d Cir. 1996)..............................................................................19, 20

*Gonzalez v. Corning,*
  885 F.3d 186 (3d Cir. 2018)............................................................................11, 13

*Hammersmith v. TIG Ins. Co.,*
  480 F.3d 220 (3d Cir. 2007)....................................................................................20

*Hartford Ins. v. Manor Inn of Bethesda,*
  642 A.2d 219 (Md. 1994) ..............................................................................13, 15

*Hobbs v. Northeast Airlines, Inc.,*
  50 F.R.D. 76 (E.D. Pa. 1970).................................................................................19

*Hyderi v. Washington Mut. Bank, FA,*
  235 F.R.D. 390 (N.D. Ill. 2006)..............................................................................12

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008)............................................................................10, 13

*Jane Doe No. 1 v. Johns Hopkins Hosp'l,*
  No. 24-C-13-001041 (Balt. City Cir. Ct.)...............................................................22

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
  313 U.S. 487 (1941)................................................................................................20

*Martin v. Behr,*
  896 F.3d 405 (6th Cir. 2018) ..................................................................................16

*Neale v. Volvo Cars of N. Am., LLC,*
  794 F.3d 353 (3d Cir. 2015)....................................................................................10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Processed Egg Prods. Antitrust Litig.*,
    312 F.R.D. 124 (E.D. Pa. 2015) ............................................................................................19

*Pryer v. C.O. 3 Slavic*,
    251 F.3d 448 (3d Cir. 2001) ........................................................................................18, 24

*Rader v. Teva*,
    276 F.R.D. 524 (D. Nev. 2011) ..................................................................................12, 21

*Remsburg v. Montgomery*,
    831 A.2d 18 (Md. 2003) ...................................................................................................14

*Romero v. Allstate Ins. Co.*,
    52 F. Supp. 3d 715 (E.D. Pa. 2014) ..........................................................................10, 19

*Spence v. Bd. of Ed. of Christina Sch. Dist.*,
    806 F.2d 1198 (3d Cir. 1986) .................................................................................. *passim*

*In re Suboxone Antitrust Litig.*,
    MDL 2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019) ...................................................10

*Sweet v. Pfizer*,
    232 F.R.D. 360 (C.D. Cal. 2005) ......................................................................................19

*In re Three Mile Island Litig.*,
    87 F.R.D. 433 (M.D. Pa. 1980) ...............................................................................12, 15, 17, 18

*Toney v. Chester Cty. Hosp'l*,
    961 A.2d 192 (Pa. Super. 2008) .......................................................................................15

*Tulp v. Educ'l Comm'n for Foreign Med. Graduates*,
    Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) .........................................3

*Wal-Mart, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...........................................................................................10, 12, 13

*Weiley v. Albert Einstein Med. Ctr.*,
    51 A.3d 202 (Pa. Super. 2012) .........................................................................................14

## Other Authorities

45 C.F.R. § 164.316(b)(2) ..................................................................................................24

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Fed. R. Evid. 702 ...................................................................................................14

Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:43 (2012) ........................................10

U.S. Const., amend. VII...........................................................................................25

Defendant Educational Commission for Foreign Medical Graduates ("ECFMG") opposes Plaintiffs' Motion for Class Certification, ECF 32 (the "Motion"). Implicitly acknowledging that their negligence-based claims seeking damages for emotional distress allegedly experienced by more than 1,000 different class members could not possibly satisfy the requirements of Federal Rule of Civil Procedure 23, Plaintiffs attempt an end-run around Rules 23(a) and (b) and propose to certify only a "limited issue" class under Rule 23(c)(4). The Court should reject this attempt.

Plaintiffs purport to offer two "options" for certification, but each would bifurcate the case in the same unworkable way. In the first phase, a jury would address on a class-wide basis certain questions not capable of class-wide resolution relating to duty, breach, and whether ECFMG's conduct in issuing an ECFMG Certificate to a doctor using the name John Nosa Akoda in the mid-1990s was "capable of" causing class members to experience emotional distress when they later learned that Dr. Akoda went by different names and pleaded guilty to misuse of a Social Security number in 2016. *See* ECF 32-1 at 14-15 ("Option A," purporting to certify question of "liability"); *id.* at 11 ("Option B," purporting to certify nine (9) sub-issues relating to the question of "liability"). In the second phase—even if Option A or Option B were certified—Plaintiffs concede that more than a thousand mini-trials on individualized issues would still be required. Among the critical issues affecting Plaintiffs' claims that apparently would be left for "another day"—actually, many, many other days—are individualized questions relating to: the existence or absence of any cognizable emotional distress injury in a particular class member (evidence already exists that some have no cognizable injury); specific causation, *i.e.*, whether ECFMG's alleged conduct solely, directly, and proximately caused a particular class member's emotional distress (assuming there is a cognizable injury); the extent of any such emotional distress; any affirmative defenses of ECFMG related to a particular class member's claims (such as statute of limitations); and whether damages are to be awarded and, if so, in what amount. *See* ECF 32-1 at 15.

Neither class Plaintiffs propose can be certified consistent with Rule 23. The issues Plaintiffs propose to certify are at once so broad that they sweep in too many individualized and variable issues of fact and law to warrant certification, and so narrow that they would not materially advance resolution of the case. Moreover, certifying an issue class here would be an unprecedented extension of the Third Circuit's jurisprudence regarding class certification and emotional distress damages. Courts in the Third Circuit have **never** tried a limited issue class like this centered on emotional distress liability because emotional distress liability and damages are "**too interwoven to allow a fair determination of damages apart from liability.**" *Spence v. Bd. of Ed. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (emphasis added). For those reasons and others set forth in detail below, the Court should deny class certification.

## I. FACTS RELEVANT TO THE MOTION

### A. ECFMG's Certification and Irregular Behavior Processes

ECFMG is a Philadelphia-based private non-profit organization that promotes quality health care for the public by, among other things, certifying eligible graduates of international medical schools ("IMGs") who have met certain minimum requirements as ready to enter U.S. graduate medical education (usually residency programs). *See* ECF 32-3. At the relevant time, those minimum requirements included passing grades on an English exam and two substantive exams (Step 1 and Step 2 of the United States Medical Licensing Examination ("USMLE")) and a primary-source verified medical school diploma. *See* ECF 32-5; ECF 32-46 at 88:21-89:2. To primary source verify an IMG's medical school diploma, ECFMG would send a copy of the diploma directly to the issuing medical school, which would inform ECFMG whether the IMG applying to ECFMG was issued that diploma. ECF 32-46 at 88:7-14; *see, e.g.*, Exs. 1 & 2.

For various reasons, IMGs and others sometimes try to subvert ECFMG's processes.

2

ECFMG calls that "irregular behavior"[1] and has a process for evaluating suspected irregular behavior. The process is set forth in various ECFMG policies and procedures. ECF 32-46 at 55:23-56:7; *see, e.g.*, ECF 32-14. The process is intended to ensure the integrity of ECFMG's programs and services while affording process and procedure to the accused.[2]

When ECFMG suspects that an individual may have engaged in irregular behavior, ECFMG staff investigates by, *inter alia*, communicating with the source of the suspicion and with the accused. ECF 32-46 at 81:22-82:13, 146:11-14, 203:3-16. ECFMG is not a government enforcement or investigative agency and uses the tools at its disposal to determine whether a suspicion of irregular behavior is well founded. *Id.* at 76:12-77:5. If ECFMG staff determines that there is sufficient evidence that an individual has engaged in irregular behavior, the matter is referred to ECFMG's Medical Education Credentials Committee (a sub-committee of ECFMG's Board of Trustees) for a formal determination on the merits. *Id.* at 76:24-77:5. Mere suspicions of irregular behavior are not made public or reported to third parties to avoid damage to the suspect individual's career and reputation based on unsubstantiated allegations. *Id.* at 181:9-23.

If an IMG is found to have engaged in irregular behavior, ECFMG annotates the individual's record and can, *inter alia*, limit the IMG's participation in ECFMG programs and services or withhold or revoke existing ECFMG Certificates. ECF 32-14.

## B.    The Medical Field Uses ECFMG Certification For Limited Purposes.

ECFMG Certification status information is not made available to members of the general

---

[1] ECFMG defines "irregular behavior" as "all actions or attempted actions on the part of applicants . . . or any other person that would or could subvert the examination, certification or other processes, programs, or services of ECFMG." ECF 32-14.

[2] *See Tulp v. Educ'l Comm'n for Foreign Med. Graduates*, Civ. A. No. 18-5540, 2019 WL 2601066 (E.D. Pa. June 25, 2019) (granting summary judgment for ECFMG because ECFMG's irregular behavior procedures afford sufficient process to the accused) (Beetlestone, J.).

public.  ECF 32-46 at 243:18-20.  Rather, it is made available only to certain third parties in the medical field like residency programs, hospitals, licensing boards, and employers.  *Id.* at 244:1-8.  At the relevant time, ECFMG Certification status reports contained the IMG's name, date of birth, medical school name and country, graduation year, certification status, and certain examination scores (depending on the recipient).  *Id.* at 44:10-23.  These reports did not (and were not expected to) verify an IMG's identity, Social Security number, immigration status, passport information, criminal background, readiness to treat patients, ethics, honesty, morality, or character.  *Id.* at 198:16-22, 200:13-15, 240:18-241:6, 242:6-243:3, 244:22-245:13.

Recipients of ECFMG Certification status reports use them for a limited purpose as part of their own processes. The information provided by ECFMG is by no means the only information used by hospitals, programs and employers when evaluating IMGs.  *See id.* at 198:11-199:13.  To the contrary, they consider significant things like (1) in-person interviews; (2) information provided directly by the IMG; (3) letters of recommendation; (4) skills assessments or additional examinations; (5) reports from prior educational or training programs; (6) medical school transcripts; (7) information obtained as part of a background check; (8) ongoing performance monitoring.  Ex. 3 at 3-6; Ex. 4 at 5-8.  ECFMG is not responsible for any of that information.

### C.      John Nosa Akoda And His Aliases

Plaintiffs are former patients of an obstetrician/gynecologist ("OB/GYN") whom ECFMG certified in 1996 based on his undisputed passing of Steps 1 and 2 of the USMLE and the primary source verification of a diploma by the University of Benin.  ECF 32-1 at 4; Ex 2.  After obtaining ECFMG Certification, but prior to treating Plaintiffs, the doctor successfully: (1) passed Step 3 of the USMLE (ECF 32-34 at 5); (2) was admitted to a residency program (Ex. 5); (3) completed that residency program (Ex. 6); (4) became licensed to practice medicine (ECF 32-34 at 4); (5) was awarded hospital privileges and hired by several medical offices (*id.*); and (6) achieved Board

certification in his specialty (Ex. 7).  As ECFMG and Plaintiffs came to later learn, that doctor committed Social Security fraud and went by several different names.  ECF 32-32.

### 1. *Oluwafemi Charles Igberase and Oluwafemi Igberase Charles*

In 1992, the doctor applied to ECFMG using the name Oluwafemi Charles Igberase.  ECF 32-7.  He presented ECFMG with a medical school diploma that was primary source verified by the University of Ibadan.  Ex. 1.  Though he failed the USMLE exams several times, he ultimately passed them and thereby earned his ECFMG Certificate (No. 482-700-2).  ECF 32-10.  Despite this, he was unable to gain admission to a residency program.  ECF 32-12 at 1-2.

In 1994, apparently believing that his exam history kept him from residency, *id.*, the doctor applied again for ECFMG Certification, this time using the name Igberase Oluwafemi Charles.  ECF 32-32 at 9.  To wipe clean his record of failed examinations, he misrepresented that he had never applied to ECFMG before and managed to obtain a new application number, pass the USMLE exams again, and obtain a new ECFMG Certificate (No. 0-519-573-0).  ECF 32-9 at 13.

Misrepresenting application history with ECFMG can constitute irregular behavior.  *Id.* at 14.  When confronted by ECFMG, the doctor admitted that he had previously applied to ECFMG, despite representing otherwise on his application.  *Id.* at 15-16.  In accordance with its irregular behavior policies and procedures, ECFMG determined that he had engaged in irregular behavior and promptly (1) invalidated the ECFMG Certificate issued to Oluwafemi Igberase Charles; and (2) revoked the ECFMG Certificate issued to Oluwafemi Charles Igberase.  *Id.* at 2-4.  The doctor later submitted additional fraudulent applications to ECFMG using other variations of the names Oluwafemi, Charles, and Igberase.  ECF 32-17; Ex. 8.  ECFMG identified the fraud, refused to even process those applications, and instead barred him from ever again applying to ECFMG.  *Id.*

### 2. *John Nosa Akoda*

In 1996, the doctor applied yet again to ECFMG, this time using a wholly different name

("John Nosa Akoda"), a different diploma from a different Nigerian medical school (University of Benin), and other different personal information. ECF 32-19; ECF 32-20; ECF 32-32 at 10. On his application, the doctor misrepresented his ECFMG application history and made no reference to the Igberase or Charles applications. ECF 32-19. After he passed the required exams and the University of Benin primary source verified the diploma, he received an ECFMG Certificate (No. 0-553-258-5) as Dr. Akoda. Ex 2; ECF 32-21.

Dr. Akoda then entered a residency program at the Jersey Shore Medical Center ("JSMC"). ECF 32-32 at 10. An unnamed "source" apparently told JSMC that Dr. Akoda had participated in two other U.S. residency programs under the name Oluwafemi Charles Igberase. ECF 32-23. When JSMC tried to verify the Social Security number that Dr. Akoda provided directly in his residency paperwork, JSMC discovered that it belonged to Charles Igberase. *Id.* After JSMC shared limited information with ECFMG, ECFMG conducted its own investigation to determine if Dr. Akoda and Dr. Igberase were the same person. ECF 32-24; ECF 32-25; ECF 32-46 at 150:24-151:6. ECFMG staff spoke with a JSMC official and with Dr. Akoda himself. ECF 32-24; ECF 32-25; ECF 32-27; ECF 32-28. ECFMG determined that some of JSMC's information was inaccurate, *see* ECF 32-24 (ECFMG had no record of sending ECFMG Certification status reports to the residency programs about which JSMC had inquired), and Dr. Akoda provided explanations and supporting hard-copy documentation in person to demonstrate that he and Dr. Igberase were not the same person. ECF 32-26; ECF 32-27. Despite some suspicions at the time, ECFMG staff determined that there was insufficient evidence to bring Dr. Akoda before the ECFMG Medical Education Credentials Committee on an allegation that he was Dr. Igberase. ECF 32-29; ECF 32-46 at 150:24-151:6. JSMC ultimately discharged Dr. Akoda in 2000 because of perceived discrepancies involving his Social Security number and green card (which was not part of his ECFMG application). ECF 32-28. At the same time, JSMC notified the Maryland

Board of Physicians about those discrepancies. Ex. 9. ECFMG continued to investigate Dr. Akoda but took no adverse action against him because ECFMG had insufficient evidence of irregular behavior. ECF 32-46 at 150:24-151:6; ECF 32-31.

Years later, in 2006, Dr. Akoda was accepted to a residency program at Howard University Hospital ("Howard"). Ex. 5. He completed his residency in 2011 and obtained medical licenses from Maryland and Virginia. ECF 32-32 at 10; Ex. 10. Dr. Akoda then obtained privileges at Prince George's Hospital Center ("PGHC") and worked with medical practices run by Dr. Abdul Chaudry and Dr. Javaka Moore. *See, e.g.*, Exs. 11-14 at Rog 1. Each of these entities—although aware of Dr. Akoda's ECFMG Certification—would have used its own process to evaluate Dr. Akoda's training and credentials. Ex. 3 at 6. Notably, **none** of these entities evaluated Dr. Akoda using the name on his ECFMG Certificate ("John Nosa Akoda"). *See, e.g.*, Ex. 6 ("John-**Charles** Nosa Akoda"); Ex. 10 ("**Charles** John Akoda"); ECF 32-34 ("**Charles** J.N. Akoda").

In 2014, ECFMG received a subpoena from a U.S. Attorney's office regarding Dr. Akoda. Ex. 15. ECFMG cooperated with the investigation and followed instructions from federal authorities **not** to impede the investigation and **not** to take adverse action against Dr. Akoda while the investigation was ongoing. *Id.*; Ex. 16. Law enforcement did not stop Dr. Akoda from practicing medicine while their investigation spanned almost two years.

In November 2016, Dr. Akoda pleaded guilty to misuse of a Social Security number and stipulated that he and Oluwafemi Charles Igberase were the same person. ECF 32-32. With that admission, ECFMG promptly consolidated the Igberase and Akoda files and revoked the ECFMG Certificate issued to John Nosa Akoda. ECF 32-33; Ex. 17.

### D. This Lawsuit

Plaintiffs are former patients of Dr. Akoda for whom Dr. Akoda was either their regular doctor or the doctor who happened to be "on-call" at the hospital when they gave birth. Plaintiffs

contend that ECFMG was negligent in its certification and investigation of Dr. Akoda, and that ECFMG's actions directly caused them to suffer emotional distress upon learning of Dr. Akoda's conduct. *See* ECF 32-1 at 1-2. Plaintiffs (and their counsel) now seek to pursue claims for negligence and negligent infliction of emotional distress on behalf of a proposed class of "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J Akoda M.D.)." *Id.* at 10.[3] As defined, the putative class includes individuals who encountered Dr. Akoda (1) before and after he came to the United States, (2) while he was a resident at JSMC, (3) while he was a resident at Howard, (4) before and after he was licensed, (5) before and after he was Board certified, (6) before and after he obtained privileges at PGHC, (7) before and after he was hired by private practices, and (8) before and after ECFMG was instructed by federal authorities not to take adverse action against him.

Dr. Akoda performed a variety of procedures on class members, ranging from mere examinations to vaginal deliveries to major surgeries. Ex. 25. Class members experienced a range of reactions both to the treatment rendered by Dr. Akoda and to the discovery of the charges against Dr. Akoda: some class members claimed emotional distress both **<u>before</u>** and **<u>after</u>** learning of the charges against Dr. Akoda; some claimed emotional distress only **<u>after</u>** learning of the charges; and others claimed no emotional distress whatsoever. *Id.* Individualized assessments of each class member will be necessary to determine whether any particular class member suffers from

---

[3] This litigation follows a proposed class action against Dimensions Health Corporation and others who operated PGHC, where Dr. Akoda practiced. *See Russell et al v. Dimensions Corp., et al.*, CAL 17-22761 (Prince George's Cty. Cir. Ct., Md.); *see Dews et al v. Dimensions Healthcare Sys., et al.*, CAL 17-37091 (Prince George's Cty. Cir. Ct., Md.). Plaintiffs in this case were also plaintiffs or class members in those cases. Exs. 18-21 at Rog 10. Those cases alleged that Dimensions was the "sole and proximate cause" of Plaintiffs' injuries. *E.g.*, Ex. 38 ¶ 81; *see* Ex. 22. Soon after moving for class certification and receiving the defendants' summary judgment motion—and without receiving any compensation—Plaintiffs abandoned their claims against Dimensions and stipulated to the dismissal of that case without prejudice. Ex. 23; Ex. 24.

emotional distress caused by ECFMG. Exs 26-31. This is evident from the Plaintiffs themselves:



***Monique Russell.*** Ex. 32 at 9. Ms. Russell acknowledges that the consequences of Dr. Akoda's treatment were "minor," Ex. 27 at 7, and that Dr. Akoda rendered treatment that "really was best/necessary." Ex. 33 at 4. Ex. 27 at 7. Nonetheless, she feels a responsibility to "stand up for women who were subjected to trauma." *Id.*

***Jasmine Riggins.*** Ex. 32 at 8. *Id.*; Ex. 28 at 2. *Id.* at 2. *Id.* at 4; Ex. 31 at 1-2.

***Elsa Powell.*** Ex. 29 at 2. Ex. 32 at 6. Ex. 29 at 3. *Id.* at 4, 6; Ex. 31 at 2.

***Desire Evans.*** Ex 32 at 4. Ex. 30 at 2-3. *Id.* at 5, 7. *Id.* at 7. *Id.* at 8.

## II.  <u>LEGAL STANDARD</u>

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart, Inc. v. Dukes*, 564 U.S. 338,

350 (2011)); *see In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 n.14, 320-21 (3d Cir. 2008). The Court must conduct a "rigorous analysis" to determine whether a party seeking to certify a class has carried its burden under Rule 23. *Dukes*, 564 U.S. at 351.

"Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.* at 349. To satisfy Rule 23(a), Plaintiffs must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Those four requirements— known as numerosity, commonality, typicality, and adequacy—"effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349.

Plaintiffs must also satisfy at least one subsection of Rule 23(b). *See Comcast*, 569 U.S. at 33; *Dukes*, 564 U.S. at 345; *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370 (3d Cir. 2015). Rule 23(b)(3) covers "individualized monetary claims," *Dukes*, 564 U.S. at 362, like those asserted by Plaintiffs here, and requires Plaintiffs to show that common questions "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Implicitly recognizing that they cannot satisfy Rule 23(b)(3), Plaintiffs suggest that they can avoid its requirements altogether by seeking to certify an issue class under Rule 23(c)(4). But Plaintiffs' reliance on Rule 23(c)(4) does not obviate their need to satisfy Rule 23(b)(3). *See In re Suboxone Antitrust Litig.*, MDL 2445, 2019 WL 4735520, at \*18 (E.D. Pa. Sept. 27, 2019) ("Certification of particular issues under Rule 23(c)(4) is only proper if the other requirements of Rule 23(a) and (b) are first met."); *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 724 (E.D. Pa. 2014) (same); *see also* Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:43 (2012) (Rule

23(c)(4) "should never be. . .used to 'fix' manifest Rule 23(b)(3) predominance problems presented where key issues going to liability require individualized proof.").[4]

"[A] court's decision to exercise its discretion under Rule 23(c)(4), like any other certification determination under Rule 23, must be supported by rigorous analysis." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272 (3d Cir. 2011) (quoting *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 200-01 (3d Cir. 2009)). The Third Circuit has provided the following "non-exclusive list of factors" that "should guide courts" as they apply Rule 23(c)(4):

> (1) the type of claim(s) and issue(s) in question; (2) the overall complexity of the case; (3) the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; (4) the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; (5) the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); (6) the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; (7) the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; (8) the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and (9) the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s).

*Id.* at 273.

## III.  ARGUMENT

### A.  Issue Certification Is Not Appropriate Because There Is No Meaningful Commonality And Individual Issues Of Fact And Law Predominate.

The issues that Plaintiffs propose to certify for class treatment encompass so many individualized questions of fact and law that they do not warrant certification under Rules 23(a) or

---

[4] There is a Circuit split about the relationship between Rules 23(b) and 23(c)(4), and the Third Circuit purports not to have "join[ed] either camp." *Gates*, 655 F.3d at 272-73. But the Third Circuit has embraced a view of Rule 23(c)(4) that effectively limits issue class certification to cases where a party satisfies the predominance, superiority, and manageability elements of Rule 23(b)(3). *Id.*; *see Gonzalez v. Corning*, 885 F.3d 186, 202-03 (3d Cir. 2018) (citing "the same reasons" for affirming denials of certification under Rules 23(b)(3) and 23(c)(4)).

23(b)(3).  No court in the Third Circuit has **<u>ever</u>** certified and tried a limited issue class centered on emotional distress liability because with respect to the claims of even a single plaintiff, emotional distress liability and damages are "**<u>too interwoven to allow a fair determination of damages apart from liability.</u>**"  *Spence*, 806 F.2d at 1202 (emphasis added).  It is obvious, then, that "the idiosyncratic nature of emotional distress claims" make them "diverse and personal" and "unsuitable for class certification."  *In re Three Mile Island Litig.*, 87 F.R.D. 433, 441-42 n.16 (M.D. Pa. 1980) ("*In re TMI*").  The overwhelming weight of authority from courts across the country agrees.[5]

Plaintiffs have identified a set of abstract questions that they contend are "common," but "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (emphasis in original).  Identifying common questions is not enough to satisfy Rule 23(a) because "[a]ny competently crafted class action complaint literally raises common 'questions.'"  *Id.* at 349.  Rather, common questions will satisfy Rule 23(a) only if they are "capable of class[-]wide resolution" and "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.* at 350.

Rule 23(b)(3)'s predominance requirement is "even more demanding" than Rule 23(a)'s exacting commonality requirement.  *Comcast*, 569 U.S. at 34.  The Court "must formulate some prediction as to how specific issues will play out in order to determine whether common or

---

[5] *See, e.g.*, *Rader v. Teva*, 276 F.R.D. 524, 530–31 (D. Nev. 2011) ("The emotional distress claims of thousands of proposed class members defeat class certification in this case because emotional distress is necessarily an individualized inquiry, and the amount of damages in such cases 'is not susceptible to a mathematical or formulaic calculation.'"); *Hyderi v. Washington Mut. Bank, FA*, 235 F.R.D. 390, 397 (N.D. Ill. 2006) (emotional distress claims are a "highly plaintiff-specific issue"); *Com. of Puerto Rico v. M/V Emily S.*, 158 F.R.D. 9, 14 (D.P.R. 1994) (emotional distress claims are "intractably individual in character").

individual issues predominate in a given case." *In re Hydrogen Peroxide*, 552 F.3d at 311.

Whether analyzed under the framework Rule 23(a) or Rule 23(b)(3), Plaintiffs' proposed issue classes do not warrant certification because they lack commonality and individualized questions of law and fact predominate. *See Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018) ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."). Notwithstanding Plaintiffs' attempts to circumscribe the scope of their proposed issue class, even those limited issues articulated by Plaintiffs present an array of individualized issues that would overwhelm any class-wide analysis and prevent the attainment of common answers to the supposedly common questions.

### 1. Duty and Breach

Whether ECFMG owed or breached a duty to any particular class member (of the more than 1,000 class members claimed by Plaintiffs) is "not capable of class[-]wide resolution," *Dukes*, 564 U.S. at 350, and certainly does not predominate over individualized inquiries. Regardless of whether the question is stated generally as in Option A (*i.e.*, whether ECFMG owed or breached a duty) or narrowly as in Option B (*i.e.*, whether ECFMG owed or breached a duty under various particular theories), *see* ECF 32-1 at 10-11, the answer will vary depending on which state's law applies (which itself presents an obstacle to class certification, *see infra* Part III.B) and whether the class member's alleged injury was a reasonably foreseeable result of ECFMG's conduct. *See, e.g.*, *Hartford Ins. v. Manor Inn of Bethesda*, 642 A.2d 219, 226 (Md. 1994).[6] Here, determining whether it was foreseeable that ECFMG's conduct would cause a particular class member to be treated by Dr. Akoda and then to suffer emotional distress upon learning of the charges against Dr.

---

[6] To the extent Pennsylvania law might apply, *see infra* Part III.B, it similarly requires a foreseeability analysis to determine whether a duty exists. *See, e.g.*, *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000).

Akoda is rife with individualized issues incapable of class treatment, including:

**When and where each class member encountered Dr. Akoda.** Class members encountered Dr. Akoda while he was (1) in Nigeria before he applied for ECFMG certification; (2) a resident at JSMC; (3) a resident at Howard; (4) a physician with privileges at PGHC; (5) an employee at Dr. Moore's office; (6) an employee at Dr. Chaudry's office; (7) a licensed physician; and/or (8) Board certified. Class members also encountered Dr. Akoda before and after ECFMG was instructed by federal authorities not to take adverse action against him. With each additional third party that independently assessed Dr. Akoda's credentials and permitted him to treat patients, it becomes less foreseeable that ECFMG's conduct might cause Dr. Akoda to treat patients or cause emotional distress. To the extent Plaintiffs contend that the duty might arise from ECFMG's relationships with third parties, ECF 32-1 at 11, each would require individualized consideration. Thus, a class member who was treated by Dr. Akoda in Nigeria or as a resident at JSMC would have to present markedly different evidence on the question of ECFMG's duty than a class member who was treated by Dr. Akoda at PGHC when he worked for Dr. Moore or Dr. Chaudry as a fully licensed and Board-certified OB/GYN.

**How each class member was treated and/or examined by Dr. Akoda.** Plaintiffs (and their experts[7]) cannot dispute that class members had a wide variety of experiences with Dr. Akoda under a wide variety of circumstances. ECF 32-44 at 21. Class members' interactions with Dr. Akoda ranged from allegedly "positive" medical examinations to allegedly inappropriate comments or contact. *See* Ex. 25. Whether it was foreseeable that ECFMG's conduct would result in Dr. Akoda treating and/or mistreating a particular class member in the particular way that factored into that class member's alleged emotional distress is an individualized issue not capable of class-wide resolution through common evidence.

**Each class member's relationship to ECFMG.** Plaintiffs had no knowledge of ECFMG until after their alleged injuries. Exs. 11-14 at Rog 7. No court has ever held that ECFMG owes a duty to members of the general public (like Plaintiffs) to ensure that IMGs who receive an ECFMG Certificates will in fact, or are qualified to, provide appropriate medical treatment. Whether ECFMG owed such a duty may turn on the specific relationship (if any) between each class member and ECFMG. *See, e.g.*, *Remsburg v. Montgomery*, 831 A.2d 18, 27 (Md. 2003).[8]

2. **Causation**

Determining liability on a class-wide basis would require a finding of both actual and

---

[7] Many of the opinions articulated by Plaintiffs' experts should be excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See, e.g.*, Ex. 34 at 3. But because Plaintiffs have not argued that the substance of their experts' opinions support class certification, ECFMG has not moved to exclude them at this time. ECFMG reserves the right to do so in connection with its motion for summary judgment.

[8] *See also, e.g.*, *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217-19 (Pa. Super. 2012).

proximate causation on a class-wide basis. *See Hartford Ins. Co.*, 642 A.2d at 229-30.[9] "When more than one act of negligence arguably could be responsible for the injury, the question is whether the second in point of time superseded the first, *i.e.*, did that act intervene and supersede the original act of negligence, thus terminating its role in the causation chain?" *Id.* Here, there are innumerable individualized questions implicated in the issue of causation, including:

> ***When and where each class member encountered Dr. Akoda.*** Each decision by an above-listed third party to supervise, credential, privilege, or hire Dr. Akoda—based on its own investigations, assessments, and criteria—was a potential break in the causal chain that would eliminate ECFMG's liability. A class member who was treated by Dr. Akoda in Nigeria or as a resident at JSMC would have to present markedly different evidence on causation than a class member who was treated by Dr. Akoda at PGHC when he worked for Dr. Moore or Dr. Chaudry as a fully licensed and Board-certified OB/GYN.

> ***How each class member was treated and/or examined by Dr. Akoda.*** Whether a class member's emotional distress was actually and proximately caused by ECFMG's conduct would likely turn on whether the class member had minimal or extensive exposure to Dr. Akoda and whether the jury believes that Dr. Akoda's decision to treat or examine the class member in a particular way broke the causal chain between ECFMG and the alleged emotional distress. It is not capable of class-wide resolution through common proof.

> ***How each class member's background affected the alleged emotional distress.*** The existence, onset, and interplay of an individual's alleged emotional distress is an overwhelmingly individualized inquiry. Whether alleged emotional distress (if proven to exist) was attributable to treatment by Dr. Akoda or the result of a preexisting mental health issue is impossible to determine through common evidence. This is evident from just the claims of the named Plaintiffs: ████████████████████████████████ ████████████████████████████████████████ *See* Exs. 26-31.

> ***Whether class members experienced physical injury.*** To recover for emotional distress, Plaintiffs must show that ECFMG's conduct caused not only emotional distress, but also an "objective and demonstrable physical injury." *Exxon Mobil Corp. v. Albright*, 71 A.3d 30 (Md. 2013).[10] The nature of any alleged physical injury that might support the recovery of emotional distress damages (and whether such injury is causally related to both the alleged negligence and emotional distress) can vary widely and is not suited to class-wide resolution. *See In re TMI*, 87 F.R.D. at 441-42 ("[A] class action is not the superior method for adjudication of the claims for physical injury related to emotional distress.").

---

[9] *See also, e.g.*, *Eckroth v. Pennsylvania Elec., Inc.*, 12 A.3d 422, 427 (Pa. Super. 2010).

[10] *See also, e.g.*, *Toney v. Chester Cty. Hosp'l*, 961 A.2d 192, 200 (Pa. Super. 2008).

Plaintiffs try to side step these fundamental causation problems by limiting their proposed issue classes to questions of general causation (*i.e.*, whether ECFMG's conduct was **capable** of causing emotional distress) and leaving questions of specific causation (*i.e.*, whether ECFMG's conduct **actually** caused emotional distress) for thousands of separate mini-trials. But in tort cases like this, courts "have routinely refused to certify common questions of general causation." *Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 185 n.19 (E.D. Pa. 2007); *see, e.g.*, *Gates*, 655 F.3d at 273 (affirming refusal to certify a "liability-only issue class when it found liability inseverable from other issues that would be left for follow-up proceedings"); *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 488-89 (E.D. Pa. 1997) (finding that "general causation" question of whether cigarettes are capable of being addictive is not common under Rule 23(a)(2)). "Any hope of efficiency would be subverted by the individual and unique circumstances of each member's case which are inextricably intertwined with the general causation issue." *Blain*, 240 F.R.D. at 192.

Separating concepts of general and specific causation is especially inappropriate for a putative class centered on allegations of emotional distress where there is no meaningful distinction between the evidence bearing on both inquiries. Emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Spence*, 806 F.2d at 1202. This case is completely unlike the out-of-Circuit chemical exposure cases cited by Plaintiffs (ECF 32-1 at 15) in which common evidence arguably could be presented to answer the question of whether, as a matter of scientific literature and study, sufficient evidence existed to establish whether exposure to a particular chemical **can** cause a particular diagnosable condition, and leaving for later whether the chemical **did** cause such a condition in a particular person. *See Martin v. Behr*, 896 F.3d 405 (6th Cir. 2018); *Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F. Supp. 3d 826 (E.D. Tenn. 2019). Moreover,

those cases are outliers. *See, e.g.*, *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 145, 164 (2d Cir. 1987) (rejecting "general causation" issue certification because the relevant and "highly individualistic" question was whether exposure to Agent Orange "*did* cause harm and to whom"); *Arch*, 175 F.R.D. at 488-89 ("Unless it is proven that cigarettes always cause or never cause addiction, 'the resolution of the general causation question accomplishes nothing for any individual plaintiff.'"). Plaintiffs here have not (and cannot) come forward with evidence speaking specifically to the question of general causation as opposed to specific causation. Rather, the "causes of the injuries alleged" must "be assessed on a plaintiff-by-plaintiff basis." *In re TMI*, 87 F.R.D. at 441-42; *see Spence*, 806 F.2d at 1202; Exs. 26-31.

### 3. Statute of Limitations Defense

For many class members, the two-year statute of limitations began to run no later than November 2016, when Dr. Akoda's guilty plea became public and class members knew or should have known of Dr. Akoda's conduct and any emotional distress they might have experienced from that knowledge. *See Erisoty v. Rizik*, No. 93-6215, 1995 WL 91406, at *10 n.4 (E.D. Pa. Feb. 23, 1995) (applying Pennsylvania's two-year limitations period for torts over Maryland's three-year limitations period for torts). But there are class members whose claims may be time-barred because they allegedly suffered emotional distress caused by Dr. Akoda **before** November 2016. Ex. 25. Indeed, one class member actually filed a lawsuit seeking emotional distress damages resulting from her treatment by Dr. Akoda in early 2016—months **before** Dr. Akoda was even arrested. Ex. 35. Whether and to what extent she (or other class members claiming emotional distress **before** November 2016) learned of the charges against Dr. Akoda **outside** the two-year limitations period applicable in this case presents an important individualized issue not capable of class-wide resolution through common proof. "[D]etermining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent class certification."

*Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998).  Thus, individualized questions of law and fact bearing on ECFMG's statute of limitations defense preclude certification under Rule 23(a) or 23(b)(3).

### B.     A Class Action Is Neither Superior Nor Manageable And Will Not Lead To Judicial Efficiency.

A class action is not the superior method for adjudicating emotional distress claims because of the "likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways" such that "an action conducted nominally as a class action would degenerate into practice into multiple lawsuits separately tried."  Fed. R. Civ. P. 23, advisory committee's note; *see In re TMI*, 87 F.R.D. at 441-42.  On this record, the Court cannot find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), for three reasons.

*First*, emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct."  *Spence*, 806 F.2d at 1202.  The Third Circuit has "steadfastly" disapproved of separate **individual** trials for liability and damages "where a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability."  *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 455 (3d Cir. 2001); *see Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931) (separate trials on liability and damages "would amount to a denial of a fair trial" where issues are "interwoven" and "cannot be submitted to the jury independently").  This concern would only be exacerbated by attempting to have a separate liability trial on a **class-wide** basis for the reasons that commonality under Rule 23(a) and predominance under Rule 23(b)(3) are lacking.  *See supra* Part III.A.  Plaintiffs have offered no efficient way to isolate meaningful issues for class treatment.  Plaintiffs

have offered no trial plan or other explanation about how they expect to try either proposed issue class in a manageable way, and they concede (as they must) that there will still be thousands of mini-trials even if an issue class is certified. *See* ECF 32-1 at 25. Any attempt by Plaintiffs to narrow further the scope of any issue class would eliminate any efficiency gains that even arguably arise from class treatment. *See Romero*, 52 F. Supp. 3d at 738 (issue certification not appropriate where it would not materially advance the litigation).

**Second**, issue certification would ignore each class member's significant interest in controlling her own litigation. This interest is particularly strong in personal injury and emotional distress cases and where discovery will involve intrusive IMEs and highly sensitive mental health and gynecological issues. *See, e.g.*, *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 633 (3d Cir. 1996) (strong interest class members have in controlling own personal injury lawsuits disfavors certification); *Blain*, 240 F.R.D. at 191-92 (same); *Sweet v. Pfizer*, 232 F.R.D. 360, 373 (C.D. Cal. 2005) ("[T]he class members appear to have large stakes in the litigation, as the alleged harm has affected such aspects of their lives as their marriages and finances."). Each class member's interest is also strengthened in this case because "there is a wide range of choice of the strategy and tactics of the litigation," including choices about which defendants to pursue and when. *See Hobbs v. Northeast Airlines, Inc.*, 50 F.R.D. 76, 79 (E.D. Pa. 1970). Each class member should be able to decide whether to focus litigation efforts on Dr. Akoda and/or the institutions that employed him.

**Third**, choice-of-law issues in this case render it unmanageable. *See, e.g.*, *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 164-65 (E.D. Pa. 2015) (finding application of 21 state laws unmanageable). Plaintiffs contend that Pennsylvania law should apply to all class members because Pennsylvania has rejected the *lex loci delicti* rule and Plaintiffs' counsel are "unaware" of any relevant conflicts between the laws of Pennsylvania and other states. ECF 32-1 at 22-23. Neither of these arguments hold water. There are material differences between the laws

19

of Pennsylvania (where ECFMG is located) and the laws of jurisdictions where Plaintiffs and class members interacted with Dr. Akoda and ultimately suffered their alleged injuries (such as Nigeria, Maryland, New Jersey, and Washington, DC).  For example, unlike Pennsylvania, Maryland—the jurisdiction where each of the named Plaintiffs was treated by Dr. Akoda, where Dr. Akoda was licensed to practice medicine, and where 3 of the 4 named Plaintiffs reside—"does not recognize the tort of negligent infliction of emotional distress."  *Alban v. Fiels*, 61 A.3d 867, 876 (Md. 2013); *see Blain*, 240 F.R.D. at 195 ("Negligent infliction of emotional distress claims vary greatly among the states.").  In such situations, Pennsylvania[11] generally applies a "flexible" choice-of-law analysis that "permits analysis of the policies and interests underlying the particular issue before the court" and applies the law of the state with the "most interest in the problem."  *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805-06 (Pa. 1964)).  Here, Maryland has a greater interest than Pennsylvania in whether a Maryland resident treated in Maryland by a doctor licensed in Maryland can recover for emotional distress arising from that treatment, so Maryland law applies to (and bars) Plaintiffs' emotional distress claims.  Similar analyses would be required based on each class member's particular circumstances, precluding a finding of superiority or manageability under Rule 23(b)(3).

### C.     Plaintiffs' Claims Are Not Typical Of Other Claims.

Rule 23(a)'s typicality requirement "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine*, 83 F.3d at 631.  Here, Plaintiffs' claims are not typical of other claims in two respects.

*First*, Plaintiffs were all treated after Dr. Akoda had completed the Howard residency program, was licensed to practice medicine in Maryland and Virginia, became Board certified in

---

[11] Because the Court is sitting in diversity, the choice of law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

his specialty, obtained privileges at PGHC, and was hired by a private medical office. Plaintiffs'

claims are clearly **not** typical of class members who were treated by Dr. Akoda at any point along

that chain of events or, alternatively, in Nigeria before he ever applied to ECFMG.

*Second*, each Plaintiff is seeking only emotional distress damages; Dr. Akoda's treatment

resulted in a healthy child, a healthy mother, and no physical injury. *See* Ex. 32 at 10. Having

disavowed all other claims, Plaintiffs are not in a position to pursue the interests of class members

who allegedly suffered in other ways at the hands of Dr. Akoda. *See* Ex. 25. Indeed, if a class is

certified here, class members would be precluded from later pursuing claims that could have been

asserted in this class action. *See Rader*, 276 F.R.D. at 529 ("insurmountable conflict" resulting

from named plaintiff's choice to pursue limited relief "jeopardiz[es] the class members' ability to

subsequently pursue other claims" and renders named plaintiff inadequate representative).

### D. Plaintiffs Are Not Adequate Class Representatives.

Rule 23(a)'s adequacy requirement is designed "to uncover conflicts of interest between

named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591,

625 (1997). Here, Plaintiffs are not adequate class representatives for three reasons.

*First*, Plaintiffs (and their counsel) previously sought to represent a similar class of

individuals in lawsuits against Dimensions Health Corp. ("Dimensions") and others who operated

PGHC, the hospital where Dr. Akoda actually treated and examined patients. *See supra* at 8 n. 3.

But just before a class certification hearing in those cases—and without securing any relief for

themselves or the putative class—Plaintiffs dismissed their claims without prejudice. Exs. 23 &

24. If Plaintiffs were not willing to represent the putative class in pursuing claims against the

hospital whose negligence was the "sole and proximate cause" of putative class members' alleged

injuries, Ex. 38 ¶ 81, and, according to Plaintiffs' own expert in that case, "directly and

proximately resulted in injuries, damages, and permanent disability" to putative class members,

Ex. 22, it is unclear why they would faithfully pursue more attenuated claims against ECFMG.[12]

*Second*, Plaintiffs are not adequate class representatives because, despite claiming that ECFMG was a direct and proximate cause of every class member's alleged injuries, Plaintiffs fundamentally misunderstand what ECFMG actually does. During their depositions, Plaintiffs testified that they believed ECFMG was a government agency (ECF 32-36 at 51:15-52:1), issued medical licenses (Ex. 37 at 90:22-91:11), was responsible for verifying passports and immigration information (Ex. 36 at 80:8-82:4), and was responsible for conducting criminal background checks (ECF 32-37 at 28:3-7 ). None of that is true. If Plaintiffs are to represent the putative class and make informed decisions about settlement and trial, they must understand ECFMG's role in the medical field and not operate under the misimpression that ECFMG is something that it is not.

*Third*, Plaintiffs claim to suffer emotional distress, but they seek to represent class members who may not yet (or ever) suffer emotional distress. Such class members may not feel aggrieved by been treated by Dr. Akoda, may have no recollection of having ever been treated by Dr. Akoda, or may not know of the charges against Dr. Akoda. In fact, some class members might suffer emotional distress only upon receiving notice of this class action, if it is certified. Because of these conflicts, Plaintiffs are not adequate class representatives for the proposed class. *See Amchem*, 521 U.S. at 625-26 (finding inadequate representation where currently injured plaintiffs sought to represent plaintiffs who had not yet suffered an injury).

---

[12] ECFMG is not challenging that Plaintiffs' counsel satisfies the adequacy requirement of Rule 23(a), but ECFMG adamantly rejects the suggestion that the case against it is "a similar class action" to *Jane Doe No. 1 v. Johns Hopkins Hosp'l*, No. 24-C-13-001041 (Balt. City Cir. Ct.), ECF 32-1 at 18, which was a case against Johns Hopkins Hospital for failing to discover, stop, and report a physician who secretly recorded women during pelvic exams **while the physician worked at Johns Hopkins Hospital**. If anything, *Jane Doe No. 1* would have been more akin to Plaintiffs' lawsuit against **Dimensions** (which operated PGHC where Dr. Akoda treated and/or examined each of the Plaintiffs and many putative class members), had Plaintiffs not dismissed their own putative class action against Dimensions and others in exchange for nothing.

**E.      Plaintiffs Cannot Satisfy Rule 23's Inherent Ascertainability Requirement.**

Rule 23's inherent "ascertainability" requirement mandates a rigorous analysis of whether the proposed classes are "currently and readily ascertainable based on objective criteria." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013). "To satisfy this standard, plaintiff must show that (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 439 (3d Cir. 2017). The ascertainability requirement is important because it: (1) "eliminates serious administrative burdens that are incongruous with the efficiencies expected in a class action by insisting on the easy identification of class members," (2) "protects absent class members by facilitating the best notice practicable . . ." and (3) "protects defendants by ensuring that those persons who will be bound by the final judgment are clearly identifiable." *Carrera*, 727 F.3d at 305-06. Plaintiffs fail to satisfy Rule 23's inherent ascertainability requirement in two respects.

*First*, Plaintiffs have defined a class that includes "all patients examined and/or treated in any manner by Oluwafemi Charles Igberase (a/k/a Charles J. Akoda, M.D.)," ECF 32-1 at 10, but the term "examined and/or treated in any manner" is hopelessly vague and lacking objective criteria. If Dr. Akoda, while a resident, participated in a supervised examination, was that patient "examined" by Dr. Akoda? If Dr. Akoda was asked to consult on a diagnosis for another doctor's patient, was that patient "treated" by Dr. Akoda?

*Second*, Plaintiffs have not identified a reliable method for identifying putative class members. Plaintiffs contend that "[m]embers of the class can be identified through records of medical treatment, which will show when and how patients were treated by Igberase," ECF 32-1 at 19, but Plaintiffs do not represent to have medical records relating to Dr. Akoda's patients in Nigeria (before Dr. Akoda came to the United States) or at Howard (where Dr. Akoda started his

residency in 2007) or from the medical offices of Dr. Moore or Dr. Chaudry (where Dr. Akoda started working in 2011).  Plaintiffs cannot represent that such records even exist because the legal obligation to retain such records has expired.  *See* 45 C.F.R. 164.316(b)(2) (HIPAA requires covered entities to retain records for only 6 years).

### F. For All Of The Foregoing Reasons, The *Gates* Factors Weigh Against Issue Certification Under Rule 23(C)(4).

Rule 23(c)(4) "both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified" and—much like Rule 23(a) and Rule 23(b)(3)—authorizes courts "to treat common things in common and to distinguish the distinguishable." *Gates*, 655 F.3d at 272.  Many of the factors guiding the application of Rule 23(c)(4) overlap with issues already discussed, and all factors weigh against certifying an issue class in this case.

Emotional distress liability and damages issues are "too interwoven to allow a fair determination of damages apart from liability" because "emotional distress damages must be evaluated in light of all the circumstances surrounding the alleged misconduct." *Spence*, 806 F.2d at 1202.  The Third Circuit has "steadfastly" refused to separate liability from damages even in **individual** emotional distress cases because to do so in a case involving "a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability." *Pryer*, 251 F.3d at 455; *see Gasoline Prods. Co.*, 283 U.S. at 500.  It would be exponentially more problematic to try to separate liability from damages to address **thousands** of such cases at once. Indeed, Plaintiffs' proposed issue classes implicate highly individualized questions—including both threshold choice-of-law questions and merits questions—that are not capable of class-wide resolution through common proof.  *See supra* Part III.A-B.  Accordingly, "common issues . . . are not divisible from the individual issues," *Gates*, 655 F.3d at 273, and issue certification is not appropriate based on the type of claims and issues presented (Factor 1), the overall complexity of

the case (Factor 2), the substantive law (Factor 4), the unfairness that would result from trying to split emotional distress liability and damages issues (Factor 7), and the kinds of evidence to be presented on the certified issues (Factor 9).

Nor would issue certification result in any efficiency gains. Setting aside that the supposedly "common" issues identified by Plaintiffs in reality present innumerable variations of law and fact that are incapable of class-wide resolution, *see supra* Part III.A, the proposed issue classes are still too narrow to advance the litigation in any material way because it is undisputed that thousands of mini-trials about important issues—including issues overlapping with those to be tried on a class-wide basis, such as foreseeability and causation—will be necessary if an issue class is certified. *See supra* Part III-B. Any bifurcation of general causation from specific causation or of liability from damages would also present a Seventh Amendment problem because the issues are "too interwoven," *Spence*, 806 F.2d at 1202, and would likely result in a later jury reexamining the findings of a prior jury. The remedies sought by each class member do not favor issue certification because they are not indivisible and granting or not granting relief to any claimant will not as a practical matter determine the claims of others. But to the extent any decisions are made in individual trials, it is possible they will have precedential and/or preclusive effect as appropriate with respect to similarly situated individuals who choose to bring claims against ECFMG, which diminishes the need for issue certification. Due to the fact that issue certification would not promote efficiency (Factor 3), the risk that issue certification would violate the Seventh Amendment (Factor 5), the potential efficiencies resulting from individual adjudications (Factor 6), the minimal impact of individual proceedings on the claims of others (Factor 8), and the kind of evidence to be presented (Factor 9), issue certification is inappropriate.

## IV.  CONCLUSION

The Court should deny Plaintiffs' Motion and not certify either proposed issue class.

Dated: October 28, 2019

*/s/ Brian W. Shaffer*
Brian W. Shaffer, PA Bar No. 78851
Elisa P. McEnroe, PA Bar No. 206143
MORGAN, LEWIS & BOCKIUS, LLP
1701 Market Street
Philadelphia, PA  19103-2921
Telephone:      +1.215.963.5000
Facsimile:      +1.215.963.5001
brian.shaffer@morganlewis.com
elisa.mcenroe@morganlewis.com

*Attorneys for the Educational Commission for*
*Foreign Medical Graduates*

# APPENDIX – CONTENTS OF EXHIBITS

| Ex. | Document |
| --- | --- |
| 1. | Verification Papers – University of Ibadan |
| 2. | Verification Papers – University of Benin |
| 3. | October 14, 2019 Expert Report from Dr. Mark A. Smith |
| 4. | October 14, 2019 Expert Report from Dr. Laurence H. Beck |
| 5. | March 16, 2007 Letter to John-Charles Akoda from Howard University Hospital |
| 6. | Howard University Hospital Certificate of Completion of Residency for John-Charles Nosa Akoda MD |
| 7. | January 31, 2014 Letter to John-Charles Akoda from American Board of Obstetrics and Gynecology |
| 8. | May 22, 2002 Letter to Dr. Oluwafemi Charles Igberase from William C. Kelly |
| 9. | November 7, 2000 Letter to State of Maryland Board of Physician Assurance from Meridian Health System |
| 10. | May 5, 2017 Virginia Department of Health Professions Report |
| 11. | Plaintiff Desire Evans's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 12. | Plaintiff Elsa Powell's Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 13. | Plaintiff Jasmine Riggins' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 14. | Plaintiff Monique Russells' Supplemental Answers to First Set of Interrogatories and Supplemental Responses to First Set of Requests for Production of Documents |
| 15. | Email from Kara Corrado to Lisa Cover, Suzann Paolini, and Roman Mizak (March 18, 2016) |
| 16. | Email from Kara Corrado to Lisa Cover (Nov. 29, 2016) |
| 17. | Notice #101 from Lisa Cover (March 1, 2017) |

## Appendix – Contents of Exhibits (cont.)

| Ex. | Document |
|-----|----------|
| 18. | Plaintiff Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 19. | Plaintiff Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 20. | Plaintiff Jasmine Riggins' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 21. | Plaintiff Monique Russells' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents |
| 22. | February 26, 2018 Expert Report from Dr. Thomas Bojko |
| 23. | Docket from *Russell et al v. Dimensions Health Corporation*, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) |
| 24. | Stipulation of Dismissal, CAL 17-22761 |
| 25. | Questionnaire Responses |
| 26. | September 25, 2019 Expert Report from Dr. Gladys Fenichel |
| 27. | September 23, 2019 Independent Medical Examination Report on Plaintiff Monique Russell, conducted by Dr. Gladys Fenichel |
| 28. | September 25, 2019 Independent Medical Examination Report on Plaintiff Jasmine Riggins, conducted by Dr. Gladys Fenichel |
| 29. | September 23, 2019 Independent Medical Examination Report on Plaintiff Elsa Powell, conducted by Dr. Gladys Fenichel |
| 30. | September 23, 2019 Independent Medical Examination Report on Plaintiff Desire Evans, conducted by Dr. Gladys Fenichel |
| 31. | October 14, 2019 Rebuttal Expert Report from Dr. Gladys Fenichel |
| 32. | September 23, 2019 Expert Report from Dr, Jay Goldberg |
| 33. | Facebook Comments Produced by Plaintiff Monique Russell |
| 34. | October 14, 2019 Rebuttal Expert Report from Dr. Susan McDonald |
| 35. | *Jalloh et al v. Chaudry et al*, CAL 16-22162 (Cir. Ct. Prince George's Cty, MD) – Complaint |

**Appendix – Contents of Exhibits (cont.)**

| Ex. | Document |
|-----|----------|
| 36. | September 5, 2019 Transcript of Deposition of Desire Evans |
| 37. | September 6, 2019 Transcript of Deposition of Elsa Powell |
| 38. | *Russell et al v. Dimensions Health Corporation*, CAL 17-22761 (Cir. Ct. Prince George's Cty, MD) – First Amended Class Action Complaint |

**CERTIFICATE OF SERVICE**

I do hereby certify that on this date, I caused true and correct copies of the foregoing document to be served via electronic filing upon all counsel of record via the ECF system and/or e-mail.

DATED:  October 28, 2019                     */s/ Brian W. Shaffer*
                                             Brian W. Shaffer

# PETITION
# EXHIBIT 14

# EXHIBIT 5



HOWARD
UNIVERSITY
HOSPITAL

2041 Georgia Avenue, N.W.     202/865-6100
Washington, D.C. 20060        202/745-3731 fax

March 16, 2007

John-Charles Akoda, M.D.
P.O. Box 744
Carrolton, VA 23314

Dear Dr. John-Charles Akoda:

The Department of Obstetrics and Gynecology at Howard University is pleased to inform you that you have matched for the categorical first year postgraduate position for the academic year 2007-2008. It is requested that you submit evidence of legal residence in the United States to the office a soon as possible.

Please contact Dr. Grace Ansah at Howard University International Services 202.806.7517, if there is a need for you to be sponsored for an H-1 Visa.

All residents will receive from the department a contract that enumerates compensation, benefits and the responsibilities of both parties, yourself and Howard University Hospital, the hospital's orientation packet from the Graduate Medical Education Office, as well as a packet from Howard University Hospital, Human Resources Department in the near future.

Please sign below to accept this offer and attach information that will confirm the most appropriate mailing address and telephone numbers and a current email address that will allow us to maintain contact with you. You may fax your signed letter back to the attention of Ms. Angela Taylor, at 202.865.4171 and mail the hard copy.

Congratulations and welcome to the Howard University Hospital family.

Sincerely,

Olanrewaju Adeyiga, M.D.
Chair and Program Director
Department if Obstetrics and Gynecology

Accept: _____

Date: _____3/26/07_____

HU 000256

# PETITION
# EXHIBIT 15

# <u>EXHIBIT 7</u>



Larry C. Gilstrap, III, M.D.
Executive Director
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX 75204
Phone: (214) 871-1619
Fax: (214) 871-1943

January 31, 2014

John-Charles Akoda, M.D.



Dear Dr. Akoda,

Congratulations!  In recognition of your fulfillment of all requirements, you are now a Diplomate of The American Board of Obstetrics and Gynecology, Inc. Your certification is effective January 31, 2014 through December 31, 2014. Your certificate must be renewed annually by completion of all the assignments in the ABOG Maintenance of Certification (MOC) process.

Please carefully review the spelling of your name on this letter as that name will be printed on the certificate you will receive.  If there is a correction, please notify our office no later than February 14, 2014.  If you have not heard from the printer regarding your diploma by April 30, 2014, please contact the Board office.

You may apply for the 2014 MOC process at www.abog.org. There is no fee for MOC for the first year.  However, if you are not an ACOG fellow or junior fellow, you must pay for the category I CME credit, as that is a benefit of ACOG membership.

We hope you will maintain an active interest in the specialty, and you will continue to improve the care of women.

Best Wishes,

*Larry C. Gilstrap II, MD*

Larry Gilstrap, III M.D.
Executive Director

LG

ABOG ID: 9025829

Incorporated 1930
A founding member of The American Board of Medical Specialties
www.abog.org

610240

CONFIDENTIAL

ABOG_nonparty_000046

# PETITION
# EXHIBIT 16

# EXHIBIT 9



BRICK HOSPITAL
JERSEY SHORE MEDICAL CENTER
POINT PLEASANT HOSPITAL
RIVERVIEW MEDICAL CENTER

**Meridian**
*Health System*

Tel 732 775-5500

Meridian Health System
Jersey Shore Medical Center
1945 State Route 33
P.O. Box 397
Neptune, NJ 07754-0397

November 7, 2000

State of Maryland Board of Physician Assurance
4201 Patterson Avenue, P.O. Box 2571
Baltimore, Maryland 21215

RE: John Charles Nosa Akoda
    aka John-Charles Nosa-Igberase Akoda
    aka Charles Johnbull Nosakhare Akoda
    aka Charles N. Akoda
    aka Charles J. Akoda

To Whom It May Concern:

We have discovered in the file of John Charles Nosa Akoda, M.D., a third-year resident in Internal Medicine at Jersey Shore Medical Center, an application for initial medical licensure in the State of Maryland. That application includes a Social Security Number which Dr. Akoda has stated is not his own.

Having earlier suspended Dr. Akoda we have now made a decision to terminate him effective November 21, 2000, for reasons as specified in our letter (and attachment) to the New Jersey State Board of Medical Examiners. Dr. Akoda was afforded his due-process rights of appeal of his termination, but the time for receipt of such an appeal has now been exhausted.

Very truly yours,

*Anna Marie Sesso, M.D., M.P.H.*

Anna Marie Sesso, M.D., M.P.H.
Associate Director of Academic Affairs

Copy to: New Jersey State Board of Medical Examiners

Jersey Shore Medical Center000006

# PETITION
# EXHIBIT 17

# EXHIBIT 33

 

 

m.facebook.com/group  90

 **Monique Russell**
Exactly. The state of Virginia suspended his license based on the federal conviction, but his Maryland license expired while he was awaiting trial.

2 yrs   Like   Reply   More

 **Karlena Walker**
I can't believe it was just suspended and not outright revoked permanently.

2 yrs   Like   Reply   More

 **Monique Russell**
Same here. The letter they wrote said that in order to reinstate the license, he would have to re-apply and fay the applicable fees. My FIL (who is a lawyer) thinks that is just CYA language and that they would not reinstate it. But something should be noted on the MD board. Also, I want to see background checks as a part of the process of getting a license. Checking SS numbers and fingerprinting could have kept him from being able to do this.

2 yrs   Like   Reply   More

 **Nakki A. Price**
I mean, is it even clear that he had some medical training?! I read the link above and that wasn't clear.

Plaintiffs0000140253



2 yrs    **Like**    Reply    More



**HoneyDip Dani**
I think people should contact their personal lawyer at this point.

2 yrs    Like    Reply    More

**Monique Russell**
Honestly, I'm not sure there's much to do at this point. I've been in touch with a lawyer. He's been convicted at the federal level, and we've spoken to the US Attorney who prosecuted the case. He's basically said it's over and done with, and he doubts he's still in the country. So I'm not sure if the state would pursue criminal charges. However, he's used at least 4 different social security numbers and a number of different names over the years to keep practicing under fraudulent licenses in MD and VA. If enough of his patients are identified, it could make way for a class action lawsuit, but individually, there's not much that can be done. However, I've found at least 1 settlement for a negligence claim against him. If there are others, those women could re-open their cases and fight for more money because he should have never been operating on them.

2 yrs    **Like**    Reply    More



Write a reply...    Reply

    

  



**Karlena Walker**

**Monique Russell** This is horrifying. I am so, so, sorry you're having to deal with this. My only hope is that it opens more eyes and allows structures to be put in place that can prevent this from happening again. It's hard enough to trust medical professionals as it is, without the stress of worrying if your doctor actually earned their license. I don't know what I can do to help, but please let me know. *hugs*

 2

2 yrs    Love    Reply    More



**Monique Russell**

**Karlena Walker** Thanks, chica. I do consider myself lucky. Luka is perfect, and I seem to be healing as expected, though this really makes me second-guess things. I was in labor for 32 hours and ended up needing an emergency c-section. I think the route we went really was best/ necessary. But, what about mothers like the one in that settlement above, mothers who had complications or whose babies sustained injuries? They should know that he might be at fault for that. They have a right to know, and no one is notifying patients.

 1

2 yrs    Like    Reply    More



**Ebony Scott-Bey Cutchin**

Monique Russell, the State of Maryland now requires

Plaintiffs0000140255

 

# PETITION
# EXHIBIT 18

# EXHIBIT 28

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 25, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

**RE:** *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*

Dear Ms. McEnroe:

On September 20, 2019, I had the opportunity to see Jasmine Riggins for an independent psychiatric evaluation. The evaluation was requested to comment on Ms. Riggins's psychiatric condition in relation to the Complaint in *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Riggins that I would prepare a report based on the psychiatric evaluation and review of records. I discussed with Ms. Riggins that the examination was not for purposes of treatment and I was not her doctor.

In preparation of this report I have reviewed the following documents:

1. Medical Records: Plaintiffs0000001134 – Plaintiffs0000001242; Plaintiffs0000001995 – Plaintiffs0000002026; Plaintiffs0000006394 – Plaintiffs0000006512; Plaintiffs0000007418 – Plaintiffs0000007425; Plaintiffs0000007426 – Plaintiffs0000007652
2. Complaint in *Russell et al. v. ECFMG*
3. Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)
6. Jasmine Riggins's Responses to Requests for Admission, CAL 18-07863
7. Jasmine Riggins's Answers to Interrogatories, CAL 18-07863 (3/29/2019)
8. Deposition of Jasmine Riggins, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (4/1/2019)

## HISTORY REPORTED BY JASMINE RIGGINS:

Jasmine Riggins ( ▓▓▓▓▓▓▓▓▓▓▓ ) said that she is involved in the current litigation because her son was delivered by a man who is "not a doctor." Ms. Riggins said that Dr. Akoda falsified information that he was a doctor. Ms. Riggins said she was in a Facebook group called Embracing Mommies. Ms. Riggins said she did not recall when she joined this Facebook group. Ms. Riggins said that she would check the Facebook group Embracing Mommies a couple times a week for notifications and information that could be helpful for her and her children. Ms. Riggins said she believes that she saw a Facebook post about Dr. Akoda sometime in 2016. Ms. Riggins said that the post was written by Monique Russell. Ms. Riggins said she did not recall the exact words from the post; but she recognized the name Dr. Akoda and wanted to get more information. Ms. Riggins said she learned that Dr. Akoda is not a doctor. Ms. Riggins said that she had communicated with Ms. Russell on Facebook, but she had never met Ms. Russell in person until they appeared for depositions on the same day.

Ms. Riggins said that she has three children. Her oldest child, Santana, was born on 07/25/19 at Howard University Hospital. Ms. Riggins said she moved to Maryland, and she chose Dr. Abdul Chaudry's practice for her second pregnancy. She said Dr. Akoda was a physician in the practice and he was her doctor during the pregnancy. Ms. Riggins said she did not have any problems with the treatment during her pregnancy. Ms. Riggins said that she needed an emergency c-section and her son Messiah was born on 03/18/13. Ms. Riggins explained that her mother went with her to a prenatal OB appointment with Dr. Akoda. Ms. Riggins had reported a decrease in fetal movement, and she said she was told to go to the hospital to deliver her baby.

Ms. Riggins said she was in the hospital for four or five days after she delivered Messiah, and she said that she continued to have pain for a couple months after he was born. Ms. Riggins said that she had been working at a bowling alley 20 hours a week during her pregnancy with Messiah, and she went back to work a few months after Messiah was born. Ms. Riggins said that she did not have concerns about her treatment with Dr. Akoda in the prenatal visits, during the c-section, or after his birth. She did have a post-delivery visit with Dr. Akoda.

Ms. Riggins said she stopped seeing any doctors for medical or gynecologic treatment until she became pregnant with her third child. Ms. Riggins said she started prenatal care a couple months after she learned that she was pregnant. Her daughter Taniya was born on 10/02/17 at Washington Hospital Center. She said the pregnancy was good. She said she had a scheduled c-section and she did not have problems after the c-section. She said she has a current gynecologist at Unity Health Care. Ms. Riggins said that the medical care provided by Dr. Akoda was no different from the treatment from the doctors who delivered her first child and her third child.

Ms. Riggins said when she learned about the lawsuit, she felt embarrassed that something like this had happened, that Dr. Akoda was not really a doctor. Ms. Riggins said that her everyday life did not change.

Ms. Riggins said she tries not to think about the lawsuit. Ms. Riggins said she feels upset for the women who had complications as a result of the care provided by Dr. Akoda, but she does not

know any of these women. Ms. Riggins said that she does not like the fact that Dr. Akoda looked at her private area, and he was not supposed to do that. She said that she feels frustrated, angry, and very sad. She said it is frustrating that she trusted Dr. Akoda, and she should not have trusted him because he is not a doctor. Ms. Riggins did not have any specific information about ECFMG. Ms. Riggins said that she has felt like she is part of a Lifetime Movie because Dr. Akoda was her doctor during her second pregnancy and delivered her son, and he was not a real doctor.

Ms. Riggins said that her mood is okay most of the time. She said her sleep is okay. Sometimes she said she feels "bothered" when she thinks about Dr. Akoda and the lawsuit. Ms. Riggins said she did not read any newspaper articles about Dr. Akoda. She said that she has only read information that she received from her attorney. Ms. Riggins denied problems with her appetite and she said her concentration is pretty good. She said she is able to experience pleasure and loves to be active with her children. Ms. Riggins said she has never had suicidal ideation or anxiety attacks.

Ms. Riggins discussed her thoughts about her future. She thinks about her career, and she wants to own a home. She wants to continue to do what she can for her children. Ms. Riggins said her children are her future. She said that she and her boyfriend are good in regard to their intimate relationship. Ms. Riggins said that she thinks that probably there were a few weeks after she found out about Dr. Akoda that she was "not in the mood."

**MEDICAL HISTORY**:

Ms. Riggins said that she had asthma as a child, and she believes that she had a hospitalization for asthma when she was a child. Ms. Riggins said that she has not had problems with asthma for years, and she does not have an inhaler.

Ms. Riggins also said that she has low iron. She was told about her low iron by her primary care physician at Unity Health Care.

Ms. Riggins denied a history of any psychiatric problems or history of treatment with a psychiatrist, psychologist, or counselor. Ms. Riggins said she has never been diagnosed with depression, anxiety, or other psychiatric disorder.

**SOCIAL HISTORY**:

Ms. Riggins said she left high school in 12th grade because she did not have enough help to take care of her son, Santana. Ms. Riggins said that Santana and Messiah have the same father and she has a joint custody arrangement with him.

Ms. Riggins said that she thought that she had received a GED. She said she had paid $57 to a company and she took the test for a GED. Ms. Riggins said that she received a certificate that she had a GED, but the certificate was not valid. The company had falsified the document, and the company is now out of business. Ms. Riggins said she did not remember the year she first took the test for the GED.

Ms. Riggins said that she is now in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.  Ms. Riggins said that she will be in this program for approximately two and a half years.  She said the program has a daycare center and Ms. Riggins takes her daughter Taniya to the daycare center when she is in school.  Ms. Riggins said that she is at the Goodwill Center approximately four hours a day, Monday to Thursday.

Ms. Riggins denied a history of any physical, mental, or sexual abuse.  She denied a history of alcohol abuse or drug use.  Ms. Riggins said that her mother has seven biological children and her father has seven biological children.  Her mother and father had two children together.  Ms. Riggins denied a family history of depression, anxiety, or substance abuse.

**MENTAL STATUS EXAMINATION**:

Mental status examination revealed a 27-year-old woman who paid attention to her appearance evidenced by her clothes, jewelry, and makeup.  Ms. Riggins answered questions in a spontaneous fashion, but she said she would not answer a question about Facebook contacts with Ms. Russell unless she called her attorney.

Ms. Riggins described her mood as most of the time okay.  Her affect was full.  She had tears in her eyes when she talked about her feelings of embarrassment when she learned that Dr. Akoda was not a real doctor.  She denied suicidal ideation.  She denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

**REVIEW OF RECORDS**:

The file did not include any records regarding psychiatric or psychological treatment.

The records included multiple notes from a primary care physician that included the Patient Health Questionnaire 2. The scores were always two or lower, indicating that Ms. Riggins did not have problems with depression or anxiety or need for counseling.  (Dates of PHQ 2: 09/07/17, 09/23/16, 10/13/17, 11/09/17, 04/18/19)

**IMPRESSION:**

It is my opinion that Ms. Riggins does not have any psychiatric disorder, and in particular, she does not have a psychiatric disorder causally related to her allegations in the Complaint *Jasmine Riggins et al. v. Educational Commission for Foreign Medical Graduates*.

In support of this opinion, Ms. Riggins discussed her history and her current well-being. She denied a history of any mental health treatment, and she denied a plan to see a psychiatrist or a psychologist. Ms. Riggins said that she did not have any problems with the treatment provided by Dr. Akoda during her pregnancy and with the delivery of her second child. Ms. Riggins said that the care she received from Dr. Akoda was no different from the treatment from the doctors

who delivered her first child and her third child.  Ms. Riggins is in school at the Goodwill Excel Center.  She will receive a high school diploma and then study computer science.   Ms. Riggins discussed her strong relationships with her partner and her children and goals for her future and for her family.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.  I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/plr

# PETITION
# EXHIBIT 19

Case 2:18-cv-05629-D Document 1-2 Page 1212 Filed Date Filed: 04/06/2020 Page 212 of 341

# **EXHIBIT 29**

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**RE:** *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates*

Dear Ms. McEnroe:

On September 10, 2019, I had the opportunity to see Elsa Powell for an independent psychiatric evaluation.  The evaluation was requested to comment on Ms. Powell's psychiatric condition in relation to the Complaint in *Elsa M. Powell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the evaluation, I discussed with Ms. Powell that the evaluation was not for purposes of treatment and it was not a confidential examination.  I discussed with Ms. Powell that I would prepare a report based on psychiatric evaluation and review of records.

In preparation for this report, I have reviewed the following records:

1. Medical Records: Plaintiffs0000000572 – Plaintiffs0000000929; Plaintiffs0000006174 – Plaintiffs0000006363; Plaintiffs0000118377 – Plaintiffs0000118653
2. Complaint in *Russell et al. v. ECFMG*
3. Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/28/2019)
4. Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5. Deposition of Elsa Powell (9/6/2019)
6. Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7. Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8. Deposition of Elsa Powell in CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9.  Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10.  Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

## HISTORY REPORTED BY ELSA POWELL:

Elsa Powell (date of birth ⬛⬛⬛⬛) said that she understood that the examination was requested, "To see my state of mind with this situation." I asked Ms. Powell to explain the "situation." Ms. Powell said that she had a doctor whom she understood to be somebody other than who he was. Ms. Powell said the doctor had fake names and Social Security numbers. Ms. Powell said that it hurt her because she had trusted him. Ms. Powell said that she does not know his name and he was not Dr. Akoda. Ms. Powell said she knew him as Dr. Akoda and that was not his real name. She said that she has felt betrayed. Ms. Powell said that she does not know who this person was whom she allowed to examine her body and deliver her child. Ms. Powell said that she had complications with the childbirth, and Dr. Akoda did surgery. Ms. Powell said that she thanks God that she did not pass away. Ms. Powell said that she just feels really mad because he was not locked up. Ms. Powell said she questions who allowed him to practice with fake names, and she believes that someone should be responsible. Ms. Powell said that she believes that she was one of Dr. Akoda's "victims" because he lied about who he was and he touched "our body parts." Ms. Powell said that it is hard to explain, but she felt shocked. She repeated that she feels angry. Ms. Powell acknowledged that there are moments when she is okay. She said that she has put her feelings aside in relation to her anger. She said that she has not talked to anybody about her feelings because "everybody depends on me."

Ms. Powell said a friend called her and told her that Dr. Akoda was not really Dr. Akoda. Ms. Powell said that she then heard the story on the news about Dr. Akoda. Ms. Powell said that her friend told her to call a particular number to talk to attorneys. Ms. Powell said that she was told that his credentials were fake. She said that she feels bad that she did not check Dr. Akoda's credentials. She said that he preyed on innocent woman. She said that this is more than nothing.

Ms. Powell said that she was very focused on delivering a healthy baby, and Dr. Akoda did deliver a healthy baby. Ms. Powell said she is not knocking what he did as a doctor, but he lied to all of these vulnerable women. Ms. Powell said that she views him as a predator, and she said that the women were his target. Ms. Powell said that she has never read anything about the doctor's training, but she said he had a fake Social Security number and a fake name. She said that he did a very serious procedure and that she questions whether he lied about the procedure. She said he is a fraud to her and that he did not have any respect for "[m]e and all the patients he saw." She said that no one wants to feel that she is lied to. She repeated that Dr. Akoda had examined her body and that she trusted him.

Ms. Powell said Dr. Chaudhry was supposed to be her doctor, but she never saw Dr. Chaudhry; she saw Dr. Akoda. She said that she saw Dr. Akoda first when she was 5½ to 6 months pregnant. Ms. Powell said that her pregnancy was not a high-risk pregnancy. She said that she has had low iron since she was 16. She said that the last appointment with Dr. Akoda was at her six-week checkup after Jaiden was born.

Ms. Powell said that after she had Jaiden, she was bleeding a lot. She said that she was not married to Jaiden's father, who is now her husband. Ms. Powell said that she was alone in the hospital. Ms. Powell said she was rushed to the operating room. She recalled that she was told to count

backwards from five and when she woke up, there were tubes everywhere. She recalled that she was crying. Ms. Powell said that she saw Dr. Akoda the day after the surgery and that he told her to take iron pills. She said Dr. Chaudhary came in the second day post-op.

Ms. Powell said that there were no complications in regard to Jaiden. She reported that he was a healthy boy who weighed 8 pounds, 5 ounces, and that the complications were after Jaiden's delivery. Ms. Powell said that she saw Dr. Akoda for her six-week checkup. He told her she had an ovarian cyst. She said he did a procedure in the office.

Ms. Powell said that she thought Dr. Akoda was very flirtatious. Ms. Powell said that she requested that a nurse be present when he did examinations. Ms. Powell said that he made comments about her breasts. She recalled that she spoke to a nurse about Dr. Akoda, but she did not make any formal complaint.

Ms. Powell said that when Jaiden was about four or five months old, she moved, her health insurance changed, and she was pregnant with her fifth child, Tatiana. She said that she had a different doctor and a different hospital for the delivery of Tatiana. She reported that Tatiana was born with an enlarged kidney. Ms. Powell said that she knew before the delivery from ultrasounds that Tatiana had a kidney problem. She reported that Tatiana had surgery before she was one year old and needs ultrasounds once a year.

Ms. Powell said that her oldest child, Lucy Mercedes, is 14 years old; her second child, Nester, is 13 years old; and her third child is Josiah Rodriguez. She said that Josiah's father is career military and lives in North Carolina. Ms. Powell said that "Powell" is her married name. She said that she was not married to Mr. Powell when Jaiden was born and again, he was not at the delivery. Ms. Powell said that Jaiden and Tatiana have the same father.

Ms. Powell said that she works full time for a security company at the National Institutes of Health. She said that she works from 9 p.m. to 5 a.m. She said that her husband is a police officer, and his current shift is 11:30 p.m. to 7:30 a.m. Ms. Powell said that she is home in the morning with her four older children before they go to school and that Tatiana is home with her all day.

Ms. Powell described herself as independent and a great, great mother. She said that she is strict. Ms. Powell said she works hard and that her main concern is her children. Ms. Powell said that she is a loner and is not the type of person who chills with friends. She said that she just enjoys spending time home with her children. Ms. Powell said that she is very caring, likes to help people, and will give a person the shirt off of her back.

Ms. Powell described her mood as up and down. She said that she is not depressed but she is not one to talk too much about her feelings. Ms. Powell said that she does not sleep very much because of her work schedule and taking care of her kids. She said that in her opinion, a good night's sleep would be four hours. She said that she is 5 feet, 4 inches tall and that her weight is up and down, ranging from 180 pounds to 204 pounds. She said her concentration is good. She said that she enjoys her family, sleep, and time with her husband. She denied suicidal ideation. She denied the experience of anxiety attacks.

Ms. Powell said that she has never been evaluated or had treatment with a psychiatrist or psychologist. Ms. Powell said that she has an appointment scheduled through her attorney for a psychiatric evaluation on September 13, 2019. Ms. Powell denied a history of drug use or alcohol abuse. She denied a history of physical, mental, or sexual abuse.

## MEDICAL HISTORY:

Ms. Powell said that she has a primary care physician through Kaiser, but she does not go to doctors' appointments. She said that she has thalassemia alpha trait. She said that she tries to eat food high in iron and takes iron pills. She said that she does not see a hematologist.

Ms. Powell said that she has not been evaluated by a gynecologist since her six-week follow-up appointment after Tatiana was born.

Ms. Powell said that ███████████████ in 2010. She said that she was given the wrong medication at CVS and this caused complications. She acknowledged she did not know she was pregnant at the time ████████████ Ms. Powell said a doctor had given her pain medication, but CVS gave her the wrong prescription. She said that she ███████████ the same night that she got the prescription, and there was a lawsuit related to the wrong prescription, which settled out of court.

Ms. Powell said that she has recently been evaluated at urgent care for pain in her left side. She said that she had an enlarged spleen. Ms. Powell said that she needs to follow-up about this problem. She said that she was only diagnosed with thalassemia when she was pregnant with Tatiana. She said that she had an MRI scheduled through urgent care.

## SOCIAL HISTORY:

Ms. Powell said that she grew up in Massachusetts. Her parents split up when she was seven years old. Ms. Powell said she has three brothers from her mother's relationship with her father. Ms. Powell said her mother had three sons in another relationship. She said that she is close to all of her siblings.

Ms. Powell said that she met Lucy and Nester's father when he was on vacation in Massachusetts. She said that she moved in with his family in Virginia. Ms. Powell said that she received her high school diploma in 2005 when she was living with Lucy and Nester's father's family. She said that she left Nester and Lucy's father because he was cheating. Ms. Powell said that she returned to Massachusetts for about a year, but the kids' father wanted to see them, and she moved back to Virginia. Ms. Powell said that she met Josiah's father in Virginia when she was working as a waitress. She said that she returned to Virginia and worked two jobs while she was in school. She said that Josiah's father was in the military, and when he had orders to go to Alaska, they ended the relationship. Ms. Powell said that she met her current husband at the local firehouse where he was her training lieutenant. She said that her husband regrets that he was not at Jaiden's delivery.

Ms. Powell described a traumatic event in 2009 or 2010. She began to cry. She said that she lived in a house with two apartments, and the whole house burned down. She said that she lost everything except her passport and $200. Ms. Powell was in school at the time at Everest College, and she was studying Homeland Security. She said she believes that God saved her life. She said she did not see a psychiatrist or psychologist, and she repeated that she is not one who likes to talk about feelings. Ms. Powell said people describe her as a brick wall, including her husband, her family, and coworkers.

Ms. Powell said she stopped school in 2013, and it would only take two months to finish her degree at Kaplan. She said she does not want to work for Homeland Security now. She said she is planning to take classes in Maryland to receive certification to work as an interpreter in the courthouse. She would like to work in Virginia. Ms. Powell said that there is a high population of Hispanics in Virginia and she will be able to earn $40 to $60 an hour.

Ms. Powell said that she was in a minor motor vehicle accident when she was pregnant with Jaiden. She said that it was a love tap really. She said no one was hurt. She said she hit the other car, and she was sued.

Ms. Powell denied a family history of psychiatric disorders or substance abuse.

## MENTAL STATUS EXAMINATION:

Mental status examination revealed a casually groomed 32-year-old woman. Her speech was goal-directed and spontaneous. She easily established rapport.

Ms. Powell described her mood stating that she feels just really mad when she thinks about her experiences with Dr. Akoda. In general, she is happy with her family. She said that she is not depressed. She said she is not one who talks much about her feelings. Her affect was full and appropriate to content. She cried during the evaluation when she talked about the house fire and losing everything except her passport and $200. She said, "I'm a tough cookie."

Ms. Powell denied the experience of anxiety attacks.

Memory and intelligence were grossly within normal limits.

## REVIEW OF RECORDS:

I have reviewed the records identified at the start of the report. At this time there are no medical records related to psychiatric complaints or treatment, and as such I will not comment on a review of any records.

RE: Elsa Powell
Page 6

**SUMMARY AND IMPRESSION:**

It is my opinion that Ms. Powell does not have any psychiatric disorder causally related to Ms. Powell's allegations in the Complaint. The conclusion is based on the following facts:

1. Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis.
2. Ms. Powell does not have a history of any psychiatric/psychological treatment in relation to the issues in the Complaint or related to other stressors that she reported.
3. Ms. Powell is doing well with her marriage, children, and job, and she has clear plans for the future in regard to her career.
4. Ms. Powell said that she had no complaints about the doctor's treatment during delivery, surgery after delivery, or the post-delivery checkup.

It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the issues in the Complaint. Although Ms. Powell testified that she almost lost her life because of a fake doctor whom she thought was a doctor, Ms. Powell said during the evaluation that Dr. Akoda delivered a healthy baby. She had a procedure after Jaiden was born, and there were no complications from that procedure. She saw Dr. Akoda for a visit after Jaiden was born, and Dr. Akoda did another procedure. Ms. Powell did not have any complications or complaints about the medical treatment.

It is my opinion Ms. Powell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Powell described herself as independent and a great, great mother. She works hard. Her main concern is her children, and she said her children are doing well. She has a steady job and she is also planning to receive certification to work as an interpreter in the Virginia court system. She has done the research and there is a large Hispanic population in the area where she plans to work. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Powell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty. I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/dmb

# PETITION
# EXHIBIT 20

# EXHIBIT 32

# 8005 Navajo Street, Philadelphia, PA 19118

September 23, 2019

Brian Shaffer, Esq.
Elisa McEnroe, Esq.
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103-2921

**Re:  Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" / ECFMG**

Dear Counsel,

     I have completed my initial review of the above case, including the following records:

- Records produced by Howard University Hospital
- Guilty Plea
- Records produced by the American Board of Obstetricians and Gynecologists ("ABOG")
- Records of Desire Evans
  - Plaintiffs0000000001 – Plaintiffs0000000571
  - Plaintiffs0000005735 – Plaintiffs0000006016
  - Complaint and Notice of Removal to EDPA
  - Desire Evans's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - Desire Evans's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - Deposition of Desire Evans
  - Documents Related to Maryland Litigation
  - Class Action Complaint in CAL 17-34091
  - Desire Evans's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Elsa Powell
  - Plaintiffs0000000572 – Plaintiffs0000000929
  - Plaintiffs0000006174 – Plaintiffs0000006363
  - Plaintiffs0000118377 – Plaintiffs0000118653
  - Complaint and Notice of Removal to EDPA
  - Elsa Powell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents

- o Elsa Powell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
- o Deposition of Elsa Powell
- o Documents Related to Maryland Litigation
- o Class Action Complaint in CAL 17-37091
- o Elsa Powell's Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A Prince George's Hospital Center
- Records of Jasmine Riggins
  - o Plaintiffs0000001134 – Plaintiffs0000001242
  - o Plaintiffs0000001995 – Plaintiffs0000002026
  - o Plaintiffs0000006394 – Plaintiffs0000006512
  - o Plaintiffs0000007418 – Plaintiffs0000007425
  - o Plaintiffs0000007426 – Plaintiffs0000007652
  - o Complaint and Notice of Removal to EDPA
  - o Jasmine Riggins's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Jasmine Riggins's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Jasmine Riggins
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863
  - o Jasmine Riggins's Responses to Requests for Admission in CAL 18-07863
  - o Jasmine Riggins's Answers to Interrogatories in CAL 18-07863
  - o Deposition of Jasmine Riggins in CAL 17-22761, CAL 17-37091, and CAL 18-07863
- Records of Monique Russell
  - o Plaintiffs0000000932 – Plaintiffs0000001133
  - o Plaintiffs0000001243 – Plaintiffs0000001685
  - o Plaintiffs0000001686 – Plaintiffs0000001839
  - o Plaintiffs0000001840 – Plaintiffs0000001845
  - o Plaintiffs0000001846 – Plaintiffs0000001994
  - o Plaintiffs0000005338 – Plaintiffs0000005429
  - o Plaintiffs0000067757 – Plaintiffs0000067847
  - o Plaintiffs0000118654 – Plaintiffs0000118679
  - o Complaint and Notice of Removal to EDPA
  - o Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents
  - o Deposition of Monique Russell
  - o Documents Related to Maryland Litigation
  - o Amended Class Action Complaint in CAL 18-07863

- o Monique Russell's Responses to Defendants' Requests for Admissions in CAL 18-07863

I have been requested to review materials provided by counsel for the Educational Commission for Foreign Medical Graduates ("ECFMG") regarding four patients who were treated by Oluwafemi Charles Igberase a/k/a "Charles John Nosa Akoda" ("Dr. Akoda").

For time spent on this matter, I will be compensated $400 per hour for reviewing materials and writing a report; $2,000 for deposition testimony; and $4,000 for trial testimony.

I have attached a copy of my CV. I have also attached a list of trial and deposition testimony within the past four years.

## Desire Evans

**Summary**

At the time of her 3/17/16 delivery, Ms. Evans was a 36-year-old gravida 3 para 0-0-2-0 at 41 weeks. She had a past history of depression and anxiety, attempted suicide in 2009, and used marijuana daily.

On 3/16/16, Dr. Akoda was the assigned OB/GYN when Ms. Evans's labor was induced at Prince George's Hospital. Dr. Akoda was the only OB/GYN who treated her during her labor and delivery. (Evans Dep. 83-86.) Her prenatal care was not provided by Dr. Akoda, but rather by Dr. Javaka Moore. (Evans Dep. 97.)

Ms. Evans's labor was induced / augmented with Cytotec and Pitocin.

She received an epidural.

She progressed to completely dilated. Extensive caput was noted.

Dr. Akoda recommended cesarean delivery due to a non-reassuring FHT and arrest of descent.

On 3/17/16, Dr. Akoda performed a cesarean section. Delivery resulted in a healthy 6 pound 14 ounce baby boy (Peyton) with Apgar scores of 8 and 9 at 1 and 5 minutes, respectively. EBL was 400 ml. There were no intra-operative complications.

Ms. Evans has no complaints about her incision. (Evans Dep. 95-96.)

Her post-operative course was uneventful.

On 3/20/16, POD#3, she was discharged.

She was later diagnosed with depression and anxiety. (Evans Dep. 102.)

On 1/17/18, she had an appointment with Shanda Smith, MD, at Kaiser Permanente Largo Medical Center for a psychiatric evaluation. "*I just told her that I felt uncomfortable and that I was touched in a way* (by Dr. Akoda) *that I felt was inappropriate and I didn't know how to deal with it.*" (Evans Dep. 128.) She stated, "*he was, like, fondling my clitoris, saying that he needed to do that in order to stimulate me to push the baby.*" She stated that Dr. Akoda did this several times. (Evans Dep. 132-34.) Her husband and mother were present.

At age three, Peyton was a healthy child. (Evans Dep. 26.)

Ms. Evans did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a radio ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A cesarean section with no complications resulted in delivery of a healthy baby. Ms. Evans had no post-operative complications.

## Elsa Powell

### Summary

In 2014, Ms. Powell was treated by Dr. Akoda during prenatal visits and her labor and delivery. She was a 30-year-old gravida 4 para 3-0-0-3.

When she arrived at a scheduled prenatal appointment with Dr. Abdul Chaudry, "*they said that Dr. Chaudry had to step out, but Dr. Akoda was there.*" She then saw Dr. Akoda every couple of weeks and then weekly for her remaining prenatal visits. (Powell Dep. 40.)

She stated that Dr. Akoda was flirtatious with her at her prenatal visits. He examined her breasts and made "*comments about I have nice breasts and stuff like that. So then I felt uncomfortable. … I was eight months pregnant at that time.*" She then asked for a nurse to be present for her next exam. She states that this occurred "*a few times.*" She did not request to be seen by a different doctor. (Powell Dep. 51-53.)

On 9/17/14, at 39+ weeks, Dr. Akoda induced Ms. Powell's labor at Prince George's Hospital. She had no support people with her.

She had a vaginal delivery of a healthy baby boy (Jaiden).

She reported having vaginal bleeding and passing blood clots several hours after her delivery. After she informed a nurse, Dr. Akoda came to evaluate her and diagnosed her with a postpartum hemorrhage.

On 9/18/14, Dr. Akoda performed a suction dilation and curettage ("D&C") under general anesthesia. EBL was 250 ml. Findings were "*Extensive amounts of cauliflower-like lesions in the vagina. … The lower uterine segments were not contracted. Bleeding from the upper part of the cervix and significant oozing from the cauliflower-like lesions from the vagina.*" The vagina was packed with gauze at the end of the surgery. (Powell Dep. 46).

Ms. Powell stated that she was anemic and uncertain if she received a blood transfusion. She stated that she asked but did not receive an answer from Dr. Akoda. (Powell Dep. 49.)

On 9/19/14, postpartum day #2, Ms. Powell was doing well. She had minimal bleeding. Her vital signs were stable. Her hemoglobin was 9.3. She was discharged. She was to follow up in six weeks.

Ms. Powell stated that at her postpartum visit, Dr. Akoda treated an ovarian cyst in the office. She was then in pain for three or four days.

Jaiden is a healthy boy.

Ms. Powell did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a friend who saw a TV ad.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A vaginal delivery resulted in delivery of a healthy baby. Ms. Powell had a postpartum hemorrhage that was due to uterine atony and ████████████████ Dr. Akoda appropriately performed a D&C and packed the vagina with gauze. █████████ result from a ████████████████████. Such ██████████ commonly bleed after delivery.

**Jasmine Riggins**

**Summary**

Between August 2012 and March 2013, Ms. Riggins was a patient of Dr. Akoda at Dimensions Healthcare.

On 3/18/13, she presented for a scheduled repeat elective cesarean section to Dimensions Healthcare. She was a 20-year-old gravida 4 para 1-0-2-1 at 40+ weeks. Her pregnancy was complicated by gonorrhea x 2 and late presentation for prenatal care. She had one prior cesarean section and two prior elective abortions.

Dr. Akoda performed a repeat elective cesarean section. Delivery occurred of an 8+ pound male with Apgar scores of 9 and 9 at 1 and 5 minutes, respectively. Extensive adhesions were noted. EBL was 1,300 ml. No intra-operative complications were noted.

She had no post-operative complications.

On 3/21/13, POD #3, she was discharged.

Ms. Riggins did not file a medical malpractice lawsuit against Dr. Akoda. She learned about litigation against Dr. Akoda from a Facebook post by Monique Russell in 2017.

**Opinions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. An elective repeat cesarean section with no complications resulted in delivery of a healthy baby. She had no post-operative complications.

## Monique Russell

### Summary

At the time of her 5/25/16 delivery, she was a 38-year-old gravida 4 para 0-0-3-0 at 37+ weeks. ███████████████████████████████████ ███████████████████████████ and stress-related back pain. (Russell Dep. 63-64, 79.)

At 37+ weeks, she presented to Prince George's Hospital with ruptured membranes.

Due to a non-reassuring FHT remote from delivery (2 cm), Dr. Akoda recommended a cesarean section. Ms. Russell's husband did not agree with the need for a cesarean section, but Ms. Russell listened to Dr. Akoda. (Russell Dep. 26, 37.)

On 5/25/16, Dr. Akoda performed a cesarean section at Prince George's Hospital. Delivery occurred of a 7+ pound male (Luka) with Apgar scores of 9 and 9 at 1 and 5 minutes, repectively. EBL was 400 ml. No intra-operative complications were noted.

Ms. Russell had no post-operative complications.

On 5/28/16, POD #3, she was discharged.

Luka is a healthy child.

Ms. Russell did not file a medical malpractice lawsuit against Dr. Akoda. Soon after the delivery she discovered an online press release from the Department of Justice about Dr. Akoda.

### Opinions

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. A cesarean section with no complications appropriately performed due to non-reassuring FHT remote from delivery resulted in a healthy baby. Ms. Russell had no post-operative complications.

**Conclusions**

The clinical care reflected by the reviewed medical records is consistent with a physician who has received medical training. The procedures that he performed are unique to the medical profession and cannot be skillfully performed by a layperson. All four of the women's deliveries resulted in healthy babies and good outcomes. The only complication, a postpartum hemorrhage due primarily to bleeding from ███████████, was not caused by Dr. Akoda and was appropriately treated by Dr. Akoda.

Review of the records reveals that Dr. Akoda successfully completed an OB/GYN residency training program at Howard University Hospital. Dr. Akoda met requirements, including written and oral examinations, to become board certified by the American Board of Obstetrics and Gynecology ("ABOG"). He also successfully completed requirements for ABOG's board recertification via the Maintenance of Certification ("MOC") program through 2015.

All opinions stated are with a reasonable degree of medical certainty.

Sincerely,

Jay Goldberg, MD, MSCP
Professor of OB/GYN

# PETITION
# EXHIBIT 21

# **EXHIBIT 27**

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

**RE: Monique Russell et al. v. Educational Commission for Foreign Medical Graduates**

Dear Ms. McEnroe,

On September 17, 2019, I had the opportunity to see Monique Russell for an independent psychiatric evaluation.

The examination was requested to comment on Ms. Russell's psychiatric condition in relation to the Complaint in *Monique Russell et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Russell that the evaluation was not for purposes of treatment and that it was not a confidential examination. I discussed with Ms. Russell that I would prepare a report based on the psychiatric evaluation and review of records.

In preparation of this report I have reviewed the following documents:

1. Medical Records:
   Plaintiffs0000000932 – Plaintiffs0000001133;
   Plaintiffs0000001243 – Plaintiffs0000001685;
   Plaintiffs0000001686 – Plaintiffs0000001839;
   Plaintiffs0000001840 – Plaintiffs0000001845;
   Plaintiffs0000001846 – Plaintiffs0000001994;
   Plaintiffs0000005338 – Plaintiffs0000005429;
   Plaintiffs0000067757 – Plaintiffs0000067847;
   Plaintiffs0000118654 – Plaintiffs0000118679
2. Complaint in *Russell et al. v. ECFMG*
3. Monique Russell's Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Monique Russell's Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/13/2019)
5. Amended Class Action Complaint in *Russell v. Dimensions Health*, CAL 18-07863 (3/16/2018)

6. Monique Russell's Responses to Defendants' Request for Admissions in CAL 18-07863 (7/10/2018)

## HISTORY REPORTED BY MONIQUE RUSSELL:

Monique Russell (date of birth ▮▮▮▮▮▮) stated that she instigated the lawsuit *Russell et al v. ECFMG* because of her feeling that she was violated by the man who had identified himself as Dr. Akoda. She said that Dr. Akoda was not a real doctor, and there is no real evidence that this man had attended medical school. Ms. Russell said that she read the "transcripts" from his federal trial. She said that she believes that Dr. Akoda had faked his way into residency programs. Ms. Russell said it is her opinion that "without consent she was subjected to assault." As a consequence of her reported experience with Dr. Akoda, Ms. Russell said she feels that she cannot trust the medical system or doctors. Ms. Russell said that she believes that Dr. Akoda had three different Social Security numbers and three different names. Ms. Russell said that she believes Dr. Akoda had applied to take the medical board examinations three times. Ms. Russell said that she does not know if Dr. Akoda could have had his license reinstated in another state.

Ms. Russell said that Dr. Akoda was not her doctor. She said that she had chosen to have her OB treatment with Dr. Danielle Waldrop at the practice of Javaka Moore, M.D. Ms. Russell said that she had expected that either Dr. Moore or Dr. Waldrop would deliver her baby, but it was Dr. Akoda who was in the delivery room. Ms. Russell said that she later wanted to recommend Dr. Waldrop to a friend who was looking for an obstetrician. Ms. Russell said that she had told this friend that if she went to the practice with Dr. Waldrop and Dr. Akoda was still in the practice, she may be treated by Dr. Akoda, and Ms. Russell had not had a good experience with him. Ms. Russell said that when she looked for information about Dr. Moore's practice, she saw that Dr. Akoda was not on the list of practitioners. Ms. Russell said that in June 2017, she began an investigation and found a release from the Justice Department regarding Dr. Akoda. Ms. Russell said that she was blown away and horrified. She said that she spent days and nights trying to make sense of the available information. Ms. Russell questioned how it was possible that this "alleged doctor" had delivered her child. Ms. Russell acknowledged that the consequences to her regarding the treatment she received from Dr. Akoda were, "For me, minor." Ms. Russell said that she read about another lawsuit against Dr. Akoda alleging that there were permanent injuries to a child as a consequence of his treatment. Ms. Russell said Dr. Akoda should never have had access to women.

Ms. Russell said that when she learned this information about Dr. Akoda, she was reminded of prior trauma and abuse. She said that she was ▮▮▮▮▮▮▮▮▮▮ when she was a child and again when she was in her early twenties.

Ms. Russell said that she does not have regular gynecologic appointments. Ms. Russell said that she has problems with trust in regard to the credentials of doctors. Ms. Russell said that the experience with Dr. Akoda has gotten in the way of family planning. She said that she wanted other children, but she has not had gynecologic treatment. Ms. Russell also said that she does not know if the caesarean section was medically necessary. She said that there was no damage to her son, but she questions the medical decision that Dr. Akoda made.

Ms. Russell had a doula in the delivery room. Her husband and her mother-in-law were also in the delivery room. Ms. Russell said that she did not like Dr. Akoda's behavior. She said that he would come into the delivery room and talk to her husband and not to her. She said that she found him to be really misogynistic. Ms. Russell said that she told her husband that if Dr. Akoda spoke to him one more time about her vagina, then they would need a different doctor. Ms. Russell said that after her husband spoke to Dr. Akoda, he began to talk to her, but she said that she did not like him.

Ms. Russell said that she was in labor for 32 hours. She said that she was given antibiotics after 18 hours because her water had broken. She said that she was only 1 cm dilated and was started on Pitocin. Ms. Russell said that she had horrible contractions, but she still did not dilate. Dr. Akoda suggested an epidural hoping that the epidural would relax her and help with the contractions. Ms. Russell said that the baby went into distress. Although the baby's stats went back to normal, Dr. Akoda recommended an emergency caesarean section. Ms. Russell repeated that she trusted that Dr. Akoda was a real doctor. Ms. Russell said that looking back, she does not know if she had an unnecessary surgery. Ms. Russell said that she continues to have itching at the scar from the surgery. Ms. Russell said when she thinks about the caesarean section, she thinks that Dr. Akoda was rough, and he was "playing football with my organs." Ms. Russell said that she was discharged from the hospital after three days. She said that her husband took two weeks off and she had help from a postpartum doula and her mother-in-law.

Ms. Russell said that she had an appointment with Dr. Waldrop for an IUD when her son was six months old. In response to the question of how the experience with Dr. Akoda affected her family planning, Ms. Russell said that she found it hard to be intimate with her husband after she learned about Dr. Akoda.

Ms. Russell said that she thinks she went back to see Dr. Moore after she learned about the charges against Dr. Akoda. She described the visit as a meeting with Dr. Moore, and not a medical appointment. Ms. Russell said that she questioned Dr. Moore about why she had not been notified about Dr. Akoda's federal charges, and Dr. Moore told her that it was not his practice's responsibility to notify the patients. Ms. Russell said that she disagreed. Ms. Russell said that she believes it was someone's job to notify patients about Dr. Akoda. Ms. Russell said that Dr. Moore was not defensive, but rather surprised about her questions. Ms. Russell said that she was really angry and really in shock.

Ms. Russell then provided additional information of what she has learned about Dr. Akoda. She said that Dr. Akoda did not have an office practice with Dr. Moore, but he worked in Dr. Chaudry's practice. She said that Dr. Akoda delivered babies for Dr. Moore's practice and for Dr. Chaudry. Ms. Russell said that Dr. Akoda's office and home were raided. Ms. Russell said that multiple passports were found, along with a machine to create diplomas. Ms. Russell said that she has to have her fingerprints checked every two years to be a Washington, DC public school teacher. Ms. Russell said that she does not understand how Dr. Akoda was able to apply to ECFMG three times, especially after he was kicked out of a residency program in New Jersey when it was discovered he was a fraud. Ms. Russell said that she believes that this information about the New Jersey residency was reported to ECFMG. She said that after "this reported doctor" was kicked out of the New Jersey program, he reapplied to ECFMG using different

names and different Social Security numbers. Ms. Russell said that Dr. Akoda got through ECFMG and was able to finish an OB/GYN residency program at Howard University. She said that Dr. Akoda met Dr. Chaudry and Dr. Moore, who were both attendings at Howard University. Ms. Russell said that in between Dr. Akoda's first residency program and the residency at Howard, Dr. Akoda had worked in Florida as a nurse. She said again there is no evidence that he had graduated from medical school.

Ms. Russell said that she believes that she was the first patient who found out about Dr. Akoda's identity and criminal charges. Ms. Russell said that she chose an attorney who was recommended to her by a friend.

Ms. Russell said that she would like to get pregnant again, but she does not have a doctor. She said that she did have complications (bleeding and cramping) with her IUD in 2018 or 2019. She said that a doctor removed the IUD at an urgent care in Costa Rica. Ms. Russell said that she was really anxious about the IUD removal. She said that she did look up information about the doctor, and she leaned the doctor was American-trained. Ms. Russell said that the experience was okay.

Ms. Russell described her mood noting that she is a pretty positive person. She tries to keep things in perspective. Ms. Russell said that she does not sleep enough, but she has a toddler and a demanding job. Ms. Russell said she does focus on self-care. She said that she walks one to two miles every day and that she does yoga. Ms. Russell said that she gets up between 5:00 a.m. – 5:30 a.m. She said that she tries to go to sleep by 10:00 p.m. – 11:00 p.m. and she does sleep through the night. Ms. Russell said that she does not have problems with her appetite. She said her concentration is fine. She said she is able to experience pleasure. Ms. Russell said she enjoys her job, and she likes to walk, hike, do yoga, and read. Ms. Russell said that she has a lot of plans for her future with her husband and son.

Ms. Russell said that in a way she feels lucky. She said that the situation could have been worse. She acknowledged there were no physical consequences to the medical experience with Dr. Akoda. She said the experience with Dr. Akoda brought up past trauma ████████ ████████ Ms. Russell said that the suffering she experienced may be less than what other women experienced, but she feels a responsibility to stand up for other women who had trauma as a consequence of their experiences with Dr. Akoda. Ms. Russell repeated that she remains concerned that Dr. Akoda will try to practice medicine again. Ms. Russell wants to make sure in any way she can that it will be impossible for Dr. Akoda to practice medicine again.

## PAST MEDICAL HISTORY

Ms. Russell said that she had an emergency appendectomy in 2000. She said her appendix did not rupture.

Ms. Russell had ████████ in 2004.

In 2005, Ms. Russell had bleeding and ████████████ This was not a planned pregnancy.

RE: Monique Russell
Page 5

In 2012, Ms. Russell had an unplanned pregnancy. She did not plan to terminate the pregnancy. She had ▇▇▇▇▇▇▇ at six weeks.

Ms. Russell said when she became pregnant with her son, she spoke to doctors and nurses about her history of miscarriages. Ms. Russell said that she learned that women often have miscarriages before they know they are pregnant. Ms. Russell said that she was not concerned about her history of miscarriages with her pregnancy with her son.

Ms. Russell said that her pregnancy with her son was challenging. She said that she had early bleeding. She had an evaluation with a high-risk pregnancy doctor, and she was closely monitored in the first trimester. Ms. Russell said that at 6.5 months, she developed problems with vomiting; she would throw up whenever she ate, but she continued to gain weight.

Ms. Russell has a condition known as vasovagal syncope that she was diagnosed with when she was in her thirties. She said that she had to be careful during her pregnancy for dizzy spells. Ms. Russell said that she learned what to do when she felt dizzy, and she was able to watch for triggers. Ms. Russell said that in the last two months of her pregnancy, she was on modified bedrest. She said that she was able to work from home. Ms. Russell said that she has only had one vasovagal episode since her son was born.

Ms. Russell said that she has a history of chronic back pain that she believes is stress related. Ms. Russell said that she developed back pain after her sister died such that she could not walk. Ms. Russell said that she learned breathing techniques and has been doing daily meditation for many years. Ms. Russell said that when her son was about one year old, she developed back pain again, and she had a course of physical therapy.

## PAST PSYCHIATRIC HISTORY:

Ms. Russell said that she had counseling growing up. She said that she was five years old when she and her sister were adopted, and four years later, her parents adopted a baby girl. Ms. Russell said that her biological sister had problems with acting out, and they had counseling.

Ms. Russell said that she was sexually molested by a family member when she was six or seven years old. She said that she did not report the abuse until she was 15 years old. Ms. Russell said she reported the abuse when her baby sister was the same age as when the assault happened to her. Ms. Russell said that the first person she told was a male guidance counselor, and the guidance counselor called Ms. Russell's parents and the police. Ms. Russell said she wanted to make sure that her sister was protected. Ms. Russell said that the guidance counselor started a support group for young girls who were victims of sexual abuse or assault.

Ms. Russell said that she was sexually assaulted as an adult when she was in her early twenties. She said that this was date rape. Ms. Russell said this was perhaps her third date with this man. She said that he did not listen when she told him to stop, and he apologized to her afterward. Ms. Russell said that she did not see a counselor and that she does not know if she dealt with the

consequences of this reported date rape effectively. Ms. Russell said later on that she did some personal work to examine her relationships and her underlying beliefs.

Ms. Russell said that her adopted sister had depression and committed suicide at the age of 21 in 2007. Ms. Russell said that her sister had a history of prior suicide attempts that Ms. Russell believes were calls for attention. Ms. Russell said that she did not go to counseling when her sister committed suicide. Ms. Russell said her family doctor prescribed ███████ and she took the medication for six months after the suicide of her sister. Ms. Russell said that she did not see the suicide coming. Ms. Russell said that she had trouble functioning after her sister's suicide. She said that she was then a student at the University of Maryland and that she was also working. She said that her professors and her employer were understanding, and she had a really strong network of friends.

## SOCIAL HISTORY:

Ms. Russell said that she lives in Costa Rica and works at a private international school as the curriculum coordinator for early childhood to fifth grade. Ms. Russell said that her contract is up in August 2020. She said she thinks that she will renew the contract and stay in Costa Rica. She said that she can stay in one place for up to five years working for this company.

Ms. Russell said that her undergraduate degree is from the University of Maryland in studio arts and education. Ms. Russell said that she was certified in 2009 to teach early childhood to third grade. She has a Master of Arts in Teaching from Trinity University that she completed in 2014. She said that in this program she took a deep dive into literacy instruction. Ms. Russell said that she has bounced back from jobs supporting teachers to teaching in the classroom. She said in 2014, she was working as an instructional specialist in the Washington, DC public schools.

Ms. Russell said that she grew up in a Catholic family, and she became a Quaker in her early twenties. She said that she knew by the age of 13 that she did not believe in Catholicism. She said that her mother told her not to proceed with confirmation if she did not believe in all the tenets. Ms. Russell said that she and her sister tried out different houses of worship. She said when she went to a Quaker meeting, she realized this was home. Ms. Russell said that she has a home meeting in Washington, DC. There is a Quaker settlement three or four hours from where she lives in Costa Rica, but she has not gone to meetings.

Ms. Russell said that she met her husband on a dating site in 2014. She said that they went on three dates in three days, and they knew that this was it. She said he proposed after five months. Ms. Russell said she and her husband met in February 2014, and they were married on October 3, 2014. She said that she was 35 and he was the man of her dreams.

Ms. Russell said that her husband is a DJ, and he travels to Washington, DC to work at weddings. She said that he cannot work in Costa Rica because of his visa. Ms. Russell said she always wanted to live in Costa Rica. She said that the culture is warm and family-oriented. She said that she works from 7:30 a.m. until 4:30 p.m. and her son is in school from 7:30 a.m. until 3:00 p.m.

RE:  Monique Russell
Page 7

## MENTAL STATUS EXAMINATION:

Mental status examination revealed a casually groomed 42-year-old woman who appeared younger than her stated age.  Her speech was goal-directed and spontaneous, and she easily established rapport.  Ms. Russell provided a detailed history and explained how she had learned about the federal charges against Dr. Akoda.

Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  Ms. Russell said in a way she feels lucky that what happened to her with Dr. Akoda was not worse.  She said that she had no physical consequences from the birth of her son.  She said that she feels responsible to stand up for women who were subjected to trauma.  Ms. Russell revealed a full range of affect appropriate to content.  She denied a history of suicidal ideation.

Ms. Russell denied a history of anxiety attacks.

Memory, intelligence, and fund of knowledge were grossly within normal limits.

## REVIEW OF RECORDS:

I have reviewed the records identified at the start of the report.  There were no records that referred to any psychiatric or psychological treatment or complaints of anxiety or depression to a treating doctor.

## SUMMARY AND IMPRESSION:

It is my opinion Ms. Russell does not have any psychiatric disorder causally related to the allegations in the Complaint.

Ms. Russell related a past history of counseling and treatment with the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮  She reported a history of seeking treatment and medication at times of stress. Ms. Russell did not engage in treatment related to learning information about Dr. Akoda. Ms. Russell acknowledged that the consequences in regard to the treatment she received from Dr. Akoda were, "For me, minor."

It is my opinion Ms. Russell did not present with symptoms compatible with any psychiatric diagnosis. Ms. Russell described her mood noting that she is a pretty positive person, and she keeps things in perspective.  She has strong relationships with her husband and her son, and she is optimistic about her future. It is my opinion there is no indication for psychiatric or psychological treatment for Ms. Russell in relation to the allegations in the Complaint.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.

RE: Monique Russell
Page 8

I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD

GSF/cl

# PETITION
# EXHIBIT 22

# EXHIBIT 30

**Gladys S. Fenichel, MD**
**210 Kent Road**
**Ardmore, PA 19003**
**FenichelMD@FenichelMD.com**
**(610) 649-8940**
**FAX (610) 649-5071**

September 23, 2019

Elisa P. McEnroe
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103-2921

**RE:** *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*

Dear Ms. McEnroe

On September 9, 2019, I had the opportunity to see Desire Evans for an independent psychiatric evaluation. The evaluation was requested to comment on Ms. Evans' psychiatric condition in relation to the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

At the start of the examination, I discussed with Ms. Evans that the examination was not for purposes of treatment and it was not a confidential examination. I discussed with Ms. Evans that I would prepare a report based on the psychiatric evaluation and review of records.

The file included the following documents:

1. Medical Records: Plaintiffs0000000001 – Plaintiffs0000000571; Plaintiffs0000005735 – Plaintiffs0000006016
2. Complaint in *Russell et al. v. ECFMG* (12/31/2018)
3. Desire Evans' Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (3/29/2019)
4. Desire Evans' Supplemental Answers to First Set of Interrogatories and Responses to First Set of Requests for Production of Documents (6/17/2019)
5. Deposition of Desire Evans (9/5/2019)
6. Class Action Complaint in *Dews v. Dimensions Health*, CAL 17-34091 (11/22/2017)
7. Desire Evans Answers to Interrogatories of Defendant Dimensions Healthcare Corporation D/B/A/ Prince George's Hospital Center (7/10/2018)
8. Deposition of Desire Evans, CAL 17-22761, CAL 17-37091, and CAL 18-07863 (3/28/2019)
9. Summary of Preliminary Psychiatric Interviews by Susan J. Fiester, M.D. (11/26/2018)
10. Expert Report of Jennifer L. Payne, M.D. (5/13/2019)

## HISTORY REPORTED BY DESIRE EVANS:

Desire Evans (███████████████████) said that she is involved in a lawsuit because the doctor who delivered her son had "identity fraud." Ms. Evans said that he used different names and Social Security numbers to obtain his certification.

Ms. Evans said she assumed that Dr. Akoda had hurt other women because she felt that he had hurt her during the delivery of her son. Ms. Evans said that when she heard an ad telling anyone who had been Dr. Akoda's patient to call a phone number, Ms. Evans assumed that Dr. Akoda had touched other women inappropriately. Ms. Evans said that when she called the number, she learned that the lawsuit was not, per se, malpractice. Ms. Evans said that it is her understanding that Dr. Akoda failed several certification tests, and he had reapplied using different Social Security numbers and names. Ms. Evans said she believes that Dr. Akoda was trying to degrade people. Ms. Evans could not understand why Dr. Akoda continued to submit applications to ECFMG using different names. Ms. Evans continued, "How do you even know he is who he said he was? I still don't know who he is." Ms. Evans said that the experience with Dr. Akoda affected her. Ms. Evans said that she lost complete trust in the medical field and has problems with trust. For example, she said she did not feel comfortable going in a car with a driver she did not know, and her husband took off from work to drive her to the independent psychiatric examination.

Ms. Evans said that her prenatal care was at the practice of Javaka Moore, MD. She said that during her pregnancy, she had to go to the practice chosen by Medicaid. She said she saw Dr. Moore and nurse practitioners. She said she had started to dilate at five months, and she was treated with progesterone. Ms. Evans said she was scheduled to be induced because she was two weeks past her due date. Ms. Evans said she expected that Dr. Moore would deliver her baby. She said she met Dr. Akoda on the day of the induction. She said a nurse had put in the epidural and given her Pitocin. She said she did not meet Dr. Akoda until her water broke, and at that time, she was in labor.

Ms. Evans said that Dr. Akoda was the only doctor in and out of the delivery room. She said that when her labor was not progressing, Dr. Akoda began to stimulate her clitoris. Ms. Evans said she questioned what he was doing, and he told her and her husband that this stimulation would help the baby come out. Ms. Evans said she was in labor and this felt weird and uncomfortable. Ms. Evans said she thinks the nurse was in the delivery room. Ms. Evans said she was not in stirrups at that time, but rather her mother and her husband were holding her legs. Ms. Evans repeated that Dr. Akoda made her feel uncomfortable. Ms. Evans said that she had an emergency C-section.

Ms. Evans had a six-week checkup with the nurse practitioner. Ms. Evans said that she had severe back and leg pain after the epidural, and she said she still has sciatic pain. She talked about the sciatic pain at her six-week checkup. She did not say anything about Dr. Akoda's behavior during the delivery of her son.

Ms. Evans said she has not had any follow-up gynecologic care since her son was born. She said, "I don't want anyone touching me down there." Ms. Evans said that she lost trust after the

Case 2:20-cv-02456-DCN Document 1-2 Filed 06/26/20 Page 245 of 341
Case 2:20-cv-02456-DCN Document 1-2 Filed 06/26/20 Page 245 of 341

RE:  Desire Evans
Page 3

delivery because her doctor did not show up, and the doctor who delivered her son was "another doctor who was supposed to be a doctor."  She said that she was uncomfortable with how he touched her.  Ms. Evans said she does not see a primary care physician.  She said she has been in treatment with a psychiatrist and a psychologist, and she has blood pressure and weight checks.

Ms. Evans began to cry.  She said that she and her husband have only had sex two or three times since her son was born.  She said that she feels uncomfortable if he tries to touch her.  She said that her husband loves her.  Ms. Evans said she is trying to work through this, and it is embarrassing.

Ms. Evans has Family Medical Leave for diagnoses of anxiety, depression, and posttraumatic stress disorder, and she has ADA accommodations for anxiety.  Ms. Evans said that Dr. Ebony Cross is her psychiatrist, and she has been in treatment with Dr. Cross since April 2019.  Ms. Evans said that her medications include ███████████████████████████████████████████ .  Ms. Evans said that she has really bad anxiety that affects her sleep.  She said that she does not believe she had postpartum depression. She said that she believes her problem was a consequence of losing complete trust in the medical field.

Ms. Evans said she has been in treatment with Dr. Donato for two years.  Ms. Evans said that Dr. Donato has recommended YouTube videos about stress.  Ms. Evans said that she is not a person who opens up to other people, and she does not like to talk about herself.  She said that she schedules appointments with Dr. Donato as needed, and he completes forms for ADA and FMLA.  Ms. Evans said that her ADA accommodations allow her to work from home, and her Family Medical Leave accommodations allow her to take days off for doctors' appointments and anxiety.  She can be out of work eight hours a day, three days a week.  Ms. Evans said that she probably works 26 to 30 hours a week.  Ms. Evans was crying as she related her history. Ms. Evans said that her ADA accommodations are permanent, but her FMLA leave requires updates.

Ms. Evans said that she will sometimes talk to Dr. Donato on the phone.  She said that she spoke to her previous psychiatrist, Dr. Shanda Smith, on the phone.  Ms. Evans said that it is her anxiety that keeps her up and it is her anxiety that affects her ability to focus.  She said, "I walk around with a big ball of stress."

Ms. Evans said that she had anxiety after the hospital experience, and she had serious trust issues about everything after the experience with Dr. Akoda.  She said that her problems with trust increased when she learned about a lawsuit regarding Dr. Akoda.

Ms. Evans said that Dr. Donato referred her for a psychiatric evaluation with Dr. Nnamani.  Ms. Evans said that she had only one appointment with Dr. Nnamani because the office was one hour from Ms. Evans' home.  Ms. Evans said that Dr. Nnamani diagnosed her with posttraumatic stress disorder.  Ms. Evans said that she has a lot of pent up trauma and there was no specific abuse, but neglect.  Ms. Evans said that she grew up in the church and her grandmother was a Pentecostal pastor who passed away in 2007.  Ms. Evans said that she was 19 years old in 2007, through her date of birth shows that she would have been 28 years old in 2007.  Ms. Evans said that her mother was 19 or 20 years old when Ms. Evans was born, and Ms. Evans' grandmother

was the constant person in her life. Ms. Evans said that she and her grandmother had everyday bible study. Ms. Evans said 50 or 60 people followed her grandmother's preaching. Ms. Evans said that after her grandmother died, she lost faith. Ms. Evans said that her grandmother was the most faithful servant of God, and she was a perfect human being. Ms. Evans said that her grandmother had breast cancer. Ms. Evans said she thought God was going to heal her grandmother, and she did not have any treatment. Ms. Evans was crying. She said she did not go back to the church after her grandmother's death.

Ms. Evans said that she had other trauma related to her brother. She said that she felt that she had to raise him. Ms. Evans said that she does not believe her mother acted in an intentional way not to care for her and her brother, but her mother was not available to raise her or her brother.

Ms. Evans said she did not have trust issues with doctors before the birth of her son. Ms. Evans said that she had trust issues with God. She repeated that since the birth of her son, she is not interested in sex. She said that she does not want to be touched by anyone. Ms. Evans said that she believes her husband has looked at her in a different way since the childbirth experience. She said that she has not wanted to talk about her experience in labor with her husband. She said that she feels that this is her issue.

Ms. Evans described her mood as a big ball of stress. She said that she has dreams that are very scary. She said that she cannot pinpoint the content of the dreams, and they are not recurring dreams. In response to a question about her appetite, she commented that she is fat. She said that she is 5 feet, 3 inches tall and she weighs 180 pounds. She said that she started gaining weight after she had her son and she weighed 156 pounds after her son was born. Ms. Evans said she feels a little better because she had recently lost 15 pounds. She reported that she eats late at night, and she believes that this contributes to the weight gain. Ms. Evans said that she has problems with her concentration. She said that she feels she is all over the place, and it is hard to stay on task. Ms. Evans said that she has problems with energy. She said that she tries to have a good time with Peyton and other family members. Ms. Evans said that she does not have suicidal thoughts. Ms. Evans said she can feel the most depressed in the world, but she will then focus on her son and her husband. Ms. Evans said that she has anxiety attacks, but she does not know what causes them. She said that when she feels the anxiety increasing, she takes a Klonopin.

Ms. Evans said that everything scares her. Ms. Evans said that she did not have her son vaccinated until he was three years old because of her fears. She said that she feels every day is Halloween, and she is terrified of the world. She said that her feelings of terror increased after her son was born. She reported that she does not like to be around people, and she does not like to leave the house because everything worries her.

Ms. Evans returned to discussing the lawsuit. Ms. Evans said that Dr. Akoda said he was a doctor. Ms. Evans said that she is now under the impression that he may not be a doctor. Ms. Evans said that she feels she was harmed and that Dr. Akoda touched her in an inappropriate way during the delivery. She repeated that she does not know if he is a doctor, and she does not know if he has the certification necessary to be a doctor.

## PAST MEDICAL/PAST PSYCHIATRIC HISTORY:

In June 2014, Ms. Evans fell down wooden stairs. She said that there were 15 steep steps in her apartment. She said that she lost her footing. She said that she did not lose consciousness and did not go to the hospital right away. Ms. Evans said that she realized that she was having a significant problem with her back and her legs. She said that she told her husband that it was bad, and she went to the emergency room. She said that she was in the hospital for five days. She said that she had a lot of tests. She said that she had occupational therapy and physical therapy before she was discharged. She said that she did not have any physical therapy after her discharge, and she did not have any follow-up. Ms. Evans said that she and her husband live in a three-bedroom house with her office in the basement. She said there are stairs in the house, and all the stairs are carpeted.

█████████████████████████ She said that she just wanted to move out; she did not want to co-parent with her mother any longer. Ms. Evans said that she has always been the adult. She said that she told her mother that she had taken ████████ of Tylenol PM, and her mother took her to the hospital. Ms. Evans said that she tried to explain that she had not taken any pills, but she was treated in the hospital ██████████████ Ms. Evans said that she was given charcoal. She said that she had taken ██████████ She said her stupidity got her into the situation. Ms. Evans said that she believes that this was an involuntary hospitalization. She said that she believes she was treated with fluoxetine. Ms. Evans said that she knew there was nothing wrong with her, and she did not have any follow-up.

Ms. Evans said she did not have any psychiatric or psychological treatment until she began treatment with Dr. Smith in January 2018.

## SOCIAL HISTORY:

Ms. Evans said that she has been married for four years, but she and her husband have been together for seven years. Their son, Peyton, was born on March 17, 2016. She said that her husband has three children from a previous relationship, including a 15-year-old boy, an 11-year-old boy, and a 7-year-old girl.

Ms. Evans reported that she has been working for Blue Cross Blue Shield in customer service since June 2015. She was not hired to a permanent position until January 2016 and she did not have any maternity leave. She said that she took off eight weeks and was then able to work from home.

Ms. Evans said that she is studying cybersecurity at Strayer University. She said that she takes two classes a semester and has gotten all A's. Ms. Evans said that she believes she can finish her degree in three or four years. Ms. Evans said she wants to work in the private sector. She said that she is concerned about issues related to voting. She said that her grandmother always worked at the polls, and her grandmother was very politically involved.

Ms. Evans said that she has a good job with health benefits. She said that all the calls are recorded, and five calls a month are reviewed. She said that the job is micromanaged. She said

that she needs to be on the phone 82% of the time.  She said that she cannot be longer than seven minutes on any call, and she only has two minutes to enter the information.

Ms. Evans said that she and her husband, a bus driver, get along well.  She said that he is really laid back.  Ms. Evans described her son Peyton as "awesome," very active, and headstrong.

Ms. Evans said that her mother is 61 years old, healthy, and works in a doctor's office.  She said that her father has been in and out of jail for drugs and robbery.  She said that her parents were divorced in 2008.

Ms. Evans said that she left school at 16 or 17.  She said that she wanted to help her mom.  She said that she got a high school diploma and studied a trade to be a nursing assistant.

Ms. Evans denied the use of alcohol.  She denied the use of drugs, including marijuana.  [Note: Ms. Evans had reported to Dr. Smith that she was using daily marijuana to help with sleep.]

## MENTAL STATUS EXAMINATION:

Mental status examination revealed a casually groomed 40-year-old woman.  Her speech was goal-directed and spontaneous.  Although Ms. Evans discussed her problems with trust, she spoke in a spontaneous fashion, provided a detailed personal history, and easily established rapport.

Ms. Evans described her mood as a big ball of stress.  Her affect was labile with frequent crying.  She denied suicidal ideation.  She would never leave her husband and her son.

Ms. Evans said that she has anxiety attacks.  She cannot identify a precipitant.  She said that she has vivid dreams, but she does not recall the content of the dreams.

Ms. Evans said that Dr. Donato sent her to a psychiatrist who diagnosed posttraumatic stress disorder.  Ms. Evans said that the posttraumatic stress disorder relates to all the previous trauma.

Memory and intelligence were grossly within normal limits.

## REVIEW OF RECORDS:

I have reviewed the records identified at the start of the report.  The following summaries of information reported in medical records focus on the provided records that referred to psychiatric complaints.

1.  Shanda Smith, MD

Ms. Evans had a new patient evaluation on January 17, 2018.  The chief complaint was depression and anxiety.  Ms. Evans was self-referred after consultation with a primary care doctor.  Ms. Evans reported feeling anxious and depressed for most of her life, but worse over the past year since her birthday in March.  Ms. Evans reported significant anxiety, described as

excess worry that was difficult to control.  Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping.  Ms. Evans seemed to cry out of the blue for no reason.  Ms. Evans had passive thoughts of death related to hopelessness but denied any intent or plans because of her strong attachment to her two-year-old son.  Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite.  Ms. Evans had poor focus because of anxiety and thoughts jumping around.  Ms. Evans was working at home so she could watch her son.  He was growing more active, and this was becoming more of a challenge.  Ms. Evans denied any specific stressors or changes.  She did note that she was not satisfied with her life.  She said she could not focus or pursue her goals because of anxiety.  She described herself as very private.  Her husband was aware of her depression, but she felt he did not know how to respond.

In regard to past psychiatric history, Ms. Evans reported histories of symptoms on and off throughought her adult life.  She had one suicide attempt by overdose in 2009.  She was admitted to a psychiatric hospital for about five days.  Ms. Evans was started on fluoxetine but stopped it soon after discharge.  There was no additional or continued care.

Ms. Evans reported that when her parents were divorced, she functioned as a parent to her younger brother, who was nine years younger.

The diagnosis was major depressive disorder, recurrent, severe, with anxious stress, and unhealthy substance behavior, referring to daily marijuana use to help with sleep.  The treatment plan was for Prozac and hydroxyzine as needed for sleep and severe anxiety.  There would be a video visit on February 16, 2018 and a psychotherapy appointment on January 19, 2018.

The records included correspondence from Ms. Evans to Dr. Smith regarding medication.  The plan was to stop hydroxyzine and prescribe trazodone.

The appointment on February 6, 2018 was a structured telephone medication management visit.  Ms. Evans reported initial improvement in mood.  She was not crying as much since starting Prozac, but about one and a half weeks after increasing to 20 mg, her anxiety increased.  The plan was to continue Prozac and use Ativan sparingly for severe anxiety and palpitations.  She was taking Prozac 20 mg and trazodone 50 mg at bedtime as needed.

Dr. Smith completed a Family Medical Leave form dated January 22, 2018.  The diagnosis was major depressive disorder, recurrent episodes, severe, with anxious stress.  The recommendation was for unplanned leave twice a month for eight hours.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

2.  Shah Associates Family Practice

The records included a note from Dionne Lucas, PAC dated July 25, 2016.  Ms. Evans was a new patient to the practice.  Ms. Evans was complaining of feeling sad all the time and having severe anxiety.  She had a baby in March 2016, and since then she had not been able to sleep.  Ms. Evans was afraid to drive a car.  She was afraid of walking down steps with her son because

she thought she might drop him. She was afraid to let her son be watched by other people. She was losing hair. She had not been able to go into work since her maternity leave ended. When Ms. Evans saw her gynecologist, she was given a note for reasonable accommodation, which allowed her to work from home until August 1, 2016. Ms. Evans was asking for an updated letter and evaluation for this complaint.

Ms. Evans said before she had her baby, she did not have any issues with anxiety and depression. Her husband and mother were described as very supportive. During her pregnancy, Ms. Evans started to complain of lower back pain that would shoot down her left leg. The symptoms continued. She said it was like a vibrating cell phone in her left back pocket. She had not used any medication for this complaint. She had reached her pre-pregnancy weight. Her only injuries to the back occurred during the summer of 2015 from C3 to C5, affecting the right side.

Ms. Evans said her lower back had never been an issue. Her past history included depression, anxiety, and anemia. She was taking naproxen every 12 hours and sertraline 50 mg. She said she had been gaining weight. She was fatigued. She was not able to fall asleep or stay asleep. The impression was depression, anxiety, possibly postpartum. She was started on Zoloft 50 mg. Ms. Evans was given information to consult a mental health professional. She received a note extending reasonable accommodations until the week of September 12, 2016. She had lumbago and sciatica. She had an order for an x-ray of the lumbar spine and an appointment for a nerve conduction study.

There was no mention of Dr. Akoda or the allegations in the Complaint anywhere in the records.

## SUMMARY AND IMPRESSION:

It is my opinion that Ms. Evans does not have a psychiatric disorder related to the allegations in the Complaint in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*. It is my opinion Ms. Evans has psychiatric conditions of major depression and panic disorder, documented in the available records, but there is no relation between those psychiatric conditions and the allegations in the Complaint. Ms. Evans discussed her feelings about the inappropriate behavior of Dr. Akoda during the delivery of her son. Ms. Evans acknowledged that she did not report this behavior to another treating doctor or nurse or discuss her feelings about Dr. Akoda with her husband. Ms. Evans said that her husband, her mother, and a nurse were in the delivery room and aware of Dr. Akoda's treatment during the delivery. Ms. Evans did not file a malpractice complaint about Dr. Akoda in relation to the delivery of her son.

Ms. Evans has ADA and FMLA accommodations for conditions of depression and anxiety. The symptoms of major depression and panic disorder were documented in the psychiatric report from Shanda Smith, MD, regarding the new patient evaluation on January 17, 2018. This report did not include any reference to Dr. Akoda or ongoing litigation. The chief complaints were depression and anxiety. Ms. Evans reported feeling anxious and depressed for most of her life. Ms. Evans reported significant anxiety, described as excess worry that was difficult to control. Ms. Evans reported intermittent panic symptoms including shortness of breath, palpitations, and weeping. Ms. Evans seemed to cry out of the blue for no reason. Ms. Evans had ███████ ████████████ related to hopelessness but denied any intent or plans because of her strong

attachment to her two-year-old son.  Ms. Evans endorsed symptoms of depression that included depressed mood, anhedonia, sleep disturbance, low energy, and low appetite.  Ms. Evans had poor focus because of anxiety and thoughts jumping around.

During the evaluation, Ms. Evans said that the current lawsuit relates to a question about Dr. Akoda's "several different names and Social Security numbers," but she could not identify how this allegation has caused her to experience depression and anxiety or cause an increase in her depression and anxiety.

Although Ms. Evans reported ongoing depression and anxiety, she has many strengths.  She described a strong marriage and her love for her "awesome" son Peyton.  Ms. Evans continues to work, and she is also in school.  She believes she can finish her degree in three or four years.  Ms. Evans wants to work in the private sector and is concerned about issues related to voting.

In conclusion, it is my opinion that Ms. Evans does not have a psychiatric disorder causally related to her allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*, and there was no exacerbation of Ms. Evans' psychiatric conditions as a consequence of the allegations in *Desire Evans et al. v. Educational Commission for Foreign Medical Graduates*.

The opinions noted in this report have been stated within a reasonable degree of medical certainty.  I reserve the right to supplement this report if additional records become available for review.

Sincerely,

Gladys S. Fenichel, MD
GSF/jne

# PETITION
# EXHIBIT 23

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                          -  -  -

 3   MONIQUE RUSSELL, et al.      :  CIVIL ACTION NO.
                                  :  2:18-cv-05629
 4      v.                        :
                                  :
 5   EDUCATION COMMISSION FOR     :
     FOREIGN MEDICAL GRADUATES    :  ORAL ARGUMENT
 6   _____

 7
                                  James A. Byrne U.S. Courthouse
 8                                601 Market Street
                                  Philadelphia, PA 19106
 9                                January 30, 2020
                                  Commencing at 2:06 p.m.
10   _____

11            BEFORE THE HONORABLE JOSHUA D. WOLSON

12   _____

13
     APPEARANCES:
14
              JANET JANET & SUGGS LLC
15            BY:  PATRICK A. THRONSON, ESQUIRE
              4 Reservoir Circle
16            Suite 200
              Baltimore, Maryland 21208
17            (410) 653-3200
              pthronson@jjsjustice.com
18            Representing the Plaintiffs

19
                              -  -  -
20
                  Ann Marie Mitchell, CRR, RDR, RMR
21                     Official Court Reporter
                          (267) 299-7250
22

23   Proceedings taken stenographically and prepared utilizing
     computer-aided transcription
24

25
```

```
 1   APPEARANCES CONTINUED:

 2
            CONRAD O'BRIEN, PC
 3          BY:  NICHOLAS M. CENTRELLA, ESQUIRE
            1500 Market Street
 4          West Tower, Suite 3900
            Philadelphia, Pennsylvania 19102
 5          (215) 864-9600
            ncentrella@conradobrien.com
 6          Representing the Plaintiffs

 7

 8          LAW OFFICES PETER G. ANGELOS PC
            BY:  PAUL M. VETTORI, ESQUIRE
 9          One Charles Center
            100 N Charles Street, 20th FLoor
10          Baltimore, Maryland 21201
            (410) 649-2027
11          pvettori@lawpga.com
            Representing the Plaintiffs
12

13
            SCHOCHOR FEDERICO & STATION PA
14          BY:  BRENT P. CERYES, ESQUIRE
            1211 St. Paul Street
15          Baltimore, Maryland 21202
            (410) 598-1667
16          bceryes@sfspa.com
            Representing the Plaintiffs
17

18
            MORGAN, LEWIS & BOCKIUS LLP
19          BY:  BRIAN W. SHAFFER, ESQUIRE
            BY:  ELISA P. McENROE, ESQUIRE
20          BY:  MATTHEW DANIEL KLAYMAN, ESQUIRE
            1701 Market Street
21          Philadelphia, Pennsylvania 19103
            (215) 963-5000
22          bshaffer@morganlewis.com
            elisa.mcenroe@morganlewis.com
23          matthew.klayman@morganlewis.com
            Representing the Defendant
24

25                               -  -  -
```

1                 (Court called to order at 2:06 p.m.)

2                 THE COURT:  Good afternoon.  Please be seated.

3                 RESPONSE:  Good afternoon, Your Honor.

4                 THE COURT:  So we're here for Russell v. Educational

5       Commission for Foreign Medical Graduates, which is 18-5629.

6                 Let me get appearances of counsel if I could so I can

7       put some faces with names.  Start with the plaintiff's side.

8                 MR. THRONSON:  Good morning, Your Honor.  Patrick

9       Thronson on behalf of the plaintiffs.

10                THE COURT:  Good afternoon, Mr. Thronson.

11                MR. VETTORI:  Good morning, Your Honor.  Paul Vettori

12      on behalf of plaintiffs.

13                THE COURT:  Mr. Vettori.

14                MR. CENTRELLA:  Good morning, Your Honor.  Nick

15      Centrella on behalf of plaintiffs.

16                THE COURT:  Okay.

17                MR. CERYES:  Good afternoon, Your Honor.  Brent Ceryes

18      on behalf of the plaintiffs.

19                THE COURT:  Good afternoon, everybody.

20                And defense?

21                MR. SHAFFER:  Good afternoon, Your Honor.  Brian

22      Shaffer on behalf of ECFMG.

23                THE COURT:  Good afternoon.

24                MS. McENROE:  Good afternoon.  Elisa McEnroe, also for

25      ECFMG.

1        MR. KLAYMAN:  Good afternoon.  Matthew Klayman, also

2  on behalf of ECFMG.

3        THE COURT:  Great.  Welcome everybody.

4        So let me tell you what I want to do here.  We've been

5  through all of the pleadings and exhibits a couple times in

6  chambers.  And certainly I have I think a pretty good handle on

7  the issues, although maybe your arguments will tell me

8  otherwise.  And I've got some sort of questions and issues that

9  I want to hone in on.

10       And so what I sort of want to cover with you all

11  are -- I want to clarify the claims themselves that are

12  asserted in the case, just to make sure I understand them.  I

13  want to talk about some of class definition and

14  ascertainability issues that I know are floating around.  And

15  then I want to -- once we kind of get through those couple

16  things, I want to turn to the -- sort of the class

17  certification issues themselves and talk about some of the

18  issues that come up with the interplay between Rule 23(b) and

19  23(c) and then sort of talk about the two alternative

20  approaches that the plaintiffs have outlined in terms of class

21  certification.  And then we can sort of circle back from there

22  to cover some of the 23(a) factors after that that I know are

23  some of the arguments that the defense has made as well.

24       And then once I've kind of covered all that, to the

25  extent there are things we haven't covered that you all think

1    are important to say to me, I'll give you an opportunity to do

2    that.  I'll tell you now -- and I'll remind you then -- that

3    I've read everything pretty carefully, and so I don't need

4    repetitions of what's in the briefs, but if there are things

5    that either I say today that trigger something in your mind or

6    just you feel you want to say in addition to what's been

7    briefed, I'm certainly happy to hear that.

8         So with that in mind -- and in terms of process, I

9    mean, I'm going to go back and forth, so certainly you don't

10   have to step up.  I'm not going to be insulted if you stay

11   seated while you talk to me.  If you have an old habit that you

12   feel like you need to stand when I talk to you, that's fine,

13   but I won't be insulted if you don't.

14        So let me just start with the claims themselves that

15   have been asserted in the Complaint, and there's two.  There's

16   a negligence and a negligent infliction of emotional distress

17   claim.

18        And so I just want to make sure in the first instance

19   on negligence, is all of the harm that the plaintiffs are

20   asserting sort of under the rubric of emotional distress in

21   this case, or are there other harms that are at issue?

22        MR. THRONSON:  Yes, Your Honor.  The harm that we're

23   proposing for classwide -- essentially for individual

24   resolution after class treatment of the common issue is

25   emotional distress.

1          THE COURT:  Okay.  So there's a reference in your

2    brief to -- I think when you talk about the questions that you

3    wanted me to certify, there was a reference to emotional

4    distress and other damages, but that's sort of just -- I'm

5    taking that more as stray language than it is some

6    suggestion --

7          MR. THRONSON:  Right.

8          THE COURT:  -- that there are other damages out there

9    that are not emotional distress damages?

10          MR. THRONSON:  That's correct, Your Honor.  There may

11    be individual, you know, plaintiffs who, you know, sustained

12    other damages who we don't know about, but, you know, for

13    purposes of this case, this class, the damages are emotional

14    distress damages.

15          THE COURT:  Right.  They may have asserted --

16    sustained other damages, but they're not asserting them or at

17    least you guys are not proposing to represent them to assert

18    them in this case, which is I think a key element to me being

19    able to get to any kind of a class here.  Right?

20          MR. THRONSON:  That's correct.

21          THE COURT:  And then the negligent infliction of

22    emotional distress claim, you know, it's not spelled out in the

23    Complaint, wouldn't normally be, but I assume what you have in

24    mind is that it's asserted under Pennsylvania law based on the

25    choice of law arguments in the briefing; is that right?

1          MR. THRONSON:  That is correct, Your Honor.  Under

2     Maryland law you can assert a claim for negligence where

3     emotional distress is the only damages.  And so that can be

4     proved either through physical injuries, some physical

5     manifestation of the emotional distress, or in certain cases

6     involving fraud or egregious conduct, it can be proved just by

7     the testimony of the plaintiff him or herself without reference

8     to objective criteria.  But we do believe that, you know,

9     Pennsylvania law applies, and that claim, to the extent that we

10    assert it in the Complaint, is based on Pennsylvania law.

11         THE COURT:  And so Pennsylvania law, at least from

12    what I've seen, when you look at the elements of negligent

13    infliction of emotional distress, there's these four -- there's

14    sort of the basic four elements of negligence, right, and then

15    the sort of additional -- there's like these four alternatives.

16    Right?  And it's contractual fiduciary duty, which I assume is

17    not applicable here in your view.  Or is that one of bases that

18    you're proceeding under?

19         MR. THRONSON:  There's no fiduciary duty that we're

20    alleging between ECFMG and the plaintiffs.

21         THE COURT:  And certainly there's no contractual duty

22    because they didn't have a direct relationship?

23         MR. THRONSON:  Right.  There is a physician-patient

24    relationship between Akoda and the patient.

25         THE COURT:  Yes.  But that doesn't get you to

1  liability against them.

2          MR. THRONSON:  Sure.

3          THE COURT:  And then physical -- plaintiff suffered a

4  physical impact?

5          MR. THRONSON:  Right.

6          THE COURT:  Are you proceeding under that prong?

7          MR. THRONSON:  Yes.  A battery.

8          THE COURT:  As opposed to zone of danger or

9  contemporaneous perception of a tortious injury --

10          MR. THRONSON:  Right.

11          THE COURT:  -- to the other two.  Right?

12          And does there need to be a physical manifestation

13  under Pennsylvania law?

14          MR. THRONSON:  You do need to prove it by some kind of

15  evidence, so we'd offer medical records, testimony of the

16  plaintiff, testimony of relatives, in these individualized

17  proceedings that we're proposing.

18          THE COURT:  Okay.  Right.  And so that's all going to

19  be -- in your mind, that would all be left to the

20  individualized proceedings?

21          MR. THRONSON:  That's right.

22          THE COURT:  So you don't have a fraud claim in the

23  case, though.  Right?

24          MR. THRONSON:  Right.

25          THE COURT:  So there's some reference in the class

1    cert briefing to -- I think one of the issues you referenced

2    that I could certify is whether or not -- we're going with Dr.

3    Akoda?  Is that the name, Akoda?  I don't actually know if I

4    should put the "Dr."  In front of it or not under the

5    circumstances, but that's the name we're using; is that right?

6          MR. THRONSON:  That's fine.

7          MR. SHAFFER:  Right.

8          THE COURT:  So we're all on the same page.  Okay.

9          So there's some reference to certifying a class

10   about -- I think ECFMG assisting the commission of fraud under

11   Section 876 of the Restatement?

12         MR. THRONSON:  That's right, Your Honor.

13         Obviously, the evidence shows, the record shows, and I

14   don't think there's any dispute about this, that Dr. Akoda,

15   Akoda -- we're not saying he's a doctor, but -- committed fraud

16   against multiple entities.  And ECFMG provided evidence of

17   certification to a residency program at Howard, a residency

18   program at Jersey Shore, and each healthcare institution at

19   which Akoda purported to practice medicine.  And that

20   documentation verified that Akoda allegedly was properly

21   certified by ECFMG and that his certification was valid.  In

22   fact, the precise piece of paper that was provided, which is in

23   our exhibits, is that it was valid indefinitely.

24         So our claim is that ECFMG knew or should have known

25   that Akoda was committing fraud and was using, you know,

1  through, among other means, this ECFMG certification, which was

2  a prerequisite to practicing at each of these healthcare

3  institutions and being licensed to practice in Maryland.  And

4  so to that extent we think there is an issue that ECFMG aided

5  in the commission of fraud.

6        THE COURT:  But why does that matter for the claims of

7  the case?  I mean, you know, it may be true in the abstract.

8  It may be something that is interesting legally, but you don't

9  have a claim based on it.  Right?

10        MR. THRONSON:  Right.  But that -- I mean, to the

11  extent that any negligence arises from that.

12        THE COURT:  So it might go to the breach question.

13        MR. THRONSON:  Right.

14        THE COURT:  Right.  But -- okay.

15        It seems to strange to me that I would sort of certify

16  something specific to the issue of fraud in a case where

17  there's no fraud.  Right?  I mean, unless you're telling me

18  that's the only theory you have that constitutes a breach.  And

19  I don't think it is.

20        MR. THRONSON:  Right.

21        THE COURT:  So I don't think -- okay.

22        All right.  So -- all right.  That gives me some

23  clarity then, I think, on what's in the case and sort of

24  what's -- how that -- some of that does bear certainly on the

25  motion that's in front of me.

1          So let me talk about class definition stuff, and then

2   related to that, I mean, sort of flowing naturally from that

3   are the ascertainability questions, I think.

4          Again, I'm going to start with plaintiffs.  So who do

5   you want to include in the class?  Because there's -- and I ask

6   that because there's, you know, a bunch of stuff in the

7   defense's responses about, for instance, patients in Nigeria.

8   And my take on that in reading it was your class definition is

9   inartfully drafted, because on its face the way it's drafted

10  potentially includes -- I don't know what kind of training

11  Akoda had in Nigeria, I don't know whether he was exposed to

12  patients, but it potentially includes that.  I don't think

13  that's what you meant to include.  I think that predates his

14  submissions to ECFMG and to his coming here.  Right?

15          MR. THRONSON:  You're right.  Yeah.

16          THE COURT:  So it struck me as a little bit of a

17  sideshow in the briefing.  It doesn't -- it's not a reason for

18  me not to certify a class.  It's certainly a reason for me to

19  red pencil your class definition.

20          So tell me who you want to include in the class, you

21  know, with bearing some of those issues in mind.

22          MR. THRONSON:  Sure.  Your Honor, you're completely

23  correct as to the Nigeria issue.  It had not even occurred to

24  us that there would be patients in Nigeria because we had no

25  evidence there were.  And we don't believe that, again, he was

1  properly trained or he saw patients in Nigeria.

2        In terms of the class definition, it is, you know,

3  everyone who was treated by Akoda.  And what we take that to

4  mean is everyone who had a physician-patient relationship with

5  Akoda.  You know, if we -- and our method for ascertaining that

6  is, as was proposed and approved in the In Re:  Suboxone case,

7  is to send subpoenas to every known institution or entity at

8  which Akoda purported to practice medicine, everywhere where he

9  worked, and to say, identify all the individuals at your

10 institution who were treated by Akoda.

11       And we did this with Prince George's Hospital Center

12 in Maryland.  They said, here's a list of 712 individuals who

13 were treated by Akoda.

14       So this is something that is objective -- it's an

15 objective criteria in both a theoretical and a practical sense,

16 because healthcare institutions understand that phrase.

17       Now, it may be, just like with any class, that there

18 are individuals who were treated by Akoda who suffered no --

19 suffered no harm as a result of it, the involvement in the care

20 was minimal.  The individuals upon finding out of Akoda's fraud

21 didn't suffer any provable emotional distress.  But it really

22 is all individuals who had a physician-patient relationship

23 with Akoda.  And the way we would determine that is, again, the

24 subpoenas to healthcare institutions that the record shows he

25 worked at.

1          THE COURT:  So geographically, are we including Jersey

2    Shore Medical Center?

3          MR. THRONSON:  We would.

4          THE COURT:  Okay.  And then Howard University.  Right?

5          MR. THRONSON:  Right.

6          THE COURT:  And then you mentioned Prince George's

7    Medical Center.  And his private practice with Dr. Chaudry?

8          MR. THRONSON:  That's right.

9          THE COURT:  Anywhere else that I missed?

10          MR. THRONSON:  No.

11          THE COURT:  Okay.  And so when you talk about -- I

12    mean, I assume you probably know better than I do based on your

13    discussions with them that if you go somewhere like Prince

14    George and say, give us everyone who he treated, they basically

15    go find everyone for whom they obtained any professional

16    revenue from him.  Right?  And -- or sent out a bill, even if

17    they didn't actually get the revenue, and look to that.

18          Is that basically correct, or is there some other way?

19          You know, I assume billing codes is the only way

20    you're going to find that, but you tell me.

21          MR. THRONSON:  You would -- this is based on just our

22    best understanding.

23          THE COURT:  Yeah.

24          MR. THRONSON:  We didn't do the search ourselves,

25    obviously, but there was a chart search.  Individuals who -- or

1  hospitals keep track of what procedures individuals are

2  involved with.

3          The physician billing itself, I'm not sure that the

4  hospital would have taken care of that.  That may have been

5  submitted through his practice.

6          THE COURT:  Okay.

7          MR. THRONSON:  But it would correspond to the patient,

8  and it would reflect the services that were rendered.

9          So in terms of reflecting -- in requesting billing

10 records and also in asking the facilities to do a chart review

11 and identify the individuals who Akoda treated and to supply

12 their -- you know, their medical records under proper HIPAA

13 procedures, that's how we would identify the class members.

14         THE COURT:  Was he an employee at Prince George's or

15 did he just have privileges there?

16         MR. THRONSON:  He had privileges there.

17         THE COURT:  So he was coming in through the private

18 practice and just treating patients there?

19         MR. THRONSON:  That's right.

20         THE COURT:  So all the professional revenue would have

21 been deprived by the practice, and it was just technical

22 revenue to the hospital for stuff he did there.  Right?

23         MR. THRONSON:  That's right.

24         THE COURT:  And so I'm going to -- Mr. Shaffer, I'm

25 going to give you a chance in a second.  I do have a couple

1    more questions.

2         So one of the issues that does come up in the defense

3    briefing is this question of, you know, patients -- so I don't

4    know what kind of records are kept for -- let me start with

5    this -- records are kept for residents.

6         Is it only if he has -- because that's essentially the

7    Howard example.  Right?  Was it just a residency at Howard?

8    Was there a fellowship also, or was it just a residency?

9         MR. THRONSON:  Just a residency.

10        THE COURT:  So do they chart every time he has, what,

11   a physical encounter with a patient?  I presume they don't

12   chart every time he's, for example, in the room observing, but

13   how do you deal with some of those issues as to people for whom

14   he may have had contact but may not show up on a chart?

15        MR. THRONSON:  To the extent that he had any

16   meaningful involvement in a procedure and treatment of a

17   patient, we think that would have been charted, both for -- if

18   he is in the capacity of, you know, rendering some -- making

19   some clinical judgment, assisting in the care, providing care

20   to these patients, that should be reflected in the chart.

21        THE COURT:  So if he's just there on rounds, right,

22   some attending or some senior resident takes them around on

23   rounds in his first year and he stands there, that's not being

24   recorded anywhere.  Right?

25        MR. THRONSON:  I mean, to the extent -- I do medical

1  malpractice as another part of my practice.  And to the extent

2  that residents are -- residents are rounding with physicians,

3  you typically see that, in my experience, reflected in the

4  medical records.

5         THE COURT:  All right.  So Mr. Shaffer -- well, before

6  I get to Mr. Shaffer, because I think the one last issue that's

7  out there, you know, is this issue of document retention.

8         As you go back to, for example, Jersey Shore in

9  particular, but maybe Howard as well, you know, you may be

10  beyond the point where they've kept records for these patients.

11  Some of the patients may have come back, in which case their

12  charts may still exist.  But how do you deal with the issue of

13  records that are no longer in existence?

14         MR. THRONSON:  You would again look at -- essentially

15  through a -- let me back up.

16         First of all, there is a federal requirement as to

17  record retention.

18         THE COURT:  Right.

19         MR. THRONSON:  But institutions aren't bound by that.

20  So many institutions like Prince George's County Hospital

21  maintain records that went beyond that point.  So, you know,

22  places will still have -- based on our experience in this

23  litigation, will have documentation of a patient being seen

24  there.  So I mean, it's -- this is essentially an objective

25  means of identifying these individuals.  And it may not be 100

1  percent perfect.  It may not capture every single individual.

2  That's theoretically possible.  I have to acknowledge that.

3  But that's always the case.  I mean, you know, in an antitrust

4  case involving price fixing, you know, a pharmacy may not have

5  all of the records of an individual who purchased a certain

6  medication at that place or a group benefit administrator or a

7  hospital that purchased that medication.  But still, the

8  inquiry is whether it's feasible and it's capable of objective

9  ascertainment.  And we think this method is -- that's through

10  this method, yeah.

11       THE COURT:  So Mr. Shaffer, let's talk about that,

12  because what's -- I mean, I understand there is a possibility

13  of some false negatives.  Right?  Because I forgot to note Dr.

14  Akoda on a chart, particularly if he's rounding or documents

15  don't exist anymore, but -- so let's start with the sort of

16  objectivity piece of this.

17       Is there a problem in terms of those criteria from

18  your perspective in terms of identifying these people?

19       MR. SHAFFER:  Your Honor, I think there could be a

20  couple of different problems.  And part of it relates to some

21  of the ways in which even during this hearing they're modifying

22  the entities or the organizations which may or may not be part

23  of any class that they would seek to involve.

24       Certainly with respect to Nigeria, we believe there

25  would have been serious issues there.  They say fine, we didn't

1    mean that.

2          They have a reference to a Harlem Hospital in their

3    briefing where apparently they believe Dr. Akoda practiced at a

4    time.  They didn't mention that today as to whether that's an

5    organization that predated his involvement, his application to

6    ECFMG, but it's in their briefing.

7          The JSMC from 1998 to 2000, that predates the

8    information that they claim our client had that should have put

9    them on notice to do something with respect to Dr. Akoda's

10   certification, which was a report in 2000.  So they've got

11   folks who are in the 1998 to 2000 time period that they are

12   claiming are going to be part of the class that they're going

13   to purport to treat.

14         And then we've got folks from -- assuming 1998 to

15   2000, 2007 to 2011 where they have not gone and identified

16   whether there are records that exist as to folks who would have

17   been treated by Dr. Akoda.  It is more than ten years ago.  The

18   suggestion that billing records will reflect exactly who was

19   there, I think I heard that maybe it would, maybe it wouldn't.

20   You would have to then take billing records and go to medical

21   records.  We don't know what medical records would exist.  We

22   don't know that they would accurately reflect, certainly in a

23   residency program at Howard, whether or not he was there.  I

24   think that's a question.

25         And from our perspective, even the question of going

1  to a hospital and saying, who treated -- who did Dr. Akoda

2  treat, the description that I heard during Mr. Thronson's

3  recitation was sort of three or four different iterations of

4  what constitutes treatment.  And so there is an

5  ascertainability problem to decide whether someone would be

6  sufficiently identified as in the class or out, which is

7  important both for the class members as well as for ECFMG.

8         THE COURT:  Well, it is.  Some of those issues, it

9  seems to me, are issues that are not so much class

10  certification issues as they may be merits issues.

11        So for example, I hear you say, well, Jersey Shore,

12  there's an issue with, you know, this temporal issue, when was

13  your client on notice.  I can anticipate responses from the

14  other side as to what their liability theory is.  But even if I

15  certify the class and say the class is anyone who was treated

16  including at Jersey Shore and then I get to summary judgment

17  and say for whatever reason there's a temporal distinction and,

18  you know, maybe there's a duty that lies post this event and

19  not pre, I can deal with that.  Right?  I mean, it's not

20  really -- that's not really a class issue.  Right?

21        MR. SHAFFER:  I disagree, Your Honor, respectfully.

22  That is a class issue.

23        If you have to decide the question of duty and breach

24  in the context of different factual evidence with respect to

25  the class that they're offering -- and that's what we think

1   happens here with what they're proposing with their liability

2   and damages separation.  They're essentially going to be asking

3   the Court to make different decisions about whether a duty

4   existed, whether that duty was breached, involving individual

5   questions which will change depending on who the plaintiff or

6   the class member is.  And so it may also be a question that

7   summary judgment would decide for a particular plaintiff.  But

8   to decide that issue on a class basis is in our view

9   inconsistent with Rule 23.

10          THE COURT:  As far as the other issues go, you know, I

11  recognize there may be informational gaps.  But I view the

12  requirements on ascertainability as sort of twofold.  Right?

13  There's the question of is it objective or subjective.  I do

14  think it's objective.  Right?  Are they on -- you know, does

15  Akoda appear on the chart or doesn't he.  Right?  It's an

16  objective measure.  It's something that we can figure out.  We

17  can go to the hospitals and say this.

18          I will say, I mean, towards the end of my run in

19  private practice, this was an issue we confronted in a case

20  involving a physician group.  And we had to go to a hospital

21  and say, tell us everyone who these guys treated.  I mean, the

22  hospital griped, but they did it.  And so it strikes me that

23  that piece is okay.

24          Now, then there's the question of are there going to

25  be a whole bunch of false negatives.  Right?  That's

1  essentially what you're telling me is there will be a whole

2  bunch of false negatives because we don't identify them this

3  way because the records aren't there and that renders the class

4  sort of nonascertainable.  Is that's essentially right?

5       MR. SHAFFER:  I think that's one of piece of it, Your

6  Honor.  I guess you could even also have the person who comes

7  forward who says, I'm not in the records, but guess what, I was

8  treated by Dr. Akoda.  I remember the name.  I had a

9  conversation with someone.  I sat in a room, and I'm pretty

10 sure that was the guy who delivered my baby.

11       What do we do with someone like that, who -- again, is

12 that a subjective question and they are excluded?  Do we allow

13 all of those individuals without verification to become class

14 members?

15       THE COURT:  Isn't that true in every class?  I mean,

16 so, you know, hypothesize some antitrust class where it's

17 direct purchasers, so the records are there.  They're in the

18 possession of the defendant.  And then, you know, some third

19 party walks up and says, I bought from them too and they just

20 don't have the record of it.  They lost it.  Right?  I mean,

21 and yet everyone says, well, antitrust cases are particularly

22 well suited to class certification.  Right?

23       And so, you know, I mean, that issue exists and I

24 understand it exists, but it strikes me as sort of marginal.

25 Isn't it?

1          MR. SHAFFER:  I guess, Your Honor, we would view it as

2    not marginal, that it is a problem for the plaintiffs the way

3    they've defined the class.  I think there are much greater,

4    more fundamental problems with what they have proposed to you

5    with their issue class certification.  If you did find that the

6    class was sufficiently ascertainable with modifications from

7    what they drafted in their motion, there are still numerous

8    other problems that we can -- are happy to talk about.

9          THE COURT:  We're going to get to them.  Absolutely.

10         Okay.  All right.  So let's --

11         MR. THRONSON:  Your Honor, could I respond briefly

12   just on one point?

13         THE COURT:  Yeah, go ahead.

14         MR. THRONSON:  So we did include Harlem Hospital in

15   the briefing.  It appears that his involvement at Harlem

16   Hospital predated his application to ECFMG.  And that's, you

17   know, evidence that we've been processing, you know, over the

18   course of this briefing period.

19         So for the purpose of notice, if this were certified,

20   it could be appropriate to include that individual -- you know,

21   to include that institution, but that's probably an issue

22   that's best resolved on summary judgment.

23         And again, with respect to these false negatives, that

24   goes -- you know, in some ways that's more a merits issue and a

25   proof problem rather than a certification issue.

 1          THE COURT:  I'm not sure it's easy enough to sort of

 2   sweep it aside and say, well, it can be dealt with at summary

 3   judgment.  You know, Mr. Shaffer's point is not an unfair one

 4   when he says, well, if there are issues that mean that I have

 5   to look at who the plaintiff is and where they were treated --

 6   I guess where she was treated in almost every case here --

 7   individually, then it's not so easy to -- you know, and that

 8   may define liability, then doesn't that seem to undermine some

 9   of the commonality issues that we would have for certification

10   even with an issue class?

11          And so I do think one of the things we need to do now,

12   not even at notice but now, is define whether it's temporally

13   or whether it's by institution.  And those two things may

14   effectively be the same thing here.  I think I need to define

15   who you think is in the class.  And I mean, we can do it by

16   year if you want to talk about it by year.  And I can hear from

17   Mr. Shaffer what problems he sees that posing.  Or we can do it

18   by institution.  But one way or another, I do think I need some

19   objective measure of who's in the class.  And I don't think I

20   can punt that issue to later to decide it if I'm going to

21   certify it.

22          I think -- and I'm jumping ahead on my outline, but

23   that's okay -- if I were to certify a class here -- and don't

24   read this as tea leaves saying that I'm going to.  But one of

25   the issues that I spotted is if I certify a class here, it is

1  ultimately a (b)(3) class.  Right?  Does everybody agree with

2  that?

3          MR. THRONSON:  In -- I think in part, Your Honor,

4  because --

5          THE COURT:  I mean, I understand there may be sort

6  of -- I understand I can tackle (c)(4) and define the issues

7  that I'm certifying, but in the end -- the reason I'm saying

8  that, isn't there going to be a notice of an opt-out period if

9  I certify some sort of class?

10          MR. THRONSON:  I think if the class is -- the case law

11  is a little unclear on (c)(4) notice.  But I would agree, we

12  would agree that in essence, it's a (b)(3) class.

13          I mean, in the sense that (b)(3) classes in most

14  instances are in some respects (c)(4) classes, because it's --

15  they're certifying on the issue of liability and they're not

16  determining damages on a classwide basis.

17          THE COURT:  That's not always true.

18          MR. THRONSON:  What's that?

19          THE COURT:  That's not always true.

20          MR. THRONSON:  Not always true.  Not always true.  But

21  in this context, it's essentially a (b)(3) class in terms of if

22  we're certifying on the issue of liability.

23          Now, if we're certifying on a threshold issue like did

24  ECFMG owe a duty to the class members, did it owe a duty to

25  hospitals and healthcare institutions or medical boards that --

1    to which it gave rise to obligations to the class members,

2    those threshold issues that we proposed a number of them in the

3    brief, then that -- that's more of a true (c)(4) class.  But I

4    think Your Honor is correct.

5              THE COURT:  But even if it's a true (c)(4) class, I

6    mean, don't I still -- so --

7              MR. THRONSON:  Yeah.  We still do notice and an

8    opt-out period.

9              THE COURT:  We still do notice and an opt-out period.

10   Right?

11             MR. THRONSON:  Yep.

12             THE COURT:  So given that and given the need to

13   identify the universe of people who are going to get notice, I

14   think we need to identify the institutions who are going to be

15   subject to presumably some sort of subpoena and, you know,

16   information retrieval process even to tackle the question of

17   defining a class.

18             MR. THRONSON:  I agree, Your Honor.  And I think that

19   the class definition, you know, to be crystal clear, could

20   clarify that we're only talking about patients within the

21   United States and we're only talking about patients who were --

22   you know, who encountered Akoda after ECFMG certified him, you

23   know, so from that point forward.  And that involves the

24   various institutions that we've talked about.

25             THE COURT:  Okay.  So it does not include Harlem?

1          MR. THRONSON:  No, it would not include Harlem.

2          THE COURT:  So we started to touch on this a little

3     bit.  And I guess one of my questions for you all is sort of

4     the interplay between Rule 23(a) and (b) on the one hand and

5     23(c)(4) on the other hand and in particular how you sort of

6     conceive of -- when do I tackle the 23(a) and -- really the

7     23(a) factors in the first instance?  I mean, and maybe the

8     (b)(3) factors and sort of do I have to decide the case as a

9     whole can be certified as a class and then define the issues,

10    or do I define the issues that I want to certify if I'm going

11    to do that and then apply the 23(a) factors to that sort of

12    universe as defined by those issues?

13         And so let me hear -- I'll start with the plaintiffs

14    and then I'll hear from the defense as to -- because I think

15    you have different views on how that works.

16         MR. THRONSON:  Your Honor, it's the latter in our

17    view, meaning defining the issues and then determining whether,

18    you know, predominance and superiority are satisfied with

19    respect to those issues.  23(a), that applies regardless.

20         THE COURT:  But 23(a) might be -- can 23(a) be

21    different?  Can the analysis be different if I'm defining the

22    issue first?  I mean, I know I'm going to find, you know,

23    that -- the 23(a) factors somewhere along the way if I do the

24    analysis.  I'm going to analyze them.

25         But so, for example, the defense has a bunch of

1  arguments about typicality and says, well, you know, the type

2  of encounter he had is significant here.  And so if I'm doing

3  the 23(a) analysis first, then that may be different and have a

4  different outcome, right, than if I'm doing it after defining

5  an issue now.  I mean, if I just say liability, it may not.

6  But if I do something narrower, then it may.  Right?

7           MR. THRONSON:  The -- I think in this case, in this

8  case not, because the issue here is -- you know, typicality

9  analysis is do the claims of the plaintiffs conflict with that

10 of the -- you know, the class members.  And, you know, can this

11 action be efficiently maintained as a class action given these

12 representative plaintiffs.  And do these plaintiffs have -- you

13 know, are they asserting claims that are typical of those of

14 the class.  Do they arise from, you know, common course of

15 conduct.

16         So I think in either event, whether you -- I guess you

17 would first look at the class definition that we're proposing

18 and the -- or that we develop and the issues that we are

19 proposing for certification, and then, you know, would go

20 through those (a)(3) factors.  But I think in either event with

21 respect to (a), the analysis is the same.

22         With respect to the interplay between (b)(3) and

23 (c)(4), I think the advisory committee on civil rules and the

24 most recent decisions -- circuit decision to analyze this

25 issue, which was Martin v. Behr.  In the Sixth Circuit, they've

1    essentially concluded that this circuit split is illusory.  And

2    the advisory committee at one point was considering, well, do

3    we need to clarify (c)(4) to address this issue, you know,

4    whether -- whether predominance and superiority have to apply

5    to the case as a whole or just to the issues within -- that are

6    defined for classwide treatment.

7         And their conclusion was that it didn't need any

8    modification, because the circuits had come into alignment with

9    respect to the predominance and superiority applying only to

10   those issues that are certified for classwide treatment as

11   opposed to needing to apply to the case as a whole.

12        In other words, Castano has been -- Castano is in the

13   past.

14        THE COURT:  Really, for me, it seems like on that last

15   point, the thing that -- I mean, I don't know that I know the

16   temporal answer, but, I mean, the Third Circuit identified that

17   split and then said we're not going either way.  Right?  That's

18   Gates.  Gates is still binding on me.  Regardless of what the

19   Sixth Circuit thinks or the advisory committee thinks, I live

20   under Gates and have to do that.  Right?  So that's sort of the

21   structure of the analysis here.

22        MR. THRONSON:  That's correct, Your Honor.

23        So if -- in terms of a (b)(3) type certification on

24   liability, you know, you would -- you know, either with that --

25   with that kind of certification or with issue certification,

1   you're looking at those factors, the Gates factors, with

2   respect to the issues in question.

3          And it doesn't really -- you know, I guess in Gates,

4   this issue doesn't really arise, because the Third Circuit has

5   taken the position of we're going to apply what's been termed a

6   functional superiority like analysis to this question rather

7   than getting way into the weeds of the interplay of how these

8   two provisions apply.

9          THE COURT:  I mean, I view Gates as essentially

10  imposing a bunch of factors that kind of capture the 23(b)(3)

11  analysis.  Right?  There's a lot of 23(b)(3) in there and then

12  maybe some more issues as well.  Right?

13         So I'm kind of doing a predominance, superiority,

14  almost like a superiority plus analysis is kind of how I

15  conceive of it.  Right?  I have to make sure it's a superior

16  way to go, but I also have to make sure that there aren't

17  issues floating around like constitutional problems and, you

18  know, choice of law problems and things like that that may

19  also -- and I understand choice of law can also come in in a,

20  you know, predominance choice -- or analysis.

21         But that's how I conceive of Gates.  So it's something

22  different.  I don't want to say it's more rigorous than (b)(3).

23  It may or may not be, but it's a little different is how I see

24  it.

25         So okay.  Let me --

1          MR. SHAFFER:  May I address --

2          THE COURT:  That's what I was going to ask, Mr.

3   Shaffer.  I want to give you a chance to talk about this before

4   I move to the sort of next thing on my list.

5          MR. SHAFFER:  Thank you, Your Honor.

6          Our view, and I think it is guided by the Third

7   Circuit's analysis in Gates and by the cases from this circuit,

8   Arch and Suboxone that are cited in our briefing, as well as a

9   decision from Judge Jordan back in December of this year,

10   Ferreras v. American Airlines, which came out after our

11   briefing.  That is 946 F.3d 178.  And the Third Circuit in that

12   case in reversing a district court's certification noted that

13   prior to certifying a class, a court must resolve every dispute

14   that is relevant to class certification before doing so.  And

15   I'm sure Your Honor is aware of that standard.  And Gates

16   similarly notes that you can't certify an issue class without

17   clearly enumerating the issues to be tried on the class basis

18   and explaining how remaining issues will be resolved.

19          And so it's not only that you can leave for another

20   day things that might not be tried in the issue class, but that

21   as part of any certification decision, the Court needs to

22   analyze whether, for example, problems of 23(a) or the

23   subsections of 23(b), including (b)(3), is analyzed through the

24   Gates factors whether or not they present a problem.  And in

25   our view, the way it's articulated here, there are problems

1   presented under 23(a), under the two alternatives, which in our

2   view are really just the same liability division that the

3   plaintiffs are arguing for.

4          23(c)(4) is a cleanup authority for the Court.  It

5   allows the Court to deal with permutations.  But as I think

6   Your Honor correctly noted, the way Gates analyzed the issue,

7   it certainly rejected Gunnells and the Fourth Circuit case

8   cited by the plaintiffs that there is not a superiority and a

9   predominance analysis as part of a (c)(4) class.  And we think

10  those are requirements that the Court needs to address.

11         THE COURT:  So do I look at the 23(a) factors sort of

12  colored by what I might do with the issues class?  Or do I have

13  to look at them for a case as a whole?  I mean, to the extent

14  there are distinctions, and there may be, what's your view on

15  that?

16         Because I don't -- well, let me say this:  I don't

17  think that Gates tackles that.  I do think that -- my

18  recollection is -- and maybe I'm going to get this name a

19  little off.  Hohider, was that the one that predated Gates in

20  the Third Circuit?

21         MR. SHAFFER:  Hohider.

22         THE COURT:  Yeah.  I think Hohider does seem to say

23  (a) and (b) kind of factor into this analysis.  And you would

24  look at both the (a) factors and the (b) factors with regard to

25  what you're considering, sort of what the issue you're

1  considering certifying.

2      MR. SHAFFER:  We think that's generally correct.  And

3  it probably can be done through several different lenses.  And

4  maybe even the Gates factors themselves allow you to think

5  about questions of commonality or typicality as you're

6  analyzing the questions that are presented.  They're

7  non-exhaustive factors.  And they specifically offer guidance

8  in an issues class like we have proposed here.

9      And I think the reason sort of logically why that

10  makes sense is otherwise plaintiffs could simply offer the

11  narrowest question for class treatment and say, well,

12  they're -- you know, typicality, commonality, numerosity are

13  satisfied as to this very, very narrow question, and Judge, you

14  don't -- you shouldn't look at anything else.  You shouldn't

15  look at the rest of the case and whether there are 23(a)

16  problems associated with that.  The Third Circuit I think would

17  reject that type of approach.

18      THE COURT:  I think as a practical matter -- and I

19  understand.  I think as a practical matter the Gates factors

20  kind of negate that possibility, personally.  I think that -- I

21  understand why it's a concern as I came into this and sort of

22  focus on the interplay of these sections.  And I understood the

23  argument about, well, you don't want to just sort of use the

24  issue class to define away the potential predominance problems

25  that are out there.  And I see that, and I think the Gates

1  factors kind of guide me in a way to say, no, look, I have to

2  look at the rest of this.  I have to look at the overlap

3  between what I'm putting in and out.  And, you know, is it kind

4  of proof, kind of witnesses, things like that, because that all

5  goes to manageability and efficiency as well.  I mean,

6  ultimately, if I'm doing this, it's because it's efficient.  I

7  mean, at some level that's -- I mean, I don't know if that word

8  is specifically in Gates, but it's sort of the guide star here

9  for why we would even consider doing this in the first place.

10        MR. SHAFFER:  And just to conclude on that, Your

11  Honor, I guess to the extent that Your Honor views the Gates

12  factors as providing a framework to look at the 23(a) factors

13  or the other 23(b) factors and is addressing those, as you say,

14  I don't think the Third Circuit has been crystal clear as to,

15  you know, you can only do it through marching through 23(a)

16  numerosity, typicality, commonality, adequacy of

17  representation, but certainly the substance of the analysis

18  must occur.

19        THE COURT:  Right.  I agree with that.

20        Okay.  I actually don't think -- listening to the two

21  of you, I understand you're different in where you want me to

22  go, but your sort of conceptual approach to how this gets

23  applied is actually not that far apart, so I'll chalk that up

24  as a win for me.

25        Okay.  So let me talk about the sort of two different

1    alternatives that you proposed here.  And let me start with

2    the -- sort of the broader version, which is option A I guess

3    you describe it as, this sort of full-fledged liability class.

4         And so cards on the table, I see problems with that.

5    Okay.  And let me tell you what they are and let you address

6    them.

7         You know, both of your claims include elements of

8    causation and harm.  And I see a problem potentially with the

9    overlap between that and the damages issue.  Right?  Isn't the

10   evidence of harm, which is an element of liability, basically

11   the same evidence of damages?

12        MR. THRONSON:  What we're proposing, Your Honor, is

13   that -- that obviously the questions of duty and breach be

14   addressed in a classwide basis.

15        And then with respect to harm, I think that there

16   is -- the relevant inquiry is whether there's an injury.  And

17   an injury is an invasion of a legally protected interest.  And

18   so here what we're proposing to determine on a classwide basis

19   is did ECFMG have a duty, you know, on all theories of

20   liability, did breach that duty on all theories of liability,

21   and was its conduct a cause of Akoda coming into contact with

22   patients, did it put him in the room with a patient, because

23   the injury here is unconsented to touching and medical

24   treatment.  That's the injury.  It's a battery.  It's, you

25   know, unconsented to treatment by a physician.

1          Now, the harm from that, the harm and the damages,

2   that's going to be determined in individualized proceedings.

3   So did that actually, you know, harm an individual class

4   member, meaning did the individual class member suffer damages

5   in some respect, and are those compensable.

6          So essentially that -- the causation inquiry doesn't

7   overlap in that sense, because the evidence that will be

8   presented in the individualized proceedings is what happened

9   with Akoda in that room.  It's already been concluded by the

10  first jury, assuming that we would succeed at the classwide

11  basis on the first class trial, that ECFMG was negligent and

12  that that caused Akoda to be in a position to cause harm to

13  these patients.  And it caused Akoda to cause an injury in

14  terms of an invasion of this legally protected interest that

15  we're talking about.

16         Now, this individualized proceeding, it's -- that's

17  the opportunity for the plaintiffs to come forward and say,

18  well, you know, did you actually see Akoda?  What happened?

19  Did you suffer emotional distress?  Is that emotional distress

20  traceable to this?  So in that sense the proof doesn't overlap.

21         THE COURT:  So I'm sorry, you said something now

22  that's going to make me go back.  But you talked about, you

23  know, the need to have come in contact with Akoda, right, that

24  it's essentially some sort of unauthorized touching.

25         And I guess that gives me some pause, because I see at

1  least two patterns where there's no touching within the

2  universe of people who you're defining as being within the

3  class.

4          So the first are, you know, you go back to the

5  rounding.  Right?  And there's, you know, some number of people

6  for whom he's just standing there.  Right?  He doesn't come in

7  contact with any of them.  So there's no battery, I don't

8  think.

9          MR. THRONSON:  That could be true in some instances,

10  that there's no battery.  But there are other -- there are

11  other interests at stake.  So, you know, was this patient --

12  was this patient naked?  Did ECFMG's negligence put Akoda in a

13  position where there's an invasion of privacy?

14          THE COURT:  But now you have a different harm.

15          MR. THRONSON:  Well, you've got -- you still have

16  injury.  So the question in the class proceeding is, is there

17  injury to patients in the form of invasion -- you know, this

18  battery that we're talking about, or, you know, an invasion of

19  privacy in terms of --

20          THE COURT:  But if those are different -- so if the

21  outcome is, you know, duty, breach, causes a battery, duty,

22  breach, causes an invasion of privacy, if those are different,

23  then doesn't that mean that potentially that last element is

24  not -- or maybe the last two elements are not susceptible to

25  classwide treatment, that we have to decide how they were

1  harmed, and isn't that an individual question?

2        MR. THRONSON:  I think, Your Honor, that it's -- the

3  classwide question is, was Akoda put in the room with patients,

4  was he put in the position to examine patients, to treat

5  patients, to touch them.

6        If -- to the extent that there are differing injuries

7  in this respect, you know, in terms of observation, then that

8  can be an issue that's addressed by subclasses.

9        THE COURT:  So let me ask a question.  If he's put in

10  the room, so he's just standing there before anything happens,

11  is the tort complete?

12        MR. THRONSON:  I think in some cases it would be.

13        THE COURT:  But not all cases?

14        MR. THRONSON:  Right.  Because just like with any --

15  with any class action, you know, you've got people who aren't

16  injured, who don't suffer any kind of injury as a result -- who

17  don't suffer any kind of harm as a result of it.

18        THE COURT:  But if they don't suffer a harm, I mean,

19  then how can I determine liability on a classwide basis for a

20  claim where one of the elements is harm?

21        MR. THRONSON:  So our allegation is that the tort --

22  the tort is complete when he's in the room, because there is

23  some invasion of a legally protected interest there.  There's a

24  touching, there's an observation of the person.  The person

25  didn't consent to an individual who is not a physician, who is

1   not a resident, who's obtained those qualifications through

2   fraud, the individual didn't consent to that person being

3   there.

4           THE COURT:  So let me just go back because I'm a

5   little concerned now on one of the other aspects of class

6   definition, which is the scenario where, you know, in the

7   private practice he meets with a patient but does not touch,

8   observe, et cetera.

9           So, you know, I'm hypothesizing, for example, you

10  know, someone who is pregnant and has a concern, comes in and

11  just sits in the room with him, maybe he's the guy there that

12  day.  Right?  And she comes in and they squeeze her in in an

13  emergency appointment.  And he sits in the room, in the office

14  with her across a desk and says, everything is normal, someone

15  did a sonogram, whatever it is, everything is normal, you're

16  fine, I understand it's nerve wracking, go home.

17          Is there a tort there in your world?

18          MR. THRONSON:  Yes.

19          THE COURT:  What's the harm then?

20          MR. THRONSON:  It's an invasion of privacy.  This

21  person disclosed confidential protected health information on

22  the basis of a fraud committed by this other person.  And Akoda

23  shouldn't have been there.  That's the whole crux of our case.

24  If ECFMG had done its job, Akoda shouldn't be there.

25          So the nature of the harm and damages is going to

1  differ, but there is a common injury in the sense that

2  regardless of the purpose of whether he's, you know --

3  regardless of the nature of his examination and treatment,

4  being in the room gives him access to confidential health

5  information of the patients.

6          THE COURT:  Okay.  I'm going to give you a chance to

7  respond, Mr. Shaffer, and then I have a different sort of

8  liability class issue for you -- question for you as well.

9          MR. SHAFFER:  Thank you, Your Honor.

10          I think your questions illustrate that what they are

11  trying to do, even with their issue class, presents the very

12  unworkable problem that the questions that they are trying to

13  carve out and say, well, these are common and can be addressed

14  without getting into individualized questions, we'll save those

15  for a later day, are involving the exact same evidence that are

16  going to go into whether there was an issue for an individual

17  person.

18          I mean, we didn't even talk about the fact that the

19  emotional distress that I understood that the plaintiffs were

20  trying to recover wasn't suffered the day they went in and met

21  with Dr. Akoda in this hypothetical meeting.  It was sometime

22  after 2016 when he pled guilty to Social Security fraud and

23  that was an event later on that may or may not have triggered

24  damage or a reaction, if they even heard about it, that is

25  necessary for their claim to begin with.

1          And so I think there are problems from a liability

2    perspective whether they want to try to identify it as a

3    liability-only question or whether they want to try to carve it

4    up into duty and breach.  And I'm happy to talk about that as

5    well.

6          THE COURT:  We're going to talk about that in a

7    second.

8          So let me ask, I think this is a sort of a logical

9    place to touch on some of the choice of law issues that you

10   raised as well.

11          Do I have to resolve the choice of law issues before I

12   certify the class, or can I sort of do it later?

13          And let me rephrase that.  Do I have to resolve them?

14   I mean, given sort of what you read to me and I think I saw in

15   the case that Judge Jordan handed down, where he says I've got

16   to resolve threshold issues if I'm going to certify a class, do

17   I just resolve it at this stage of the proceedings, or do I

18   have to say, well, because it's out there, it's a problem?

19          And just -- I know you want to answer.  I'm just going

20   to put one more little piece on this, which is, is the choice

21   really that significant from a class standpoint, because isn't

22   it really either Pennsylvania or Maryland law applies?  Or I

23   mean, I guess maybe there's a New Jersey possibility with

24   Jersey Shore, but otherwise, isn't it those two states?

25          MR. SHAFFER:  Let me take a couple of the questions

1    that you asked in order.

2         THE COURT:  Yeah.

3         MR. SHAFFER:  First of all, what is crystal clear is

4    that you cannot punt the choice of law issues and say, I don't

5    need to confront differences in choice of law; I don't need to

6    decide whether there are conflicts in choices of law and

7    certify a class at this stage.  That's not --

8         THE COURT:  Can't I say, look, I don't know which law

9    applies but it's going to be a state's law, and so therefore,

10   the claims will be common, without actually saying for certain

11   which state's law it is because maybe I want more factual

12   development on that?

13        MR. SHAFFER:  I don't think so in a class context,

14   Your Honor.  If you're going to certify a class -- I know Your

15   Honor had the Sheridan case recently where you were able to

16   defer the choice of law analysis for a more complete record.

17            I don't believe Rule 23, especially in the context of

18   looking at manageability, conflicts, triability of the case,

19   that you can -- that you have the luxury of that type of

20   approach in this case.  And I don't think it is clear that

21   there could only be two or three choices of law.

22            Pennsylvania's choice of law analysis is flexible.  We

23   have plaintiffs who are residents of Virginia, the District,

24   Maryland.  We have New Jersey.  We have Pennsylvania.

25            THE COURT:  So the way you characterize it in the

 1  brief, and I think correctly, is to say, look, Pennsylvania

 2  says you look at the state that has the most significant

 3  interest in regulating this.  And the argument you make is,

 4  well, Maryland has an interest in regulating the contact that

 5  people who are seeing a doctor in Maryland have, you know, with

 6  that doctor.

 7          So even if -- I mean, let's assume I accept that

 8  analysis.  It brings me, I guess, to the people in New Jersey

 9  at Jersey Shore are subject to New Jersey law.  The people at

10  Prince George's and the private practice who are all seen in

11  Maryland are subject to Maryland law.  The people who are seen

12  at Howard are all subject to DC law.  Right?  But that should

13  be it, if that's the most significant interest test.  Right?

14  The fact that someone lives in Virginia doesn't bring Virginia

15  law into play.  Right?  Otherwise, I don't know how the most

16  significant interest test that you articulated works.

17          MR. SHAFFER:  I think that's probably right, Your

18  Honor.  You could, I suppose, have an individual plaintiff who

19  would argue that their choice of law analysis is different than

20  that.  But at a minimum, I agree with you that you're looking

21  at at least four subclasses for different choices of law if

22  you're going to adopt the proposition that there are -- that

23  the choice of law analysis is not a problem, because you're

24  going to have to analyze the question of whether, for example,

25  a negligent infliction of emotional distress claim even exists

1    under Maryland law.

2          THE COURT:  Or I could just look at those four states

3    and conclude their laws aren't meaningfully different and then

4    certify the class.  Right?  I'm not saying I've done that, but

5    if that's where that comes out, then I could do that.  Right?

6    Or potentially two subclasses if two states go one way and two

7    states go a different way or something like that.

8          MR. SHAFFER:  Obviously the choice of law analysis

9    will drive how many different laws are applied.  We certainly

10   think that there are conflicts here.  The false conflict

11   suggestion that the plaintiffs made certainly isn't true with

12   respect to Pennsylvania and Maryland.  And so I guess from our

13   perspective, we don't think the outcome of that choice of law

14   analysis would remove the problems that are presented by it,

15   but it would certainly have to be done.

16         THE COURT:  So, I mean, that answers one of my

17   questions, because I was concerned about, you know, the

18   hypothetical where, for example, someone has moved to Colorado

19   and would say Colorado law applies even though they were

20   treated in Maryland, but I don't think that's where we are.

21         So I think what I have to do to figure out -- I mean,

22   the words of the test sort of speak to it.  Right?  Which state

23   has the most significant interest.  And you say to me, well,

24   Maryland has got an interest, and maybe that's right, but you

25   haven't really weighed it against Pennsylvania's interest.

1  Right?  So Pennsylvania's interest is an entity.  It's

2  Pennsylvania.  It's Pennsylvania law.  Its actions occur in

3  Pennsylvania.  That's all of the actions that the plaintiffs

4  posit that give rise to the claim that are performed by that

5  entity take place in Pennsylvania.  Why doesn't Pennsylvania

6  have an interest that's at least as great as Maryland?  And if

7  Pennsylvania's interest is, you know, sort of the proverbial

8  balancing scales, that they're equal, why don't I apply

9  Pennsylvania?

10         MR. SHAFFER:  I guess, Your Honor, which plaintiff?

11  Right?  If we're talking about a named plaintiff who lives in

12  the District of Columbia who was seen at Howard County in

13  Maryland by -- with respect to a birth given in Maryland who

14  filed suit in Pennsylvania against a Pennsylvania company,

15  that's one choice of law analysis.  If you have a Maryland

16  resident with a Maryland injury, a Maryland birth at Howard

17  County and the only connection to Pennsylvania is that in this

18  case they've sued a Pennsylvania defendant, I think the choice

19  of law analysis that we cited would say Maryland has a greater

20  interest in regulating whether physicians, including those like

21  Dr. Akoda, can practice medicine in Maryland, what the standard

22  is going to be for a negligent infliction of emotional distress

23  claim in the context of the scenarios that the plaintiffs are

24  positing, there absolutely could be a greater interest on the

25  part of Maryland in defining the contours of what claim exists.

1          THE COURT:  So one of the things I find a little

2    strange about this is if there's a woman who was seen either in

3    the District of Columbia at Howard or in Maryland at Prince

4    George's County, I mean, that's a small area with a lot of

5    state boundaries nearby.  And so, you know, if you have, for

6    example, a woman who -- I'm going to sort of lay out one

7    variation of the hypothetical.  But who lives in Virginia and

8    gave birth at Howard and was treated by -- you know, seen Dr.

9    Akoda potentially as a resident or whatever, under the -- and

10   then she doesn't know anything about it until 2016 when she

11   was sort of -- until which she was sort of blissfully ignorant

12   and was living in Virginia with her kids and now she finds out

13   about it, says, this is horrible, right, I'm distressed.

14          So in that world, the ECFMG conduct takes place in

15   Pennsylvania.  Right?  And the -- I guess the plaintiff's

16   theory is that the harm arises in DC but the damages arise in

17   Virginia.  And it seems strange to me that for the most part,

18   none of the -- I mean, I don't know if I agree with your

19   conception.  And if I don't, then none of the elements of the

20   tort took place in DC, but you're still saying DC law would

21   apply.  And in their conception I guess one of the elements of

22   the tort took place in DC.  But it seems an odd outcome in some

23   respects to me that you could have this possibility where none

24   of the elements take place in the jurisdiction whose law you

25   think should apply.

1          MR. SHAFFER:  I guess the problem is you have to

2     choose a choice of law.

3          THE COURT:  But I could choose Pennsylvania, and in

4     Pennsylvania there's no doubt that some of the actions took

5     place for everybody.  Right?  I mean some of what happened at

6     issue in the case is ECFMG's conduct.

7          MR. SHAFFER:  So if this were a single plaintiff case

8     and that -- we had the scenario you articulated, which creates

9     problems, DC, Virginia, Pennsylvania, maybe they now move to

10    Colorado --

11         THE COURT:  Right.

12         MR. SHAFFER:  -- you could make an individualized

13    choice of law determination for that plaintiff and their

14    situation and their harm, and you could decide, there's nothing

15    really good here.  Pennsylvania seems to me to be the best and

16    it has the most interest.

17         We have a punitive class with individuals who will

18    have varying different analyses that have to be applied.  And

19    so from our perspective on a class basis to simply say, well,

20    because some class members might have no really good connection

21    to Maryland, so I'll just pick Pennsylvania, we would think

22    that would not be consistent with your obligations.

23         MR. THRONSON:  Just a brief response, Your Honor.

24         Courts, as you know, certify nationwide classes.  And

25    they certify, for instance, in the Warfarin case, the Court

1    noted, the Third Circuit:  When a defendant's singular conduct

2    gives rise to one cause of action in one state while providing

3    for a different cause of action in another state, the courts

4    may group both claims in a single class action.

5         And what courts do is they group relevant laws, you

6    know, similar laws together and apply them to the claims at

7    issue.

8         So here, as we talked about in our brief, we think

9    it's pretty clear that Pennsylvania law applies.  Defendants

10   haven't identified any relevant distinction on the negligence

11   claim.  Right?  Their only distinctions that they're raising

12   are on the negligent infliction of emotional distress claim.

13   So there's been no conflict that's been identified as to

14   negligence itself.

15        Moreover, you know, under Maryland law, you can't have

16   negligence that gives rise to emotional distress, as I

17   mentioned, in the absence of physical injury.  So we don't

18   think this is an issue under the case law or the facts of this

19   case that precludes class certification.

20        THE COURT:  Let me shift gears and focus on sort of

21   the option B prospects here for some narrower issues.  And I

22   mean, I'm -- I remain sort of dubious on the notion of any kind

23   of causation or harm issues being certified.  But let me talk

24   about the sort of duty and breach issues.  And let me start

25   with this.

1           I didn't see a lot, I don't think, in the briefs about

2    this, but I have seen some -- in some of what I've read about

3    it.  And maybe this has been resolved and I just missed it,

4    it's been resolved already.

5           But is there a constitutional problem under the 7th

6    Amendment if I allow some elements of the negligence claim to

7    be tried on a classwide basis and then have other elements

8    tried individually?

9           MR. THRONSON:  No, Your Honor.

10          THE COURT:  No?

11          You think yes?

12          MR. SHAFFER:  Absolutely could be, Your Honor.

13          THE COURT:  If there's overlap in the proofs; is that

14   right?

15          MR. SHAFFER:  Correct.  And there most certainly will

16   be.

17          THE COURT:  Well, let's get to that.

18          So let me sort of focus on sort of the duty and breach

19   elements, okay, because that's where I see the stronger

20   arguments here for certification.

21          It seems like from my perspective -- and, you know,

22   so, Mr. Shaffer, you can tell me why you think I'm wrong.  It

23   seems like the duty and breach analyses are sort of based on

24   the law, whichever law I determine is applicable.  And then as

25   a matter of law I decide if there's a duty.  And there's a

1  question about breach, but the breach is really about what

2  ECFMG did.  It's not about what any plaintiff did.  So why

3  aren't those issues subject to common proof?

4       MR. SHAFFER:  I think the simplest answer is that in

5  order to determine duty, whether it's a question of law for the

6  Court or it's an application of factual information to the law

7  to determine the existence of the duty, it's not a simple, does

8  ECFMG owe a duty to members of the public.  Duty is a

9  multifactorial analysis that the Court applies.  And the number

10  one factor that is part of that duty question is

11  foreseeability, and it's foreseeability of harm to the

12  plaintiff in a particular situation.  And your questions

13  earlier about harm highlight the very different nature of the

14  analysis that could occur with this particular case.

15       The other factors that go into duty, the degree of

16  certainty the plaintiff suffered the injury.  So the fact of

17  injury is relevant not only to causation but also to duty.  And

18  then another is the closeness of the connection between the

19  defendant's conduct and the injury suffered.

20       You know, we think of this as a Palsgraf or a

21  causation and remoteness context, which I think Your Honor has

22  pointed out, but the connection and the analysis of whether a

23  duty exists is highly individualized to look at a particular

24  plaintiff.  And --

25       THE COURT:  Why?

1       MR. SHAFFER:  We could look at two particular examples

2   here to perhaps think of a scenario.

3       Under the timeline that we have here, we could have a

4   question of whether someone who was seen at JMSC (sic) in 1998,

5   so a year after ECFMG had let the person through, no one else

6   had done anything, there is a person who's treated there, did

7   they owe that person a duty on the first day at JMSC not to

8   have certified Dr. Akoda, a legal duty that could result in

9   harm.

10      Then let's take a plaintiff like one of the named

11  plaintiffs here who wasn't seen until 2016 or 2017, after Dr.

12  Akoda had been hired by six, seven different entities, had been

13  subjected to licensing, to board certification, had been

14  through multiple employers, had been hired, had been fired, had

15  been hired by new individuals, whether they might have looked

16  at him.

17      And the question of whether ECFMG owes a duty to that

18  person in 2016 may be a different question.  We think there's

19  no duty in either respect, but there could be and there is a

20  different factual analysis that Your Honor has to address to

21  decide whether the duty that exists on January 1, 1998 is the

22  same as the duty in 2016.

23      THE COURT:  Why isn't that a causation argument?

24      MR. SHAFFER:  It's both.

25      THE COURT:  But it feels like you're blurring the two

1  elements then of the claim.

2          MR. SHAFFER:  The reason it's distinct is that

3  foreseeability is a requirement of duty.  It's a crux of duty.

4          THE COURT:  So foreseeability, as I understand it, is

5  a requirement both of duty and of causation.  But I think they

6  are different -- although the word is the same, I think they

7  are different foreseeability analyses.

8          As I -- and again, I'm going to have to go back and

9  read more on this, but as I at least understand it as I come in

10  here today, the foreseeability for the duty is, you know, sort

11  of analyzing whether the risk is there, whether you have

12  created a risk, versus the foreseeability for causation, which

13  is more -- you know, was the harm something you expected to

14  have happen.  And I think there's a distinction there.  And

15  maybe it's subtle, but I think at least in this context it's

16  important.

17          MR. SHAFFER:  I'll agree with you that there is a

18  distinction.  And I guess the way we have thought about it

19  here, it is a different foreseeability question.

20          So the question on the causation side really is, like

21  a Palsgraf, is it foreseeable that someone would read a report

22  from a US attorney's guilty plea about a Social Security fraud

23  and suffer injury related to some alleged conduct in 1996.

24  That's a causation/remoteness problem.

25          Here, even on duty, I guess the foreseeability

 1   question is whether it was foreseeable that ECFMG's alleged

 2   actions in 1996 after -- would have nonetheless placed the

 3   plaintiff in 2016 after having been hired, fired, subject to

 4   what everyone would expect an employer would do, what everyone

 5   would expect a licensing board to do, what everyone would

 6   expect a state to do before allowing that person to practice

 7   medicine, whether those intervening steps, whether the

 8   foreseeability of the harm to the plaintiff in 2016 because of

 9   the degree of certainty, all of those separate acts, reviews,

10   obligations, many of which they have alleged in other cases,

11   are negligence on the part of those folks, whether those things

12   change the analysis on an individual basis for class members.

13   And if the answer is yes, then duty isn't a common question.

14   It still has individualized questions about who that plaintiff

15   is.

16            THE COURT:  Let me just break down two things.

17            I understand the argument about the individualized

18   issues.  I don't know whether I agree or disagree at this

19   point.  I'm still trying to figure it out.  But I understand

20   the argument.

21            I don't think from what you're telling me, and given

22   that the foreseeability analysis is different than it is for

23   the causation element, I don't think there's a common proof

24   problem as to that issue in terms of the sort of 7th Amendment

25   concern that I was articulating a couple minutes ago.  I think

1  the proofs are going to be different.  Right?  I'm going to ask

2  the jury at the duty and breach stage to evaluate one thing.

3  I'm going to ask the jury at the causation and damages phase to

4  answer something different.

5        MR. SHAFFER:  I guess I would -- A, we don't have a

6  trial plan to know whether or not what evidence would be

7  presented would be the same or different.  Given one of the

8  factors is the degree of certainty the plaintiff suffered the

9  injury, there absolutely would be a likelihood that the same

10  type of testimony that they're going to offer about a

11  particular plaintiff's interactions in the first phase is going

12  to be the exact same testimony they're going to offer in the

13  second phase.  And that's especially true I think in the

14  emotional distress context, where Spence kind of identified

15  this problem with, you know, an attempt to address certain

16  issues of duty and breach in the first phase and then damages

17  in the second phase and said they're interwoven.

18        And so we think given the nature of the claim here,

19  could I conceive of a case, for example, where it's, you know,

20  a mailing of some kind and there's no third parties and no

21  difference and everybody got it on the exact same day.  Maybe

22  Your Honor is correct in that scenario you don't have the

23  problem, but it is present here.

24        THE COURT:  So tell me what differences the plaintiff

25  sees in terms of sort of the foreseeability piece here.  I

1   mean, first off, tell me about it from -- the distinctions you

2   see in terms of the proof that would be presented as to duty

3   and breach versus harm and causation and then more generally

4   whether -- how you see the duty issues playing out classwide if

5   you think they can be done that way.

6          MR. THRONSON:  Your Honor, we see the evidence being

7   presented in the two stages as distinct.

8          The first stage would focus on ECFMG's conduct, what

9   ECFMG did or didn't do and whether that conduct was a cause of

10  Akoda coming into contact with patients.

11         Then the second phase, the evidence is what happened

12  in the interaction between Akoda and an individual patient.

13  Was it foreseeable that that interaction could give rise to

14  emotional distress on behalf of the plaintiffs, and learning of

15  his fraudulent certification years later, could that give rise

16  to emotional distress.

17         THE COURT:  So assume for a second that the causation

18  piece is something that I think needs to be done individually.

19  Okay?  So let's focus on sort of duty and breach.

20         You know, Mr. Shaffer identified a bunch of issues

21  that he thinks the -- sort of nature of the plaintiff, the

22  plaintiff's history, status, temporal -- you know, when they

23  encountered Mr. Akoda, all of that bears on the duty analysis.

24         You know, if that's right, then it does seem like

25  there's a bunch of individualized issues that preclude class

1  certification on -- even as to duty and breach.  Right?

2          MR. THRONSON:  I think that's an incorrect analysis of

3  duty.

4          THE COURT:  And why?

5          MR. THRONSON:  Because the issue of duty -- a duty is

6  determined primarily with reference to the defendant, you know.

7  They cite the Tulp case in which Judge Beetlestone identified a

8  common law duty on the part of ECFMG to give due process to

9  applicants.  And that was done without reference to this

10  individual's characteristics who was the plaintiff who was

11  aggrieved about a decision of ECFMG.  But the role of ECFMG

12  this is quasi public and private entity, its importance within

13  the healthcare system.

14          And you're right, there are those five factors.  One

15  of them is foreseeability of the injury, but it's not

16  foreseeability of the particular harm that's in question.  I

17  mean, when we -- in a medical malpractice case, you don't

18  reanalyze in every single case, well, does this doctor have a

19  duty to this patient who had a negligently performed C-section

20  and suffered these damages.  The duty analysis doesn't depend

21  on the individual characteristics of the plaintiff.  The duty

22  analysis depends, among other factors, on whether it's

23  foreseeable that a breach of this defendant's duty could cause

24  harm.  And it doesn't have to be the particular type of harm

25  that's suffered by the plaintiff.  It's just not how that

1  analysis occurs.

2      THE COURT:  Well, no, but it does -- I mean, doesn't

3  the nature of the plaintiff and her -- even in the medical

4  malpractice context, the nature of the plaintiff and, you know,

5  her injuries and the context in which she comes in contact with

6  the doctor, doesn't that impact what the scope of the doctor's

7  duty is?

8      MR. THRONSON:  So there has to be a doctor-patient

9  relationship, so that has to be shown.

10      THE COURT:  Right.  But even then, within the confines

11  of a doctor-patient relationship, for example, you know, I

12  mean, in the world of the absurd, if a patient who is pregnant

13  and is having pregnancy problems goes to see her dermatologist,

14  the dermatologist's duties are presumably different by virtue

15  of the nature of that interaction than they are if she goes to

16  see her OB.

17      MR. THRONSON:  The breach of the duty is different.  I

18  mean --

19      THE COURT:  The duty is different.  Right?

20      MR. THRONSON:  The duty is the same of reasonable care

21  under the circumstances with respect to the patient.

22      THE COURT:  Under the circumstances.

23      MR. THRONSON:  Yeah.  Acting as an ordinary physician.

24  And so the breach of the duty may be different with respect to

25  the dermatologist, the nature of the breach of it.

1        THE COURT:  But isn't it that -- I mean, if the

2   duty -- well, two things.  One is if the duty is different

3   under the circumstances, then doesn't that mean -- I mean, if I

4   port that logic here, then the circumstances -- if the

5   circumstances define or help define the duty, then I can't

6   certify a class, because the circumstances are going to be

7   different.

8        MR. THRONSON:  I'm not saying the duty differs.

9   That's not what I meant to say at all.

10        THE COURT:  Okay.

11        MR. THRONSON:  What I'm saying is that the duty -- the

12   duty doesn't depend on the individual nature of the harm and

13   damages suffered by these patients.  You know, these patients

14   all share a common characteristic, the proposed class.  They're

15   all patients of this one individual who was certified by ECFMG.

16   That's the relevant inquiry for class cert purposes, and that's

17   what can be determined on a classwide basis.

18        THE COURT:  Okay.  Let me just ask from both of your

19   perspectives -- let me ask the plaintiff in particular, because

20   you're the one who's positing a class here as a way to resolve

21   this.

22        If I resolve any of the duty or breach issues, let's

23   say I took one of your named plaintiffs as an initial test case

24   and resolved the duty issue in particular.  Let's start there,

25   because I resolve duty as a question of law.  Does that have

1  collateral estoppel effects in other cases, and is that an

2  alternative way to proceed that buys me some of the efficiency

3  without having to certify a class?

4        MR. THRONSON:  It does not, and it hasn't been the

5  experience I think of the judiciary that that is a workable

6  alternative.  Because under Park Lane, the inquiry is, is it

7  fair to apply this offensively to another case.  And so there's

8  going to be an argument from both sides that, well, it's not

9  fair to apply that result to this patient, this client, in this

10  case because there's some differences or because of mutuality.

11        This came up in the asbestos cases.  And there's

12  actually a reference in -- I think it's in the School Asbestos

13  Litigation case, In Re:  School Asbestos Litigation, where the

14  Court says, look, this has not proved to be a workable

15  alternative and certified the class as a (b)(3) class.

16        THE COURT:  So that seems a little strange to me from

17  an analytical standpoint, only because the reason collateral

18  estoppel doesn't apply is the differences, and the differences

19  are a reason to certify a class?  That seems like a strange

20  outcome.

21        MR. THRONSON:  I'm sorry, Your Honor.

22        THE COURT:  So I think what you said was, well,

23  collateral estoppel is not going to apply because the parties

24  are going to say, well, this plaintiff is different and this

25  plaintiff is different and this plaintiff is different, and

1   therefore, it's unfair to apply collateral estoppel; but if the

2   differences are what prevent the application of collateral

3   estoppel, and I'm looking at commonality in trying to find a

4   common solution, then doesn't that seem to suggest that I can't

5   certify a class because there are individual differences that

6   prevent the application of collateral estoppel as well?

7           MR. THRONSON:  I'm saying something slightly

8   different, which is that not that collateral estoppel wouldn't

9   apply, but you would get that argument with respect to each

10  plaintiff.

11          THE COURT:  So you're saying I wouldn't have to

12  relitigate the collateral estoppel?

13          MR. THRONSON:  Exactly.  It's a manageability issue.

14  You'd have to --

15          THE COURT:  Okay.  All right.  I understand.  Let me

16  see.

17          Okay.  We've covered -- from my perspective, we have

18  sort of already -- the discussion subsumed what I wanted to

19  cover on typicality.

20          I do want to hear from the defendant initially and

21  then hear your response on adequacy, because I'm not sure I

22  fully understood the issues.  You know, and I'm mostly

23  concerned again -- I understand the issues on adequacy as to

24  different types of injuries and encounters with Dr. Akoda, that

25  that sort of all -- I don't know whether it's right, but it all

1    makes sense to me, and I understand the arguments.

2          But the issue with respect to the Maryland litigation,

3    which I think was the first one you identified in your

4    opposition, I'm not sure I fully followed.  Both -- I mean, I

5    sort of know what happened.  I don't really want to retry the

6    litigation strategy decisions that were made in Maryland, but I

7    want to understand why you think that renders them inadequate.

8          MR. SHAFFER:  I guess what I will say about adequacy,

9    Your Honor, and it falls within the context of the types of

10   claims that are being asserted, which are emotional distress

11   claims, which we articulate in other parts of our brief,

12   individuals would have a strong interest in controlling, A,

13   whether they want to bring them; B, whether they want to be

14   involved in this particular case as to how they're going to

15   pursue it; and C, whether those class members believe that the

16   named plaintiffs who are here are aligned in terms of what any

17   individual class member might feel about their own situation.

18         And again, we're not in a position where we have, you

19   know, perspective on that, other than to know that you could

20   certainly understand that individuals, for example, might not

21   agree with having dismissed claims against the hospital in

22   Maryland that hired and allowed Akoda to treat 700 women for

23   nothing.

24         THE COURT:  But those were dismissed without a class

25   certification.  Right?

1          MR. SHAFFER:  Correct.

2          THE COURT:  So there's no preclusive effect of that.

3    And to the extent that someone here has a problem with the

4    litigation decision to pursue this as, say, an emotional

5    distress claim as opposed to a specific battery, intentional

6    tort type claim or something like that, they'll have the chance

7    to opt out and to do that if they want to.  Right?

8          MR. SHAFFER:  As we discussed earlier, there would

9    have to be an opt-out period.  The suggestion that there would

10   be some sort of limited issue class, there would be an opt out

11   of many individuals who might decide to bring their own claims,

12   and a second set of many mini-trials suggests that those

13   factors that talk about manageability and efficiency are not

14   served in a case like this.  Whether those are truly adequacy

15   of the representatives, maybe that's not the best prong to

16   identify those issues.

17         THE COURT:  I mean, the rubrics blur sometimes.  And I

18   understand that.  And, you know, the many mini-trials thing,

19   frankly, it doesn't -- it doesn't motivate me a lot, because it

20   does seem that they've signed a lot of plaintiffs up.  And one

21   way or another, there's probably going to be a lot of trials,

22   or, you know, a lot of -- at least a lot of time in court,

23   whether that's motions practice or what.

24         And so, you know, I think the thing I have to figure

25   out is whether there's a way to short-circuit some of that by

1    doing, you know, one trial on some issue and then a bunch of

2    what amount to like half-day trials or day-long trials on some

3    of the other issues.  If it's not that, if it's going to be,

4    well, I'm going to do the big trial and then we're still going

5    to have a bunch of three- and four-day trials, then I'm not

6    sure I get much.

7           And I understand you're -- I know you're about to say,

8    well, you don't have a trial plan, Judge.  And I heard that

9    argument, and I have to think about how significant that is

10   here.  I mean, obviously, I think to some extent the courts

11   have the discretion to call upon their experience to sort of

12   see how this case would play out.  If there's only one logical

13   way it would play out versus if there's a lot of ways it might

14   play out and there's a lot of uncertainty, then maybe it's

15   important for me to get a trial plan.

16          MR. SHAFFER:  And I think, again, we're speculating as

17   to what will come and what will ultimately be the posture of

18   plaintiffs who they have averred they have signed up.  We have

19   all been involved with cases with consolidated Complaints with

20   plaintiffs who all of a sudden it happens that there's far, far

21   fewer than there were represented to be.  And there are ways to

22   structure cases of consolidated actions in a way that don't run

23   afoul of Rule 23.

24          And so you know, I guess we would simply note for the

25   Court's consideration that the manageability and whether there

1   would be additional actions here or elsewhere, that if any

2   class action were trying to shoehorn a case into Rule 23 that

3   doesn't really belong there and that the Third Circuit has said

4   is not the kind of case that fits within that rubric doesn't

5   leave the Court without options on how to manage, administer

6   and effectively handle the docket.

7          THE COURT:  So I have two last issues on my outline to

8   cover, one sort of for each of you.  So I'll start with you,

9   Mr. Shaffer.

10          Statute of limitations, which I know you raise.  I

11  struggled a little bit with what your statute of limitations

12  argument is.  So tell me what your statute of limitations

13  argument is, and then I have some questions about how it

14  applies.

15          MR. SHAFFER:  Sure, Your Honor.

16          So the way in which a statute of limitations defense

17  would be presented here would be that the triggering event,

18  which we've heard from the named plaintiffs and I think was

19  averred in the Complaint, was the US Attorney's press release

20  announcing the guilty plea of Akoda for Social Security fraud

21  and that individual plaintiffs upon having read that suffered

22  harm or injury or damage as a result of having tied that to

23  some experience they had.

24          The Complaint in this case was filed two years minus

25  one day to the day of that press release.  And so there could

1   be a possibility that there would be individuals who would have

2   knowledge prior to the press release on an individual basis of

3   Akoda, of either his charge, of his arrest.  We have references

4   in some of the survey-like responses that we got from the

5   plaintiffs that certain individuals had suffered emotional

6   distress prior to that announcement by the US Attorney's

7   office.  And so if you have your emotional distress prior to

8   that date, it would be more than two years from the date of

9   filing, and that individual would have a potential statute of

10  limitations problem.

11        We pointed out as -- primarily to note that this is

12  not, as the plaintiffs tried to suggest, the only issue left

13  for another day is damages.  No.  There will be statute of

14  limitations issues that have to be resolved if there were

15  subsequent proceedings, not just amount of damages.

16        THE COURT:  So -- and, you know, I can go back and

17  find out, but with respect to the Akoda prosecution, there's an

18  announcement of a guilty plea.

19        Was there either an arrest or an indictment that

20  preceded that, or is this the kind of thing where there were

21  discussions with Akoda and his counsel, there's, you know, a

22  plea that's contemporaneous with the announcement?

23        MR. SHAFFER:  We don't know the answer for sure.  We

24  do know there was a pending medical malpractice claim against

25  Akoda at the time that he was arrested.

1           THE COURT:  That alleged that he wasn't a doctor?

2           MR. SHAFFER:  No.  But that would have perhaps --

3   that's a class member who would have perhaps been in discovery,

4   perhaps would have gained information about the arrest during

5   that process that would potentially trigger again a question

6   that would have to be resolved in that person's individual

7   proceeding.

8           To your question, I don't believe they issued a press

9   release when the arrest occurred.

10          THE COURT:  So -- well, I mean, but if an arrest

11  occurred beforehand, you know, there's certainly -- I mean, you

12  know, there's a gossip mill and people may have known.

13          If there was no arrest, if there's just discussion,

14  he's a target, there's discussions with his counsel, he works

15  something out and then there's a press release at which time

16  either he turns himself in or, you know, has his first day

17  hearing or something like that, that's a little different in

18  terms of how much -- what the odds are that there's public

19  disclosure of it in advance.

20          And I guess that gets me to sort of my question here,

21  which is, you know -- I understand you're hypothesizing the

22  possibility that there are people who are going to be barred by

23  the statute of limitations, but is that enough to trigger a

24  statute of limitations defense that precludes class

25  certification?  Or -- you know, I mean, I haven't had you yet,

1  I've had some of your partners in Rule 16s with me.  One of my

2  bugaboos is that people plead affirmative defenses

3  prophylactically instead of affirmative defenses for which they

4  have a good faith basis under Rule 11.

5          Do you need a good faith basis under Rule 11 to say

6  that there are class members who are barred by the statute of

7  limitations, or is it just enough to say there might be?

8          MR. SHAFFER:  So I think what we have here at least,

9  Your Honor, evidence from the one malpractice case of an

10  individual who if they brought a -- if there was an issue class

11  certified and there was a secondary proceeding, there would be

12  a fight about whether that claim was barred by the statute of

13  limitations.  And our point in --

14          THE COURT:  But why?  I mean, doctors get sued for

15  malpractice all the time.  And sometimes it's meritorious and

16  sometimes it's not, but that doesn't mean that you have any

17  suspicion the person is not a doctor.

18          MR. SHAFFER:  If it -- I mean, the way the defense

19  would come up is in discovery and taking the deposition of that

20  plaintiff, did you hear about Dr. Akoda being arrested?  Yes.

21  How did you hear about that?  It was in the newspaper.  I don't

22  know.  I don't have specific information that says I know of

23  Person A who had knowledge that Dr. Akoda was arrested.  But if

24  discovery revealed that, we would be entitled to assert a

25  statute of limitations defense in a subsequent proceeding.

1          Maybe Ms. McEnroe can address you.

2          THE COURT:  You're welcome to address it.  That's

3     fine.

4          MS. McENROE:  Thank you.  One related point on that

5     also is there was a law enforcement search warrant executed at

6     the individual's residence, medical practice and vehicle in

7     June of 2016, which especially for the medical practice could

8     potentially more credibly implicate potential class members

9     who --

10         THE COURT:  I think I need a lot more detail before I

11    would be willing to conclude that that provided any kind of

12    constructive notice.  I mean, whether you have actual notice

13    because some patient is sitting in the waiting room when the

14    agents show up, I don't know.

15         Okay.  My last question, saved for the plaintiffs

16    before I kind of give you each a chance to cover anything you

17    think I haven't that you think I need to hear.  You know,

18    there's any number of cases out there that are resolved as mass

19    torts rather than as classes.  And there's a playbook for how

20    you do that.  And why isn't that what I should be doing here?

21    I mean, you've got a defendant that's in Pennsylvania.  Maybe

22    you get them with specific jurisdiction elsewhere, I don't even

23    know, for individual cases, but otherwise, you're going to file

24    it here.  The cases are all going to come here.  They're all

25    going to be related here.  Maybe or maybe not.  Maybe there

1  will be an MDL.  I don't know.

2         But, you know, it seems to me it's fairly likely one

3  way or another that even if I don't certify the class and even

4  if there is a bunch of individualized claims, you know, even if

5  you sue in Maryland, you know, I don't want to assume I know

6  Mr. Shaffer's playbook, but I'm willing to guess that he's

7  going to remove all of them if you file in Maryland Circuit

8  Court and -- or in, you know, Virginia or DC Superior Court.  I

9  think they're going to get removed.  And, you know, I see them

10  winding up here either via transfer motions or via an MDL.  I

11  don't presume to tell them how to consolidate things, but this

12  case is obviously a lot further along than anything else would

13  be.

14         And so why isn't that the way to resolve this?  And

15  just to do that and then either to have some test cases where I

16  could bracket value, you know, or you guys could just file your

17  cases here and we could consolidate them locally and, you know,

18  we could run some test cases and bracket value and then put a

19  master in place and try to get it resolved, why isn't that a

20  more efficient way to do this?

21         MR. THRONSON:  I think, Your Honor, you lose

22  efficiency in a couple of respects.

23         There's a lot of evidence that's going to need to

24  be -- to be put on as to this case.  And that's true of

25  other -- you know, other MDLs as well, but, you know -- cases

1    that are filed as mass torts.  But the conduct of ECFMG, the

2    conduct of Akoda, each side has identified eight to nine

3    experts.  It's a lot of trial time.

4            And so, you know, the pretrial proceedings for that

5    are going to be hotly contested I think in terms of who's an

6    appropriate bellwether plaintiff, you know, case information

7    sheets, things of that nature.

8            And at the end of the day, you don't have -- you've

9    got to put on the same evidence a number of times in any event

10   with the hope of eventually getting settlement.  And you don't

11   have a common resolution of these questions that we believe are

12   really common to each plaintiff and the resolution of which

13   will have a preclusive effect.

14           THE COURT:  So how does that distinguish this case

15   from any of the universe of mass tort cases that are out there

16   that the MDL panel consolidates somewhere, you know, whether

17   it's Opioids right now or -- you know, I mean, this Court has

18   had Fen-Phen over the years, and we had the Asbestos and, you

19   know, any of the other ones.  I mean, Tobacco was certainly a

20   case where -- you know, any number of Tobacco cases where there

21   was all kinds of common proof about the industry.  Years ago I

22   was in the Welding Fumes MDL where the allegation was that

23   there was this industrywide conspiracy to conceal the harmful

24   health effects of welding fumes.  And there was a lot of common

25   proof that had to be put on again and again and again.  And

1  some of it got done -- frankly, I thought -- maybe it was

2  inefficient that it got done again and again in the state

3  courts, but it also got done in federal court six or eight

4  times in the Northern District of Ohio, and then we were able

5  to sort of start sorting out where we stood.  And yeah, it's

6  common proof, and yeah, it's a little slower, but maybe it's

7  not a lot slower if there's a whole bunch of individual issues

8  that have to get tried anyway.

9        MR. THRONSON:  I think the distinction is in all of

10  those cases you have typically multiple producers, multiple

11  methods of distribution, multiple, you know, points of

12  consumption.  And so the -- there's common proof, but it

13  doesn't end up being very meaningful in terms of driving the

14  ultimate resolution of the litigation.

15        Here we have the actions of one corporation as to one

16  individual which caused damage to a group of plaintiffs.

17  That's the difference.  And it's just a lot easier and simpler

18  and cleaner to resolve these numerous common issues on a

19  classwide basis.

20        THE COURT:  What's your view on that?  I mean, in some

21  respects, I mean, I always felt weird saying it in practice,

22  but there's the arguable advantage to the defendant of having a

23  class certified as opposed to having to try the case, you know,

24  35 times just in bellwether trials, because if you win, it's a

25  grand slam.  You're done.

 1          MR. SHAFFER:  And Your Honor, it's a question, but the

 2   reality is the types of cases that we're talking about here,

 3   the types of claims that are being asserted here, and the wide

 4   range of experiences that we have and we already know about

 5   from the individuals who are involved here, makes this much

 6   more like your Welding Fume or your MDL or your consolidated

 7   plaintiff at a -- you know, in a -- some sort of toxic case

 8   than a class action with a single mailing, with a single

 9   defendant and a single outcome four days after the letter is

10   mailed.  That's a class action -- you know, that has

11   feasibility and value in a class setting.

12          These cases may.  You're correct.  There are things

13   that can be done in a situation if there are consolidated

14   cases, if there are additional cases filed, that can be done to

15   advance multiple cases at once.  But Rule 23 doesn't allow you

16   to sort of, again, shoehorn cases that don't belong as a class

17   action in a class action purely for efficiency and especially

18   where there are other alternatives.  And you are correct, there

19   are -- there are risks to the defendant of that scenario as

20   well as, you know, to the class scenario.

21          But, you know, our view on that is it is not

22   appropriate.  The example we were talking about on a duty

23   question or a res judicata to say, you know, you can decide

24   that on a classwide basis and then individuals will come in and

25   fight about their facts were different and they weren't bound

1  anyway.

2        So we respectfully submit that Rule 23 isn't the way

3  you can go here.

4        THE COURT:  So I've covered what I wanted to cover

5  with you guys today.  I'll give you each a few minutes to wrap

6  up if there's things you want to cover with me, arguments you

7  want to make that I haven't covered, bearing in mind I hope you

8  can tell I read your briefs, and so I don't need you to repeat

9  that.  And also bear in mind that if you say to me, nope, I'm

10 good, I'm not going to look down on you and think that means

11 there's some weakness in your case.  I will be perfectly

12 happily to hear that.

13       MR. VETTORI:  Nope, we're good.

14       THE COURT:  From plaintiff's side?

15       MR. THRONSON:  I think one case that I think could be

16 instructive for Your Honor to take a look at is Wallace v.

17 Powell, which we cited in our brief.  That's the Kids for Cash

18 case.  And there was a -- it was a case that was certified on

19 all issues of liability out of the Middle District of

20 Pennsylvania.  And there were a variety of claims brought

21 there, you know, RICO claims, constitutional violation, various

22 constitutional violations, also state law false imprisonment.

23 And the Court found that certification on a classwide basis as

24 to liability was appropriate, notwithstanding obviously you

25 have all these plaintiffs, probably about 5,000 plaintiffs,

1  different kinds of interaction with the judicial system,

2  different injuries.  Emotional distress was claimed in that

3  case.  But at the core of it all is a common course of conduct

4  by Judge Shivarelo and these corporations to deprive these

5  individuals of their constitutional rights.  And so that case I

6  think is a good demonstration of the facts that the fact that

7  emotional distress damages are claimed is no barrier to class

8  certification.

9          THE COURT:  Okay.  All right.  Mr. Shaffer, anything?

10         MR. SHAFFER:  Only one point to bring us back to.  I

11 think the very first question that Your Honor asked the

12 plaintiffs that I made a note of, and that related to the

13 damages that they're talking about asserting, only emotional

14 distress damages.  And we've discussed that yes, if there were

15 notice and an opt-out, that there would be maybe individuals

16 who believe that they had a personal injury claim of some kind

17 that they could decide to opt out.

18         I believe there would be a claim-splitting problem if

19 they don't opt out and go to judgment in this case, that they

20 couldn't say at the judgment, let's say our client prevails and

21 they say, well, I only asserted a claim for emotional distress.

22 Now I want to file a lawsuit for my personal injury arising

23 from the exact same conduct.  I believe that judgment is going

24 to bar them from all damages that would arise from the same

25 conduct.

1    And so again, it's just another point that certifying

2   this as a class both from the defendant's perspective but also

3   for class members could mean if they don't opt out, it's not

4   that the plaintiffs in this case have asserted the full panoply

5   of possible claims and damages that someone could envision

6   could arise from Dr. Akoda, and a judgment would potentially

7   raise the possibility that those claims are extinguished.

8    THE COURT:  Yeah.  I mean, I don't have to decide

9   that.  Right?  Because presumably they file somewhere else.

10   But it seems to me that's what the opt-out is for.  Right?  If

11   we think notice is meaningful, you know, if we operate under

12   the view that the notice that they get is meaningful, it

13   actually tells them what their rights are and then they get to

14   make an informed judgment.

15    And some plaintiffs choose -- I mean, a plaintiff

16   might say, no, I was damaged by more than this.  Some other

17   plaintiff might say, hey, great, there's less for me to do and

18   someone else is carrying the water.  So I'm less troubled by

19   that possibility in this circumstance as long as there's an

20   opt-out.

21    MR. SHAFFER:  I guess I would just simply compare it

22   to the typical (b)(3) opt-out case where you're not just simply

23   seeking one type of damages and you're excluding all the other

24   possible damages arising from an act.  You would -- presumably

25   most (b)(3) cases, the plaintiffs seek all the damages arising

1    from a particular conduct at one time.  And so --

2          THE COURT:  I don't know.  I mean, you know, I sat on

3    the plaintiff's side of cases sometimes where we'd say issue X,

4    Y or Z creates a problem for us from a class certification

5    standpoint and we don't think that makes sense and, you know,

6    we're not going to pursue, for instance, unjust enrichment.

7    Unjust enrichment is really, really hard to certify because of

8    the variations among state law.  And some plaintiffs will say,

9    let's drop it.  I don't want to do that.  Or I don't want to

10   pursue a state unfair competition claim instead of an antitrust

11   claim.

12         MR. SHAFFER:  And with respect to theories, I

13   understand and agree with Your Honor that that doesn't create

14   the issue I'm talking about here.  This is -- they're talking

15   about some of the interactions and saying that person gets up

16   and testifies about the interaction and the physical injury

17   that they suffered, then that person hasn't opted out, that

18   claim is going to be barred.  And again, maybe that's not for

19   today's problem, but when considering the practical

20   implications, the manageability and the issue certification

21   concept that they've offered, I just wanted to raise it since

22   it was the first Post-it note I kept.

23         THE COURT:  I will keep it in mind.

24         All right.  So no surprise, I'm not ruling today.  I'm

25   going to take it under advisement.  This was extraordinarily

1   helpful to me, so thank you.  And we'll try and get you

2   something expeditiously.  The motion I know has been pending

3   for a while, although it took a while to get the argument

4   scheduled too.  But I'll try to get you something, you know, in

5   the not too, too distant future so we've got some clarity about

6   what's going to happen with this case going forward.  Okay.

7           We're going to be adjourned.  I'm going to clean up

8   here for a minute, so you can sit or go about your business,

9   that's fine.  Have a good day, everybody.

10          (Proceedings concluded at 3:56 p.m.)

11

12

13          I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  _____

17  Ann Marie Mitchell, CRR, RDR, RMR
    Official Court Reporter

18

19

20

21

22

23

24

25

**1** [1] - 50:20
**100** [2] - 2:9, 16:25
**11** [2] - 66:3, 66:4
**1211** [1] - 2:14
**1500** [1] - 2:3
**16s** [1] - 65:25
**1701** [1] - 2:20
**178** [1] - 30:11
**18-5629** [1] - 3:5
**19102** [1] - 2:4
**19103** [1] - 2:21
**19106** [1] - 1:8
**1996** [2] - 51:22, 52:1
**1998** [5] - 18:7, 18:11, 18:14, 50:4, 50:20
**200** [1] - 1:16
**2000** [4] - 18:7, 18:10, 18:11, 18:15
**2007** [1] - 18:15
**2011** [1] - 18:15
**2016** [8] - 39:22, 45:10, 50:10, 50:17, 50:21, 52:2, 52:7, 67:6
**2017** [1] - 50:10
**2020** [1] - 1:9
**20th** [1] - 2:9
**21201** [1] - 2:10
**21202** [1] - 2:15
**21208** [1] - 1:16
**215** [2] - 2:5, 2:21
**23** [6] - 20:9, 41:17, 62:22, 63:1, 71:14, 72:1
**23(a** [16] - 4:22, 26:4, 26:6, 26:7, 26:11, 26:19, 26:20, 26:23, 27:3, 30:22, 31:1, 31:11, 32:15, 33:12, 33:15
**23(b** [3] - 4:18, 30:23, 33:13
**23(b)(3** [2] - 29:10, 29:11
**23(c** [1] - 4:19
**23(c)(4** [2] - 26:5, 31:4
**267** [1] - 1:21
**299-7250** [1] - 1:21
**2:06** [2] - 1:9, 3:1
**2:18-cv-05629** [1] - 1:3
**30** [1] - 1:9
**35** [1] - 70:23
**3900** [1] - 2:4
**3:56** [1] - 76:9
**4** [1] - 1:15
**410** [3] - 1:17, 2:10, 2:15
**5,000** [1] - 72:24
**598-1667** [1] - 2:15
**601** [1] - 1:8
**649-2027** [1] - 2:10
**653-3200** [1] - 1:17
**700** [1] - 60:21
**712** [1] - 12:12
**7th** [2] - 48:5, 52:23
**864-9600** [1] - 2:5

**876** [1] - 9:11
**946** [1] - 30:11
**963-5000** [1] - 2:21
**a)(3** [1] - 27:20
**able** [3] - 6:19, 41:15, 70:3
**above-entitled** [1] - 76:13
**absence** [1] - 47:17
**absolutely** [4] - 22:9, 44:24, 48:12, 53:8
**abstract** [1] - 10:7
**absurd** [1] - 56:11
**accept** [1] - 42:7
**access** [1] - 39:4
**accurately** [1] - 18:22
**acknowledge** [1] - 17:2
**act** [1] - 74:23
**acting** [1] - 56:22
**ACTION** [1] - 1:3
**action** [11] - 27:11, 37:15, 47:2, 47:3, 47:4, 63:1, 71:7, 71:9, 71:16
**actions** [7] - 44:2, 44:3, 46:4, 52:1, 62:21, 62:25, 70:14
**acts** [1] - 52:8
**actual** [1] - 67:11
**addition** [1] - 5:6
**additional** [3] - 7:15, 62:25, 71:13
**address** [8] - 28:3, 30:1, 31:10, 34:5, 50:19, 53:14, 66:25, 67:1
**addressed** [3] - 34:14, 37:8, 39:13
**addressing** [1] - 33:13
**adequacy** [5] - 33:16, 59:20, 59:22, 60:7, 61:13
**adjourned** [1] - 76:6
**administer** [1] - 63:4
**administrator** [1] - 17:6
**adopt** [1] - 42:22
**advance** [2] - 65:18, 71:14
**advantage** [1] - 70:21
**advisement** [1] - 75:24
**advisory** [3] - 27:23, 28:2, 28:19
**afoul** [1] - 62:22
**afternoon** [9] - 3:2, 3:3, 3:10, 3:17, 3:19, 3:21, 3:23, 3:24, 4:1
**agents** [1] - 67:13
**aggrieved** [1] - 55:10
**ago** [3] - 18:17, 52:24, 69:20
**agree** [11] - 24:1, 24:11, 24:12, 25:18, 33:19, 42:20, 45:18, 51:16, 52:17, 60:20, 75:12
**ahead** [2] - 22:13, 23:22
**aided** [2] - 1:23, 10:4
**Airlines** [1] - 30:10

**Akoda** [53] - 7:24, 9:3, 9:14, 9:15, 9:19, 9:20, 9:25, 11:11, 12:3, 12:5, 12:8, 12:10, 12:13, 12:18, 12:23, 14:11, 17:14, 18:3, 18:17, 19:1, 20:15, 21:8, 25:22, 34:21, 35:9, 35:12, 35:13, 35:18, 35:23, 36:12, 37:3, 38:22, 38:24, 39:21, 44:21, 45:9, 50:8, 50:11, 54:9, 54:11, 54:22, 59:23, 60:21, 63:19, 64:2, 64:16, 64:20, 64:24, 66:19, 66:22, 69:1, 74:5
**Akoda's** [2] - 12:20, 18:9
**al** [1] - 1:3
**aligned** [1] - 60:15
**alignment** [1] - 28:8
**allegation** [2] - 37:21, 69:21
**alleged** [4] - 51:22, 51:25, 52:9, 64:25
**allegedly** [1] - 9:20
**alleging** [1] - 7:20
**allow** [4] - 21:12, 32:4, 48:6, 71:14
**allowed** [1] - 60:21
**allowing** [1] - 52:5
**allows** [1] - 31:5
**almost** [2] - 23:6, 29:14
**alternative** [4] - 4:19, 58:1, 58:5, 58:14
**alternatives** [4] - 7:15, 31:1, 34:1, 71:17
**Amendment** [2] - 48:6, 52:23
**American** [1] - 30:10
**amount** [2] - 62:1, 64:14
**analyses** [3] - 46:18, 48:23, 51:6
**analysis** [34] - 26:21, 26:24, 27:3, 27:9, 27:21, 28:21, 29:6, 29:11, 29:14, 29:20, 30:7, 31:9, 31:23, 33:17, 41:16, 41:22, 42:8, 42:19, 42:23, 43:8, 43:14, 44:15, 44:19, 49:9, 49:14, 49:22, 50:19, 52:11, 52:21, 54:22, 55:1, 55:19, 55:21, 55:25
**analytical** [1] - 58:16
**analyze** [4] - 26:24, 27:24, 30:22, 42:24
**analyzed** [2] - 30:23, 31:6
**analyzing** [2] - 32:6, 51:10
**ANGELOS** [1] - 2:8
**Ann** [2] - 1:20, 76:16
**announcement** [3] - 64:5, 64:17, 64:21
**announcing** [1] - 63:19
**answer** [6] - 28:16, 40:19, 49:4, 52:12, 53:3, 64:22
**answers** [1] - 43:16
**anticipate** [1] - 19:13

**antitrust** [4] - 17:3, 21:16, 21:21, 75:9
**anyway** [2] - 70:7, 71:25
**apart** [1] - 33:23
**appear** [1] - 20:15
**APPEARANCES** [2] - 1:13, 2:1
**appearances** [1] - 3:6
**applicable** [2] - 7:17, 48:24
**applicants** [1] - 55:8
**application** [5] - 18:5, 22:16, 49:6, 59:1, 59:5
**applied** [3] - 33:23, 43:9, 46:18
**applies** [8] - 7:9, 26:19, 40:22, 41:9, 43:19, 47:9, 49:9, 63:13
**apply** [15] - 26:11, 28:4, 28:11, 29:5, 29:8, 44:8, 45:21, 45:25, 47:6, 58:6, 58:8, 58:17, 58:22, 58:25, 59:8
**applying** [1] - 28:9
**appointment** [1] - 38:13
**approach** [3] - 32:17, 33:22, 41:20
**approaches** [1] - 4:20
**appropriate** [4] - 22:20, 69:5, 71:21, 72:23
**approved** [1] - 12:6
**Arch** [1] - 30:8
**area** [1] - 45:4
**arguable** [1] - 70:21
**argue** [1] - 42:19
**arguing** [1] - 31:3
**ARGUMENT** [1] - 1:5
**argument** [11] - 32:23, 42:3, 50:22, 52:16, 52:19, 58:7, 59:8, 62:8, 63:11, 63:12, 76:2
**arguments** [7] - 4:7, 4:23, 6:25, 27:1, 48:20, 59:25, 72:5
**arise** [5] - 27:14, 29:4, 45:16, 73:23, 74:5
**arises** [2] - 10:11, 45:16
**arising** [3] - 73:21, 74:23, 74:24
**arrest** [6] - 64:2, 64:18, 65:3, 65:8, 65:9, 65:12
**arrested** [3] - 64:24, 66:19, 66:22
**articulate** [1] - 60:10
**articulated** [3] - 30:25, 42:16, 46:8
**articulating** [1] - 52:24
**asbestos** [1] - 58:10
**Asbestos** [3] - 58:11, 58:12, 69:17
**ascertainability** [4] - 4:14,

11:3, 19:5, 20:12

**ascertainable** [1] - 22:6
**ascertaining** [1] - 12:5
**ascertainment** [1] - 17:9
**aside** [1] - 23:2
**aspects** [1] - 38:5
**assert** [4] - 6:17, 7:2, 7:10, 66:23
**asserted** [8] - 4:12, 5:15, 6:15, 6:24, 60:9, 71:2, 73:20, 74:3
**asserting** [4] - 5:20, 6:16, 27:13, 73:12
**assisting** [2] - 9:10, 15:19
**associated** [1] - 32:16
**assume** [7] - 6:23, 7:16, 13:12, 13:19, 42:7, 54:16, 68:4
**assuming** [2] - 18:14, 35:10
**attempt** [1] - 53:14
**attending** [1] - 15:22
**Attorney's** [2] - 63:18, 64:5
**attorney's** [1] - 51:21
**authority** [1] - 31:4
**averred** [2] - 62:17, 63:18
**aware** [1] - 30:15
**b)(3** [11] - 24:1, 24:12, 24:13, 24:21, 26:8, 27:22, 28:23, 30:23, 58:14, 74:21, 74:24
**b)(3)** [1] - 29:22
**baby** [1] - 21:10
**balancing** [1] - 44:8
**Baltimore** [3] - 1:16, 2:10, 2:15
**bar** [1] - 73:23
**barred** [4] - 65:21, 66:5, 66:11, 75:17
**barrier** [1] - 73:6
**based** [7] - 6:24, 7:10, 10:9, 13:12, 13:21, 16:22, 48:23
**bases** [1] - 7:17
**basic** [1] - 7:14
**basis** [18] - 20:8, 24:16, 30:17, 34:14, 34:18, 35:11, 37:19, 38:22, 46:19, 48:7, 52:11, 57:16, 64:1, 66:3, 66:4, 70:18, 71:23, 72:22
**battery** [7] - 8:7, 34:24, 36:7, 36:10, 36:18, 36:21, 61:4
**bceryes@sfspa.com** [1] - 2:16
**bear** [2] - 10:24, 72:8
**bearing** [2] - 11:21, 72:6
**bears** [1] - 54:22
**become** [1] - 21:13
**Beetlestone** [1] - 55:6
**BEFORE** [1] - 1:11
**beforehand** [1] - 65:10
**begin** [1] - 39:25

**behalf** [7] - 3:9, 3:12, 3:15, 3:18, 3:22, 4:2, 54:13
**Behr** [1] - 27:25
**bellwether** [2] - 69:5, 70:23
**belong** [2] - 63:2, 71:15
**benefit** [1] - 17:6
**best** [4] - 13:22, 22:22, 46:15, 61:14
**better** [1] - 13:12
**between** [9] - 4:18, 7:20, 7:24, 26:4, 27:22, 33:3, 34:9, 49:18, 54:11
**beyond** [2] - 16:10, 16:21
**big** [1] - 62:3
**bill** [1] - 13:16
**billing** [5] - 13:19, 14:3, 14:9, 18:18, 18:20
**binding** [1] - 28:18
**birth** [3] - 44:13, 44:16, 45:8
**bit** [3] - 11:16, 26:3, 63:10
**blissfully** [1] - 45:11
**blur** [1] - 61:16
**blurring** [1] - 50:24
**board** [2] - 50:12, 52:4
**boards** [1] - 24:25
**BOCKIUS** [1] - 2:18
**bought** [1] - 21:19
**bound** [2] - 16:19, 71:24
**boundaries** [1] - 45:5
**bracket** [2] - 68:15, 68:17
**breach** [23] - 10:12, 10:18, 19:23, 34:13, 34:20, 36:21, 36:22, 40:4, 47:24, 48:18, 48:23, 49:1, 53:1, 53:15, 54:2, 54:18, 54:25, 55:22, 56:16, 56:23, 56:24, 57:21
**breached** [1] - 20:4
**break** [1] - 52:15
**BRENT** [1] - 2:14
**Brent** [1] - 3:17
**BRIAN** [1] - 2:19
**Brian** [1] - 3:21
**brief** [6] - 6:2, 25:3, 42:1, 46:23, 47:8, 60:10, 72:16
**briefed** [1] - 5:7
**briefing** [10] - 6:25, 9:1, 11:17, 15:3, 18:3, 18:6, 22:15, 22:18, 30:8, 30:11
**briefly** [1] - 22:11
**briefs** [3] - 5:4, 48:1, 72:7
**bring** [4] - 42:14, 60:12, 61:10, 73:9
**brings** [1] - 42:8
**broader** [1] - 34:2
**brought** [2] - 66:9, 72:19
**bshaffer@morganlewis.
com** [1] - 2:22
**bugaboos** [1] - 66:1
**bunch** [11] - 11:6, 20:25,

21:2, 26:25, 29:10, 54:19, 54:24, 61:25, 62:4, 68:3, 70:6
**business** [1] - 76:7
**buys** [1] - 58:1
**Byrne** [1] - 1:7
**c)(4** [8] - 24:6, 24:11, 24:14, 25:3, 25:5, 27:23, 28:3, 31:9
**C-section** [1] - 55:18
**cannot** [1] - 41:4
**capable** [1] - 17:8
**capacity** [1] - 15:18
**capture** [2] - 17:1, 29:10
**cards** [1] - 34:4
**care** [5] - 12:19, 14:4, 15:19, 56:19
**carefully** [1] - 5:3
**carrying** [1] - 74:17
**carve** [2] - 39:13, 40:3
**case** [68] - 4:12, 5:21, 6:13, 6:18, 8:23, 10:7, 10:16, 10:23, 12:6, 16:11, 17:3, 17:4, 20:19, 23:6, 24:10, 26:8, 27:7, 27:8, 28:5, 28:11, 30:12, 31:7, 31:13, 32:15, 38:23, 40:15, 41:15, 41:18, 41:20, 44:18, 46:6, 46:7, 46:25, 47:18, 47:19, 49:14, 53:18, 55:6, 55:16, 55:17, 57:22, 58:6, 58:9, 58:12, 60:13, 61:13, 62:11, 63:1, 63:3, 63:23, 66:8, 68:11, 68:23, 69:5, 69:13, 69:19, 70:22, 71:6, 72:10, 72:14, 72:17, 73:2, 73:4, 73:18, 74:3, 74:21, 76:5
**cases** [28] - 7:5, 21:21, 30:7, 37:12, 37:13, 52:9, 57:25, 58:10, 62:18, 62:21, 67:17, 67:22, 67:23, 68:14, 68:16, 68:17, 68:24, 69:14, 69:19, 70:9, 71:1, 71:11, 71:13, 71:14, 71:15, 74:24, 75:2
**Cash** [1] - 72:16
**Castano** [2] - 28:12
**causation** [13] - 34:8, 35:6, 47:23, 49:17, 49:21, 50:22, 51:4, 51:11, 51:19, 52:22, 53:2, 54:2, 54:16
**causation/remoteness** [1] - 51:23
**caused** [3] - 35:12, 35:13, 70:15
**causes** [2] - 36:21, 36:22
**Center** [4] - 2:9, 12:11, 13:2, 13:7
**Centrella** [1] - 3:15
**CENTRELLA** [2] - 2:3, 3:14
**cert** [2] - 9:1, 57:15
**certain** [5] - 7:5, 17:5, 41:10,

53:14, 64:4
**certainly** [17] - 4:6, 5:7, 5:9, 7:21, 10:24, 11:18, 17:24, 18:22, 31:7, 33:17, 43:9, 43:11, 43:15, 48:15, 60:19, 65:10, 69:18
**certainty** [3] - 49:16, 52:8, 53:7
**certification** [29] - 4:17, 4:21, 9:17, 9:21, 10:1, 18:10, 19:10, 21:22, 22:5, 22:25, 23:9, 27:19, 28:23, 28:25, 30:12, 30:14, 30:21, 47:19, 48:20, 50:12, 54:14, 54:25, 60:24, 65:24, 72:22, 73:7, 75:3, 75:19
**certified** [12] - 9:21, 22:19, 25:22, 26:9, 28:10, 47:23, 50:8, 57:14, 58:14, 66:10, 70:22, 72:17
**certify** [25] - 6:3, 9:2, 10:15, 11:18, 19:15, 23:21, 23:23, 23:25, 24:9, 26:10, 30:16, 40:12, 40:16, 41:7, 41:14, 43:4, 46:24, 46:25, 57:5, 58:2, 58:18, 59:4, 68:2, 75:6, 76:12
**certifying** [8] - 9:9, 24:7, 24:15, 24:22, 24:23, 30:13, 32:1, 73:25
**Ceryes** [1] - 3:17
**CERYES** [2] - 2:14, 3:17
**cetera** [1] - 38:8
**chalk** [1] - 33:23
**chambers** [1] - 5:12
**chance** [5] - 14:25, 30:3, 39:6, 61:5, 67:15
**change** [2] - 20:5, 52:11
**characteristic** [1] - 57:13
**characteristics** [2] - 55:9, 55:20
**characterize** [1] - 41:25
**charge** [1] - 64:2
**Charles** [2] - 2:9, 2:9
**chart** [8] - 13:25, 14:10, 15:10, 15:12, 15:14, 15:20, 17:14, 20:15
**charted** [1] - 15:17
**charts** [1] - 16:12
**Chaudry** [1] - 13:7
**choice** [19] - 6:25, 29:18, 29:19, 29:20, 40:9, 40:11, 40:20, 41:4, 41:5, 41:16, 41:22, 42:19, 42:23, 43:8, 43:13, 44:15, 44:18, 46:2, 46:13
**choices** [3] - 41:6, 41:21, 42:21
**choose** [3] - 46:2, 46:3, 74:14

**Circle** [1] - 1:15
**circle** [1] - 4:21
**circuit** [4] - 27:24, 28:1, 30:7, 61:24
**Circuit** [12] - 27:25, 28:16, 28:19, 29:4, 30:11, 31:7, 31:20, 32:16, 33:14, 47:1, 63:2, 68:6
**Circuit's** [1] - 30:7
**circuits** [1] - 28:8
**circumstance** [1] - 74:18
**circumstances** [7] - 9:5, 56:20, 56:21, 57:2, 57:3, 57:4, 57:5
**cite** [1] - 55:6
**cited** [4] - 30:8, 31:8, 44:19, 72:16
**CIVIL** [1] - 1:3
**civil** [1] - 27:23
**claim** [29] - 5:17, 6:22, 7:2, 7:9, 8:22, 9:24, 10:9, 18:8, 37:20, 39:25, 42:25, 44:4, 44:23, 44:25, 47:11, 47:12, 48:6, 50:25, 53:17, 61:4, 61:5, 64:23, 66:11, 73:15, 73:17, 73:20, 75:9, 75:10, 75:17
**claim-splitting** [1] - 73:17
**claimed** [2] - 73:1, 73:6
**claiming** [1] - 18:12
**claims** [19] - 4:11, 5:14, 10:6, 27:9, 27:13, 34:7, 41:10, 47:4, 47:6, 60:9, 60:10, 60:20, 61:10, 68:3, 71:2, 72:19, 72:20, 74:4, 74:6
**clarify** [3] - 4:11, 25:20, 28:3
**clarity** [2] - 10:23, 76:4
**class** [123] - 4:13, 4:16, 4:20, 5:24, 6:13, 6:19, 8:25, 9:9, 11:1, 11:5, 11:8, 11:18, 11:19, 11:20, 12:2, 12:17, 14:13, 17:23, 18:12, 19:6, 19:7, 19:9, 19:15, 19:20, 19:22, 19:25, 20:6, 20:8, 21:3, 21:13, 21:15, 21:16, 21:22, 22:3, 22:5, 22:6, 23:10, 23:15, 23:19, 23:23, 23:25, 24:1, 24:9, 24:10, 24:12, 24:21, 24:24, 25:1, 25:3, 25:5, 25:17, 25:19, 26:9, 27:10, 27:11, 27:14, 27:17, 30:13, 30:14, 30:16, 30:17, 30:20, 31:9, 31:12, 32:8, 32:11, 32:24, 34:3, 35:3, 35:4, 35:11, 36:3, 36:16, 37:15, 38:5, 39:8, 39:11, 40:12, 40:16, 40:21, 41:7, 41:13, 41:14, 43:4, 46:17, 46:19, 46:20, 47:4, 47:19, 52:11, 54:24, 57:5,

57:13, 57:15, 57:19, 58:2, 58:14, 58:18, 59:4, 60:14, 60:16, 60:23, 61:9, 63:1, 65:2, 65:23, 66:5, 66:9, 67:7, 68:2, 70:22, 71:7, 71:9, 71:10, 71:15, 71:16, 71:19, 73:6, 74:1, 74:2, 75:3
**classes** [4] - 24:13, 24:14, 46:24, 67:18
**classwide** [16] - 5:23, 24:16, 28:6, 28:10, 34:14, 34:18, 35:10, 36:25, 37:3, 37:19, 48:7, 54:3, 57:16, 70:18, 71:23, 72:22
**clean** [1] - 76:6
**cleaner** [1] - 70:17
**cleanup** [1] - 31:4
**clear** [5] - 25:19, 33:14, 41:3, 41:20, 47:9
**clearly** [1] - 30:17
**client** [4] - 18:8, 19:13, 58:8, 73:19
**clinical** [1] - 15:19
**closeness** [1] - 49:18
**codes** [1] - 13:19
**collateral** [8] - 57:25, 58:16, 58:22, 58:25, 59:1, 59:5, 59:7, 59:11
**Colorado** [3] - 43:18, 43:19, 46:10
**colored** [1] - 31:12
**Columbia** [2] - 44:12, 45:3
**coming** [4] - 11:14, 14:17, 34:21, 54:9
**Commencing** [1] - 1:9
**commission** [2] - 9:10, 10:5
**COMMISSION** [1] - 1:5
**Commission** [1] - 3:5
**committed** [2] - 9:15, 38:22
**committee** [3] - 27:23, 28:2, 28:19
**committing** [1] - 9:25
**common** [5] - 5:24, 27:14, 39:1, 39:13, 41:10, 49:3, 52:12, 52:22, 55:7, 57:13, 59:3, 69:10, 69:11, 69:20, 69:23, 70:5, 70:11, 70:17, 73:2
**commonality** [5] - 23:9, 32:5, 32:12, 33:16, 59:2
**company** [1] - 44:14
**compare** [1] - 74:20
**compensable** [1] - 35:5
**competition** [1] - 75:9
**Complaint** [5] - 5:15, 6:23, 7:10, 63:18, 63:23
**Complaints** [1] - 62:18
**complete** [3] - 37:11, 37:22, 41:16
**completely** [1] - 11:22

**computer** [1] - 1:23
**computer-aided** [1] - 1:23
**conceal** [1] - 69:22
**conceive** [4] - 26:6, 29:15, 29:21, 53:18
**concept** [1] - 75:20
**conception** [2] - 45:19, 45:21
**conceptual** [1] - 33:22
**concern** [3] - 32:21, 38:10, 52:24
**concerned** [3] - 38:5, 43:17, 59:22
**conclude** [3] - 33:10, 43:3, 67:10
**concluded** [3] - 28:1, 35:9, 76:9
**conclusion** [1] - 28:7
**conduct** [16] - 7:6, 27:15, 34:21, 45:14, 46:6, 47:1, 49:19, 51:22, 54:7, 54:8, 68:25, 69:1, 73:2, 73:22, 73:24, 74:25
**confidential** [2] - 38:21, 39:4
**confines** [1] - 56:9
**conflict** [3] - 27:9, 43:10, 47:13
**conflicts** [3] - 41:6, 41:18, 43:10
**confront** [1] - 41:5
**confronted** [1] - 20:19
**connection** [4] - 44:17, 46:20, 49:18, 49:22
**CONRAD** [1] - 2:2
**consent** [2] - 37:25, 38:2
**consider** [1] - 33:9
**consideration** [1] - 62:24
**considering** [4] - 28:2, 31:25, 32:1, 75:18
**consistent** [1] - 46:22
**consolidate** [2] - 68:10, 68:16
**consolidated** [4] - 62:18, 62:21, 71:5, 71:12
**consolidates** [1] - 69:15
**conspiracy** [1] - 69:22
**constitutes** [2] - 10:18, 19:4
**constitutional** [5] - 29:17, 48:5, 72:20, 72:21, 73:4
**constructive** [1] - 67:11
**consumption** [1] - 70:11
**contact** [7] - 15:14, 34:21, 35:23, 36:7, 42:4, 54:9, 56:4
**contemporaneous** [2] - 8:9, 64:21
**contested** [1] - 69:4
**context** [11] - 19:24, 24:21, 41:13, 41:17, 44:23, 49:21, 51:14, 53:13, 56:3, 56:4, 60:8

**CONTINUED** [1] - 2:1
**contours** [1] - 44:25
**contractual** [2] - 7:16, 7:21
**controlling** [1] - 60:11
**conversation** [1] - 21:9
**core** [1] - 73:2
**corporation** [1] - 70:14
**corporations** [1] - 73:3
**correct** [14] - 6:10, 6:20, 7:1, 11:23, 13:18, 25:4, 28:22, 32:2, 48:15, 53:21, 60:25, 71:11, 71:17, 76:12
**correctly** [2] - 31:6, 42:1
**correspond** [1] - 14:7
**counsel** [3] - 3:6, 64:20, 65:13
**County** [4] - 16:20, 44:12, 44:17, 45:4
**couple** [7] - 4:5, 4:15, 14:25, 17:20, 40:25, 52:24, 68:21
**course** [3] - 22:18, 27:14, 73:2
**COURT** [1] - 1:1
**Court** [6] - 1:21, 3:1, 68:7, 69:16, 76:16
**court** [3] - 30:13, 61:21, 70:2
**Court's** [1] - 62:24
**court's** [1] - 30:12
**Courthouse** [1] - 1:7
**courts** [5] - 46:24, 47:3, 47:5, 62:9, 70:2
**cover** [7] - 4:10, 4:22, 59:18, 63:7, 67:15, 72:3, 72:5
**covered** [5] - 4:24, 4:25, 59:16, 72:3, 72:6
**create** [1] - 75:12
**created** [1] - 51:11
**creates** [2] - 46:8, 75:3
**credibly** [1] - 67:7
**criteria** [3] - 7:8, 12:15, 17:17
**CRR** [2] - 1:20, 76:16
**crux** [2] - 38:23, 51:2
**crystal** [3] - 25:19, 33:14, 41:3
**damage** [3] - 39:24, 63:21, 70:15
**damaged** [1] - 74:15
**damages** [30] - 6:4, 6:8, 6:9, 6:12, 6:13, 6:14, 6:16, 7:3, 20:2, 24:16, 34:9, 34:11, 35:1, 35:4, 38:25, 45:16, 53:2, 53:15, 55:19, 57:12, 64:12, 64:14, 73:6, 73:12, 73:13, 73:23, 74:4, 74:22, 74:23, 74:24
**danger** [1] - 8:8
**DANIEL** [1] - 2:20
**date** [2] - 64:7
**day-long** [1] - 62:1
**days** [1] - 71:8

**DC** [7] - 42:12, 45:16, 45:20, 45:22, 46:9, 68:7

**deal** [4] - 15:13, 16:12, 19:19, 31:5

**dealt** [1] - 23:2

**December** [1] - 30:9

**decide** [15] - 19:5, 19:23, 20:7, 20:8, 23:20, 26:8, 36:25, 41:6, 46:14, 48:25, 50:20, 61:10, 71:22, 73:16, 74:7

**decision** [5] - 27:24, 30:9, 30:21, 55:10, 61:3

**decisions** [3] - 20:3, 27:24, 60:5

**Defendant** [1] - 2:23

**defendant** [8] - 21:18, 44:18, 55:5, 59:19, 67:20, 70:21, 71:8, 71:18

**defendant's** [4] - 47:1, 49:19, 55:22, 74:1

**defendants** [1] - 47:9

**defense** [9] - 3:20, 4:23, 15:2, 26:14, 26:25, 63:15, 65:23, 66:17, 66:24

**defense's** [1] - 11:7

**defenses** [2] - 66:1, 66:2

**defer** [1] - 41:16

**define** [9] - 23:8, 23:12, 23:14, 24:6, 26:9, 26:10, 32:24, 57:4

**defined** [3] - 22:3, 26:12, 28:6

**defining** [6] - 25:17, 26:17, 26:21, 27:4, 36:2, 44:25

**definition** [8] - 4:13, 11:1, 11:8, 11:19, 12:2, 25:19, 27:17, 38:6

**degree** [3] - 49:15, 52:8, 53:7

**delivered** [1] - 21:10

**demonstration** [1] - 73:5

**deposition** [1] - 66:18

**deprive** [1] - 73:3

**deprived** [1] - 14:21

**dermatologist** [2] - 56:12, 56:24

**dermatologist's** [1] - 56:13

**describe** [1] - 34:3

**description** [1] - 19:2

**desk** [1] - 38:14

**detail** [1] - 67:9

**determination** [1] - 46:13

**determine** [6] - 12:23, 34:18, 37:19, 48:24, 49:5, 49:7

**determined** [3] - 35:2, 55:5, 57:16

**determining** [2] - 24:16, 26:17

**develop** [1] - 27:18

**development** [1] - 41:12

**differ** [1] - 39:1

**difference** [2] - 53:20, 70:16

**differences** [7] - 41:5, 53:23, 58:9, 58:17, 59:1, 59:4

**different** [51] - 17:20, 19:3, 19:24, 20:3, 26:15, 26:21, 27:3, 27:4, 29:22, 29:23, 32:3, 33:21, 33:25, 36:14, 36:20, 36:22, 39:7, 42:19, 42:21, 43:3, 43:7, 43:9, 46:18, 47:3, 49:13, 50:11, 50:17, 50:19, 51:5, 51:6, 51:18, 52:21, 52:25, 53:3, 53:6, 56:13, 56:16, 56:18, 56:23, 57:1, 57:6, 58:23, 58:24, 59:7, 59:23, 65:16, 71:24, 72:25, 73:1

**differing** [1] - 37:6

**differs** [1] - 57:7

**direct** [2] - 7:22, 21:17

**disagree** [2] - 19:21, 52:17

**disclosed** [1] - 38:21

**disclosure** [1] - 65:18

**discovery** [3] - 65:2, 66:18, 66:23

**discretion** [1] - 62:10

**discussed** [2] - 61:7, 73:13

**discussion** [2] - 59:17, 65:12

**discussions** [3] - 13:13, 64:20, 65:13

**dismissed** [2] - 60:20, 60:23

**dispute** [2] - 9:14, 30:13

**distant** [1] - 76:4

**distinct** [2] - 51:1, 54:6

**distinction** [5] - 19:17, 47:10, 51:13, 51:17, 70:8

**distinctions** [3] - 31:14, 47:11, 53:25

**distinguish** [1] - 69:13

**distress** [29] - 5:16, 5:20, 5:25, 6:4, 6:9, 6:14, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:4, 64:5, 64:6, 73:1, 73:6, 73:13, 73:20

**distressed** [1] - 45:13

**distribution** [1] - 70:10

**district** [1] - 30:12

**DISTRICT** [2] - 1:1, 1:1

**District** [5] - 41:23, 44:12, 45:3, 70:3, 72:18

**division** [1] - 31:2

**docket** [1] - 63:5

**doctor** [9] - 9:15, 42:5, 42:6, 55:17, 56:5, 56:7, 56:10, 64:25, 66:16

**doctor's** [1] - 56:5

**doctor-patient** [2] - 56:7, 56:10

**doctors** [1] - 66:13

**document** [1] - 16:7

**documentation** [2] - 9:20, 16:23

**documents** [1] - 17:14

**done** [14] - 32:3, 38:24, 43:4, 43:15, 50:6, 54:4, 54:17, 55:8, 69:25, 70:1, 70:2, 70:24, 71:12, 71:13

**doubt** [1] - 46:4

**down** [3] - 40:15, 52:15, 72:9

**Dr** [19] - 9:2, 9:4, 9:14, 13:7, 17:13, 18:3, 18:9, 18:17, 19:1, 21:8, 39:21, 44:21, 45:8, 50:8, 50:10, 59:23, 66:19, 66:22, 74:5

**drafted** [3] - 11:9, 22:7

**drive** [1] - 43:9

**driving** [1] - 70:12

**drop** [1] - 75:8

**dubious** [1] - 47:22

**due** [1] - 55:7

**during** [3] - 17:21, 19:2, 65:3

**duties** [1] - 56:13

**duty** [69] - 7:16, 7:19, 7:21, 19:18, 19:23, 20:3, 20:4, 24:24, 34:13, 34:19, 34:20, 36:21, 40:4, 47:24, 48:18, 48:23, 48:25, 49:5, 49:7, 49:8, 49:10, 49:15, 49:17, 49:23, 50:7, 50:8, 50:16, 50:18, 50:20, 50:21, 51:2, 51:4, 51:9, 51:24, 52:12, 53:1, 53:15, 54:1, 54:3, 54:18, 54:22, 54:25, 55:2, 55:4, 55:7, 55:18, 55:19, 55:20, 55:22, 56:6, 56:16, 56:18, 56:19, 56:23, 57:1, 57:4, 57:7, 57:10, 57:11, 57:21, 57:23, 57:24, 71:21

**easier** [1] - 70:16

**EASTERN** [1] - 1:1

**easy** [2] - 23:1, 23:7

**ECFMG** [30] - 3:22, 3:25, 4:2, 7:20, 9:10, 9:16, 9:21, 9:24, 10:1, 10:4, 11:14, 18:6, 19:7, 22:16, 24:24, 25:22, 34:19, 35:11, 38:24, 45:14, 49:2, 49:8, 50:5, 50:16, 54:8, 55:7, 55:10, 57:14, 68:25

**ECFMG's** [4] - 36:12, 46:6, 51:25, 54:7

**EDUCATION** [1] - 1:5

**Educational** [1] - 3:4

**effect** [2] - 61:1, 69:12

**effectively** [2] - 23:14, 63:5

**effects** [2] - 57:25, 69:23

**efficiency** [5] - 33:5, 58:1, 61:12, 68:21, 71:16

**efficient** [2] - 33:6, 68:19

**efficiently** [1] - 27:11

**egregious** [1] - 7:6

**eight** [2] - 69:1, 70:2

**either** [14] - 5:5, 7:4, 27:16, 27:20, 28:17, 28:24, 40:22, 45:2, 50:18, 64:2, 64:18, 65:15, 68:9, 68:14

**element** [4] - 6:18, 34:10, 36:23, 52:22

**elements** [12] - 7:12, 7:14, 34:7, 36:24, 37:20, 45:19, 45:21, 45:24, 48:6, 48:7, 48:19, 50:25

**Elisa** [1] - 3:24

**ELISA** [1] - 2:19

**elisa.mcenroe@ morganlewis.com** [1] - 2:22

**elsewhere** [2] - 62:25, 67:21

**emergency** [1] - 38:13

**emotional** [29] - 5:16, 5:20, 5:25, 6:3, 6:9, 6:13, 6:22, 7:3, 7:5, 7:13, 12:21, 35:19, 39:19, 42:25, 44:22, 47:12, 47:16, 53:13, 54:13, 54:15, 60:9, 61:3, 64:4, 64:6, 73:1, 73:6, 73:12, 73:20

**employee** [1] - 14:14

**employer** [1] - 52:3

**employers** [1] - 50:13

**encounter** [2] - 15:11, 27:2

**encountered** [2] - 25:22, 54:22

**encounters** [1] - 59:23

**end** [4] - 20:18, 24:7, 69:7, 70:12

**enforcement** [1] - 67:4

**enrichment** [2] - 75:5, 75:6

**entities** [3] - 9:16, 17:22, 50:11

**entitled** [2] - 66:23, 76:13

**entity** [4] - 12:7, 44:1, 44:5, 55:11

**enumerating** [1] - 30:17

**envision** [1] - 74:4

**equal** [1] - 44:8

**especially** [4] - 41:17, 53:12, 67:6, 71:16

**ESQUIRE** [7] - 1:15, 2:3, 2:8, 2:14, 2:19, 2:19, 2:20

**essence** [1] - 24:12

**essentially** [12] - 5:23, 15:6, 16:14, 16:24, 20:2, 21:1, 21:4, 24:21, 28:1, 29:9, 35:6, 35:24

**estoppel** [8] - 57:25, 58:17, 58:22, 58:25, 59:2, 59:5, 59:7, 59:11

**et** [2] - 1:3, 38:8

**evaluate** [1] - 53:1

**event** [6] - 19:18, 27:16,

27:20, 39:23, 63:16, 69:8
**eventually** [1] - 69:9
**everywhere** [1] - 12:8
**evidence** [16] - 8:15, 9:13, 9:16, 11:25, 19:24, 22:17, 34:10, 34:11, 35:7, 39:15, 53:5, 54:5, 54:10, 66:8, 68:22, 69:8
**exact** [4] - 39:15, 53:11, 53:20, 73:22
**exactly** [2] - 18:18, 59:12
**examination** [1] - 39:3
**examine** [1] - 37:4
**example** [14] - 15:7, 15:12, 16:8, 19:11, 26:25, 30:22, 38:9, 42:24, 43:18, 45:6, 53:18, 56:10, 60:19, 71:21
**examples** [1] - 50:1
**excluded** [1] - 21:12
**excluding** [1] - 74:22
**executed** [1] - 67:4
**exhaustive** [1] - 32:7
**exhibits** [2] - 4:5, 9:23
**exist** [4] - 16:12, 17:15, 18:16, 18:21
**existed** [1] - 20:4
**existence** [2] - 16:13, 49:7
**exists** [6] - 21:23, 21:24, 42:25, 44:25, 49:23, 50:20
**expect** [3] - 52:3, 52:4, 52:5
**expected** [1] - 51:12
**expeditiously** [1] - 76:1
**experience** [5] - 16:3, 16:22, 58:4, 62:10, 63:22
**experiences** [1] - 71:3
**experts** [1] - 69:2
**explaining** [1] - 30:18
**exposed** [1] - 11:11
**extent** [12] - 4:25, 7:9, 10:4, 10:11, 15:15, 15:25, 16:1, 31:13, 33:11, 37:6, 61:2, 62:9
**extinguished** [1] - 74:6
**extraordinarily** [1] - 75:24
**F.3d** [1] - 30:11
**face** [1] - 11:9
**faces** [1] - 3:7
**facilities** [1] - 14:10
**fact** [5] - 9:22, 39:18, 42:14, 49:16, 73:5
**factor** [2] - 31:23, 49:10
**factors** [25] - 4:22, 26:7, 26:8, 26:11, 26:23, 27:20, 29:1, 29:10, 30:24, 31:11, 31:24, 32:4, 32:7, 32:19, 33:1, 33:12, 33:13, 49:15, 53:7, 55:13, 55:21, 61:12
**facts** [3] - 47:18, 71:24, 73:5
**factual** [4] - 19:24, 41:11, 49:6, 50:19

**fair** [2] - 58:6, 58:8
**fairly** [1] - 68:1
**faith** [2] - 66:3, 66:4
**falls** [1] - 60:8
**false** [6] - 17:13, 20:25, 21:2, 22:23, 43:10, 72:21
**far** [4] - 20:10, 33:23, 62:19
**feasibility** [1] - 71:10
**feasible** [1] - 17:8
**federal** [2] - 16:16, 70:2
**FEDERICO** [1] - 2:13
**fellowship** [1] - 15:8
**felt** [1] - 70:20
**Fen** [1] - 69:17
**Fen-Phen** [1] - 69:17
**Ferreras** [1] - 30:10
**few** [1] - 72:4
**fewer** [1] - 62:20
**fiduciary** [2] - 7:16, 7:19
**fight** [2] - 66:11, 71:24
**figure** [4] - 20:16, 43:21, 52:18, 61:23
**file** [5] - 67:22, 68:6, 68:15, 73:21, 74:8
**filed** [4] - 44:14, 63:23, 68:25, 71:13
**filing** [1] - 64:8
**fine** [6] - 5:12, 9:6, 17:25, 38:16, 67:2, 76:8
**fired** [2] - 50:13, 52:2
**first** [21] - 5:18, 15:23, 16:16, 26:7, 26:22, 27:3, 27:17, 33:9, 35:10, 35:11, 36:4, 41:3, 50:7, 53:10, 53:15, 53:25, 54:7, 60:2, 65:15, 73:10, 75:21
**fits** [1] - 63:3
**five** [1] - 55:13
**fixing** [1] - 17:4
**fledged** [1] - 34:3
**flexible** [1] - 41:22
**floating** [2] - 4:14, 29:17
**FLoor** [1] - 2:9
**flowing** [1] - 11:2
**focus** [5] - 32:22, 47:20, 48:18, 54:7, 54:18
**folks** [4] - 18:11, 18:14, 18:16, 52:10
**followed** [1] - 60:3
**foregoing** [1] - 76:12
**FOREIGN** [1] - 1:5
**Foreign** [1] - 3:5
**foreseeability** [14] - 49:11, 51:2, 51:3, 51:6, 51:9, 51:11, 51:18, 51:24, 52:7, 52:21, 53:24, 55:14, 55:15
**foreseeable** [4] - 51:20, 51:25, 54:12, 55:22
**forgot** [1] - 17:13

**form** [1] - 36:17
**forth** [1] - 5:9
**forward** [4] - 21:7, 25:23, 35:17, 76:5
**four** [8] - 7:13, 7:14, 7:15, 19:3, 42:21, 43:2, 62:4, 71:8
**four-day** [1] - 62:4
**Fourth** [1] - 31:7
**framework** [1] - 33:12
**frankly** [2] - 61:18, 69:25
**fraud** [14] - 7:6, 8:22, 9:10, 9:15, 9:25, 10:5, 10:16, 10:17, 12:20, 38:2, 38:22, 39:22, 51:21, 63:19
**fraudulent** [1] - 54:14
**front** [2] - 9:4, 10:25
**full** [2] - 34:3, 74:3
**full-fledged** [1] - 34:3
**fully** [2] - 59:21, 60:3
**Fume** [1] - 71:5
**Fumes** [1] - 69:21
**fumes** [1] - 69:23
**functional** [1] - 29:6
**fundamental** [1] - 22:4
**future** [1] - 76:4
**gained** [1] - 65:3
**gaps** [1] - 20:11
**Gates** [18] - 28:18, 28:20, 29:1, 29:3, 29:9, 29:21, 30:7, 30:15, 30:24, 31:6, 31:17, 31:19, 32:4, 32:19, 32:25, 33:8, 33:11
**gears** [1] - 47:20
**generally** [2] - 32:2, 54:2
**geographically** [1] - 13:1
**George** [1] - 13:14
**George's** [6] - 12:11, 13:6, 14:14, 16:20, 42:10, 45:4
**given** [8] - 25:12, 27:11, 40:14, 44:13, 52:20, 53:6, 53:17
**gossip** [1] - 65:11
**GRADUATES** [1] - 1:5
**Graduates** [1] - 3:5
**grand** [1] - 70:24
**great** [3] - 4:3, 44:6, 74:16
**greater** [3] - 22:3, 44:19, 44:24
**griped** [1] - 20:22
**group** [5] - 17:6, 20:20, 47:4, 47:5, 70:15
**guess** [25] - 21:6, 21:7, 22:1, 23:6, 26:3, 27:16, 29:3, 33:11, 34:2, 35:25, 40:23, 42:8, 43:12, 44:10, 45:15, 45:21, 46:1, 51:17, 51:24, 53:4, 60:7, 62:23, 65:19, 68:5, 74:20
**guidance** [1] - 32:7
**guide** [2] - 33:1, 33:8

**guided** [1] - 30:6
**guilty** [4] - 39:22, 51:21, 63:19, 64:17
**Gunnells** [1] - 31:7
**guy** [2] - 21:10, 38:11
**guys** [4] - 6:17, 20:21, 68:15, 72:4
**habit** [1] - 5:11
**half** [1] - 62:1
**half-day** [1] - 62:1
**hand** [2] - 26:4, 26:5
**handed** [1] - 40:15
**handle** [2] - 4:6, 63:5
**happily** [1] - 72:11
**happy** [3] - 5:7, 22:8, 40:4
**hard** [1] - 75:6
**Harlem** [5] - 18:2, 22:14, 22:15, 25:25, 26:1
**harm** [30] - 5:19, 5:22, 12:19, 34:8, 34:10, 34:15, 35:1, 35:3, 35:12, 36:14, 37:17, 37:18, 37:20, 38:19, 38:25, 45:16, 46:14, 47:23, 49:11, 49:13, 50:8, 51:12, 52:7, 54:2, 55:15, 55:23, 57:11, 63:21
**harmed** [1] - 37:1
**harmful** [1] - 69:22
**harms** [1] - 5:21
**health** [3] - 38:21, 39:4, 69:23
**healthcare** [6] - 9:18, 10:2, 12:16, 12:24, 24:25, 55:12
**hear** [11] - 5:7, 19:11, 23:16, 26:13, 26:14, 59:19, 59:20, 66:19, 66:20, 67:16, 72:11
**heard** [5] - 18:19, 19:2, 39:24, 62:7, 63:17
**hearing** [2] - 17:21, 65:16
**help** [1] - 57:4
**helpful** [1] - 75:25
**herself** [1] - 7:7
**highlight** [1] - 49:13
**highly** [1] - 49:23
**himself** [1] - 65:15
**HIPAA** [1] - 14:12
**hired** [5] - 50:11, 50:13, 50:14, 52:2, 60:21
**history** [1] - 54:21
**Hohider** [3] - 31:19, 31:21, 31:22
**home** [1] - 38:16
**hone** [1] - 4:9
**Honor** [49] - 3:3, 3:8, 3:11, 3:14, 3:17, 3:21, 5:22, 6:10, 7:1, 9:12, 11:22, 17:19, 19:21, 21:6, 22:1, 22:11, 24:3, 25:4, 25:18, 26:16, 28:22, 30:5, 30:15, 31:6, 33:11, 34:12, 37:2, 39:9,

41:14, 41:15, 42:18, 44:10, 46:23, 48:9, 48:12, 49:21, 50:19, 53:21, 54:5, 58:20, 60:8, 63:14, 66:8, 68:20, 70:25, 72:15, 73:10, 75:12
**HONORABLE** [1] - 1:11
**hope** [2] - 69:9, 72:6
**horrible** [1] - 45:13
**Hospital** [5] - 12:11, 16:20, 18:2, 22:14, 22:16
**hospital** [7] - 14:4, 14:22, 17:7, 19:1, 20:20, 20:22, 60:20
**hospitals** [3] - 14:1, 20:17, 24:25
**hotly** [1] - 69:4
**Howard** [11] - 9:17, 13:4, 15:7, 16:9, 18:23, 42:12, 44:12, 44:16, 45:3, 45:8
**hypothesize** [1] - 21:16
**hypothesizing** [2] - 38:9, 65:20
**hypothetical** [3] - 39:21, 43:18, 45:7
**identified** [10] - 18:15, 19:6, 28:16, 47:10, 47:13, 53:13, 54:19, 55:6, 60:2, 69:1
**identify** [8] - 12:9, 14:11, 14:13, 21:2, 25:13, 25:14, 40:2, 61:15
**identifying** [2] - 16:25, 17:18
**ignorant** [1] - 45:11
**illusory** [1] - 28:1
**illustrate** [1] - 39:10
**impact** [2] - 8:4, 56:5
**implicate** [1] - 67:7
**implications** [1] - 75:19
**importance** [1] - 55:11
**important** [4] - 5:1, 19:7, 51:15, 62:14
**imposing** [1] - 29:10
**imprisonment** [1] - 72:21
**inadequate** [1] - 60:6
**inartfully** [1] - 11:9
**include** [9] - 11:5, 11:13, 11:20, 22:14, 22:20, 22:21, 25:25, 26:1, 34:7
**includes** [2] - 11:10, 11:12
**including** [4] - 13:1, 19:16, 30:23, 44:20
**inconsistent** [1] - 20:9
**incorrect** [1] - 55:1
**indefinitely** [1] - 9:23
**indictment** [1] - 64:18
**individual** [28] - 5:23, 6:11, 17:1, 17:5, 20:4, 22:20, 35:3, 35:4, 37:1, 37:25, 38:2, 39:16, 42:18, 52:11, 54:11, 55:20, 57:11, 57:14, 59:4, 60:16, 63:20, 64:1, 64:8,

65:5, 66:9, 67:22, 70:6, 70:15
**individual's** [2] - 55:9, 67:5
**individualized** [12] - 8:16, 8:20, 35:2, 35:8, 35:16, 39:14, 46:12, 49:23, 52:13, 52:16, 54:24, 68:3
**individually** [3] - 23:7, 48:8, 54:17
**individuals** [21] - 12:9, 12:12, 12:18, 12:20, 12:22, 13:25, 14:1, 14:11, 16:25, 21:13, 46:17, 50:14, 60:11, 60:19, 61:10, 63:25, 64:4, 71:4, 71:23, 73:4, 73:14
**industry** [1] - 69:20
**industrywide** [1] - 69:22
**inefficient** [1] - 70:1
**infliction** [6] - 5:16, 6:21, 7:13, 42:25, 44:22, 47:12
**information** [8] - 18:8, 25:16, 38:21, 39:5, 49:6, 65:3, 66:21, 69:5
**informational** [1] - 20:11
**informed** [1] - 74:13
**initial** [1] - 57:22
**injured** [1] - 37:16
**injuries** [5] - 7:4, 37:6, 56:4, 59:23, 73:1
**injury** [22] - 8:9, 34:16, 34:17, 34:23, 34:24, 35:13, 36:16, 36:17, 37:16, 39:1, 44:16, 47:17, 49:16, 49:17, 49:19, 51:22, 53:8, 55:14, 63:21, 73:15, 73:21, 75:15
**inquiry** [5] - 17:8, 34:16, 35:6, 57:15, 58:5
**instance** [5] - 5:18, 11:7, 26:7, 46:25, 75:5
**instances** [2] - 24:14, 36:9
**instead** [2] - 66:2, 75:9
**institution** [6] - 9:18, 12:7, 12:10, 22:21, 23:13, 23:18
**institutions** [8] - 10:3, 12:16, 12:24, 16:19, 16:20, 24:25, 25:14, 25:24
**instructive** [1] - 72:15
**insulted** [2] - 5:10, 5:13
**intentional** [1] - 61:4
**interaction** [5] - 54:11, 54:12, 56:14, 72:25, 75:15
**interactions** [2] - 53:10, 75:14
**interest** [17] - 34:17, 35:14, 37:23, 42:3, 42:4, 42:13, 42:16, 43:23, 43:24, 43:25, 44:1, 44:6, 44:7, 44:20, 44:24, 46:16, 60:11
**interesting** [1] - 10:8
**interests** [1] - 36:11

**interplay** [5] - 4:18, 26:4, 27:22, 29:7, 32:22
**intervening** [1] - 52:6
**interwoven** [1] - 53:16
**invasion** [8] - 34:17, 35:14, 36:13, 36:17, 36:18, 36:22, 37:23, 38:20
**involve** [1] - 17:23
**involved** [4] - 14:2, 60:13, 62:18, 71:4
**involvement** [4] - 12:19, 15:16, 18:5, 22:15
**involves** [1] - 25:23
**involving** [5] - 7:6, 17:4, 20:4, 20:20, 39:15
**issue** [56] - 5:21, 5:24, 10:4, 10:16, 11:23, 16:6, 16:7, 16:12, 19:12, 19:20, 19:22, 20:8, 20:19, 21:23, 22:5, 22:21, 22:24, 22:25, 23:10, 23:20, 24:15, 24:22, 24:23, 26:22, 27:5, 27:8, 27:25, 28:3, 28:25, 29:4, 30:16, 30:20, 31:6, 31:25, 32:24, 34:9, 37:8, 39:8, 39:11, 39:16, 46:6, 47:7, 47:18, 52:23, 55:4, 57:23, 59:12, 60:1, 61:9, 61:25, 64:11, 66:9, 75:2, 75:13, 75:19
**issued** [1] - 65:7
**issues** [58] - 4:7, 4:8, 4:14, 4:17, 4:18, 9:1, 11:21, 15:2, 15:13, 17:25, 19:8, 19:9, 19:10, 20:10, 23:4, 23:9, 23:25, 24:6, 25:2, 26:9, 26:10, 26:12, 26:17, 26:19, 27:18, 28:5, 28:10, 29:2, 29:12, 29:17, 30:17, 30:18, 31:12, 32:8, 40:9, 40:11, 40:16, 41:4, 47:21, 47:23, 47:24, 49:3, 52:17, 53:15, 54:3, 54:19, 54:24, 57:21, 59:21, 59:22, 61:15, 62:2, 63:6, 64:13, 70:6, 70:17, 72:18
**iterations** [1] - 19:3
**itself** [2] - 14:3, 47:14
**James** [1] - 1:7
**JANET** [2] - 1:14
**January** [2] - 1:9, 50:20
**Jersey** [11] - 9:18, 13:1, 16:8, 19:11, 19:16, 40:23, 40:24, 41:24, 42:8, 42:9
**JMSC** [2] - 50:4, 50:7
**job** [1] - 38:24
**Jordan** [2] - 30:9, 40:15
**JOSHUA** [1] - 1:11
**JSMC** [1] - 18:7
**Judge** [6] - 30:9, 32:13, 40:15, 55:6, 62:7, 73:3

**judgment** [10] - 15:19, 19:16, 20:7, 22:22, 23:3, 73:18, 73:19, 73:22, 74:5, 74:13
**judicata** [1] - 71:22
**judicial** [1] - 72:25
**judiciary** [1] - 58:4
**jumping** [1] - 23:22
**June** [1] - 67:6
**jurisdiction** [2] - 45:24, 67:21
**jury** [3] - 35:10, 53:1, 53:2
**keep** [2] - 14:1, 75:22
**kept** [4] - 15:4, 15:5, 16:10, 75:21
**key** [1] - 6:18
**Kids** [1] - 72:16
**kids** [1] - 45:12
**kind** [25] - 4:15, 4:24, 6:19, 8:14, 11:10, 15:4, 28:25, 29:10, 29:13, 29:14, 31:23, 32:20, 33:1, 33:3, 33:4, 37:16, 37:17, 47:22, 53:13, 53:19, 63:3, 64:19, 67:10, 67:15, 73:15
**kinds** [2] - 69:20, 72:25
**KLAYMAN** [2] - 2:20, 4:1
**Klayman** [1] - 4:1
**knowledge** [2] - 64:1, 66:22
**known** [3] - 9:24, 12:7, 65:11
**Lane** [1] - 58:5
**language** [1] - 6:5
**last** [6] - 16:6, 28:14, 36:23, 36:24, 63:6, 67:14
**latter** [1] - 26:16
**law** [53] - 6:24, 6:25, 7:2, 7:9, 7:10, 7:11, 8:13, 24:10, 29:18, 29:19, 40:9, 40:11, 40:22, 41:4, 41:5, 41:6, 41:8, 41:9, 41:11, 41:16, 41:21, 41:22, 42:9, 42:11, 42:12, 42:15, 42:19, 42:21, 42:23, 43:1, 43:8, 43:13, 43:19, 44:2, 44:15, 44:19, 45:20, 45:24, 46:2, 46:13, 47:9, 47:15, 47:18, 48:24, 48:25, 49:5, 49:6, 55:7, 57:24, 67:4, 72:21, 75:7
**LAW** [1] - 2:8
**laws** [4] - 43:3, 43:9, 47:5, 47:6
**lawsuit** [1] - 73:21
**lay** [1] - 45:6
**learning** [1] - 54:13
**least** [9] - 6:17, 7:11, 36:1, 42:21, 44:6, 51:8, 51:14, 61:21, 66:7
**leave** [2] - 30:19, 63:4
**leaves** [1] - 23:24
**left** [2] - 8:19, 64:11
**legal** [1] - 50:8

**legally** [4] - 10:8, 34:17, 35:14, 37:23
**lenses** [1] - 32:3
**less** [2] - 74:16, 74:17
**letter** [1] - 71:8
**level** [1] - 33:7
**LEWIS** [2] - 2:18
**liability** [19] - 8:1, 19:14, 20:1, 23:8, 24:15, 24:22, 27:5, 28:24, 31:2, 34:3, 34:10, 34:20, 37:19, 39:8, 40:1, 40:3, 72:18, 72:23
**liability-only** [1] - 40:3
**licensed** [1] - 10:3
**licensing** [2] - 50:12, 52:4
**lies** [1] - 19:18
**likelihood** [1] - 53:8
**likely** [1] - 68:1
**limitations** [11] - 63:9, 63:10, 63:11, 63:15, 64:9, 64:13, 65:22, 65:23, 66:6, 66:12, 66:24
**limited** [1] - 61:9
**list** [2] - 12:12, 30:4
**listening** [1] - 33:20
**Litigation** [2] - 58:12
**litigation** [5] - 16:23, 60:1, 60:5, 61:3, 70:13
**live** [1] - 28:19
**lives** [3] - 42:14, 44:11, 45:7
**living** [1] - 45:12
**LLC** [1] - 1:14
**LLP** [1] - 2:18
**locally** [1] - 68:16
**logic** [1] - 57:3
**logical** [2] - 40:8, 62:11
**logically** [1] - 32:9
**look** [23] - 7:12, 13:17, 16:14, 23:5, 27:17, 31:11, 31:13, 31:24, 32:14, 32:15, 33:1, 33:2, 33:12, 41:8, 42:1, 42:2, 43:2, 49:23, 50:1, 58:13, 72:9, 72:15
**looked** [1] - 50:14
**looking** [4] - 29:1, 41:18, 42:20, 59:2
**lose** [1] - 68:20
**lost** [1] - 21:20
**luxury** [1] - 41:19
**mailed** [1] - 71:9
**mailing** [2] - 53:19, 71:7
**maintain** [1] - 16:21
**maintained** [1] - 27:11
**malpractice** [6] - 16:1, 55:16, 56:3, 64:23, 66:8, 66:14
**manage** [1] - 63:4
**manageability** [6] - 33:5, 41:18, 59:12, 61:12, 62:24, 75:19

**manifestation** [2] - 7:5, 8:12
**marching** [1] - 33:15
**marginal** [2] - 21:24, 22:2
**Marie** [2] - 1:20, 76:16
**Market** [3] - 1:8, 2:3, 2:20
**Martin** [1] - 27:25
**Maryland** [33] - 1:16, 2:10, 2:15, 7:2, 10:3, 12:12, 40:22, 41:24, 42:4, 42:5, 42:11, 43:1, 43:12, 43:20, 43:24, 44:6, 44:13, 44:15, 44:16, 44:19, 44:21, 44:25, 45:3, 46:21, 47:15, 60:1, 60:5, 60:21, 68:4, 68:6
**mass** [3] - 67:17, 68:25, 69:14
**master** [1] - 68:18
**matter** [5] - 10:6, 32:18, 32:19, 48:25, 76:13
**MATTHEW** [1] - 2:20
**Matthew** [1] - 4:1
**matthew.klayman@ morganlewis.com** [1] - 2:3
**McEnroe** [5] - 2:19, 3:24, 66:25, 67:3
**MDL** [5] - 67:25, 68:9, 69:15, 69:21, 71:5
**MDLs** [1] - 68:24
**mean** [72] - 5:9, 10:7, 10:10, 10:17, 11:2, 12:4, 13:12, 15:25, 16:24, 17:3, 17:12, 18:1, 19:19, 20:18, 20:21, 21:15, 21:20, 21:23, 23:4, 23:15, 24:5, 24:13, 25:6, 26:7, 26:22, 27:5, 28:15, 28:16, 29:9, 31:13, 33:5, 33:7, 36:23, 37:18, 39:18, 40:14, 40:23, 42:7, 43:16, 43:21, 45:4, 45:18, 46:5, 47:22, 53:25, 55:16, 56:1, 56:11, 56:17, 56:25, 57:2, 60:3, 61:16, 62:9, 65:9, 65:10, 65:24, 66:13, 66:15, 66:17, 67:11, 67:20, 69:16, 69:18, 70:19, 70:20, 74:2, 74:7, 74:14, 75:1
**meaning** [2] - 26:17, 35:4
**meaningful** [4] - 15:16, 70:12, 74:10, 74:11
**meaningfully** [1] - 43:3
**means** [3] - 10:1, 16:25, 72:9
**meant** [1] - 11:13, 57:8
**measure** [2] - 20:16, 23:19
**MEDICAL** [1] - 1:5
**Medical** [3] - 3:5, 13:2, 13:7
**medical** [13] - 8:15, 14:12, 15:25, 16:4, 18:20, 18:21, 24:25, 34:23, 55:16, 56:2, 64:23, 67:5, 67:6
**medication** [2] - 17:6, 17:7

**medicine** [4] - 9:19, 12:8, 44:21, 52:6
**meeting** [1] - 39:21
**meets** [1] - 38:7
**member** [5] - 20:6, 35:4, 60:16, 65:2
**members** [13] - 14:13, 19:7, 21:14, 24:24, 25:1, 27:10, 46:20, 49:8, 52:11, 60:14, 66:5, 67:7, 74:2
**mention** [1] - 18:4
**mentioned** [2] - 13:6, 47:17
**meritorious** [1] - 66:14
**merits** [2] - 19:10, 22:24
**met** [1] - 39:20
**method** [3] - 12:5, 17:9, 17:10
**methods** [1] - 70:10
**Middle** [1] - 72:18
**might** [13] - 10:12, 26:20, 30:20, 31:12, 46:20, 50:14, 60:16, 60:19, 61:10, 62:12, 62:6, 74:15, 74:16
**mill** [1] - 65:11
**mind** [8] - 5:5, 5:8, 6:24, 8:19, 11:21, 72:6, 72:8, 75:22
**mini** [2] - 61:11, 61:17
**mini-trials** [2] - 61:11, 61:17
**minimal** [1] - 12:20
**minimum** [1] - 42:20
**minus** [1] - 63:23
**minute** [1] - 76:7
**minutes** [2] - 52:24, 72:4
**missed** [2] - 13:9, 48:3
**Mitchell** [2] - 1:20, 76:16
**modification** [1] - 28:8
**modifications** [1] - 22:6
**modifying** [1] - 17:21
**MONIQUE** [1] - 1:3
**moreover** [1] - 47:15
**MORGAN** [1] - 2:18
**morning** [3] - 3:8, 3:11, 3:14
**most** [10] - 24:13, 27:24, 42:2, 42:13, 42:15, 43:23, 45:17, 46:16, 48:15, 74:24
**mostly** [1] - 59:21
**motion** [3] - 10:25, 22:7, 76:1
**motions** [2] - 61:22, 68:9
**motivate** [1] - 61:18
**move** [2] - 30:4, 46:9
**moved** [1] - 43:18
**MR** [124] - 3:8, 3:11, 3:14, 3:17, 3:21, 4:1, 5:22, 6:7, 6:10, 6:20, 7:1, 7:19, 7:23, 8:2, 8:5, 8:7, 8:10, 8:14, 8:21, 8:24, 9:6, 9:7, 9:12, 10:10, 10:13, 10:20, 11:15, 11:22, 13:3, 13:5, 13:8, 13:10, 13:21, 13:24, 14:7,

**14:16, 14:19, 14:23, 15:9, 15:15, 15:25, 16:14, 16:19, 17:19, 19:21, 21:5, 22:1, 22:11, 22:14, 24:3, 24:10, 24:18, 24:20, 25:7, 25:11, 25:18, 26:1, 26:16, 27:7, 28:22, 30:1, 30:5, 31:21, 32:2, 33:10, 34:12, 36:9, 36:15, 37:2, 37:12, 37:14, 37:21, 38:18, 38:20, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 46:23, 48:9, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 54:5, 55:1, 55:4, 56:7, 56:16, 56:19, 56:22, 57:7, 57:10, 58:3, 58:20, 59:6, 59:12, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 68:20, 70:8, 70:25, 72:12, 72:14, 73:9, 74:20, 75:11**
**MS** [2] - 3:24, 67:3
**multifactorial** [1] - 49:9
**multiple** [6] - 9:16, 50:13, 70:9, 70:10, 71:14
**must** [2] - 30:13, 33:18
**mutuality** [1] - 58:9
**naked** [1] - 36:12
**name** [4] - 9:3, 9:5, 21:8, 31:18
**named** [5] - 44:11, 50:9, 57:22, 60:15, 63:17
**names** [1] - 3:7
**narrow** [1] - 32:13
**narrower** [2] - 27:6, 47:21
**narrowest** [1] - 32:11
**nationwide** [1] - 46:24
**naturally** [1] - 11:2
**nature** [11] - 38:25, 39:3, 49:13, 53:17, 54:20, 56:2, 56:3, 56:14, 56:24, 57:11, 69:6
**ncentrella@conradobrien. com** [1] - 2:5
**nearby** [1] - 45:5
**necessary** [1] - 39:25
**need** [19] - 5:3, 5:12, 8:12, 8:14, 23:11, 23:14, 23:18, 25:12, 25:14, 28:3, 28:7, 35:23, 41:5, 66:4, 67:9, 67:16, 68:22, 72:7
**needing** [1] - 28:11
**needs** [3] - 30:21, 31:10, 54:17
**negate** [1] - 32:20
**negatives** [4] - 17:13, 20:25, 21:2, 22:23
**negligence** [11] - 5:16, 5:19, 7:2, 7:14, 10:11, 36:12,

47:10, 47:14, 47:16, 48:6,
52:10

**negligent** [7] - 5:16, 6:21,
7:12, 35:11, 42:25, 44:22,
47:12

**negligently** [1] - 55:18

**nerve** [1] - 38:16

**new** [1] - 50:14

**New** [4] - 40:23, 41:24, 42:8,
42:9

**newspaper** [1] - 66:20

**next** [1] - 30:4

**NICHOLAS** [1] - 2:3

**Nick** [1] - 3:14

**Nigeria** [6] - 11:7, 11:11,
11:23, 11:24, 12:1, 17:24

**nine** [1] - 69:1

**NO** [1] - 1:3

**non** [1] - 32:7

**non-exhaustive** [1] - 32:7

**nonascertainable** [1] - 21:4

**none** [3] - 45:18, 45:19,
45:23

**nonetheless** [1] - 52:1

**normal** [2] - 38:14, 38:15

**normally** [1] - 6:23

**Northern** [1] - 70:3

**note** [5] - 17:13, 62:23,
64:10, 73:11, 75:21

**noted** [3] - 30:12, 31:6, 47:1

**notes** [1] - 30:16

**nothing** [2] - 46:14, 60:22

**notice** [14] - 18:9, 19:13,
22:19, 23:12, 24:8, 24:11,
25:7, 25:9, 25:13, 67:11,
73:14, 74:10, 74:11

**notion** [1] - 47:22

**notwithstanding** [1] - 72:23

**number** [6] - 25:2, 36:5,
49:9, 67:17, 69:8, 69:19

**numerosity** [2] - 32:12,
33:16

**numerous** [2] - 22:7, 70:17

**O'BRIEN** [1] - 2:2

**OB** [1] - 56:15

**objective** [9] - 7:8, 12:14,
12:15, 16:24, 17:8, 20:13,
20:14, 20:16, 23:19

**objectivity** [1] - 17:16

**obligations** [3] - 25:1, 46:22,
52:9

**observation** [2] - 37:7, 37:24

**observe** [1] - 38:8

**observing** [1] - 15:12

**obtained** [2] - 13:15, 38:1

**obviously** [7] - 9:13, 13:25,
34:13, 43:8, 62:9, 68:11,
72:23

**occur** [3] - 33:18, 44:2, 49:14

**occurred** [3] - 11:23, 65:8,
65:10

**occurs** [1] - 55:25

**odd** [1] - 45:22

**odds** [1] - 65:17

**offensively** [1] - 58:6

**offer** [5] - 8:15, 32:7, 32:10,
53:9, 53:11

**offered** [1] - 75:20

**offering** [1] - 19:25

**office** [2] - 38:13, 64:6

**OFFICES** [1] - 2:8

**Official** [2] - 1:21, 76:16

**Ohio** [1] - 70:3

**old** [1] - 5:11

**once** [3] - 4:15, 4:24, 71:14

**one** [51] - 7:17, 9:1, 15:2,
16:6, 21:5, 22:12, 23:3,
23:11, 23:18, 23:24, 26:3,
26:4, 28:2, 31:19, 37:20,
38:5, 40:20, 43:6, 43:16,
44:15, 45:1, 45:6, 45:21,
47:2, 49:10, 50:5, 50:9, 53:1,
53:6, 55:13, 57:1, 57:14,
57:19, 57:22, 60:2, 61:19,
61:25, 62:11, 63:7, 63:24,
65:25, 66:8, 67:3, 68:1,
70:14, 72:14, 73:9, 74:22,
74:25

**One** [1] - 2:9

**ones** [1] - 69:18

**operate** [1] - 74:10

**Opioids** [1] - 69:16

**opportunity** [2] - 5:1, 35:17

**opposed** [4] - 8:8, 28:11,
61:4, 70:22

**opposition** [1] - 60:3

**opt** [13] - 24:8, 25:8, 25:9,
61:6, 61:8, 61:9, 73:14,
73:16, 73:18, 74:2, 74:9,
74:19, 74:21

**opt-out** [8] - 24:8, 25:8, 25:9,
61:8, 73:14, 74:9, 74:19,
74:21

**opted** [1] - 75:16

**option** [2] - 34:2, 47:21

**options** [1] - 63:4

**ORAL** [1] - 1:5

**order** [3] - 3:1, 41:1, 49:5

**ordinary** [1] - 56:22

**organization** [1] - 18:5

**organizations** [1] - 17:22

**otherwise** [5] - 4:8, 32:10,
40:24, 42:15, 67:22

**ourselves** [1] - 13:24

**outcome** [6] - 27:4, 36:21,
43:13, 45:22, 58:19, 71:8

**outline** [2] - 23:22, 63:6

**outlined** [1] - 4:20

**overlap** [5] - 33:2, 34:9, 35:7,
35:20, 48:13

**owe** [4] - 24:24, 49:8, 50:7

**owes** [1] - 50:16

**own** [2] - 60:16, 61:10

**p.m** [3] - 1:9, 3:1, 76:9

**PA** [2] - 1:8, 2:13

**page** [1] - 9:8

**Palsgraf** [2] - 49:20, 51:20

**panel** [1] - 69:15

**panoply** [1] - 74:3

**paper** [1] - 9:22

**Park** [1] - 58:5

**part** [12] - 16:1, 17:20, 17:22,
18:12, 24:3, 30:21, 31:9,
44:25, 45:17, 49:10, 52:10,
55:7

**particular** [14] - 16:9, 20:7,
26:5, 49:12, 49:14, 49:23,
50:1, 53:10, 55:15, 55:23,
57:18, 57:23, 60:13, 74:25

**particularly** [2] - 17:14,
21:21

**parties** [2] - 53:19, 58:22

**partners** [1] - 65:25

**parts** [1] - 60:10

**party** [1] - 21:19

**past** [1] - 28:13

**patient** [20] - 7:23, 7:24,
12:4, 12:22, 14:7, 15:11,
15:17, 16:23, 34:22, 36:11,
36:12, 38:7, 54:11, 55:18,
56:7, 56:10, 56:11, 56:20,
58:8, 67:12

**patients** [12] - 11:7, 11:12,
11:24, 12:1, 14:18, 15:3,
15:20, 16:10, 16:11, 25:20,
25:21, 34:22, 35:13, 36:17,
37:3, 37:4, 37:5, 39:5, 54:9,
57:12, 57:14

**Patrick** [1] - 3:8

**PATRICK** [1] - 1:15

**patterns** [1] - 36:1

**PAUL** [1] - 2:8

**Paul** [2] - 2:14, 3:11

**pause** [1] - 35:25

**PC** [2] - 2:2, 2:8

**pencil** [1] - 11:19

**pending** [2] - 64:23, 76:1

**Pennsylvania** [30] - 2:4,
2:21, 6:24, 7:9, 7:10, 7:11,
8:13, 40:22, 41:24, 42:1,
43:12, 44:2, 44:3, 44:5, 44:9,
44:14, 44:17, 44:18, 45:15,
46:3, 46:4, 46:9, 46:15,
46:21, 47:9, 67:20, 72:19

**PENNSYLVANIA** [1] - 1:1

**Pennsylvania's** [4] - 41:22,
43:25, 44:1, 44:7

**people** [13] - 15:13, 17:18,
25:13, 36:2, 36:5, 37:15,

**percent** [1] - 17:1

**perception** [1] - 8:9

**perfect** [1] - 17:1

**perfectly** [1] - 72:10

**performed** [2] - 44:4, 55:18

**perhaps** [4] - 50:2, 65:1,
65:2, 65:3

**period** [6] - 18:11, 22:18,
24:8, 25:8, 25:9, 61:8

**permutations** [1] - 31:5

**person** [15] - 21:6, 37:24,
38:2, 38:21, 38:22, 39:17,
50:5, 50:6, 50:7, 50:17, 52:5,
66:16, 75:14, 75:16

**Person** [1] - 66:22

**person's** [1] - 65:5

**personal** [2] - 73:15, 73:21

**personally** [1] - 32:20

**perspective** [9] - 17:18,
18:25, 40:2, 43:13, 46:19,
48:21, 59:16, 60:18, 74:1

**perspectives** [1] - 57:18

**PETER** [1] - 2:8

**pharmacy** [1] - 17:4

**phase** [6] - 53:2, 53:10,
53:12, 53:15, 53:16, 54:10

**Phen** [1] - 69:17

**Philadelphia** [3] - 1:8, 2:4,
2:21

**phrase** [1] - 12:16

**physical** [8] - 7:4, 8:3, 8:4,
8:12, 15:11, 47:17, 75:15

**physician** [8] - 7:23, 12:4,
12:22, 14:3, 20:20, 34:25,
37:25, 56:22

**physician-patient** [3] - 7:23,
12:4, 12:22

**physicians** [2] - 16:2, 44:20

**pick** [1] - 46:21

**piece** [7] - 9:22, 17:16,
20:23, 21:5, 40:20, 53:24,
54:17

**place** [10] - 17:6, 33:9, 40:9,
44:5, 45:14, 45:20, 45:22,
45:24, 46:5, 68:18

**placed** [1] - 52:1

**places** [1] - 16:22

**plaintiff** [38] - 7:7, 8:3, 8:16,
20:5, 20:7, 23:5, 42:18,
44:10, 44:11, 46:7, 46:13,
49:2, 49:12, 49:16, 49:24,
50:9, 52:2, 52:7, 52:13, 53:7,
53:23, 54:20, 55:9, 55:20,
55:24, 56:2, 56:3, 57:18,
58:23, 58:24, 59:9, 66:19,
69:5, 69:11, 71:6, 74:14,
74:16

**plaintiff's** [6] - 3:7, 45:15,

53:10, 54:21, 72:13, 75:2
**Plaintiffs** [4] - 1:18, 2:6, 2:11, 2:16
**plaintiffs** [43] - 3:9, 3:12, 3:15, 3:18, 4:20, 5:19, 6:11, 7:20, 11:4, 22:2, 26:13, 27:9, 27:12, 31:3, 31:8, 32:10, 35:17, 39:19, 41:23, 43:11, 44:3, 44:23, 50:10, 54:13, 57:22, 60:15, 61:19, 62:17, 62:19, 63:17, 63:20, 64:4, 64:11, 67:14, 70:15, 72:24, 73:11, 74:3, 74:14, 74:24, 75:7
**plan** [3] - 53:5, 62:7, 62:14
**play** [4] - 42:15, 62:11, 62:12, 62:13
**playbook** [2] - 67:18, 68:5
**playing** [1] - 54:3
**plea** [4] - 51:21, 63:19, 64:17, 64:21
**plead** [1] - 66:1
**pleadings** [1] - 4:5
**pled** [1] - 39:22
**plus** [1] - 29:14
**point** [12] - 16:10, 16:21, 22:12, 23:3, 25:23, 28:2, 28:15, 52:18, 66:12, 67:3, 73:9, 73:25
**pointed** [2] - 49:22, 64:10
**points** [1] - 70:10
**port** [1] - 57:3
**posing** [1] - 23:17
**posit** [1] - 44:4
**positing** [2] - 44:24, 57:19
**position** [5] - 29:5, 35:12, 36:13, 37:4, 60:17
**possession** [1] - 21:18
**possibility** [8] - 17:12, 32:20, 40:23, 45:23, 63:25, 65:21, 74:6, 74:18
**possible** [3] - 17:2, 74:4, 74:23
**Post** [1] - 75:21
**post** [1] - 19:18
**Post-it** [1] - 75:21
**posture** [1] - 62:16
**potential** [3] - 32:24, 64:8, 67:7
**potentially** [9] - 11:10, 11:12, 34:8, 36:23, 43:6, 45:9, 65:4, 67:7, 74:5
**Powell** [1] - 72:16
**practical** [2] - 12:15, 32:18, 32:19, 75:18
**practice** [17] - 9:19, 10:3, 12:8, 13:7, 14:5, 14:18, 14:21, 16:1, 20:19, 38:7, 42:10, 44:21, 52:5, 61:22, 67:5, 67:6, 70:20

**practiced** [1] - 18:3
**practicing** [1] - 10:2
**pre** [1] - 19:19
**preceded** [1] - 64:19
**precise** [1] - 9:22
**preclude** [1] - 54:24
**precludes** [2] - 47:19, 65:23
**preclusive** [1] - 61:1, 69:12
**predated** [3] - 18:5, 22:16, 31:19
**predates** [1] - 11:13, 18:7
**predominance** [7] - 26:18, 28:4, 28:9, 29:13, 29:20, 31:9, 32:24
**pregnancy** [1] - 56:12
**pregnant** [2] - 38:10, 56:11
**prepared** [1] - 1:23
**prerequisite** [1] - 10:2
**present** [2] - 30:24, 53:22
**presented** [8] - 31:1, 32:6, 35:8, 43:14, 53:6, 54:1, 54:6, 63:16
**presents** [1] - 39:11
**press** [5] - 63:18, 63:24, 64:1, 65:7, 65:14
**presumably** [4] - 25:15, 56:13, 74:8, 74:23
**presume** [2] - 15:11, 68:10
**pretrial** [1] - 69:3
**pretty** [4] - 4:6, 5:3, 21:9, 47:9
**prevails** [1] - 73:19
**prevent** [2] - 59:1, 59:5
**price** [1] - 17:4
**primarily** [2] - 55:5, 64:10
**Prince** [7] - 12:11, 13:6, 13:13, 14:14, 16:20, 42:10, 45:3
**privacy** [4] - 36:13, 36:19, 36:22, 38:20
**private** [6] - 13:7, 14:17, 20:19, 38:7, 42:10, 55:11
**privileges** [2] - 14:15, 14:16
**problem** [20] - 17:17, 19:5, 22:2, 22:25, 30:24, 34:8, 39:12, 40:18, 42:23, 46:1, 48:5, 51:23, 52:23, 53:14, 53:22, 61:2, 64:9, 73:17, 75:3, 75:18
**problems** [15] - 17:20, 22:4, 22:8, 23:17, 29:17, 29:18, 30:22, 30:25, 32:16, 32:24, 34:4, 40:1, 43:14, 46:9, 56:12
**procedure** [1] - 15:16
**procedures** [2] - 14:1, 14:13
**proceed** [1] - 58:1
**proceeding** [7] - 7:18, 8:6, 35:16, 36:16, 65:6, 66:10, 66:24

**Proceedings** [2] - 1:23, 76:9
**proceedings** [8] - 8:17, 8:20, 35:2, 35:8, 40:17, 64:14, 69:3, 76:13
**process** [4] - 5:8, 25:16, 55:7, 65:4
**processing** [1] - 22:17
**producers** [1] - 70:9
**professional** [2] - 13:15, 14:20
**program** [3] - 9:17, 9:18, 18:23
**prong** [2] - 8:6, 61:14
**proof** [10] - 22:25, 33:4, 35:20, 49:3, 52:22, 54:1, 69:20, 69:24, 70:5, 70:11
**proofs** [2] - 48:13, 52:25
**proper** [1] - 14:12
**properly** [2] - 9:20, 12:1
**prophylactically** [1] - 66:2
**proposed** [6] - 12:6, 22:4, 25:2, 32:8, 34:1, 57:13
**proposing** [1] - 42:22
**proposition** [1] - 44:22
**prosecution** [1] - 64:16
**prospects** [1] - 47:21
**protected** [4] - 34:17, 35:14, 37:23, 38:21
**provable** [1] - 12:21
**prove** [1] - 8:14
**proved** [3] - 7:4, 7:6, 58:13
**proverbial** [1] - 44:7
**provided** [3] - 9:16, 9:22, 67:10
**providing** [3] - 15:19, 33:12, 47:2
**provisions** [1] - 29:8
**pthronson@jjsjustice.com** [1] - 1:17
**public** [3] - 49:8, 55:11, 65:17
**punitive** [1] - 46:17
**punt** [2] - 23:20, 41:4
**purchased** [2] - 17:5, 17:7
**purchasers** [1] - 21:17
**purely** [1] - 71:16
**purport** [1] - 18:13
**purported** [2] - 9:19, 12:8
**purpose** [2] - 22:19, 39:2
**purposes** [2] - 6:13, 57:15
**pursue** [4] - 60:14, 61:3, 75:5, 75:9
**put** [13] - 3:7, 9:4, 18:8, 34:22, 36:12, 37:3, 37:4, 37:9, 40:20, 68:17, 68:23, 69:8, 69:24
**putting** [1] - 33:3

**pvettori@lawpga.com** [1] - 2:11
**qualifications** [1] - 38:1
**quasi** [1] - 55:11
**questions** [18] - 4:8, 6:2, 11:3, 15:1, 20:5, 26:3, 32:5, 32:6, 34:13, 39:10, 39:12, 39:14, 40:25, 43:17, 49:12, 52:13, 63:12, 69:10
**raise** [3] - 63:9, 74:6, 75:20
**raised** [1] - 40:10
**raising** [1] - 47:11
**range** [1] - 71:3
**rather** [3] - 22:25, 29:6, 67:18
**RDR** [2] - 1:20, 76:16
**Re** [2] - 12:6, 58:12
**reaction** [1] - 39:24
**read** [8] - 5:3, 23:24, 40:14, 48:2, 51:8, 51:20, 63:20, 72:7
**reading** [1] - 11:8
**reality** [1] - 71:1
**really** [20] - 12:21, 19:20, 26:6, 28:14, 29:3, 29:4, 31:2, 40:21, 40:22, 43:25, 46:15, 46:20, 49:1, 51:19, 60:4, 63:2, 69:11, 75:6
**reanalyze** [1] - 55:17
**reason** [8] - 11:17, 11:18, 19:17, 24:7, 32:9, 51:1, 58:16, 58:18
**reasonable** [1] - 56:19
**recent** [1] - 27:24
**recently** [1] - 41:15
**recitation** [1] - 19:3
**recognize** [1] - 20:11
**recollection** [1] - 31:18
**record** [6] - 9:13, 12:24, 16:17, 21:20, 41:16, 76:13
**recorded** [1] - 15:24
**records** [18] - 8:15, 14:10, 14:12, 15:4, 15:5, 16:4, 16:10, 16:13, 16:21, 17:5, 18:16, 18:18, 18:20, 18:21, 21:3, 21:7, 21:17
**recover** [1] - 39:20
**red** [1] - 11:19
**reference** [9] - 6:1, 6:3, 7:7, 8:25, 9:9, 18:2, 55:5, 55:8, 58:11
**referenced** [1] - 9:1
**references** [1] - 64:2
**reflect** [3] - 14:8, 18:18, 18:22
**reflected** [2] - 15:20, 16:3
**reflecting** [1] - 14:9
**regard** [1] - 31:24
**regardless** [4] - 26:19, 28:18, 39:2, 39:3

regulating [3] - 42:3, 42:4, 44:20
reject [1] - 32:17
rejected [1] - 31:7
related [5] - 11:2, 51:22, 67:3, 67:24, 73:11
relates [1] - 17:20
relationship [6] - 7:22, 7:24, 12:4, 12:22, 56:8, 56:10
relatives [1] - 8:16
release [5] - 63:18, 63:24, 64:1, 65:8, 65:14
relevant [6] - 30:14, 34:16, 47:5, 47:10, 49:17, 57:15
relitigate [1] - 59:11
remain [1] - 47:22
remaining [1] - 30:18
remember [1] - 21:8
remind [1] - 5:2
remoteness [1] - 49:21
remove [2] - 43:14, 68:6
removed [1] - 68:8
rendered [1] - 14:8
rendering [1] - 15:18
renders [2] - 21:3, 60:6
repeat [1] - 72:7
repetitions [1] - 5:4
rephrase [1] - 40:13
report [2] - 18:10, 51:20
Reporter [2] - 1:21, 76:16
represent [1] - 6:17
representation [1] - 33:17
representative [1] - 27:12
representatives [1] - 61:14
represented [1] - 62:20
Representing [5] - 1:18, 2:6, 2:11, 2:16, 2:23
requesting [1] - 14:9
requirement [3] - 16:16, 51:2, 51:4
requirements [2] - 20:12, 31:10
res [1] - 71:22
Reservoir [1] - 1:15
residence [1] - 67:5
residency [6] - 9:17, 15:7, 15:8, 15:9, 18:23
resident [4] - 15:22, 38:1, 44:16, 45:9
residents [4] - 15:5, 16:2, 41:23
resolution [4] - 5:24, 69:10, 69:11, 70:13
resolve [10] - 30:13, 40:11, 40:13, 40:16, 40:17, 57:19, 57:21, 57:24, 68:13, 70:17
resolved [9] - 22:22, 30:18, 48:3, 48:4, 57:23, 64:13, 65:5, 67:17, 68:18

respect [21] - 17:24, 18:9, 19:24, 22:23, 26:19, 27:21, 27:22, 28:9, 29:2, 34:15, 35:5, 37:7, 43:12, 44:13, 50:18, 56:20, 56:23, 59:8, 60:1, 64:16, 75:11
respectfully [2] - 19:21, 72:1
respects [4] - 24:14, 45:23, 68:21, 70:20
respond [2] - 22:11, 39:7
response [2] - 46:23, 59:20
RESPONSE [1] - 3:3
responses [3] - 11:7, 19:13, 64:3
rest [2] - 32:15, 33:2
Restatement [1] - 9:11
result [6] - 12:19, 37:16, 37:17, 50:8, 58:8, 63:21
retention [2] - 16:7, 16:17
retrieval [1] - 25:16
retry [1] - 60:4
revealed [1] - 66:23
revenue [4] - 13:16, 13:17, 14:20, 14:22
reversing [1] - 30:12
review [1] - 14:10
reviews [1] - 52:8
RICO [1] - 72:20
rights [2] - 73:4, 74:12
rigorous [1] - 29:22
rise [6] - 25:1, 44:4, 47:2, 47:16, 54:12, 54:14
risk [2] - 51:10, 51:11
risks [1] - 71:18
RMR [2] - 1:20, 76:16
role [1] - 55:10
room [1] - 15:12, 21:9, 34:22, 35:9, 37:3, 37:10, 37:22, 38:11, 38:13, 39:4, 67:12
rounding [3] - 16:2, 17:14, 36:5
rounds [2] - 15:21, 15:23
rubric [2] - 5:20, 63:3
rubrics [1] - 61:16
Rule [11] - 4:18, 20:9, 26:4, 41:17, 62:22, 63:1, 65:25, 66:3, 66:4, 71:14, 72:1
rules [1] - 27:23
ruling [1] - 75:23
run [3] - 20:18, 62:21, 68:17
RUSSELL [1] - 1:3
Russell [1] - 3:4
sat [2] - 21:9, 75:1
satisfied [2] - 26:18, 32:13
save [1] - 39:14
saved [1] - 67:14
saw [2] - 12:1, 40:14
scales [1] - 44:8

scenario [6] - 38:6, 46:8, 50:2, 53:21, 71:18, 71:19
scenarios [1] - 44:23
scheduled [1] - 76:3
SCHOCHOR [1] - 2:13
School [2] - 58:11, 58:12
scope [1] - 56:5
search [3] - 13:24, 13:25, 67:4
seated [3] - 3:2, 5:11
second [7] - 14:25, 40:7, 53:12, 53:16, 54:10, 54:16, 61:11
secondary [1] - 66:10
Section [1] - 9:11
section [1] - 55:18
sections [1] - 32:22
Security [3] - 39:22, 51:21, 63:19
see [17] - 16:3, 29:23, 32:25, 34:4, 34:8, 35:18, 35:25, 48:1, 48:19, 54:1, 54:3, 54:5, 56:12, 56:15, 59:15, 62:11, 68:8
seeing [1] - 42:5
seek [2] - 17:23, 74:24
seeking [1] - 74:22
seem [5] - 23:8, 31:22, 54:23, 59:3, 61:19
sees [2] - 23:17, 53:24
send [1] - 12:7
senior [1] - 15:22
sense [8] - 12:15, 24:13, 32:10, 35:7, 35:20, 39:1, 59:25, 75:4
sent [1] - 13:16
separate [1] - 52:8
separation [1] - 20:2
serious [1] - 17:25
served [1] - 61:13
services [1] - 14:8
set [1] - 61:11
setting [1] - 71:10
settlement [1] - 69:9
seven [1] - 50:11
several [1] - 32:3
SHAFFER [43] - 2:19, 3:21, 9:7, 17:19, 19:21, 21:5, 22:1, 30:1, 30:5, 31:21, 32:2, 33:10, 39:9, 40:25, 41:3, 41:13, 42:17, 43:8, 44:10, 46:1, 46:7, 46:12, 48:12, 48:15, 49:4, 50:1, 50:23, 51:1, 51:16, 53:4, 60:7, 60:25, 61:7, 62:15, 63:14, 64:22, 65:1, 66:7, 66:17, 70:25, 73:9, 74:20, 75:11
Shaffer [12] - 3:22, 14:24, 16:5, 16:6, 17:11, 23:17, 30:3, 39:7, 48:22, 54:19,

63:8, 73:8
Shaffer's [2] - 23:3, 68:5
share [1] - 57:13
sheets [1] - 69:6
Sheridan [1] - 41:15
shift [1] - 47:20
Shivarelo [1] - 73:3
shoehorn [1] - 63:1, 71:15
Shore [7] - 9:18, 13:2, 16:8, 19:11, 19:16, 40:24, 42:9
short [1] - 61:24
short-circuit [1] - 61:24
show [2] - 15:14, 67:13
shown [1] - 56:8
shows [3] - 9:13, 12:24
side [6] - 3:7, 19:14, 51:19, 69:1, 72:13, 75:2
sides [1] - 58:7
sideshow [1] - 11:17
signed [2] - 61:19, 62:17
significant [7] - 27:2, 40:21, 42:2, 42:13, 42:16, 43:23, 62:8
similar [1] - 47:6
similarly [1] - 30:16
simple [1] - 49:7
simpler [1] - 70:16
simplest [1] - 49:4
simply [5] - 32:10, 46:19, 62:23, 74:20, 74:21
single [7] - 17:1, 46:7, 47:4, 55:17, 71:7, 71:8
singular [1] - 47:1
sit [1] - 76:7
sits [2] - 38:11, 38:13
sitting [1] - 67:12
situation [4] - 46:14, 49:12, 60:16, 71:12
six [2] - 50:11, 70:2
Sixth [2] - 27:25, 28:19
slam [1] - 70:24
slightly [1] - 59:6
slower [2] - 70:5, 70:6
small [1] - 45:4
Social [3] - 39:22, 51:21, 63:19
solution [1] - 59:3
someone [12] - 19:5, 21:9, 21:11, 38:10, 38:14, 42:14, 43:18, 50:4, 51:20, 61:2, 74:4, 74:17
sometime [1] - 39:21
sometimes [4] - 61:16, 66:14, 66:15, 75:2
somewhere [4] - 13:13, 26:23, 69:15, 74:8
sonogram [1] - 38:15
sorry [2] - 35:21, 58:20
sort [68] - 4:8, 4:10, 4:16,

4:19, 4:21, 5:20, 6:4, 7:14, 7:15, 10:15, 10:23, 11:2, 17:15, 19:3, 20:12, 21:4, 21:24, 23:1, 24:5, 24:9, 25:15, 26:3, 26:5, 26:8, 26:11, 28:20, 30:4, 31:11, 31:25, 32:9, 32:21, 32:23, 33:8, 33:22, 33:25, 34:2, 34:3, 35:24, 39:7, 40:8, 40:12, 40:14, 43:22, 44:7, 45:6, 45:11, 47:20, 47:22, 47:24, 48:18, 48:23, 51:9, 52:23, 53:24, 54:18, 54:20, 59:17, 59:24, 60:4, 61:9, 62:10, 63:7, 65:19, 70:4, 71:6, 71:15

**sorting** [1] - 70:4
**specific** [4] - 10:16, 61:4, 66:21, 67:21
**specifically** [2] - 32:7, 33:8
**speculating** [1] - 62:15
**spelled** [1] - 6:22
**Spence** [1] - 53:13
**split** [2] - 28:1, 28:17
**splitting** [1] - 73:17
**spotted** [1] - 23:25
**squeeze** [1] - 38:12
**St** [1] - 2:14
**stage** [4] - 40:17, 41:7, 53:1, 54:7
**stages** [1] - 54:6
**stake** [1] - 36:11
**stand** [1] - 5:12
**standard** [2] - 30:15, 44:21
**standing** [2] - 36:6, 37:10
**standpoint** [3] - 40:21, 58:16, 75:4
**stands** [1] - 15:23
**star** [1] - 33:8
**start** [11] - 3:7, 5:14, 11:4, 15:4, 17:15, 26:13, 34:1, 47:24, 57:23, 63:7, 70:4
**started** [1] - 26:2
**state** [10] - 42:2, 43:22, 45:5, 47:2, 47:3, 52:5, 70:1, 72:21, 75:7, 75:9
**state's** [2] - 41:9, 41:11
**STATES** [1] - 1:1
**States** [1] - 25:21
**states** [4] - 40:24, 43:2, 43:6, 43:7
**STATION** [1] - 2:13
**status** [1] - 54:21
**statute** [11] - 63:9, 63:10, 63:11, 63:15, 64:8, 64:12, 65:22, 65:23, 66:5, 66:11, 66:24
**stay** [1] - 5:10
**stenographically** [1] - 1:23
**step** [1] - 5:10

**steps** [1] - 52:6
**still** [13] - 16:12, 16:22, 17:7, 22:7, 25:6, 25:7, 25:9, 28:18, 36:15, 45:20, 52:13, 52:18, 62:3
**stood** [1] - 70:4
**strange** [5] - 10:15, 45:2, 45:17, 58:15, 58:18
**strategy** [1] - 60:5
**stray** [1] - 6:5
**Street** [5] - 1:8, 2:3, 2:9, 2:14, 2:20
**strikes** [2] - 20:22, 21:24
**strong** [1] - 60:11
**stronger** [1] - 48:19
**struck** [1] - 11:16
**structure** [2] - 28:21, 62:21
**struggled** [1] - 63:10
**stuff** [3] - 11:1, 11:6, 14:22
**subclasses** [3] - 37:8, 42:21, 43:6
**subject** [6] - 25:15, 42:9, 42:11, 42:12, 49:3, 52:2
**subjected** [1] - 50:12
**subjective** [2] - 20:13, 21:12
**submissions** [1] - 11:14
**submit** [1] - 72:1
**submitted** [1] - 14:5
**Suboxone** [2] - 12:6, 30:8
**subpoena** [1] - 25:15
**subpoenas** [2] - 12:7, 12:24
**subsections** [1] - 30:23
**subsequent** [2] - 64:14, 66:24
**substance** [1] - 33:17
**subsumed** [1] - 59:17
**subtle** [1] - 51:14
**succeed** [1] - 35:10
**sudden** [1] - 62:19
**sue** [1] - 68:4
**sued** [2] - 44:18, 66:13
**suffer** [7] - 12:21, 35:4, 35:19, 37:16, 37:17, 37:18, 51:22
**suffered** [13] - 8:3, 12:18, 12:19, 39:20, 49:16, 49:19, 53:7, 55:19, 55:24, 57:12, 63:20, 64:4, 75:16
**sufficiently** [2] - 19:6, 22:6
**suggest** [2] - 59:3, 64:11
**suggestion** [4] - 6:6, 18:18, 43:11, 61:8
**suggests** [1] - 61:11
**SUGGS** [1] - 1:14
**suit** [1] - 44:14
**Suite** [2] - 1:16, 2:4
**suited** [1] - 21:22
**summary** [4] - 19:16, 20:7, 22:22, 23:2

**superior** [1] - 29:15
**Superior** [1] - 68:7
**superiority** [7] - 26:18, 28:4, 28:9, 29:6, 29:13, 29:14, 31:8
**supply** [1] - 14:11
**suppose** [1] - 42:18
**surprise** [1] - 75:23
**survey** [1] - 64:3
**survey-like** [1] - 64:3
**susceptible** [1] - 36:24
**suspicion** [1] - 66:16
**sustained** [2] - 6:11, 6:16
**sweep** [1] - 23:2
**system** [2] - 55:12, 72:25
**table** [1] - 34:4
**tackle** [2] - 24:6, 25:16, 26:6
**tackles** [1] - 31:17
**target** [1] - 65:13
**tea** [1] - 23:24
**technical** [1] - 14:21
**temporal** [4] - 19:12, 19:17, 28:16, 54:21
**temporally** [1] - 23:12
**ten** [1] - 18:17
**termed** [1] - 29:5
**terms** [18] - 4:20, 5:8, 12:2, 14:9, 17:17, 17:18, 24:21, 28:23, 35:14, 36:19, 37:7, 52:23, 53:24, 54:1, 60:15, 65:17, 69:4, 70:12
**test** [6] - 42:13, 42:16, 43:22, 57:22, 68:14, 68:17
**testifies** [1] - 75:15
**testimony** [5] - 7:7, 8:15, 8:16, 53:9, 53:11
**The Court** [136] - 3:2, 3:4, 3:10, 3:13, 3:16, 3:19, 3:23, 4:3, 6:1, 6:8, 6:15, 6:21, 7:11, 7:21, 7:25, 8:3, 8:6, 8:8, 8:11, 8:18, 8:22, 8:25, 9:8, 10:6, 10:12, 10:14, 10:21, 11:16, 13:1, 13:4, 13:6, 13:9, 13:11, 13:23, 14:6, 14:14, 14:17, 14:20, 14:24, 15:10, 15:21, 16:5, 16:18, 17:11, 19:8, 20:3, 20:10, 21:15, 22:9, 22:13, 23:1, 24:5, 24:17, 24:19, 25:5, 25:9, 25:12, 25:25, 26:2, 26:20, 28:14, 29:9, 30:2, 30:21, 31:4, 31:5, 31:10, 31:11, 31:22, 32:18, 33:19, 35:21, 36:14, 36:20, 37:9, 37:13, 37:18, 38:4, 38:19, 39:6, 40:6, 41:2, 41:8, 41:25, 43:2, 43:16, 45:1, 46:3, 46:11, 46:25, 47:20, 48:10, 48:13, 48:17, 49:5, 49:9, 49:25, 50:22, 50:24,

51:3, 52:15, 53:23, 54:16, 55:3, 56:1, 56:9, 56:18, 56:21, 56:25, 57:9, 57:17, 58:12, 58:15, 58:21, 59:10, 59:14, 60:23, 61:1, 61:16, 63:4, 63:6, 64:15, 64:25, 65:9, 66:13, 67:1, 67:9, 69:13, 70:19, 72:3, 72:13, 72:22, 73:8, 74:7, 75:1, 75:22
**themselves** [4] - 4:11, 4:17, 5:14, 32:4
**theoretical** [1] - 12:15
**theoretically** [1] - 17:2
**theories** [3] - 34:19, 34:20, 75:11
**theory** [3] - 10:18, 19:14, 45:16
**therefore** [2] - 41:9, 58:25
**they've** [7] - 16:10, 18:10, 22:3, 27:25, 44:18, 61:19, 75:20
**thinks** [3] - 28:19, 54:20
**third** [2] - 21:18, 53:19
**Third** [9] - 28:16, 29:4, 30:6, 30:11, 31:20, 32:16, 33:14, 47:1, 63:2
**three** [3] - 19:3, 41:21, 62:4
**threshold** [3] - 24:23, 25:2, 40:16
**Thronson** [2] - 3:9, 3:10
**THRONSON** [78] - 1:15, 3:8, 5:22, 6:7, 6:10, 6:20, 7:1, 7:19, 7:23, 8:2, 8:5, 8:7, 8:10, 8:14, 8:21, 8:24, 9:6, 9:12, 10:10, 10:13, 10:20, 11:15, 11:22, 13:3, 13:5, 13:8, 13:10, 13:21, 13:24, 14:7, 14:16, 14:19, 14:23, 15:9, 15:15, 15:25, 16:14, 16:19, 22:11, 22:14, 24:3, 24:10, 24:18, 24:20, 25:7, 25:11, 25:18, 26:1, 26:16, 27:7, 28:22, 34:12, 36:9, 36:15, 37:2, 37:12, 37:14, 37:21, 38:18, 38:20, 46:23, 48:9, 54:5, 55:1, 55:4, 56:7, 56:16, 56:19, 56:22, 57:7, 57:10, 58:3, 58:20, 59:6, 59:12, 68:20, 70:8, 72:14
**Thronson's** [1] - 19:2
**tied** [1] - 63:21
**timeline** [1] - 50:3
**Tobacco** [2] - 69:18, 69:19
**today** [5] - 5:5, 18:4, 51:9, 72:4, 75:23
**today's** [1] - 75:18
**together** [1] - 47:6
**took** [5] - 45:20, 45:22, 46:4, 57:22, 76:2

tort [8] - 37:11, 37:21, 37:22, 38:17, 45:20, 45:22, 61:5, 69:14
tortious [1] - 8:9
torts [2] - 67:18, 68:25
touch [4] - 26:2, 37:5, 38:7, 40:9
touching [4] - 34:23, 35:24, 36:1, 37:24
towards [1] - 20:18
Tower [1] - 2:4
toxic [1] - 71:6
traceable [1] - 35:20
track [1] - 14:1
trained [1] - 12:1
training [1] - 11:10
transcript [1] - 76:12
transcription [1] - 1:23
transfer [1] - 68:9
treat [4] - 18:13, 19:2, 37:4, 60:21
treated [16] - 12:3, 12:10, 12:13, 12:18, 13:14, 14:11, 18:17, 19:1, 19:15, 20:21, 21:8, 23:5, 23:6, 43:20, 45:8, 50:6
treating [1] - 14:18
treatment [10] - 5:24, 15:16, 19:4, 28:6, 28:10, 32:11, 34:24, 34:25, 36:25, 39:3
triability [1] - 41:18
trial [7] - 35:11, 53:5, 61:25, 62:3, 62:7, 62:14, 69:2
trials [7] - 61:11, 61:17, 61:20, 62:1, 62:4, 70:23
tried [6] - 30:17, 30:20, 48:7, 48:8, 64:11, 70:7
trigger [3] - 5:5, 65:4, 65:22
triggered [1] - 39:23
triggering [1] - 63:16
troubled [1] - 74:17
true [12] - 10:7, 21:15, 24:17, 24:19, 24:20, 25:3, 25:5, 36:9, 43:11, 53:12, 68:23
truly [1] - 61:13
try [6] - 40:2, 40:3, 68:18, 70:22, 75:25, 76:3
trying [6] - 39:11, 39:12, 39:20, 52:18, 59:2, 63:1
Tulp [1] - 55:6
turn [1] - 4:16
turns [1] - 65:15
two [23] - 4:19, 5:15, 8:11, 23:13, 29:8, 31:1, 33:20, 33:25, 36:1, 36:24, 40:24, 41:21, 43:6, 50:1, 50:24, 52:15, 54:6, 57:1, 63:6, 63:23, 64:7
twofold [1] - 20:12
type [8] - 27:1, 28:23, 32:17,

41:19, 53:9, 55:23, 61:5, 74:22
types [4] - 59:23, 60:8, 71:1, 71:2
typical [2] - 27:13, 74:21
typicality [6] - 27:1, 27:8, 32:5, 32:12, 33:16, 59:18
typically [2] - 16:3, 70:9
U.S [1] - 1:7
ultimate [1] - 70:13
ultimately [3] - 24:1, 33:6, 62:16
unauthorized [1] - 35:24
uncertainty [1] - 62:13
unclear [1] - 24:11
unconsented [2] - 34:23, 34:25
under [26] - 5:20, 6:24, 7:1, 7:18, 8:6, 8:13, 9:4, 9:10, 14:12, 28:20, 31:1, 43:1, 45:9, 47:15, 47:18, 48:5, 50:3, 56:20, 56:21, 57:2, 58:5, 66:3, 66:4, 74:10, 75:24
undermine [1] - 23:8
understood [3] - 32:22, 39:19, 59:21
unfair [3] - 23:3, 58:25, 75:9
United [1] - 25:21
UNITED [1] - 1:1
universe [4] - 25:13, 26:12, 36:2, 69:14
University [1] - 13:4
unjust [2] - 75:5, 75:6
unless [1] - 10:17
unworkable [1] - 39:12
up [18] - 4:18, 5:10, 15:2, 15:14, 16:15, 21:19, 33:23, 40:4, 58:10, 61:19, 62:17, 66:18, 67:13, 68:9, 70:12, 72:5, 75:14, 76:6
US [3] - 51:21, 63:18, 64:5
utilizing [1] - 1:23
valid [2] - 9:21, 9:23
value [3] - 68:15, 68:17, 71:10
variation [1] - 45:7
variations [1] - 75:7
variety [1] - 72:19
various [2] - 25:24, 72:20
varying [1] - 46:18
vehicle [1] - 67:5
verification [1] - 21:13
verified [1] - 9:20
version [1] - 34:2
versus [3] - 51:11, 54:2, 62:12
Vettori [2] - 3:11, 3:13
VETTORI [3] - 2:8, 3:11, 72:12

via [2] - 68:9
view [13] - 7:17, 20:8, 20:11, 22:1, 26:17, 29:9, 30:6, 30:25, 31:2, 31:14, 70:19, 71:20, 74:11
views [2] - 26:15, 33:11
violation [1] - 72:20
violations [1] - 72:21
Virginia [8] - 41:23, 42:14, 45:7, 45:12, 45:17, 46:9, 68:7
virtue [1] - 56:13
waiting [1] - 67:12
walks [1] - 21:19
Wallace [1] - 72:15
Warfarin [1] - 46:25
warrant [1] - 67:4
water [1] - 74:17
ways [4] - 17:21, 22:24, 62:12, 62:20
weakness [1] - 72:10
weeds [1] - 29:7
weighed [1] - 43:25
weird [1] - 70:20
welcome [2] - 4:3, 67:1
Welding [2] - 69:21, 71:5
welding [1] - 69:23
West [1] - 2:4
whichever [1] - 48:24
whole [8] - 20:25, 21:1, 26:9, 28:5, 28:11, 31:13, 38:23, 70:6
wide [1] - 71:2
willing [2] - 67:10, 68:5
win [2] - 33:24, 70:23
winding [1] - 68:9
witnesses [1] - 33:4
WOLSON [1] - 1:11
woman [2] - 45:2, 45:6
women [1] - 60:21
word [2] - 33:7, 51:5
words [2] - 28:12, 43:22
workable [2] - 58:4, 58:13
works [3] - 26:15, 42:16, 65:13
world [3] - 38:17, 45:14, 56:11
wracking [1] - 38:16
wrap [1] - 72:4
year [5] - 15:23, 23:16, 30:9, 50:5
years [6] - 18:17, 54:14, 63:23, 64:7, 69:17, 69:20
zone [1] - 8:8

## CERTIFICATE OF SERVICE

I hereby certify that on April 6, 2020, the foregoing Exhibits in Support of Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) was filed with the Clerk of Court for the U.S. Court of Appeals for the Third Circuit by email to emergency_motions@ca3.uscourts.gov, in accordance with the April 1, 2020 Filing Notice on acceptance of original proceedings filings by email. I also certify that copies of the foregoing Exhibits were served by email upon the following counsel:

Nicholas M. Centrella
CONRAD O'BRIEN
1500 Market Street
Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102

Jonathan Schochor
Philip C. Federico
Brent P. Ceryes
SCHOCHOR FEDERICO & STATON, PA
1211 St. Paul Street
Baltimore, MD 21202

Cory L. Zajdel
Z LAW LLC
2345 York Road, Suite #B-13
Timonium, MD 21093

Patrick A. Thronson
JANET JANET & SUGGS LLC
4 Reservoir Circle, Suite 200
Baltimore, MD 21208

David E. Haynes
Karen E. Evans
THE COCHRAN FIRM
1100 New York Ave NW
Suite 340
Washington, DC 20005

Paul M. Vettori
Danielle S. Dinsmore
LAW OFFICES OF PETER ANGELOS
One Charles Center
100 N. Charles Street
Baltimore, MD 21201

Robin Schleifer Weiss
HAGGERTY GOLDBERG
SCHLEIFER & KUPERSMITH
92 Buck Road
Holland, PA 18966

*Counsel for Plaintiffs-Respondents*

_William Peterson_
William R. Peterson