No. 20-8024

In the United States Court of Appeals for the
Third Circuit

MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL,
and DESIRE EVANS, on behalf of themselves and all others similarly situated,
*Plaintiffs-Respondents*,

v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,
*Defendant-Petitioner.*

On Petition for Permission to Appeal from the United States District Court for
the Eastern District of Pennsylvania, No. 2:18-cv-05629-JDW (Wolson, J.)

# EXHIBITS TO RESPONSE IN OPPOSITION TO PETITION FOR PERMISSION TO APPEAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)

## <u>TABLE OF CONTENTS</u>

| <u>Exhibit</u> | <u>Exhibit Number</u> |
|---|---|
| Deposition of William Kelly, Aug. 20, 2019 (ECF No. 32-35) | 1 |
| Reply Memorandum of Law in Support of Motion for Class Certification (ECF No. 47) | 2 |
| Proposed Case Management Plan (ECF No. 66) | 3 |

# EXHIBIT 1



# Transcript of William C. Kelly

**Date:** August 20, 2019
**Case:** Russell, et al. -v- Educational Commission for Foreign Medical Graduates

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of William C. Kelly
Conducted on August 20, 2019

1 (1 to 4)

## Page 1

Volume I
Pages 1 224

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Case No. 2:18 cv 05629 JW

Hon. Joshua D. Wolson

MONIQUE RUSSELL, JASMINE RIGGINS

ELSA M. POWELL AND DESIRE EVANS,

    Plaintiffs,

vs.

EDUCATIONAL COMMISSION FOR

FOREIGN MEDICAL GRADUATES

    Defendant.

DEPOSITION OF WILLIAM C. KELLY

Tuesday, August 20, 2019 at 9:40 a.m.

Law Offices of Morgan, Lewis & Bockius, LLP

One Federal Street

Boston, Massachusetts 02110 176

Jennifer A. Doherty, CSR

Certified Shorthand Reporter

## Page 2

APPEARANCES:

LAW OFFICE OF PETER G. ANGELOS, P.C.
BY: Paul M. Vettori, Esq.
One Charles Center
100 North Charles Street
Baltimore, Maryland 21201
410 649 2000
pvettori@lawpga.com
For the Plaintiffs.

JANET, JANET & SUGGS, LLC
BY: Patrick A. Thronson, Esq.
4 Reservoir Circle, Suite 200
Baltimore, Maryland 21208
410 653 3200
For the unnamed class members.

SCHORCHOR FEDERICO AND STATON, P.C.
BY: Brent Ceryes, Esq.
1211 St. Paul Street
Baltimore, Maryland, 21202
310 234 1000
bceryes@sfspa.com
For the Plaintiffs.

MORGAN LEWIS
BY: Elisa P. McEnroe, Esq. and
Matthew Klayman, Esq
1701 Market Street
Philadelphia, Pennsylvania 19103
215 963 5917
elisa.mcenroe@morganlewis.com
For the Defendant.

## Page 3

Testimony of:          I N D E X
                       Direct  Cross

WILLIAM KELLY
   by Mr. Vettori       6
   by Mr. Ceryes              179


          E X H I B I T S

No.        Description            For I.D.

Exhibit 1 Bates ECFMG RUSS 0000982 1032      15
Exhibit 2 Bates ECFMG RUSS 0000155 158       27
Exhibit 3 Bates ECFMG RUSS 0000105          31
Exhibit 4 Bates ECFMG RUSS 0000407 409       35
Exhibit 5 Bates ECFMG RUSS 0003572 3573      40
Exhibit 6 Bates ECFMG RUSS 0000433 437       41
Exhibit 7 Bates ECFMG RUSS 0000167          45
Exhibit 8 Bates ECFMG RUSS 0000074 167       47
Exhibit 9 Bates ECFMG RUSS 0000440          54
Exhibit 10 Bates ECFMG RUSS 0003465 3468     55
Exhibit 11 Bates ECFMG RUSS 0003463 3468     58
Exhibit 12 Bates ECFMG RUSS 0000446 447      60
Exhibit 13 Bates ECFMG RUSS 0000202         61
Exhibit 14 Bates ECFMG RUSS 0000268 269      63
Exhibit 15 Bates ECFMG RUSS 0000116 119      65
Exhibit 16 Bates ECFMG RUSS 0000267         67
Exhibit 17 Bates ECFMG RUSS 0003471 3472     68
Exhibit 18 Bates ECFMG RUSS 0004007 4014     70

## Page 4

          E X H I B I T S

No.     Description            For I.D.

Exhibit 19 Bates ECFMG 000464-462        78
Exhibit 20 Bates ECFMG RUSS 0000348-351      81
Exhibit 21 Bates ECFMG RUSS 0000021-22       86
Exhibit 22 Bates ECFMG RUSS 0000023       86
Exhibit 23 Bates ECFMG RUSS 0000703-706      87
Exhibit 24 Bates ECFMG RUSS 0000643       90
Exhibit 25 Bates ECFMG RUSS 0000586       94
Exhibit 26 Bates IGBERASE 1908        95
Exhibit 27 Bates ECFMG RUSS 0000567       97
Exhibit 28 Bates ECFMG RUSS 0000666       99
Exhibit 29 Bates ECFMG RUSS 0000679       100
Exhibit 30 Bates ECFMG RUSS 0000568       102
Exhibit 31 Bates ECFMG RUSS 0000640-641      103
Exhibit 32 Bates ECFMG RUSS 0000576       105
Exhibit 33 Bates ECFMG RUSS 0000617       106
Exhibit 34 Bates ECFMG RUSS 0000559       110
Exhibit 35 Bates ECFMG RUSS 0000552-553      112
Exhibit 36 Bates ECFMG RUSS 0004194-4195     115
Exhibit 37 Bates ECFMG RUSS 0000560       118
Exhibit 38 Bates ECFMG RUSS 0000557       119
Exhibit 39 Bates ECFMG RUSS 0000555       120
Exhibit 40 Bates ECFMG RUSS 0004476       121
Exhibit 41 Bates ECFMG RUSS 0000556       123

Case 20-8024 Document: 5-2 Page: 6 Date Filed: 04/20/2020
Case 2:18-cv-08629-JDW Document 32-5 Filed 10/07/19 Page 2 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

2 (5 to 8)

---

**5**

```
1        E X H I B I T S
2
3   No.    Description         For I.D.
4   Exhibit 42 Bates ECFMG RUSS 0000544      127
5   Exhibit 43 Bates ECFMG RUSS 0000352-392    132
6   Exhibit 44 Bates ECFMG RUSS 0003742      134
7   Exhibit 45 Bates ECFMG RUSS 000671       137
8   Exhibit 46 Bates ECFMG RUSS 0000554      139
9   Exhibit 47 Bates ECFMG RUSS 0003905      140
10  Exhibit 48 Bates ECFMG RUSS 0004160      145
11  Exhibit 49 Bates ECFMG RUSS 0000262-271    159
12  Exhibit 50 Bates ECFMG RUSS 0003899      161
13  Exhibit 51 Bates ECFMG RUSS 0000647-652    164
14  Exhibit 52 Bates ECFMG RUSS 0000569      168
15  Exhibit 53 Bates ECFMG RUSS 0000594-596    175
16
17
18
19
20
21
22
23
24
25
```

**6**

```
1        P R O C E E D I N G S
2        WILLIAM KELLY, having been
3   satisfactorily identified by the Notary Public was
4   duly sworn and testified as follows:
5        DIRECT EXAMINATION
6   BY MR. VETTORI:
7   Q. Good morning, Mr. Kelly.
8   A. Good morning.
9   Q. Again, thank you for appearing. My name
10  is Paul Vettori. As I told you before, I represent
11  two of the named plaintiffs in this case and I'm
12  going to ask you a series of questions about
13  information we need to learn about the case. Is
14  that fair?
15  A. Yes.
16  Q. So have you ever had your deposition taken
17  before?
18  A. Yes.
19  Q. Multiple times, two times, how many
20  times?
21  A. Multiple times.
22  Q. So I don't have to go through a lot of
23  rules with you. The only rule I have is I'll try
24  not to talk over you, you try not to talk over me.
25  If you don't understand a question I ask you, please
```

**7**

```
1   tell me.
2   A. I will.
3   Q. Because if you answer the question, I'm
4   going to assume you understood it. Fair enough?
5   A. Fair enough.
6   Q. Can we have, for the record, your full
7   name and address?
8   A. My name is William Kelly, K-E-L-L-Y. My
9   home address is 47 Powerhouse, P-O-W-E-R-H-O-U-S-E,
10  Hill, H-I-L-L, Lane. That's in Rockport, Maine
11  04856.
12  Q. So you at one time worked for ECFMG, the
13  Educational Commission for Foreign Medical
14  Graduates?
15  A. Yes.
16  Q. And when did you leave that company's
17  employment?
18  A. I retired in May 2015.
19  Q. So when you left ECFMG, you didn't take
20  employment elsewhere?
21  A. When I left ECFMG, I worked full-time. I
22  worked as a consultant for them for one year
23  part-time.
24  Q. What years would that be?
25  A. That would be May 2015 until I think it
```

**8**

```
1   was June 2016.
2   Q. Okay. But since June 2016 you've been
3   completely retired?
4   A. No. I do contracting work with the State
5   Department, their International Visitor Leadership
6   Program. I'm a liaison officer.
7   Q. How much of your time does that take?
8   A. It varies from year to year and this year
9   it will be a total of maybe ten weeks.
10  Q. What's your educational background?
11  A. My undergraduate, I have a Bachelor of
12  Arts from LaSalle University in Philadelphia and
13  graduate school I have a Master of Science from the
14  University of Pennsylvania.
15  Q. Did you work in Pennsylvania?
16  A. Yes.
17  Q. When you graduated from college, did you
18  go immediately into your master's program or did you
19  work first?
20  A. I worked first.
21  Q. For how long?
22  A. About twenty years.
23  Q. So who did you work for in that twenty
24  year period?
25  A. From when I graduated from college?
```

Transcript of William C. Kelly
Conducted on August 20, 2019

**9**

1    Q.  Yes, sir.
2    **A.  I first worked for an insurance company,**
3    **Liberty Mutual Insurance Company.  And then I worked**
4    **for ECFMG.**
5    Q.  When did you start with ECFMG?
6    **A.  October 1977.**
7    Q.  Is that thirty-eight years you were with
8    the company?
9    **A.  Almost.**
10   Q.  Congratulations.
11   **A.  Thank you.**
12   Q.  And congratulations on your
13   semi-retirement.
14   **A.  Okay.**
15   Q.  I need to ask you, what did you do to
16   prepare for this deposition once you learned you
17   were coming here for this deposition?
18   **A.  On my own?**
19   Q.  Well, in any way.  Did you do anything on
20   your own?  Did you talk with anybody?  Did you
21   review any documents?  I can ask those as separate
22   questions, but basically I will start with:  What
23   did you do to prepare for this deposition?
24        MS. MCENROE:  Objection to form.
25   **A.  Well, I met with counsel.**

**0**

1    BY MR. VETTORI:
2    Q.  And I'm not going to ask you what counsel
3    asked you or what you told them, but how many times
4    did you meet with counsel?
5    **A.  Once.**
6    Q.  And did you review any documents in
7    preparation for this deposition?
8    **A.  Yes.**
9    Q.  What type of documents did you review?
10        MS. MCENROE:  Objection to form.
11   **A.  What do you mean by what type?**
12   BY MR. VETTORI:
13   Q.  Well, I want to know what it is you
14   reviewed.  Were there certain files that you asked
15   for or were directed to?
16        MS. MCENROE:  Objection to form.
17   **A.  Paper documents.**
18   BY MR. VETTORI:
19   Q.  Okay.  Of?
20        MS. MCENROE:  Objection to form.
21   BY MR. VETTORI:
22   Q.  Of whom or relating to what?  Akoda?
23   **A.  ECFMG applicants, yes.**
24   Q.  And is one of the -- did you review any
25   documents relating to a gentleman by the name of

**1**

1    John Charles or John Noka Shami Akoda.  I'm not
2    pronouncing it correctly.
3    **A.  Akoda, yes.**
4    Q.  And did you review any documents with
5    respect to an individual by the name of Charles
6    Oluwafemi Igberase?
7    **A.  Yes.**
8    Q.  Did you review any document relating to a
9    person by the name of Igberase Oluwafemi Charles?
10   **A.  That could be one of the names.**
11   Q.  Is there an individual with the last name
12   of Oluwafemi sound like someone whom you looked at
13   documents?
14   **A.  That name was in the documents.**
15   Q.  And about how many hours did you spend
16   preparing for this deposition in either reviewing
17   for documents or meeting with counsel?
18   **A.  The four hours.**
19   Q.  Most of the events I'm going to ask you
20   about, Mr. Kelly, relate to the period from
21   approximately 1992 through at least 2000 and perhaps
22   some limited documents thereafter.
23        Do you have independent recollection of
24   those events?
25        MS. MCENROE:  Objection to form.

**2**

1    **A.  No, not really.**
2    BY MR. VETTORI:
3    Q.  So I'm going to ask you some general
4    questions before I ask specific questions about some
5    of the names I just mentioned.  Can you explain to
6    us, at least in general terms, how the ECFMG
7    certification of foreign medical graduates process
8    worked?
9         MS. MCENROE:  Objection to form.
10   Calls for a narrative.
11   BY MR. VETTORI:
12   Q.  Do you understand my question?
13   **A.  Yes.  I can only speak at the time I**
14   **worked there.**
15   Q.  Fair enough.  I don't want to speak over
16   you.  I don't mean to interrupt you, but I'm only
17   interested in an answer to that question based on
18   the time period that you were there.  I don't want
19   to know anything since you left.
20   **A.  Well, they -- so you're talking about the**
21   **ECFMG certification program?**
22   Q.  Yes.  Of --
23   **A.  -- international --**
24   Q.  I call them IMGs, international medical
25   graduates.

Case 20-8024 Document 5-2 Page 8 Date Filed 04/20/2020
Case 2:16-cv-08629-JDW Document 32-35 Filed 10/07/19 Page 9 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

4 (13 to 16)

---

**3**

1    **A. Could you repeat the question?**

2    Q. Could you explain how that certification

3  process works or worked at the time you were

4  employed at ECFMG?

5        MS. MCENROE: Objection to form.

6    **A. There was an evaluation and certification**

7  **process where international medical graduates passed**

8  **a series of examinations, documented their education**

9  **and credentials and -- that were verified by**

10  **ECFMG.**

11    Q. So fair enough. What is the first step in

12  this process that ultimately leads to certification

13  by ECFMG?

14        MS. MCENROE: Objection to form.

15  BY MR. VETTORI:

16    Q. Do you understand my question?

17    **A. The first step related to ECFMG?**

18    Q. Yes, yes.

19    **A. My recollection is it would be an**

20  **application to ECFMG.**

21    Q. So is that an application to take steps

22  one and/or two of the USLME? Is that what that

23  application is all about?

24    **A. Those were some of the exams. There were**

25  **different exams over time, but those were some of**

---

**4**

1  **the exams that were administered.**

2    Q. Was the English examination another one of

3  those?

4    **A. There was an English test, yes.**

5    Q. So at the time you -- again, all of my

6  questions are directed to the time period right now,

7  between 1992 and the end of year 2000. Fair

8  enough?

9    **A. Yes.**

10    Q. And if there is any question in your mind

11  about the period I'm asking about, please tell me

12  and I'll tell you again.

13      So in or around 1992 when an applicant, an

14  IMG applicant filled out a form to take one of the

15  USLME exams, was it the practice of ECFMG to assign

16  an identification number to that application?

17        MS. MCENROE: Objection to form.

18    **A. First let me circle back. My recollection**

19  **is in 1992 the USLME exams weren't given. It was a**

20  **different exam. But they would submit an**

21  **application and an identification number would be**

22  **assigned to them.**

23    Q. Okay. So I know I haven't established yet

24  what is required in order to get a certification,

25  but for the purposes of my question right now, let

---

**5**

1  me fast-forward. If that same applicant to whom a

2  number had been assigned, when he filed his

3  application or her application, ultimately became

4  certified, would the certification number be the

5  same as that identification number? Again, I'm

6  talking abut the '92, '93 period.

7    **A. Yes.**

8        MR. VETTORI: So can you mark

9  Exhibit 1?

10    (Exhibit No. 1 marked for

11  identification.)

12  BY MR. VETTORI:

13    Q. So again, I'm not trying to mislead you.

14  This is a 1996 booklet, not a 1992 or 1993 booklet.

15  Okay?

16    **A. Okay.**

17    Q. But do you recognize the document that's

18  been marked as Exhibit 1?

19    **A. Yes.**

20    Q. And is this the type -- is this document

21  given to any applicant -- was this document given

22  to any IMG applicant who applied to take any of the

23  USLME exams in 1996?

24        MS. MCENROE: Objection to form.

25    **A. I think they would have had to have it in**

---

**6**

1  **order to apply. That was the sequence.**

2  **BY MR. VETTORI:**

3    Q. Would you go about halfway through that?

4  I think attached as part of that document is also

5  the USMLE booklet.

6        MS. MCENROE: Do you have a specific

7  Bates number?

8        MR. VETTORI: I'm looking for it.

9        MS. MCENROE: Thank you.

10    (Discussion off the record.)

11  BY MR. VETTORI:

12    Q. Do you want me to repeat the question?

13    **A. Yeah.**

14    Q. Is the 1996 USMLE bulletin of information

15  part of the document that's marked as Exhibit 1?

16    **A. Yes. That appears to be so, yes.**

17    Q. And does this -- would this document be

18  provided to people who want to apply to take the

19  USLME exams in 1996?

20        MS. MCENROE: Objection to form.

21    **A. As with the ECFMG information booklet, I**

22  **think the applicant would have had to have this in**

23  **order to apply.**

24  **BY MR. VETTORI:**

25    Q. And if you'll back up to the end of the

---

Transcript of William C. Kelly

5 (17 to 20)

Conducted on August 20, 2019

7

1  ECFMG document, I guess it's page -- I'm sorry, it's
2  at the end. Would you please go to -- it's not Bate
3  stamped. Yeah, they are, sorry. I think it's
4  001028. While --
5        For the record, all of these documents to
6  date will have Bates numbers on them provided by
7  counsel for ECFMG. For the most part, I'm just
8  going to use the actual number part as opposed to
9  ECFMG underline Russ underline and the number.
10       So is the page that I'm directing you to
11 the first page of the application that's filled out
12 by the IMG when they want to apply to take the
13 examinations that are required in order to be
14 certified by ECFMG?
15    **A. To the best of my recollection, yes.**
16    Q. Do you -- sitting here today, do you
17 recall what the step one exams, the step two exams,
18 the English exam, and the step three exams were in
19 the period, say, from 1992 through 1996?
20       MS. MCENROE: Objection to form.
21    **A. I have a good recollection, yes.**
22 **BY MR. VETTORI:**
23    Q. So is it accurate -- would it be correct
24 for me to say step one is essentially basic science
25 material? When I say, "is," "was" is the word I

8

1  meant.
2     **A. Yes.**
3     Q. And was step two basic clinical science
4  material?
5     **A. Yes.**
6     Q. And both were, at that time, two-day
7  multiple choice tests administered by ECFMG; is that
8  correct?
9     **A. My -- that -- I have no independent**
10 **recollection of that. Just from what's on the form**
11 **the answer would be yes.**
12    Q. So am I correct that in addition to
13 successfully -- again, I'm in this 1992 to 1996
14 period. Am I correct that in addition to pass --
15 successfully completing steps one and two of the
16 USLME exams an applicant would also -- an IMG
17 applicant would also have to pass an English test?
18    **A. Yes.**
19    Q. And in addition, before ECFMG would
20 certify an applicant there had to be primary source
21 verification of that applicant's medical
22 credentials; is that correct?
23    **A. Of their medical diploma, yes.**
24    Q. Nothing more than their diploma?
25    **A. Generally not.**

9

1     Q. And am I correct also that in that same
2  time period in order -- I'm sorry, was -- in that
3  time period were steps one and two and was the
4  English exam administered by ECFMG?
5     **A. To the best of my recollection, yes.**
6     Q. Step three was not administered by ECFMG,
7  was it?
8     **A. It was not.**
9     Q. It was administered by whom?
10    **A. My recollection was that it was**
11 **administered by state medical boards.**
12    Q. And am I correct in saying that an IMG
13 applicant could not sit for step three of the USLME
14 unless he or she was certified by ECFMG?
15       MS. MCENROE: Objection to form.
16    **A. I believe that was the process in most, if**
17 **not all states, yes.**
18 **BY MR. VETTORI:**
19    Q. So again, this is just a general question,
20 Mr. Kelly. And again, we're referring to this time
21 period that I framed from 1992 through 2000. Let's
22 say through 1996.
23       Is it correct to say that an IMG couldn't
24 practice medicine in the United States without being
25 certified by ECFMG?

20

1        MS. MCENROE: Objection to form.
2     **A. That is not correct.**
3  **BY MR. VETTORI:**
4     Q. How would they practice without a
5  certification from ECFMG?
6     **A. My -- the best of my recollection is that**
7  **state licenses are granted by the individual state**
8  **medical boards and there were different pathways,**
9  **for example, the Fifth Pathway program for graduates**
10 **of medical schools in Mexico that were not required**
11 **to have ECFMG certificates.**
12    Q. Are there any other countries where that
13 applied?
14    **A. I don't recall.**
15    Q. How about Nigeria? Did it apply to
16 graduates of medical schools in Nigeria?
17    **A. I do not believe so.**
18    Q. So with respect to graduates of Nigeria
19 medical schools in the time period we're talking
20 about, an IMG couldn't obtain a medical license in
21 the United States without being certified by ECFMG,
22 correct?
23       MS. MCENROE: Objection to form.
24    **A. It would have been very, very unlikely,**
25 **yes.**

Transcript of William C. Kelly
Conducted on August 20, 2019

2

1  BY MR. VETTORI:
2      Q.  Well, can you even sit for the -- at that
3  time period, could you even sit for step three exams
4  without being certified by ECFMG?
5          MS. MCENROE:  Objection to form.
6      **A.  A graduate of a Nigerian medical school?**
7  **BY MR. VETTORI:**
8      Q.  Yes.
9      **A.  To best of my recollection, no.**
10     Q.  And in that same time period a graduate of
11  a Nigerian medical school wouldn't be permitted to
12  take -- wouldn't be licensed by any state in the
13  United States unless he or she successfully
14  completed step three of USMLE; isn't that correct?
15         MS. MCENROE:  Objection to form.
16     **A.  If they were applying for an initial**
17  **license and had not passed the earlier licensing**
18  **examination, yes.**
19  **BY MR. VETTORI:**
20     Q.  So would you agree with me that ECFMG
21  works on behalf of domestic and international
22  regulatory authorities to protect the public for
23  which programs and services, including primary
24  source verification, of physician credentials?
25         MS. MCENROE:  Objection.

22

1  BY MR. VETTORI:
2      Q.  Do you agree with that statement?
3      **A.  Would you repeat that for me, please?**
4  **BY MR. VETTORI:**
5      Q.  ECFMG works on behalf of domestic and
6  international regulatory authorities to protect the
7  public through its programs and services, including
8  primary source verification of physician
9  credentials?
10         MS. MCENROE:  Objection to form.
11     **A.  That appears to be a statement of what it**
12  **currently does and I really don't have any direct**
13  **knowledge of that.  It appears to be a contemporary**
14  **statement.**
15  **BY MR. VETTORI:**
16     Q.  You don't believe that statement applied
17  during the period of time you were employed by
18  ECFMG?
19     **A.  During part of that period.**
20     Q.  When did that --
21     **A.  The international part I don't think was**
22  **part of it back in the time frame you're talking**
23  **about.**
24     Q.  Okay.  So let me rephrase it, give you --
25  ask you if you agree with the following statement.

23

1  ECFMG works on behalf of domestic regulatory
2  authorities to protect the public through its
3  programs and services including primary source
4  verification of physician credentials?
5          MS. MCENROE:  Objection to form.
6      **A.  I would say yes.**
7  **BY MR. VETTORI:**
8      Q.  Would it be accurate to say that ECFMG
9  protects the public by, among other ways, seeing
10  that foreign medical graduates have completed an
11  acceptable medical education?
12         MS. MCENROE:  Objection to form.
13     **A.  In that that's part of the certification**
14  **process, yes.**
15  **BY MR. VETTORI:**
16     Q.  And would it be accurate to say that ECFMG
17  serves to protect the public by seeing to it that
18  foreign medical graduates can successfully pass the
19  requirements of the USLME examinations?
20         MS. MCENROE:  Objection to form.
21     **A.  Yes.**
22  **BY MR. VETTORI:**
23     Q.  Would it also be accurate to say that
24  ECFMG protects the public by ensuring that foreign
25  medical graduates meet certain standards of

24

1  professional conduct, such as honesty?
2          MS. MCENROE:  Objection to form.
3      **A.  That's difficult for me to say.  I don't**
4  **know that that's specifically spelled out.**
5  **BY MR. VETTORI:**
6      Q.  Well, isn't that what happened in the
7  situation that brings us here today?
8          MS. MCENROE:  Objection to form.
9  BY MR. VETTORI:
10     Q.  Do you understand what I'm asking you?
11     **A.  Yes.**
12     Q.  Yes, you understand what I'm asking you or
13  yes, that's what happened here?
14     **A.  Oh, I don't know that that's what happened**
15  **here.**
16     Q.  So you understand my question?
17     **A.  Could you repeat the question?**
18     Q.  What I'm asking you is, isn't one of the
19  ways that the ECFMG protects the public is to ensure
20  that an IMG reports with certain standards of
21  conduct including honesty?
22         MS. MCENROE:  Objection to form.
23     **A.  I don't know if I can say that.**
24  **BY MR. VETTORI:**
25     Q.  Well, from your review of the material

Case: 20-8024   Document: 5-2   Page: 11   Date Filed: 04/20/2020
Case 2:19-cv-03629-JGW   Document 32-51   Filed 10/07/19   Page 3 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019                    7 (25 to 28)

---

**25**

1 that you reviewed in preparation for this
2 deposition, are you aware that, for example, the
3 person who identified himself with the last name of
4 Igberase successfully completed steps one and two
5 and the English examination? Were you aware of
6 that?
7    **A. Independently?**
8    Q. Yes.
9    **A. No.**
10    Q. When you say independently -- let me
11 rephrase.
12        From your review of the material that you
13 reviewed in this case, are you aware that this
14 gentleman with the last name Igberase successfully
15 completed steps one and two of the USLME?
16    **A. I don't recall that.**
17    Q. Let me ask you: Do you recall that he was
18 certified at one point by ECFMG?
19    **A. That I recall, yes.**
20    Q. He couldn't have been certified by ECFMG
21 unless he met the examination requirements, could he
22 have been?
23    **A. Yes, but the examinations could have been**
24 **different examinations.**
25    Q. But whatever examinations were required

**26**

1 for him, he would have had to have successfully
2 completed them in order to become certified?
3    **A. Yes.**
4    Q. So do you also recall from your review of
5 material in this case that this gentleman by the
6 name of Igberase met all of the medical education
7 requirements, that is they were verified by ECFMG?
8    **A. Yes, I recall that.**
9    Q. And do you recall that he was actually
10 certified? I may have asked that already, but --
11    **A. At one point, yes.**
12    Q. And his certification was revoked,
13 correct?
14    **A. That is my recollection.**
15    Q. And I'm going to get into that detail
16 about that later. For general purposes, I'm asking
17 that question.
18        And wasn't his certification revoked
19 because he was dishonest, he lied on his
20 applications?
21        MS. MCENROE: Objection to form.
22    **A. He answered a question incorrectly is my**
23 **recollection, yes.**
24 **BY MR. VETTORI:**
25    Q. You're not willing to concede that he was

**27**

1 dishonest?
2        MS. MCENROE: Objection to form.
3    **A. I don't know that it's up to me to make**
4 **that...**
5 **BY MR. VETTORI:**
6    Q. All right. So his -- the revocation of
7 his certificate had nothing to do with his medical
8 ability, for want of a better term, correct?
9    **A. That is my recollection.**
10    Q. It had to do with the way in which he made
11 applications to ECFMG on multiple occasions and/or
12 took examinations on multiple occasions, correct?
13        MS. MCENROE: Objection to form.
14    **A. It was based -- my recollection is it was**
15 **based on providing false information on an**
16 **application.**
17 **BY MR. VETTORI:**
18    Q. Isn't that equivalent to dishonesty?
19        MS. MCENROE: Objection to form.
20 Calls for opinion.
21    **A. It wouldn't be up to me to characterize**
22 **that.**
23        (Exhibit No. 2 marked for
24 identification.)
25 BY MR. VETTORI:

**28**

1    Q. So I believe the document that you've been
2 handed, Mr. Kelly, begins on the first page with the
3 Bates number 0000155; is that correct?
4    **A. Yes.**
5    Q. Have you -- in your preparation for this
6 deposition did you review that document?
7    **A. I don't recall.**
8    Q. You see the number up at the right-hand
9 corner of the document on the first page?
10    **A. Yes.**
11    Q. Is that like an incomplete number because
12 of the way it was copied or for any other reason?
13    **A. The long answer is this was printed by**
14 **machine and although the applicant identification**
15 **numbers were 7 digits, the machine only printed the**
16 **first six and the seventh was added by hand.**
17    Q. So I take it that this identification
18 number, the 482-700, whatever the last number is, I
19 have the document, I can find it if you need it, was
20 assigned to this gentleman by the name of Igberase
21 when he made, as part of his application, to take
22 certain examinations; is that correct?
23    **A. That is my recollection of the process at**
24 **that time, yes.**
25        and as I look at this stamp on the bottom

Transcript of William C. Kelly
Conducted on August 20, 2019

29

1  left, it looks like it was filed, that is received
2  by ECFMG on April 6, 1992; is that correct?
3      A.  Yes.
4      Q.  And do you see in the middle of page 1
5  that he submitted a Social Security number ending in
6  5054?
7      A.  Yes.
8      Q.  Item four?
9      A.  Yes, I see that.
10      Q.  If you'll turn to page 2, what is the date
11  of birth he provided?
12      A.  It looks as though it says the ██████
13  ████ 1962.
14      Q.  When ECFMG receives -- I'm sorry.  When
15  ECFMG received this application, was any of the
16  information contained on this form, I guess it's
17  Exhibit 2, inputted into a -- this is a dinosaur
18  talking, I don't know computer terminology -- into a
19  computer program?
20          MS. MCENROE:  Objection to form.
21      A.  That was the procedure at this time.  What
22  happened to this specific one, I could not say for
23  certain.
24  BY MR. VETTORI:
25      Q.  And this may be difficult to answer, but

30

1  just in general terms was there a specific computer
2  program set up to deal with IMGs who applied to take
3  certain medical examinations?
4          MS. MCENROE:  Objection to form.
5      A.  When you say computer program, I know we
6  captured certain information from the application in
7  the computer system, yes.
8  BY MR. VETTORI:
9      Q.  And for the most part -- strike that.
10          Would ECFMG do that, I mean, input the
11  information on the application any time an IMG
12  submitted this application, this type of
13  application?
14          MS. MCENROE:  Objection to form.
15      A.  The procedure was to enter some, but not
16  all of the information from the application.
17  BY MR. VETTORI:
18      Q.  Was your computer program like a software
19  package that you either developed internally or
20  acquired commercially?
21          MS. MCENROE:  Objection to form.
22      A.  My recollection is yes.
23  BY MR. VETTORI:
24      Q.  Which?
25      A.  In 1992 I think it was developed

3

1  outside.
2      Q.  And how about in 1996?
3      A.  I don't recall.
4          (Exhibit No. 3 marked for
5  identification.)
6  BY MR. VETTORI:
7      Q.  As part of your review in preparation for
8  this deposition, did you review this document?
9      A.  I don't recall this specific one, but I
10  may have.
11      Q.  For the record, this is what purports to
12  be a diploma from the University of Ibadan for
13  someone by the name of Charles Olufemi,
14  O-L-U-F-E-M-I, Igberase, I-G-B-E-R-A-E-S-E.  Would
15  it be the normal practice of ECFMG in 1992 to
16  require someone like Mr. Igberase who filled out the
17  application we just reviewed to also submit a
18  diploma?
19      A.  Yes.
20      Q.  But you don't have any specific
21  recollection about this diploma?
22      A.  No.
23      Q.  Do you have an independent recollection or
24  a recollection that's been refreshed by your review
25  of documents in this case as to whether ECFMG issued

32

1  a certificate to someone with the last name
2  Igberase?
3      A.  Yes.
4      Q.  Do you have any recollection,
5  independently or as refreshed by your review of
6  records in this case approximately when that was
7  done?
8      A.  I don't recall.
9      Q.  So I think the last digit that's missing
10  is zero.  We'll show that later.  It says zero.
11          MR. VETTORI:  Off the record.
12          (Discussion off the record.)
13  BY MR. VETTORI:
14      Q.  So accept for the purposes of my next
15  question that he was certified, he being
16  Mr. Igberase, on October 4, 1993, okay?  I know you
17  didn't remember that, but accept it for purposes of
18  my next question.
19          Would I be correct in stating that
20  that means he had passed the required medical
21  examinations and the English examination -- when I
22  say required, either steps one and two of the USMLE
23  or the equivalent, and you had verified his diploma?
24          MS. MCENROE:  Objection to form.
25      A.  That was the process for certification,

Transcript of William C. Kelly
Conducted on August 20, 2019

9 (33 to 36)

33

1  yes.
2  BY MR. VETTORI:
3      Q.  Certification --
4      A.  ECFMG certification.
5      Q.  To be clear, ECFMG will not issue a
6  certificate to an IMG -- I hate to sound like
7  alphabet soup, but -- unless the applicant passes
8  the required medical examinations and the English
9  exam and ECFMG is able to verify the medical
10 credentials, I think you said the diploma; is that
11 correct?
12         MS. MCENROE:  Objection to form.
13     A.  As a general rule.  There are always
14 exceptions.
15 BY MR. VETTORI:
16     Q.  So what type of exceptions?
17     A.  My recollection was that, for example, for
18 the diploma verification the board had authorized
19 use of sworn affidavits in the case of people who
20 were refugees from certain countries where the
21 schools would not respond to verification or they
22 had fled their country and couldn't bring out their
23 diploma and there was review by a standing
24 committee, the board of credentials committee would
25 look at individuals on a case-by-case basis.

34

1      Q.  Thank you.  You testified a little earlier
2  that ECFMG required IMGs to submit diplomas,
3  correct?
4      A.  Yes.
5      Q.  And it was only the diploma that had to be
6  verified; is that your testimony?
7      A.  At that time, yes.
8      Q.  When did that change?
9      A.  I don't know that it changed.  I have no
10 independent knowledge that it changed.
11     Q.  So your recollection is that during the
12 entire -- what did we say, thirty-five, thirty-eight
13 years that you were at ECFMG?
14     A.  Thirty-seven and a half.
15     Q.  It didn't change, only the diplomas were
16 required?
17     A.  Not the whole time.  And there was a
18 period before 1986 -- 1984 or 1986 where we did not
19 require primary source verification directly with
20 the medical school.
21     Q.  But in the period of time that we're
22 talking about here today, which I've mentioned
23 probably too many times already, the diploma was the
24 only thing that had to be verified?
25         MS. MCENROE:  Objection to form.

35

1      A.  As a general rule, yes.
2  BY MR. VETTORI:
3      Q.  IMGs who applied for certification by
4  ECFMG were not required to submit transcripts of
5  their medical school, were they, or were they?
6         MS. MCENROE:  Objection to form.
7      A.  At that time, no.
8  BY MR. VETTORI:
9      Q.  So when an applicant such as Mr. Igberase
10 provided you -- I'm sorry -- provided ECFMG with a
11 diploma, would I be correct in stating that ECFMG
12 would forward that with a form to the medical school
13 for the medical school to verify the accuracy or the
14 authenticity of that document, the diploma?
15     A.  That was the procedure, yes.
16         (Exhibit No. 4 marked for
17 identification.)
18 BY MR. VETTORI:
19     Q.  Do you recall reviewing this document as
20 part of the review you did in preparation for this
21 deposition?
22     A.  I have no recollection of this specific
23 document.
24     Q.  I'll represent to you that this is an
25 application filed by someone with the last name

36

1  Charles, first name Igberase, middle name Oluwafemi,
2  and this looks like -- I'm going to ask you to
3  verify this -- that it was received by ECFMG on
4  March 30, 1994?
5      A.  I can't make out the date, but it could be
6  that, yes.  It's difficult to read.
7      Q.  Do you see anywhere -- do you see in item
8  four whether a Social Security number was
9  provided?
10     A.  I do not see one on this copy.
11     Q.  And again, I'm sorry, for the record this
12 is Bates number 0000407, correct?
13     A.  Yes.
14     Q.  So turn to page 408, the next page.  What
15 date of birth is provided?
16     A.  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆61.
17     Q.  So I take it since you don't recall
18 reviewing this, you can't tell me whether the
19 medical information -- the medical school
20 information on that form is almost identical to the
21 information on the form filed by Mr. Igberase,
22 correct?
23         MS. MCENROE:  Objection to form.
24 BY MR. VETTORI:
25     Q.  You didn't make that comparison?

Case 20-3024 Document 5-2 Page 14 Date Filed: 04/20/2020
Case 1:18-cv-03629-JDW Document 32-5 Filed 10/07/19 Page 22 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

10 (37 to 40)

**37**

1  A. I don't recall.
2  Q. Do you know, either independently of your
3  own personal knowledge or from any review you made
4  in this case prior to this deposition, whether a new
5  identification number was assigned to a gentleman
6  with the last name Charles?
7  A. On this document I see where there's -- an
8  identification number has been put on it.
9  Q. Is that the 51?
10  A. It looks -- that's what it appears to be,
11  519-573.
12  Q. And that would be consistent with ECFMG's
13  then practice to assign an identification number to
14  an applicant when he or she first applies,
15  correct?
16  A. Yes.
17  Q. So would you agree with me that ECFMG
18  interpreted this application as coming from someone
19  other than Mr. Igberase?
20  MS. MCENROE: Objection to form.
21  A. Yeah, I don't know that I understand the
22  question.
23  BY MR. VETTORI:
24  Q. Okay. So Mr. Igberase, we've looked at
25  his application. Do you need to look at it again?

**38**

1  A. No, I recall it.
2  Q. He's assigned an identification number,
3  correct?
4  A. According to that application, yes.
5  Q. And it's different from the identification
6  number assigned to this gentleman by the name of
7  Charles, correct?
8  A. Yes.
9  Q. ECFMG wouldn't assign a new number if it
10  thought these were one and the same person, would
11  it?
12  MS. MCENROE: Objection to form.
13  A. This number -- the procedure would have
14  been that this number would have been assigned
15  because we checked that he had not previously
16  applied for an examination.
17  Q. And that implies that ECFMG didn't think
18  he was the same person as Mr. Igberase, correct?
19  MS. MCENROE: Objection to form.
20  A. I don't know that. Just that I think what
21  we felt was he had not previously applied, yeah.
22  BY MR. VETTORI:
23  Q. And consistent with ECFMG's practice at
24  the time, do you have any personal knowledge as to
25  whether the information on this application --

**39**

1  MR. VETTORI: What's the exhibit
2  number, I'm sorry?
3  MS. MCENROE: Four.
4  A. Four.
5  Q. -- was, quote, inputted into the computer
6  program?
7  MS. MCENROE: Objection to form.
8  A. I have no personal knowledge that that was
9  done.
10  BY MR. VETTORI:
11  Q. And you don't have any refreshed
12  recollection as a result of the review you did in
13  this case?
14  A. No.
15  Q. So is it fair for me to say that within
16  several months of the receipt by ECFMG of the
17  application by the gentleman with the last name
18  Charles --
19  A. Exhibit 4.
20  Q. Exhibit 4.
21  A. Right.
22  Q. -- ECFMG became suspicious that he and
23  Mr. Igberase were one and the same person?
24  MS. MCENROE: Objection to form.
25  A. I have no knowledge of that.

**40**

1  (Exhibit No. 5 marked for
2  identification.)
3  BY MR. VETTORI:
4  Q. I know you haven't had time to read it
5  because I'm watching you. Did you review this
6  document in preparation for this deposition?
7  A. I may have, I don't recall this specific
8  one.
9  Q. So this is your letter; is it not?
10  A. Yes, it appears to be.
11  Q. So I'm prepared for you to take as much as
12  as you want to read it, if you feel it necessary in
13  order to answer my questions.
14  MS. MCENROE: It's a short letter,
15  why don't we just give him a quick minute to scan
16  over it.
17  MR. VETTORI: Sure. Fairness to the
18  witness, I'm happy to do that.
19  A. (Complies.) I finished reading it.
20  Q. So wouldn't you agree with me that when
21  you wrote that letter, ECFMG had decided that there
22  was a possible connection between Mr. Charles and
23  Mr. Igberase?
24  MS. MCENROE: Objection to form.
25  A. That the -- that these two applications

Case 20-3024 Document: 5-2 Page: 15 Date Filed: 04/20/2020
Case 2:18-cv-09629-JDW Document 329-5 Filed 10/07/19 Page 29 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

11 (41 to 44)

**4**

1 were for the same individual, yes.

2     Q. Correct. Right. And you in fact told him

3 that you were conducting an investigation in this

4 matter, correct?

5     **A. In the letter, yes.**

6     Q. And you told him he needed to write to

7 ECFMG to explain why he certified on his Charles

8 application that he had never taken the exams

9 before, correct?

10     **A. That he had not previously applied for**

11 **exams, yes.**

12     Q. Do you have any independent recollection

13 of what it is that triggered ECFMG to write -- to

14 have you write this letter?

15     **A. No.**

16     Q. How did you catch on to them?

17     **A. I don't recall.**

18     Q. That's not an unfair way to characterize

19 it, is it?

20        MS. MCENROE: Objection.

21 BY MR. VETTORI:

22     Q. How you caught on to him?

23        MS. MCENROE: Objection.

24     **A. Why we started the investigation, yeah.**

25        (Exhibit No. 6 marked for

**42**

1        identification.)

2        (Discussion off the record.)

3 BY MR. VETTORI:

4     Q. So Mr. Kelly, Exhibit 6 is a handwritten

5 letter, which is dated in the upper right-hand side

6 July 14, 1995, and received at ECFMG on July 20,

7 1995. Can we agree on that?

8     **A. Yes.**

9     Q. And it's Bates number 0000433 through 437.

10 Can we agree on that?

11     **A. Yes.**

12     Q. And it is signed -- well, it says,

13 "Sincerely, Igberase Oluwafemi Charles" and it has

14 that 519 certification number. Do you see that?

15     **A. Yes.**

16     Q. And is it your understanding -- I'm sorry,

17 have you had time to look at it?

18     **A. Give me a minute. I can look at this,**

19 **yeah.**

20        (Complies.)

21        MS. MCENROE: I've finished reviewing

22 it.

23 BY MR. VETTORI:

24     Q. Okay. Do you remember this letter?

25     **A. Remember?**

**43**

1     Q. Do you have an independent recollection of

2 receiving this letter?

3     **A. No.**

4     Q. As part of your review to prepare for this

5 deposition, did you review it?

6     **A. This letter, yes.**

7     Q. So would you agree with me that this is a

8 letter in response to the prior exhibit when you

9 wrote to him saying you were investigating the

10 matter and he should write to you?

11     **A. Yes.**

12     Q. And would you agree with me that in this

13 letter he confesses to the fact that he's really

14 Igberase, that he and Igberase are one and the same

15 person?

16     **A. Yes.**

17     Q. And would you agree with me that basically

18 he blamed what he did on his friends?

19        MS. MCENROE: Objection to form.

20     **A. I don't know that I would characterize it**

21 **that way.**

22 **BY MR. VETTORI:**

23     Q. Well, take a look at the middle of page 2.

24 He says, "As a result of these" -- meaning his

25 inability to get into 150 residency programs, any of

**44**

1 150 -- "I explained to my friends, who felt I should

2 take the test over again to improve on my scores

3 despite my difficult position, they suggested that

4 since I had already been issued one ECFMG

5 certificate I could not possibly use that same

6 number again to sit for new tests."

7     Do you see that?

8     **A. Yes.**

9     Q. Isn't that, in fact, blaming it on his

10 friends?

11        MS. MCENROE: Objection to form.

12     **A. To me they're suggesting a course of**

13 **action for him to take.**

14 **BY MR. VETTORI:**

15     Q. And he followed that course of action?

16     **A. I don't see that they're telling him to**

17 **provide a false response on the application. That's**

18 **what he did.**

19     Q. But he did admit to lying on the

20 application, correct?

21     **A. In his letter, yes.**

22     Q. And would you turn to page 436, page 4 of

23 the letter?

24     **A. Yes.**

25     Q. Isn't it true that he told you that in the

Transcript of William C. Kelly

Conducted on August 20, 2019

| 45 | 47 |
|---|---|
| 1 future -- that the future records he was going to<br>2 use the name Igberase Oluwafemi Charles?<br>**3 A. Yes.**<br>4 Q. So after receiving this handwritten letter<br>5 in response to your letter, did the committee on<br>6 medical education credentials meet to review the<br>7 matter?<br>**8 A. That is my recollection, yes.**<br>9 MR. VETTORI: Let me show him the<br>10 letter and we can stop right here after this.<br>11 (Exhibit No. 7 marked for<br>12 identification.)<br>13 BY MR. VETTORI:<br>14 Q. It's a short letter. Why don't you read<br>15 it, please.<br>**16 A. (Complies.) I finished reading it.**<br>17 Q. So this letter is signed by you?<br>**18 A. Yes.**<br>19 Q. And this letter is telling, I guess both<br>20 Charles and Igberase, what the results are of the<br>21 meeting of the education -- ECFMG committee on<br>22 medical education credentials; is that correct?<br>**23 A. Yes.**<br>24 Q. And as I understand it, the decision of<br>25 the committee was to invalidate the ECFMG | 1 MR. VETTORI: It is with me.<br>2 MR. KLAYMAN: And with me.<br>3 MS. MCENROE: Thank you. Go back<br>4 off.<br>5 (Recess taken at 10:35 a.m.)<br>6 (Back on the record at 10:45 a.m.)<br>7 (Exhibit No. 8 marked for<br>8 identification.)<br>9 BY MR. VETTORI:<br>10 Q. So I'm going to let you read this letter,<br>11 but let me just point out to you, first of all, it's<br>12 Bates number 5074 through 5076 with attachments,<br>13 okay?<br>**14 A. I have --**<br>15 Q. Multiple attachments.<br>**16 A. My last one is 167.**<br>17 MS. MCENROE: You know what, it looks<br>18 like, just for purposes of the record, that last<br>19 page looks to have been a duplicate of Exhibit 7<br>20 stapled to the back of Exhibit 8.<br>21 BY MR. VETTORI:<br>22 Q. Okay. So before you read it, okay, take a<br>23 look at that. This appears to me be a letter that<br>24 you wrote dated December 7, 1995, which, Mr. Kelly,<br>25 I'll point out to you is the same date that you |

| 46 | 48 |
|---|---|
| 1 certificate issued as 0519573-0, correct?<br>**2 A. Yes.**<br>3 Q. That's the one that was issued to the<br>4 gentleman by the name of Charles, correct?<br>**5 A. I have no independent knowledge of that.**<br>6 Q. And also is telling Charles and Igberase<br>7 that ECFMG was revoking the certificate issued under<br>8 0482700-2, correct?<br>**9 A. Yes.**<br>10 Q. And isn't that certificate issued to<br>11 Mr. Igberase?<br>**12 A. That I don't know.**<br>13 MR. VETTORI: This is a good time to<br>14 take a break.<br>15 MS. MCENROE: Off the record.<br>16 (Discussion off the record.)<br>17 MS. MCENROE: So can we hop back on<br>18 the record just for two quick things for the<br>19 purposes of the record.<br>20 On behalf of ECFMG we are reserving<br>21 the right to review and sign today's transcript.<br>22 And we've also discussed with counsel a stipulation<br>23 that all objections, except as to the form, are<br>24 reserved for the time of trial, if that is<br>25 acceptable with you-all as well. | 1 wrote the letter to Igberase, correct?<br>**2 A. Yes.**<br>3 Q. Which was Exhibit 6 -- no, 7. And this is<br>4 a letter that you're writing to a Mr. Kenneth Cotton<br>5 at USLME; is that correct?<br>**6 A. Yes.**<br>7 Q. I want you to take as much time as you<br>8 want to read it, but I would suggest to you at the<br>9 end I'm going to ask you would you agree with me<br>10 that this is pretty much summarizing all of the<br>11 events leading up to your December 7th letter.<br>12 Okay. So take your time.<br>13 MS. MCENROE: Objection to form.<br>**14 A. (Complies.) Okay, I finished reading the**<br>**15 letter.**<br>**16 BY MR. VETTORI:**<br>17 Q. So would you agree with me that this is<br>18 pretty much summarizing what's taken place up to and<br>19 including your December 7th letter?<br>**20 A. It appears to be a well-written summary.**<br>21 Q. So you know something? I wrote that on<br>22 there. It is a very good summary.<br>23 So I had asked you previously a question<br>24 something like what is it that triggered ECFMG to<br>25 suspect that Charles and Igberase were the same |

Case: 20-3024 Document: 5-2 Page: 17 Date Filed: 04/20/2020
Case 2:18-cv-09829-JDW Document 32-5 Filed 10/07/19 Page 29 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

13 (49 to 52)

49

1  person. Do you remember that?
2  **A. Yes, I recall you asked.**
3  Q. And you don't remember?
4  **A. I do not.**
5  Q. So at the bottom of page 1 of your letter
6  you wrote to Mr. Cotton saying "since the name on
7  the application was altered" -- I'm going to stop
8  you right there. When you say "altered," do you
9  mean rearranged?
10  **A. That may be what I meant.**
11  Q. And then you said, "and the year of birth
12  changed."
13  My recollection is that Igberase had
14  a 1962 birth date and Charles had a 1961 birth date?
15  **A. And that's stated in this letter, yeah.**
16  Q. Right. And you say that ECFMG's search of
17  its database at that time did not show that he had
18  previously applied and been assigned an ECFMG
19  identification number.
20  What search of the database had taken
21  place, do you remember?
22  **A. I can tell you what the procedure or**
23  **process was at that time.**
24  MR. VETTORI: Objection as to form.
25  Q. Go ahead, please.

50

1  MS. MCENROE: You may answer the
2  question.
3  **A. Okay. The procedure at that time was any**
4  **individual indicating he or she had not previously**
5  **applied and not providing an ID number, part of the**
6  **process was to search the database against certain**
7  **biographical elements, and I can't remember**
8  **specifically which ones they were, to see if that**
9  **individual could potentially already have an**
10  **identification number.**
11  **BY MR. VETTORI:**
12  Q. I appreciate the fact that you can't
13  remember, we're going back a long time now. But it
14  seems to me, at least implicitly, that by your
15  statement at the bottom of page 2, two of the ways
16  you would have searched your database would have
17  been by the name and by the date of birth; would
18  that be correct?
19  **A. Yes, that's fair.**
20  Q. So let me ask you this: Has ECFMG ever
21  had a practice, policy, or procedure whereby if a
22  name of an applicant on a diploma is different than
23  the name on the application, you required that
24  application to do something to satisfy ECFMG that
25  the name on the -- that the person whose name is on

5

1  the diploma and the person whose name is on the
2  application are really the same person?
3  MS. MCENROE: Objection to form.
4  **A. Yes.**
5  **BY MR. VETTORI:**
6  Q. Okay. When did that policy, practice, or
7  procedure first go into effect?
8  **A. I don't recall the date.**
9  Q. Was it effective as of 1995?
10  **A. I don't recall it being in effect at that**
11  **time.**
12  Q. What is that policy, practice, or
13  procedure?
14  **A. Okay. And I'm -- again, this is at the**
15  **time it was in place when I was there. I mean,**
16  **again, I don't know what it is now, that if there is**
17  **a -- a significant -- a discrepancy between the name**
18  **on the diploma and the name they're using when they**
19  **apply for the examination that they provide**
20  **certain -- some sort of documentation to connect**
21  **that -- to indicate the two names belong to the same**
22  **person.**
23  Q. But is it your testimony that you don't
24  believe that policy was in effect, at least not in
25  1995?

52

1  **A. I don't recall it being in effect.**
2  Q. Well, is it that it was -- you don't
3  recall whether --
4  **A. I don't believe it was in effect.**
5  Q. Thank you. So will you turn to, again to
6  page -- well, not again. Turn to page 2 of that
7  letter, that being Exhibit 8, and it's Bates number
8  5075. Do you see what I call a chart at the bottom
9  of the page?
10  **A. Yes.**
11  Q. And as I understand it, this is a chart of
12  the examinations, the dates of the examination, and
13  the scores taken by, I think it's both Igberase and
14  Charles; am I correct in that?
15  **A. You keep saying both and I'm -- I don't**
16  **know that they're two different individuals, but**
17  **under one identification number, under the two**
18  **different identification numbers.**
19  Q. Under the two identification numbers?
20  **A. Right.**
21  Q. Okay. So these are the examinations,
22  dates, and scores for the person who had
23  identification number 04827002 and the person who
24  had identification number 05195730, correct?
25  **A. Yes.**

Transcript of William C. Kelly
Conducted on August 20, 2019

14 (53 to 56)

53

1    Q.  Okay.  And so it looks to me like the
2  person who took the July 1992 day one and day two
3  exams failed; is that correct?
4    **A.  Failed in July 1992.**
5    Q.  Correct.
6    **A.  Yes.**
7    Q.  And failed step one in September 1992; is
8  that correct?
9    **A.  Yes.**
10   Q.  And failed day one in January 1993; is
11  that correct?
12   **A.  Yes.**
13   Q.  Do you have an independent recollection or
14  a recollection refreshed by any review of documents
15  you made prior to this deposition as to whether the
16  applicant by the name of Charles took an appeal from
17  the decision of the committee that's reflected in
18  your December 7, 1995, letter?
19   **A.  My recollection is that he took an appeal,**
20  **but I don't know which -- I don't recall which**
21  **decision.**
22   Q.  Do you remember whether that appeal
23  resulted in a hearing?
24   **A.  My recollection is that there was a**
25  **hearing, yes.**

54

1    Q.  And bear with me one second.
2       Do you remember when that appeal hearing
3  took place?
4    **A.  No.**
5    Q.  I'll come back to that later.  Do you
6  remember the outcome of the appeal?
7    **A.  Yes.**
8    Q.  What was the outcome?
9    **A.  My recollection is that the appeal was**
10  **denied.**
11   Q.  Is that the same thing as saying the
12  decision to invalidate one certificate and revoke
13  the other was affirmed?
14   **A.  Yes, but that there was a -- a change in I**
15  **believe the length of time of the revocation of the**
16  **one certificate, the specification of the date.**
17       (Exhibit No. 9 marked for
18  identification.)
19  BY MR. VETTORI:
20   Q.  It's a one-page letter, sir.  If you take
21  your time to read it, I'd appreciate it.  Thank you,
22  Mr. Kelly.
23   **A.  (Complies.)  Yes, I've read it.**
24   Q.  So who is Marie Shafron?
25   **A.  At that time Ann Marie Shafron was the**

55

1  **vice president of operations at ECFMG.**
2    Q.  And would you agree with me that this
3  letter is outlining to the gentleman by the name of
4  Charles the results of the appeal hearing?
5    **A.  Yes.**
6    Q.  And do you see where this letter recites
7  that the appeal was considered on July 10, 1996?
8  It's in the middle paragraph.
9    **A.  Yes.**
10   Q.  In Washington, DC?
11   **A.  Yes.**
12   Q.  And would you agree with me that the
13  decision of the review committee affirmed the
14  decision invalidating one certificate and revoking
15  the other, but limited the length of the revocation
16  of certificate 04827002 to five years from July 10,
17  1996, until July 10, 2001?
18   **A.  Yes.**
19   Q.  Thank you.
20       (Exhibit No. 10 marked for
21  identification.)
22  BY MR. VETTORI:
23   Q.  So Mr. Kelly, what is this document?
24   **A.  It appears to be a photocopy of an**
25  **application for USMLE exams.**

56

1    Q.  Which exams was he applying for?
2    **A.  According to the application, the -- both**
3  **the step one and the step two.**
4    Q.  And what is the name of the applicant?
5    **A.  On the application it's Femi Charles**
6  **Igberase.**
7    Q.  Do you see whether any Social Security
8  number was provided?
9    **A.  I see no Social Security number on the**
10  **application.**
11   Q.  And can you tell from the Bates stamp on
12  the document when it was received by ECFMG?
13   **A.  Yes.**
14   Q.  When was it received?
15   **A.  October 23, 2000.**
16   Q.  Do you see the date of birth on the --
17  towards the bottom of Page 1 of that application?
18   **A.  Yes.**
19   Q.  What is the date of birth?
20   **A.                          1962.**
21   Q.
22   **A.**
23   Q.  Isn't that the same date as on the 1992
24  application by Igberase?
25   **A.  I would have to look.**

Case: 20-3024 Document: 5-2 Page: 19 Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW Document 32-5 Filed 10/07/19 Page 27 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

15 (57 to 60)

57

1  Q.  Please do.  It's one of the early -- it's
2  the second exhibit, I think.
3  **A.  Yes, it is.**
4  Q.  So did you review this document, the
5  application, Exhibit 10, in preparation for this
6  deposition?
7  **A.  I don't recall this specific -- no.**
8  Q.  Am I correct that ECFMG pretty quickly
9  picked up on the fact this is the same Igberase
10 whose certificate had been revoked for five years
11 through and including July 10, 2001?
12 **A.  My recollection is that at some point, I**
13 **don't know the time period, but I know subsequent to**
14 **this, there was an allegation that he provided false**
15 **information on his application, yes.**
16 Q.  What do you mean by there was an
17 allegation?
18 **A.  My recollection is subsequent to this we**
19 **alleged that he had engaged in irregular behavior.**
20 Q.  Just to help answer this question, I'm
21 going to show you in a minute your letter dated
22 November 16, 2000, about this application.
23 **A.  Okay.**
24 Q.  So it appears to me that within less than
25 a month's time ECFMG has concluded that this is the

58

1  same Igberase who had been told that his
2  certification was revoked through July 10, 2001.
3  Would you agree with me?
4  MS. MCENROE:  Objection.
5  **A.  We made that allegation, yes.**
6  **BY MR. VETTORI:**
7  Q.  So do you have an independent recollection
8  as to how you came to that determination?
9  **A.  No.**
10 Q.  So do you remember me reading to you from
11 Charles's handwritten letter that for future records
12 he is going to use the name Igberase Oluwafemi
13 Charles?  Do you recall that?
14 **A.  Yes, I do.**
15 Q.  He didn't do that here, did he?
16 **A.  No, he did not.**
17 (Exhibit No. 11 marked for
18 identification.)
19 BY MR. VETTORI:
20 Q.  Let me know after you've read it, okay,
21 Mr. Kelly?  Thank you.
22 **A.  (Complies.)  I finished reading it.**
23 Q.  Okay.  Can we go back to the prior
24 exhibit, No. 10?  Put that in front of you, please.
25 Would you agree with me that this

59

1  applicant, Femi Charles Igberase, checked no to the
2  question, "Have you ever submitted an application to
3  ECFMG for an examination" -- I'm sorry.  I talk
4  fast -- "even if you did not take the examination?"
5  Do you see where he checked the no?
6  **A.  Yes.**
7  Q.  Okay.  And there is non identification
8  number included on that application, is there?
9  **A.  I don't see one.**
10 Q.  When you wrote to him, your Exhibit 11,
11 you used the ECFMG identification number 0482700-2,
12 didn't you?
13 **A.  Yes.**
14 Q.  And isn't it correct that in your letter
15 of November 16, 2000, Exhibit 11, you advised
16 Mr. Igberase that ECFMG requires an explanation in
17 writing within fifteen days of receiving this
18 letter?
19 **A.  Yes.**
20 Q.  So you addressed your letter to
21 Mr. Igberase?
22 **A.  Dr. Igberase.**
23 Q.  I'm sorry, Dr. Igberase.  Thank you.  I
24 apologize.
25 Did you or did anyone at ECFMG ever

60

1  receive an explanation?
2  **A.  I don't recall.**
3  Q.  So do you have a recollection, either
4  independently or as a result of the review you did
5  in your case, whether the ECFMG committee on medical
6  education credentials met to review this matter?
7  **A.  I don't have an independent or I don't**
8  **have a recollection of that, no.**
9  (Exhibit No. 12 marked for
10 identification.)
11 **A.  Yes, I've finished reviewing Exhibit 12.**
12 **BY MR. VETTORI:**
13 Q.  Okay.  So in your first sentence you
14 indicate that the committee on -- ECFMG committee on
15 medical education credentials made -- a decision was
16 made by the ECFMG medical -- committee on medical
17 education credentials on April 18, 2001, correct?
18 **A.  Yes.**
19 Q.  And your writing this letter is being
20 written to Dr. Igberase Oluwafemi Charles
21 referencing the identification number 0482700-2
22 advising him of the outcome of that -- I'm sorry --
23 as to what that decision was?
24 **A.  Yes.**
25 Q.  And in this letter you recite many of the

Case: 20-3024 Document: 5-2 Page: 20 Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW Document 32-95 Filed 10/07/19 Page 20 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

16 (61 to 64)

**Page 6**

1  events we've talked about today up to and including
2  the October 2000 application that was submitted,
3  correct?
4  **A. Yes.**
5  Q. And was it the decision of the ECFMG
6  committee to revoke his standard certificate for a
7  yet to be specified period of time?
8  **A. To extend the length of the revocation,**
9  **yes.**
10  Q. For an as yet unspecified period of
11  time?
12  **A. Yes.**
13  Q. And also to refer it to the USMLE
14  committee on irregular behavior, correct?
15  **A. Yes.**
16  Q. And you advised him that ECFMG was going
17  to review the matter again after the USMLE
18  committee's decision, correct?
19  **A. Yes.**
20      (Exhibit No. 13 marked for
21  identification.)
22  BY MR. VETTORI:
23  Q. One-page letter, would you read it,
24  please?
25  **A. (Complies.) I finished reading it.**

**Page 62**

1  Q. Okay. See if you agree with this. It
2  appears to me that this is a response letter from
3  Igberase to your November 16, 2000, letter. Would
4  you agree with me, even though he says 2001?
5  **A. That is correct.**
6  Q. And it's coming -- I'm sorry, I spoke over
7  you. I apologize. Did you finish your --
8  **A. Yes, I did.**
9  Q. It appears to me that it's actually coming
10  too late, the committee has already made its
11  decision, correct?
12  **A. This is after the committee had made its**
13  **decision, yes.**
14  Q. So would you agree with me that in this
15  letter he is blaming his application on his
16  cousin?
17      MS. MCENROE: Objection to form.
18  **A. He appears to be doing that, yes.**
19  BY MR. VETTORI:
20  Q. And I think basically what he's saying is
21  the cousin filled out the wrong form?
22  **A. Well, he says, "my childhood friend."**
23  Q. Childhood friend, I'm sorry. The
24  childhood friend filled out the wrong form?
25  **A. Filled out the wrong form incorrectly**

**Page 63**

1  somehow, yes.
2  Q. And he makes a reference to the Social
3  Security number not being applicable because the INS
4  was going to discontinue the number due to the
5  problems involving my, I think it means cousin, Dr.
6  Akoda, do you see that?
7  **A. Yes.**
8  Q. Akoda was not a name that was unfamiliar
9  to you at that time; isn't that correct?
10      MS. MCENROE: Objection to form.
11  **A. I don't recall.**
12  BY MR. VETTORI:
13  Q. As a result of the review of documents you
14  undertook to prepare for this deposition, you don't
15  recall that as of June of 2001 you were familiar
16  with the name Akoda?
17      MS. MCENROE: Objection.
18  **A. I don't recall the dates.**
19      (Exhibit No. 14 marked for
20  identification.)
21      MR. VETTORI: I had that same
22  question.
23      MS. MCENROE: Is there a question
24  pending?
25      MR. VETTORI: No. He had a quizzical

**Page 64**

1  look on his face and I think I had the same one, but
2  I think I got the answer.
3  **A. Okay. I finished reading.**
4  BY MR. VETTORI:
5  Q. So this is a letter dated May 22, 2002,
6  this being Exhibit 14, correct?
7  **A. Yes.**
8  Q. And it's your letter?
9  **A. It's from me, yes.**
10  Q. This is approximately a year after your
11  previous letter, correct?
12  **A. Yes.**
13  Q. Can I offer what I think is the
14  explanation for that period of time and see if you
15  agree with me?
16  **A. Yes.**
17  Q. I think in an earlier letter you wrote
18  that you would reconsider the matter after the
19  decision by the USMLE and their remand to you. Do
20  you remember that?
21  **A. Yes.**
22  Q. Is that the reason for this letter being
23  almost a year later?
24  **A. That would have been the process, yes.**
25  Q. Thank you.

Case 20-3024 Document 5-2 Page 21 Date Filed 04/20/2020
Case 2:18-cv-09629-JDW Document 32-25 Filed 10/07/19 Page 29 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

17 (65 to 68)

**Page 65**

1    (Exhibit No. 15 marked for
2 identification.)
3    **A.  I finished reviewing, yes.**
4 **BY MR. VETTORI:**
5    Q.  So what is Exhibit 15?
6    **A.  It's a photocopy of an application for**
7 **USLME examination.**
8    Q.  And this applicant checked no to the
9 question, "Have you ever submitted an application to
10 ECFMG for any examination even if you did not take
11 the examination," correct?
12    **A.  Correct.**
13    Q.  And would you agree with me that this
14 appears to be a different name than the Igberase and
15 Charles names that we've been discussing up until
16 now?
17    **A.  There is a difference, yes.**
18    Q.  So the last name is Oluwafemi,
19 O-L-U-W-A-F-E-M-I, correct?
20    **A.  On this application yes.**
21    Q.  First name Charles?
22    **A.  Yes.**
23    Q.  Middle initial, Ugberaese,
24 U-G-B-E-R-A-E-S-E, correct?
25    **A.  Yes.**

**Page 66**

1    Q.  No Social Security number listed,
2 correct?
3    **A.  That is correct.**
4    Q.  Date of birth of ████████ , 1967, correct?
5    **A.  Yes.**
6    Q.  There is no identification number on this,
7 is there?
8    **A.  An ECFMG USLME identification number,**
9 **no.**
10    Q.  And it appears to have been -- I know it's
11 hard to read, but I think some iteration of this
12 I've seen.  I think it's March 18, 2002.  It's
13 clearly --
14    **A.  I see 18 and 2002.**
15    Q.  Okay, fair enough.  And this application
16 is received by ECFMG in the period of time after
17 Igberase wrote you that letter, which was after the
18 decision had been made.  In other words, it was an
19 untimely response to your earlier letter.  Do you
20 follow me?
21    **A.  Yes.**
22    Q.  But before May of 2002 when you reviewed
23 this matter again upon remand for the USLME,
24 correct?  This falls within that time period?
25    **A.  If it were in April.  You're saying it was**

**Page 67**

1 received April 18th?
2    Q.  March 18th.
3    **A.  March 18th, yes, that would have been.**
4    MS. MCENROE:  Do you want to take a
5 break?
6    MR. VETTORI:  No.
7    (Exhibit No. 16 marked for
8 identification.)
9 BY MR. VETTORI:
10    Q.  Mr. Kelly, Exhibit 16, which is Bates
11 number 0000267, appears to be a copy of something
12 that purports to be a diploma from the University of
13 Ibadan for a person named Charles Igberase
14 Oluwafemi.  Do you see that?
15    **A.  Yes.**
16    Q.  Do you know whether this was submitted to
17 ECFMG as part of the application we just
18 discussed?
19    **A.  I do not know.**
20    Q.  You don't have any independent
21 recollection of this?
22    **A.  I do not.**
23    Q.  Do you have any recollection whether this
24 diploma was ever verified with the University of
25 Ibadan?

**Page 68**

1    **A.  I have no knowledge.**
2    Q.  Do you have any knowledge whether any
3 information was inputted into the computer system
4 when this application was filed?
5    **A.  I have no knowledge.**
6    Q.  Do you have a recollection that ECFMG
7 determined within a short period of time after this
8 application was filed by this gentleman with the
9 last name Oluwafemi that it was the same person that
10 applied as Igberase and as Charles?
11    **A.  I don't recall that, no.**
12    (Exhibit No. 17 marked for
13 identification.)
14 BY MR. VETTORI:
15    Q.  March 18, 2002.
16    **A.  Okay, I finished.  I read -- reviewed the**
17 **letter.**
18    Q.  So does this refresh your recollection
19 that ECFMG realized pretty quickly after the March
20 18, 2002, application that this person by the name
21 of Oluwafemi is really the same as the person
22 identified as Charles and as Igberase?
23    **A.  It doesn't refresh my recollection, but**
24 **the letter tells me that that is what happened.**
25    Q.  You wouldn't have written that if it

Case: 20-3024 Document: 5-2 Page: 22 Date Filed: 04/20/2020
Case 2:18-cv-09629-JDW Document 32-5 Filed 10/07/19 Page 20 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

18 (69 to 72)

69

1  weren't accurate, would you?
2      **A.  I would hope not.**
3      Q.  Again, I know this may sound petty, but
4  I'm doing this for a particular reason so humor me.
5          We couldn't be sure on the
6  application whether it was March 18, 2002, but there
7  are several references in your letter to that date;
8  am I correct?
9      **A.  That is correct.**
10     Q.  And you asked for an explanation from him,
11 didn't you?
12     **A.  Well, it references several letters that I**
13 **haven't seen.  And it's likely the explanation would**
14 **have been -- request would have been in, for**
15 **example, the May 22 letter.**
16     Q.  Apparently I didn't ask a very good
17 question.  I apologize.
18         You would agree with me that in this
19 letter you told Oluwafemi that he should write ECFMG
20 immediately to explain the reason why he indicated
21 on his application received on March 18, 2002 that
22 he had not previously submitted an application to
23 ECFMG when in fact he had previously submitted
24 applications and taken the examinations, correct?
25         MS. MCENROE:  Objection to form.

70

1      **A.  This letter does not ask for that.  This**
2  **is the decision of the credentials committee.  This**
3  **letter, this November 12, Exhibit 17 letter.**
4  **BY MR. VETTORI:**
5      Q.  I'm sorry, I apologize, I got out of order
6  here.
7          What is -- may I see the letter, the
8  original?
9      **A.  (Complies.)**
10     Q.  Hold that letter.  I apologize.
11         MR. VETTORI:  Can we take a quick
12 break?
13         MS. MCENROE:  Sure.
14         (Recess taken at 11:30 a.m.)
15         (Back on the record at 11:35 a.m.)
16 BY MR. VETTORI:
17     Q.  Did you -- do you remember whether in your
18 review of documents in preparation for this
19 deposition you saw any documents indicating that the
20 person named Charles's diploma was verified by his
21 medical school?
22         MS. MCENROE:  Objection to form.
23     **A.  I recall seeing a verification of his**
24 **diploma, but I don't recall whose it was.**
25         (Exhibit No. 18 marked for

7

1  identification.)
2          MR. VETTORI:  Off the record a
3  minute.
4          (Discussion off the record.)
5      **A.  I've reviewed this document, Exhibit 18.**
6  **BY MR. VETTORI:**
7      Q.  Have you seen these before or do you
8  recall seeing them before?
9      **A.  Yes, I do.**
10     Q.  As part of your preparation for this
11 deposition?
12     **A.  Yes.**
13     Q.  This page 1, 4007 -- 4007 appears to me to
14 be an ECFMG form; is that correct?
15     **A.  Yes.**
16     Q.  And if I understand from your prior
17 testimony, the practice would have been for ECFMG to
18 use this form to forward the diploma provided to it
19 by the applicant; is that correct?
20     **A.  That was the process, yes.**
21     Q.  And so I'm just going by the sequence of
22 numbers that they were produced to us.  Immediately
23 following 4007 is page 4008 and it's a diploma,
24 correct?
25     **A.  Yes.**

72

1      Q.  But it's not a diploma for somebody by the
2  name of Charles, is it?
3          MS. MCENROE:  Objection to form.
4      **A.  It says Charles right on it.**
5  **BY MR. VETTORI:**
6      Q.  What is the last name?
7      **A.  It's Charles Oluwafemi Igberase.**
8      Q.  It's not Igberase Oluwafemi Charles, is
9  it?
10         MS. MCENROE:  Objection to form.
11     **A.  The names are in a different order.**
12 **BY MR. VETTORI:**
13     Q.  Correct.  And you were treating the person
14 with the name Igberase Oluwafemi Charles as someone
15 different from the person with the name Charles
16 Oluwafemi Igberase, weren't you?
17         MS. MCENROE:  Objection to form.  Are
18 you asking --
19 BY MR. VETTORI:
20     Q.  When I say "you," I mean ECFMG for
21 purposes of its certification.
22     **A.  I don't recall that.**
23     Q.  Well, you assigned it a separate
24 identification number to Igberase Oluwafemi Charles
25 than you did to Charles Oluwafemi Igberase.  We've

Case: 20-3024 Document: 5-2 Page: 23 Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW Document 32-15 Filed 10/07/19 Page 21 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

19 (73 to 76)

Page 73

1  already established that, Mr. Kelly.
2          MS. MCENROE:  Objection to form.
3  BY MR. VETTORI:
4      Q.  Isn't that correct?
5      A.  If that is what we did, then this was a
6  different applicant, yes.
7      Q.  Correct.  Are you aware that this is the
8  identical diploma submitted by the person with the
9  name Charles Oluwafemi Igberase that you verified
10  with the school?
11      A.  I'm not aware of that.
12      Q.  So again, we have a situation where the
13  applicant's name is different than the name on the
14  diploma, correct?
15          MS. MCENROE:  Objection.
16      A.  The name -- the sequence of names is
17  different, yes.
18  BY MR. VETTORI:
19      Q.  Correct.  And is there any documentation
20  to indicate to ECFMG an explanation for that?
21      A.  I see none.
22      Q.  So as I -- is it correct to say that ECFMG
23  relied on a verification of a diploma for someone
24  whose name is different than the applicant Igberase
25  Oluwafemi Charles?

Page 74

1          MS. MCENROE:  Objection to form.
2      A.  What I can say is I, at this time in 1994,
3  I do not believe ECFMG considered them, the name not
4  to do -- to belong to this applicant.  It was not
5  uncommon for people from different cultures and
6  certain countries to have their name, you know, in
7  different sequences.
8  BY MR. VETTORI:
9      Q.  Then why did you apply -- I'm sorry.  Why
10  did you assign different identification numbers to
11  these two people?
12          MS. MCENROE:  Objection to form.
13      A.  Yeah, you have me a little confused.
14  My -- I don't know.  I don't have the two records in
15  front of me so I would have to see.
16      Q.  I understand, but let me tell you what the
17  record that we developed here today shows.  A
18  gentleman by the name of Charles Oluwafemi Igberase,
19  a name on a diploma, filed an application with ECFMG
20  in 1992 and you assigned -- ECFMG assigned to him
21  the O482700-2 number.  That's established in the
22  record.
23      A.  Yes.
24      Q.  A gentleman by the name of Igberase
25  Oluwafemi Charles applied to ECFMG in 1994 and ECFMG

Page 75

1  assigned to him the number 0519573-0.  ECFMG
2  certified both of those individuals with different
3  certification numbers.
4      A.  Yes.
5      Q.  And that's because, isn't it, Mr. Kelly,
6  that ECFMG thought they were two different people?
7      A.  I don't know that I would have used that
8  language, but they were two separate applicants,
9  yes, yes, individuals, yes.
10      Q.  ECFMG would never assign two certification
11  numbers and -- I'm sorry -- two identification
12  numbers and actually certify with two different
13  certification numbers the same person, would it?
14          MS. MCENROE:  Objection to form.
15      A.  Not knowingly.
16  BY MR. VETTORI:
17      Q.  So again, ECFMG relied on a verification
18  of a diploma for a person whose name is different
19  than the name on the application.  You would agree
20  with that, wouldn't you?
21          MS. MCENROE:  Objection to form.
22      A.  The sequence of names on the diploma are
23  different than the sequence of names on the
24  application.
25  BY MR. VETTORI:

Page 76

1      Q.  And do you see on the first page at the
2  top where those two certificate numbers appear, one
3  of which is crossed out?
4      A.  Yes.
5      Q.  Do you know why that is?  Do you have any
6  explanation for that?
7      A.  I can -- I know what the process was.
8      Q.  What was the process?
9      A.  Okay.  At some point after it was
10  determined that both numbers belonged to the same
11  individual, all the records that had the second
12  number, the 05195730, would have been marked with
13  the original identification number 04827002.
14      Q.  So you -- ECFMG at some point -- we know
15  from the record we established, at some point
16  determined that they're one and the same person?
17      A.  That's correct.
18      Q.  Did it raise any red flags at ECFMG that
19  the University of Ibadan would verify a diploma for
20  someone named Charles Oluwafemi Igberase when ECFMG
21  was requesting verification of a diploma for
22  Igberase Oluwafemi Charles?
23          MS. MCENROE:  Objection to form.
24      A.  At that time it was not uncommon for names
25  to be in a different sequence so it would not have

Case: 20-3024   Document: 5-2   Page: 24   Date Filed: 04/20/2020
Case 2:18-cv-03629-JDW   Document 32-25   Filed 10/07/19   Page 22 of 58

20 (77 to 80)

Transcript of William C. Kelly
Conducted on August 20, 2019

77

1   raised a flag.
2   BY MR. VETTORI:
3      Q.   So why then when Igberase Oluwafemi
4   Charles applied, didn't ECFMG question whether it
5   was just a rearrangement of names or not?
6          MS. MCENROE:  Objection to form.
7      A.   I would have to go back to the application
8   and look.
9   BY MR. VETTORI:
10     Q.   Well, we know from one of your letters
11  that you said the reason why you didn't make that
12  determination when the application, the second
13  application was filed, that is the one by
14  Mr. Charles or Dr. Charles was because his date of
15  birth was different and the order of his name was
16  different, correct?  You remember that letter?
17     A.   Yes, yes, yes.
18     Q.   So you thought they were two different
19  people, even though the names were similar, they
20  were in a different arrangement; isn't that
21  correct?
22         MS. MCENROE:  Objection to form.
23     A.   That would be correct, yes.
24  BY MR. VETTORI:
25     Q.   I'm just curious why there's not a diploma

78

1   with the names ordered Igberase Oluwafemi Charles?
2          MS. MCENROE:  Objection to form.
3   Asked and answered.
4   BY MR. VETTORI:
5      Q.   Can you tell me why?
6      A.   I don't.
7      Q.   But that never raised a question with
8   ECFMG?
9          MS. MCENROE:  Objection to form.
10  Asked and answered.
11     A.   I couldn't answer that.
12         (Exhibit No. 19 marked for
13  identification.)
14     A.   I completed reviewing this document.
15  BY MR. VETTORI:
16     Q.   Okay.  Let me see if I can put this back
17  into the context where I was reading from a letter I
18  hadn't shown to you.
19         So if you recall, Mr. Kelly, someone by
20  the name of Charles Igberase Oluwafemi filed an
21  application with ECFMG to take certain medical
22  examinations on March 18, 2002.  We've established
23  that.
24     A.   Yes.
25     Q.   And although we couldn't read the date

79

1   stamp, we established from some other letters that
2   it clearly was March 18, 2002; do you agree?
3      A.   Yes.
4      Q.   I think my question to you was, it appears
5   to me -- I'm sorry.
6          Would you agree with me that ECFMG
7   realized within a short period of time after this
8   March 18, 2002 application was filed that this
9   person using the name Charles Igberase Oluwafemi was
10  really the person certified under number
11  0482700-2?
12     A.   Yes.
13     Q.   And so you wrote a letter on July 22,
14  2002, to someone by the name of Charles Igberase
15  Oluwafemi, correct?
16     A.   Yes.
17     Q.   His application had not referenced any
18  identification or certification number, had it?
19     A.   Yes.
20     Q.   Yes, it had not?
21     A.   That is correct.
22     Q.   But you referenced the 0482700-2
23  certification number, correct?
24     A.   Correct.
25     Q.   And that was the one assigned to Igberase

80

1   who had applied in 1992, correct?  I think it's
2   Exhibit 2.
3      A.   Yes.
4      Q.   So would I be incorrect in assuming that
5   that meant that ECFMG had concluded that the person
6   holding certificate 0482700-2 and this individual by
7   the name of Charles Igberase Oluwafemi were one and
8   the same?
9      A.   That was our suspicion, yes.
10     Q.   Again, in your letter you recite the
11  history of ECFMG's involvement with Igberase and
12  Charles ad nauseam.  I'm sorry, that wasn't a
13  criticism.  You recite all that again?
14     A.   There's a history, yes.
15     Q.   Thank you.  And then you discussed the
16  application filed by this Charles Igberase Oluwafemi
17  on March 18, 2002, and you tell him to write ECFMG
18  immediately to explain the reason why he indicated
19  on his application received on March 18, 2002, that
20  he had not previously submitted an application to
21  ECFMG when, in fact, he had previously submitted an
22  application and taken examinations, correct?
23     A.   Yes.
24     Q.   I apologize for the confusion, sir.  So
25  I'm sorry.  Can we pull the November 12th letter

Case: 20-3024 Document: 5-2 Page: 25 Date Filed: 04/20/2020
Case 1:18-cv-09629-JPW Document 329-5 Filed 10/07/19 Page 25 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

21 (81 to 84)

**81**

1  now?
2    **A. (Complies.)**
3       MS. MCENROE: Exhibit 17.
4       MR. VETTORI: Thank you.
5  BY MR. VETTORI:
6    Q. This is your letter?
7    **A. Yes.**
8    Q. It's Bates 0003471-3472; is that
9  correct?
10   **A. Yes.**
11   Q. And is this advising a gentleman with the
12 last name Charles that he's barred permanently from
13 admission to all ECFMG examinations and from ECFMG
14 certification?
15   **A. Yes.**
16   Q. Thank you.
17      (Exhibit No. 20 marked for
18 identification.)
19 BY MR. VETTORI:
20   Q. Mr. Kelly, I'm going to give an
21 opportunity to review it as thoroughly as you want,
22 but just for the record let's establish that this
23 letter is Bates number 0000348 through 351. It's a
24 letter dated June 17, 2003, to Charles Igberase
25 Oluwafemi referencing the number 0482700-2 from

**82**

1  Susan Deitch, Office of the USLME secretary, with a
2  copy to ECFMG. Do you see that?
3    **A. Yes.**
4    Q. Do you have any recollection, either
5  independently or from your review of records in this
6  case, of having seen this letter?
7    **A. Yes.**
8    Q. And now take as much time as you want to
9  look at it or whenever you're ready my question is
10 going to be: What was the gist of this letter?
11      MS. MCENROE: Objection to form.
12   **A. The gist of this letter is that the USMLE**
13 **had received the information from ECFMG's finding of**
14 **irregular behavior and specifically July 22, 2002**
15 **letter Exhibit 19. They had reviewed that material**
16 **and separately determined that the individual had**
17 **engaged in irregular behavior and took certain**
18 **actions.**
19 BY MR. VETTORI:
20   Q. What actions did they take?
21   **A. They annotated the USMLE record and said**
22 **there was an annotation that he engaged in irregular**
23 **behavior and barred him from taking future**
24 **administrations of USMLE, suspension of the bar to**
25 **be considered at such time as a request is received**

**83**

1  **from the medical licensing authority, and after full**
2  **disclosure to such authority of events that led to**
3  **the bar.**
4    Q. Thank you. Do you have any personal
5  knowledge or is your memory refreshed at all with
6  respect to whether anybody by the name of Igberase
7  or Charles ever received a medical license in
8  Maryland?
9    **A. I have no knowledge of that.**
10      MR. VETTORI: This would be a good
11 time to take a break.
12      MS. MCENROE: Great.
13      (Recess taken at 12:00 p.m.)
14      (Back on the record at 12:25 p.m.)
15 BY MR. VETTORI:
16   Q. Just one clean-up question with respect to
17 the subject we've been talking about.
18      I know that when we looked at Exhibit 20,
19 the last letter you have there, the USMLE discusses
20 the fact that any USMLE transcripts or any third
21 party submitted to you or any third party will
22 include this annotation, in other words, the action
23 that they have taken.
24      But my question is: Would it have been
25 ECFMG's practice in this June 2003 period to notify

**84**

1  any organizations or regulatory authorities about
2  the action with respect to Igberase and Charles?
3    **A. All findings of irregular behavior were**
4  **reported to a host of different organizations and**
5  **agencies.**
6    Q. So do you remember seeing any documents to
7  that effect in your review in preparation for this
8  deposition?
9    **A. I remember seeing a notification.**
10   Q. With respect to Igberase and --
11   **A. I don't know who it was for, but I think**
12 **it's for --**
13   Q. I'm getting way ahead of myself. So you
14 weren't with ECFMG when the individual with the last
15 name Akoda pled guilty to certain criminal offenses,
16 correct?
17   **A. I believe I was not, yeah.**
18   Q. Well, that was October 2016. I think you
19 told us you had left in 2015?
20   **A. That is correct.**
21   Q. And so you weren't with ECFMG in December
22 of 2016 when Karen Corrada -- do you know her?
23   **A. Yes.**
24   Q. Was she working at ECFMG when you were
25 there?

Case: 20-3024   Document: 5-2   Page: 26   Date Filed: 04/20/2020
Case 2:18-cv-05629-JDW   Document 3295   Filed 10/07/19   Page 24 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

22 (85 to 88)

---

85

1  A. Yes.
2  Q. So you weren't at ECFMG in December of
3  2016 when Karen Corrada wrote to this gentleman by
4  the name of Akoda and indicated that the report of
5  the revocation of the standard ECFMG certificate --
6  I'm sorry.  That ECFMG would report the revocation
7  of his ECFMG certificate to the Federation of State
8  Medical Boards, US State and International Medical
9  Licensing Authorities, the Records of Graduate
10 Medical Education Programs, and to any other
11 organization or individual who in the judgment of
12 ECFMG has a legitimate interest in such
13 information?
14 A. I was not there.
15 Q. Do you know whether the organizations or
16 bodies that I just referenced in her letter are the
17 ones you were talking about with respect to
18 notification that would have been --
19 A. That was our procedure.
20       MS. MCENROE: Let him finish.
21       MR. VETTORI: He's good.  That's the
22 first time it happened.
23 BY MR. VETTORI:
24 Q. Those are the organizations that would
25 have received notice about Igberase?

86

1  A. Yes.
2  Q. But again, do you remember any notices
3  other than the one I just referenced in your
4  review?
5       MS. MCENROE: Objection to form.
6  A. No, I don't recall.
7  BY MR. VETTORI:
8  Q. So let me ask it a little different way.
9  Did you review this December 19, 2016 letter that
10 Karen Corrada wrote?
11 A. No.
12       MS. MCENROE: Can you mark that or do
13 you want --
14       MR. VETTORI: I can, if you want me
15 to.
16       MS. MCENROE: Just for purpose of the
17 record of what it was he did not review.
18       (Exhibit No. 21 marked for
19 identification.)
20       (Exhibit No. 22 marked for
21 identification.)
22 BY MR. VETTORI:
23 Q. So Mr. Kelly, before you look at it I'm
24 telling you this is an incomplete document.  This is
25 just page 1 of a multiple page document.  Take a

87

1  look at it for a moment and then I'm going to ask
2  you a question about it.
3  A. (Complies.) Okay.
4  Q. So this is dated March 1, 2017, and I
5  think we've already agreed that you weren't with
6  ECFMG at the time?
7  A. That's correct.
8  Q. So you don't know what information is
9  contained on the other pages of this document,
10 obviously?
11 A. That is correct.
12 Q. Have you even seen this document before?
13 A. No.
14       MR. VETTORI: Let's mark it as 23
15 anyway.
16       (Exhibit No. 23 marked for
17 identification.)
18 BY MR. VETTORI:
19 Q. So tell us what Exhibit 23 is.
20 A. It is a photocopy of an application for a
21 USMLE examination.
22 Q. By whom?
23 A. The name on the application is John Nosa
24 Akoda.
25 Q. A-K-O-D-A.  It appears to me that it's

88

1  dated January 3, 1996.  Can you confirm that?
2  A. That appears to be the receipt date,
3  yes.
4  Q. Right.  Does it list a Social Security
5  number?
6  A. There is none listed on there.
7  Q. What is the date of birth?  Second page.
8  A. ███████████ 1959.
9  Q. And does this applicant, John Nosa Akoda,
10 indicate what medical school he attended?
11 A. Yes.
12 Q. Which one?
13 A. University of Benin, Nigeria.
14 Q. Does he indicate when he graduated?
15 A. He does not list the degree date.  He
16 lists his attendance dates.
17 Q. What are the attendance dates?
18 A. October '81 to October '87.
19 Q. If you look at Bates page 40705, which I
20 think is the third page of the application, part C.
21 A. Yes.
22 Q. There is a photograph attached or there is
23 a photograph on that page; is there not?
24 A. It appears to be a photograph.
25 Q. Isn't that a requirement of all

Case: 20-3024  Document: 5-2  Page: 27  Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW  Document 32-25  Filed 10/07/19  Page 29 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

23 (89 to 92)

**89**

1 applications, that they attach a photograph?
2    MS. MCENROE:  Objection to form.
3    **A.  That is, yes.**
4 BY MR. VETTORI:
5    Q.  And doesn't that photograph have to be
6 verified by the dean of the medical school?
7    MS. MCENROE:  Objection to form.
8    **A.  It does not have to be.**
9 BY MR. VETTORI:
10    Q.  What was the procedure in 1996 at ECFMG
11 with respect to the verification of a photograph on
12 an application?
13    **A.  I don't recall.**
14    Q.  So in section B1, down towards the bottom,
15 the form says, "Explain in the space below why the
16 application could not be signed in the presence of
17 your medical school dean, vice dean, or register --
18 any registrar.  Any explanation must be acceptable
19 to ECFMG and must be provided each time you submit
20 an application to ECFMG."
21    Do you see that?
22    **A.  Yes.**
23    Q.  And the handwritten answer was "because
24 the postal system to Nigeria could not be guaranteed
25 within the available time."  Did I read that

**90**

1 correctly?
2    **A.  That's what I read as well.**
3    Q.  Okay.  So when did ECFMG require
4 verification of the photo and when did it not in
5 1996, if you recall?
6    MS. MCENROE:  Objection to form.
7    **A.  I don't recall.**
8 BY MR. VETTORI:
9    Q.  Also on this application John Nosa Akoda
10 indicates that he's never submitted an application
11 to ECFMG for any examination, correct?
12    **A.  That is correct.**
13    MR. VETTORI:  What number was this?
14    MS. MCENROE:  23.
15    MR. VETTORI:  Thank you.
16    (Exhibit No. 24 marked for
17 identification.)
18    **A.  Okay.**
19 BY MR. VETTORI:
20    Q.  So what is Exhibit 24?
21    **A.  It is a photocopy of an application for**
22 **USMLE.**
23    Q.  By the same John Nosa Akoda?
24    **A.  John Akoda, yes.**
25    Q.  Doesn't it say the middle name is Nosa?

**9**

1    **A.  I believe he has it on the wrong line, but**
2 **that appears to be what he meant.**
3    Q.  And I think this is dated August 30, 1996.
4 Can you verify or deny that?
5    **A.  The received date appears to be August 30,**
6 **1996, yes.**
7    Q.  And on this application he indicates that
8 he has applied previously for examination,
9 correct?
10    **A.  He has checked the yes box, yes.**
11    Q.  Is this identification number the same as
12 his identification number on Exhibit 23?
13    **A.  I can't say for the last digit, but it**
14 **appears to be, yes.**
15    Q.  Again, no Social Security number,
16 correct?
17    **A.  None listed, correct.**
18    Q.  The rest of the information is the same?
19    **A.  I would have to compare them.**
20    Q.  Do a quick comparison as of the dates of
21 attendance and medical school, the name of the
22 medical school, his birth date.
23    MS. MCENROE:  Can we do them one at a
24 time because some of the things are different, his
25 address is different.  What is it that you want him

**92**

1 to compare?
2 BY MR. VETTORI:
3    Q.  So is this the same applicant that applied
4 in Exhibit 23?
5    MS. MCENROE:  Objection to form.
6 BY MR. VETTORI:
7    Q.  If you know.
8    **A.  It appears to be, yes.**
9    Q.  And if you look at page 000645, the last
10 page there is a -- I'm sorry, the next to last page,
11 there is a photograph?
12    **A.  Yes.**
13    Q.  And does that have a -- some kind of a
14 stamp or symbol of the dean of college in
15 medicine?
16    **A.  It appears to be, yes.**
17    Q.  And are you familiar with that kind of a
18 stamp or were you then?
19    **A.  I don't recall.**
20    Q.  So what, if anything, was ECFMG's practice
21 in 1996 to verify that the person in effect stamping
22 this picture is, in fact, an authorized
23 representative of the university?
24    **A.  In 1996 I don't recall.**
25    Q.  Do you recall what the procedure was at

Case: 20-3024   Document: 5-2   Page: 28   Date Filed: 04/20/2020
Case 1:18-cv-05629-JDW   Document 32-5   Filed 10/07/19   Page 26 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

24 (93 to 96)

---

**93**

1  any time while you were employed by ECFMG?
2      A.  Yes.
3      Q.  What?
4      A.  You would check the name and the seal
5  against samples in the reference library, in the
6  credential reference library.
7      Q.  But you don't know when that was?
8      A.  No.
9      Q.  You don't know if that reference library
10  was utilized in the 1996 time period?
11      A.  I don't recall.
12      Q.  Does it appear to you that the dates of
13  attendance at the University of Benin are the same
14  on Exhibits 24 and 23?
15      A.  Yes.
16      Q.  From your review of the many records in
17  preparation for this deposition or from your
18  independent personal knowledge, do you know why this
19  occurred, the individual applied once, didn't take
20  any exams and then applied again?
21      A.  No, I don't know.
22      Q.  You don't remember?
23          MS. MCENROE:  I'm just going to -- he
24  stated he didn't remember, but I think testified he
25  didn't know.

**94**

1      A.  I don't know why.
2  BY MR. VETTORI:
3      Q.  Did you ever know why?
4      A.  I don't recall.
5          (Exhibit No. 25 marked for
6  identification.)
7  BY MR. VETTORI:
8      Q.  Can you tell us what Exhibit 25 is?
9      A.  It appears to be a photocopy of a medical
10  diploma.
11      Q.  For whom?
12      A.  The name on it is Johnbull, middle name,
13  I'll spell it, E-N-O-S-A-K-H-A-R-E, last name,
14  Akoda.
15      Q.  And would you agree with me that that name
16  is different than the name on Exhibit 24, the
17  application to take certain exams?
18      A.  There is a difference in the name, yes.
19      Q.  So the application is John, first name,
20  correct?
21      A.  Yes.
22      Q.  The diploma is Johnbull, correct?
23      A.  Yes.
24      Q.  The middle name on the application is
25  Nosa, correct?

**95**

1      A.  Yes.
2      Q.  And the middle name on the diploma is
3  Enosekhare, E-N-O-S-E-K-H-A-R-E, correct?
4      A.  Yes.
5      Q.  And Akoda is the same on both, correct?
6      A.  Yes.
7      Q.  Do you know if ECFMG verified this
8  diploma?
9      A.  I do not know.
10      Q.  Do you know whether John Nosa Akoda was
11  ever certified by ECFMG?
12      A.  My recollection is that he was.
13          MR. VETTORI:  Off the record.
14          (Discussion off the record.)
15          (Exhibit No. 26 marked for
16  identification.)
17  BY MR. VETTORI:
18      Q.  So Mr. Kelly, what is this document?
19      A.  It -- to me it's got a photocopy of an
20  ECFMG certificate.
21      Q.  Are you familiar with this form of
22  document?
23      A.  Yes.
24      Q.  So would I be correct in stating that when
25  an applicant is certified, they receive one of

**96**

1  those -- a document like this?
2      A.  Yes.
3      Q.  So should there be somewhere in the files
4  of ECFMG a copy of a similar certificate for
5  somebody by the name of Igberase and somebody by the
6  name of Charles, if you know?
7          MS. MCENROE:  Objection.
8      A.  It was not our procedure to have physical
9  copies of certificates, just a record of when it was
10  issued.  We didn't keep actual copies.
11          MR. VETTORI:  So off the record.
12          (Discussion off the record.)
13  BY MR. VETTORI:
14      Q.  So is it your testimony that when ECFMG --
15  the practice of ECFMG was to issue a certificate
16  like Exhibit 26 to the certified IMG, but not keep a
17  copy of that certificate?
18      A.  That is correct.
19      Q.  I think you added something that I sort of
20  didn't pay any attention to and I should have.
21          You would have made some notation in
22  your records that the person had been certified?
23      A.  In the person's ECFMG record would be an
24  indication when this certificate was issued and that
25  they were certified.

Transcript of William C. Kelly
Conducted on August 20, 2019

25 (97 to 100)

97

1    Q.   When you say, "in the record," you mean as
2  part of their computer program, profile, whatever
3  you call it?
4    **A.   Yes, and if I can just interject, at this**
5  **time perhaps also in their paper file.  We keep**
6  **paper file paper records.**
7         (Exhibit No. 27 marked for
8  identification.)
9  BY MR. VETTORI:
10    Q.   Let me know when you're finished reading
11 it.
12    **A.   I'm finished reading it.**
13    Q.   So what is this document?
14    **A.   I know what I believe it to be.  This is a**
15 **photocopy of a section of one of the ECFMG internal**
16 **software applications listing various components of**
17 **an individual's record with ECFMG.**
18    Q.   Part of a computer program?
19    **A.   Yes, it's a printout of one of the**
20 **screens.**
21    Q.   So if you wanted to know when someone's
22 certificate was issued, you would go into your
23 computer program under his name or his
24 identification number and punch in
25 certificate information?

98

1    **A.   You can access it a number of different**
2  **ways.**
3    Q.   But this document confirms that Akoda's
4  certificate was issued August 18, 1987, correct?
5    **A.   It does have that issue date.  Yes.**
6    Q.   Okay.
7    **A.   1997.**
8    Q.   And I think I know this answer, but it
9  will save me asking questions later.  So there is a
10 section on here that says English pass date
11 8/28/1996.  Do you see that?
12    **A.   Yes.**
13    Q.   Valid through 9/1/1998.  What does that
14 mean?
15    **A.   At this time a passing performance on the**
16 **English test had a limited period of time of**
17 **validity during which time the holder of the**
18 **certificate had to start a residency program.  And**
19 **if he or she then started the residency program and**
20 **provided documentation, it would -- that expiration**
21 **date would be removed and it becomes valid**
22 **indefinitely.  If they did not, they were required**
23 **to take the English test.**
24         MR. VETTORI:  Off the record.
25         (Discussion off the record.)

99

1  BY MR. VETTORI:
2    Q.   I'm going to ask you about that later
3  again, but thank you very much.
4         (Exhibit No. 28 marked for
5  identification.)
6    **A.   I reviewed it.**
7  **BY MR. VETTORI:**
8    Q.   This is another copy of a portion of the
9  computer program relating to this guy Akoda?
10    **A.   I'm looking for the name.  I don't see the**
11 **name of the candidate on it, but it's a screen, it's**
12 **a print of a screen print from one of these ECFMG**
13 **programs.  I don't see a name.  I can barely make**
14 **out an ID number, though.**
15    Q.   I can tell you, if I'm reading this
16 accurately, the user ID number is the same on the
17 previous exhibit.
18    **A.   What do you mean user ID?**
19         MS. MCENROE:  The USLME.
20    **A.   The USLME ID?**
21 **BY MR. VETTORI:**
22    Q.   USMLE ID, the 553 --
23    **A.   055332585?**
24    Q.   Correct.
25    **A.   So this would be the exam history.**

00

1    Q.   So it's titled -- I'm sorry.  The heading
2  on the top of this form is ECFMG applicant
3  information management system V2.  What is it?  Is
4  that the computer program that's used?
5    **A.   Yes.**
6    Q.   That's like the universal program for all
7  of these?
8    **A.   It's one of the programs.**
9    Q.   And what this document reflects is when
10 the individual named Akoda passed step one, the
11 English exam, and step two, correct?
12    **A.   I don't know when this was -- this screen**
13 **print was -- you know, when the screen was done, but**
14 **at the time it was done, that would have been -- it**
15 **looks like they checked the entire exam history.  It**
16 **would show, yes.**
17         (Exhibit No. 29 marked for
18 identification.)
19    **A.   Okay, I read it.**
20 **BY MR. VETTORI:**
21    Q.   This is another screen shot from the same
22 program?
23    **A.   I actually think it's a different program,**
24 **but it's an ECFMG program.  This one I think is the**
25 **verification information processing of electronic**

Transcript of William C. Kelly
Conducted on August 20, 2019

26 (101 to 104)

---

**01**

1  requests program.
2      Q.  What is VIPER?
3      A.  The acronym for Verification Information
4  Processing of Electronic Requests.
5      Q.  What is it used for?
6      A.  At that time it was used to track requests
7  from outside organizations and agencies of the ECFMG
8  status using the certification status of
9  individuals.
10     Q.  Do you know what outside organization was
11 seeking such information at that time?
12     A.  According to this information, the request
13 was sent to, so I -- you know, a presumption is
14 that's the person who requested it was the State
15 Board of Medical Examiners of New Jersey.
16     Q.  Is there any way to tell from this
17 printout the date that that information was sent?
18     A.  There is a print date, which I'm having a
19 hard time reading, but it is the third column under
20 record status.
21     Q.  Oh, I see print date, 01 -- it looks like
22 1999.  Do you see the date 1999 in there?
23     A.  It could be.  You know, I'm under oath so
24 I'm not going to say.
25     Q.  I will let the younger eyes in here tell

---

**03**

1  is.
2      Q.  In the heading column, the next one
3  following column it says "IB." Do you know
4  what that stands for?
5      A.  My recollection is whether there was a
6  determination of irregular behavior.
7      Q.  What does TA stand for?
8      A.  Whether test accommodations were
9  administered.
10     Q.  Thank you.  So you don't have to look at
11 these unless you don't trust me, but the two
12 applications for Akoda that we identified a moment
13 ago didn't include Social Security numbers?
14     A.  That's correct, yes.
15     Q.  So at some point in time he provided a
16 Social Security number to ECFMG.  Do you remember
17 that?
18     A.  I don't remember him providing it, the
19 Social Security number.
20     (Exhibit No. 31 marked for
21 identification.)
22 BY MR. VETTORI:
23     Q.  Mr. Kelly, before you read the letter, let
24 me just make a statement.  I'm going to come back to
25 this letter later and ask you some questions about

---

**02**

1  us.
2      Anybody want to volunteer anything?
3      MR. CERYES:  Nope.
4      MR. VETTORI:  All right.  Let's move
5  on.
6      (Exhibit No. 30 marked for
7  identification.)
8  BY MR. VETTORI:
9      Q.  Again, what is this document?
10     A.  Okay.  This is a photocopy of a screen
11 print from one of the ECFMG programs.
12     Q.  What is an AVTS report?
13     A.  I don't recall.
14     Q.  In any event, there is no information
15 entered in that field, is there?
16     A.  I don't see any.
17     Q.  Then there is a portion that says, "Exam
18 history, all exams?"
19     A.  I see that, yes.
20     Q.  It again talks about steps one, two,
21 English, and step one that we've seen on a previous
22 form, correct?
23     A.  Yes.
24     Q.  What's the update column mean?
25     A.  I don't know.  I don't recall what that

---

**04**

1  it.  The only purpose in my showing it to you now is
2  with respect to the question I asked about Social
3  Security number, okay?
4      Let me just confirm.  This is an August
5  22, 2000, letter from Stephen Seeling, J.D., vice
6  president of operations of ECFMG to James McCorkel,
7  Ph.D. at Jersey Shore Medical Center.  Can we agree
8  on that?
9      A.  Yes.
10     Q.  If you will take a look at the second full
11 paragraph of that letter, the last sentence, read it
12 aloud, please.
13     A.  "The Social Security number he provided
14 ECFMG in 1998 is," and then part of it is --
15     Q.  And my letter says 9065?
16     A.  Then it has 9065.
17     Q.  You saw this letter contemporaneously with
18 it being written, didn't you?
19     A.  Frankly, I wrote the letter.
20     Q.  I was going to ask you that later because
21 I thought you did, but thank you.
22     We know because you said so, in 1998 he
23 provided a Social Security number.  Can you tell us
24 why he did that?  What was the reason for supplying
25 it then?

---

Transcript of William C. Kelly
Conducted on August 20, 2019

27 (105 to 108)

---

**05**

1      MS. MCENROE: Objection.
2    **A. I don't recall.**
3 **BY MR. VETTORI:**
4    Q. You don't recall?
5    **A. I don't.**
6      MS. MCENROE: Again, he said I don't
7 recall or I don't know, he said I don't recall. I
8 want to make sure the record is straight what the
9 witness said.
10 BY MR. VETTORI:
11    Q. Is the answer I don't know because I don't
12 recall?
13    **A. I do not know the reason why he provided**
14 **this number.**
15    Q. Do you know if at the time he did so you
16 knew the reason he provided it?
17    **A. That I do not know. I do not know if I**
18 **ever knew.**
19      (Exhibit No. 32 marked for
20 identification.)
21    **A. I'm ready.**
22 **BY MR. VETTORI:**
23    Q. What is this document?
24    **A. This is a screen print of one of the**
25 **sections of an ECFMG program concerning Akoda,**

**06**

1 comma, John Nosa.
2    Q. What does CIBIS stand for?
3    **A. I don't recall what the acronym stands**
4 **for, but CIBIS was the common USMLE database for the**
5 **three organizations that used the USLME.**
6    Q. Which three organizations?
7    **A. They were ECFMG, National Board of Medical**
8 **Examiners, and the Federation of State Medical**
9 **Boards.**
10    Q. It looks to me like this document reflects
11 that this person by the name of Akoda passed step
12 three at the exam of May 12, 1998. Am I reading
13 that correctly?
14    **A. Yes.**
15      (Exhibit No. 33 marked for
16 identification.)
17    **A. I reviewed this.**
18 **BY MR. VETTORI:**
19    Q. This is what we were talking about
20 earlier?
21    **A. Right, this is a request to permanently**
22 **revalidate the certificate with respect to the**
23 **English test expiration.**
24    Q. And this Exhibit 33 is Bates stamp
25 0000617. And it's -- does this document indicate

**07**

1 that the gentleman by the name of Akoda is
2 participating in a residency program at Jersey Shore
3 Medical Center?
4    **A. Strictly speaking that he had started the**
5 **program.**
6    Q. And this completed form was received by
7 ECFMG on July 24, 1990 -- I can't tell the date.
8 Can you read that date?
9    **A. I can read the July 24, but not the**
10 **rest.**
11    Q. I think it's '99.
12    **A. Since the valid indefinitely sticker was**
13 **sent in 1998, it's likely 1998 is the date it was**
14 **received.**
15    Q. So it's my somewhat limited understanding
16 that as of 1998 when a IMG who has been certified by
17 ECFMG and who has passed step three of the USMLE
18 applies to a residency program, ECFMG in some
19 fashion assists in that application if requested to
20 do so? Is that understanding correct?
21      MS. MCENROE: Objection for form.
22    **A. Assist in the application?**
23 **BY MR. VETTORI:**
24    Q. Yes. And you can restate it, if it helps
25 you

**08**

1    **A. Yeah. I mean, we work with the**
2 **Association of Medical -- American Medical Colleges**
3 **for the electronic residency application service**
4 **where we serve as the dean station for international**
5 **medical graduates applying for residency programs.**
6 **So in that sense we are a part of that process.**
7    Q. So as part of your participation in the
8 ERAS process, is it correct that -- when an
9 applicant is -- I'm sorry. When an IMG applies to a
10 residency program using ERAS, another acronym, ECFMG
11 transmits a status report to the residency program;
12 is that correct?
13    **A. That was the process, yes.**
14    Q. As part of that ERAS process, again I'm
15 talking about this 1998 time period, did the -- was
16 the applicant required to send to ECFMG supporting
17 documents for further transmission to the residency
18 program?
19    **A. I am not sure.**
20    Q. As part of the ERAS program, in the time
21 period we're talking about, was it the practice for
22 ECFMG to transmit the IMGs USMLE transcripts as
23 requested by the applicant?
24    **A. If requested by the applicant, yes.**
25    Q. Do you know what, generally speaking,

Transcript of William C. Kelly
Conducted on August 20, 2019

09

1 application materials would have been provided to
2 the residency program through this ERAS process?
3    A. I don't recall.
4    Q. How about a curriculum vitae, would that
5 be part of it?
6    A. I believe that was something they would
7 look for, yes.
8    Q. Is there something called a universal
9 residency application form?
10    A. There may be, but I have no knowledge.
11    Q. Would the application materials also
12 include evidence of graduation from medical
13 school?
14    A. I don't know.
15    Q. Would it also include ECFMG
16 certification?
17    A. The application itself?
18    Q. Or anything that ECFMG did in connection
19 with this ERAS process.
20    A. The ECFMG status report sent to the
21 program would indicate their certification status.
22    Q. Were letters of recommendation a part of
23 this ERAS process?
24    A. Yes.
25    Q. Let's talk about that for a minute. What

0

1 was the applicant's role in submitting letters of
2 recommendation, if any, and what was ECFMG's role in
3 following up on those letters of recommendation, if
4 any?
5        MS. MCENROE: Objection to form.
6    A. I believe the process changed
7 significantly over time and at this period of time I
8 really don't recall what the specific process was.
9 BY MR. VETTORI:
10    Q. Well, do you recall what the process was
11 before it evolved at some point, because if you do,
12 you can tell what it was and what it became?
13    A. First I circle back. ERAS was not part of
14 my area. I just want to let you know that so -- but
15 I found it significantly a lot about it.
16        I know letters of recommendation were
17 submitted to ECFMG in hard copy. Whether they were
18 submitted directly by the person who wrote them or
19 by the applicant I don't recall.
20    Q. Fair enough. More to come.
21    A. Pardon?
22    Q. More to come on that subject.
23    A. Okay.
24        (Exhibit No. 34 marked for
25 identification.)

1    A. Okay. I reviewed it.
2    Q. Okay. Are you familiar with this
3 letter?
4    A. I've seen this letter before, yes.
5    Q. This is a letter from James McCorkel who
6 is vice president of academic affairs at Jersey
7 Shore Medical Center to Eric Holmes at ECFMG
8 dated -- I don't know what the date is, but it was
9 received by ECFMG on August 11, 2000, correct?
10    A. That's the received date, yes. There is a
11 Friday, August 11, 2000, that date under Meridian
12 Health Systems.
13    Q. Thank you. What does the AIS stand for
14 under ECFMG?
15    A. Applicant Information Services.
16    Q. Are you the "To Bill" on the top?
17    A. Very likely, yes.
18    Q. I take it Mr. Holmes holds a pretty steep
19 position or did at ECFMG?
20    A. His name was Royce, R-O-Y-C-E, and he
21 since died and he was in the information services
22 department.
23    Q. Would you agree with me that in this
24 letter Doctor McCorkel is notifying ECFMG that John
25 Charles Akoda certificate 05532585 who is a resident

2

1 in the Jersey Shore residency program presented to
2 Jersey Shore Medical Center a Social Security number
3 that was issued to Igberase?
4    A. That is what he states, yes.
5    Q. That Social Security number ended in
6 9065?
7    A. That's what the letter says, yes.
8    Q. That's the same 9065 number that was
9 provided to you in Exhibit 32 in 1998, correct?
10    A. Exhibit 31, yes.
11    Q. Did I mix my numbers up? Okay. I stand
12 corrected. Thank you. It looks to me like Stephen
13 Seeling replied to that letter on August 22, 2000.
14 Do you remember we talked about that earlier?
15    A. That's Exhibit 31.
16        MR. VETTORI: Can we mark that,
17 please?
18    A. I have a letter.
19    Q. I think you told me you wrote this
20 letter?
21    A. Yes, I'm sure I did.
22        (Exhibit No. 35 marked for
23 identification.)
24    Q. This letter that you ghosted for
25 Mr. Seeling indicates that the medical diploma of

Transcript of William C. Kelly
Conducted on August 20, 2019

---

**3**

1  the individual certified under 482700-2 was verified
2  with the medical school.  Do you see that in the
3  third paragraph?
4      **A.  Yes.**
5      Q.  And it says the same thing in the second
6  paragraph about the diploma of the individual
7  certified as number 0553-285-5, correct?
8      **A.  Yes.**
9      Q.  We've already established for the record
10  that it was the same diploma, correct?
11          MS. MCENROE:  Objection to form.
12      Q.  Let me restate the question.  There is no
13  diploma in the name of -- hold on a second.  Let me
14  make sure I got the right name -- Igberase Oluwafemi
15  Charles?
16          MS. MCENROE:  Objection to form.
17      **A.  I have to go back and look at the**
18  **diploma.**
19      Q.  I can represent to you -- you can look at
20  anything you want.  I can represent to you we talked
21  about this for about five minutes and the last name
22  on the diploma is Igberase.  This is the one you
23  said was the order of the names was different?
24      **A.  Yes.**
25      Q.  But there is in fact no diploma with the

---

**4**

1  last name Charles on it?
2          MS. MCENROE:  Objection.
3      **A.  Listed as the last name on the diploma?**
4      Q.  Correct.
5      **A.  Yes.**
6      Q.  In Mr. McCorkel's letter to you, the prior
7  exhibit, he also talks about the fact that Jersey
8  Shore Medical Center would be interested in knowing
9  whether ECFMG had requested for verification of
10  Doctor Akoda, also known as Doctor Igberase, ECFMG's
11  certification status from other teaching hospitals
12  including Harlem Hospital Center in the period of
13  time of approximately 1995 to '96 or JFK Memorial
14  Hospital in 1997, '98.  Do you see that?
15      **A.  Yes, I do.**
16      Q.  In the letter you ghosted for Mr. Seeling
17  it was stated that on the last paragraph, "ECFMG has
18  no record of receipt of request for verification of
19  the certification status from Harlem Hospital Center
20  or JFK Memorial Hospital Center."  Do you see
21  that?
22      **A.  Yes.**
23      Q.  I take it you or somebody at your
24  direction made an investigation of that before
25  writing that letter?

---

**5**

1      **A.  That's correct.**
2      Q.  Do you have a specific recollection of
3  that?
4      **A.  I do not.**
5          (Exhibit No. 36 marked for
6  identification.)
7      Q.  Have you read the letter?
8      **A.  Yes.**
9      Q.  I'm not trying to rush you.
10      **A.  No, I read it.**
11      Q.  This is a letter from you to Akoda dated
12  August 22, 2000, correct?
13      **A.  That is correct.**
14      Q.  And it's basically telling Akoda you want
15  an explanation in writing within fifteen days of the
16  information that had been submitted to you by Doctor
17  McCorkel, correct?
18      **A.  I don't think it makes any reference to**
19  **McCorkel in this letter, but we asked for an**
20  **explanation, yes.**
21      Q.  But it's because of Doctor McCorkel's
22  letter that you're writing this letter, correct?
23          MS. MCENROE:  Objection to form.
24      **A.  It appears to be, yes.**
25      Q.  And in your opening sentence you said that

---

**6**

1  ECFMG has received information alleging that he may
2  have engaged in irregular behavior, correct?
3      **A.  Yes.**
4      Q.  And irregular behavior would have been
5  using somebody else's Social Security number?
6          MS. MCENROE:  Objection to form.
7      **A.  Including that, yes.**
8      Q.  What else?
9      **A.  It also indicates that there may be a**
10  **question with a name and date of birth.**
11      Q.  And so your reference to irregular
12  behavior would have included all of those things?
13      **A.  Yeah, but this letter does not**
14  **specifically spell it out like a routine allegation**
15  **would.**
16      Q.  What would a routine allegation say
17  instead?
18      **A.  It would be more specific about what the**
19  **alleged irregular behavior is.  It would say you**
20  **were led to irregular behavior with respect to and**
21  **then specify what that irregular behavior was.**
22      Q.  Well, in this letter you set out that
23  according to the information recently received by
24  ECFMG, it's alleged that Akoda may have previously
25  applied to ECFMG using the name Igberase and the

---

Case: 20-3024 Document: 5-2 Page: 34 Date Filed: 04/20/2020
Case 1:18-cv-09629-JPW Document 32-25 Filed 10/07/19 Page 32 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

30 (117 to 120)

**7**

1  name Charles, correct?
2  **A. Yes.**
3  Q. And it also goes on to say, next
4  paragraph, when Akoda applied to ECFMG, he certified
5  on his application that the falsification of the
6  application or submission of any falsified
7  educational documents may be sufficient to cause --
8  sufficient cause for ECFMG to bar, et cetera, et
9  cetera. You were telling him that he may have
10  engaged in that illegal behavior?
11  **A. Yes.**
12  Q. May have engaged in that illegal behavior;
13  is that correct?
14  **A. Yes.**
15  Q. And you also told him in this letter that
16  ECFMG required an explanation from him in writing
17  within fifteen days, correct?
18  **A. Yes.**
19  Q. And you also told him that his file
20  together with any explanation he would provide and
21  any other material he wanted to submit would be
22  referred to the ECFMG committee on medical education
23  credentials for review at its next scheduled
24  meeting, correct?
25  **A. Yes.**

**8**

1  Q. You never did that, did you?
2  **A. I don't recall.**
3  (Exhibit No. 37 marked for
4  identification.)
5  Q. What is Exhibit 37, Mr. Kelly?
6  **A. It's a copy of a memorandum from me to the**
7  **file of 05532585, Doctor John Akoda.**
8  Q. And it recites that he spoke with James
9  McCorkel that day?
10  **A. Yes.**
11  Q. And that among other things, Doctor
12  McCorkel had contacted Harlem Hospital and sent a
13  photograph to them and he was waiting to hear back
14  from them?
15  **A. Yes.**
16  MR. VETTORI: This is a good time to
17  stop.
18  (Recess taken at 1:30 p.m.)
19  (Back on the record at 1:35 p.m.)
20  BY MR. VETTORI:
21  Q. Can you go back to Exhibit 34?
22  **A. (Complies.)**
23  Q. So in the first paragraph Doctor McCorkel
24  writes -- I'm sorry. He indicates that there has
25  been an allegation that Akoda also served as a

**9**

1  resident -- I'm in the first paragraph -- two other
2  U.S. residency programs under the name of Oluwafemi
3  Charles Igberase. Do you see that?
4  **A. Yes.**
5  Q. And he says, "On verifying his Social
6  Security number, 9065, we have discovered that it
7  was issued to Charles Igberase. When presented with
8  this information late yesterday, this doctor stated
9  that he had used all of these names and that he has
10  never served in another USACG accredited residency
11  program." Do you see that?
12  **A. Yes.**
13  (Exhibit No. 38 marked for
14  identification.)
15  Q. Let me know when you're finished reading
16  it, sir.
17  **A. I've read it.**
18  Q. Is this the letter that was received by
19  ECFMG from Akoda in response to your August 22, 2000
20  letter?
21  **A. That's what it states, yes.**
22  Q. In this letter he denies that he has taken
23  the examination under different names; is that
24  correct?
25  **A. That's correct.**

**20**

1  Q. He admits, however, that he used -- he
2  used Igberase Social Security number; is that
3  correct?
4  **A. Yes.**
5  Q. And he tells you that he's going to
6  provide you with a country issued passport,
7  correct?
8  **A. That's what it says, yes.**
9  Q. Whose handwriting is at the bottom,
10  transfer to something?
11  **A. That looks like it's mine.**
12  Q. Can you read "transfer to"?
13  **A. I would just be guessing.**
14  Q. Don't.
15  (Exhibit No. 39 marked for
16  identification.)
17  **A. I've read it.**
18  Q. So this is a memorandum that you wrote to
19  file on September 13, 2000, correct?
20  **A. Yes.**
21  Q. It's a memorandum of a conversation you
22  had with Doctor McCorkel?
23  **A. Yes.**
24  Q. And he's telling you that Akoda has been
25  suspended, correct?

Case: 20-3024    Document: 5-2    Page: 35    Date Filed: 04/20/2020
Case 1:18-cv-09629-JPW    Document 329-5    Filed 10/07/19    Page 35 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019                          31 (121 to 124)

| 2 |
|---|
| 1   A.  Yes. |
| 2   Q.  And that's for, quote, inconsistencies, |
| 3  closed quotes? |
| 4   A.  Yes. |
| 5   Q.  Do you remember any more discussion or any |
| 6  elaboration of that? |
| 7   A.  No. |
| 8   Q.  Also it appears in the last sentence that |
| 9  McCorkel told you Akoda claims he and Igberase and |
| 10 Charles are cousins, correct? |
| 11  A.  That Akoda claimed that was a cousin, |
| 12 yes. |
| 13  Q.  And McCorkel says his discussions with |
| 14 Harlem Hospital were, quote, not definitive, |
| 15 right? |
| 16  A.  Yes. |
| 17  Q.  Do you remember any more details about |
| 18 what "not definitive" meant? |
| 19  A.  No. |
| 20      (Exhibit No. 40 marked for |
| 21 identification.) |
| 22  A.  I've read this. |
| 23  Q.  So am I correct these are your handwritten |
| 24 notes of your conversation with McCorkel reflected |
| 25 in Exhibit 39? |

| 22 |
|---|
| 1   A.  That's what they appear to be, yes. |
| 2   Q.  So at the bottom of the page you write, |
| 3  Received, I think, communications, hyphen, off |
| 4  record, and above it is written CEO.  What does that |
| 5  mean, CEO? |
| 6   A.  Chief executive officer, I believe. |
| 7   Q.  So can you put that into context?  What |
| 8  does "received CEO communications" mean? |
| 9   A.  What McCorkel was telling me was -- and |
| 10 these were notes I would have been taking during the |
| 11 time of the telephone call. |
| 12  Q.  Sure. |
| 13  A.  But that he had said he received CEO |
| 14 communications at his institution, but off the |
| 15 record he's telling me he cannot share -- he cannot |
| 16 share them, and it's not definitive, but whatever |
| 17 information they had did not ease his concern. |
| 18  Q.  Did you ask him what he meant by that? |
| 19  A.  I may have. |
| 20  Q.  You don't recall? |
| 21  A.  I don't recall. |
| 22  Q.  You didn't put it in your notes? |
| 23  A.  I have nothing in my notes. |
| 24  Q.  And you didn't put it in a memorandum? |
| 25 You didn't put in your memorandum anything that may |

| 23 |
|---|
| 1  have elaborated on this last sentence? |
| 2   A.  That's correct. |
| 3   Q.  If it happened? |
| 4   A.  Yeah, which leads me to think it may |
| 5  not. |
| 6      (Exhibit No. 41 marked for |
| 7  identification.) |
| 8   Q.  Can we go back to the previous exhibit, |
| 9  Exhibit No. 40? |
| 10  A.  Yes. |
| 11  Q.  Sort of like in the left-hand margin |
| 12 there's a couple of entries.  Can you read that |
| 13 "more than ECFMG" -- I can't read that. |
| 14  A.  It says, "More than ECFMG, it looks to me |
| 15 we'll be interested." |
| 16  Q.  And is there an arrow down to the next |
| 17 entry? |
| 18  A.  It looks as those there is some connecting |
| 19 line. |
| 20  Q.  What does it say? |
| 21  A.  If I'm reading correctly, sometimes it's |
| 22 hard to read your own handwriting from 20 something |
| 23 years ago. |
| 24  Q.  Amen. |
| 25  A.  It looks like "A waiver in name Akoda, not |

| 24 |
|---|
| 1  Igberase. |
| 2   Q.  What does waiver mean? |
| 3   A.  I don't know. |
| 4   Q.  So in the middle of the page of your notes |
| 5  it says, "He'll talk to attorney," meaning |
| 6  McCorkel? |
| 7   A.  That is my understanding of what I mean |
| 8  here, yes. |
| 9   Q.  "If appeal will not" -- can you read the |
| 10 rest of that for me? |
| 11  A.  It says, "Communicate additional fifteen |
| 12 days.  We'll hear otherwise in a week." |
| 13  Q.  Is that pretty much what you said in your |
| 14 memorandum, 39? |
| 15  A.  Yes. |
| 16  Q.  Is that what you're referring to? |
| 17  A.  Yes. |
| 18  Q.  Let's go to 41, would you, please?  What |
| 19 is 41? |
| 20  A.  It's a memorandum from me to file 0553258 |
| 21 John Akoda. |
| 22  Q.  Does this memorandum reflect the fact that |
| 23 Akoda came to your office? |
| 24  A.  Yes. |
| 25  Q.  On that date, September 27, 2000? |

Case: 20-3024  Document: 5-2  Page: 36  Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW  Document 329-5  Filed 10/07/19  Page 34 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

32 (125 to 128)

25

```
1     A.  Yes.
2     Q.  He told you that he's not Igberase
3  Charles, but rather than he's his cousin?
4     A.  That's what he said, yes.
5     Q.  And --
6     A.  -- according to the memo.
7     Q.  I apologize, Mr. Kelly.  He again admits
8  to using his cousin's Social Security number,
9  correct?
10    A.  Yes.
11    Q.  And so he provided you with an original
12 Nigerian passport and Nigerian international driving
13 permit and you made copies, right?
14    A.  That's what it says.
15    Q.  He told you that he'd been suspended by
16 Jersey Shore?
17    A.  Yes.
18    Q.  Did you make any attempt at that time to
19 verify the authenticity of his passport?
20        MS. MCENROE:  Objection to form.
21    A.  I don't remember.
22    Q.  Did you at any time make an attempt to
23 verify the authenticity of his passport?
24        MS. MCENROE:  Objection to form.
25    A.  I don't remember.
```

26

```
1     Q.  Do you remember whether his passport
2  showed a date of birth?
3     A.  I would have to look at it, but generally
4  I know passports have dates of birth.
5     Q.  And did you ever go back and check the
6  date of birth on his passport in comparison with the
7  date of birth on Exhibit 33, his request for
8  permanent revalidation of standard ECFMG
9  certificate?
10    A.  I don't know if I did.
11    Q.  Do you know how you would go about
12 checking the authenticity of a Nigerian passport?
13        MS. MCENROE:  Objection to form.
14    A.  Do I know?
15    Q.  Did you know at that time?
16    A.  I may have.  That would be trying to
17 project or guessimate what would have happened.
18        MR. VETTORI:  Shut up.  That was my
19 watch I was talking to.
20        MS. MCENROE:  Let the record
21 reflect.
22    Q.  Take a look at Exhibit 33 for me, would
23 you, please?
24    A.  Yes.
25    Q.  What is the date of birth listed on
```

27

```
1  there?
2     A.  ▇▇▇▇ 1963.
3        (Exhibit No. 42 marked for
4  identification.)
5     Q.  While looking at -- Mr. Kelly, this is a
6  copy of Federal Republic of Nigeria passport
7  produced to you by ECFMG.  Would you agree with what
8  I just said?
9     A.  Is this the copy that was in his ECFMG
10 record?
11    Q.  It was produced to us by ECFMG.  It's got
12 a Bates number on it.
13    A.  Then it is.
14    Q.  Would this have been what he produced to
15 you at this meeting?
16    A.  If this is in the ECFMG records as having
17 been produced, yes.  I don't know just by looking at
18 it.
19    Q.  I appreciate that.  What is his date of
20 birth on his passport?
21    A.  It looks like January 1, 1959.
22    Q.  That's different from the birth date on
23 Exhibit 33?
24    A.  Yes.
25    Q.  So I'm not sure, maybe this is a function
```

28

```
1  of my age, whether Google even existed in the year
2  2000, but I can tell you, I Googled Nigerian
3  passports and that search tells me that a Nigerian
4  passport has eight digits and one letter.
5        How many digits do you see on the
6  passport that I just marked as an exhibit?
7        MS. MCENROE:  Objection to form.
8     A.  Are you talking about the passport number?
9     Q.  Yes, sir.
10    A.  It looks like one letter and six
11 numbers -- six digits.
12    Q.  I think it is seven.
13    A.  Counting zero, yes.
14    Q.  That's still part of our numbering system,
15 isn't it?  Don't answer that question.  So if in
16 fact a simple search can lead to a determination
17 that Nigerian passports have to have at least eight
18 numbers in them and the passport he presented to you
19 only has seven, wouldn't that have heightened ECFMG
20 suspicion in light of all things that are being said
21 by Doctor McCorkel about Akoda's true identity?
22        MS. MCENROE:  Objection to form.
23    A.  You said the numbering system in 2000 was
24 the same that you're saying?
25    Q.  I don't know the answer to that.  I'm
```

Case: 20-3024 Document: 5-2 Page: 37 Date Filed: 04/20/2020
Case 1:18-cv-09629-JPW Document 3295 Filed 10/07/19 Page 35 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

33 (129 to 132)

**Page 29**

1 telling you that is the number system now.
2    MS. MCENROE: Objection to form.
3    Q. I don't think there's a question pending.
4 I think he's told me he doesn't know.
5    A. I don't know.
6    Q. It's fair to say that, though, that you
7 have no recollection of making any attempt to verify
8 the authenticity of that passport?
9    MS. MCENROE: Objection to form.
10    A. I do not remember making an attempt,
11 yes.
12    Q. So either before Akoda came into your
13 office on September 27 or after he came into your
14 office, did you undertake any investigation of your
15 database to try to determine whether Akoda and
16 Igberase were one and the same person?
17    A. I don't remember.
18    Q. I think we've established from some of the
19 applications that we've gone over here today that
20 photographs are attached to the applications?
21    A. Photographs of the applicant, yes.
22    Q. Those are maintained in ECFMG's
23 database?
24    A. Yes.
25    Q. If you, either before or after September

**Page 30**

1 27, had gone into the database to look for a
2 photograph of Igberase and looked for a photograph
3 of Akoda, you could have done that?
4    MS. MCENROE: Objection to form.
5    A. I believe I could have, yes.
6    Q. You didn't do that?
7    A. I don't know if I did.
8    Q. So how long did Igberase spend in your
9 office on the 27th of September 2000?
10    A. I do not know.
11    Q. I take it you didn't recognize him as
12 somebody you'd seen before?
13    A. I don't know. I don't recall.
14    Q. Well, I take it if you had recognized him
15 as someone you had seen before, you would have
16 memorialized that in some fashion, wouldn't you?
17    MS. MCENROE: Objection to form.
18    A. It depends on what you mean by someone
19 I've seen before.
20    Q. Seen as a someone holding himself out to
21 be someone by the name of Charles or by the name of
22 Igberase?
23    MS. MCENROE: Objection to form.
24    A. I believe I would have, yes.
25    Q. So you actually had seen Charles before,

**Page 31**

1 hadn't you?
2    MS. MCENROE: Objection to form.
3    A. I don't recall.
4    Q. So do you remember when I asked you some
5 questions earlier today about -- humor me -- the
6 history of the events with Igberase and Charles?
7    A. Yes.
8    Q. Do you remember you told me, because you
9 wrote it in a letter when you were reciting that
10 history, that he took an appeal from the original
11 invalidation and revocation of the two
12 certificates?
13    A. Yes.
14    Q. And that there was an appeal hearing in
15 Washington, D.C. on July 11, 2016.
16    A. I remember there was an appeal hearing.
17    Q. And you were there?
18    A. Yes.
19    Q. And you were there for a number of
20 hours?
21    A. Okay.
22    MS. MCENROE: Objection to form.
23    Q. Is that correct?
24    A. I remember being there, yes.
25    Q. And so you sat in a room with this person

**Page 32**

1 calling himself Charles for several hours in July of
2 1996 but you didn't recognize him as the same person
3 when he came into your office on September 27,
4 2000?
5    MS. MCENROE: Objection to form.
6    A. I don't know how long he was in the room,
7 first of all.
8    Q. You mean back in 1996?
9    A. Yes.
10    MS. MCENROE: Off the record for a
11 second.
12    (Recess taken at 2:00 p.m.)
13    (Back on the record at 2:30 p.m.)
14    MR. VETTORI: I'm going to have to
15 ask for a favor from you. I made copies of the
16 cover sheet of the appeal hearing.
17    MS. MCENROE: Yes.
18    MR. VETTORI: But I didn't make
19 copies of the entire transcript.
20    MS. MCENROE: Just mark that one. Is
21 that okay?
22    MR. VETTORI: This one.
23    MS. MCENROE: That one you have
24 complete.
25    (Exhibit No. 43 marked for

Case: 20-3024  Document: 5-2  Page: 38  Date Filed: 04/20/2020
Case 1:18-cv-08629-JDW  Document 52-5  Filed 10/07/19  Page 30 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

34 (133 to 136)

33

1  identification.)
2      A.  I'm leafing through it.
3      Q.  Please do.  I can tell you that I didn't
4  find any start date for that transcript, but if you
5  look on the last page it ends at 11:50.
6      A.  Okay.
7      Q.  Don't take my word for it.  Please verify
8  it.
9      A.  Okay.  Yes.
10     Q.  And on the cover sheet it shows you as
11 being present, correct?
12     A.  Yes.
13     Q.  And I'll represent to you that this
14 individual who goes by the name of Charles who is
15 also we know now Igberase testified at this
16 hearing?
17     A.  Yes.
18     Q.  So whether it's an hour or two hours or
19 three hours, it's some period of time that you were
20 present in Washington, D.C. at a proceeding where
21 the individual calling himself Charles appeared and
22 testified, correct?
23     A.  Yes.
24     Q.  And a person calling himself Akoda, who
25 was in your office having been accused of really

34

1  being Igberase, who was really Charles, and you
2  didn't know it was the same person you'd seen
3  testifying?
4      MS. MCENROE:  Objection.
5      A.  From four years before, I did not know.
6         (Exhibit No. 44 marked for
7  identification.)
8      Q.  Is that your handwriting?
9      A.  Yes.  Okay.  I've read it.
10     Q.  These are your notes of the telephone
11 conversation with Doctor McCorkel on October 5,
12 2000; is that correct?
13     A.  That's what they appear to be, yes.
14     Q.  So it starts off by saying, "Akoda meeting
15 schedule with Akoda at 11 a.m. and at 2 p.m." What
16 meeting is that referencing?
17     A.  I believe it's a meeting Akoda was having
18 with McCorkel.
19     Q.  And "inconsistencies in file." Can you
20 read the next sentence for me?
21     A.  "With Doctor Frank, the program director."
22     Q.  Do you know what that means?  What do you
23 remember that means?
24     A.  Whether it means that the meeting is going
25 to include the program director or not, I don't

35

1  know.
2      Q.  "Final meeting next week," do you know
3  what was meant by that?
4      A.  No.
5      Q.  You write, "Akoda on suspension until 10/1
6  asking him to clarify inconsistencies." Did I read
7  that correctly?
8      A.  I think that's correct, yes.
9      Q.  That was related to you by Doctor
10 McCorkel?
11     A.  That would have been, yes.
12     Q.  It says, "Two different green cards,
13 slash, different dates." Am I reading that
14 correctly?
15     A.  That's what it looks like, yes.
16     Q.  Do you remember that conversation?
17     A.  I don't remember the conversation.
18     Q.  "Fingerprints, birth dates, numbers,
19 driver license." Am I reading that accurately?
20     A.  Yes.
21     Q.  What is the significance of that or what
22 do you recall about it?
23     A.  I have no recollection of it.
24     Q.  So you don't really recall this
25 conversation, we're just going over your notes?

36

1      A.  Yes.
2      Q.  "Indicated he was going to Nigeria and
3  return on 10/15 but he is in USA"?
4      A.  That would be what McCorkel would have
5  told me.
6      Q.  Over on the left -- I saw you tilt your
7  head too, which I have to do too.  I guess I can
8  turn to the page.
9      A.  That's what I should have done.
10     Q.  "Currently suspended and will not be
11 reinstated"?
12     A.  Yes.
13     Q.  "Unless satisfactory explanation for
14 inconsistencies, will notify ECFMG"?
15     A.  That's what I read as well.
16     Q.  Is that what McCorkel told you when he
17 reported it?
18     A.  Yes.
19     Q.  "Due process review panel Wednesday 2 p.m.
20 10/11, question mark, not yet there." Do you
21 remember what that was all about?
22     A.  I don't.
23     Q.  "Harlem Hospital thinks he may be the
24 same." Can you explain that?
25     A.  I would only be guessing what I meant by

Case: 20-3024   Document: 5-2   Page: 39   Date Filed: 04/20/2020
Case 1:18-cv-03629-JDW   Document 3295   Filed 10/07/19   Page 37 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019                    35 (137 to 140)

37

1  that. I don't know.
2      Q.  You don't remember what he was referring
3  to?
4      A.  No.
5      Q.  "10/19 notice to Akoda he will be
6  terminated in thirty days. If he does not appeal in
7  ten days, re, two Social Security numbers"?
8      A.  That's what it says.
9      Q.  Did I read that correctly? That's what
10 Doctor McCorkel told you?
11     A.  That what's he would have told me, yes.
12         (Exhibit No. 45 marked for
13 identification.)
14     A.  Okay. I read it.
15     Q.  So it looks to me like on this document --
16 it's an e-mail chain -- it's you to Igberase and
17 Akoda back to you. Am I correct?
18     A.  Yes.
19     Q.  The bottom e-mail is the first e-mail in
20 time?
21     A.  Yes.
22     Q.  You e-mailed Cfeme, C-F-E-M-E, at
23 hotmail.com on Thursday, December 21, 2000 at 1638
24 hours. What is that? 4:38? Who is in the
25 military?

38

1      A.  Yes.
2      Q.  Thank you.
3      A.  It looks like 39.
4      Q.  You said, "Doctor Igberase, I've been
5  trying to contact you concerning your application
6  submitted to ECFMG. Please contact me as soon as
7  possible."
8          Do you know if that's referring to
9  the 2000 application we saw where he blamed it on
10 his friends and his cousin?
11     A.  I don't.
12     Q.  You don't remember?
13     A.  No.
14     Q.  Okay. So then you get an e-mail back from
15 Akoda, correct?
16     A.  Yes.
17     Q.  Not Igberase?
18     A.  Yes.
19     Q.  And he says he's been trying to reach you.
20 Left several messages on your machine. Do you have
21 any recollection of that?
22     A.  No.
23     Q.  He's questioning why Igberase gave you his
24 e-mail because he doesn't use it anymore, correct?
25     A.  That's what he says, yes.

39

1      Q.  Fair enough.
2          (Exhibit No. 46 marked for
3  identification.)
4      A.  I've read this.
5      Q.  So Exhibit 46, am I correct, is your
6  December 21, 2000 memorandum to the file?
7      A.  To file 05532585, John Akoda.
8      Q.  Correct. It's memorializing a telephone
9  conversation you had that day with Doctor
10 McCorkel?
11     A.  Yes.
12     Q.  And in the telephone call Doctor McCorkel
13 told you Akoda had been dismissed from the Jersey
14 Shore Medical Center, correct?
15     A.  That's what it says, yes.
16     Q.  He says it was because, one, Akoda used a
17 false Social Security number when he applied to the
18 hospital?
19     A.  Yes.
20     Q.  And that he acknowledged to McCorkel that
21 he had used the Social Security number of his cousin
22 Charles Igberase; is that correct?
23     A.  Yes.
24     Q.  He also says because the green card he
25 provided the hospital was inconsistent with the

40

1  subsequent green card he also provided; different
2  number, name, expiration date, and date of birth,
3  correct?
4      A.  Yes.
5      Q.  Did you ever do anything to check into
6  those green cards?
7          MS. MCENROE:  Objection to form.
8      A.  When you say ECFMG normally doesn't
9  receive green cards, so, you know...
10     Q.  Were you curious as to whether there was
11 some inconsistences with this gentleman's green
12 card?
13         MS. MCENROE:  Objection to form.
14     A.  I don't remember.
15         (Exhibit No. 47 marked for
16 identification.)
17     A.  I finished reading it.
18     Q.  Can you tell me what this document is?
19     A.  It appears to be an internal, meaning
20 ECFMG produced comparison chart of two records.
21     Q.  Have you ever seen it before? I'm
22 sorry --
23     A.  Yes.
24     Q.  -- do you recall ever seeing it before?
25     A.  Yes, I do.

Transcript of William C. Kelly
Conducted on August 20, 2019

4

1   Q.  And do you know when it was generated?
2   A.  No, I do not.
3   Q.  Do you know the purpose for which this
4   document was generated?
5   A.  I believe it was to compare the records.
6   Q.  To what end?  Why was ECFMG comparing the
7   records?
8          MS. MCENROE:  Objection to form.
9   A.  It looks as though to see what is
10  comparable and what's not.
11  Q.  Did you participate in providing any of
12  the information that's contained on this document?
13  A.  I'm not sure I understand what you mean
14  by --
15  Q.  Okay.
16  A.  I don't think I prepared the document.
17  Q.  Okay.  Do you know who did?
18  A.  I don't know for sure, no.
19  Q.  Would it more likely have been some staff
20  at the direction of someone who would have tasked
21  them with doing this?
22         MS. MCENROE:  Objection to form.
23  A.  That is very likely.
24  Q.  You don't remember who that might have
25  been?

42

1   A.  No.
2   Q.  Do you recall this document ever being
3   used for any purpose after it was generated?
4   A.  I don't recall, no.
5   Q.  So at the bottom of the page it looks to
6   me like it's got the medical examination
7   information, much of which we've gone over before,
8   correct?
9   A.  Yes.
10  Q.  So under the -- strike that.
11         There is no particular name given to
12  this form; this was just an internal document
13  generated for some purpose?
14  A.  Yes.
15  Q.  So on the left-hand side, am I correct,
16  this document recounts historical information about
17  the person certified under 04827-2 and the person
18  certified under 0519573-0, correct?
19  A.  Yes.
20  Q.  And you remember from our probably very
21  boring and tedious testimony earlier today that it
22  was as of October 2002 that USMLE barred this person
23  permanently from ECFMG exams and ECFMG
24  certification?
25         MS. MCENROE:  Objection to form.

43

1   A.  Such a bar would be the ECFMG -- USMLE.
2   Q.  That's as of October 2002, correct?
3   A.  That's what it says, yes.
4   Q.  On the right-hand side, am I correct this
5   is all information about the individual by the name
6   of Akoda?
7   A.  Yes.
8   Q.  I think if you compare most of the dates
9   in that part of the document with the documents
10  we've already been over, they're consistent?
11  A.  Yes.
12         MS. MCENROE:  Objection to form.
13  Q.  Like you sent a letter on August 22 after
14  McCorkel contacted you guys, ECFMG?
15  A.  Yes.
16  Q.  And on September 1, 2000 we talked about
17  the letter Akoda wrote back to where he stated
18  the allegations were false but admitted that he used
19  Charles' Social Security number, correct?
20  A.  Yes.
21  Q.  And it recites that he came to your office
22  and provided a Nigerian passport, right?
23  A.  Yes.
24  Q.  So can you focus on that 9/27/2000
25  entry?

44

1   A.  Yes.
2   Q.  And read it into the record aloud, please.
3   A.  "Akoda came to ECFMG providing a Nigerian
4   passport.  Claimed Charles was his cousin and he had
5   not used his SS number."
6   Q.  That's incorrect, isn't it?
7          MS. MCENROE:  Objection to form.
8   A.  There are other documents in which he
9   admits he used the number.
10  Q.  Right, and he told you when he came to
11  your office that he had used his cousin's Social
12  Security number --
13  A.  Yes.
14  Q.  -- correct?  So why does this document say
15  he had not used his cousin's Social Security
16  number?
17         MS. MCENROE:  Objection to form.
18  Q.  That's an error, isn't it?
19  A.  I don't know why it says that.
20  Q.  Okay.  That answers that question.  Thank
21  you.  The next question is: That is an error that is
22  incorrect, is it not?
23  A.  It's incorrect based on the other
24  documents.
25  Q.  Is there any way in which it is correct?

Case: 20-3024 Document: 5-2 Page: 41 Date Filed: 04/20/2020
Case 2:18-cv-05629-JDW Document 32-5 Filed 10/07/19 Page 39 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

37 (145 to 148)

45

1         MS. MCENROE:  Objection to form.
2      **A.  Not that I'm aware of.**
3      Q.  The last entry says, "Stated in a separate
4   memo, Bill sent Charles an e-mail.  Akoda replied,
5   Not enough documentation for credentials today." Do
6   you see that?
7      **A.  Yes.**
8      Q.  Do you know who authored that entry?
9      **A.  I do not.**
10     Q.  Similarly, do you know who authored the
11  entry we went over a moment ago on line 27, 2000
12  that he erroneously states that he said he was
13  not -- he did not use his cousin's Social Security
14  number?
15     **A.  No.**
16         (Exhibit No. 48 marked for
17  identification.)
18     **A.  I've read it.**
19     Q.  Is it correct this is a memo dated
20  December 20, 2000 from you to Stephen Seeling, JD?
21     **A.  Yes.**
22     Q.  And it's referencing Akoda ID number
23  05532595; is that correct?
24     **A.  Yes.**
25     Q.  And the first sentence says, "Attached is

46

1   a copy of a memorandum for the file." Is that
2   Exhibit 46, the one dated the day before?
3      **A.  It appears to be.**
4      Q.  So then you say, "This memorandum is being
5   written separately since I did not think it should
6   be made part of the official file." Why didn't you
7   think it should be made part of the official file?
8      **A.  I don't remember.**
9      Q.  You don't remember why you made that
10  statement?
11     **A.  No.**
12     Q.  So did you look at this document in
13  preparation for this deposition today?
14     **A.  Yes.**
15     Q.  And did you reflect upon this
16  memorandum?
17     **A.  Yes.**
18     Q.  Did you ask yourself, Why did I say
19  that?
20     **A.  Yes.**
21     Q.  And you can't tell me?
22     **A.  I cannot tell you.**
23     Q.  So in your memorandum you're telling
24  Mr. Seeling that in your discussion with Doctor
25  McCorkel, Doctor McCorkel told you he believed

47

1   Igberase and Akoda were one and the same person,
2   correct?
3      **A.  Yes.**
4      Q.  And he said he has no proof, just a strong
5   suspicion, correct?
6      **A.  Yes.**
7      Q.  And he said information he received from
8   an informant provided details that led him to
9   believe this, correct?
10     **A.  Yes.**
11     Q.  Do you know who that informant is?
12     **A.  No.**
13     Q.  Did you ever ask him?
14     **A.  I don't recall.**
15     Q.  You didn't memorialize that anywhere in
16  any memos or notes, did you?
17     **A.  If I had, it would be in the record.**
18     Q.  "I also believe Akoda and Igberase are one
19  and the same," that's you talking, correct?
20     **A.  Yes.**
21     Q.  Why did you believe that?
22     **A.  I don't remember, but from reviewing the**
23  **records I thought there was a nexus between the**
24  **two.**
25     Q.  After all the time we spent here today

48

1   don't you believe it was because of all of the
2   information we've talked about?
3         MS. MCENROE:  Objection to form.
4      **A.  In hindsight, yes.**
5      Q.  At the time it wasn't hindsight; it was
6   based on information made available to you then,
7   correct?
8      **A.  Yes.**
9      Q.  You indicate that, "The only information
10  that you have for the committee is Akoda's statement
11  that he's not Igberase, although he did admit in
12  writing that he used Igberase's Social Security
13  number." Did I read that correctly?
14     **A.  Yes.**
15     Q.  Didn't you tell Akoda in the letter that
16  you wrote to him after McCorkel brought it to
17  ECFMG's attention that you were going to refer this
18  to the credentials committee including his response,
19  if any?
20     **A.  Yes.**
21     Q.  Again, "he has given us a passport that
22  appears to confirm his identify as John Akoda." You
23  didn't verify the authenticity of that passport, did
24  you?
25         MS. MCENROE:  Objection to form.

Transcript of William C. Kelly
Conducted on August 20, 2019

49

```
1     A.  I don't remember.
2     Q.  So in many of the letters we've reviewed
3  here today when you talked about verifying
4  applicant's credentials, you also go out and state
5  you verified their medical school credentials
6  including their diploma, correct?
7     A.  Yes.
8     Q.  Would it be safe or fair for me to assume
9  that if you had verified the accuracy or
10 authenticity of his passport, you would have made a
11 statement to that effect somewhere?
12         MS. MCENROE:  Objection to form.
13    A.  Yes.
14    Q.  So you indicate that you sent Igberase an
15 e-mail, correct?
16    A.  Yes.
17    Q.  That's the one we went over a little while
18 ago, right?
19    A.  Yes.
20    Q.  And you state, quote, "And who should
21 reply but Akoda, exclamation mark"?
22    A.  Yes.
23    Q.  Correct?  That's your emphasis?
24    A.  Yes.
25    Q.  That surprised you, didn't it?
```

50

```
1     A.  You mean at the time he answered?
2     Q.  At the time you wrote this memo.  Why did
3  you put an exclamation "but Akoda, exclamation
4  mark"?
5     A.  For emphasis or something like that,
6  yes.
7     Q.  Emphasis to what effect?
8     A.  That it seemed strange.
9     Q.  Okay.  "We need to brainstorm on this
10 one."  You wrote that, correct?
11    A.  Yes.
12    Q.  "Maybe Shirley Williams, parens, Ms.
13 Sherlock" -- is that a reference to Sherlock
14 Holmes?
15    A.  Most likely, yes.
16    Q.  I'm sure it's an affectionate reference.
17 I don't know Ms. Williams.  "Maybe Shirley Williams,
18 parens, Ms. Sherlock could sit in."  You wrote that,
19 correct?
20    A.  Yes.
21    Q.  Did you and Mr. Seeling with or without
22 the assistance of Ms. Sherlock brainstorm this
23 matter further?
24    A.  I don't remember.
25    Q.  Can you point to me any record, any
```

5

```
1  document that would indicate that such brainstorming
2  took place?
3     A.  No, I have no document.
4     Q.  In your review for today's deposition did
5  you see any such information?
6     A.  No.
7     Q.  So why did you suggest Ms. Shirley
8  Williams participate?  Who is she?  What is her
9  expertise?  Why?
10         MS. MCENROE:  Objection.  Compound.
11    A.  This period she worked with Steve, and a
12 part of her responsibility was researching difficult
13 issues and items.
14    Q.  So Mr. Kelly, I took some time to run
15 through the events as I can put them together from
16 the documents that counsel provided to me in this
17 August to December 2000 period concerning, if you'll
18 allow me, this Jersey Shore Medical Center matter.
19 Okay?
20    A.  Yes.
21    Q.  I've gone through them with you.  And I
22 want to ask you some questions now that we've been
23 through those documents.  Fair enough?
24    A.  Yes.
25    Q.  As of the last record that we have dealing
```

52

```
1  with this matter, late December 2000, the year 2000,
2  correct?
3     A.  The last document, yes.
4     Q.  As of late December 2000, you were
5  personally familiar with the complete history of the
6  fraud committed by Igberase, slash, Charles,
7  correct?
8     A.  I was personally.
9         MS. MCENROE:  Objection to form.
10    Q.  Familiar with it.
11    A.  I would have had access to that
12 information, yes.
13    Q.  You were personally involved in writing
14 letters to him about the irregular behavior he
15 participated in, correct?  We've been through them
16 all today.
17    A.  Yes.
18    Q.  Again, as of that same time period, the
19 end of December 2000, you knew that Igberase -- I'm
20 saying Igberase, slash, Charles because both of
21 those names were used.  Do you understand what I'm
22 referring to?
23    A.  I understand.
24    Q.  So you knew Igberase Charles had falsified
25 answers on documents submitted to ECFMG, correct?
```

Case: 20-3024 Document: 5-2 Page: 43 Date Filed: 04/20/2020
Case 3:18-cv-03629-JDW Document 3295 Filed 10/07/19 Page 41 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

39 (153 to 156)

53

1   A.  Yes.
2   Q.  And you knew as of late December 2000 that
3  ECFMG had invalidated and/or revoked the
4  certificates issued to Igberase and Charles,
5  correct?
6   A.  Yes.
7   Q.  You knew there was some connection, a
8  relationship between Igberase and Akoda, correct?
9   A.  Yes.
10   Q.  And you knew that Akoda had used a Social
11  Security number of Igberase when he applied to the
12  residency program at Jersey Shore Medical Center,
13  correct?
14   A.  Yes.
15   Q.  And I think we've already established
16  this, I know I'm repeating myself, but bear with me,
17  you had the ability to look up all the computer
18  photographs of Igberase and Akoda to verify whether
19  they were one and the same person, correct?
20       MS. MCENROE:  Objection to form.
21   A.  Yes.
22   Q.  And you didn't do that, correct?
23       MS. MCENROE:  Objection to form.
24   A.  If I can circle back, the internal
25  document with the comparison, so it would have had

54

1  the applications -- the applications would have been
2  looked at, I believe, yeah.
3   Q.  All right.  I'm talking about in the
4  period when you were investigating whether Akoda had
5  used someone else's Social Security number or had
6  otherwise acted improperly in connection with the
7  matter brought to your attention by the Jersey Shore
8  Medical Center.
9   A.  Okay.
10   Q.  So for example, when he came into your
11  office, you could have looked at photographs on the
12  computer, correct?
13   A.  Yes, that is correct.
14   Q.  Or when he left the office, you could have
15  done it?
16   A.  That is correct.
17   Q.  And you didn't?
18   A.  I don't remember doing it.
19   Q.  Well, I think we've also established that
20  as of this date in late December 2000, you were
21  present during the July 10, 1996 appeal hearing
22  where Charles testified, correct?
23   A.  Yes.
24   Q.  And you had the ability to hear him
25  testify at that proceeding?

55

1   A.  Yes.
2   Q.  And you heard him talk to you in your
3  office in September 2000, correct?
4   A.  When he came to the office, yes.
5   Q.  And you knew according to Doctor McCorkel,
6  at least, that Akoda had presented false green
7  cards, correct?
8   A.  He had stated that, yes.
9   Q.  You could have but didn't verify that the
10  passport that Akoda gave you when he came to the
11  your office was authentic, correct?
12       MS. MCENROE:  Objection to form.
13   A.  I did not verify the passport.
14   Q.  And as of late December 2000, you knew
15  that Jersey Shore Medical Center has dismissed Akoda
16  from its residency program, correct?
17   A.  Yes.
18   Q.  You knew that was at least in part due to
19  the fact he used someone else's Social Security
20  number?
21   A.  Yes.
22   Q.  And you sent Igberase an e-mail at the
23  address he provided and Akoda replied to it.  We've
24  already established that, correct?
25   A.  Yes.

56

1   Q.  You were really surprised at that,
2  correct?
3   A.  Apparently, yes.
4   Q.  So Doctor McCorkel told you that he
5  believed Igberase and Akoda were one and the same
6  person as of December 2000, correct?
7   A.  Yes.
8   Q.  And you also believed Igberase and Akoda
9  were one and the same person, correct?
10   A.  Yes.
11   Q.  And you were so concerned about this that
12  you wrote a memorandum to Stephen Seeling that you
13  didn't think should be made part of the file,
14  correct?
15       MS. MCENROE:  Objection to form.
16   A.  Yes.
17   Q.  And in your original letter to Akoda after
18  Doctor McCorkel contacted ECFMG, you told him that
19  all of the information would be referred to the
20  ECFMG committee on medical credentials for review,
21  correct?
22   A.  Yes.
23   Q.  You didn't do that, right?
24   A.  Correct.
25   Q.  So despite all of these things that we

Case: 20-3024 Document: 5-2 Page: 44 Date Filed: 04/20/2020
Case 1:18-cv-05629-JDW Document 32-5 Filed 10/07/19 Page 42 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

40 (157 to 160)

**57**

1 just went over for the last couple of hours and in
2 this last series of questions, ECFMG took no action
3 against Akoda until December 2016 following his
4 conviction, isn't that true?
5          MS. MCENROE:  Objection to form.
6     **A.  I don't know that.**
7     Q.  Prior to the time you left in 2015, had
8 ECFMG taken any action against Akoda?
9     **A.  I don't recall.**
10    Q.  Would you admit in having made a
11 mistake?
12         MS. MCENROE:  Objection to form.
13    **A.  Would I admit?**
14    Q.  Yes.
15    **A.  If I had, yes.**
16    Q.  Would you admit that you made a mistake
17 not referring Akoda to the ECFMG credentials
18 committee?
19         MS. MCENROE:  Objection to form.
20    **A.  I don't think it was a mistake.**
21    Q.  So if he had been referred to the
22 credentials committee, would he have been charged
23 with irregular behavior for using someone else's
24 Social Security number?
25         MS. MCENROE:  Objection to form.

**58**

1     **A.  The irregular behavior he would have been**
2 **charged with would be providing false information**
3 **to ECFMG on an application, among other things.**
4     Q.  Which would be the Social Security
5 number?
6     **A.  If he provided it on an application.**
7     Q.  So you're aware that Jersey Shore Medical
8 Center dismissed him from a residency program he was
9 participating in and had been participating in for
10 several years for, among other things, submitting
11 and using someone else's Social Security number?
12    **A.  Yes.**
13    Q.  You may not be able to answer this.  Have
14 you ever been advised of what he was convicted of or
15 what he pled guilty to in the federal court?
16    **A.  No.**
17    Q.  Do you recall that apparently Igberase was
18 licensed as a -- I'm sorry -- Akoda was licensed as
19 a nurse in New York?
20    **A.  No.**
21    Q.  Do you remember any information provided
22 to ECFMG by Akoda about him being licensed as a
23 nurse in the State of New York?
24    **A.  No.**
25    Q.  Same set of questions about Igberase.  Do

**59**

1 you remember whether he was licensed as a -- did you
2 ever learn he was licensed as a nurse in New York?
3     **A.  I don't recall.**
4         (Exhibit No. 49 marked for
5 identification.)
6     **A.  I've read this.**
7     Q.  So Exhibit 49 is a series of letters back
8 and forth between ECFMG, either Steve Seeling and
9 you and someone by the name of Raymond Heard,
10 H-E-A-R-D, senior investigator, Office of
11 Professional Discipline, New York State Education
12 Department; is that correct?
13    **A.  Yes.**
14    Q.  I don't want to spend a lot of time on
15 this, but would you agree with me Mr. Heard is
16 inquiring about action that ECFMG took concerning
17 Igberase that may affect his nursing status?
18    **A.  It references his license.**
19    Q.  So it looks to me the December 17, 2002
20 letter from Mr. Heard indicates that his
21 organization received notice from ECFMG about the
22 revocation of Igberase's standard certification,
23 correct?
24    **A.  Yes.**
25    Q.  And he's talking about investigating

**60**

1 allegations against the person licensed by the State
2 of New York Education Department, correct?
3     **A.  Yes.**
4     Q.  So the next letter, which is Bates number
5 000253, is from you to Mr. Heard basically telling
6 him what action had been taken with respect to
7 Igberase, correct?
8     **A.  Yes.**
9     Q.  And then Heard writes back to you on March
10 31, 2003 asking for some certified documents
11 including the application that contains Igberase's
12 false response, correct?
13    **A.  Yes.**
14    Q.  And I think the final letter in this
15 series is your letter of April 29, 2003, Bates
16 number 0000260 through, if you will, 262, which you
17 supply a certified copy of the October 23, 2000
18 application for Igberase, correct?
19    **A.  Yes.**
20    Q.  Do you know whether there's any document
21 in ECFMG's files that ever reflects that Igberase
22 was licensed as a nurse in New York?
23    **A.  Separate from this statement here?**
24    Q.  Separate from the information here.
25    **A.  I have no knowledge.**

Case: 20-3024 Document: 5-2 Page: 45 Date Filed: 04/20/2020
Case 1:18-cv-09629-JPW Document 32-5 Filed 10/07/19 Page 45 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

41 (161 to 164)

6

```
1    Q.  Was this a surprise to you?
2         MS. MCENROE:  Objection to form.
3    A.  I don't remember.
4    Q.  Okay.  You don't remember this incident at
5  all?
6    A.  No.
7    Q.  Do you have a recollection sitting here
8  today, either based on your personal knowledge or
9  anything that in any way your recollection was
10  refreshed in preparation for this deposition, that
11  Akoda applied for a residency program at Howard
12  University, Washington, DC?
13    A.  No.
14    Q.  You don't remember that at all?
15    A.  No.
16         (Exhibit No. 50 marked for
17  identification.)
18    A.  Okay.  I looked at the document.
19    Q.  This appears to be a -- well, it says ERAS
20  document submission form, correct?
21    A.  Yes.
22    Q.  I think you told me you weren't really
23  involved in the ERAS process, correct?
24    A.  It was not part of my department.
25    Q.  But you're familiar with it?
```

62

```
1    A.  Yes.
2    Q.  At the bottom it looks like -- is that the
3  ECFMG ERAS stamp or did I miss --
4    A.  Yes.
5    Q.  And that's October 5, 2006, correct?
6    A.  Yes.
7    Q.  So given that this is an ERAS document
8  submission form, wouldn't that necessarily mean that
9  this is related to some attempt to obtain a
10  residency program?
11         MS. MCENROE:  Objection to form.
12    A.  It's part of the electronic residency
13  application service, yes.
14    Q.  But it doesn't have any use outside
15  residency programs, does it?
16         MS. MCENROE:  Objection to form.
17    A.  The form?
18    Q.  The whole ERAS process.
19    A.  Not to my knowledge.
20    Q.  Because you told me before that as part of
21  the ERAS program, ECFMG in effect acts as the dean's
22  office for foreign medical graduates or
23  international medical graduates to assist them in
24  applying for residency programs, correct?
25    A.  Yes.
```

63

```
1    Q.  You don't know -- do you know what was
2  going on in 2006 that caused the ERAS process to be
3  implemented for Akoda?
4         MS. MCENROE:  Objection to form.
5    A.  I can only make a guess that he submitted
6  an application.
7    Q.  But you don't have any recollection about
8  him applying to Howard University?
9    A.  No.
10    Q.  So this document indicates that -- it says
11  "documents submitted with this form, please circle."
12  What is MSPE?
13    A.  It stands for medical school performance
14  elevation.  It's often called the dean's letter.
15    Q.  But that wasn't included, according to the
16  form?
17    A.  Right.
18    Q.  I'm just asking you to help me understand
19  this form.  Color photograph, that was included?
20    A.  It says yes.
21    Q.  Medical school transcript was not
22  included?
23    A.  That's correct.
24    Q.  So then it says, No. 4, "Original letters
25  of recommendation that are included in this
```

64

```
1  mailing."  Did I read that correctly?
2    A.  Yes.
3    Q.  It lists Doctor A.O. Roberts, Doctor Phil
4  Robertson, and Doctor Charles Francis, correct?
5    A.  Yes.
6    Q.  Do you know who they are?
7    A.  No.
8    Q.  You didn't have any personal knowledge
9  about any of them, do you?
10    A.  That's correct.
11    Q.  You didn't know if they are real people,
12  do you?
13    A.  I do not know.
14    Q.  I think you told me you don't have any
15  knowledge of or recollection of his applying to
16  Howard University?
17    A.  That is correct.
18    Q.  Okay.  That eliminates a bunch of
19  questions.
20         (Exhibit No. 51 marked for
21  identification.)
22    A.  Okay.  I've finished reviewing this.
23    Q.  Okay.  So let me see if we can agree on
24  what we have here.  The first page of Exhibit 51 is
25  Bates stamped 40467 and it's a letter from you to an
```

Transcript of William C. Kelly
Conducted on August 20, 2019

42 (165 to 168)

---

**65**

1  individual by the name of Charles A. Francis, MD,
2  correct?
3      A.  Yes.
4      Q.  And you enclose a copy of a letter of
5  recommendation that Akoda submitted to ECFMG as part
6  of the ERAS process, correct?
7      A.  Yes.
8      Q.  Is it ERAS services?  Help me out.
9      **A.  Electronic residency application**
10 **service.**
11     Q.  That's like saying ATM machine.  ATM is a
12 machine.  So we'll just call it ERAS.
13         So you asked in this first page
14 Charles A. Francis MD to write to you to advise
15 whether the enclosed letter is authentic, correct?
16     **A.  Yes.**
17     Q.  And immediately following Bates stamp 650,
18 40650, is the letter of reference that you're
19 referring to, some letter purportedly by Charles A.
20 Francis, MD about Doctor John Charles Nosa Akoda
21 dated October 1, 2006, correct?
22     **A.  Yes.**
23         MS. MCENROE:  Just for purposes of
24 the record the Bates stamps seem to be a little
25 jumbled together in this exhibit.

**66**

1         MR. VETTORI:  You mean out of order?
2         MS. MCENROE:  Yes.
3         MR. VETTORI:  They are because they
4  were not produced in a particular order.
5         MS. MCENROE:  In terms of making
6  representations -- that's just not how they were
7  produced so I'm just making sure it's clear.
8         MR. VETTORI:  Okay.  But for the
9  record what I would like to make clear is the two
10 letters go together.
11        MS. MCENROE:  That's fine that you're
12 representing that, but I want to make it clear that
13 was not how they were produced.
14 BY MR. VETTORI:
15     Q.  So Mr. Kelly, do you have any reason to
16 believe that Bates number 0000650 is not the letter
17 of reference referred to in your letter Bates number
18 000647?
19     **A.  I have no reason.**
20     Q.  So continuing you on with this exhibit, on
21 November 22, 2006 you wrote a letter to A.O.
22 Roberts, MD and enclosed or attached a letter of
23 reference purportedly written by him on behalf of
24 Akoda on August 20, 2006, correct?
25     **A.  Yes.**

**67**

1      Q.  That's Bates stamp 000651?
2      **A.  Yes.**
3      Q.  And you'll note on Bates stamp 000651
4  there is a stamp received October 5, 2006 ERAS,
5  correct?
6      **A.  Yes.**
7      Q.  If you go back to Exhibit 50, the ERAS
8  document submission form that references these three
9  letters of reference you'll see the ERAS form was
10 received on the same date; is that correct?
11     **A.  Yes.**
12     Q.  Continuing, the next page in this exhibit
13 is Bates stamp 000649, November 22, 2006, your
14 letter to Phil Robertson, MD, correct?
15     **A.  Yes.**
16     Q.  Again, enclosing a letter of reference
17 purportedly from Phil Robertson, MD on behalf of
18 Doctor John Charles Akoda dated 28 September, 2006,
19 correct?
20     **A.  Yes.**
21     Q.  It's got the same October 5, 2005 ERAS
22 stamp on it, does it not?
23     **A.  Yes.**
24     Q.  Do you have any recollection whether
25 Doctor A.O. Roberts, Doctor Phil Robertson, or

**68**

1  Doctor Charles Francis ever replied to your
2  letters?
3      **A.  I have no recollection.**
4      Q.  In your review in preparation for this
5  deposition, did you see any such records?
6      **A.  I don't recall seeing any.**
7          (Exhibit No. 52 marked for
8  identification.)
9      **A.  Okay.  I've read this.**
10     Q.  What is this document?
11     **A.  It is a screen print from the ECFMG**
12 **applicant status program.**
13     Q.  About Akoda?
14     **A.  Yes.**
15     Q.  What does applicant restrictions mean?
16     **A.  That's what we called flags from the flag**
17 **file.**
18     Q.  Flag to file for what purpose?
19     **A.  There are myriad a number of reasons.**
20     Q.  Like in this case what was the reason?
21     **A.  There would always be a reason listed**
22 **here.  It's other, other, credentials investigation,**
23 **credentials investigation, credentials**
24 **investigation, other.**
25     Q.  What does release date mean?

Transcript of William C. Kelly
Conducted on August 20, 2019

43 (169 to 172)

---

**69**

1    A.  The flag was removed.
2    Q.  So does the applicant restriction date
3 column mean the date it was flagged?
4    A.  The first column would be the date it was
5 flagged, yes.
6    Q.  Ms. Sherlock?
7    A.  Shirley Williams, yes.
8    Q.  So I see that on Exhibit 52, the last
9 entry but the earliest in time entry is there was a
10 flag placed on 8/14/2000 for other reasons; is that
11 correct?
12    A.  Yes.
13    Q.  What is the level?  What's the series
14 of --
15    A.  Four.
16    Q.  Is that bad?
17    A.  The number doesn't -- it's not on a grade.
18 It's what can be done with the applicant record
19 based on the restriction and who can see it.
20    Q.  What does level four mean?
21    A.  I don't know off the top of my head what
22 that would be.
23    Q.  Would your answer be the same for level
24 three?
25    A.  Yes.

**70**

1    Q.  Okay.  So let's help me with this.  On
2 August 14, 2000 for some other reason Akoda's file,
3 if you will, was flagged.  Is that the way to say
4 it?
5    A.  The computer record would have been
6 flagged.
7    Q.  Meaning what?  If somebody tried to access
8 it?
9    A.  If they accessed it.
10    Q.  What would happen?  Things would burn?
11    A.  Depends on what the level was, so, yeah.
12    Q.  So --
13    A.  So in some cases it may say you can see
14 this but not see that.
15    Q.  Okay.  So that flag, the other reason was
16 under the comments section, because the comment
17 section explains what other means or what CREDS
18 investigation means?
19    A.  It could add -- it would be reason.
20 There's reasons -- there was a whole menu of level
21 three means this, level four means this.
22    Q.  On August 14, 2000 Akoda's computer
23 program was flagged by Ms. Williams?
24    A.  That's what that would mean.
25    Q.  And she or someone else entered a comment

**7**

1 because a duplicate record examinee barred under
2 other number.  Is that what it says?
3    A.  That's what it says.
4    Q.  And do you know why it was released?
5    A.  I don't.
6    Q.  So is this examinee barred under other
7 number is that a reference to Akoda being the
8 examinee?
9    A.  I don't know.
10    Q.  And is the other number the Igberase
11 number we've been talking about all day?
12    A.  I don't know.
13    Q.  You just don't know what this means?
14    A.  Not on this one, no.
15    Q.  The one immediately above it, the next
16 date, August 17, 2000, reason for flag, abbreviation
17 for credentials is CREDS, hyphen, invest.  Does that
18 stand for investigation?
19    A.  Yes.
20    Q.  So there's a credential investigation
21 going on, correct?
22    A.  Yes.
23    Q.  And it was released on August 30 by you?
24    A.  Yes.
25    Q.  And the comment says investigation of

**72**

1 allegation this applicant is 0482700-2, correct?
2    A.  Yes.
3    Q.  Why did you release this on August 30 when
4 you were still actively investigating the Jersey
5 Shore Medical Center allegations?
6    A.  If you see, it was re-restricted the very
7 same day on the road.  So why it was don't I, I don't
8 know.
9    Q.  So on the same date that you released it,
10 August 30, 2000 for credentials investigation, it
11 was flagged again by somebody with the initial V,
12 last name Kesting, K-E-S-T-I-N-G?
13    A.  Yes.
14    Q.  "Applicant may have a previous ID number
15 0482700-2"?
16    A.  Yes.
17    Q.  Who is WK?  William Kelly?
18    A.  I'm assuming that's me, yeah.
19    Q.  Why are your initials after that?
20    A.  I don't know.
21    Q.  That was released on September 26, 2006?
22    A.  That's what it says.
23    Q.  By whom?  This Kesting individual?
24    A.  I don't know whether the user is
25 referencing who restricted or released the

Case: 20-3024 Document: 5-2 Page: 48 Date Filed: 04/20/2020
Case 2:18-cv-09629-JDW Document 32-35 Filed 10/07/19 Page 46 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

44 (173 to 176)

73

1  restriction.
2    Q.  Do you know why it was released?
3    A.  I don't know, but it was restricted again
4  the same day.
5    Q.  There you go.
6    A.  It's chronological from the bottom to the
7  top.
8    Q.  Do you know why it was flagged -- why it
9  was released and then flagged again?
10   A.  I don't know.
11   Q.  But the comment is the same thing?
12   A.  Yes.
13   Q.  So it was re-flagged on the same day and
14 released on October 9, 2006, correct?
15   A.  Correct.
16   Q.  And re-flagged the same day?
17   A.  Correct.
18   Q.  And then the October 9, 2006 re-flagging
19 is released February 20, 2007, correct?
20   A.  Correct.
21   Q.  Do you know why?
22   A.  No.
23   Q.  Then on February 27 it was reinstated, the
24 flag that is, February 20, 2007?
25   A.  Yes, it was released on February 20, 2007

74

1  and the same date it was flagged again.
2    Q.  Flagged again?
3    A.  Yes.
4    Q.  And the last entry is it was released on
5  September 13, 2011?
6    A.  Yes.
7    Q.  Do you know why?
8    A.  No.
9    Q.  So from February 20, 2007 to September 10,
10 2011 this program remained flagged?
11   A.  This applicant's computer record was
12 flagged, yes.
13   Q.  So if in the period from February 20, 2007
14 to September 10, 2011 an applicant, any applicant's
15 file had been flagged, what information would ECFMG
16 according to its practices and procedure have
17 provided to any residency program to which the
18 applicant was applying?
19       MS. MCENROE:  Objection to form.
20   A.  I really don't know.  I don't recall.
21   Q.  Do you know whether any of the information
22 about this flagging would have been provided to any
23 other organization about this applicant?
24       MS. MCENROE:  Objection to form.
25   A.  The flagging of the record?

75

1    Q.  Yes.
2    A.  I don't think so.
3    Q.  So am I to understand that this flagging
4  is just for internal purposes only, to restrict
5  certain people's access to the file?
6        MS. MCENROE:  Objection to form.
7    A.  Yes, yes.
8    Q.  Why?  Why is ECFMG restricting personnel's
9  access to the computer record of this applicant?
10       MS. MCENROE:  Objection to form.
11   A.  Of course it would be for different
12 things, but usually there would be a note about --
13 for this person to refer to the restricter.
14   Q.  It's not on here.
15   A.  It may have been at the bottom of the
16 computer screen during the time it was restricted.
17   Q.  But you've told me everything that you
18 know about this?
19   A.  Yes.
20       MS. MCENROE:  Objection to form.
21       (Exhibit No. 53 marked for
22 identification.)
23   A.  I have reviewed the document.
24   Q.  So it looks to me that Exhibit 53 consists
25 of three pages.  Is that what you have?

76

1    A.  Yes.
2    Q.  Tell me what is this three-page document.
3    A.  Actually, I don't know.
4    Q.  That hurts.
5    A.  And --
6    Q.  You don't know?
7    A.  I'm not familiar with these documents.
8    Q.  But does it appear to you to be some kind
9  of a screenshot of the ECFMG computer system for
10 Akoda?
11       MS. MCENROE:  Objection to form.
12   A.  That's what it appears to be.
13   Q.  But you're not familiar with --
14   A.  With these screens or this program.
15   Q.  So you can't interpret it for us?
16   A.  Not definitively, yeah, you know.
17   Q.  So just a couple of general questions on
18 the first page which is Bates 0000594.  What does
19 Token ID mean?
20   A.  When an individual applied to be an ECFMG
21 participate in ERAS, they received a token, a
22 permission to submit documents, and so that's what
23 the token -- each one had a unique identification
24 number.
25   Q.  You don't -- I take it sitting here today,

Case: 20-3024 Document: 5-2 Page: 49 Date Filed: 04/20/2020
Case 1:18-cv-03629-JDW Document 32-5 Filed 10/07/19 Page 47 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

45 (177 to 180)

**77**

1 because you told me you didn't participate in or
2 have any knowledge of Akoda applying to Howard
3 University for a residency program, you don't know
4 whether he even completed that program?
5     A. I have no knowledge.
6     Q. Do you know whether he was ever licensed
7 by the Maryland Board of Physicians?
8     A. No, I do not know.
9     Q. Do you know whether ECFMG provided any
10 documentation to the Maryland Board of Physicians in
11 connection with any application Akoda may have
12 made --
13     A. I have no knowledge of that.
14     Q. That's beyond your scope of your duties at
15 the time?
16         MS. MCENROE: Objection to form.
17     A. It would not necessarily have been beyond
18 the scope, but it could happen and I would have no
19 knowledge.
20     Q. Do you remember anything at all about
21 Akoda after the December 2000 period we talked about
22 in detail?
23     A. No.
24     Q. Do you know anything about how, if at all,
25 ECFMG assists in a graduate of a residency program

**78**

1 obtaining privileges at a hospital, for example?
2         MS. MCENROE: Objection to form.
3     A. No.
4     Q. You don't have anything to do with that?
5     A. I don't know that it is something that we
6 did -- ECFMG did.
7     Q. You don't know whether ECFMG provides
8 documentation or other information at the request of
9 an IMG when he or she applies to a hospital for
10 privileges?
11     A. We did provide an ECFMG status report.
12 Either the program or the hospital or the candidate
13 would request from ECFMG that we send a report of
14 their status with us.
15     Q. Meaning whether they were certified?
16     A. Certified, right.
17     Q. You don't have any personal knowledge
18 whether that happened with Akoda?
19     A. That is correct.
20     Q. And after you left in 2015, you don't know
21 what, if anything, happened with Akoda?
22     A. That is correct.
23     Q. You don't know anything about his plea
24 agreement?
25     A. I have no knowledge of that.

**79**

1     Q. You don't know whether his certification
2 was ever revoked by ECFMG?
3     A. I think I was told it was, yes.
4         MR. VETTORI: Give me five minutes to
5 talk to these people.
6         MS. MCENROE: Take a quick break.
7         (Recess taken at 3:05 p.m.)
8         (Back on the record at 3:10 p.m.)
9         CROSS-EXAMINATION
10 BY MR. CERYES:
11     Q. Mr. Kelly, my name is Brent Ceryes. I
12 represent the plaintiffs in this as well. I
13 promised your counsel I will be as efficient as
14 possible and avoid going over material we already
15 discussed, and I promised to do that.
16         I think you have your copies of your
17 exhibits there. I want to run through just a few of
18 these exhibits very briefly.
19         First of all, if I could direct your
20 attention to Exhibit No. 2. I want to confirm
21 something that I think is fairly obvious. This is a
22 form that, generally speaking, is completed by the
23 applicant, not by the ECFMG, correct?
24     A. Correct.
25     Q. And the potential exception may be these

**80**

1 boxes in which it's indicated that the applicant
2 should not write in this space and that's for office
3 use only?
4     A. Correct.
5     Q. Now, if we turn to the second-to-the-last
6 page of that exhibit, Bates stamp 157?
7     A. I see it.
8     Q. We have the section here which requests a
9 certification from medical school official regarding
10 the photograph that is included as part of the
11 application. To your understanding, Mr. Kelly, what
12 is the purpose of having a medical school official
13 certify that the photograph, signature, and
14 information on the form accurately applies to the
15 individual named above?
16         MS. MCENROE: Objection to form.
17     A. My recollection it was to help confirm
18 this was the individual who went to that medical
19 school.
20     Q. Now, in this particular application on
21 behalf of Igberase, there is no certification from a
22 medical school official, correct?
23     A. That is correct.
24     Q. However, there is an option as I
25 understand it that there would be a notarized -- a

Case: 20-3024 Document: 5-2 Page: 50 Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW Document 32-25 Filed 10/07/19 Page 49 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

46 (181 to 184)

**81**

1 signature from a Notary and an explanation as to why
2 the form could not be signed in the presence of a
3 medical school dean; is that correct?
4    **A. That is correct.**
5    Q. Those are two separate options that the
6 applicant can select in completing this
7 application?
8    **A. Yes.**
9    Q. On this particular application there's no
10 explanation provided at all, correct?
11    **A. On this form, that is correct.**
12    Q. With respect to this form, it would not
13 represent a completed application on behalf of
14 Igberase?
15       MS. MCENROE: Objection to form.
16    **A. Yeah, I don't know that I would say -- all**
17 **the information is not on this form, yes.**
18    Q. What kinds of explanations are deemed
19 acceptable on behalf of an applicant in failing to
20 provide a signature of a medical school official?
21       MS. MCENROE: Objection.
22    **A. The most common one was they were no**
23 **longer in the country where they went to medical**
24 **school and could not go to the dean's office.**
25    Q. And was that fact alone considered an

**82**

1 acceptable reason for not having a signature of a
2 medical school official, that they are now outside
3 of the country for which they graduated medical
4 school?
5       MS. MCENROE: Objection to form.
6    **A. For not having the signature on the**
7 **application, yes.**
8    Q. Approximately what percentage of
9 applicants apply for ECFMG certification while still
10 in the country where they went to medical school?
11       MS. MCENROE: Objection to form.
12    **A. I do not know.**
13    Q. Is it most students?
14       MS. MCENROE: Objection to form.
15    **A. Most individuals who are still students,**
16 **but with respect to graduates I don't know.**
17    Q. To the extent that applicants are
18 permitted to submit an application without having a
19 signature of a medical school official verifying
20 that they are in fact the person submitting the
21 application, that would reduce the credibility of
22 that application in terms of, is this person who
23 they say they are?
24       MS. MCENROE: Objection to form.
25    **A. There is a Notary making that**

**83**

1 **certification rather than the school, yes.**
2    Q. In terms of whether the individual
3 pictured is in fact the person signing the
4 application, is that also a role the Notary plays in
5 this instance?
6    **A. Yes.**
7    Q. Now, how does ECFMG determine from which
8 schools they will accept medical degrees?
9       MS. MCENROE: Objection to form.
10    **A. I can state going back to what the**
11 **requirement was when I was there, and it had to be a**
12 **medical school that was recognized by the**
13 **appropriate agency in the country where the school**
14 **was located, which was a ministry of health or a**
15 **licensing board and also list it in either -- at**
16 **this period of time I think it was World Director of**
17 **Medical Schools which was published and maintained**
18 **by the World Health Organization and later it was**
19 **the International Medical Education Director, but at**
20 **this period I believe it was World Director of**
21 **Medical Schools.**
22    Q. From the period of time from approximately
23 1990 to 2000, was there any process by which ECFMG
24 would develop relationships with these medical
25 schools in order to make sure that they had an open

**84**

1 line of communication with those institutions?
2       MS. MCENROE: Objection to form.
3    **A. In some cases, yes.**
4    Q. Do you know if ECFMG had such a
5 relationship with the University of Ibadan College
6 of Medicine?
7    **A. I do not know.**
8    Q. What about the University of Benin?
9    **A. I do not know.**
10    Q. I assume there are cases in which ECFMG
11 determines an applicant has engaged in some fraud in
12 the course of submitting an application? Fair?
13    **A. Yes, there were instances.**
14    Q. Can you provide me some estimate in terms
15 of how frequent an occurrence that was, let's say
16 between 1990 and 2000, maybe as a percentage of
17 total applicants?
18       MS. MCENROE: Objection to form.
19    **A. I really don't have any idea how many were**
20 **done, but just to let you know that we always**
21 **reported and there is notification so it could be**
22 **reconstructed.**
23    Q. And as I understand it, one of the
24 principle goals at ECFMG is to make sure or to do --
25 is to verify that those people who are applying to

Case: 20-3024 Document: 5-2 Page: 51 Date Filed: 04/20/2020
Case 1:18-cv-03629-JDW Document 32-5 Filed 10/07/19 Page 49 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

47 (185 to 188)

---

85

1  practice medicine here in the United States have
2  authentic credentials when they come here to
3  practice medicine. Fair?
4      A.  To assure they're competent physicians,
5  yes.
6      Q.  And in your role with ECFMG you understood
7  that one of the -- well, that residency programs and
8  state medical boards rely upon ECFMG to conduct that
9  verification of foreign medical graduate credentials
10 prior to those individuals coming here to practice
11 medicine. Fair?
12         MS. MCENROE:  Objection to form.
13     A.  That was one of the components of ECFMG
14 certification, yes.
15     Q.  And would you agree that ECFMG plays an
16 important role in public health by verifying that
17 physicians who come here to practice medicine have
18 the necessary and requisite credentials to do so?
19         MS. MCENROE:  Objection to form.
20     A.  That is part of it, to protect the
21 American public, yes.
22     Q.  And another role that ECFMG plays is
23 detecting or endeavoring to detect when an
24 individual lacks the -- well, when an individual has
25 not been honest in presenting their identity or

86

1  credentials.
2         MS. MCENROE:  Objection to form.
3      Q.  Fair?
4      A.  Yes, that -- yes.
5      Q.  Were there occasions in your experience
6  with ECFMG where you found that certain medical
7  schools -- well, strike that.
8         Were there occasions when you found
9  that certain medical schools were not credible in
10 terms of the process of verifying the credentials of
11 foreign medical graduates.
12         MS. MCENROE:  Objection to form.
13     A.  Of their own graduates?
14     Q.  Yes.
15     A.  I don't recall such an instance.
16     Q.  Okay.  Do you have a recollection of ever
17 finding that the University of Ibadan in particular
18 had been in any way fraudulent or misleading in
19 response to requests from ECFMG?
20     A.  I have no knowledge of that.
21     Q.  Same question with regard to the
22 University of Benin?
23     A.  I have no knowledge of that.
24     Q.  What is the credentialing committee at
25 ECFMG?  What was it when you worked there?

87

1      A.  It was standing committee of the ECFMG at
2  Board of Trustees for the specific charge of
3  reviewing policies and procedures, making
4  recommendations to the Board for any changes or
5  modifications to the certification requirements, and
6  to review allegations for irregular behavior.
7      Q.  And who, if any, at ECFMG had the ability
8  to elevate potential suspicious conduct such that it
9  would be considered by the credentialing
10 committee?
11     A.  It was generally a group, a review of a
12 group recommendation or decision of staff.
13     Q.  Sure.  If you in particular -- and did you
14 hold the same position from approximately 1991 until
15 your retirement?
16     A.  No.
17     Q.  Can you describe how your position with
18 ECFMG changed during that period of time?
19         MS. MCENROE:  Objection to form.
20 Calls for a narrative over 38 years.
21     A.  And I'm not sure of the exact dates for
22 some of these, but around 1991 I think I was the
23 manager of the information services department.  I
24 was not involved in credentials, but around 1992 or
25 1993 I became a manager of the credentials

88

1  department for a period of time, and then I became
2  director of the credentials and records services,
3  and then at the time I retired, I was associate vice
4  president for operations areas of credentials and
5  information services, records-keeping, and a number
6  of other areas.
7      Q.  Okay.  So from the time beginning when you
8  were the manager of the credentialing department
9  through until your retirement, if you had a
10 particular concern about an applicant, would you
11 have the ability to elevate that concern to the
12 credentialing committee?
13     A.  By myself solely?  So long as nobody
14 objected, I think I might have.
15     Q.  Okay.  What was Stephen Seeling's role
16 with ECFMG?
17     A.  He was the vice president for operations.
18     Q.  If Mr. Seeling had a concern about a
19 potential applicant, would he also have the ability
20 to independently bring that before the credentialing
21 committee?
22         MS. MCENROE:  Objection to form.
23     A.  When you say independently, he would have
24 done that in conjunction with me.  I would have been
25 part of that.  I don't know that he would take an

Case: 20-3024 Document: 5-2 Page: 52 Date Filed: 04/20/2020
Case 1:18-cv-05629-JDW Document 32-25 Filed 10/07/19 Page 50 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

48 (189 to 192)

89
1 independent action.
2 Q. Generally speaking, if Mr. Seeling had a
3 concern about an applicant and expressed that to
4 you, would you tend to escalate that to the
5 credentialing committee?
6 MS. MCENROE: Objection to form.
7 A. Yes.
8 Q. Is there anyone else who was -- during the
9 period from approximately, let's say, 1990 to 2006,
10 during that window of time, was there anyone else at
11 ECFMG who was actively involved in the decision to
12 elevate potential suspicious behavior to the
13 credentialing committee?
14 A. Mr. Seeling's predecessor Marie Shafran
15 who was vice president of operations prior to him.
16 Q. Do you recall when that transition took
17 place between Shafron and Seeling?
18 A. I think she left around 1998.
19 Q. And under what criteria were you to
20 determine that an issue should be brought before the
21 credentialing committee?
22 MS. MCENROE: Objection to form.
23 A. There are a couple criteria or factors,
24 and one was something that fell under our definition
25 of irregular behavior, an action or attempted

90
1 action, that could or would subvert the ECFMG
2 certification process, et cetera, and so it had to
3 be something that directly concerned us. And then
4 you would have to have enough information to take to
5 the credentials committee for them to be able to
6 make an informed decision. And at due notice you
7 would follow procedures, send an allegation to the
8 candidate, put them on notice, give then an
9 opportunity to respond.
10 Q. Okay. And were these criteria set forth
11 in any written policies or protocols maintained by
12 ECFMG?
13 A. There were policies and procedures
14 regarding irregular behavior written, yes.
15 Q. And where were they maintained?
16 A. At different times at different places,
17 and in the earlier periods they were hard copy typed
18 printout. Later they were actually in the ECFMG
19 information booklet and on the website.
20 Q. Okay. And so were -- was this typically a
21 decision -- strike that.
22 Unless you or Mr. Seeling or Ms.
23 Shafron brought an issue to the credentialing
24 committee, they would have no way to address it. Is
25 that fair?

9
1 MS. MCENROE: Objection to form.
2 A. An allegation of irregular behavior, yeah,
3 but it would go through staff first. It's possible
4 the CEO, something might originate with them, but
5 very, very unlikely.
6 Q. Who was the CEO during the period of 1990
7 to 2006?
8 A. They were a couple of different ones.
9 Q. Okay. Can you do your best?
10 A. Yeah, yeah, and one of James Hallock,
11 H-A-L-L-O-C-K, MD. One, because it was in the
12 proceedings there, was Nancy Gary, G-A-R-Y, MD. And
13 there may have been Marjorie Wilson, W-I-L-S-O-N,
14 MD. Those were the three names, I think.
15 Q. All right. Okay. Let's go back to the
16 exhibits, if you would?
17 A. Sure.
18 Q. If you would go to No. 22 -- 23.
19 A. Okay.
20 Q. Now, you reviewed this document with
21 Mr. Vettori, and in the section four, as you
22 previously addressed, this individual applying under
23 the name Akoda did not enter a US Social Security
24 number, correct?
25 A. Yes.

92
1 Q. Certainly the expectation is if an
2 individual has a Social Security number, that they
3 would write that on the application?
4 MS. MCENROE: Objection to form.
5 A. That's a reasonable expectation, yes.
6 Q. And is entering a Social Security number a
7 requirement of completing the form?
8 A. No.
9 Q. Why not?
10 A. In many cases individuals did not have
11 Social Security numbers.
12 Q. Retrospeculatively we know that -- well,
13 in fact subsequent to his application, this
14 individual under the name of Akoda did provide a
15 Social Security number?
16 A. I think --
17 MS. MCENROE: Objection to form.
18 A. -- there's reference in the letter to
19 ECFMG's receipt of a Social Security number.
20 Q. All right. What, if anything, did ECFMG
21 do with the Social Security information when
22 received through an application such as this?
23 MS. MCENROE: Objection to form.
24 A. I know it was entered into the database.
25 Q. Okay.

Case: 20-3024 Document: 5-2 Page: 53 Date Filed: 04/20/2020
Case 1:18-cv-09629-JDW Document 32-35 Filed 10/07/19 Page 52 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

49 (193 to 196)

93

1    A.  And it was one of the items that would be
2  used if we had for some individual to check to see
3  if they were potentially duplicate records.
4    Q.  Was there any effort made to investigate
5  the owner of the Social Security number?
6       MS. MCENROE:  Objection.
7    A.  I'm not sure what you mean by --
8    Q.  Was there any -- I'll rephrase the
9  question and ask a new question.
10      Was there any effort made in the
11 period of time between 1990 and 2006 to run the
12 Social Security number against any databases to find
13 out any information that you might be able to about
14 a particular applicant?
15      MS. MCENROE:  Objection to form.
16   A.  Do you mean databases outside of ECFMG?
17   Q.  Correct.
18   A.  I have no knowledge that we did that.
19   Q.  Presumably if that was something ECFMG
20 did, you would have knowledge of it in your role
21 within the organization?
22      MS. MCENROE:  Objection to form.
23   A.  Yes.
24   Q.  All right.  I think when asked about the
25 ECFMG role in the ERAS system you referred to it as

94

1  a dean station?
2    A.  Dean's office.
3    Q.  Dean's office.  So what do you mean by
4  that?
5    A.  It's the facilitator for the process to
6  gather together all the components of an application
7  for a residency program and submit them on behalf of
8  the graduate.  Unlike in the US, the University of
9  Pennsylvania School of Medicine, that dean's office,
10 would gather together all the documents for its
11 graduates to submit to the residency programs.
12 ECFMG did that for international medical
13 graduates.
14   Q.  And how was ECFMG compensated for that
15 effort?
16   A.  There was a fee for the ERAS token, and my
17 recollection is that that's how it was
18 compensated.
19   Q.  That was paid by the applicant?
20   A.  By the -- yes.
21   Q.  And so is it generally the fact that
22 residency programs require letters of reference as
23 part of an application?
24      MS. MCENROE:  Objection to form.
25   A.  Letters of recommendation they called

95

1  them, but yes.
2    Q.  And ECFMG undertook the role to provide
3  some verification with respect to those letters of
4  recommendation?
5    A.  No.
6    Q.  In this particular case you reviewed with
7  Mr. Vettori a series of letters that you wrote in
8  response to an application written by Akoda asking
9  those individuals to verify that the letters of
10 recommendation were authentic.  Do you recall
11 that?
12   A.  Yes.
13   Q.  Is that not something that you would do in
14 the normal course?
15   A.  That was not a routine procedure.
16   Q.  And why is it that you elected to do it in
17 this case?
18   A.  My belief is that because he was otherwise
19 being investigated.
20   Q.  And so safe to say that at that point in
21 2006 you had some concerns about Akoda's
22 credibility?
23      MS. MCENROE:  Objection to form.
24   A.  Yes.
25   Q.  And so under these circumstances you

96

1  thought it was important to reach out to those
2  individuals from whom Akoda had offered letters of
3  recommendation to find out if they were in fact
4  authentic?
5       MS. MCENROE:  Objection to form.
6    A.  That is correct.
7    Q.  And as far as what is reflected in the
8  record and to the best of your recollection, none of
9  those individuals responded to your letters,
10 correct?
11   A.  That is correct.
12   Q.  In other words, your concerns regarding
13 Akoda's credibility were not alleviated by that
14 process that you went through in sending out these
15 letters to those individuals?
16      MS. MCENROE:  Objection to form.
17   A.  We did not receive verification of those
18 letters of recommendation.
19   Q.  Did you -- if you would turn to Exhibit
20 51.
21   A.  Yes.
22   Q.  First of all -- actually, if we would go
23 to the actual letter of reference reportedly from a
24 Charles Francis, when -- actually, I'm going to step
25 back just a minute.

Transcript of William C. Kelly
Conducted on August 20, 2019

50 (197 to 200)

| 97 |
|---|
| 1    At some point you received notice |
| 2 that Akoda sought to use ECFMG's ERAS service for |
| 3 some purpose, correct, in 2006. |
| 4    **A.  At that time I was obviously aware that he** |
| 5 **was participating in the ERAS, yes.** |
| 6    Q.  I assume that ECFMG would have some |
| 7 knowledge of why the applicant was trying to use |
| 8 ERAS as between applying to different residency |
| 9 programs? |
| 10    **A.  Yes.** |
| 11        MS. MCENROE:  Objection. |
| 12    Q.  So they would fill out some application |
| 13 and presumably as part of that application would |
| 14 notify ECFMG where they sought to obtain a |
| 15 residency? |
| 16        MS. MCENROE:  Objection to form. |
| 17    **A.  I'm trying to remember where the** |
| 18 **designation of -- where they were applying comes in.** |
| 19 **Yes, we did have that information of the** |
| 20 **institutions to which they were applying, yes.** |
| 21    Q.  In review of the file -- is there an |
| 22 application that Akoda would have to have submitted |
| 23 to ECFMG to receive this service? |
| 24    **A.  I don't know that it was an application.** |
| 25 **There was a request for a token.  I don't recall** |

| 98 |
|---|
| 1 **what that entailed.** |
| 2    Q.  Do you write for it or is it something you |
| 3 do online? |
| 4    **A.  I know at some point it was online.  At** |
| 5 **this point I don't know whether it was a written** |
| 6 **request or not.** |
| 7    Q.  Since the ultimate purpose here is to |
| 8 actually send documents out to different residency |
| 9 programs, at some point ECFMG would have to know |
| 10 where they're sending these materials, correct? |
| 11    **A.  The documents, yes, yes.** |
| 12    Q.  That would have to be included within the |
| 13 file somewhere in order for you as ECFMG to know |
| 14 where to send these materials? |
| 15        MS. MCENROE:  Objection to form. |
| 16 Asked and answered. |
| 17    **A.  The applicant would have provided us with** |
| 18 **information as to which programs he or she was** |
| 19 **applying to, yes.** |
| 20    Q.  Based on your review of the materials in |
| 21 preparation for the deposition today, have you seen |
| 22 any application or any other documentation submitted |
| 23 by Akoda, by an individual named Akoda, related to |
| 24 this application for ERAS services? |
| 25        MS. MCENROE:  Objection to form. |

| 99 |
|---|
| 1    **A.  I remember seeing that ERAS transmittal** |
| 2 **sheet we saw in these materials.** |
| 3    Q.  Okay.  Anything else? |
| 4    **A.  Not that I recall.** |
| 5    Q.  Now, getting back to this letter of |
| 6 reference -- well -- so still not there yet. |
| 7        When you would receive a request such |
| 8 as this or when your office would receive a request |
| 9 such as this, would you then go back and review the |
| 10 applicant's file? |
| 11        MS. MCENROE:  Objection to form. |
| 12 What kind of such as this? |
| 13    **A.  That's what I'm trying to say.** |
| 14    Q.  When an ERAS request for an individual |
| 15 seeking to apply for residency programs, how would |
| 16 you go about processing that?  Can you walk me |
| 17 through the steps? |
| 18        MS. MCENROE:  Objection for form. |
| 19    **A.  I want to clarify that.  That was not in** |
| 20 **my particular area of operations, so I don't know** |
| 21 **that I could speak to it.** |
| 22    Q.  At some point you became aware that this |
| 23 individual named Akoda was seeking to use the ERAS |
| 24 services? |
| 25    **A.  In this particular case, yes.** |

| 200 |
|---|
| 1    Q.  How did that come to your attention? |
| 2    **A.  In looking at the totality of documents it** |
| 3 **most likely was through the flag.** |
| 4    Q.  And so because the existence of this flag |
| 5 you believe that someone processing ERAS |
| 6 applications brought this to your attention? |
| 7    **A.  To someone's attention, whether it was me** |
| 8 **particularly, but someone in my area, yes.** |
| 9    Q.  But at some point they brought this to |
| 10 your attention as well because you're the one who |
| 11 wrote the letters? |
| 12    **A.  Yes.** |
| 13    Q.  Now, I presume that once this was brought |
| 14 to your attention, you would make an effort to |
| 15 review this applicant's file? |
| 16        MS. MCENROE:  Objection to form. |
| 17    **A.  Yes.** |
| 18    Q.  And we've already addressed that |
| 19 presumably after you reviewed this file of Akoda, |
| 20 you had some concerns regarding credibility which is |
| 21 what prompted you to send these letters? |
| 22        MS. MCENROE:  Objection to form. |
| 23    **A.  Yes.** |
| 24    Q.  Now, if we go to this letter from Charles |
| 25 A. Francis, MD, reportedly from the First Medical |

Transcript of William C. Kelly
Conducted on August 20, 2019

51 (201 to 204)

20

1  Operations Squadron, you of course would have
2  reviewed this letter of reference prior to writing
3  this letter to Charles A. Francis, MD, correct?
4       MS. MCENROE: Objection to form.
5       A. I don't know -- I don't know that I
6  personally may have reviewed it, but someone would
7  have reviewed it.
8       Q. Okay. You, I'm sure -- well. Had you
9  reviewed this letter of reference, can we agree that
10 this document would raise red flags for you based
11 upon your years of experience in terms of the
12 credibility assigned to this particular letter of
13 reference?
14      MS. MCENROE: Objection to form.
15      Q. Is it what it purports to be?
16      MS. MCENROE: Objection.
17      A. I've seen all kinds of letters of
18 recommendation, and I can't say that there is any
19 one that I would be more concerned about this than
20 maybe other ones that turned out to be legitimate.
21      Q. Did you make any effort or did anyone in
22 your office make any effort to confirm that Charles
23 A. Francis is in fact a licensed medical
24 physician?
25      A. Verifying someone's licensure status would

202

1  not have been something we would have done.
2       Q. Okay. Certainly you would have the
3  ability to do that if you wanted to. Someone in
4  Virginia in 2006, you could have determined whether
5  they had a -- there's a licensed physician by the
6  name of Charles A. Francis as of that point in
7  time?
8       MS. MCENROE: Objection.
9       A. I'm sure there was a process, yes.
10      Q. Did you make any effort to find out if
11 Charles A. Francis actually existed as a person?
12      A. By writing to him would be the only way I
13 see here.
14      Q. Your effort in that regard was not -- did
15 not neither confirm nor deny that he was an existing
16 person?
17      A. That is correct.
18      Q. At the top of Exhibit 51 there are some
19 notes. Is it your handwriting?
20      A. Part of it is my handwriting, I believe,
21 yes.
22      Q. Can you read for me what's written up
23 there?
24      A. Okay. The part that's in my handwriting
25 is, "Igberase transcript, question mark," and the

203

1  letters SSS.
2       Q. Can you read what's below that?
3       A. I believe it says, "Why some things are
4  suspicions or suspicious." And that's in a
5  different handwriting.
6       Q. All right. This is a letter of
7  recommendation purportedly on behalf of Akoda and
8  not Igberase, correct?
9       MS. MCENROE: Objection to form.
10      A. Correct.
11      Q. What were you indicating by writing
12 "Igberase transcript, question mark"?
13      A. I don't know.
14      Q. Fair to say at this point you had some
15 concerns that Igberase and Akoda maybe have been one
16 and the same person?
17      MS. MCENROE: Objection.
18      A. Based on the other documents, yes.
19      Q. Do you know what transcript you're
20 referring to?
21      A. No.
22      Q. What does the SSS mean?
23      A. I believe it referenced Stephen Seeling
24 the vice president of operations.
25      Q. And to what purpose or to what end?

204

1       A. I don't recall.
2       Q. Do you think this is something you would
3  have spoken with him about in around 2006?
4       MS. MCENROE: Objection to form.
5       A. It's possible.
6       Q. The letter of reference from Charles A.
7  Francis lists a couple of telephone numbers. Did
8  you make any effort to call those telephone
9  numbers?
10      A. There is nothing in the record to indicate
11 that I did, no.
12      Q. Typically that's something you would
13 document had you done it?
14      A. Had I done it, yes.
15      Q. Going on to the letter to Phil Robertson,
16 MD, Maxicare, Incorporated?
17      A. Okay.
18      Q. First of all, just to be clear, it seems
19 to be a similar letter to each individual, but one
20 of the things that you request is any biographic
21 information you may have concerning Doctor Akoda
22 such as date of birth, medical school, and medical
23 school graduation date?
24      A. Yes, I see that.
25      Q. That's because you had concerns about each

Transcript of William C. Kelly
Conducted on August 20, 2019

52 (205 to 208)

205

1 of those elements of Doctor Akoda's background at
2 this point. Fair?
3       MS. MCENROE: Objection to form.
4       **A. They were the items that were at question**
5 **in the investigation, yes.**
6       Q. And in particular as of 2006 you had seen
7 various dates of birth assigned to Doctor Akoda, the
8 individual named Doctor Akoda, correct?
9       **A. I think the -- I know -- I don't know**
10 **that -- it may have just been, you know, as part of**
11 **biographic data. I don't know that we were -- that**
12 **this means necessarily that we were questioning that**
13 **or who the medical school was as much to confirm who**
14 **Akoda was.**
15       Q. This is not a request that you typically
16 make to individuals submitting letters of
17 recommendation on behalf of applicants for ERAS
18 service, correct?
19       MS. MCENROE: Objection to form.
20       **A. At that time that is correct.**
21       Q. Okay. So the letter from Phil
22 Robertson -- similar questions as before -- did you
23 make any effort to verify as to whether Phil
24 Robertson is in fact the name of a licensed
25 physician in the State of Maryland?

206

1       **A. Other than sending a letter to a Phil**
2 **Robertson as shown here, not that I see.**
3       Q. Certainly if you want to confirm whether
4 there was a licensed medical doctors named Phil
5 Robertson, that's something you would have had the
6 ability to do in 2006?
7       MS. MCENROE: Objection to form.
8       **A. There was a process in place to do that,**
9 **yes.**
10       Q. And there is a reference -- this is a
11 document from Maxicare, Incorporated. Did you make
12 any effort to investigate what Maxicare,
13 Incorporated is?
14       **A. I don't see that.**
15       Q. Again, that's something that you would
16 have done -- if that's something you did, it is
17 something you would have documented in the file?
18       MS. MCENROE: Objection to form.
19       **A. That is correct.**
20       Q. There is also a telephone number indicated
21 here on this letter of recommendation. Had you made
22 that phone call to speak with the purported Phil
23 Robertson, that's something you would have
24 documented in the file?
25       **A. Yes.**

207

1       Q. And next to the receive date there is a
2 reference handwritten SH10-16. Do you know what
3 that is?
4       **A. I don't. That would have been in the ERAS**
5 **department.**
6       Q. Doctor, if you would go to Exhibit 25 -- I
7 mean, Mr. Kelly?
8       **A. Okay. I'm looking at Exhibit 25.**
9       Q. And this has been addressed before in Mr.
10 Vettori's questions. This is a medical degree of
11 some sort, a purported medical degree for Johnbull
12 Nosa Akoda. In your review of the medical chart,
13 you never received a medical degree in the name of
14 John Nosa Akoda, correct?
15       MS. MCENROE: Objection to form.
16       **A. There is none in these records.**
17       Q. Okay. If we go to Exhibit 26. Despite
18 the fact that ECFMG had not received a medical
19 diploma in the name of John Nosa Akoda, it
20 nevertheless certified that John Nosa Akoda had
21 satisfied the requirements of ECFMG and could
22 proceed on with residency training. Fair?
23       MS. MCENROE: Objection to form.
24       **A. And apply to residency training, yes.**
25       Q. Let's go to 41 -- actually, start with 42.

208

1 Towards the lower part of the page there is
2 reference here -- this, by the way, is notes that
3 you took contemporaneous with your phone call with
4 Doctor McCorkel?
5       **A. Yes.**
6       Q. And you write, "While Akoda said he was
7 going to Nigeria, they have info he's in Maryland."
8 Is that something you learned from Mr.
9 McCorkel -- Doctor McCorkel?
10       **A. Yes.**
11       Q. That was further evidence that Akoda or
12 this individual going by the name of Akoda was
13 misrepresenting certain facts about his background.
14 Fair?
15       MS. MCENROE: Objection to form.
16       **A. I don't know that I would necessarily say**
17 **that, but...**
18       MS. MCENROE: Are you pretty close to
19 wrapping up?
20       MR. CERYES: Yes.
21       Q. Moving on to 41, there is a -- this is the
22 discussion that -- the memo you wrote to the file
23 regarding this Nigerian passport that you obtained
24 from this individual.
25       What ability did you have in

Transcript of William C. Kelly
Conducted on August 20, 2019

53 (209 to 212)

**209**

1 approximately 2000 to verify passports at ECFMG?
2     MS. MCENROE: Objection to form
3 Already covered this with co-counsel.
4    **A. When you say what ability, you mean?**
5    Q. What resources did you have at your
6 disposal to verify the authenticity of this Nigerian
7 passport?
8     MS. MCENROE: Objection to form.
9    **A. I don't know that there were any in-house**
10 **resources. Is that what you're referring to?**
11    Q. In-house or out of house.
12    **A. Right.**
13    Q. Any databases or other sources in which
14 you could have verified?
15    **A. I don't recall any, no.**
16    Q. Now, moving on to 48 -- actually, go to
17 47, if you would.
18    **A. Okay.**
19    Q. Do you know when this document was
20 prepared?
21    **A. No.**
22    Q. Do you know if it was before or after
23 2006?
24    **A. No.**
25    Q. All right. So on 48 you write that, "The

**20**

1 memorandum was being written separately since I did
2 not think it should be made part of the official
3 file."
4     If not in the official file, where
5 was this document located?
6    **A. I don't know.**
7    Q. Okay. What was your thinking or purpose
8 in not including this within an official file on
9 behalf of Akoda?
10     MS. MCENROE: Objection to form.
11 Covered extensively by co-counsel.
12    **A. Yeah, I don't know.**
13    Q. What is the significance of a document
14 being inside the file versus outside the file?
15     MS. MCENROE: Objection to form.
16    Q. What are the criteria that would dictate
17 whether a document goes in an applicant file versus
18 outside a file?
19     MS. MCENROE: Objection to form.
20    **A. I don't know.**
21    Q. Presumably on December 22, 2000 there was
22 some purpose in not including this document within
23 Akoda's file, correct?
24     MS. MCENROE: Objection to form.
25    **A. Or an intention not to include it. It**

**2**

1 obviously was included.
2    Q. Do you know if this was in fact within a
3 file on behalf of an official file for Akoda versus
4 kept somewhere else with ECFMG's records?
5     MS. MCENROE: Objection to form.
6    **A. I don't know.**
7    Q. Is there any justification that you can
8 think of as we sit here today as to why a document
9 concerning a physician's credibility and honesty
10 would not be included within their official file?
11     MS. MCENROE: Objection to form.
12    **A. I don't know.**
13    Q. You conclude that in the conclusion of
14 Paragraph No. 4 that you don't think this is enough
15 for the committee.
16     Help me understand in view of the
17 various documents previously discussed why you did
18 not believe that this was sufficient evidence to
19 even raise before a credentialing committee.
20     MS. MCENROE: Objection to form.
21    **A. Based on experience and working with the**
22 **documents and presumably maybe talking with other**
23 **people that, you know, there was a staff had to**
24 **review all the materials that were part of the --**
25 **that were the result of the investigation, and part**

**22**

1 **of it was a determination whether there was**
2 **enough -- we thought there was enough information**
3 **for the committee in its review to make an informed**
4 **decision.**
5    Q. Were you ever part of any presentation to
6 the credentials committee regarding a Doctor John
7 Akoda?
8    **A. I don't believe so.**
9    Q. Mr. Kelly, after -- well, do you know
10 how -- we discussed previously the letters of
11 recommendation that were sent out or sent to you in
12 2006 or to ECFMG.
13     Do you have any understanding as to
14 how that concern that you articulated previously was
15 ultimately addressed? Was there any formal decision
16 that we should proceed with sending out these
17 materials on behalf of a Doctor Akoda?
18     MS. MCENROE: Objection to form.
19    **A. Can you restate that?**
20    Q. Sure. At what point was it determined
21 that despite some concerns regarding Akoda's
22 credentiality that ECFMG through the ERAS service
23 should proceed with sending out this material on
24 behalf of Akoda the individual to various residency
25 programs or a program?

Transcript of William C. Kelly
Conducted on August 20, 2019

54 (213 to 216)

**23**

1        MS. MCENROE: Objection to form.
2    **A. I don't know.**
3    Q. You've not seen any documentation in the
4 file reflecting a decision one way or the other in
5 that regard?
6    **A. I have not.**
7    Q. You've not seen any correspondence to any
8 particular residency program regarding Akoda --
9 well, strike that -- with the exception of the ERAS
10 form that you previously alluded to?
11   **A. That is correct.**
12   Q. With respect to the levels of flags that
13 we discussed that concept generally, I understand
14 you might not have a recollection specifically of
15 what the different levels mean. This is Exhibit 52.
16   **A. I have it.**
17   Q. What is the general concern that is being
18 addressed through the use of flags on internal ECFMG
19 servicers with regard to who can see what?
20       MS. MCENROE: Objection to form.
21   **A. Well, it's not just who can see what.**
22 **It's what you can do with the record, and that would**
23 **vary based upon the reason behind it.**
24   Q. Certainly one of the purposes of the flags
25 in situations like in 2006 when someone went to

**24**

1 Akoda's file, there was presumably a flag that
2 alerted them that they should take some further
3 investigation on this case. Fair?
4    **A. They would need to check with the person**
5 **who flagged it to see if they could proceed, yes,**
6 **and what they can proceed with.**
7    Q. I think you mentioned another purpose is
8 actually to hide certain information from certain
9 staff at ECFMG?
10       MS. MCENROE: Objection to form.
11   **A. That's -- not really not so much that. I**
12 **think maybe I misspoke with that.**
13   Q. All right. Do you know what the range of
14 levels is?
15       MS. MCENROE: Objection --
16   **A. My recollection was there were five**
17 **separate restriction levels.**
18   Q. You mentioned in your prior testimony that
19 ECFMG would send a status report to individuals
20 requesting a status report on someone's ECFMG
21 certification; is that correct?
22   **A. Yes.**
23   Q. Was that essentially a binary
24 determination, either they're certified or not
25 certified?

**25**

1    **A. No. In some cases if there had been a**
2 **finding of irregular behavior that we would tell the**
3 **applicant their status report was annotated.**
4    Q. As of 2006 there had not been a finding of
5 irregular behavior with respect to Akoda, correct?
6    **A. That is correct.**
7    Q. And so would it be your expectation in
8 view of that that the status -- ECFMG status that
9 ECFMG would send out would not contain any
10 information about the various concerns that we've
11 addressed previously?
12       MS. MCENROE: Objection to form.
13   **A. That is correct.**
14   Q. All right. In this particular case you
15 made the decision in 2000 that this -- the Akoda
16 matter should not proceed to the credentialing
17 committee, correct?
18   **A. It was my belief that it should not at**
19 **that time go to the credentialing committee, yes.**
20   Q. Did you -- and ultimately you were the one
21 responsible for, following discussion with staff as
22 to making that decision whether it should or should
23 not. Fair?
24   **A. At that time, yes.**
25   Q. Would it have been reasonable for you to

**26**

1 have decided to the contrary, that let's have the
2 credentialing committee look at this and see what
3 they think?
4        MS. MCENROE: Objection to form.
5    **A. When you say reasonable, based on the**
6 **record, at the time I didn't think it was reasonable**
7 **action to take at that time based on the information**
8 **I had.**
9    Q. Certainly when we make decisions sitting
10 like this, we look at the risks versus the benefits.
11 Fair?
12       MS. MCENROE: Objection to form.
13   **A. But you're looking at -- this decision not**
14 **to provide it?**
15   Q. Right.
16   **A. Yes.**
17   Q. And so in this situation what were the
18 risks or what were the potential bad outcomes or
19 consequences that would be associated with bringing
20 this issue to the credentialing committee for their
21 consideration?
22       MS. MCENROE: Objection to form.
23   **A. That there was not enough information for**
24 **them to be make an informed decision.**
25   Q. Certainly that's a conclusion the

Case: 20-3024 Document: 5-2 Page: 59 Date Filed: 04/20/2020
Case 2:18-cv-05629-JDW Document 329-5 Filed 10/07/19 Page 57 of 58

Transcript of William C. Kelly
Conducted on August 20, 2019

55 (217 to 220)

2 7

1 credentialing committee could come to on their own
2 account, correct?
3     MS. MCENROE: Objection to form.
4   A. Yes.
5     MS. MCENROE: We've been going almost
6 an hour. You said you're going to be brief.
7     MR. CERYES: Yes.
8   Q. Does the credentialing committee meet on
9 some regular basis?
10     MS. MCENROE: Objection to form.
11   Q. Or did they?
12   A. At that time it varied according to this,
13 but I think for a long period there is no set
14 schedule. It was if there were just allegations for
15 it to review, you would set up a meeting, but at
16 some point we started having them in conjunction
17 with the periodic Board of Trustees meetings.
18   Q. When there would be a meeting, would
19 multiple issues typically be discussed at that
20 time?
21   A. Yes.
22   Q. Mr. Kelly, you mentioned that you had
23 given testimony on other cases in the past,
24 deposition testimony, correct?
25   A. Yes.

2 8

1   Q. Can you estimate on practically --
2 approximately how many depositions you've given?
3   A. Fewer than ten. Anywhere from five to
4 ten, maybe.
5   Q. In what circumstances have you been asked
6 to give deposition testimony?
7   A. I think they were all ECFMG related when I
8 was employed at ECFMG.
9   Q. And so you were testifying as a
10 representative or employee of ECFMG with regard to
11 certain aspects of their operations?
12   A. Yes.
13   Q. Have you had the -- well, were those
14 generally lawsuits in which ECFMG was a defendant?
15     MS. MCENROE: Objection to form.
16   A. The cases that I recall, the answer is
17 yes.
18   Q. To your knowledge, has ECFMG ever been
19 sued or been a defendant in a case involving
20 negligent credentialing of a physician?
21     MS. MCENROE: Objection to form.
22   A. I have no knowledge.
23   Q. I know ECFMG has been sued by physicians
24 in the past for their -- for being deprived
25 privileging through ECFMG or credentialing through

2 9

1 ECFMG; is that correct?
2   A. Yes.
3   Q. Would that represent the majority if not
4 all of the cases in which you've given deposition
5 testimony or were they in other matters?
6   A. Those are some of the cases, yes.
7   Q. Have you given testimony in any other case
8 regarding -- strike that.
9     Have you given testimony in any case
10 wherein there was an allegation that ECFMG was in
11 some way negligent in its credentialing of a
12 physicians.
13     MS. MCENROE: Objection to the form.
14 Asked and answered.
15   A. I don't remember.
16     MR. CERYES: Do you want to take a
17 minute?
18     MR. VETTORI: I'm good.
19     MR. CERYES: Okay. I'm sorry, one
20 other question for you. I don't mean to get
21 everybody excited.
22 BY MR. CERYES:
23   Q. If we go to Exhibit 53.
24   A. I have it in front of me.
25   Q. Great. There is in the text box toward

220

1 the bottom of this document a reference from -- it
2 says, "Anna, do not scan any document into applicant
3 file, period. Bring all documents to Anna,
4 parentheses, CREDS, invest, bring to Virginia, end
5 parentheses."
6     Why was it the case that there was
7 some instruction here to not scan documents into an
8 applicant file.
9     MS. MCENROE: Objection to form.
10 Also a reminder the witness testified earlier he
11 didn't know anything about this document when
12 counsel asked him.
13   A. That's correct, I don't know what this
14 document is.
15   Q. Okay. I'll re-ask the question. Are you
16 aware of any reason why documents from -- for an
17 applicant would not be scanned into an applicant
18 file?
19     MS. MCENROE: Objection to form.
20   A. I don't know any reason why.
21   Q. All right. Have you seen any -- is it
22 commonplace for an applicant through the ERAS system
23 to include a personal statement?
24   A. My recollection is that was one of
25 the expected documents.

Transcript of William C. Kelly
Conducted on August 20, 2019

**22**

1 Q. And your expectation would be in this case
2 that the applicant Akoda would have produced such a
3 document?
4 **A. It was one of the expected documents.**
5 Q. Have you seen a personal statement from
6 Akoda --
7 **A. I don't recall.**
8 Q. All right. That's a wrap.
9 MS. MCENROE: We'll take a quick
10 minute to make sure we don't have anything.
11 MR. VETTORI: Sure.
12 (Recess taken.)
13 MS. MCENROE: Nothing from us today.
14 Thank you very much.
15 THE COURT REPORTER: Before we go off
16 the record, orders?
17 MR. VETTORI: I'm ordering one.
18 MS. MCENROE: Us as well. Get an
19 electronic. We don't need a hard copy --
20 MR. VETTORI: Likewise here,
21 electronic transcript.
22 THE COURT REPORTER: And minuscript.
23 (Whereupon, the deposition was
24 concluded at 4:20 p.m.)
25

**223**

1 WITNESS: William Kelly
2 DATE: August 20, 2019
3 CASE: Monique Russell, et al v. ECFMG
4
5
6 DISTRIBUTION TO COUNSEL: The original signature
7 page/errata sheet was sent to Elisa McEnroe, Esq. to
8 obtain signature for the deponent. When signed,
9 please forward same to Paul Vettori, Esq. for
10 inclusion with the original of the deposition
11 transcript.
12
13 WITNESS INSTRUCTIONS: After reading the transcript
14 of your deposition, please not any change or
15 correction and the reason for it on the errata
16 sheet. DO NOT make any notations on the transcript
17 itself. Use additional sheets if necessary.
18
19 SIGN AND DATE THE ERRATA SHEET and return it, along
20 with the transcript, to your counsel.
21
22
23
24
25

**222**

1 C R T F C AT
2 COMMONW A TH OF MASSACHUS TTS
Worcester, ss
3
, Jenni er A Doherty, Certi ied
4 Shorthand Reporter and Notary Pub ic du y
commissioned and qua i ied in and or the
5 Commonwea th o Massachusetts, do hereby certi y
that there came be ore me on the 20th day o August,
6 2019, the person hereinbe ore named, who was by me
du y sworn to testi y to the truth and nothing but
7 the truth o their know edge touching and concerning
the matters in controversy in this cause that they
8 were thereupon examined upon their oath, and their
examination reduced to typewriting under my
9 direction and that the deposition is a true record
o the testimony given by the deponent
10 urther certi y that am neither
attorney nor counse or, nor re ated to or emp oyed
11 by, any o the parties to the action in which this
deposition is taken, and urther that am not a
12 re ative or emp oyee or inancia y interested in
this action
13
N W TN SS WH R OF, HAV H R UNTO S T MY
14 HAND AND S A TH S 1ST DAY OF S PT MB R, 2019
15
16
17 Notary Pub ic
18 My Commission xpires
October 19, 2023
19 CSR No 1398F95
20
21
22
23
24
25

**224**

1 ACKNOW DG M NT OF D PON NT
2 , Wi iam Ke y, do hereby certi y
3 that have read the ongoing transcript o my
4 testimony taken on August 20, 2019, and urther
5 certi y that it is a true and accurate record o my
6 testimony, with the exception o the
7 changes corrections isted be ow
8 _____
9 PAG N CHANG OR CORR CT ON
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20 Wi iam Ke y
21
22
23
24
25

**PLANET DEPOS**
888.433.3767 | WWW.PLANETDEPOS.COM

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONIQUE RUSSELL, JASMINE RIGGINS, ELSA M. POWELL AND DESIRE EVANS, | CIVIL ACTION NO. 18-5629 |
| **Plaintiffs,** | |
| v. | |
| EDUCATIONAL COMMISSION FOR FOREIGN MEDICAL GRADUATES, | |
| **Defendant.** | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF

## MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Table of Authorities ................................................................................................... iv

Introduction...................................................................................................................1

I.    ECFMG's arguments do not overcome the fact that Plaintiffs satisfy the requisite
      criteria under Rule 23(a) for certification by a preponderance of the evidence. ..........2

      A.    ECFMG's effort to impose a per se bar on class certification of emotional
            distress claims should fail as contrary to applicable law.....................................2

      B.    Typicality is satisfied, as the named plaintiffs have suffered a similar
            injury from the same course of conduct by ECFMG as the class members.....6

      C.    Plaintiffs are fully adequate to represent the interests of the class, as their
            claims are typical of the class, and they do not have interests that diverge
            from those of other class members. ...................................................................6

      D.    ECFMG's contentions regarding ascertainability lack merit, as well over
            600 patients have retained one or more of the undersigned counsel, and
            additional class members can be identified via subpoena. ...............................8

      E.    Additional Class Counsel ...................................................................................8

II.   ECFMG misunderstands and fails to overcome Plaintiffs' arguments in favor of
      satisfying Rules 23(b)(3) and 23(c)(4).........................................................................9

      A.    Plaintiffs' satisfaction of the *Gates* factors means that Plaintiffs satisfy
            Rule 23(b)(3) in the context of a Rule 23(c)(4) issue class certification............9

      B.    Key questions of liability, including key elements of duty and causation,
            can be determined on a classwide basis. ..........................................................10

III.  The statute of limitations and the issue of superseding cause pose no bar to class
      certification, because their applicability is properly addressed in individual
      damages proceedings. .................................................................................................11

**IV.**  **ECFMG's choice of law analysis is flawed, because it fails to take into account that conflicts between the tort law of Pennsylvania and those of Plaintiffs' domiciles are false conflicts.** ............................................................................13

**V.**  **The recitation of facts in ECFMG's brief is flawed.** ........................................14

**CONCLUSION** ...........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................ 6

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................ 6

*Bouriez v. Carnegie Mellon Univ.,*
   585 F.3d 765 (3d Cir. 2009) ............................................................................. 13

*Butler v. Sears, Roebuck & Co.,*
   727 F.3d 796 (7th Cir. 2013) ........................................................................... 10

CV-0291,
   2013 WL 2042369 (M.D. Pa. May 14, 2013) ................................................... 4

*Erisoty v. Rizik,*
   No. 93-, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995) ....................................... 15

*Gates v. Roem and Haas Co.,*
   655 F.3d 255 (3d Cir. 2011) ........................................................................... 5, 9

*Gunnells v. Healthplan Serv., Inc.,*
   348 F.3d 417 (4th Cir. 2003) .................................................................... 4, 5, 10

*In re Linerboard Antitrust Litig.,*
   305 F.3d 145 (3d Cir. 2002) In *Linerboard* ............................................ 11, 12, 13

*In re Nassau County Strip Search Cases,*
   461 F.3d 219 (2d Cir. 2006) ............................................................................. 10

*In re Suboxone Antitrust Litig.,*
   No. 13-MD-2445, 2019 WL 4735520 (E.D. Pa. Sept. 27, 2019) ....................... 8

*In re Three Mile Island Litig.,*
   87 F.R.D. 433 (M.D. Pa. 1980) ......................................................................... 5

*Lacey v. Cessna Aircraft Co.,*
   932 F.2d 170 (3d Cir. 1991) ............................................................................. 13

*Martin v. Behr,*
   896 F.3d 405 (6th Cir. 2018) ........................................................................ 9, 10

*McRobie v. Credit Protection Association,*
   No. 5:18-cv-00566, 2019 WL 1469097 (E.D. Pa.April 3, 2019) ..................... 2, 3

*Shady Grove Orthopedic Assoc, v. Allstate Ins. Co.,*
   559 U.S. 393 (2010) ........................................................................................... 6

*Spence v. Bd. Of Ed. Of Christina Sch. Dist.,*
   806 F.2d 1198 (3d Cir. 1986) ........................................................................ 2, 5

*Thierfelder v. Wolfort,*
   52 A.3d 1251 (Pa. 2012) .................................................................................. 10

*Valentino v. Carter-Wallace, Inc.,*
   97 F.3d 1227 (9th Cir. 1996) ........................................................................... 10

*Wallace v. Powell,*
   No. 3:09-CV-0291, 2013 WL 2042369 (M.D. Pa. May 14, 2013) .................... 4

Case 2:18-cv-05629-JDW   Document 97   Filed 12/11/19   Page 6 of 22

## Rules

Fed. R. Civ. P. 1 ................................................................................................... 11

Fed. R. Civ. P. 23 ........................................................................................... *passim*

## Other Authorities

2 Newberg on Class Actions § 4.57 (3d. ed.) ...................................................... 12

Charles E. Clark & James William Moore, *A New Federal Civil Procedure I, The Background*, 44 Yale L.J. 387 (1935).............................................................................................. 6

Stephen B. Burbank, *The Rules Enabling Act of 1934*, 130 U. Pa. L. Rev. 1015 (1982)............... 6

Plaintiffs Monique Russell, Jasmine Riggins, Elsa Powell, and Desire Evans, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this Reply Memorandum of Law in Support of Motion for Class Certification.

## INTRODUCTION

As Plaintiffs allege, ECFMG's negligence facilitated, aided, and abetted Oluwafemi Igberase a/k/a John Nosa Akoda to repeatedly commit sexual assault for more than a decade. As a result of ECFMG's negligence, Igberase had the opportunity to examine and touch hundreds of obstetrics and gynecology patients, who would never have consented to such an examination had they known—as ECFMG did—that Igberase had obtained his credentials through repeated acts of fraud, later found to constitute a "crime of moral turpitude." See Ex. 1 at 1; ECF No. 32-34 (Ex. 32) at 5. As ECFMG itself admitted, patients have the right to be treated by an appropriately certified physician. Although the severity of damages may vary, plaintiffs claim a common injury: the wrongful touching of patients' bodies based on Igberase's false pretense that he was a lawfully licensed and certified physician, which was aided and abetted by ECFMG's negligence in certifying Igberase/Akoda and in failing to notify hospitals and medical boards when it knew Igberase had obtained his certification through fraud. A single course of conduct led to a single type of injury suffered by all members of the proposed class. Plaintiffs thus appropriately seek certification on issues central to ECFMG's liability for negligently certifying Igberase.

ECFMG's opposition to certification fails to sidestep this core commonality of Plaintiffs' claims. Instead, it objects that Plaintiffs' claims may vary in the amount of damages and the circumstances under which they were inflicted. Thus it has always been so: the individualized nature of Plaintiffs' damages cannot defeat class certification, any more than can differences in

1

antitrust impact defeat certification of an antitrust action. ECFMG cannot avoid the reality that

the proposed class members' claims arise from one, and only one, course of conduct by ECFMG.

Class certification of liability or key issues central to the class member's claims will materially

advance the termination of the litigation, to the benefit of the Court and all parties.

I. **ECFMG's arguments do not overcome the fact that Plaintiffs satisfy the requisite criteria under Rule 23(a) for certification by a preponderance of the evidence.**

    A. **ECFMG's effort to impose a *per se* bar on class certification of emotional distress claims should fail as contrary to applicable law.**

Defendant erroneously contends that no court can possibly try limited issue class action

where emotional distress damages are claimed, because "with respect to the claims of even a

single plaintiff, emotional distress liability and damages are 'too interwoven to allow a fair

determination of damages apart from liability.'" ECF No. 39 at 12 (quoting *Spence v. Bd. Of Ed.*

*Of Christina Sch. Dist.*, 806 F.2d 1198 (3d Cir. 1986)).

Earlier this year, however, this District, in *McRobie v. Credit Protection Association*, No.

5:18-cv-00566, 2019 WL 1469097 (E.D. Pa. April 3, 2019), certified a limited issue class per

Rule 23(c)(4) of a claim brought under the Fair Debt Collection Practices Act (FDCPA) even

though the sole representative plaintiff sought emotional distress damages. The representative

plaintiff filed a putative class action seeking relief under several provisions of the FDCPA after

receiving a notice from the defendant, a debt collector, which allegedly did not comply with the

requirements of the FCDPA. Plaintiff sought certification of claims corresponding to two

putative violations under the FDCPA. The court, exercising its discretion under Rule 23(c)(4),

certified only one of the claims, citing authority from this circuit that "a court may grant a

motion to certify in part and certify a class with respect to one of several causes of action in a

suit, even where the others do not satisfy Rule 23." *Id.* at *2.

As here, the defendant argued that the plaintiff "cannot establish commonality because she suggested in her deposition that she seeks emotional distress damages for her 'hyperbolic' reaction [to the notice], and that as a result, she cannot establish damages on a class-wide basis." *Id.* at *4. The court disagreed. It noted that the commonality element "is easily met" because it "will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Id.* It further found as follows

> [Plaintiff's] claim under Section 1692f(8) [of the FDCPA] requires resolving a question common to her and the members of the proposed class who received the mailer, specifically, whether the use of the numerical creditor code on the outside of the mailer violated Section 1692f(8) of the FDCPA. Because all members of the class received identical mailers in this respect, the answer to this question— and the evidence required to prove it—will be common to the class. <u>Even if [Defendant] is correct and McRobie claims a measure of damages different than the other members of the proposed class, she has shown at least one issue of law and fact common to her and the proposed class; therefore, the proposed class satisfies the commonality requirement.</u>

*Id.* (emphasis added). The court further found that a class action was a superior device for resolving the litigation because "[t]he alternative to this class action is myriad individual lawsuits for relatively small amounts of damages resulting from the same conduct." *Id.* at *7.

Here, Plaintiffs and the members of the prospective class were assaulted—intimately examined by Igberase without obtaining informed consent—as a result of a single, common course of conduct by the defendant, provable by common evidence. ECFMG does not rebut this central proposition. The fact that the nature of damages may differ among the various class members does not, and cannot, defeat commonality. *See, e.g.*, *McRobie*, 2019 WL 1469097, at *4; *Wallace v. Powell*, No. 3:09-CV-0291, 2013 WL 2042369, at *20–21 (M.D. Pa. May 14, 2013); *Gunnells v. Healthplan Serv., Inc.*, 348 F.3d 417, 427-28 (4th Cir. 2003).

*McRobie* is hardly an outlier. In *Gunnells*, a major decision on certification under Rule 23(c)(4), the Fourth Circuit found that a district court appropriately certified a single issue for class-wide treatment: whether a third-party health benefits administrator breached its duty to the class members and caused the collapse of a health plan, thus injuring members and purchasers of the plan. Notably, the Fourth Circuit deemed appropriate the fact that the district court certified the issue for class treatment while expressly reserving "all issues regarding the fact and nature of injury specifically as to plaintiffs' claims of mental anguish and emotional distress" for individualized proceedings, *id.* at 458 (Niemeyer, J., concurring in part), and "acknowledged the potential need for individualized mini-trials on proximate causation specifically relating to the reason for nonpayment of a given claim," *id*. The Fourth Circuit squarely rejected the argument ECFMG relies on here:

> TPCM contends that individualized damages determinations destroy commonality, typicality, and predominance. But Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. **In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations.** See Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (c)(4)) (noting that Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with "the members of the class ... thereafter ... required to come in individually and prove the amounts of their respective claims."); see also 5 Moore's Federal Practice § 23.23[2] (1997) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality."). Indeed, "[i]n actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred." *Id.* at § 23.46[2][a] (1997) (emphasis added). When such individualized inquiries are necessary, if "common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied." *Id.* This is precisely the situation here—"common questions [do] predominate over individual questions as to liability." *Id.*

*Id.* at 428 (emphasis added). In other words, certification of the proposed issues for class-wide treatment in this action would follow a well-worn path.

ECFMG relies on inapposite authority in seeking to erect a *per se* barrier against certification of emotional distress claims. The court in *In re Three Mile Island Litig.*, 87 F.R.D. 433 (M.D. Pa. 1980), did not consider whether issues of liability pertaining to the emotional distress claim could be certified under Rule 23(c)(4). *Spence v. Board of Education of Christina School District*, 806 F.2d 1198 (3d Cir. 1986), was not a class action. The issue on appeal in *Spence* concerned whether damages could be tried separately from liability without presenting evidence as to liability. The court reasonably concluded that a jury would have to understand the circumstances out of which the emotional distress arose. Here, if Plaintiffs prevail at the class certification stage, a jury or special master will be presented with the details of each class member's treatment by Igberase and the effect of learning that Igberase was not a lawfully licensed physician and realizing they had been assaulted. There is no evidence that any of the class members had any direct contact with ECFMG (and they would have no reason to); thus, the relevant circumstances to be presented to a jury regarding their emotional distress are Igberase's conduct and testimony about their own circumstances. An issues trial centered on the negligent conduct of ECFMG that enabled Igberase to practice as an OB/GYN at a discrete number of institutions, followed by individual proceedings focused on the individual injury and damages incurred once Igberase was able to practice as an OB/GYN at those institutions, appropriately "carve[s] at the joint" in this action. *Gates*, 655 F.3d at 273.[1]

---

[1] To the extent that the Court might deem Plaintiffs' prayer for punitive damages an obstacle to issue class certification, as it might involve duplicative presentation of evidence regarding ECFMG's conduct, Plaintiffs would seek leave to amend the complaint to drop the punitive damages claim.

5

Finally, Defendant's effort to categorically exclude actions that involve emotional

distress damages proves too much, and is at odds with first principles. The Federal Rules of Civil

Procedure are trans-substantive. See Stephen B. Burbank, *The Rules Enabling Act of 1934*, 130

U. Pa. L. Rev. 1015, 1108 (1982); Charles E. Clark & James William Moore, *A New Federal*

*Civil Procedure I, The Background*, 44 Yale L.J. 387, 388–89 (1935). Courts do not vary their

interpretation and application of Rule 23 based on the nature of the action or amount of damages

claimed. *Id.* Instead, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the

specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assoc, v.*

*Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).

### B.     Typicality is satisfied, as the named plaintiffs have suffered a similar injury from the same course of conduct by ECFMG as the class members.

ECFMG argues that Plaintiffs' claims are not typical of other claims because Plaintiffs

and putative class members may have been treated at different times along a certain chain of

events. This is a smokescreen. Plaintiffs, and all class members, are those treated by Igberase at

any time who suffered emotional damage because of learning Igberase was not who he held

himself out to be. ECFMG also argues that Plaintiffs' claims are not typical of putative class

members who may have suffered other damages, but points to no evidence that any putative class

member has suffered damages different in nature from Plaintiffs' damages.

### C.     Plaintiffs are fully adequate to represent the interests of the class, as their claims are typical of the class, and they do not have interests that diverge from those of other class members.

ECFG argues that Plaintiffs are not adequate class representatives because 1) they filed

and then dismissed a similar class action complaint against the hospital that granted privileges to

Igberase, 2) they do not understand what ECFMG does and 3) some putative class members may

not yet have suffered emotional distress. None of these arguments have merit. The four named class representatives have diligently performed their duties on behalf of the class. All of them have traveled to Pennsylvania for defense medical examinations by a defense psychiatrist. Indeed, at great inconvenience, one of them traveled from Costa Rica. All four have sat for hours for depositions by the defense. And all four have responded to interrogatories and requests for production of documents propounded by the defense.

The fact that Plaintiffs dismissed the class action complaint against Dimensions Health Corporation in Maryland state court does not result in the conclusion that Plaintiffs will not pursue to conclusion the more direct claims against ECFMG. It seems paradoxical that ECFMG would challenge the adequacy of representation due to this possibility, since such a dismissal would be in the best interests of ECFMG. Nothing that has taken place in this case even hints at the possibility that Plaintiffs will not pursue this case to a conclusion. In fact, if it becomes necessary, the 600+ clients represented by Plaintiffs' counsel will file individual cases.

The fact that Plaintiffs, as lay people, do not know the role ECFMG plays in the careers of international medical graduates has no bearing on their adequacy as class representatives. Plaintiffs are not required to know this. It is enough that Plaintiffs suffered emotional distress upon learning that Igberase was not who he held himself out to be. It is for lawyers to determine who may be responsible for allowing Igberase to commit his fraud. How and when putative class members learned about Igberase and the circumstances of injury has no bearing on the adequacy of class representation. Finally, there is no evidence to suggest that Plaintiffs or putative class members have an interest in controlling the litigation that would make class certification inappropriate. Any class member would have the right to opt out and pursue her own action.

**D.    ECFMG's contentions regarding ascertainability lack merit, as well over 600 patients have retained one or more of the undersigned counsel, and additional class members can be identified via subpoena.**

ECFMG improperly characterizes the class definition as "hopelessly vague" and incapable of identifying members of the class. The proposed class consists of patients who were examined or treated by Igberase. This cannot be clearer. Health care institutions will be able to identify these individuals—indeed, the institution at which Igberase provided the majority of patient care, Prince George's Hospital Center, has already done so. (ECFMG knows this: all records for these patients in Plaintiffs' counsel's possession have already been provided to ECFMG's counsel. *See* Ex. 2.) If the class is certified, subpoenas can issue to the other institutions at which Igberase provided care, to identify other class members. As this District has expressly held, such a procedure satisfies the ascertainability requirement. *In re Suboxone Antitrust Litig.*, No. 13-MD-2445, 2019 WL 4735520, at *42 (E.D. Pa. Sept. 27, 2019). Finally, ECFMG's repeated reference to Nigerian patients is a distraction: there is no evidence Igberase treated anyone there after seeking certification from ECFMG, and evidence is lacking that he treated anyone there before that time. At deposition, ECFMG refused to state that a purported confirmation of his registration and licensure as a physician practicing in Nigeria was authentic. *See* Ex. 32-46 (Ex. 45) at 105:13–22, 109:21–110:5. If the Court deems it necessary, however, it can reform the class definition to encompass only patients in the United States.

**E.    Additional Class Counsel**

Regarding the adequacy of class counsel, which ECFMG does not challenge, Plaintiffs neglected in their opening brief to discuss co-counsel Conrad O'Brien, PC and Z Law, LLC. Conrad O'Brien has extensive experience in representing clients in class and mass actions and other complex litigation. Nicholas Centrella, co-counsel in this case, is the managing shareholder

8

of Conrad O'Brien. Cory Zajdel of Z Law has been appointed class counsel in both state and federal courts on more than ten occasions and has represented more than 2.5 million consumers in class actions. These class actions recovered more than one hundred million dollars ($100,000,000.00) in settlements in certified class actions over the last ten years.

## II.    ECFMG misunderstands and fails to overcome Plaintiffs' arguments in favor of satisfying Rules 23(b)(3) and 23(c)(4).

### A.    Plaintiffs' satisfaction of the *Gates* factors means that Plaintiffs satisfy Rule 23(b)(3) in the context of a Rule 23(c)(4) issue class certification.

ECFMG misunderstands the interplay between Rule 23(b)(3) and Rule 23(c)(4) when it argues that Plaintiffs' pursuit of Rule 23(c)(4) certification entails an "[i]mplicit[] recogni[tion]" that Plaintiffs do not meet Rule 23(c)(4). ECF No. 39 at 10. In fact, the *Gates* factors, which Plaintiffs discuss at length, are precisely the factors courts in the Third Circuit analyze when determining whether an issue class proposed under Rule 23(c)(4) meets the predominance requirement of Rule 23(b)(3). As the *Gates* court observed, the adoption in *Gates* of the multifactor test for issue class certification originally propounded by ALI was the Third Circuit's answer to the "complicated area of class action procedure" pertaining to "the extent to which the ability to certify issue classes alters the predominance requirement." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 272–73 (3d Cir. 2011). The *Gates* factors apply not only to the predominance requirement in Rule 23(b)(3) but also to the superiority requirement, as they involve a "functional, superiority-like analysis," *Martin v. Behr,* 896 F.3d 405 (6th Cir. 2018). In other words, satisfying the *Gates* factors satisfies Rule 23(c)(4) and 23(b)(3) for purposes of a damages class action in the Third Circuit. Plaintiffs have explained in detail how either proposed option for certification meets those factors. *See* ECF No. 32-1 at 20–25.

9

The consensus among the Circuits that whether common questions predominate over individual ones should be evaluated *within the issues to be certified*, rather than in the context of the entire action, provides persuasive authority that weighs in favor of class certification.[2] The "circuit split" referenced by ECFMG is illusory, as the Rule 23 Subcommittee of the Advisory Committee on Civil Rules found when considering whether to amend Rule 23(c)(4) to address this supposed split.[3]

### B. Key questions of liability, including key elements of duty and causation, can be determined on a classwide basis.

This action raises the question whether ECFMG owed a duty to an individual plaintiff as a result of a general duty to the public or as a result of its undertaking of a duty to another health care provider. The existence of a duty is an issue of law to be determined by the Court, not a class jury. *Thierfelder v. Wolfort*, 52 A.3d 1251, 1264 (Pa. 2012). There are a relatively small number of health care institutions at which Igberase provided care: Harlem Hospital, Jersey Shore Medical Center, Howard University Hospital, Prince George's Hospital Center, and the office practice of Drs. Chaudry and Moore. The Court can determine whether a duty to class members arises out of a relationship with one or more of these entities, based on the evidence and a determination of whether it was foreseeable that ECFMG's conduct resulted in Igberase being in a position to assault class members at those institutions by performing intimate

---

[2] *See, e.g.*, *Martin v. Behr,* 896 F.3d 405 (6th Cir. 2018); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417 (4th Cir. 2003)*; In re Nassau County Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

[3] Rule 23 Subcommittee Report 5, in Advisory Comm. on Civil Rules, Agenda Book, Nov. 5–6, 2015, at 91, https://www.uscourts.gov/sites/default/files/2015-11-civil-agenda_book.pdf (noting that "there is no significant need" to amend Rule 23(c)(4) because the "circuits seem to be in accord" about the propriety of certifying classes limited to particular issues even when certifying the entire action might not satisfy Rule 23(b)(3)").

OB/GYN procedures and examinations on false pretenses. It would be reasonable to create subclasses for this determination, if necessary. *See* Fed. R. Civ. P. 23(c)(5). Subclasses would be unnecessary, however, to address the other issues proposed for classwide determination (e.g., whether ECFMG owed a duty to the public by virtue of its undertaking, whether it owed a duty as a result of aiding and abetting the tortious conduct of Igberase), as the relationship with individual healthcare entities would not need to be analyzed.

After resolving these questions on a classwide basis, fact-of-injury and the foreseeability and extent of the damages sought can be resolved in mini trials or, if the parties consent, through a special master process. Trying a limited number of these claims would help the parties to more accurately value the case, and thus facilitate settlement. The alternative to this procedure— determining the existence of a duty and the foreseeability of damages in each of hundreds of individual cases, on a common set of facts—is hardly in the interest of judicial economy. ECFMG offers no reason—and there is none—why such an arrangement would be preferable to a class-wide determination of common issues, followed by individual mini-trials or, with the parties' consent, an administrative determination of damages. The choice facing the court is between a class trial on common issues followed by resolution of the individual plaintiffs claims, or hundreds of full-blown trials on all issues, with repetitive presentations of extensive factual and expert evidence on ECFMG's conduct. The latter does not serve judicial economy or "secure the just, speedy, and inexpensive determination" of this matter. Fed. R. Civ. P. 1.

III.  **The statute of limitations and the issue of superseding cause pose no bar to class certification, because their applicability is properly addressed in individual damages proceedings.**

The Third Circuit has long held that the statute of limitations questions generally do not bar class certification. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002). In

*Linerboard*, the defendants argued that the district court erred in granting class certification on antitrust liability, because of the necessity of individualized inquires on whether a class member could avail itself of tolling of limitations under the fraudulent concealment doctrine. The Third Circuit acknowledged that an analysis of the applicability of the fraudulent concealment exception to the statute of limitations would require individualized proof, because some class members would be barred from asserting a fraudulent concealment defense due to prior knowledge of defendants' conduct or failure to act with the requisite due diligence in bringing a claim. *Id.* at 161. But this was insufficient to defeat class certification. As the Third Circuit observed, "[c]hallenges based on the *statute of limitations*, fraudulent concealment, releases, causation, or reliance have usually been rejected and will not bar predominance satisfaction because those issues go to the right of a class member to recover, in contrast to underlying common issues of the defendant's liability.'" *Id.* at 163 (quoting Newberg on Class Actions § 4.26 (3d ed.)) (emphasis added). Common issues predominated, as the common evidence to be presented in the class-wide proceeding concerned the defendants' conduct in concealing unlawful antitrust activity. The Third Circuit determined that the applicability of the statute of limitations should be determined in individual damages proceedings. *Id.* at 161; *see also* 2 Newberg on Class Actions § 4.57 (5th ed.) ("Statute of limitations defenses—like damage calculations, affirmative defenses, and counterclaims—rarely defeat class certification.")

Here, as in *Linerboard*, any question of when individual claimants became aware of Igberase's or ECFMG's conduct goes to the right of the class member to recover, not the defendant's liability. The statute of limitations is appropriately raised in individualized damages proceedings, and cannot defeat class certification.

ECFMG also claims the "superseding cause" of other healthcare institutions' privileging of Igberase bars class certification. Again, "[c]hallenges based on . . . causation . . . will not bar predominance satisfaction." *Id.* at 163. The dubious nature of this argument also undermines its persuasiveness in the class certification context. A superseding cause "is an intervening force that is 'so extraordinary as not to have been reasonably foreseeable.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009). An event is a superseding cause if it "operat[es] independently of any situation created by the first actor's negligence" and "is not . . . a normal result of that situation." *Id.* Here, neither of these conditions is met: ECFMG certification was a prerequisite to him attending a residency program and becoming able to practice obstetrics and gynecology. For a health care institution to grant him privileges is hardly extraordinary so as to not have been reasonably foreseeable.

IV.    **ECFMG's choice of law analysis is flawed, because it fails to take into account that conflicts between the tort law of Pennsylvania and those of Plaintiffs' domiciles are false conflicts.**

ECFMG's conflicts of law analysis fails to acknowledge that any purported conflict it identifies between the substantive tort law of Pennsylvania and that of the Plaintiffs' domiciles, where the law of the domicile would tend to limit recovery of damages (e.g., the fact that Pennsylvania recognizes negligent infliction of emotional distress while Maryland does not), is a *false* conflict. This is because Pennsylvania has a strong interest in regulating the conduct of its domiciliary corporations by applying its substantive tort law, and other jurisdictions have no interest in applying their own law when doing so would limit their citizen's right to recover, to the benefit of a foreign corporation. *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187–88 (3d Cir. 1991). Applying Maryland law on negligent infliction of emotional distress, or another jurisdiction's law in a manner that would limit Plaintiffs' recovery, would impair Pennsylvania's

interest in regulating the conduct of its domestic corporations by deterring tortious conduct through the civil justice system. Conversely, applying Pennsylvania's law does not harm Maryland's interest, since Maryland has no interest in restricting compensation of its residents for harm done to them. To the extent that any true conflicts arise, they can be dealt with through appropriate subclasses under Rule 23(c)(5). The relatively small number of relevant domiciles (Pennsylvania, Maryland, New York, New Jersey, Washington, D.C.) would render such a procedure manageable.

## V.     **The recitation of facts in ECFMG's brief is flawed.**

ECFMG fails to respond to Plaintiffs' overwhelming evidence of ECFMG's failure to revoke Igberase's certification obtained under the Akoda identity. Instead, ECFMG attempts to discredit Jersey Shore Medical Center (JSMC), which took this evidence seriously, by arguing that some of JSMC's information was inaccurate: namely, that Igberase had served in other residency programs, because "ECFMG has no record of sending ECFMG Certification status reports to the residency programs about which JSMC had inquired." ECF No. 39 at 6. But Plaintiffs have obtained documents (copies of which have been produced to ECFMG in this case) which cast doubt on ECFMG's representation. *See* Ex. 3 at 000041–43 According to the American Board of Internal Medicine, Igberase served in a residency program at Harlem Hospital Center from August 16, 1995 to June 30, 1996. *Id.* at 000043. ECFMG must have provided certification information to Harlem Hospital Center as a necessary precondition for Igberase to practice medicine as a resident there.

ECFMG incorrectly states that Plaintiffs' causes of action accrued no later than November 16, 2016, the date when Igberase's guilty plea became public, because, it says, class member knew or should have known of Igberase's conduct and any emotional distress they

14

might have experienced from that knowledge. Plaintiffs disagree. Simply because Igberase's guilty plea became public does not mean that class members knew or should have known of this fact. Under Pennsylvania's discovery rule, a cause of action does not accrue "until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." The applicability of the discovery rule is fact-dependent. *See Erisoty v. Rizik,* No. 93-6215, 1995 WL 91406 (E.D. Pa. Feb. 23, 1995). The applicability of statute of limitations defenses can be determined at the damages phase.

ECFMG next argues that there are class members whose claims may be time-barred because they allegedly suffered emotional distress caused by Igberase before November 2016. In support of this statement, ECFMG refers to its Exhibit 25, which consists of a few of the 200+ surveys sent to Plaintiffs by Annie Steinberg, M.D., a psychiatrist retained by Plaintiffs who has provided a report as to damages suffered by the class members. None of these surveys support this argument because they do not state when any of the persons responding to the survey learned of the charges against Igberase. To compound its error, ECFMG exults that "indeed, one class member actually filed a lawsuit seeking emotional damages resulting from treatment by Dr. Igberase in early 2016—months **before** Dr. Igberase was even arrested." Br. at 17. Attached in support of this statement is a copy of a complaint seeking damages for medical negligence based on a theory of wrongful birth. But that complaint had nothing to do with Igberase's identity and Social Security fraud. It does not contain any allegations of negligent privileging or certification.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Class Certification, appoint them as representative plaintiffs, and appoint their counsel as class counsel. Plaintiffs respectfully request oral argument on this motion.

Dated: <u>November 11, 2019</u>

CONRAD O'BRIEN PC

<u>/s/ Nicholas M. Centrella</u>
Nicholas M. Centrella, Esquire (Pa. I.D. No. 67666)
Howard M. Klein, Esquire (Pa. I.D. No. 33632)
Benjamin O. Present, Esquire (Pa. I.D. No. 322682)
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-9600

SCHOCHOR, FEDERICO AND STATON

<u>/s/ Brent Ceryes</u>
Jonathan Schochor jschoehor@sfspa.com (*pro hac vice*
Lauren Schochor (Identification No. 87618)
lsehochor@sfspa.corn
Brent Ceryes (*pro hac vice*)
 bceryes@sfspa.com
Phil Federico (*pro hac vice*)
The Paulton
1211 St. Paul Street
Baltimore, Maryland 21202
Phone: (410) 234-1000
Fax: (410) 234-1010

LAW OFFICES OF PETER G. ANGELOS, P.C.

<u>/s/ Paul M. Vettori</u>
Danielle S. Dinsmore (*pro hac vice*)
ddinsmore@lawpga.com
Paul M. Vettori (*pro hac vice*)
pvettori@lawpga.com
One Charles Center
100 N. Charles Street, 20th Floor
Baltimore, Maryland 21201
Telephone: (410) 649-2000
Fax: (410) 649-2150

Respectfully submitted,

JANET, JANET & SUGGS, LLC

<u>/s/ Patrick Thronson</u>
Patrick A. Thronson (*pro hac vice*)
pthronson@JJSjustice.com
Executive Centre at Hooks Lane
4 Reservoir Circle, Suite 200
Baltimore, MD 21208
Telephone: (410) 653-3200
Fax: (410) 653-9030

THE COCHRAN FIRM

<u>/s/ Karen Evans</u>
Karen E. Evans, R.N., J.D. (*pro hac vice*)
David Haynes
kevans@cochranfirm.com
1100 New York Ave, N.W.
Washington, D.C. 20005
Telephone: (202) 682-5800

Z LAW, LLC

<u>/s/ Cory Zajdel</u>
Cory L. Zajdel (*pro hac vice*)
clz@zlawmaryland.com
2345 York Rd. Suite B-13
Timonium, MD 21093
Telephone: (443) 213-1977

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 11th day of November, 2019, the undersigned

caused to be filed the foregoing Reply Memorandum of Law in Support of Motion for Class

Certification, using the CM/ECF system of the United States District Court for the Eastern

District of Pennsylvania, which will send notification of the filing to all counsel of record.

/s/ Patrick Thronson
Patrick A. Thronson

EXHIBIT 1



August 30, 2017

CERTIFIED RETURN RECEIPT REQUESTED

John-Charles Akoda, MD

Dear Dr. Akoda:

The American Board of Obstetrics and Gynecology (ABOG) was recently made aware through a Disciplinary Action Notification System (DANS) report that the Maryland State Board of Physicians took adverse action on your license on July 10, 2017. Your Maryland medical license was revoked in a Final Decision and Order for the following:

1. You pled guilty to a crime involving moral turpitude on November 15, 2016.

2. You were convicted of social security number fraud, a felony, in violation of 42 U.S.C. 408(a)(7)(B) In the United States District Court for the District of Maryland.

3. You were sentenced to six months incarceration, three years of supervised release, home detention for six months, and an assessment of $100.00.

The ad hoc committee of the Credentials Committee has reviewed the above information and determined that you do not meet the terms of the requirements to maintain certification by the ABOG. The committee voted unanimously that you have violated the moral and ethical standards of the practice of medicine accepted by organized medicine because your license was revoked and you were convicted of a felony. Your ABOG certificate expired December 31, 2016. The committee has determined that you currently are ineligible to participate in the ABOG Re-entry exam/ MOC Process.

Disqualification or Diplomate revocation may occur whenever the physician's license has had his/her license revoked. Disqualification or Diplomate revocation may also occur whenever the physician has been convicted of a felony or has pled guilty to a felony. The ABOG policies require Diplomates to have an unrestricted license to practice in all states in which they are licensed. This information is under the Policies section at
https://www.abog.org/new/n_policies.aspx?title=revocation

2915 Vine Street, Dallas, Texas 75204 | P: 214.871.1619 | F: 214.871.1943 | E: info@abog.org | W: ABOG.org

CONFIDENTIAL

The ad hoc committee also voted to refer your case to the Credentials Committee for consideration of revocation of certification. The Credentials Committee will review your case for possible revocation of your certification at the next Board of Directors meeting in January 2018. You may submit any additional information that you think may aid the Credentials Committee in consideration of the revocation of your certification. Please submit any information to me in writing or by email, and we will see that the committee has the information to consider at the meeting.

Please feel free to contact us if you have any further questions.

Sincerely,

Susan M. Ramin, M.D.
Associate Executive Director
Maintenance of Certification
American Board of Obstetrics and Gynecology
2915 Vine Street
Dallas, TX 75204
Phone: (214) 721-7510
Fax: (214) 871-1943


ABOG Diplomate # 9025829
SMR/kw

CONFIDENTIAL          ABOG_nonparty_000002

# EXHIBIT 2



## Delivery Details

Act

### Delivery Information

| | |
|---|---|
| **To** | Class Action All Counsel |
| **Subject** | Russell et al. v. ECFMG - Plaintiffs Supplemental ... |

| | |
|---|---|
| **Date available** | 09/16/2019 03:47 PM |
| **Date expires** | 10/16/2019 11:59 PM (Expired) |
| **Password assigned** | No |
| **Require recipients to sign in** | No |
| **Notify when recipients access this delivery** | First time |
| **Notify when recipients download files** | Do not notify |
| **Notify when recipient deletes** | No |
| **Access status** | 7 recipient(s) have not accessed the delivery |

| | |
|---|---|
| **Secure message** | Counsel, |
| | Attached, please find a supplemental document production from Plainti the above-referenced matter with respect to various putative class mem |
| | Best, |
| | Ben |
| **Notification message** | You are receiving a secure email from Conrad O'Brien. Please click o link to retrieve your message and attachments. |
| **Package name** | Russell et al. v. ECFMG - Pla... |
| **Tags** | |
| **Description** | |

### Files

| | File name | Date created | Size |
|---|---|---|---|
| ☐ | | | |
| ☐ | Plaintiffs0000118760 - 0000140233.PDF | 09/16/2019 03:47 PM | 1,864.7 |
| | | **Total:** | **1,864.7** |

[Download As Zip]  [Forward]

### Secure Replies

No replies

# EXHIBIT 3

MERIDIAN HEALTH SYSTEM

*JERSEY SHORE MEDICAL CENTER*
*DEPARTMENT OF MEDICINE*
*OFFICE: 732-776-4420*
*FAX:     732-776-3795*

*CONFIDENTIAL*

### INTEROFFICE MEMORANDUM

**TO:**       Distribution

**FROM:**    Elliot Frank, MD, Chair/Program Director, Department of Medicine

**DATE:**    October 26, 2001

**RE:**       Former Medical Resident:  Dr. Akoda

I am passing on the enclosed letter since you expended so much time in this matter.  This appears to resolve the question of whether Dr. Akoda had been in another training program, something he continued to deny.

By the way, I have not heard from, or of, Dr. Akoda since his departure.


k
Enclosure


Distribution:   Carl Marchetti, MD
                Steve Littleson
                Katie Luciani
                David DeSimone, Esq.

Jersey Shore Medical Center000041



**AMERICAN BOARD OF INTERNAL MEDICINE**

PROMOTING
EXCELLENCE IN
HEALTH CARE
◆
510 Walnut Street
Suite 1700
Philadelphia, PA
19106-3699

Tel: 215-446-3500
Tel: 800-441-2246
Fax: 215-446-3470
E-mail: request@abim.org
www.abim.org
◆
Paul G. Ramsey, MD
Chair

Douglas P. Zipes, MD
Chair-Elect

James L. Naughton, MD
Secretary-Treasurer
◆
Harry R. Kimball, MD
President

F. Daniel Duffy, MD
Executive Vice President

John J. Norcini, PhD
Senior Vice President
Psychometrics and Research

Lynn O. Langdon, MS
Senior Vice President
Subspecialty Medicine and
Test Development

Linda L. Blank
Vice President
Clinical Competence and
Communications

Henry F. Strozeski, MBA
Vice President
Administration and
Operations
Chief Financial Officer

Leslie D. Goode, MHS
Vice President
Assistant to the President

Elizabeth A. Hopkins
Associate Vice President
Registration and Credentials

Muriel Horne
Associate Vice President
Registration and Credentials

October 19, 2001

Dr. John C. Akoda
22344 Rolling Hill Lane
Laytonsville, MD 20882

Dear Dr. Akoda:

At the end of each year of residency training, the American Board of Internal Medicine asks program directors to evaluate the performance of residents in their program to document satisfactory humanistic qualities, moral and ethical behavior, and overall clinical competence.

The attached report summarizes the information received to date regarding the level of training, program(s) performance rating(s), and number of months credit you have received toward the requirements for admission to a future Certifying Examination in Internal Medicine. No credit is granted for training rated as unsatisfactory.

The requirements for admission to the Certifying Examination may be found in the enclosed *Policies and Procedures*. If you have any questions regarding the report, we suggest that you contact your program director directly.

Respectfully,

Muriel Horne

Enclosures:     Summary of Training and Evaluation Report
                *ABIM Policies and Procedures for Certification,
                July, 2001*

PC: Dr. Elliot Frank

10/19/01

# AMERICAN BOARD OF INTERNAL MEDICINE

## Summary of Training and Evaluation Report

**Name:** Akoda, John C.

**Social Security number:** ███████

| Prog No | Program Name | Dates of Training | Level | Rating | Credit |
|---|---|---|---|---|---|
| 0477 | HARLEM HOSPITAL CENTER | | | | |
| | Internal Med. | 08/16/95 - 06/30/96 | 1 | | 0 |

AES form has not been returned for this resident.

| 0420 | JERSEY SHORE MEDICAL CENTER | | | | |
|---|---|---|---|---|---|
| | Internal Med. | 07/01/98 - 06/30/99 | 1 | Superior | 12 |
| | Internal Med. | 07/01/99 - 06/30/00 | 2 | Superior | 12 |
| | Internal Med. | 07/01/00 - 11/21/00 | 3 | Unsatisfactory | 0 |

*No credit toward the Board's training requirements for admission to the Certification Examination is granted for training rated unsatisfactory.*

Total    24

Jersey Shore Medical Center000043

# EXHIBIT 3



# Janet, Janet & Suggs, LLC
## Attorneys at Law

Howard A. Janet, P.C.* | Kenneth M. Suggs• | Adam P. Janet*§±✿
Dov A. Apfel*± | Giles H. Manley, M.D.* | Gerald D. Jowers, Jr.• | Seth L. Cardeli *§≠

Patrick A. Thronson*‡§ | Andrew S. Janet*§ | Matthew M. White*±°≡
Natalie C. D'Antonio* | Brenda A. Harkavy*§

OF COUNSEL
Richard M. Serbin ∆° | John C. Hensley, Jr.° | Steven J. German §≠± | Joel M. Rubenstein §≠
Frederick W. James ¶ | Brian D. Ketterer ∆ | Justin L. Browne* | Sharon L. Van Dyck §

BAR MEMBERSHIPS
* Maryland | • South Carolina | ± District of Columbia | ∆ Pennsylvania | ≡ Virginia
§ Minnesota | ‡ Illinois | ¶ Iowa | ° North Carolina | § New York | ≠ New Jersey

IN MEMORIAM
✿ Adam P. Janet, Esq. | 1989-2019

April 14, 2020

***VIA ECF AND E-MAIL***

Honorable Joshua D. Wolson
United States District Court
 for the Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

      RE:    Russell, et al. v. Educational Commission for Foreign Medical Graduates
              No. 2:18-cv-05629-JDW

Dear Judge Wolson:

      This letter is submitted pursuant to the telephonic status conference held in the above-entitled matter on March 31, 2020, this Court's April 1, 2020 Order (ECF No. 62), as well as Defendant Educational Commission for Foreign Medical Graduates' Motion for Limited Stay ("Motion") (ECF No. 60).

      On April 9, 2020, class counsel and counsel for Defendant held a conference call in an attempt to resolve outstanding issues pertaining to case management during the pendency of Defendant's Rule 23(f) Petition and possible appellate proceedings. These issues were raised in Defendant's Motion and discussed with the Court on March 31.

      As a result of the conference call, the parties have agreed to the following:

- Class counsel will proceed with issuing subpoenas for patient names and addresses to health care institutions where Oluwafemi Igberase a/k/a Charles Akoda is believed to have encountered patients after he enrolled in a postgraduate medical education program at Howard University in 2007, to

ascertain the membership of the class for purposes of issuing notice. Pursuant to Rule 45, class counsel will submit proposed subpoenas to defense counsel before serving them on the health care providers, to reduce or eliminate disputes with Defendant regarding their content.

- The parties will work collaboratively during the pendency of Defendant's Petition for Permission to Appeal—and, should the Petition be granted, during the appellate process itself—to define areas of agreement on a potential proposed form of notice.

- If Defendant's Rule 23(f) Petition is denied, or the Third Circuit affirms the Court's Order Granting Plaintiffs' Motion for Class Certification, the parties will submit to the Court a proposed case management plan for the notice process and motion practice, within 14 days of the date of said denial or affirmance. One objective of the proposed case management plan will be to have summary judgment briefing occur concurrently with notice and opt-out, to the extent appropriate and possible, such that any dispositive motions will be fully briefed and ripe for resolution shortly after the opt-out period has ended.

- The parties are currently meeting-and-conferring with respect to one discovery issue; should they be unable to resolve the matter themselves, this Order does not preclude Plaintiffs from bringing the matter before the Court, with Defendant reserving all rights and objections thereto, including the ripeness or timeliness of any such request.

The parties believe these mutual understandings resolve the case management issues anticipated to arise while an appeal is pending. A revised, stipulated Proposed Order Granting Defendant's Motion for Limited Stay that reflects the points of agreement is enclosed with this letter.

If the Court believes a status conference should still proceed on April 30, as discussed on the March 31 call, the parties would appreciate receiving an order to that effect from the Court. Otherwise, the parties believe that the April 30 status conference can be cancelled.

Hon. Joshua D. Wolson
April 14, 2020
Page 3
_____

      Counsel for Defendant has reviewed and approves the content and submission of this letter. Should the Court have any questions or require additional information, please do not hesitate to contact counsel. The parties appreciate the Court's consideration and assistance in this matter.

                Respectfully submitted,

                /s/ Patrick Thronson
                Patrick A. Thronson
                *One of the attorneys for the class*

Enclosure

cc:  Brian W. Shaffer, Counsel for Defendant

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONIQUE RUSSELL, JASMINE RIGGINS,
ELSA M. POWELL, and DESIRE EVANS,

        Plaintiffs,

    v.

EDUCATIONAL COMMISSION FOR
FOREIGN MEDICAL GRADUATES,

        Defendant.

Civil Action No. 18-5629

Honorable Joshua D. Wolson

## [PROPOSED] ORDER

**AND NOW**, this __ day of _____ 2020, upon consideration of Defendant Educational Commission for Foreign Medical Graduates' Limited Motion to Stay (ECF No. 60), the March 31, 2020 status conference, and the Parties' April 14, 2020 letter proposing a case management schedule, **IT IS HEREBY ORDERED** as follows:

1.      The Limited Motion to Stay is **GRANTED in part**;

2.      All proceedings and deadlines, including, but not limited to, the distribution of notice to class members, approval of a notice plan, and deadlines for the filing of summary judgment or *Daubert* motions in this case are hereby **STAYED** pending the resolution of Defendant's Rule 23(f) Petition for Permission to Appeal to the United States Court of Appeals for the Third Circuit;

3.      Plaintiffs' counsel are permitted to issue subpoenas for patient names and addresses to health care institutions where John Nosa Akoda is believed to have encountered patients after he enrolled in a postgraduate medical education program at Howard University in 2007, provided

that Plaintiffs' counsel complies with Rule 45 of the Federal Rules of Civil Procedure with respect to such subpoenas;

4. The parties are currently meeting-and-conferring with respect to one discovery issue; should they be unable to resolve the matter themselves, this Order does not preclude Plaintiffs from bringing the matter before the Court, with Defendant reserving all rights and objections related thereto, including the ripeness or timeliness of any such request.

5. If Defendant's Rule 23(f) Petition is denied or the Third Circuit affirms this Court's certification order (ECF 58), the Parties shall submit a proposed case management plan for the notice process and motion practice, including a dispositive motions briefing schedule whereby any dispositive motions are fully briefed and ripe for resolution by or shortly after the end of the opt-out period; and

6. The status conference set for April 30, 2020 is cancelled.

BY THE COURT:

_____
                                                                                    J.